**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., *et al*., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Case No. 8:21-cv-01736-TDC **(L)** |
| | ) Case No. 8:22-cv-01967-DLB |
| MONTGOMERY COUNTY, MD., | ) |
| | ) |
| *Defendant*. | ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A**
**TEMPORARY RESTRAINING ORDER**
**AND**
**EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

As more fully set forth below and in Count VII, Bill 21-22E effectively eviscerates the

ability of plaintiffs, who have been issued a wear and carry permit by the Maryland State Police,

to exercise their fundamental Second Amendment right to carry a firearm in the County, as

recognized in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). Bill

21-22E creates a vast, uncertain web of locations, including within 100 yards of such locations,

where firearms are prohibited by law. That result effectively nullifies the use of a wear and carry

permit in the County. Under State law, that permit operates as exception to the ban on public carry

otherwise imposed by MD Code, Criminal Law, § 4-203(a), but does so **only** where carry is not

otherwise prohibited by law, including the County's laws. Bill 21-22E thus exposes plaintiffs and

every permit holder to prosecution and imprisonment not only under Chapter 57 but also to

prosecution and imprisonment under Section 4-203(a). A TRO and a preliminary injunction is

urgently needed to preserve the *status quo ante* and protect plaintiffs from unlawful criminal

prosecution under Chapter 57 and Section 4-203(a).

**STATEMENT OF THE CASE**

**A.    Statutory Scheme**

**1.    MD Code, Criminal Law, § 4-203 and the Maryland Carry Permit Statute**

The enactment of Bill 21-22E must be assessed in the context of existing Maryland State law. MD Code, Criminal Law, 4-203(a)(1), provides "[e]xcept as provided in subsection (b) of this section, a person may not: (i) wear, carry, or transport a handgun, whether concealed or open, on or about the person; (ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State." Verified Second Amended Complaint ("SAC"), ¶ 25.

A violation of 4-203(a) is a strict liability offense, and thus a person may be convicted of the offense without regard to intent, knowledge or state of mind. *Lawrence v. State*, 476 Md. 384, 257 A.3d 588 (2021). A person convicted of a violation of 4-203(a) "is subject to imprisonment for not less than 30 days and not exceeding 3 years or a fine of not less than $250 and not exceeding $2,500 or both." MD Code, Criminal Law, 4-203(c)(2)(i). Under federal law, 18 U.S.C. § 922(g), and 18 U.S.C. § 921(a)(20), any conviction under Section 4-203(a) results in a lifetime federal firearms disability. See *Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir.), *cert. denied*, 138 S.Ct. 500 (2017). The same lifetime firearms disability for such a conviction is imposed by Maryland law. See MD Code, Public Safety, § 5-101(g)(3) (defining disqualifying crime), § 5-133(b)(1) (regulated firearms), § 5-205(b)(1) (long guns). SAC, ¶ 147.

The wear and carry permit, issued by the Maryland State Police under MD Code, Public Safety, § 5-306, is an express exception to this broad ban on public carry otherwise imposed by Section 4-203(a) if the carry is within "any limitation" imposed by the State Police on the permit. See subsection 4-203(b)(2). SAC, ¶ 26. One such "limitation" is that all permits issued by the State Police provide that the permit is "not valid where firearms are prohibited by law." SAC, ¶ 39.

Prior to the Supreme Court's decision in *Bruen*, the Maryland State Police enforced the requirement, found in MD Code, Public Safety, § 5-306(b)(6)(ii), that an applicant for a wear and carry permit demonstrate a "good and substantial reason" for wishing to carry a firearm in public. In *Bruen*, the Court specifically cited this statutory requirement as the functional twin of New York's "good cause" requirement and thus, by necessary implication, likewise invalidated Maryland's "good and substantial reason" requirement for a carry permit. See *Bruen*, 142 U.S. at 2124 n.2 (citing the Maryland statute as one of six State statutes that had "analogues to the 'proper cause' standard" of the New York statute invalidated in *Bruen*).

As a result, the Maryland Attorney General and the Governor instructed the State Police that the "good and substantial reason" requirement could no long be enforced. https://bit.ly/3UraHuB. The Maryland Court of Special Appeals agreed. *Matter of Rounds,* 255 Md.App. 205, 213, 279 A.3d 1048 (2022) ("We conclude that this ruling [in *Bruen*] requires we now hold Maryland's 'good and substantial reason' requirement unconstitutional."). Maryland wear and carry permits are thus now issued on a "shall issue" basis to all applicants who otherwise satisfy the stringent training, fingerprinting and investigation requirements otherwise set forth in MD Code, Public Safety, § 5-306(a)(5),(6).

### 2. Montgomery County Code, Chapter 57 and Bill 21-22E

As previously amended by County Bill 4-21 (SAC, ¶¶ 6-9), Section 57-11(a) of Chapter 57 of Montgomery County Code ("Chapter 57") currently provides that "(a) In or within 100 yards of a place of public assembly, a person must not: (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or (2) sell, transfer, possess, or transport a firearm created through a 3D printing process." As enacted in 2021, Bill 4-21 left unaltered the pre-existing exemption for "a person who has received a permit to carry the handgun under State law" found in subsection 57-11(b). Id. at ¶ 9.

A major change made by Bill 21-22E was to amend Section 57-11(b) of Chapter 57 to eliminate the prior exemption for permit holders from the bans otherwise imposed by Section 57-11(a). SAC, ¶ 85. As thus amended, the bans imposed by Section 57-11(a) now apply equally to persons who have been issued a wear and carry permit by the Maryland State Police under Section 5-306 of the Public Safety Article.

Bill 21-22E also altered the definition of "place of public assembly," as used in Section 57-11(a) of Chapter 57. Specifically, Bill 21-22E defined the "place of public assembly" to mean:

> "(1) a publicly or privately owned: (A) park; (B) place of worship; (C) school; (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility, including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility; (2) government building, including any place owned by or under the control of the County; (3) polling place; (4) courthouse; (5) legislative assembly; or (6) a gathering of individuals to collectively express their constitutional right to protest or assemble." SAC, ¶ 11).

Bill 21-22E further defined the "place of public assembly" to mean: "A 'place of public assembly' includes all property associated with the place, such as a parking lot or grounds of a building." Id. Chapter 57 has no *mens rea* requirement and thus any possession or transport within such areas would create strict criminal liability for permit holders, under both Chapter 57 and Section 4-203(a) without regard to the permit holder's knowledge, intent or state of mind.

## B.    The Parties And The Facts

The Second Amendment textually protects the right of the "people" and the Supreme Court has held that the term refers to "all members of the political community, not an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008). The Court has made clear that the Second Amendment protects all "law-abiding citizens" in this political community. Id. at 625. See also *Bruen*, 142 S.Ct. at 2131. The plaintiffs are "law-abiding citizens" who belong to this "political community."

MSI is an Internal Revenue Service certified Section 501(c)(4), non-profit, non-partisan, all-volunteer membership organization with approximately 2500 members statewide. SAC, ¶ 48. It brings this suit on behalf of its members, including each of the individual named plaintiffs and each of the non-party declarants. MSI alleges that it has one or more members who are subject to Chapter 57, as amended by Bill 21-22E who have wear and carry permits and who have engaged in the past and intend to engage in the future in activities that are now banned by Chapter 57. Id. ¶¶ 49-54.

