**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | * | |
| | * | |
| Plaintiffs | * | |
| | * | Consolidated Case Nos.: |
| v. | * | 8:21-cv-01736-TDC (lead) |
| | * | 8:22-cv-01967-DLB |
| MONTGOMERY COUNTY, MARYLAND | * | |
| | * | |
| Defendant | * | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION**

Defendant Montgomery County, Maryland, ("the County") by and through its undersigned counsel, respectfully requests that this Court deny Plaintiff's Emergency Motion for a Temporary Restraining Order and Emergency Motion for a Preliminary Injunction (ECF No. 054) because Plaintiffs lack standing, and all places of public assembly identified in the County's law are constitutional.

## I.    INTRODUCTION

> "[In] 2020, the number of firearm-related deaths [in the U.S. rose] to 45,222 . . . That means that, in 2020, an average of about 124 people died from gun violence every day . . . [G]un violence has now become the leading cause of death in children and adolescents, surpassing car crashes, which had previously been the leading cause of death in that age group for over 60 years."

*New York State Rifle & Pistol Assoc., Inc. v. Bruen,* 142 S. Ct. 2111, 2165 (2022) (Breyer, J., dissenting) (citations omitted).

> [G]un violence has become sort of the norm, which is not where we need to be… It is of grave concern.

– Montgomery County Police Chief Marcus Jones, July 11, 2022.[1]

Against this backdrop of increased gun violence in the country, and within the County, the County enacted a new law on guns in places of public assembly. Plaintiffs allege this new law infringes upon their Second Amendment right to bear arms.

In addition to lacking standing, Plaintiffs have not met the elements for this Court to issue injunctive relief they seek. The County's law is consistent with recent Second Amendment guidance from the Supreme Court as to how the government may appropriately regulate the right to bear arms. As much of the County's law aligns with State law, banning enforcement of the County's law will not alter the status quo or spare Plaintiffs' the irreparable harm they claim. Last, the public interest in public safety far outweighs the minimal burden the County's law places upon Plaintiffs' Second Amendment right. The Plaintiffs' Motion should be denied.

## II.    FACTS

Plaintiffs' Second Amended Complaint (ECF No. 049), filed on November 30, 2022, challenges amendments made by the County to its Code provisions that govern weapons. Although the Second Amended Complaint purports to allege eight counts, Plaintiffs seek injunctive relief solely based upon Count VII, "Alleged Violations of the Second Amendment Right to Armed Self-Defense in Public." Count VII asserts that the County's regulation of firearms in places of public assembly cannot meet the test for permissible regulation in "sensitive places" set out by the Supreme Court in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111 (2022). (ECF No. 49 ¶¶ 135-158).

---

[1] *See* Dan Morse, *Gun violence rises sharply in Montgomery County, police chief says,* The Washington Post, July 11, 2022,  *https://www.washingtonpost.com/dc-md-va/2022/07/11/montgomery-county-gun-violence-double/* (Ex. 5).

Plaintiffs seek a temporary restraining order and preliminary injunction only as to Count VII to prevent and enjoin the County from enforcing Section 57-11(a) of Chapter 57 of the Montgomery County Code, as amended by County Bill 21-22E, against persons who have been issued a wear and carry permit. (ECF No. 54 at 1).

Alternatively, Plaintiffs seek to restrain the County from enforcing Section 57-11(a): (1) as to wear and carry permit holders who allegedly "provide armed security to places of worship and/or to private schools"; and (2) restrain the County from enforcing the 100-yard restriction of places of public assembly as to wear and carry permit holders. (ECF No. 54 at 1-2).

Plaintiffs in this case are licensed gun owners, with State of Maryland-issued wear-and-carry permits; a non-profit group dedicated to the preservation and advancement of gun owners' rights in Maryland; a firearms training facility; and a federally- and state-licensed firearms dealer.

## III.    SUMMARY OF COUNTY LAW

The County enacted the weapons ban at issue in Count VII in the aftermath of the Supreme Court's June 2022 decision, *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) (hereafter "*Bruen*"). The *Bruen* Court found New York's requirement that a party must demonstrate "proper cause" to qualify for a handgun carry license violated the Second Amendment's right to bear arms. In so doing, the Court articulated a new test to evaluate whether governmental firearms regulations pass muster under the Second Amendment. The Court stated that the ban of firearms in "sensitive locations" is constitutionally permissible, and proceeded to identify five locations – schools, legislative assemblies, government buildings, polling places, and courthouses – as "sensitive places" where weapons may be totally prohibited. The Court left open the possibility that other locations where weapons were historically banned – or the modern

counterparts of those locations – could also qualify as "sensitive places."[2]

    *Bruen* led the County to enact changes to Chapter 57, "Weapons," of the County Code. Bill 21-22E, effective November 28, 2022, changed *inter alia* the definition of "public assembly," where firearms are banned, and removed a prior exception that permitted State concealed carry permit holders to carry in places of public assembly.

### A. The County Narrowed Its Definition of Place of Public Assembly and Aligned the Definition with *Bruen*.

    Bill 21-22E continued the existing prohibition of carrying a firearm within 100 yards of a place of public assembly, but revised the definition of a "place of public assembly" to comport with *Bruen*:

A place of public assembly is:

    (1)    a publicly or privately owned:

        (A)    park;

        (B)    place of worship;

        (C)    school;

        (D)    library;

        (E)    recreational facility;

        (F)    hospital;

        (G)    community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;

        (H)    long-term facility, including any licensed nursing home, group home, or care home;

        (I)    multipurpose exhibition facility, such as a fairgrounds or conference center; or

---

[2] *Bruen* will be discussed in more detail below.

    (J)  childcare facility;

  (2)  government building, including any place owned by or under the control of the County;

  (3)  polling place;

  (4)  courthouse;

  (5)  legislative assembly; or

  (6)  a gathering of individuals to collectively express their constitutional right to protest or assemble.

  A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

*See* Ex. 1, Bill 21-22E at 3-4, Lines 34-59. The Bill removed a prior broad statement that a place of public assembly was a place "where the public may assemble." *See id.* at 3, Line 35. The Bill also removed the statement that a place public assembly "included" locations listed; in other words, the prior list of locations of public assembly was not exhaustive. *See id.* at 3, Lines 35-36. By removing "included," the Bill 21-22E thereby made its scope narrower and clearer. Bill 21-22E also added several "sensitive places" that *Bruen* expressly indicated were locations where weapons could be constitutionally banned. *See id.* at 3-4, Lines 51-55.

  The Code's prohibition against carrying in a place of public assembly expressly does *not* apply to: law enforcement officers or security guards licensed to carry a firearm; possession of firearm (other than a ghost gun) or ammunition in a person's home; an unloaded firearm (other than a ghost gun) in an enclosed case; or a firearm and its ammunition at a business whose owner has a permit to carry or one authorized employee of the business who has a permit to carry. *See id*. 4-5, Lines 77-92.

  In addition to the exceptions to the firearms ban within the County's law, Federal law – the

the Law Enforcement Officers Safety Act – permits a qualified law enforcement officer or a qualified retired or separate law enforcement officer to carry a concealed weapon regardless of state or local laws. *See* 18 U.S.C. §§ 926B, 926C. There are exceptions to that law however for State or County-owned properties; LEOSA expressly states weapons bans on those properties must still be honored. *See id.* §§ 926B(b)(2); 926C(b)(2).

### B.  State Concealed Carry Permit Holders Are No Longer Exempt From the County's Ban on Carrying in a Place of Public Assembly.

Bill 21-22E also removed a previous exception that allowed a State concealed carry permit holder to carry a firearm in a place of public assembly. *See* Exhibit 2, Report of Staff of Montgomery County Council, Expedited Bill 21-22 (November 10, 2022) at 4 (stating "[e]xpedited Bill 21-22 would prevent an individual from possessing a firearm within 100 yards of a place of public assembly even when the individual has a wear-and-carry permit from the State of Maryland"). Prior to *Bruen*, Maryland required a person demonstrate "good and substantial reason" to receive a wear-and-carry gun permit. Immediately after *Bruen,* Maryland Governor Larry Hogan instructed the Maryland State Police to no longer enforce this requirement.[3] In the weeks after Governor Hogan's instruction, the number of applications for concealed carry permits received by Maryland State Police increased eleven fold.[4] *See* Ex. 2 at 20. As concealed carry permit holders would no longer have to demonstrate any justification for a concealed carry permit, Bill 21-22E prevents a person from carrying a firearm within 100 yards of a place of public assembly even if they have a valid State concealed carry permit.

---

[3] Also after *Bruen*, the Appellate Court of Maryland struck down the "good and substantial reason" requirement. *See In re Rounds*, 255 Md. App. 205 (2022).

[4] *See also* Fredrick Kunkle, *Supreme Court ruling sets off rush for concealed gun permits in Maryland,* The Washington Post (July 25, 2022) *https://www.washingtonpost.com/dc-md-va/2022/07/15/concealed-carry-maryland-guns-hogan/*.

Last, in the event any provision of Bill 21-22E is found to be unenforceable by the final judgment of a court of competent jurisdiction, Bill 21-22E has a severability provision that provides remaining provisions remain in full force and effect. *See* Ex. 1 at 5, Lines 97-100. *See also* Montgomery County Code § 1-202(a) ("it is the intent of the Council that the provisions of this Code and all laws enacted by the County Council are severable. If a provision is held invalid or inapplicable, the remainder of the Code or the law remains in effect").