Plaintiff Engage Armament, Inc, ("Engage") is a federally licensed Type I dealer (retail dealer) a Type VII dealer (firearms manufacturer) and Type X dealer (manufacturer of destructive devices and ammunition for such devices). Id. ¶¶ 55-56. It is also a State licensed dealer permitted to sell and transfer regulated firearms, including handguns. Id. ¶ 55. Engage alleges that its business location is arguably located at or within 100 yards of one or more of the locations in which Chapter 57 bans the possession, transport, sale and transfer of firearms. Id. ¶¶ 55-56. Plaintiffs Andrew Raymond and Carlos Rabanales are co-owners of Engage and both work at and commute to Engage on a daily basis. Both individuals have wear and carry permits issued by the Maryland State Police and have in the past and intend to in the future possessed and transported firearms at or within 100 yards of the locations in which such activities are now banned by Chapter 57. Id. ¶¶ 57-62. Plaintiffs Brandon Ferrell, Deryck Weaver, and Joshua Edgar are individual employees or contractors for Engage. Each alleges that he has in the past and will in the future possess and transport firearms at or within 100 yards of the locations in which such activities are now banned by Chapter 57, as amended by Bill 21-22E. Id. ¶¶ 63-69. Plaintiffs Weaver and Edgar have wear and carry permits. Id at ¶ 66 (Weaver) ¶ 69 (Edgar). Plaintiff Ferrell has applied for such a permit. Id. at ¶ 65.

Plaintiff ICE Firearms is a corporation located in the County engaged in active firearms training and instruction of adults and minors and alleges that it is arguably located within 100 yards of a location in which Chapter 57, as amended by Bill 21-22E, prohibits the possession, transport,

sale or transfer of firearms. Id., ¶ 71. Plaintiff Ronald David is the owner and operator of ICE Firearms and a certified instructor for firearms training in Maryland. He has a wear and carry permit and regularly carries at and within 100 yards of a location at which the possession and transport of a firearm is banned by Chapter 57. Id., ¶¶ 71-72. Plaintiff Nancy David is the spouse of plaintiff Ronald David and is an instructor at ICE Firearms. She likewise has a wear and carry permit and alleges that she regularly carries at and within 100 yards of a location at which the possession and transport of a firearm is banned by Chapter 57. Id., ¶ 73.

Plaintiff Eliyahu Shemony is an Orthodox Jew who is a former head of security for his synagogue located in the County. He was a member of the Special Forces of the Israeli Defense Force before immigrating to the United States and becoming an American citizen and is highly trained and proficient in the use of firearms. He possesses a wear and carry permit. Because Jewish synagogues and communities are under constant threat of attack in the United States and Montgomery County, he has regularly carried a loaded firearm while attending services at his synagogue and other locations in the County for his own self-defense and for the defense of others and intends to do so in the future. Id., ¶ 74. Each of the individual plaintiffs possess a wear and carry permit and each such permit states that it is "not valid where firearms are prohibited by law." Id., ¶¶ 39, 50, 58, 61, 66, 69, 71, 73, 74.

All of the individual plaintiffs and corporations and MSI members with permits who lie in or travel through the County reasonably fear prosecution under Chapter 57 and under MD Code, Criminal Law, 4-203(a), if they engage in any activity banned by Chapter 57. Each of the plaintiffs has standing because each has been injured by the enactment of Bill 21-22E. MSI has standing to represent the interests of its members who have likewise been injured by Bill 21-22E. All plaintiffs allege in the verified Verified Second Amended Complaint that their injuries are directly traceable to Chapter 57 and are redressable by the relief sought. Id. ¶ 75.

The defendant is Montgomery County, Maryland, which is a Maryland municipality and a person for purposes of suit under 42 U.S.C. § 1983. For purposes of Section 1983, the actions challenged herein are official actions and policies of the County under 42 U.S.C. § 1983. *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Starbuck v. Williamsburg James City County School Board,* 28 F.4th 529, 533-34 (4th Cir. 2022). SAC, ¶ 80.

## ARGUMENT

## I.     STANDARD FOR A TRO AND PRELIMINARY INJUNCTION

A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Base v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (collecting case law). "[A] preliminary injunction can also act to restore, rather than merely preserve, the status quo, even when the nonmoving party has disturbed it." Id. at 231. All these elements are satisfied here.

While all four elements for a preliminary injunction must be satisfied (id.), irreparable injury and a likelihood of success are the "most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The element of a likelihood of success "does not require a 'certainty of success,'" but rather only that "the plaintiff 'must make a clear showing that he is likely to succeed at trial.'" *St. Michael's Media, Inc. v. Mayor and City Council of Baltimore*, 566 F.Supp.3d 327, 351 (D. Md. 2021) (quoting *Di Biase v.* 872 F.3d at 230), *aff'g. denial of a stay*, 2021 WL 6502219 & 2021 WL 6502220 (4th Cir. 2021). While a plaintiff must also show irreparable harm, *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018), "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion). See also

*Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011) (same). "When an alleged deprivation

of a constitutional right is involved ... most courts hold that no further showing of irreparable injury

is necessary." 11A Charles Alan Wright, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d

ed. 2022). The Second Amendment "is not 'a second-class right, subject to an entirely different body

of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S.Ct. at 2156 (citation omitted).

Indeed, the irreparable harm is even more evident in this case, because, as noted in the Motion,

Bill 21-22E effectively nullifies permits that were granted by the State Police before *Bruen* and thus

were premised on a showing of a "good and substantial reason" for being armed. Again, those prior

permits were issued to people who had documented a special need for self-defense, such as people

with protective orders and church or synagogue members who were tasked with protecting these

places. Permits were likewise granted to people falling within "presumed risk" occupations, such as

judges, prosecutors, government officials and persons holding a very high government security

clearance. See https://bit.ly/3izcG2W. The irreparable harm to these people is obvious.

Similarly, the public interest is served, as a matter of law, by enjoining the unconstitutional

actions of a locality. See, e.g., *Legend Night Club*, 637 F.3d at 303 ("upholding constitutional rights

is in the public interest"). While the plaintiff must show that the balance of equities favors it, "[a] state

is 'in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing

restrictions likely to be found unconstitutional. If anything, the system is improved by such an

injunction.'" *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted).

As detailed below, plaintiffs have a substantial likelihood of success on the merits on the

Second Amendment claim set out in Count VII. A TRO and a preliminary injunction is essential to

maintain the *status quo ante* during the pendency of this lawsuit. The certain loss of Second

Amendment rights, as alleged in Count VII, is irreparable in every sense of the word. The County's

effective denial of the right of public carry with a carry permit is ongoing. Every permit holder who carries in the County is at profound risk of violating both Chapter 57 and MD Code, Criminal Law, 4-203(a), and is thus continually subject to arrest and imprisonment as well as the consequent permanent loss of all Second Amendment rights. There is no public interest associated with the County's continuing violation of plaintiffs' constitutional rights.

## II.     BILL 21-22E VIOLATES THE SECOND AMENDMENT

Plaintiffs' motion for a TRO and a preliminary injunction is limited to Count VII of the Second Amended Complaint because that Count addresses the County's effective abolition of the right to carry a firearm in public that *Bruen* recognized. This destruction of the right to carry in public is egregious and certainly the most urgent matter requiring the Court's attention.

### A.     The Supreme Court's Decision In *Bruen*

In *Bruen*, the Supreme Court held that the Second Amendment right to bear arms means "a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." Id. at 2135 n.8. Under *Bruen*, "the Second Amendment guarantees a general right to public carry." Id. at 2135. The Second Amendment thus "presumptively guarantees" an individual's "right to 'bear' arms in public for self-defense." Id. at 2135. Applying that ruling, *Bruen* struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. The Court went on to reject the "means-end," two-step, intermediate scrutiny analysis used by the lower courts to sustain gun regulations, holding that "[d]espite the popularity of this two-step approach, it is one step too many." Id. at 2127. The Court ruled that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Id. at 2126.