## IV.   STANDARD OF REVIEW

Preliminary injunctions are extraordinary, drastic remedies. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Preliminary injunctions should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *See id.*

A party seeking a temporary restraining order or a preliminary injunction must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Pashby v. Delia,* 709 F.3d 307, 320 (4th Cir. 2013) (citing *Winter v. Nat'l Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). Courts considering whether to impose preliminary injunctions must consider each factor. *Id.* Further, Rule 65(d) requires that any order granting an injunction must "describe in reasonable detail ... the act or acts restrained or required," such that affected parties receive "explicit notice of precisely what conduct is outlawed." *Pashby* at 331.

## V.   ARGUMENTS

### A.   All Plaintiffs Lack Standing.

#### 1.   Plaintiffs' Claims and Purported Basis for Standing.

Plaintiffs allege that they have standing on the following bases: (1) each of the eight individual plaintiffs are alleged "to have a wear and carry permit issued by the Maryland State

Police, and either lives in or transports a loaded firearm in and/or through the County," including "within 100 yards of multiple locations at which the possession or transport of a loaded firearm is prohibited by Section 57-11(a) and fully intend to do so in the future." Pls.' Mem. (ECF No. 54-1) at 31, 33: (2) the residential homes of individual plaintiffs, Ronald David, Nancy David, Joshua Edgar Brandon Ferrell are allegedly "situated within 100 yards of one or more" places of public assembly as defined under Section 57 and thus are allegedly unable to leave their house with a firearm without violating Chapter 57.[5]  *Id.* at 33; (3) MSI argues that it has both standing on its own behalf as it allegedly seeks to protect interests that "are germane to MSI's purpose," and representation standing to sue on behalf its members. *Id.* at 33-34; (4) Engage Armament alleges that it is a federally and state licensed firearms dealer that is "arguably at or within 100-yards" of a place of public assembly as defined under Section 57[6] and "has standing to sue on its own behalf and on behalf of its customers and "other similarly situated persons" for injuries inflicted by Chapter 57." *Id.* at 32; (5) ICE Firearms alleges that it operates a firearms training facility in the County and is allegedly "located within 100 yards" of a place of public assembly as defined under Section 57. *Id* at 34.

The County respectfully requests that this Court dismiss Plaintiffs' Motion for Temporary Restraining Order because all Plaintiffs lack standing, both individually and organizationally, as Plaintiffs have not identified any credible threat of prosecution under Chapter 57 or cognizable harm beyond speculative potential future harm to themselves or their members.

---

[5] Notably, the Motion for Temporary Restraining Order does not specifically identify any place of public assembly that is "arguably" within 100 years of the residential home of any individual Plaintiff. Plaintiffs' broad pronouncements are insufficient to establish standing.

[6] Plaintiff Engage Armament alleges that is it "arguably," within 100 years of a place of public assembly, but County Code § 57-11(d) exempts certain licensed gun shops. *See* Ex. 58 at 17.

2.      **All Plaintiffs Lack Standing for a Pre-Enforcement Challenge.**

As acknowledged by Plaintiffs in their Motion for TRO, "A preliminary injunction is an extraordinary remedy…" Pls.' Mem. (ECF No. 54-1) at 9, citing *Di Base v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Here, the extraordinary relief sought by the Plaintiffs is neither warranted on the merits nor have the Plaintiffs established standing to pursue such relief.

The Supreme Court has called the doctrine of standing "perhaps the most important" of the case-or-controversy doctrines and the "the threshold question in every federal case." *Allen v. Wright,* 468 U.S. 737, 750 (1984); *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct . . . and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Justiciable injury for purposes of Article III must be "real and immediate" and not purely speculative and abstract. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). Since Plaintiffs here seek pre-enforcement declaratory and injunctive relief, they must establish an ongoing or future injury in fact. *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.").

A plaintiff alleges sufficient injury in a pre-enforcement suit to establish standing if she alleges: (1) "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and (2) there exists a credible threat of prosecution

thereunder." *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

While none of the Plaintiffs have faced prosecution, they allege generally that they fear future prosecution and a conviction that could hypothetically result in a lifetime federal and Maryland restriction on possession of firearms. Pls. Mem. (ECF No. 54-1) at 2. While a plaintiff challenging the constitutionality of a law generally need not wait until they are actually arrested or prosecuted, **a credible threat of imminent prosecution against the plaintiff must exist**. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)(emphasis added). A credible threat of future prosecution cannot rest on fears that are "imaginary or speculative." *Babbitt,* 442 U.S. at 298 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)). Nor is such an injury evident where plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Babbitt, 442* U.S. at 298–99 (internal quotation marks omitted).

To the extent that Plaintiffs here have alleged a sufficient intention "to engage in conduct afflicted with a constitutional interest," they have offered no evidence to support a credible threat of prosecution as required by *Babbitt*. *Id.* Plaintiffs do not allege that they have been threatened with prosecution as in *Steffel*. Similarly, Plaintiffs have offered no evidence of the laws at issue having been enforced in any fashion, again as in *Steffel*. Furthermore, Plaintiffs have alleged no past or present threats of prosecution, nor any other particularized threats that would justify "imminent injury."

If this Court were to adopt Plaintiffs' "imminent injury" argument, then any person would have standing to challenge any existing criminal statute by alleging only that they intend to violate said statute. Adopting such a broad scope of standing negates any real showing of "imminent

injury" and we ask the Court not to do so here. Absent threatened injury, such as prosecution, review of criminal laws is, in effect, an appropriation of power by the federal judiciary. *See United Public Workers v. Mitchell*, 330 U.S. 75, 86-91 (1947). Such an exercise would leave "the federal courts as virtually continuing monitors of the wisdom and soundness of Executive [and Legislative] action." *Laird*, 408 U.S. at 15 (1972). Federal judges would come to operate as second vetoes, through whom laws must pass for approval before they could be enforced. *Doe v. Duling*, 782 F.2d 1202, 1207, 1986 U.S. App. LEXIS 22121, *12 (4th Cir. 1986).

Plaintiffs heavily rely upon recent Second Circuit decisions, including *Hardaway v. Nigrelli*, --- , 2022 U.S. Dist. LEXIS 200813, __ F.Supp.3d __ (W.D.N.Y. Nov. 3, 2022) to support their Motion for Temporary Restraining Order. (ECF No. 56, Notice of Supplemental Authorities). Although these Second Circuit decisions are not binding upon this Court, they nonetheless highlight precisely why Plaintiffs here have not identified any credible threat of prosecution and thus failed to establish standing.

In *Hardaway v. Nigrelli*, plaintiffs Reverend Dr. Jimmie Hardaway, Jr, Bishop Larry A. Boyd, Firearms Policy Coalition, Inc. and Second Amendment Foundation filed claims against three defendants in their official capacities, the superintendent of the New York State Police, the Niagara County District Attorney (Nigrelli), and the Erie County District Attorney and sought a temporary restraining order and preliminary injunction enjoining New York from enforcing its post-*Bruen* firearm laws, including but not limited to its restriction on possession of firearms by carry permit holders in places of worship. *Hardaway*, at *3-4. Similar to certain individual Plaintiffs in this action, the *Hardaway* plaintiffs sought to carry "concealed firearms on church property in case of confrontation to both themselves and their congregants." *Id.*

11

In *Hardaway*, as in this action, "only the first element of the test, *i.e.*, whether the individual Plaintiffs have suffered an injury-in-fact" was at issue. *Id*. * 7. The *Hardaway* court reiterated "that a plaintiff suffers an injury-in-fact sufficient to establish standing when he or she faces "threatened enforcement of a law" that is "sufficiently imminent." *Id*. * 7, citing *Susan, B. Anthony List,* 573 U.S. at 158-189.

The Second Circuit found that the *Hardaway* plaintiffs faced "threatened enforcement of a law" that was "sufficiently imminent " because New York public officials, including the Governor of New York and Defendant Nigrelli, First Deputy State Police Superintendent, specifically threatened arrests and prosecution for those who violated the New York post-*Bruen* firearms laws at issue. *Hardaway* at *8-10. In particular, the *Hardaway* court cited to New York Governor Kathy Hochul's press statement announcing that individuals "who carry concealed weapons in sensitive locations … will face criminal penalties" and defendant Nigrelli's public statements emphasizing a "**zero tolerance**" enforcement policy, that New York State, troopers "are standing ready" to ensure that "all laws are enforced" and that if "you violate this law, you will be arrested. Simple as that." *Id*. at *8-10 (emphasis added). The *Hardaway* court found that these specific and public threats of enforcement by New York public officials "show that New York residents…face "threatened enforcement of a law" that is 'sufficiently imminent.'" *Id*. at *10 citing *Susan B. Anthony List*, 573 U.S. at 158-59.

Plaintiffs in this action have not cited to any similar public threats of "zero tolerance" enforcement or prosecution by Montgomery County public officials.  In fact, Plaintiffs in this action have also not alleged that the County's post-*Bruen* firearm carry laws have been enforced against any person or entity. Furthermore, it is notable that even after Plaintiffs have publicly announced through their filings in this action that they allegedly continue to violate Rule 57, they

have not been arrested or personally threated with prosecution. Indeed, Plaintiffs have not identified a single citation, civil or criminal, that has issued from the County.

Plaintiffs' attempt to rely on two other recent and non-binding Second Circuit rulings, *Antonyuk v. Hochul*, 2022 U.S. Dist. LEXIS 201944, __ F.Supp.3d __, 2022 WL 4367410 and *Christian v. Nigrelli*, 2022 U.S. Dist. LEXIS 211652, __ F.Supp.3d __, fail for the same reason as their reliance on the *Hardaway* ruling fails. *See* Pls. Mem. (ECF No. 54-1) at 25 – 27.