The historical analysis required by *Bruen* is "straightforward" when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." Id. at 2131. In such cases, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Id. Here, as in *Bruen* and *Heller*, the bans imposed by Chapter 57 are not prompted by some "unprecedented societal concerns or dramatic technological changes," id. at 2132, but rather are based on "the same alleged societal problem addressed in *Heller*: handgun violence, primarily in urban area[s]." Id. at 2131. Thus, the historical inquiry in this case is "straightforward" and is controlled by "the lack of a distinctly similar historical regulation." Id.

That historical inquiry looks to 1791[1] or, at the latest, 1868, when the 14th Amendment was adopted. *Bruen*, 142 S.Ct. at 2135-36 (finding it unnecessary to resolve the scholarly dispute about which time period is controlling). That is because "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" Id. at 2136, quoting *Heller*, 554 U.S. at 634-35. "[T]he right to keep and bear arms is fundamental to *our* scheme of ordered liberty," and thus is incorporated as such into the Fourteenth Amendment. *McDonald v. Chicago*, 561 U.S. 742, 767 (2010) (plurality opinion) (emphasis in original). It is therefore fully applicable to the States. Id. The rule is firmly established that "[i]ncorporated Bill of Rights guarantees are 'enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'" *Timbs v. Indiana*, 139 S.Ct. 682, 687 (2019) (citation omitted).

Thus, 20th century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct.

---

[1] The Founding Era is the appropriate time period for this Court's historical analysis. See generally Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868* (working draft), Oct. 1, 2022, available at https://bit.ly/3CMSKjw (last visited Nov. 28, 2022).

at 2154 & n.28. Under *Bruen*, the historical analogue necessary to justify a regulation must be "a well-established and representative historical analogue," not outliers. Id. at 2133. Thus, historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. Id. at 2133, 2153, 2147 n.22 & 2156. This analysis is a legal inquiry which is appropriately presented in the briefs. See id. at 2130 n.6 (noting that the historical inquiry presents "*legal* questions" that judges are capable of addressing) (emphasis in original); see also id. at 2135 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). Accordingly, the required analysis does not require fact-finding by a court.

*Bruen* holds that governments may presumptively regulate the public possession of firearms at "legislative assemblies, polling places, and courthouses" and notes that governments may also regulate firearms "in" schools and government buildings. Id. at 2133, citing *Heller,* 554 U.S. at 599. *Bruen* states that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." (Id.). Applying that test, the *Bruen* Court rejected New York's "attempt to characterize New York's proper-cause requirement as "a 'sensitive-place' law," ruling that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." Id. at 2134. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." (Id.).

The government bears the burden of proof to show such a "well-established and representative historical analogue." Id. at 2150 ("we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). Public safety concerns are not part of the analysis and cannot be used to justify any statute or regulation that restricts the general right to carry

arms in public. Under *Bruen*, the government "may not simply posit that the regulation promotes an important interest," but rather "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." Id. at 2126. Accordingly, under *Bruen*, a court must "closely scrutinize *all* gun restrictions for a historically grounded justification." *Frein v. Pennsylvania State Police*, 47 F.4th 247, 254 (3d Cir. 2022) (emphasis in original).

**B.      Chapter 57, As Amended By Bill 21-22E, Violates The Second Amendment**

**1.      The text of the Second Amendment**

*Bruen* holds that the analysis starts with the "plain text" of the Second Amendment and here the right to "keep and bear Arms" indisputably covers the "possession" (keep) and "transport" (bear) of firearms and ammunition, as regulated by Chapter 57. The text necessarily also covers transfers and sales as a person can hardly "keep and bear Arms" if she cannot legally acquire them. See, e.g., *Teixeira v. City of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc), *cert. denied,* 138 S.Ct. 1988 (2018) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms"); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("this right of keeping arms . . . necessarily involves the right to purchase them … and to purchase and provide ammunition suitable for such arms."). Likewise, the right includes the corresponding, ancillary right to sell firearms. *Teixeira*, 873 F.3d at 682 ("[c]ommerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense"). See *MSI v. Hogan,* 971 F.3d 199, 214 (4th Cir. 2020). The same is true for ammunition. *Jackson v. San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014), *cert. denied*, 576 U.S. 1013 (2015).

The bans imposed by Chapter 57 on sales and transfers directly affect plaintiff Engage's business, as Engage is a federally licensed, Type I, Type VII and Type X firearms dealer and, as such, is licensed to sell and transfer firearms. SAC, ¶¶ 55, 56. Similarly, plaintiff ICE Firearms, runs a training facility and may, incidental to such training, temporarily transfer the possession of firearms

to students. Id. ¶ 70. Both Engage and ICE Firearms state that their business locations are arguably within 100 yards of one of the places in which possession, transport, sales and transfers are banned by Chapter 57. Id. ¶ 56 (Engage), ¶ 70 (ICE Firearms). Chapter 57 may shut down these businesses.

The bans imposed by Chapter 57 are not supported by any showing that they are "consistent with this Nation's historical tradition of firearm regulation." Nothing in *Bruen* can be read to allow a State (or a municipality) to regulate or ban firearms at all these other places which the County defines to be a "place of public assembly," especially where that definition includes a 100-yard exclusion zone. *Bruen* holds that "[a]part from a few late-19th century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." 142 S.Ct. at 2156. This holding precludes any attempt by the County to redefine any of these five areas in any way inconsistent with how those terms were understood in 1791.

For example, prior to the enactment of County Bill 4-21 in 2021, Chapter 57 defined "school" to mean "elementary or secondary" school. Bill 4-21 amended Chapter 57 to delete the ordinance's former limitation to "elementary or secondary schools" and Bill 21-22E retains that redefinition. SAC, ¶ 6. In contrast, Maryland law has long limited its prohibition on possession of weapons in schools to "*public* school property." MD Code, Criminal Law, § 4-102(b). That coverage excludes private schools, such as those associated with churches or synagogues, and other types of schools, such as trade schools, and colleges and universities. That limitation is no accident. Bills submitted in the General Assembly to expand the reach of Section 4-102 to *private* schools or to *public* institutions of higher education have all failed, including most recently House Bill 780 in the 2022 General Assembly. See also House Bill 159, in the 2017 Session of the General Assembly and House Bill 904, in the 2018 Session of the General Assembly.

While the County plainly intended to expand the scope of "school" in enacting Bill 4-21, the term is now hopelessly vague. See SAC, ¶ 112. Nothing in *Heller* or *Bruen* or in the historical tradition

would allow the County to extend its absolute ban on the possession of firearms by *all* persons (not merely by students) and to *all* types of "schools," such as trade schools or by all adults on the campuses of colleges and universities. See D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 249-52 (2018), cited with approval in *Bruen*, 142 S.Ct. 2133. In particular, as discussed, *infra*, the inclusion of private schools destroys the ability of religious institutions, such as churches and synagogues, to provide vital armed security by permit-holding members of their congregations. Such protection, prior to *Bruen*, was considered by the State Police to be a "good and substantial reason" for the issuance of a wear and carry permit. See Exhibits D at 45, 57, N, O, P, Q, R, S. That option is eliminated by Bill 21-22E.