In the *Antonyuk* and *Christian* cases, as in the *Hardaway* case, the Second Circuit found that the plaintiffs had standing to bring a pre-enforcement challenge of New York's post-*Bruen* firearms laws based upon numerous specific public statements by New York public officials which amounted to the credible and imminent threat of prosecution. *Antonyuk*, 2022 U.S. Dist. LEXIS 201944 *34-8; *Christian*, 2022 U.S. Dist. LEXIS 211652 * 8-10. The statements by New York public officials cited by the *Antonyuk* and *Christian* courts were similar, and in some instances identical, to those public official statements relied upon by the *Hardaway* court, including defendant Nigrelli's announcement of a "zero tolerance" enforcement policy and New York Governor Hochul's statement that those "who carry concealed weapons in sensitive locations ... will face criminal penalties." *Christian*, *9.

Plaintiffs in this action have not alleged similar specific statements by Montgomery County public officials necessary to establish an imminent and credible threat of prosecution. As such, Plaintiffs have alleged nothing more than hypothetical, future harm which is insufficient to establish Article III standing for a pre-enforcement challenge.

### 3.      Plaintiffs MSI and Engage Armament Lack Organizational Standing.

An organization can demonstrate standing to sue in two ways: on its own behalf (organizational standing) or on behalf of its members (representational standing). *White Tail*

*Park, Inc.*, 413 F.3d at 458 (4th Cir., 2005). For the reasons set forth above in Section V(A)(2), neither MSI nor Engage Armament can establish representation standing through their members because their members do not have standing in their own right to pursue a pre-enforcement challenge due to a lack of any credible threat of prosecution.

In an improper attempt to seemingly further bolster their argument for representation standing on behalf of their members, MSI cites to four John Doe declarants, who are allegedly MSI members, possess wear and carry permits issued prior to the enactment of Bill 21-22E, and each provided armed security to their respective synagogues and churches. Pls.' Mot. (ECF No. 54) at 4. The Court should reject these anonymous declarations of non-parties, as they are inherently unreliable and violate the spirit and letter  of 28 U.S. Code § 1746, especially in light of the "extraordinary relief" of a pre-enforcement injunction sought by Plaintiffs here. Affidavits must meet applicable rules of evidence to be admissible. An anonymous affidavit is not generally considered to be a "sworn affidavit." *See Patterson v. Cty. of Oneida*, 375 F.3d 206, 223 (2d Cir. 2004) (redacted name of affiant did not satisfy FRCP Rule 56(e)). Plaintiffs' attempt to submit anonymous testimony is patently inadmissible. Through these anonymous declarations, the Plaintiffs seek to introduce medical reports of incidents of violence occurring at houses of worship outside the County and outside the Plaintiffs or John Doe's personal knowledge in a blatant attempt to inflame the court.  The Court should reject these improper tactics. Accordingly, MSI and Engage Armament do not have representational standing.

Furthermore, MSI and Engage Armament lack standing to assert an independent, organizational claim on their own behalf.  A plaintiff can establish organizational standing only "when it seeks redress for an injury suffered by the organization itself." *White Tail Park, Inc.*, 413 F.3d at 458.  An injury is cognizable, for organizational standing purposes, when the plaintiff

alleges that "a defendant's practices have hampered an organization's stated objectives causing the organization to divert its resources as a result." *Action NC v. Strach*, 216 F. Supp. 3d 597, 616 (M.D.N.C. 2016) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)).

Plaintiff MSI fails to allege any such injury to itself in the Motion for Temporary Restraining Order, stating only "that the interests MSI seeks to protect are germane to MSI's [unspecified] purpose." Pls. Mem. (ECF No. 54-1) at 32. The Second Amended Complaint alleges that the purposes of MSI include "promoting the exercise of the right to keep and bear arms and education, research and legal action associated with the constitutional right to privately own, possess and carry firearms." Pls. Second Am. Compl. (ECF No. 49) ¶ 48.

MSI was a very active litigant on the issue of gun rights for years prior to the County enacting Chapter 57. *See Md. Shall Issue v. Hogan*, 963 F.3d 356, 2020 U.S. App. LEXIS 20426, *1 (4th Cir. 2020); *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 2020 U.S. App. LEXIS 24370 (4th Cir. 2020); and *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 2018 U.S. Dist. LEXIS 195615. As the Court is aware, MSI was a named Plaintiff in this action prior to the County's post-*Bruen* firearms laws at issue. The Motion for Temporary Restraining Order fails to identify any basis for organizational standing or differentiate how MSI's operations or participation in this action post enactment of Chapter 57 is anything other than business as usual for MSI.

Without elaboration, the Motion for Temporary Restraining Order alleges that Engage Armament has standing on its own behalf "[as] a [firearms] dealer." *Id.* The Amended Complaint alleges that Engage Armament suffered financial injury due to the prohibitions from possessing the "ghost guns" banned by Chapter 57. Pls. Second Am. Compl. (ECF No. 49) at 27. However,

any such alleged financial injury related to "ghost guns" is immaterial to the relief sought, and insufficient to establish an injury-in-fact, in the Motion for Temporary Restraining Order.

Accordingly, neither MSI nor Engage Armament have alleged any injury-in-fact and both lack representational and organizational standing.  On this basis alone, the Motion for Temporary Restraining Order should be denied.

**B.    The County's Law is Constitutional.**

The County's regulation of firearms is constitutional and consistent with the recently evolving Supreme Court Second Amendment precedent. Bill 21-22E constitutionally prohibits firearms in places of public assembly that, historically, are the very "sensitive areas" where the Second Amendment right to keep and bear arms does not apply. Alternatively, the prohibited carry locations are analogous to relevantly similar historical precursors prohibiting the carry of weapons in certain locations.

Within the last 15 years, the Supreme Court issued three seminal Second Amendment decisions. In its "first in-depth examination" of the Second Amendment, the Court found unconstitutional a ban against handguns in the home in *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). In 2010, the Court determined that the Second Amendment applies to the states via the Fourteenth Amendment in *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). Finally, in *Bruen*, the Court found the Second Amendment violated by a law that required that a person demonstrate "proper cause" to carry a concealed handgun outside of their home. *See Bruen* at 2122. All three cases emphasized that the inherent right of self-defense is central to the Second Amendment, and that right of self-defense is most acute in one's own home. *See Bruen* at 2135; *McDonald,* 561 U.S. at 767; *Heller*, 554 U.S. at 628.

All three cases also recognized, however, that an individual's Second Amendment right to possess a firearm for self-defense is not without limits and can appropriately be subject to government regulation. *See Bruen* at 2162 (Kavanaugh, J., concurring) ("[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations" (quoting *Heller*, 554 U.S. at 636)); *McDonald*, 561 U.S. at 786 (noting that it is "important to keep in mind" that *Heller* did not cast doubt on certain "longstanding regulatory measures" in connection with firearms); *Heller*, 554 U.S. at 595 (2008) (the right to keep and bear arms is "not unlimited"); *Id.* 626 (the right to bear arms for self-defense is not a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose").

The Supreme Court announced a new analysis of whether a government regulation violates the Second Amendment in *Bruen.* Under the new analysis, if the conduct sought to be regulated falls within the scope of the Second Amendment, there is only one step for a court to consider: whether the government can justify its regulation by demonstrating it is "[c]onsistent with the Nation's historical tradition of firearm regulation." *Bruen* at 2130.[7]

*Bruen* identified five "sensitive places" where firearms historically could be constitutionally prohibited: schools, government buildings, legislative assemblies, polling places, and courthouses, finding no evidence of disputes or challenges to the prohibition of weapons in those locales. *See Bruen* at 2133. The Court instructed courts to "use analogies to those historical regulations of 'sensitive places' to determine [whether] modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 2133 (emphasis in original).

---

[7] In so holding, the Court expressly rejected a two-step test previously developed and used by Courts of Appeals to assess whether a governmental regulation of firearms was constitutional. *See Bruen* at 2126-27.

These five sensitive places in *Bruen* are not exhaustive. *See Bruen* at 2134. The government may justify its regulation by identifying other "relevantly similar" historical regulations. *See id.* at 2132. The *Bruen* Court identified two metrics for courts to use in a "relevantly similar" analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The analogue analysis therefore should review "[w]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

While the "how" and "why" metrics are central to the analysis, they are not the only metrics for a court to review. *See Bruen* at 2132 (stating that the Court does not provide an "exhaustive survey of the features that render regulations relevantly similar under the Second Amendment"). In addition to the "how" and "why" metrics, the Court stated that the task of historical analogue analysis can be a "straightforward" assessment if the challenged law "addresses a general societal problem that has persisted since 18th century." *Bruen* at 2131. In that case, the absence of a similar law addressing the problem is relevant evidence that the new law is unconstitutional. *See id.* at 2131. But for laws that implicate "unprecedented societal concerns or dramatic technological changes," a more "nuanced" approach may be required, as "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132.

To that end, the Court cautioned that the historical analogue analysis as "[n]either a straightjacket nor a regulatory blank check." *Bruen* at 2133. Analogical reasoning "[r]equires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original). *See also U.S. v. Tallion,* No. 8:22-po-01758-AAQ, 2022 U.S. Dist. LEXIS 225175 *4 (D. Md. December 13, 2022) (noting that *Bruen*'s test

requires "[l]ower courts to thread the needle between upholding every modern law that remotely resembles a historical analogue and striking down all laws that lack a precise historical twin" (quotations omitted)). Thus, if the challenged law is not a "[d]ead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen* at 2133.