2. **Bill 21-22E is an illegitimate response to *Bruen***

After *Bruen* was decided, the County rushed to introduce Bill 21-22E. The County Executive was particularly vocal in opposing *Bruen*. https://bit.ly/3B9ucB4. That Bill, as sponsored by the President of the County Council, simply deleted the existing exemption, found in Section 57-11(b), for permit holders. In an official press release, dated July 12, 2022, the sponsor touted the Bill, saying: "This legislation will help to ensure that we do everything possible to minimize the number of guns in our public space." https://bit.ly/3VvCf3u. As thus crafted, Section 57-11(a) of Chapter 57 would have imposed its bans within 100 yards of any and every location where the public "may assemble" in the County, which is, of course, virtually everywhere. See SAC, ¶ 6 (amending Section 57-1).

On July 26, 2022, the County Council held a public hearing on this original version of Bill 21-22E, at which it heard heavy opposition to the Bill, including a detailed legal analysis submitted by MSI. (Exhibit D at 73). Faced with the self-evident invalidity of a ban on carrying with a permit anywhere and everywhere in the County, the sponsor subsequently amended the Bill to change the definition of "place of public assembly" to its current language. See Exhibit D at 5. The

amendments merely tacked on the five locations specified in *Bruen* to the long list of banned locations that had already been specified in Bill 4-21, passed in 2021. It also expanded the scope of several of the existing locations and added as well a wholly new location, imposing the bans of Section 57-11(a) at and within 100 yards of, "a gathering of individuals to collectively express their constitutional right to protest or assemble." Bill 21-22E thus *expanded* the locations previously regulated by Bill 4-21.

The Bill, as thus amended, was approved by the Public Safety Committee of the Council in a meeting conducted October 31, 2022. At that time, the lead sponsor of Bill 21-22E, the President of the Council, voiced strident opposition to *Bruen*, complaining that the decision made it more difficult for the County to enact policies that "prevent someone's Second Amendment right from infringing on the right of me and my family to go to a movie theater without having to wonder or worry about someone sitting next to me is carrying a gun on them," and stating that "more guns, in my opinion, is not the answer." https://bit.ly/3P1mmz9 starting at 01:40. His views were endorsed by the leadership of the Montgomery County Police Department. Id. On November 15, 2022, the Bill 21-22E was enacted by the County Council, at which time the Council unanimously embraced the sponsor's views on the Bill. https://bit.ly/3VydQdF (starting at 2:04). The County Executive also expressed hostility to the right of armed self-defense. https://bit.ly/3ET5bv3 (at 2:05) (stating "there is no excuse for walking around with a gun in this County").

*Bruen* squarely holds that Second Amendment protects the right to carry in public while also making clear that a State may condition that right on obtaining a wear and carry permit from the State, as long as the permit is issued on an otherwise reasonable and objective "shall issue" basis. *Bruen*, 142 S.Ct. at 2138 & n.9. The County has no power to ban the exercise of that right to carry on the belief that the Bill's sponsor or members of the public have a "right" not to have "to wonder or worry" that someone nearby has such a carry permit and is exercising her

constitutional right to carry in public. The test adopted in *Bruen* excludes such considerations, whether they be well-founded or not. See *Bruen*, 142 S.Ct. at 2126 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest." More fundamentally, any law enacted for the avowed purpose of 'minimizing' the exercise of a constitutional right is "patently unconstitutional." See *Saenz v. Roe*, 526 U.S. 489, 499 n.11 (1999) ("[i]f a law has 'no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional.'"), quoting *United States v. Jackson*, 390 U.S. 570, 581 (1968) (brackets and ellipsis the Court's).

For the same reasons, the *Bruen* test does not permit the County to ban carry by permit holders because of a fear that the permit holders might commit crimes. First, Maryland's permit requirements are designed to prevent precisely such occurrences. Permit holders in Maryland are fingerprinted, thoroughly investigated by the State Police and, unless exempt, receive at least 16 hours of training. MD Code, Public Safety, § 5-306(a)(5),(6). These training requirements include a mandatory, course of live-fire in which the applicant must achieve as specific minimum score. COMAR 29.03.02.05 C.(4). Of the 43 "shall issue" States identified in *Bruen*, 142 U.S. at 2123 n.1, only Illinois requires as much training as Maryland. Permit holders, nationwide, are the most law-abiding persons in America, with crime rates a fraction of those of police officers. https://bit.ly/3VwdtQT.

Second, and more fundamentally, it is no answer to *Bruen* to assert that "guns are not the answer." The right "to keep and bear Arms" is "an individual right," *Bruen*, 142 S.Ct. at 2125, and for individuals who may find themselves at imminent risk of death or severe bodily harm, a gun may well be the *only* sufficient "answer." *Bruen*, 142 S.Ct. at 2158 (Alito, J., concurring) (noting that "defensive firearm use occurs up to 2.5 million times per year"). The law-abiding citizen's right to armed self-defense is thus important *because* of violent crime. See id. at 2159 ("it is these

very facts that cause law-abiding citizens to feel the need to carry a gun for self-defense"). Whether "guns are the answer" for society as a whole is irrelevant.

Finally, and more generally, a government may not suppress possible adverse secondary effects flowing from the exercise of a constitutional right by suppressing the right itself. See, e.g., *City of L.A. v. Alameda Books, Inc.,* 535 U.S. 425, 449-50 (2002) (Kennedy, J., concurring) ("It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech"). See *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010) (same); *St. Michael's Media, Inc. v. Mayor and City Council of Baltimore*, 566 F.Supp.3d 327, 374 (D. Md. 2021), *aff'd.,* 2021 WL 6502219 (4th Cir. 2021) (same). The same point applies to Second Amendment rights. *Grace v. District of Columbia*, 187 F.Supp.3d, 124, 187 (D.D.C. 2016), *aff'd, sub. nom. Wrenn v. Dist. of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ("it is not a permissible strategy to reduce the alleged negative effects of a constitutionally protected right by simply reducing the number of people exercising the right") (quotation marks omitted). See *Bruen*, 142 S.Ct. at 2126, 2148 (citing *Wrenn* with approval). "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636.

The record establishes that the County was determined to pursue its anti-gun, ideological agenda in spite of *Bruen*. The County started with banning carry with a permit entirely, and retreated from that extreme position only when it realized that such a ban could not possibly survive judicial review. Exhibit D. Instead, the County elected to ban carry with a permit at or within 100 yards of a long list of vaguely defined locations, a cosmetic change that still effectively banned carry throughout the County. See Part B.3, *infra*. The County made no attempt to identify any well-established, representative historical analogue for the many restricted locations specified by Bill 21-22E's definition of a place of public assembly. Nor did the County identify any such

analogue for its ban on firearms within 100 yards of those locations. It surely was not lost on the County that Bill 21-22E made it impossible to carry with a permit because, as a practical matter, there is no way to move around in the County without coming within 100 yards of one or more of this long list of restricted locations. There is also no way for an ordinary permit holder to know, for example, the location of a "library" on privately owned land, or the meaning or location of a privately owned "recreational facility," a privately owned "park," or other privately or publicly owned locations in which possession and transport are banned. These realities are obvious.

It is likewise obvious that, taken together, the broad sweep of the locations in which possession and transport are banned by Chapter 57, the vagueness associated with some of these places, and the strict criminal liability imposed by Chapter 57 for any violation, creates and was intended to create, a massive *in terrorem* effect for wear and carry permit holders. Such permit holders are effectively at risk of arrest and prosecution when using a permit to carry a firearm anywhere in the County in locations in which carry is otherwise permitted by State law. Any such arrest or prosecution could severely and adversely affect the plaintiffs' employment status, ability to conduct business or maintain other legal relationships. Such enforcement could lead to a revocation or non-renewal of the person's carry permit thus abrogating the right to carry recognized in *Bruen*.