Contrary to Plaintiffs' assertion that the County enacted Bill 21-22E "in spite of" *Bruen,* the County enacted Bill 21-22E expressly considering *Bruen's* guidance and to align the County's law with *Bruen*. *Cf.* Pls.' Mem. (ECF No. 54-1) at 17, *with* Exhibit 2, Report of Staff of Montgomery County Council, Expedited Bill 21-22 (November 10, 2022) at 3, 5-8; Exhibit 4, Steve Bohnel, *County Council passes legislation prohibiting firearm use, carrying within 100 yards of some public places,* November 15, 2022, BethesdaMagazine.com, https://bethesdamagazine.com/2022/11/15/county-council-passes-legislation-prohibiting-firearm-use-carrying-within-100-yards-of-some-public-places/ (quoting the Council President stating that the Council worked to ensure Bill 21-22E aligned with *Bruen*).

Unlike the law at issue in *Bruen*, which required individuals to demonstrate "proper cause" to carry a weapon anywhere outside of the home, the County's law is much more limited in scope. The County's law addresses the right to carry in places of public assembly, or where large groups of persons are likely to be gathered and therefore more likely vulnerable to gun violence.

      1.      **Plaintiffs Will Not Likely Succeed on the Merits**

As the County's regulation of firearms in places of public assembly is consistent with *Bruen*, Plaintiffs will not likely succeed on the merits. The County's definitions of "place of public assembly" are either one of the five *Bruen* "sensitive locations," have exact historical statutory matches, or have historical statutory analogues that demonstrate the right to bear arms was understood to not exist in those areas.

a.      The 5 *Bruen* Sensitive Locations

The Supreme Court recognizes schools, government buildings, polling places, legislative assemblies, and courthouses as sensitive places where weapons may be constitutionally prohibited. *See Bruen* at 2133. Bill 21-22E's prohibition of guns in these locales is constitutional. Plaintiffs notably do not contest these prohibitions.

b.      **Buffer Zones Around Sensitive Locations, and Inclusion of a Place's Parking Lots or Building Grounds.**

The County's law prohibits carry within 100 yards of a place of public assembly, and includes "[a]ll property associated with the place [of public assembly], such as a parking lot or grounds of a building." *See* Ex. 1 at 4, Lines 58-59. Plaintiffs challenge this as overly broad and restrictive of their ability to travel throughout the County. *See* Pls.' Mem. (054-1) at 21-27. Despite Plaintiffs' arguments, this Court should uphold these "buffer zone" provisions of the County's law, as the State of Maryland expressly authorizes the County to do so, courts prior to *Bruen* upheld the concept of a buffer zone, and many historical analogues included buffer zones around sensitive areas and populations.

(i)      **State Law Expressly Permits the County to Prohibit Carry Within 100 Yards of Public Assembly.**

State law expressly authorizes the County to include a "buffer zone" in any regulation of the carry of weapons in places of public assembly. *See* Md. Code Ann., Crim. Law § 4-209(b)(1)(iii). The law provides that a county may regulate the "purchase, sale, transfer, ownership, possession and transportation" of a handgun, rifle, or shotgun, or the ammunition for and components thereof, "within 100 yards of or in a park, church, school, public building, and any other place of public assembly." *Id.* This is reflective of the fact that both case law and prior statutes recognize that not only should a sensitive location be protected, but similarly the area

20

surrounding it is entitled to protection.

>    **(ii)     Cases Acknowledge the Concept of Buffer Zones and Inclusion of Parking Lots as Part of a Building Where the Second Amendment Does Not Apply.**

Several recent appellate decisions found that the parking lots associated with federal property qualified as a "sensitive location" in which the Second Amendment right to bear arms did not apply.

For example, a parking lot reserved for government employees 1,000 feet from the U.S. Capitol's entrance was "sufficiently integrated" with the Capitol to be considered a sensitive place where firearms may be banned in *U.S. v. Class*, 930 F.3d 460 (D.C. Cir. 2019).[8] The Court relied upon several factors to support this conclusion: 1) the lot had been set aside for the use of government employees, 2) the lot was in close proximity to the Capitol building, and 3) the lot was on land owned by the government. *See id.* at 464. The Court had "[l]ittle trouble concluding that the same security interests which permit regulation of firearms 'in' government buildings permit regulation of firearms on the property surrounding those buildings as well." *Id.*  464.

In addition to *Class*, two other Courts of Appeals found that the Second Amendment right to bear arms does not apply in the parking lots around government buildings in *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) and *U.S. v. Dorosan*, 350 Fed. Appx. 874  (5th Cir. 2009). Both cases involved challenges to federal regulations that prohibited storage and carriage of firearms on U.S. Postal Service property. *See Bonidy*, 790 F. 3d at 1123; *Dorosan*, 350 Fed. Appx. at 875. Both Courts held that the ban on guns in government buildings apply with the same force to the parking lot as to the building itself. *See Bonidy*, 790 F. 3d at 1126; *Dorosan*, 350 Fed.

---

[8] While this decision and the next two discussed predated *Bruen*, all nevertheless relied heavily upon *Heller* and its discussion of "sensitive locations" that *Bruen* augmented. *See Class*, 930 F.3d at 464; *Bonidy* 790 F.3d at 1124-25; *Dorosan* at 350 Fed. Appx. at 875-76.

Appx. at 875-76.

The same logic applies here: the same security interests that permit regulation of firearms in sensitive locations permits the County's regulation of firearms in the parking lot or on building grounds.

> **(iii)      Historical Analogues for Buffer Zones Demonstrate Their Need and Validity.**

Many historical laws prohibit weapons within a certain distance of various areas, activities, and populations.

Maryland prohibited guns within one mile of polling places, recognized by *Bruen* as a sensitive area, on election days in Calvert County (1886 and 1888) and in Kent, Queen Anne's, and Montgomery Counties (1874). *See* 1886 Md. Laws 315, ch. 189, § 1 (Ex. 30); John Prentiss Poe, Maryland Code: Public Local Laws, Adopted by the General Assembly of Maryland, March 14, 1888, at 604 § 71 (1888) (Ex. 33); 1874 Md. Laws 366, ch. 250, § 1 (Ex. 22). Louisiana in 1870 similarly prohibited guns on within "one-half mile of any place of registration" for elections. *See* 1870 La. Acts 159-160, no. 100, § 73 (Ex. 19).

To protect water fowl, Somerset County in 1837 banned guns in or within 50 yards of any water fowl blind on Smith Island. *See* 1837 Md. Acts Ch. 101, An Act for the Preservation of Wild Fowl in the Waters of Smith's Island and its Vicinity, in Somerset County, §§ 1-2 (Ex. 9)

Many localities (Philadelphia; St. Paul; Pittsburgh; Reading, Pennsylvania; Trenton, New Jersey) banned guns within 50 or 100 yards of their parks, squares, or common areas. *See* Pa. – General Assembly, P.L. 1083, No. 1020, A Supplement to An Act appropriating ground for public purposes in the city of Philadelphia § 21.2 (1867) (prohibiting the carry of firearms or shooting at birds in the park or "within 50 yards thereof") (Ex. 16); Acts of Assembly Relating to Fairmount Park (Philadelphia, PA) § 21(II) (1870) (prohibiting the carry of fire-arms or shooting birds in the

Fairmount Park in Philadelphia, or "within fifty yards thereof") (Ex. 20); Annual Reports of the City Officers and City Boards of the City of Saint Paul, for the Fiscal Year Ending December 31, 1888, at 689 (prohibiting the carry of firearms of shooting birds in any park or "within fifty yards thereof") (Ex. 32); A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, from 1804 to Jan. 1, 1897, Ordinances–Executive Departments, Bureau of Parks (1893) (prohibiting firearms "within the limits of parks or within one hundred yards thereof") (Ex. 41); A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pa., Park Rules and Regulations, 240 (1897) (prohibiting carry of firearms "in the common, or within fifty yards thereof") (Ex. 44); City of Trenton, N.J., Charter and Ordinances 390, An Ordinance providing for the government and protection of public parks and squares of the city of Trenton (1903) (prohibiting the carry firearms or shooting birds "in said park or squares, or within fifty yards thereof") (Ex. 47).

New Mexico, when it was still a Territory,[9] prohibited the unlawful brandishing of a weapon within a "settlement," defined to mean "any point within three hundred yards of any inhabited house." *See* 1887 N.M. Laws 56, An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, ch. 30, § 4; An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55 (1887) (Ex. 31).

The concealed carry of weapons could not occur within two miles of a university, college, or school in Mississippi in 1892. R. H. Thompson, *The Annotated Code of the General Statute*

---

[9] *See* Andrew Willinger, *Territorial Gun Regulation and the "Lost" History of the Federal Second Amendment*, Duke Center for Firearms Law Blog (August 8, 2022) https://firearmslaw.duke.edu/2022/08/territorial-gun-regulation-and-the-lost-history-of-the-federal-second-amendment/ (arguing the Second Amendment has always applied in territories, and historical territorial laws should be given weight despite *Bruen* court's discount of same).

*Laws of the State of Mississippi* 327, § 1030 (1892) (Ex. 38). And Connecticut in 1859 banned the sale of liquor "within one mile of any military parade-ground, muster-field, or encampment." *See* 1859 Conn. Acts 62, An Act in Addition to and in Alteration of "An Act For Forming And Conducting The Military Force," chap. 82, § 5 (Ex. 14).

These historical laws *expressly* prohibit weapons in buffer zones around sensitive areas; the County's prohibition of guns in buffer zones is consistent with this historical tradition and is constitutional.