Moreover, the Maryland wear and carry permit is "not valid where firearms are prohibited by law." SAC, ¶¶ 39, 50, 58, 61, 66, 69, 71, 73, 74. Thus, any violation of Chapter 57 by a permit holder could also easily lead to arrest and prosecution under MD Code, Criminal Law, § 4-203(a), since the exception for carry with a valid permit, found in subsection 4-203(b)(2), would no longer obtain. A violation of Section 4-203(a) is a strict liability offense, and is punishable by up to three years imprisonment and a substantial fine for the first offense. SAC, ¶ 25. Under 18 U.S.C. § 922(g), and 18 U.S.C. § 921(a)(20), any conviction under Section 4-203 would result in a lifetime

federal firearms disability and the consequent destruction of the permit holder's Second Amendment rights. See *Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir.), *cert. denied,* 138 S.Ct. 500 (2017). SAC, ¶ 147. The same firearms disability is imposed under Maryland law. See MD Code, Public Safety, § 5-101(g)(3) (defining disqualifying crime), § 5-133(b)(1) (regulated firearms), § 5-205(b)(1) (long guns). These draconian punishments and disqualifications make the *in terrorem* effect of Chapter 57 severe.

In effect, through the enactment of Bill 21-22E, the County has purposefully enacted a legal scheme that effectively "den[ies] ordinary citizens their right to public carry." *Bruen*, 142 S.Ct. at 2138 n.9. Chapter 57 "defines the category of 'sensitive places' far too broadly" and "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." Id. at 2134. Chapter 57, as amended by Bill 21-22E, is therefore unconstitutional. The Court should so hold.

### 3.    The vast sweep of the bans enacted by Bill 21-22E

The County may presumptively regulate the five, specific locations identified in *Bruen* and *Heller*, *viz*, "in" schools, public buildings, polling places, courthouses and legislative assemblies, to the extent such regulations are otherwise authorized by State law. These five places are easy to identify and avoid by a permit holder and thus do not have the *in terrorem* effect inflicted by Chapter 57. However, the County may not enact firearms or ammunition bans for any place *beyond* these five, specific locations without identifying and proving that "a well-established and representative historical analogue" for any such regulation exists. The County has not carried that burden.

The County's bans on any place "within 100 yards" of all its specified locations are particularly egregious. Bill 21-22E includes within its bans "all property associated with the place, such as a parking lot or grounds of a building," and thus the 100-yard zone is measured from the edge of the grounds or any parking lots associated with each of these locations. As thus measured,

the bans include major roads and vast acreage of private property, including countless swaths of private property that are otherwise open to the public. For example, as measured from the southern edge of the Caroline Freeland Urban Park in downtown Bethesda, the 100-yard exclusion zone would ban possession and transport by a permit holder at the Giant Food grocery store to the South and several shops and to the North and East, including a restaurant, a LensCrafters, a UPS Store, a barbershop, a pilates gym, a woman's clothing store, a gift shop and other retail outlets, not to mention private apartments and homes within that zone.

Just to the south of that park is the Capital Crescent Trail (a County park) and that Trail runs from Bethesda to the C&O Canal. A 100-yard arc from where the Trail intersects Bradley Boulevard in Bethesda would include a CVS drug store, a Safeway grocery store, a gas station, a bicycle store, and an ATM outlet as well as numerous private offices and apartment buildings. Further up the Trail, a 100-yard arc would cover Ourisman Honda, a Pottery Barn Kids outlet, an eyeglasses store and more private homes and offices. Just north of Bethesda, Route 355 borders Walter Reed Hospital on one side and NIH on the other. A bit further north on Route 355 is Temple Hill Baptist Church, well within 100 yards of Route 355. The same type of scenarios for parks and places of worship and other banned locations obtain up and down Rockville Pike and Wisconsin Ave, U.S. Route 29 in Silver Spring, as well as along other major roads in the County.

Indeed, because I-495 (the Capital Beltway) is easily within 100 yards of the athletic grounds of Montgomery Blair High School, Holy Cross Hospital facilities, Sligo Creek Stream Valley Park, the Sligo Creek Golf Course and Rose Nix Elementary School, permit holders would be banned from traveling on adjoining parts of the Beltway. Similarly, Rock Creek Park runs right along the Beltway from Stoneybrook Drive, up to the Route 355 exit for Rockville Pike, a distance of approximately three miles. On the other side of the I-270 exit, the Beltway runs next to the

Bethesda Country Club and the Burning Tree Club, both of which are arguably a "recreational facility" under Chapter 57. In short, virtually all of I-495 in the County lies within exclusion zones.

Similarly, north on I-270, lies the Robert C. McDonell Campground and Wolftree Park, Julius West Middle School, the iFLY Indoor Skydiving, Browns Station Park, and the New Covenant Fellowship Church parking lot. All of these locations fall within 100 yards of I-270. Route 355 is not an alternative route, as it runs along the Little Bennett Regional Park in northern Montgomery County for miles while bordering many parks, churches, recreational facilities, and schools, including County government buildings, fairgrounds and Montgomery College further south. Permit holders are thus effectively banned from the Beltway, Route 355 and I-270 in the County. This is just a tiny, illustrative sampling. A comprehensive list would likely include hundreds (if not thousands) of locations and all major roads and most neighborhoods in the County. These restraints on the exercise of a constitutional right are unconscionable. *Dombrowki*, 380 U.S. at 486-87 ("A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms."); *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710-11 (4th Cir. 1999) (noting the "chilling" effect that the threat of prosecution would have on the exercise of a First Amendment right).

Taken together, the banned places and the 100-yard exclusion zone effectively preclude carry at and within 100-yards of countless "places of public congregation" in the County. There is nothing remotely abstract or conjectural about that injury. The regulatory scheme effectively works to ban carry nearly anywhere in the urban portions of the County, as a permit holder would almost surely cross within 100 years of some banned location to get anywhere. SAC, ¶¶ 146, 147. That result is squarely at odds with the Court's holding in *Bruen*, 142 S.Ct. at 2134 ("expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from

law enforcement defines the category of 'sensitive places' far too broadly"). See D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244- 247 (2018), cited with approval in *Bruen*, 142 S.Ct. at 2133.

Significantly, American law at the time the Bill of Rights was adopted "typically required that arms be brought to churches or to all public meetings," and "statutes required arms carrying when traveling or away from home." Id. at 232 (emphasis added). See also id., at 242 ("Boston's unusual law against carrying loaded guns into buildings was far outnumbered by statutes all over America that required bringing guns into churches, and sometimes to other public assemblies."). Indeed, nothing in current Maryland State law purports to regulate or ban permit holders from, for example, carrying in churches or other places of worship, in a library, in a recreational facility, a hospital, a community center, a long-term facility or exhibition facility. As noted, the State ban on weapons in schools is limited to "public school *property*." MD Code, Criminal Law, 4-102(b) (emphasis added). There is no State ban for carrying with a permit within 100 yards of schools.

In fact, "places of worship" in the County have long used permit holders among their congregations to provide much-needed armed protection for these locations. The State Police, in the past, found such use to be a "good and substantial reason" for the issuance of a carry permit under MD Code, Public Safety, § 5-306(a)(6)(ii). Plaintiff Eliyahu Shemony, an Orthodox Jew, is a former head of security for his synagogue and provided armed security for the synagogue with a permit issued for this reason. SAC, ¶ 74. This reality is also attested to by the accompanying declarations from six other persons who, as members of their respective congregations, provide armed security to their houses of worship. Such persons were issued permits by the State Police, prior to *Bruen*, specifically in order to provide that protection. See, e.g, Decl. of John Doe No. 1 ¶¶ 3,4, Decl. of John Doe No. 2, ¶ 2; Decl. of Allan Barall, ¶¶ 2,3.