The foregoing authority in State law, federal appellate decisions identifying parking lots as integrated with sensitive locations, and historical statutes support a determination that the County's regulation of firearms within 100 yards of places of public assembly and in parking lots and building grounds of places of public assembly is consistent with historical tradition and constitutional. If Maryland historically protected water fowl with a buffer zone, certainly human life in areas of public assembly can similarly be protected by a buffer zone.

### c.    Privately Owned Schools

Plaintiffs challenge the County's inclusion of private schools in the list of areas of public assembly where guns are banned. *See* Pls.' Mem. (ECF No. 54-1) at 13, 24. Private schools present the same security and safety concerns as public schools, as they similarly involve a vulnerable population – children – gathering for purposes of education. To that end, when the Supreme Court listed schools as sensitive places, it did not specify "only public" schools. *See Bruen* at 2133; *Heller*, 554 U.S. at 626 ("nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings).

Any argument that a ban in schools must be limited to public schools infers that the need to protect children disappears magically where private sector employees are acting as teachers. In

terms of the hazards of firearms, there is absolutely no principled difference between public school students and private school students.

Further, historical statutory bans on weapons in schools (from Texas, Missouri, the territory of Arizona, and the territory Oklahoma) are not limited to public schools, but rather ban weapons in *any* school. *See* 1870 Tex. Gen. Laws 63, ch. 46, § 1 (prohibiting weapons in "*any* school-room or other place where persons are assembled for educational, literary, or scientific purposes" (emphasis added)) (Ex. 21), 1879 Tex. Crim. Stat. tit. IX, Ch. 4, Art. 320 (same law still in effect) (Ex. 26); John A. Hockaday et al., *Revised Statutes of the State of Missouri 1879*, at 224 (1879) (§ 1274) (prohibiting carrying firearms at "*any* school room or place where people are assembled for educational, literary or social purposes" (emphasis added)) (Ex. 25);[10] 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1 (same law still in effect) (Ex. 29); 1889 Ariz. Sess. Laws 16-17 § 3 (prohibiting the carrying of guns into "*any* school room, or other place where persons are assembled for amusement or for educational or scientific purposes" (emphasis added)) (Ex. 34); Revised Statutes of Arizona Territory 1252 (1901) (§ 387) (same law) (Ex. 46); 1890 Okla. Laws 495, Art. 47 § 7 (Ex. 36); W. A. McCartney et al., *Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma* 504 (1893) (Art. 45, § 7) (same) (Ex. 40).

Similar to the above state laws, two localities in Missouri (Columbia and Huntsville) enacted municipal ordinances that banned guns in *any* school. *See* Chapter XVII: Carrying

---

[10] This statute's the concealed carry introductory phrase does not apply to the remainder of the statute: a comma follows, and it would render the later phrase "having upon or about his person any kind of fire-arms" superfluous. *See Collier v. Connolley*, 285 Md. 123, 132 (1979) (courts should avoid statutory construction that renders subsection surplusage). *Cf.* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine,* 13 Charleston L. Rev. 205, 255 (2018).

Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, reprinted in General Ordinances of the Town of Columbia, in Boone County, Missouri 34, 35 (Lewis M. Switzler ed., 1890) (prohibiting the carrying of dangerous weapons "into *any* school room, or place where people are assembled for educational, literary or social purposes" (emphasis added)) (Ex. 35); The Revised Ordinances of the City of Huntsville, Missouri of 1894, at 58-59 (1894) (prohibiting concealed carry of any deadly or dangerous weapon into "*any* school room or place where people are assembled for educational, literary or social purposes" (emphasis added)) (Ex. 42).

Of note, most County households do not qualify for public preschool, and must send their children to private preschool.[11] Absent this ban in private schools by the County, children attending private preschool would not be protected by the County's ban on firearms.

The historical justification for the ban at the time of the laws above – safety and protection of children – remains in effect today and applies to children in both private and public schools. The County's ban on weapons in public and private schools is constitutional.

### d.    Publicly or Privately Owned Childcare Facilities

There are over 1,000 licensed childcare facilities in the County. *See* Exhibit 3, *https://www.marylandfamilynetwork.org/sites/default/files/2022-02/Montgomery%202022.pdf,* at 5. Although there will not be any historic "dead ringers" governing the carry of firearms at childcare facilities (as most did not exist at the time of the Founders or for most of the 1800s), childcare facilities are nearly identical to schools for purposes of the Court's analysis. Both involve

---

[11] *See https://www.montgomeryschoolsmd.org/departments/dtecps/earlychildhood/prek/* (pre-kindergarten and head start programs are available for "income-eligible" persons); https://www.benefits.gov/benefit/1915 (listing incomes to qualify for Head Start, with income caps from $13,560 to $46,630); https://www.census.gov/quickfacts/montgomerycountymaryland (median household income in Montgomery County 2017-2021 is $117,345).

groups of children – a vulnerable population – under supervision away from the normal protection of their parents. This prohibition against guns in childcare facilities places a comparable burden on the right to carry and is comparably justified given the historical and recognized restriction against firearms in schools. *See Bruen* at 2133 (central considerations to analogical inquiry are whether the regulation imposes a comparable burden on the right to self-defense and whether the burden is comparably justified).

Schools are "a well-established and representative historical *analogue*, not a historical *twin*" to childcare facilities. *Bruen* at 2133. (emphasis in original). *Bruen* recognized schools as a sensitive area; the line between schools and daycares is often non-existent in today's society. Many schools today offer before or after-school care at the preschool or elementary level, and many locations combine preschool with daycare.

Further, although prior to *Bruen*, at least one federal trial court found that a gun ban in daycare centers did not violate the Second Amendment in *Miller v. Smith*, No. 18-cv-3085, 2022 U.S. Dist. LEXIS 44490 (C.D. Ill. Mar. 14, 2022). The Court observed:

> The fact that day cares are designated spaces for the care of young children is a powerful indicator that they may be "sensitive places." Moreover, a ban on firearms in day cares is closely analogous to a ban on firearms in schools, which is one of the core "presumptively lawful" measures referenced in *Heller*. For these reasons, the Court finds that licensed day cares are "sensitive places" in which unusually restrictive firearms prohibitions may be permissible.

*See id.* at *27. This decision preceded *Bruen* and therefore did not have any analysis of historical predecessors, But as noted above, the over 1,000 childcare facilities that exist today in the County simply did not exist at the time of the Founding or the Reconstruction period.

The "how" and "why" the County regulates firearms for childcare centers – a ban on firearms to protect children – is entirely consistent with *Bruen's* recognition of schools as sensitive places.

  **e.**  **A Gathering of Individuals to Express Their Constitutional Right to Assemble.**

Many states – Tennessee, Georgia, Texas, and Missouri – historically prohibited carrying firearms at places of public assembly, public gathering, public assemblage, or political conventions. *See* 1869 Tenn. Ch. 22 § 2 (prohibiting any person from carrying a pistol to "any public assembly of the people") (Ex. 17); 1870 Ga. Laws 421 ("[F]rom and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any ... pistol, or revolver ... to ... any ... public gathering in this State") (Ex. 18); R. H. Clark, *The Code of the State of Georgia* (1882), Part V, Title I, Division IX, § 4528 (firearms not permitted at "any other public gathering") (Ex. 28);  1870 Tex. Gen. Laws 63, ch. 46, § 1 (prohibiting a gun or pistol of any kind in any "public assembly") (Ex. 21); 1879 Tex. Crim. Stat. tit. IX, Ch. 4, Art. 320 (prohibiting firearm where people gather to perform public duty or "to any other public assembly) (Ex. 26); 1875 Mo. Laws at 50-51, § 1 (no firearms permitted at any "public assemblage"); John A. Hockaday et al., *Revised Statutes of the State of Missouri 1879*, at 224 (1879) (§ 1274) (no firearms allowed "into any other public assemblage of persons met for any lawful purpose") (Ex. 25); 1883 Mo. Laws 76 (prohibiting anyone from "having upon or about his person any kind of firearms" in areas including "any other public assemblage of persons met for any lawful purpose") (Ex. 29).

Arizona and Oklahoma, when they were territories, similarly prohibited the carry of firearms to any "public assembly." *See* 1889 Ariz. Sess. Laws 16-17  (Ex. 34); Revised Statutes of Arizona Territory at 1252 (1901) (§ 387) (Ex. 34); The Statutes of Oklahoma, 1890, § 7 (Ex.

36); W. A. McCartney et al., *Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma* 504 (1893) (Art. 45, § 7) (prohibiting firearms at any "political convention" or "any other public assembly") (Ex. 40).

Finally, two municipalities prohibited bringing weapons to lawful public assemblies. *See* Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, reprinted in General Ordinances of the Town of Columbia, Boone County, Mo. 34, 35 (Lewis M. Switzler ed., 1890) (banning the carry of firearms into any "public assemblage of persons met for any lawful purpose") (Ex. 35); The Revised Ordinances of the City of Huntsville, Missouri of 1894, at 58-59 (similar law) (Ex. 42).

The County's ban on firearms at public assemblies is permissible constitutionally given the foregoing longstanding laws that similarly banned firearms at public assembles.

### f.  Publicly or Privately Owned Parks

Examples of historical laws prohibiting weapons in parks abound.