Chapter 57 has now precluded these individuals from serving that function, leaving these houses of worship and associated private schools defenseless. Thus, in its zeal to "minimize" public carry with the enactment of Bill 21-22E, the County has disarmed even those persons who had satisfied the "good and substantial reason" requirement that the State Police applied prior to *Bruen*. The County's ban on carry by permit holders negates the ability of places of worship to provide for their own security. See https://youtu.be/COWCwb6KU8wj (testimony on HB 302 before the Senate Judicial Proceedings Committee in the 2020 Session of the General Assembly); https://bit.ly/3VDGKJs (testimony on HB 302 before the House Judiciary Committee). There can be no dispute that places of worship and associated private religious schools have a vital need for armed security. Id. Even those who advocated in favor of the Bill told the County Council that "[h]ouses of worship should be left to establish their own security plans." Exhibit D at 61 (testimony of JCRC, purporting to represent synagogues, and Jewish schools throughout the region). Yet, Bill 21-22E makes that virtually impossible, as a practical matter.

Chapter 57's ban on a "privately owned" park is flawed twice over: it lacks an historical analogue and is also egregiously vague. The definition for "park" is a *public* park, not a "privately owned" park. See, e.g., "Park," OXFORD LEARNER'S DICTIONARIES ("[A]n area of public land in a town or a city where people go to walk, play, and relax."); BLACK'S LAW DICTIONARY (11th Ed.), likewise defines "park" to mean "[a] large open area usu. with grass and trees, esp. in a city or town, for public recreation" or "[a] large area of public land that is kept largely in a natural state to conserve plants and wildlife." These definitions are incompatible with the notion that a "park" can be "privately owned." As thus expanded to private property, the term "park" becomes impossibly vague, as it could include anything from an industrial park to a privately owned grassy strip with trees, See SAC, ¶ 113. Nothing in Chapter 57 even requires these

private locations actually be open to the public. As discussed below, Part B.4, *infra*., there is no historical analogue for *any* park, much less a "privately owned" park.

The same dual flaws afflict other places in which possession and transport are banned by Chapter 57, such as any privately or publicly owned (1) library, (2) recreational facility, (3) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health, and (4) long-term facility, including any licensed nursing home, group home, or care home. SAC, ¶¶ 109-114. Chapter 57's bans encompass multiple "privately owned" facilities, like Engage's in-house library (SAC, ¶ 56), or a private "recreational facility," like a backyard pool. Id. ¶ 108. The Bill imposes its bans at or within 100 yards of "any health care facility" and thus arguably includes a private doctor's office. Id. ¶ 111. The bans include any "place … under the control of the County" and thus includes vacant land, such as across Gude Drive from Engage's parking lot. None of these vague bans have an historical analogue. Again, nothing in Chapter 57 requires that locations actually be open to the public. Chapter 57 and Section 4-203(a), impose strict criminal liability, so an unknowing intrusion into these zones is a crime. See *City of Chicago v. Morales*, 527 U.S. 41, 54 (1999); SAC, Count IV, ¶¶ 102-117.

As is apparent, Chapter 57 makes carrying with a permit in Montgomery County a form of legal Russian roulette. A permit holder cannot know how Chapter 57 would be interpreted by law enforcement officials and cannot possibly know where many of these prohibited places are located. It is physically impossible to move through the urban area of the County without intruding into one or more of the County's exclusion zones. The potential for abuse by the County is self-evident. See *Wayte v. United States*, 470 U.S. 598, 608 (1985) (prosecutorial discretion cannot be based on "the exercise of a protected statutory or constitutional rights"). See also *Hunter v. Underwood*, 471 U.S. 222, 229-31 (1985). This *in terrorem* effect is effectively without remedy. See, e.g., *Wayte*,

470 U.S at 608; *Nieves v. Bartlett*, 139 S.Ct. 1715 (2019) (conditioning a retaliation First Amendment claim on a showing that the plaintiff was arrested without probable cause). Carry permit holders are thus left to the discretion of officials who have already voiced hostility.

In sum, the County has not identified any "well-established, representative historical analogue" for Chapter 57's bans on the possession, transport, sale or transfer of firearms and components at a (A) park; (B) place of worship; (C) private school or a public institution of higher education; (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility, including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility or for "all property associated with the place, such as a parking lot or grounds of a building" for these areas. While *Bruen* indicates that possession at "schools" can be regulated, the County's use of that term to vaguely include all "schools" of whatever type, including private religious schools and schools for adults, is unsupported by any "well-established, representative historical analogue." The County has also identified no such "analogue" for Chapter 57's bans on the 100-yard "exclusion zone" around these locations or around the five locations specified in *Bruen*, or at any other location. A TRO and a preliminary injunction enjoining enforcement in all these locations is thus appropriate.

### 4. Bill 21-22E is without support in the case law

The case law, decided since *Bruen*, confirms that no such historical analogues exist for the locations in which possession is banned by Bill 21-22E. For example, in *Antonyuk v. Hochul*, --- F.Supp.3d ----, 2022 WL 16744700 at *86 (N.D.N.Y. Nov. 7, 2022), the court applied *Bruen* and preliminarily enjoined New York's ban on possession of a firearm by a permit holder at or on (1) any location providing behavioral health or dependence services, (2) any place of worship, (3) any

public parks and zoos, (4) airports where a person is complying with otherwise applicable federal regulations, (5) buses, (6) any establishment where alcohol is consumed, (7) theaters, conference centers and banquet halls, (8) any gathering of individuals to collectively express their constitutional rights, and (9) private property. In so holding, the court comprehensively examined each of these categories and found no suitable "well-established, representative historical analogue" that could justify New York's limitation on carry permits.

The *Antonyuk* court denied a preliminary injunction as to libraries, concluding that the plaintiffs lacked standing as to libraries. *Antonyuk*, at *16. The court thus declined to follow its earlier order in which the court had issued a TRO enjoining enforcement as to libraries along with other locations. *Antonyuk v. Hochul*, --- F.Supp.3d ----, 2022 WL 5239895 at *20-21 (N.D.N.Y. Oct. 6, 2022). Here, plaintiff Eliyahu Shemony regularly carries inside a public library, SAC ¶ 74, multiple plaintiffs regularly carry within 100 yards of libraries, SAC ¶¶ 68, 72, 73, and all these plaintiffs intend to do so in the future. Id. The court's TRO ruling as to libraries is thus applicable. Similarly, in *Hardaway v. Nigrelli,* --- F.Supp.3d ----, 2022 WL 11669872 at *17-18 (W.D.N.Y. Oct. 20, 2022), the court applied *Bruen* and preliminarily enjoined New York's ban on the possession of firearms in or at any place of worship as a violation of the Second Amendment. And in *Christian v. Nigrelli*, --- F.Supp.3d ---, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022), the court preliminarily enjoined New York's presumptive ban on carry on private property.

The decisions in *Antonyuk* and *Christian* are highly instructive on carry on private property. Both of these decisions addressed New York's post-*Bruen* legislation that banned possession of a firearm by a permit holder where the owner of the property had not posted signage indicating that such possession was permitted or had otherwise given express consent. *Antonyuk* held that "imposition of a state-wide restriction on concealed carry on all private property that is open for business to the public finds little historical precedent." *Antonyuk*, at *79. As *Antonyuk* notes, "this

restriction appears to be a thinly disguised version of the sort of impermissible 'sensitive location' regulation that the Supreme Court considered and rejected in *NYSRPA*." Id. at *81.