Two states – Minnesota, and Wisconsin – prohibited firearms in their state parks. *See* 1905 Minn. Laws 620, ch. 344, § 53 (prohibiting firearms within state parks or within "one-half mile of the outer limits" of a state park, unless the firearm is unloaded and has been sealed by the park commissioner) (Ex. 50); 1917 Wis. Sess. Laws 1243-44, ch. 668, § 29.57 (4) (no person shall "have in his possession or under his control therein any gun or rifle, unless the same is unloaded and knocked down or enclosed within its carrying case" while in any "wild life refuge, state park, or state fish hatchery lands") (Ex. 56).

Notably, North Carolina in 1921 prohibited firearms in any public or private park or reservation unless the owner or manager gave permission.  *See* 1921 N.C. Sess. Laws 54, Pub. Laws Extra Sess., ch. 6, §§ 1, 3 (Ex. 57).

Fifteen municipalities, between 1857 and 1917, prohibited firearms in public parks completely, and frequently, with buffer zones around them. *See* First Annual Report of the Board of Commissioners of the Central Park (of New York City) (1857) (forbidding the carrying of firearms in Central Park) (Ex. 13); Fourth Annual Report of the Board of Commissioners of the Central Park (of New York City) 106 (1861) (same prohibition) (Ex. 15); Acts of Assembly Relating to Fairmount Park (in Philadelphia) 18 (1870) ("No persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof") (Ex. 20); M. J. Sullivan, *The Revised Ordinance of the City of St. Louis*, 635 (1881) (§ 3) ("No person shall … use or have in his possession ready for use in any street, alley, walk or park of the city of St. Louis" any "air gun or other contrivance" that discharges a "fragment, bolt, arrow, pellet, or other missile") (Ex. 27); Annual Reports of the City Officers and City Boards of the City of Saint Paul 689 (Minnesota) (1888) ("No person shall carry firearms or shoot birds in any Park or within fifty yards thereof") (Ex. 32); Laws and Ordinances for the Government of the Municipal Corporation of the City of Williamsport, Pa. 141 (1891) ("No person shall carry fire-arms, or shoot in the park") (Ex. 37); Charter of the City of Wilmington (Delaware) (1893) (Part VII, § 7) ("No person shall carry fire-arms or shoot birds or other animals within the Park") (Ex. 39); 1895 Mich. Local Acts 596, § 44 (prohibiting the carrying or discharging of firearms within the public parks and Grand Boulevard of Detroit without permission of the commissioner) (Ex. 43); A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pa. 240 (1897) ("No person shall carry firearms, or shoot in the common, or within fifty yards thereof") (Ex. 44); Oscar F. Greene, *A Revised Ordinances of the City of Boulder, Colorado* § 511 (at 157) (1899) (prohibiting the carrying of firearms into "any of the parks belonging to the City of Boulder") (Ex. 45); City of Trenton, New Jersey, Charter and Ordinances 390 (1903) ("No person shall carry firearms or shoot

30

birds in said park or squares, or within fifty yards thereof") (Ex. 47); Amendments to the Revised Municipal Code of Chicago of 1905 and New General Ordinances Ch. 45, Art. I § 1526 (at 40) (1905) ("All persons are forbidden to carry firearms . . . within any of the Parks, Public Play Grounds or Bathing Beaches of the City") (Ex. 49); Ordinances, Rules and Regulations of the Department of Parks of the City of New York § 17(8) (1906) (prohibiting the carrying or firing of any firearm in parks) (Ex. 51); P. G. Carey, *A Digest of the Ordinances of the Borough of Phoenixville, Pa.* at 135 (1906) ("No person shall carry fire-arms or shoot birds or throw stones or other missiles therein [Reeves Park]") (Ex. 52); General Municipal Ordinances of the City of Oakland, Cal., at 15 § 9 (1909) ("No person shall carry firearms. . . within the boundaries of the parks controlled by the Park Commission") (Ex. 53); City of Staunton, Va. Code Ch. II, § 135 (at 115) (1910) ("All persons are forbidden … to carry firearms, or to throw stones or other missiles within [the park.]") (Ex. 54); Birmingham, Ala. Code Ch. 44 § 1544 (1917) (prohibiting the carry of firearms in public parks) (Ex. 55).

Courts considering bans in parks in recent years have held they are "sensitive places." Courts so held after finding that the need for self-defense, and by extension carrying a firearm in parks, is not as acute in as in the home, given that parks are places where children recreate. *See, e.g.*, *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) (finding a city park is a "sensitive place" where it is permissible for the city to ban firearms because, in part, "[t]he need for self-defense is not 'most acute' at city parks and community centers where children and youth recreate"); *Zaitzeff v. City of Seattle*, 17 Wash. App. 2d 1, 17, 484 P.3d 470, 479 (2021), *review denied*, 498 P.3d 478 (Wash. 2021), *cert. denied*, 142 S. Ct. 1 123 (2022) (observing that although the Supreme Court in *Heller* "[d]oes not list parks as sensitive areas, the public safety concerns underlying the sensitive area distinction also apply here, particularly the concern about protecting

children").

Given the numerous historical "twins" prohibiting weapons in parks, the County's gun restriction in parks is constitutional.

### g.    Places of Worship

There are many historical analogues to support the County's ban on guns in places of worship.[12] Georgia in 1870 and 1882 prohibited the carrying of a "pistol or revolver, or any kind of deadly weapon, to any…place of public worship." 1870 Ga. Laws 421 (Ex. 18); R. H. Clark, *The Code of the State of Georgia* (1882), Part V, Title I, Division IX, § 4528 (prohibiting deadly weapons at "any place of public worship") (Ex. 28). In 1870 and 1879, Texas prohibited any person from going into "any church or religious assembly" with a gun. 1870 Tex. Gen. Laws 63, ch. 46, § 1 (Ex. 21); 1879 Tex. Crim. Stat. tit. IX, Ch. 4, Art. 320 (Ex. 26). The Texas laws did not apply however to "any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." *See id.*

Missouri in 1875, 1879, and 1883 prohibited firearms in any church or place where people assembled for religious worship. *See* 1875 Mo. Laws at 50-51, § 1 (prohibiting carrying "any kind of fire arms" at "any church or place where people have assembled for religious worship") (Ex. 23); John A. Hockaday et al., *Revised Statutes of the State of Missouri 1879*, at 224 (§ 1274) (Ex. 25) (;1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1 (Ex. 29).

Pistols or other dangerous weapons were prohibited in Virginia in 1877  in "any place of worship while a meeting for religious purposes is being held at such a place, or without good or

---

[12] Many southern states historically required white male church attendees to bring arms to church as a precaution to thwart slave revolts. *See* Patrick J. Charles, *Article: Racist History and the Second Amendment: A Critical Commentary*, 43 Cardozo L. Rev. 1343, 1351 (2022).

sufficient cause therefor." *See* 1877 Va. Acts 305 (Ex. 24).

Arizona, while still a territory in 1889, prohibited the carry "a pistol or other firearm" in "any church or religious assembly." 1889 Ariz. Sess. Laws 16-17 § 3 (Ex. 34). Similar to Texas's law, this did not apply to law enforcement. *See* 1889 Ariz. Sess. Laws 16-17 § 4. (Ex. 34)

Carrying of dangerous weapons "into any church, or place where people have assembled for religious worship" was not permitted in Columbia, Missouri, in 1890.  Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, reprinted in General Ordinances of the Town of Columbia, in Boone County, Mo., 34, 35 (Lewis M. Switzler ed., 1890) (emphasis added) (Ex. 35).

When it was still a territory, Oklahoma, in 1890 and 1893, prohibited the carry of firearms into "any church or religious assembly." 1890 Okla. Laws 495, Art. 47 § 7 (Ex. 36); W. A. McCartney et al., *Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma* 504 (1893) (Art. 45, § 7) (Ex. 40).

In 1894, Huntsville, Missouri, prohibited the carry of a deadly or dangerous weapon in "any church or place where people have assembled for religious worship." This prohibition did not apply to police officers. *See* The Revised Ordinances of the City of Huntsville, Missouri of 1894,  at 58-59 (Ex. 42).

These historical precursors are exact matches of the County's prohibition of guns in places of worship. Indeed, similar to these laws, the County's law exempts law enforcement officers or security guards.

In addition to these analogous historical statutory precursors, several courts in the 1870s viewed churches or places of worship as no place for firearms. *See Hill v. State*, 53 Ga 472, 475 (Ga. 1874) (carrying arms at places of worship "[i]s a thing so improper in itself, so shocking to

33

all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee"); *English v. State*, 35 Tex. 473 478-79 (Tex. 1872) ( finding it "[l]ittle short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church…"); *Andrews v. State*, 50 Tenn. 165, 182 (Tenn. 1871) (observing a "[m]an may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them").[13]

Given the "twin" historical analogues above, as well as the historical views of courts on the propriety of firearms in places of worship, the County's gun restriction in places of worship is constitutional.

### h.   Publicly or Privately Owned Recreational Facilities and Multipurpose Exhibition Facilities, such as a Fairgrounds or Conference Center

Similar to childcare facilities, the County's ban of firearms in public or private recreational or exhibition facilities calls upon this Court to apply the "nuanced" approach described by *Bruen*, as recreational activities in today's society do not always have a precise "twin" in 18th and 19th century America.

Many statutes banned firearms at ballrooms, balls, or a "Fandango", with some specifying that the prohibition applied only at public rooms, and others making the prohibition broad enough to include private rooms. *See* Jerome Bayon, *General Digest of the Ordinances and Resolutions*

---

[13] To the extent the *Bruen* court distinguished the *English* decision and some of the statutes relied upon by Defendant, it was in the context of assessing the "proper cause" requirement in in New York's public carry law, not in the context of a "sensitive places" analysis. *Bruen* at 2133-34 (observing defenders of New York's law "[e]rr in their attempt to characterize New York's proper-cause requirement as a 'sensitive-place law'").