Likewise, in *Christian*, the court held that the State had failed to "demonstrate a tradition in support of its private property exclusion." 2022 WL 17100631 at *9, citing *Bruen*, 142 S.Ct. at 2135, 2138, 2150, 2156. The court thus rejected New York's assertion that its "policy preference" of banning firearms on private property was the appropriate "default" position, holding the State's position "was not part of any historical tradition" and "did not form a limitation of the scope of the right so codified in the Bill of Rights." Id. Rather, "[t]he Nation's historical traditions have not countenanced such an incursion into the right to keep and bear arms across all varieties of private property spread across the land. The right to self-defense is no less important and no less recognized on private property." Id. "[C]olonial-era enactments … *mandated* such carry at places of worship." Id. at *15 (emphasis the court's), citing Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 699 (2014).

The County's bans on possession and transport in public areas, including any public park, libraries and recreational facilities and other public areas are also without support. *Antonyuk* is again instructive. There, the court struck down New York's ban on carry by permit holders in "libraries, public playgrounds, public parks, and zoos," holding that the "common thread" of the bans placed on these and other locations by New York, was that "they are all locations where (1) people typically congregate or visit and (2) law-enforcement or other security professionals are-- presumably--readily available." 2022 WL 3999791 at *33. As the court noted "[t]his is precisely the definition of 'sensitive locations' that the Supreme Court in *NYSRPA* considered and rejected." Id., citing *Bruen*, 142 S.Ct. at 2133-34. The court found that New York had failed to demonstrate that such bans were "consistent with this Nation's historical tradition of firearm regulation,"

holding that while a few jurisdictions restricted firearms in a few of such places, the "vast majority of the other states … did not have statutes restricting firearms at those very locations." Id. at *34.

Even prior to *Bruen*, there was a substantial body of law indicating that the County's regulated locations would not pass muster under *Heller*. For example, the Fourth Circuit discussed whether parks are a "sensitive place" in *United States v. Masciandaro*, 638 F.3d 458 (4th Cir.), *cert. denied,* 565 U.S. 1058 (2011), but ultimately elected not to decide the question but rather to apply intermediate scrutiny to sustain the constitutionality of the Park Service regulation there at issue. That holding in *Masciandaro* was abrogated in *Bruen*. See *Bruen*, 142 S.Ct. at 2124 (citing *Masciandaro* with disapproval). Significantly, the regulation at issue in *Masciandaro* was *legislatively* abrogated by Congress with the enactment of Pub. Law 113-287, § 3, 128 Stat. 3168 (2014), *codified at* 54 U.S.C. § 104906. That legislation provides that "[f]ederal laws should make it clear that the 2d amendment rights of an individual at a System unit should not be infringed," 54 U.S.C. § 104906(a)(7), and thus permits the carrying of firearms in the National Park System, if "the possession of the firearm is in compliance with the law of the State in which the System unit is located." 54 U.S.C. § 104906(b).

No Maryland statute bars a permit holder from possession in a State or National Park.[2] Maryland permit holders may and do carry firearms in federal parks and wildlife refuges and other places administered by the National Park System. Effectively, Chapter 57 would ban a permit holder from carrying on the Capital Crescent Trail, until the permit holder reached the boundary

---

[2] The Maryland Department of Natural Resources has regulations limiting possession of firearms in *State* parks and *State* forests. See COMAR 08.07.06.04, & 08.07.01.04 (excepting hunting and shooting ranges). But, by their terms, these pre-*Bruen* regulations do not apply to County-owned, or "privately owned" parks or to the National Park System.

of the C&O National Park, at which time that same permit holder may legally carry fully armed.[3]

That result is incongruous, especially given the federal policy, noted above, favoring the exercise of Second Amendment rights in the National Park System. *United States v. Kelly*, 989 F.2d 162, 164 (4th Cir.), *cert. denied*, 510 U.S. 114 (1993) ("federal courts have consistently declined to assimilate provisions of state law through the ACA [Assimilative Crimes Act, 18 U.S.C. § 13] if the state law provision would conflict with federal policy"). Indeed, many States likewise allow possession of firearms in State parks, including Pennsylvania, Title 18 § 6109 (m.3) & (n), and Ohio, Title 29: 2923.126 (B)(7), just to name two. Other States allow such access by carry permit holders. See, e.g, Wisconsin, Wisc. Code § 29.089(2)(d). There is hardly a wide-spread, representative *modern* tradition of flatly banning permit holders from all possession of firearms in *public* parks, much less the required "well-established and representative historical" tradition, *circa* 1791 allowing a government to ban firearms in *private* and public parks.

Thus, the Delaware Supreme Court held in *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 652 (Del. 2017), that Delaware's regulation broadly banning firearms in State parks and forests was unconstitutional under Delaware's version of the Second Amendment. In so holding, the court expressly held that such a regulation could not be justified under any "sensitive place" analysis. *Bridgeville*, 176 A.3d at 654. As the court explained, "State Parks and State Forests also present a far different 'place restriction' than one limiting possession of firearms in a school or courthouse—traditional 'sensitive places.'" (176 A.3d at 658). The Delaware Supreme Court applied intermediate scrutiny to hold that a resident had a State constitutional right to carry a firearm in a residential common area. *Doe v. Wilm. Hous. Auth.*, 88 A.3d 654, 665-68 (Del. 2014).

---

[3] The County has no jurisdiction over federal property and, because a county is not a "State, Territory, Possession, or District," County laws are not enforceable as federal law on such property under the Assimilative Crimes Act, 18 U.S.C. § 13(a). See, e.g., *United States v. Robson*, 391 F.Supp.2d 383, 386 (D. Md. 2005).

And the Delaware Superior Court has struck down a State regulation banning firearms from State park camping sites, holding that such places were not sensitive areas. *Delaware State Sportsmen's Association v. Garvin*, 196 A.3d 1254, 1271 (Del.Sup.Ct. 2018).

Likewise in *People v. Chairez*, 2018 IL 121417, 104 N.E.3d 1158, 1176 (2018), the Supreme Court of Illinois applied a version of means-ends scrutiny to hold that an Illinois statute banning the possession of a firearm within 1000 feet of a public park violated the Second Amendment. The court held that the area was not a sensitive place and that the State had failed to justify the restriction with "evidentiary support." Similarly, *Morris v. Army Corps of Engineers*, 60 F. Supp. 3d 1120 (D. Idaho 2014), *appeal dismissed*, 2017 WL 11676289 (9th Cir. 2017), rejected the government's argument that Corps' outdoor recreation sites were sensitive places.

In *Solomon v. Cook County Board of Commissioners*, 550 F.Supp. 3d 675, 690-96 (N.D. Ill. 2021), the court applied intermediate scrutiny to invalidate a county's ban on carry by permit holders in public recreational areas, holding that county's properties were not a "sensitive place" under *Heller*. And the Seventh Circuit in *Ezell v. City of Chicago*, 846 F.3d 888, 894-95 (7th Cir. 2017), invalidated the City of Chicago's zoning restrictions on firing ranges, holding that the restrictions could not be justified as sensitive places under a sliding scale form of heightened scrutiny. These decisions have even more force in light of *Bruen*'s abrogation of means-end, intermediate scrutiny.