*of the Corporation of New Orleans* at 371 (1831) (Art. 1) (prohibiting "any person to enter into a public ball-room with any cane, stick, sword or any other weapon" and requiring weapons be checked before entering a ball room) (enacted 1817) (Ex. 7); 1852 N.M. Laws at 68-97, § 3 (prohibiting "any person to enter said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with fire arms or other deadly weapons") (Ex. 12); 1869 Tenn. Ch. 22 § 2 (prohibiting the carry of a pistol at any "fair or race course") (Ex. 17); 1870 Tex. Gen. Laws 63, ch. 46, § 1 (prohibiting firearms in "a ball room, social party, or other social gathering, composed of ladies and gentleman") (Ex. 21); 1889 Ariz. Sess. Laws 16–17 § 3 (banning pistols at any "place where persons are assembled for amusement" or "any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering") (Ex. 34); 1890 Okla. Laws 495, Art. 47 § 7 (banning the carry of pistols or revolvers into any "place where persons are assembled … for amusement, or … into any ball room, or to any party or social gathering") (Ex. 36); W. A. McCartney et al., *Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma* 504 (1893) (Art. 45, § 7) (same prohibition) (Ex. 40); Revised Statutes of Arizona Territory at 1252 (1901) (§ 387) (prohibiting firearms at any "place where persons are assembled for amusement …, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering") (Ex. 46).[14]

The burden placed upon the Second Amendment right by these analogous statutes – to not bring firearms into places for balls or "amusement" – is similar to the burden created by the County's ban on carrying in recreational facilities and convention centers.

Further, courts considering the issue have found that fairgrounds or community centers are in fact "sensitive locations" where the Second Amendment does not protect the right to carry and

---

[14] Oklahoma and Arizona were territories at the time of these statutes.

guns may be restricted. *See, e.g., Christopher v. Ramsey Cty.*, No. 21-2292 (JRT/ECW), 2022 U.S. Dist. LEXIS 144159, at *13 (D. Minn. Aug. 12, 2022) (finding state fairgrounds as during the State Fair "are a sensitive location with thousands of people and children present in often crowded conditions" and upholding gun ban as constitutional); *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) (finding for Second Amendment purposes "[n]o logical distinction between a school on the one hand and a community center where educational and recreational programming for children is also provided on the other").

### i.    Publicly or Privately Owned: Hospital; Community Health Center, Any Health Care Facility or Community-Based Program Licensed by the Maryland Department of Health; Long-Term Facility, Including any Licensed Nursing Home, Group Home, or Care Home

Many of the health care and long-term living facilities in the County's places of public assembly did not exist at the time of the founding of our Country, and therefore will require the exercise of the more "nuanced" analysis called for in *Bruen*.

The various health care facilities, especially hospitals, are similar to historical predecessors in Texas, the territory of Arizona, the territory of Oklahoma, and Montana, whose laws prohibited firearms in places where persons are assembled for "scientific purposes." *See* 1870 Tex. Gen. Laws 63, ch. 46, § 1 (no firearms permitted in any "place where persons are assembled for educational, literary, or scientific purposes") (Ex. 21); Revised Statutes of Arizona Territory at 1252 (1901) (§ 387) (prohibiting firearms in any "place where persons are assembled for amusement or for educational or scientific purposes") (Ex. 46); 1903 Mont. Laws at 49 Ch. 35, § 3 (banning the concealed or partially concealed carry of a firearm into any "place where persons are assembled for amusement or for educational or scientific purposes") (Ex. 47); 1890 Okla. Laws 495, Art. 47 § 7 (prohibiting the carry of firearms into any place where persons are assembled "for educational or scientific purposes") (Ex. 36).

Several states refused to accept in their militias those with mental illnesses, using the much cruder nomenclature of the era for same,. *See* Mass. Gen. Laws ch. 240 § 1 (1837) (Ex. 10); 1837 Me. Pub. Laws 424 (Ex. 8); 1843 R.I. Pub. Laws 1 (June 1843) (Ex. 11).

Ultimately, persons frequenting many of these establishments are in a vulnerable condition seeking treatment for their health, physical or mental. The prohibition against bearing of arms by such vulnerable populations, historically, were recognized in *Heller* as constitutional. *See Heller*, 554 U.S. at 626 ("[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill").

As the historical statutes above prevented weapons in facilities where persons are gathered for scientific purposes and recognized that individuals who are vulnerable – such as those who are ill – should not be in the presence of firearms, the County's prohibition at these facilities is analogous, and constitutional.

### j.      Publicly or Privately Owned Libraries

The County's ban of guns in public libraries is constitutional: all public libraries in the County are in government-owned or leased buildings, a "sensitive place" where governments may constitutionally prohibit firearms. Moreover, State law expressly authorizes County to regulate guns in "public buildings." *See* Md. Code Ann., Crim. Law 4-209(b).

As for privately owned libraries, laws in Texas, Missouri, the territory of Arizona,  and Montana banned the carry of weapons into *any* place of gathering for "literary" or "educational" purposes. *See* 1870 Tex. Gen. Laws 63, ch. 46, § 1 (banning weapons in "*any* . . . place where persons are assembled for educational [or] literary" purposes (emphasis added)) (Ex. 21); 1879 Tex. Crim. Stat. tit. IX, Ch. 4, Art. 320 (same law still in effect) (Ex. 26); John A. Hockaday et al., *Revised Statutes of the State of Missouri 1879*, at 224 (1879) (§ 1274) (prohibiting carrying

firearms at "*any . . .* place where people are assembled for educational, literary or social purposes" (emphasis added)) (Ex. 25); 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1 (same law still in effect) (Ex. 29); 1889 Ariz. Sess. Laws 16-17 (prohibiting the carrying of guns into "*any* . . . place where persons are assembled for . . . for educational or scientific purposes" (emphasis added)) (Ex. 34); Revised Statutes of Arizona Territory at 1252 (1901) (§ 387) (same law) (Ex. 46); W. A. McCartney et al., *Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma*, 504 (1893) Art. 45, § 7 (prohibiting guns at "*any* . . . place where persons are assembled for . . . for educational or scientific purposes" (emphasis added)) (Ex. 40); 1903 Mont. Laws at 49, Ch. 35 § 3 (prohibiting concealed firearm carry at "*any* . . . place where persons are assembled for . . . educational or scientific purposes" (emphasis added)) (Ex. 48).

These prohibitions banned firearms anywhere people gathered for educational or literary purposes, not just public property or government buildings. Given these analogous historical precursors, Bill 21-22E's ban of firearms in private libraries is constitutional.

## 2.    Plaintiffs Will Not Suffer Irreparable Harm if the Court Does Not Issue an Injunction.

Plaintiffs must make a clear showing that "irreparable injury is *likely* in the absence of an injunction." *Winter v. NRDC, Inc.,* 555 U.S. 7, 22 (2008) (emphasis in original). The harm to be suffered may not be "remote or speculative, but actual and imminent." *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 19, 216 (4th Cir. 2019) (quotation omitted). Additionally, harm is irreparable when it cannot be fully rectified by the final judgment after trial. *Id.*

Many provisions of the County's ban on places of public assembly are authorized expressly by State law and are analogous to gun restrictions in State law. As such, Plaintiffs will not suffer

irreparable harm if the County's restrictions remain in effect.

For example, the State prohibits firearms in childcare centers. *See* COMAR § 13A.16.10.04(G) (prohibiting firearms in childcare centers except in a small center located in a residence). The removal of Bill 21-22's prohibition of guns in public or privately owned childcare facilities from places of public assembly would not empower Plaintiffs to carry guns in those locations given the State's existing prohibition.

The County's prohibition against carrying within a buffer zone of 100 yards of places of public assembly is authorized by State law. *See*  Md. Code Ann., Crim. Law § 4-209(b)(1)(iii). Further, the County's use of a 100 yard buffer zone around places of public assembly mirrors Maryland's use of buffer zones on election day, near public demonstrations, and around Ravens Stadium and Oriole Park at Camden Yards. *See* Md. Code Ann., Elec. Law § 16-903(a)(3) (2022) (prohibiting the carry or display of a gun "within 100 feet of a polling site" on election day); Md. Code Ann., Crim. Law § 4-208(b)(2) (2021) (prohibiting a person from having a firearm in a vehicle within 1,000 of a demonstration in a public place after being advised by law enforcement of the demonstration and being ordered to leave); COMAR §§ 14.25.02.06; 14.25.01.01(B)(2) (weapons prohibition at offices, restaurants, stores, museums, parking facilities, and other facilities located at Ravens Stadium and Oriole Park at Camden Yards include "the grounds and walkways surrounding the facilities" and "adjacent parking lots or garages owned or controlled by" the State).

State law expressly authorizes the County to ban guns within 100 yards of a park. *See* Md. Code Ann., Crim. Law § 4-209(b)(1)(iii). Maryland also bans guns in State parks. *See* COMAR § 08.07.06.04; § 08.07.01.01.

The County's ban prohibition against firearms within 100 yards of schools is also authorized expressly by State law, *see* Md. Code Ann., Crim. Law § 4-209(b)(1)(iii), and is

analogous to the State's existing prohibition of firearms on public school property. *See* Md. Code Ann., Crim. Law § 4-102 (b) (2021) ("a person may not carry or possess a firearm, knife, or deadly weapon of any kind on public school property").