The Eleventh Circuit's decision in *GeorgiaCarry.Org, Inc. v. Georgia*, 788 F.3d 1318, 1328 (11th Cir. 2015), is inapposite. There, the court merely held, on an interlocutory appeal, that it was "missing basic information" that the court thought necessary to decide whether the Army Corps of Engineers property there at issue was a "sensitive place" under heightened scrutiny. The court thus concluded that the district court did not abuse its discretion in denying a preliminary injunction under that standard. That approach is obviously inconsistent with *Bruen*'s abrogation

of any "means-end" scrutiny under the Second Amendment in favor of a strict text and historical analysis. In short, even before *Bruen*, parks and other areas of general public access were generally not considered to be sensitive places, even under intermediate scrutiny. There is no evidence that parks in particular were historically regulated at the time of the Founding.

In sum, Chapter 57 is facially unconstitutional under the Second Amendment to the extent that it purports to impose any regulatory restrictions on the possession, transfer, sale or transport of firearms and ammunition in or at any place other than in the five specific locations specified in *Bruen* and *Heller*. Chapter 57 is also facially unconstitutional under the Second Amendment to the extent that it purports to impose any regulatory restrictions on the possession or transport of firearms and ammunition in or at any place within 100 yards of any location. There is zero historical support for exclusion zones and none of the cases, either pre-*Bruen* or post-*Bruen,* can be read as sanctioning such exclusion zones. For the same reasons, Chapter 57 is also unconstitutional under the Second Amendment as applied to the named plaintiffs and to any member of plaintiff MSI to the extent that it purports to impose any regulatory restrictions on the possession, transfer, sale or transport of firearms or ammunition in or at any place other than "in" the five specific locations, as properly limited and understood, specified in *Bruen* and *Heller*.

## III.     EACH OF THE PLAINTIFFS HAS STANDING

### A.     Plaintiffs Have Standing

Each of the plaintiffs in this case has standing to challenge Chapter 57, as amended by Bill 4-21 and Bill 21-22E. Each plaintiff is alleged to have a wear and carry permit issued by the Maryland State Police, and either lives in or transports a loaded firearm in and/or through the County. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) ("Where "the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."). MSI has representational standing

to sue on behalf its members who live in Montgomery County or who travel through Montgomery County or who otherwise are injured by the County's unlawful actions. *Hunt v. Washington State Apple Advert. Com'n.*, 432 U.S. 333, 342 (1977).

MSI need only show that its membership includes "at least one member with standing to present, in his or her own right" in order to have standing. *United Food and Commercial Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 555 (1996). That requirement is satisfied here. SAC, ¶ 50. Each of MSI's members who possesses a wear and carry permit and who possesses or transports a firearm in Montgomery County is injured by the bans imposed by Bill 21-22E. MSI has many such members with carry permits and Chapter 57 effectively bars every one of these members from traveling in the County. The interests that MSI seeks to protect are germane to MSI's purpose and neither the claims asserted herein nor the relief requested require the participation of MSI's individual members. See *Retail Industry Leaders Ass' v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007). If one plaintiff has standing, that is sufficient. *MSI,* 971 F.3d at 214 & n.5.

One of the plaintiffs, Engage Armament, is a Type I, Type VII and Type X federally licensed firearms dealer, as well as a State licensed dealer. It possesses, transports, sells and transfers firearms and "major components" in the County and it is arguably at or within 100-yards of a location directly regulated by Section 57-11's bans. SAC, ¶¶ 55, 56. See *MSI*, 971 F.3d at 212-13 (applying *Lujan* to sustain standing of a plaintiff firearms dealer). As a dealer, Engage has standing to sue on its own behalf and on behalf of its customers and "other similarly situated persons" for injuries inflicted by Chapter 57. Id*.,* 971 F.3d at 216.

The other corporate plaintiff, ICE Firearms, operates a firearms training facility in the County and is located within 100 yards of one of the locations in the bans imposed by Bill 21-22E apply. As a result, the owner of that facility and his spouse, Ronald and Nancy David, are effectively banned from stepping outside their home with a loaded firearm onto their own real estate, as otherwise

permitted under State law. SAC, ¶¶ 71, 73. Again, State law expressly permits possession of a loaded handgun on the "real estate" owned by the resident (SAC, ¶ 38) and nothing in State law bans the possession and transport in public of a long gun. Id. ¶¶ 27, 32.

All the individual plaintiffs with a wear and carry permit use their permit to carry while engaged in daily activities, including commuting, throughout the County. These individuals allege that they regularly come within 100 yards of multiple locations at which the possession or transport of a loaded firearm is prohibited by Section 57-11(a) and fully intend to do so in the future. Id. ¶¶ 58, 59, 61, 62, 68, 69, 71, 72, 73. Those verified allegations concerning day-to-day activities cannot be reasonably contested. Indeed, the homes of four plaintiffs, Ronald and Nancy David, (id., ¶¶ 71, 73) and plaintiffs, Joshua Edgar (id., ¶ 69), and Brandon Ferrell (id., ¶ 64), are situated within 100 yards of one or more of the places at which mere possession or transport are banned by Chapter 57. These plaintiffs cannot even step outside of their homes onto their own real estate with a firearm without violating Chapter 57.

## B. Plaintiffs Have Standing To Bring A Pre-Enforcement Suit

Each of the plaintiffs is entitled to bring a pre-enforcement challenge to Chapter 57, as amended by Bill 21-22E. In order to show injury in a pre-enforcement challenge, plaintiffs need show "'an intention to engage in a course of conduct arguably affected with a constitutional interest.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014), quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). See also *FEC v. Cruz*, 142 S.Ct. 1638, 1649 (2022); *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc*., 139 S.Ct. 2051 (2109) (noting that plaintiffs may bring "both facial, pre-enforcement challenges and as-applied challenges to agency action"). The verified allegations of each of the plaintiffs satisfy these requirements. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List,* 573 U.S. at 158 (citation omitted). An individual need not "first

expose himself to actual arrest or prosecution to be entitled tAo challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

Indeed, each of the plaintiffs in this case has engaged in constitutionally protected conduct that would have violated Chapter 57, as amended by Bill 21-22E, and each of the plaintiffs affirmatively have alleged that they fully intend to engage in such conduct in the future. Save for one, each of the plaintiffs have a wear and carry permit and each such permit has been effectively nullified by the reach of Bill 21-22E. Each of these plaintiffs reasonably fears prosecution if they carry in the County. Nothing "requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony*, 573 U.S. at 163. See also *Cruz*, 142 S.Ct. at 1649; *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007); *Free Enter. Fund. v. Pub.Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010). Plaintiffs are not required "to risk criminal prosecution to determine the proper scope of regulation." *Dombrowski,* 380 U.S. at 487.

Plaintiffs also need not show affirmatively that the County intends to enforce Chapter 57 against them in particular. "[I]n numerous pre-enforcement cases" the Supreme Court "did not place the burden on the plaintiff to show an intent by the government to enforce the law against it," but rather the Court "presumed such intent in the absence of a disavowal by the government or another reason to conclude that no such intent existed." *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013). See *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010); *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *Babbitt*, 442 U.S. at 301. The County has not disavowed enforcement of Chapter 57, and there is no reason to believe that the County will not enforce Chapter 57 at its time and place of choosing. See *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 711 (4th Cir. 1999). Under the forgoing principles, the individual and corporate plaintiffs, and MSI, on behalf of its members, may seek pre-enforcement review of Chapter 57, as amended by Bill 4-21 and Bill 21-22E. See *MSI.*, 971 F.3d at 217.

**CONCLUSION**

A TRO and a preliminary injunction should be granted without delay.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd
Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
District Court Bar No. 21033