Similar to the State, and again expressly pursuant to State law, the County prohibits against guns in any government buildings. *See* COMAR § 04.05.01.03; COMAR § 04.05.01.01 (an individual may not carry "open or concealed firearms" in "State public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the State Department of General Services"); Md. Code Ann., Crim. Law § 4-209(b)(1)(iii) (authorizing counties to regulate guns in public buildings). The County's inclusion of polling places, legislative assembly, and courthouses as places of public assembly where guns are not permitted are a reflection of their State law counterparts. *See* Md. Code Ann., Elec. Law § 16-903(a)(3) (2022) (prohibiting the carry or display of a gun "within 100 feet of a polling site" on election day); Md. Code Ann., State Gov't § 2-1702 (2021) (a person may not willfully bring a firearm into a building where the "Senate or House has a chamber; a member, officer, or employee of the General Assembly has an official office; or a committee of the General Assembly, the Senate, or the House has an office"); COMAR § 04.05.01.03; COMAR § 04.05.01.01 (an individual may not carry "open or concealed firearms" in "State public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the State Department of General Services").

Another example of a similarity between County's law and the State's firearms ban exists with respect to the constitutional right to public assembly. The State prohibits firearms at a demonstration in a public place after advised by law enforcement to leave the area because a demonstration is occurring. *See* Md. Code Ann., Crim. Law § 4-208(b)(2) (2021). While the County's law does not include the requirement of interaction with a law enforcement officer, the

State's prohibition of a weapon in a "demonstration in a public place" aligns with the County's prohibition against bearing arms around those assembled to exercise their constitutional rights.

Finally, the State similarly prohibits weapons in areas that are for recreational use or are used for convention-type events. *See* COMAR §§ 14.25.02.06, 14.25.01.01(B)(2) (prohibiting weapons at Oriole Park at Camden Yard and Ravens Stadium, and at offices, restaurants, stores, museums, parking facilities, and other facilities located on the Camden Yards Sports Complex); COMAR §§ 11.05.05.08(C); 11.05.05.02(B)(16) (prohibiting possession or carrying, either openly or concealed, of any weapon on Baltimore World Trade Center property, except for official purposes and by authorized personnel); COMAR § 34.04.08.04 (prohibiting a person other than an authorized law enforcement officer from possessing a weapon at a State museum). The County's inclusion of recreational or convention facilities as places of public assembly where weapons may not be carried is comparable to these State restrictions.

Enjoining the County's prohibitions against carrying in places of public assembly will not preserve or alter Plaintiffs' status quo as to the foregoing analogous locations and activities where the State bans weapons. And as noted, many of the County's defined places of public assembly are in fact identical to State prohibitions. As law-abiding citizens with State-issued carry permits, Plaintiffs were apparently able to comply with the same or similar State carry prohibitions to date without suffering irreparable harm.[15] Plaintiffs' attestations of irreparable harm due to the County's gun ban at similar locations and activities in the County, even with a State permit, ring hollow.

---

[15] *See*, *e.g.*, https://www.marylandshallissue.org/jmain/information/md-carry-permits#f (listing "Places and Times In Which Firearms Can Not Be Legally Carried by a Permit Holder").

3.     **The Balance of the Equities and the Public Interest Weigh in Favor of Denying Plaintiffs' Request for an Injunction.**

When a temporary restraining order is sought against the government, "the government's interest is the public's interest," and the third and fourth elements necessary for an injunction – the balance of the equities and the public interest – merge. *See Ass'n of Cmty. Cancer Cntrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (citing *Pursuing America's Greatess v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) and *Nken v. Holder*, 556 U.S. 518, 435 (2009)).

As an initial matter, courts historically recognize that public safety – albeit in a means-end scrutiny context – is a compelling governmental interest. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 750 (1987) ("the Government's general interest in preventing crime is compelling"; *Schall v. Martin*, 467 U.S. 253, 264, 104 S. Ct. 2403, 2410 (1984) ("[t]he legitimate and compelling state interest in protecting the community from crime cannot be doubted" (quotation omitted)).

Staying enforcement of Bill 21-22E will undermine the strong interest that the public has in preventing gun violence in areas where people, especially vulnerable populations, congregate. According to the Centers for Disease Control, in 2020, 45,222 people died from gun-related injuries in the United States – the most in any year recorded. *See* Montgomery County, Maryland, Office of Legislative Oversight, Memorandum Report 2022-13, Firearms: Availability, Data, and Legal Authority in Montgomery County, MD (November 1, 2022) (Ex. 2 at 20). Gun deaths are now the leading cause of death for children, teens, and young adults in the United States of America. *See Bruen* at 2165.

The County is not immune from this scourge of gun violence. As of July 2022, nonfatal shootings were up 75 percent and noncontact shootings increased 29 percent compared to the same time period in 2021. *See* Dan Morse, *Gun violence rises sharply in Montgomery County, police*

*chief says*, The Washington Post, July 11, 2022,   https://www.washingtonpost.com/dc-md-va/2022/07/11/montgomery-county-gun-violence-double/ (Ex. 5). The number of guns, except for personally manufactured firearms (PMFs) (or "ghost guns"), confiscated by the Police increased 51% in 2021. *See* Exhibit 2 at 13. In 2022, the Police confiscated 22% more ghost guns than the prior year. *See id.* One such confiscated ghost gun was used in January 2022 by a 17-year old student to shoot another 15-year old student in the restroom of a County high school in the middle of the school day. *See* Darcy Spencer, *Maryland Teenager Sentenced to 18 Years for Shooting Student at Magruder High,* NBCwashington.com, December 22, 2022, https://www.nbcwashington.com/news/local/maryland-teenager-sentenced-to-18-years-for-shooting-student-at-magruder-high/3239939/.

Plaintiffs assert that by virtue of residing next to an unspecified County park, they risk a violation of the law as soon as they leave their property. Similarly, Plaintiffs argue that the buffer zones and number of places of public assembly make it impossible to traverse the County on major thoroughfares without being in violation of the law. These are not reasonable constructions of the law. *See Davis v. State,* 295 Md. 370, 377-78 (1982) (courts must construe statutes reasonably; a construction giving rise to a doubt about its constitutionally should be avoided). Law enforcement officers are not routinely parked at the edges of County parks hoping to ensnare lawful gun owners as they leave their adjacent property, nor can they constitutionally pull vehicles over on the road in the absence of probable cause.

Plaintiffs make much of the *in terrorem* effect upon them of the County's law when exercising their Second Amendment right to carry *in public*, away from their homes where their right to self-defense is most acute. At some point, Plaintiffs' fear is outweighed by the fear the non-permit holding public may have that a stranger standing next to them – of unknown current

mental state or temperament – is carrying a loaded firearm as they exercise their First Amendment right to assemble in a place of public assembly.[16] *See, e.g.*, *State v. Spencer*, 75 Wash. App. 118, 124, 876 P.2d 939, 942 (1994) (observing "[p]eople have a strong interest in being able to use public areas without fearing for their lives"). Given the recent torrent of mass shootings in the U.S., any person would feel trepidation knowing an individual, who is not a law enforcement officer, brought lethal force to any of the County's defined places of public assembly. *See, e.g., Bruen* at 2165 (Breyer, J., dissenting) (observing that "[s]ince the start of this year alone (2022), there have already been 277 reported mass shootings—an average of more than one per day"). And any assertion that the public should feel safer knowing a law-abiding, licensed firearm carrier is standing beside them and could stop a mass shooting is simply not statistically accurate. *See* Larry Buchanan and Laura Leatherby, *Who Stops a 'Bad Guy With a Gun'?*, The New York Times, June 22, 2022, https://www.nytimes.com/interactive/2022/06/22/us/shootings-police-response-uvalde-buffalo.html?searchResultPosition=1, attached hereto as Exhibit 6 (stating that out of 433 active shooting attacks, 22 were stopped by armed bystanders shooting attackers, and 10 of armed bystanders were security guards or an off-duty police officer).

    The balance of the equities and the public interest weigh in favor of the County, which again, enacted this law neither to flout the Second Amendment nor *Bruen*, but rather, to combat the rise of gun violence, and to protect the rights of the public to exercise their constitutional rights in public without fear of being shot.

---

[16] *See* Pls. Memo. (ECF No. 54-1) at 15 (quoting the County Council President "on the right of me and my family to go to a movie theater without having to wonder or worry about someone sitting next to me is carrying a gun on them").

## VI.    CONCLUSION

This Court should deny Plaintiffs' request for injunctive relief: Plaintiffs lack standing, and every place of public assembly defined in the County's law has either an exact historical match or similar historical analogue that prohibited firearms. The County's law is constitutional under the historical analysis required by *Bruen*. Moreover, the County's law is authorized by the State and is similar or analogous to many similar gun restrictions in effect at the State level. The County's law reflects the very strong public interest in stemming the surge of gun violence in the County.

Plaintiffs will not likely succeed on the merits, have not shown irreparable harm, and the public interest and equities lie in enforcing the County's law. Defendant respectfully requests that this Court deny Plaintiffs' request for a Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

JOHN P. MARKOVS
COUNTY ATTORNEY

_____/s/_____
Edward B. Lattner, Chief
Division of Government Operations
edward.lattner@montgomerycountymd.gov
Bar No. 03871

_____/s/_____
Erin J. Ashbarry
Associate County Attorney
erin.ashbarry@montgomerycountymd.gov
Bar No. 26298

_____/s/_____
Matthew H. Johnson
Associate County Attorney
matthew.johnson3@montgomerycountymd.gov
Bar No. 17678

Attorneys for Defendant Montgomery County,
Maryland

101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax