

**Committee:** PS
**Committee Review:** Completed
**Staff:** Christine Wellons, Senior Legislative Attorney
**Purpose:** Final action – vote expected
**Keywords:** #FirearmsInPublicPlaces

Montgomery
County Council

AGENDA ITEM #4B
November 15, 2022
**Action**

---

**SUBJECT**

Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly

Lead Sponsors: Council President Albornoz

Co-Sponsors: Councilmembers Hucker, Friedson, Navarro, Jawando, Riemer, and Katz; Council Vice-President Glass; and Councilmember Rice

**EXPECTED ATTENDEES**

N/A

**COUNCIL DECISION POINTS & COMMITTEE RECOMMENDATION**

- Action – Council vote expected
- The Public Safety Committee (3-0) recommends enactment of Bill 21-22 as amended.

**DESCRIPTION/ISSUE**

Expedited Bill 21-22 would:
- (1) prohibit the possession of firearms in or near places of public assembly, with certain exemptions;
- (2) remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly: and
- (3) generally amend the law regarding restrictions against firearms in the County.

**SUMMARY OF KEY DISCUSSION POINTS**

The PS Committee recommends the enactment of Expedited Bill 21-22 with amendments to:

- clarify the definition of "place of public assembly" in light of recent Supreme Court jurisprudence;
- update provisions regarding ghost guns due to changes in Maryland law; and
- expressly add a severability clause to Chapter 57 of the County Code.

**This report contains:**

| | |
|---|---|
| Staff Report | Pages 1-8 |
| Expedited Bill 21-22 | © 1 |
| Legislative Request Report | © 7 |
| Fiscal Impact Statement | © 8 |
| Racial Equity and Social Justice Impact Statement | © 10 |
| Economic Impact Statement | © 16 |
| Public Testimony | © 18 |

**EXHIBIT**
**2**

*Bruen* Decision                                                      © 84

---

**Alternative format requests for people with disabilities.** If you need assistance accessing this report you may <u>submit alternative format requests</u> to the ADA Compliance Manager. The ADA Compliance Manager can also be reached at 240-777-6197 (TTY 240-777-6196) or at <u>adacompliance@montgomerycountymd.gov</u>

Agenda Item #4B
November 15, 2022
**Action**

# M E M O R A N D U M

November 10, 2022

TO:             County Council

FROM:        Christine Wellons, Senior Legislative Attorney

SUBJECT:   Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly

PURPOSE:   Final action – roll call vote expected

| Committee recommendation (3-0): approval of Bill 21-22 with amendments |
|---|

Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly, sponsored by Lead Sponsor Council President Albornoz and Co-Sponsored by Councilmembers Hucker, Friedson, Navarro, Jawando, Riemer, Katz, Council Vice-President Glass and Councilmember Rice, was introduced on July 12, 2022. A Public Hearing occurred on July 26, 2022 and a Public Safety Committee worksession was held on October 31, 2022. Final action is scheduled for November 15, 2022.

Expedited Bill 21-22 would:

(1)      prohibit the possession of firearms in or near places of public assembly, with certain exemptions;

(2)      remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly: and

(3)      generally amend the law regarding restrictions against firearms in the County.

**BACKGROUND**

In the Supreme Court decision of *New York State Rifle & Pistol Assn. v. Bruen, Superintendent of New York State Police,* Slip Opinion No. 20-843 (June 23, 2022), available at https://www.supremecourt.gov/opinions/21pdf/20-843_7j80.pdf, the Supreme Court overturned a requirement of New York's handgun carry law. The New York law had required an applicant for a handgun carry license to show "proper cause" for the license, and the Supreme Court held that the requirement violated the Second Amendment's right to bear arms. The Court explained, however, that "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutionally permissible.

Like New York, Maryland has a proper-cause requirement for wear-and-carry handgun licenses. *See* Md. Code Ann., Public Safety Section 5-306. Governor Hogan, in response to *Bruen*, instructed the Maryland State Police not to enforce the proper-cause element of the Maryland law. https://governor.maryland.gov/2022/07/05/governor-hogan-directs-maryland-state-police-to-suspend-good-and-substantial-reason-standard-for-wear-and-carry-permits/. Subsequently, the Court of Special Appeals struck down Maryland's proper cause requirement in late July. *In re Rounds*, 255 Md. App. 205 (2022).

As a result of the Supreme Court eliminating "just cause" requirements, more individuals in Maryland likely will carry firearms, regardless of whether the individuals have any good or substantial reason to carry them.

### BILL SPECIFICS

Expedited Bill 21-22 would **prevent an individual from possessing a firearm within 100 yards of a place of public assembly even when the individual has a wear-and-carry permit from the State of Maryland**. This restriction would strengthen current County law, which exempts individuals with permits from the restriction against carrying weapons within 100 yards of places of public assembly.

### LEGAL FRAMEWORK

Maryland law specifically allows counties to regulate the possession of certain firearms within 100 yards of a place of public assembly. Under the Criminal Law Article of the Maryland Code, § 4-209:

**State preemption**

(a) Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of:

(1) a handgun, rifle, or shotgun; and

(2) ammunition for and components of a handgun, rifle, or shotgun.

**Exceptions**

(b)(1) A county, municipal corporation, or special taxing district **may regulate the purchase, sale, transfer, ownership, possession, and transportation** of the items listed in subsection (a) of this section:

(i) with respect to minors;

(ii) with respect to law enforcement officials of the subdivision; and

(iii) except as provided in paragraph (2) of this subsection, **within 100 yards of or in a park, church, school, public building, and other place of public assembly**.

(2) A county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety, or other educational or sporting use of the items listed in subsection (a) of this section.

(Emphasis added).

There are many instances in which the State limits a person's ability to carry a weapon, regardless of whether the person has a permit. *See* the Maryland State Police website, https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Firearms/WearandCarryPermit.aspx, which lists numerous state areas, such as State parks and State buildings, where a concealed carry permit does not apply. Currently, the State law prevents permit carriers from possessing firearms at specific locations including school property, state buildings (not County buildings), state parks, the General Assembly, aircraft, Maryland Rest Areas, and certain daycares. *See id.*

Notably, these restricted areas identified by the State Police do not include certain areas within the County's broader definition of "place of public assembly" – which was amended under Bill 4-21 bill to mean "a place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as a fairgrounds or conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building."

### SUMMARY OF PUBLIC HEARING

On July 26, 2022, the Council heard extensive testimony regarding Expedited Bill 21-22. (©15). Many speakers supported the bill as necessary for public safety. Many speakers opposed the bill based upon Second Amendment and safety concerns.

### SUMMARY OF PUBLIC SAFETY WORKSESSION

The Committee discussed the following issues, and adopted the following amendments.

**1.   Supreme Court Approach to Identifying "Sensitive Places" – *i.e.*, places where Guns may be Banned**

Prior to *Bruen*, the judicial test to review firearms regulations consisted of two parts: (1) whether a gun regulation was consistent with Constitutional text and history; and (2) whether the regulation satisfied a means-ends balancing test (consisting of strict or intermediate scrutiny). Under *Bruen*, the Court has shifted so that only the first part of the test now matters; if the court concludes that a regulation is not consistent with the Constitutional text and history, it is invalid. It can no longer be resuscitated by a balancing test.

In *Bruen*, the Supreme Court explicitly rejected New York's identification of "sensitive places" where firearms may be banned, even for individuals who have wear-and-carry permits:

> Although we have no occasion to comprehensively define "sensitive places" in this case, ***we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive***

> ***places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available."*** Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. ***But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly.*** Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate ***the general right to publicly carry arms for self-defense*** ….
>
> Slip opinion at 21 (emphasis added).

The Court went on to identify five locations – schools, legislative assemblies, government buildings, polling places, and courthouses – it considers to be "sensitive places" where weapons may be totally prohibited.  The Court left open the possibility that other locations where weapons were historically banned – or the modern counterparts of those locations – might qualify as "sensitive places."

> ….***[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster***.
>
> Consider, for example, Heller's discussion of ***"longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings***." 554 U. S., at 626.  Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—***e.g., legislative assemblies, polling places, and courthouses***—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); see also Brief for Independent Institute as Amicus Curiae 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. ***And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible***.
>
> Slip opinion at 21 (emphasis added).

**2.**     **Amendments to the Definition of "Place of Public Assembly"**

The County currently defines a "place of public assembly" as follows:

> Place of public assembly: A "place of public assembly" is a place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health

4

center; long-term facility; or multipurpose exhibition facility, such as a fairgrounds or conference center.  A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building. (Sec. 57-1).

In order to make this definition more closely aligned with *Bruen*'s approach to "sensitive places" (as discussed above) – and in order to include places that *Bruen* has specifically said do qualify as "sensitive places" – the Committee voted to adopt the following amendment.

*After line 1, add the following.*

## 57-1. Definitions



Place of public assembly: A "place of public assembly" is:

(1)     a **[**place where the public may assemble, whether the place is**]** publicly or privately owned:**[**, including a**]**

   (A)     park;

   (B)     place of worship;

   (C)     school;

   (D)     library;

   (E)     recreational facility;

   (F)     hospital;

   (G)     community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;

   (H)     long-term facility, including any licensed nursing home, group home, or care home; **[**or**]**

   (I)     multipurpose exhibition facility, such as a fairgrounds or conference center; or

   (J)     childcare facility;

(2)     government building, including any place owned by or under the control of the County;

(3)     polling place;

(4)     courthouse;

(5)     legislative assembly; or

(6)     a gathering of individuals to collectively express their constitutional right to protest or assemble.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

\*       \*       \*

### 3.     Severability Clause

Given the fluctuating jurisprudence regarding the Second Amendment, the Committee voted to add a "severability clause" to the bill.  The purpose of the severability clause is to explicitly reflect the Council's intent that if any portion of the bill is found to be invalid, the remainder of the bill must remain in effect.  This is important so that if a court were to strike down portions of the County's law against carrying firearms in "places of public assembly", the remainder of the law would be enforceable.

*After line 31, insert the following.*

**Sec. 3. Severability.**  If any provision of this Act, or any provision of Chapter 57, is found to be invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect.

### 4.     Alignment with Maryland Law

After the adoption of Council Bill 4-21 (Ghost Guns), the General Assembly adopted ghost gun legislation requested by Attorney General Frosh (Chapter 1 of the 2022 Laws of Maryland).

In order to align County ghost gun definitions with those of the new state law – and in order to acknowledge that the ghost gun laws must be interpreted in accordance with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives – the Committee adopted the following amendments.

*After line 1, add the following.*

### 57-1. Definitions

\*       \*       \*

*Gun* or *firearm:* Any rifle, shotgun, revolver, pistol, ghost gun, undetectable gun, air gun, air rifle or any similar mechanism by whatever name known which is designed to expel a projectile through a gun barrel by the action of any explosive, gas, compressed air, spring or elastic.

\*       \*       \*

(2)     "Ghost gun" means a firearm, including an unfinished frame or receiver, that:

6

(A)   lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer [under] in accordance with federal law; and

(B)   lacks markings and is not registered with the Secretary of the State Police in accordance with [27 C.F.R. § 479.102] Section 5-703(b)(2)(ii) of the Public Safety Article of the Maryland Code.

[It] "Ghost gun" does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968.

\*       \*       \*

(8)   "Undetectable gun" means:

\*       \*       \*

(9)   "Unfinished frame or receiver" means a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm.

*Add the following uncodified section to Bill 21-22.*

**Sec. 4.** This Act and Chapter 57 must be construed in a manner that is consistent with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives, including 87 FR 24652 (effective August 24, 2022), as amended.

**5.** **Technical Correction**

The Committee voted to adopt the following technical amendment to correct a typographical error in Section 57-7(d).

**57-7. Access to guns by minors.**

\*       \*       \*

(d)   A person must not purchase, sell, transfer, possess, or [transfer] transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

\*       \*       \*

**NEXT STEP:** Roll call vote on whether to enact Expedited Bill 21-22 with amendments, as recommended by the Public Safety Committee.

| This packet contains: | Circle # |
|---|---|
| Expedited Bill 21-22 | 1 |
| Legislative Request Report | 7 |
| Fiscal Impact Statement | 8 |

Racial Equity and Social Justice Impact Statement                10
Economic Impact Statement                                         16
Public Testimony                                                  18
*Bruen* Decision                                                  84

Expedited Bill No.  21-22
Concerning: Weapons – Firearms In or Near Places of Public Assembly
Revised:   11/10/2022      Draft No.  2
Introduced:      July 12, 2022
Expires:            January 12, 2024
Enacted:
Executive:
Effective:
Sunset Date:   None
Ch. _____, Laws of Mont. Co.

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

---

Lead Sponsor: Council President Albornoz
Co-Sponsors: Councilmembers Hucker, Friedson, Jawando, Riemer, and Katz; Council Vice-President Glass; and Councilmember Rice

---

**AN EXPEDITED ACT** to:

(1)     prohibit the possession of firearms in or near places of public assembly, with certain exemptions;

(2)     remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly; and

(3)     generally amend the law regarding restrictions against firearms in the County.

By amending
   Montgomery County Code
   Chapter 57, Weapons
   [[Section]] Sections 57-1, 57-7, and 57-11

---

| | |
|---|---|
| **Boldface** | *Heading or defined term.* |
| Underlining | *Added to existing law by original bill.* |
| [Single boldface brackets] | *Deleted from existing law by original bill.* |
| Double underlining | *Added by amendment.* |
| [[Double boldface brackets]] | *Deleted from existing law or the bill by amendment.* |
| * * * | *Existing law unaffected by bill.* |

*The County Council for Montgomery County, Maryland approves the following Act:*

(1)

1    **Sec. 1.  [[Section]] <u>Sections 57-1, 57-7, and</u> 57-11 [[is]] <u>are</u> amended as**

2    **follows:**

3    **57-1. Definitions.**

4                                            *        *        *

5           *Gun* or *firearm:* Any rifle, shotgun, revolver, pistol, ghost gun,

6           undetectable gun, air gun, air rifle or any similar mechanism by

7           whatever name known which is designed to expel a projectile through a

8           gun barrel by the action of any explosive, gas, compressed air, spring or

9           elastic.

10                                           *        *        *

11          (2)      "Ghost gun" means a firearm, including an unfinished frame or

12                   receiver, that<u>:</u>

13                   <u>(A)</u>    lacks a unique serial number engraved or cased in metal

14                           alloy on the frame or receiver by a licensed manufacturer,

15                           maker or importer **[[under]]** <u>in accordance with</u> federal

16                           law<u>; and</u>

17                   <u>(B)</u>    <u>lacks</u> markings <u>and is not registered with the Secretary of</u>

18                           <u>the State Police</u> in accordance with **[[27 C.F.R. § 479.102]]**

19                           <u>Section 5-703(b)(2)(ii) of the Public Safety Article of the</u>

20                           <u>Maryland Code</u>.

21                   **[[It]]** <u>"Ghost gun"</u> does not include a firearm that has been

22                   rendered permanently inoperable, or a firearm that is not required

23                   to have a serial number in accordance with the Federal Gun

24                   Control Act of 1968.

25                                           *        *        *

26          (8)      "Undetectable gun" means:

(2)

27                       \*     \*     \*

28     (9)    "Unfinished frame or receiver" means a forged, cast, printed,

29            extruded, or machined body or similar article that has reached a

30            stage in manufacture where it may readily be completed,

31            assembled, or converted to be used as the frame or receiver of a

32            functional firearm.

33

34                       \*     \*     \*

35   Place of public assembly: A "place of public assembly" is:

36     (1)    a **[[place where the public may assemble, whether the place is]]**

37            publicly or privately owned:**[[, including a]]**

38         (A)    park;

39         (B)    place of worship;

40         (C)    school;

41         (D)    library;

42         (E)    recreational facility;

43         (F)    hospital;

44         (G)    community health center, including any health care facility

45                 or community-based program licensed by the Maryland

46                 Department of Health;

47         (H)    long-term facility, including any licensed nursing home,

48                 group home, or care home; **[[or]]**

49         (I)    multipurpose exhibition facility, such as a fairgrounds or

50                 conference center; or

51         (J)    childcare facility;

(3)

| 52 | | (2) | government building, including any place owned by or under the |
| 53 | | | control of the County; |
| 54 | | (3) | polling place; |
| 55 | | (4) | courthouse; |
| 56 | | (5) | legislative assembly; or |
| 57 | | (6) | a gathering of individuals to collectively express their |
| 58 | | | constitutional right to protest or assemble. |

59      A "place of public assembly" includes all property associated with the
60      place, such as a parking lot or grounds of a building.

61               \*     \*     \*

62 **57-7. Access to guns by minors.**

63               \*     \*     \*

64   (d)      A person must not purchase, sell, transfer, possess, or [[transfer]]
65           transport a ghost gun, including a gun created through a 3D printing
66           process, in the presence of a minor.

67               \*     \*     \*

68 **57-11.  Firearms in or near places of public assembly.**

69   (a)      In or within 100 yards of a place of public assembly, a person must not:

| 70 | | (1) | sell, transfer, possess, or transport a ghost gun, undetectable gun, |
| 71 | | | handgun, rifle, or shotgun, or ammunition or major component |
| 72 | | | for these firearms; or |
| 73 | | (2) | sell, transfer, possess, or transport a firearm created through a 3D |
| 74 | | | printing process. |

75   (b)      This section does not:

| 76 | | (1) | prohibit the teaching of firearms safety or other educational or |
| 77 | | | sporting use in the areas described in subsection (a); |

78    (2) apply to a law enforcement officer, or a security guard licensed to
79      carry the firearm;

80    (3) apply to the possession of a firearm or ammunition, other than a
81      ghost gun or an undetectable gun, in the person's own home;

82    (4) apply to the possession of one firearm, and ammunition for the
83      firearm, at a business by either the owner who has a permit to
84      carry the firearm, or one authorized employee of the business
85      who has a permit to carry the firearm; or

86    (5) [apply to the possession of a handgun by a person who has
87      received a permit to carry the handgun under State law; or]

88    [(6)] apply to separate ammunition or an unloaded firearm:

89     (A) transported in an enclosed case or in a locked firearms rack
90      on a motor vehicle, unless the firearm is a ghost gun or an
91      undetectable gun; or

92     (B) being surrendered in connection with a gun turn-in or
93      similar program approved by a law enforcement agency.

94      *  *  *

95  **Sec. 2.  Expedited Effective Date.**  The Council declares that this legislation
96 is necessary for the immediate protection of the public interest.  This Act takes effect
97 on the date on which it becomes law.

98  **Sec. 3. Severability.**  If any provision of this Act, or any provision of Chapter
99 57, is found to be invalid by the final judgment of a court of competent jurisdiction,
100 the remaining provisions must be deemed severable and must continue in full force
101 and effect.

- 5 -

(5)

102       **Sec. 4.** This Act and Chapter 57 must be construed in a manner that is

103 consistent with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and

104 Explosives, including 87 FR 24652 (effective August 24, 2022), as amended.

# LEGISLATIVE REQUEST REPORT

Bill 21-22
*Weapons – Firearms in or Near Places of Public Assembly*

**DESCRIPTION:** The bill would prohibit the possession of firearms in or near areas of public assembly and remove an exemption that currently allows individuals with certain handgun permits to possess weapons within 100 yards of a place of public assembly.

**PROBLEM:** Gun violence.

**GOALS AND OBJECTIVES:** Protect the possession of certain areas within sensitive areas, e.,g., in or near places of public assembly.

**COORDINATION:** Montgomery County Police Department

**FISCAL IMPACT:** Office of Management and Budget

**ECONOMIC IMPACT:** Office of Legislative Oversight

**RACIAL EQUITY AND SOCIAL JUSTICE IMPACT:** Office of Legislative Oversight

**EVALUATION:** To be done.

**EXPERIENCE ELSEWHERE:** State of Maryland

**SOURCE OF INFORMATION:** Christine Wellons, Senior Legislative Attorney

**APPLICATION WITHIN MUNICIPALITIES:** Yes

**PENALTIES:** N/A

(7)

**Fiscal Impact Statement**
**Bill 21-22 – Weapons – Firearms In or Near Places of Public Assembly**

1. **Legislative Summary**

   Bill 21-22 would prohibit the possession of firearms in or near places of public assembly, remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly, and amend the law regarding restrictions against firearms in the County.

2. **An estimate of changes in County revenues and expenditures regardless of whether the revenues or expenditures are assumed in the recommended or approved budget. Includes source of information, assumptions, and methodologies used.**

   The Bill's impact on County expenditures is expected to be nominal.  Changes in the number of calls for service are expected to be small and can be absorbed within the Montgomery County Police Department's current staff complement.  There is no anticipated impact on County revenues.

3. **Revenue and expenditure estimates covering at least the next 6 fiscal years.**

   As stated in the response to question #2, the Bill's impact on County expenditures is expected to be nominal, and there is no anticipated impact on County revenues.

4. **An Actuarial analysis through the entire amortization period for each bill that would affect retiree pension or group insurance costs.**

   Not applicable.

5. **An estimate of expenditures related to County's information technology (IT) systems, including Enterprise Resource Planning (ERP) systems.**

   There is no anticipated impact on County information technology systems.

6. **Later actions that may affect future revenue and expenditures if the bill authorizes future spending.**

   Bill 21-22 does not authorize future spending.

7. **An estimate of the staff time needed to implement the bill.**

   Staff time required to administer the Bill is expected to be minimal. Officer training will be accomplished through an informational bulletin.

8. **An explanation of how the addition of new staff responsibilities would affect other duties.**

   No new staff would be required.

(8)

9. **An estimate of costs when an additional appropriation is needed.**

   Not applicable.

10. **A description of any variable that could affect revenue and cost estimates.**

    Not applicable.

11. **Ranges of revenue or expenditures that are uncertain or difficult to project.**

    The number of additional calls that the Emergency Communications Center (ECC) may receive in a calendar year due to this Bill is difficult to quantify, but is expected to be minimal. The Department will reevaluate after one year.

12. **If a bill is likely to have no fiscal impact, why that is the case.**

    See response to question #2.

13. **Other fiscal impacts or comments.**

    Not applicable.

14. **The following contributed to and concurred with this analysis:**

    Darren Francke, Assistant Chief of Police, Management Services Bureau
    Dale Phillips, Director, Management and Budget Division
    Karla Thomas, Manager, Management and Budget Division
    Derrick Harrigan, Office of Management and Budget

    _____                    8/22/22
    Jennifer R. Bryant, Director                          Date
    Office of Management and Budget

# Racial Equity and Social Justice (RESJ) Impact Statement

## Office of Legislative Oversight

| | |
|---|---|
| **EXPEDITED BILL 21-22:** | **WEAPONS – FIREARMS IN OR NEAR PLACES OF PUBLIC ASSEMBLY** |

## SUMMARY

The Office of Legislative Oversight (OLO) finds the racial equity and social justice (RESJ) impact of Expedited Bill 21-22 is indeterminant due to insufficient information on the demographics of the Bill's beneficiaries, as well as on the potential effects on gun violence and police interactions in the County.

## PURPOSE OF RESJ IMPACT STATEMENT

The purpose of RESJ impact statements is to evaluate the anticipated impact of legislation on racial equity and social justice in the County. Racial equity and social justice refer to a **process** that focuses on centering the needs, leadership, and power of communities of color and low-income communities with a **goal** of eliminating racial and social inequities.[1] Achieving racial equity and social justice usually requires seeing, thinking, and working differently to address the racial and social harms that have caused racial and social inequities.[2]

## PURPOSE OF EXPEDITED BILL 21-22

Gun violence is a significant public health problem in the United States. In 2020, there were 45,222 gun-related deaths, 54 percent of which were suicides and 43 percent of which were homicides.[3] Gun homicides have recently been highlighted as a rapidly growing concern, potentially a result of distress during the pandemic.[4] In 2020, 79 percent of homicides involved a firearm, the highest percentage recorded in over 50 years.[5] Further, the firearm homicide rate jumped 35 percent in 2020, an increase deemed as historic by the Centers for Disease Control and Prevention (CDC).[6] The U.S. also stands out internationally when it comes to gun homicides. Among high-income countries with populations of 10 million or more, the U.S. ranks first in gun homicides, having a rate more than double the next country on the list, Chile, and 22 times greater than in the European Union as a whole.[7]

Following the Supreme Court decision on *New York State Rifle & Pistol Assn. v. Bruen, Superintendent of New York State Police*, Governor Larry Hogan ordered Maryland State Police to suspend the 'good and substantial reason' standard in reviewing applications for wear-and-carry permits.[8] Recent reports have noted a sharp increase in new permit applications in Maryland following the governor's orders.[9]

The goal of Expedited Bill 21-22 is to "prevent an individual from possessing a firearm within 100 yards of a place of public assembly even when the individual has a wear-and-carry permit from the State of Maryland."[10] The Bill achieves this goal through removing an exemption in County law that currently allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly.

# RESJ Impact Statement
## Expedited Bill 21-22

State law currently prohibits permit carriers from possessing firearms at specific locations, including school property, state buildings, and state parks, among other locations. Bill 21-22 broadens the restricted areas established by the state to include places of public assembly as defined by County law, which includes parks, places of worship, schools, libraries, recreational facilities, hospitals, community health centers, long-term facilities, or multipurpose exhibition facilities, such as fairgrounds or conference centers. A place of public assembly can be publicly or privately owned, and includes all property associated with the place, such as a parking lot or grounds of a building.[11]

Expedited Bill 21-22 was introduced to the Council on July 12, 2022.

In February 2021, OLO published a RESJ impact statement (RESJIS) for Bill 4-21, Weapons – Protection of Minors and Public Places – Restrictions Against Ghost Guns and Undetectable Guns.[12] OLO builds on Bill 4-21's analysis for this RESJIS.

## GUN VIOLENCE AND RACIAL EQUITY

Black, Indigenous, and Other People of Color (BIPOC), have long experienced significant disparities in gun violence. Regarding the recent sharp increase in gun homicides, researchers at the CDC stated:

> "The firearm homicide rate in 2020 was the highest recorded since 1994 (1). However, the increase in firearm homicides was not equally distributed. Young persons, males, and Black persons consistently have the highest firearm homicide rates, and these groups experienced the largest increases in 2020. These increases represent the widening of long-standing disparities in firearm homicide rates. For example, the firearm homicide rate among Black males aged 10–24 years was 20.6 times as high as the rate among White males of the same age in 2019, and this ratio increased to 21.6 in 2020."[13]

While some attribute violence in BIPOC communities to individual behaviors and choices, these explanations often ignore the central role government has played in driving segregation and concentrated poverty, common conditions in communities stricken with violence. The following section provides an overview of studies that explore the relationship between violence, segregation, and concentrated poverty, with the intent of demonstrating that racial and ethnic disparities in gun violence are neither natural nor random. Please see the RESJIS for Expedited Bill 30-21 , Landlord-Tenant Relations – Restrictions During Emergencies – Extended Limitations Against Rent Increases and Late Fees, for detailed background on the government's role in fostering segregation and the racial wealth divide.[14]

**Drivers of Gun Violence.** Multiple studies have pointed to residential segregation and concentrated poverty as strong predictors of violence, and more specifically gun violence, in communities, for instance:

- A study of 103 metropolitan areas over five decades found that "(1) racial segregation substantially increases the risk of homicide victimization for blacks while (2) simultaneously decreasing the risk of white homicide victimization. The result…is that (3) segregation plays a central role in driving black-white differences in homicide mortality."[15]

- A study of over 65,000 firearm-related deaths among U.S. youth ages 5 to 24 between 2007 and 2016 found that "higher concentration of county-level poverty was associated with increased rates of total firearm-related deaths." Moreover, "two-thirds of firearm-related homicides could be associated with living in a county with a high concentration of poverty."[16]

# RESJ Impact Statement
## Expedited Bill 21-22

- A study of U.S. gun violence data between 2014 and 2017 found that "gun violence is higher in counties with both high median incomes and higher levels of poverty." The researchers went on to state that the "findings may well be due to racial segregation and concentrated disadvantage, due to institutional racism, police-community relations, and related factors."[17]

- A study of shootings in Syracuse, New York between 2009 and 2015 found that "higher rates of segregation, poverty and the summer months were all associated with increased risk of gun violence."[18]

- A study of gunshot victims (GSVs) in Louisville, KY between 2012 and 2018 found that "[r]elative to green-graded neighborhoods, red-graded [redlined] neighborhoods had five times as many GSVs. This difference remained statistically significant after accounting for differences in demographic, racial, and housing characteristics of neighborhoods."[19]

- A study of 13 U.S. cities between 2018 and 2020 found that in 2020, "violence was higher in less-privileged neighborhoods than in the most privileged," where less-privileged neighborhoods demonstrated a higher degree of racial, economic, and racialized economic segregation.[20]

**Consequences of Gun Violence.** Gun violence has harmful effects that reverberate deeply in families and communities. As Dr. Thomas R. Simon, CDC Associate Director for Science, Division of Violence Prevention, stated to Vox "[p]art of the reason why violence is a public health problem is because of the significant and lasting health consequences for victims." The 2022 Vox article provides an overview of research on the toll of gun violence, including the following findings:[21]

- Survivors of gun violence are at an increased risk of chronic pain, psychiatric disorders, and substance abuse and are more likely to experience mental health challenges.

- More than 15,000 American children lose a parent to gun violence each year. Children who lose a parent (for any reason, including gun violence) are more likely to have lower educational attainment, which could lead to poorer health given the strong link between education and health outcomes.

- Even if a person has not directly lost a loved one to a gun incident, being exposed to gun violence in a community leads to mental health issues, including problems with social function, anxiety, and depression.

- A 2018 study of six American cities found that individual shootings cost between $583,000 and $2.5 million, depending on the city and whether the firearm injury was fatal or nonfatal.

**Data on Gun Violence.** National data in Table 1 demonstrates racial and ethnic disparities in gun homicides, whereby Black Americans had a firearm homicide rate eleven times that of White Americans in 2020. Latinx and Native Americans respectively had firearm homicide rates two and three times greater than Whites, while Asian/Pacific Islanders had a lower firearm homicide rate than Whites.

Case 8:31-cv-04736-SAG   Document 59-6   Filed 12/30/22   Page 23 of 94

**Table 1: 2020 Firearm Homicide Incidence by Race and Ethnicity, United States**

| Race and Ethnicity[22] | Number of Firearm Homicides | Rate of Firearm Homicides per 100,000 persons |
|---|---|---|
| Asian or Pacific Islander | 227 | 1.0 |
| American Indian or Alaska Native | 221 | 8.1 |
| Black | 11,904 | 26.6 |
| Latinx | 2,946 | 4.5 |
| White | 4,052 | 2.2 |

Note: Rates are age-adjusted
Source: Changes in Firearm Homicide and Suicide Rates Report, CDC

Local data also confirms racial and ethnic disparities in gun violence. A review of 2016-2018 data by Healthy Montgomery, the County's community health improvement initiative, found that Black residents had an age-adjusted firearm hospitalization rate of 8.6 per 100,000 persons, compared to 2.4 for Latinx residents, 1.2 for White residents, and 0.3 for Asian residents.[23]

## ANTICIPATED RESJ IMPACTS

To consider the anticipated impact of Expedited Bill 21-22 on RESJ in the County, OLO recommends the consideration of two related questions:

- Who are the primary beneficiaries of this bill?
- What racial and social inequities could passage of this bill weaken or strengthen?

**For the first question,** the primary beneficiaries of the Bill are presumably residents who frequent places of public assembly, as they could experience increased safety from more gun restrictions in these areas.  However, there is no definitive data on the demographics of people who frequent places of public assembly in the County. As such, OLO cannot conclude whether there are racial or ethnic disparities among the primary beneficiaries of this Bill.

**For the second question,** OLO considers the effect this Bill could have on reducing gun violence in the County given its disproportionate impact on BIPOC residents. While there is strong evidence to suggest that restricting gun access can reduce gun violence,[24] there is little research on the effect of place-based restrictions such as those proposed in this Bill. Further, it is unclear how the enforcement of this law would potentially change police contact with residents, and whether that could worsen existing disparities in police interactions with BIPOC residents.[25]

Taken together, OLO finds that the RESJ impact of this Bill is indeterminant.

## RECOMMENDED AMENDMENTS

The Racial Equity and Social Justice Act requires OLO to consider whether recommended amendments to bills aimed at narrowing racial and social inequities are warranted in developing RESJ impact statements.[26] OLO finds that the RESJ impact of Expedited Bill 21-22 is indeterminant due to insufficient information on the demographics of the Bill's beneficiaries, as well as on the potential effects on gun violence and police interactions in the County. OLO does not offer recommended amendments since the Bill was not found to be inequitable.

In their recently released study on increased gun violence, researchers at the CDC note, "[t]he findings of this study underscore the importance of comprehensive strategies that can stop violence now and in the future by addressing factors that contribute to homicide and suicide, including the underlying economic, physical, and social inequities that drive racial and ethnic disparities in multiple health outcomes."[27] Should the Council seek to improve the RESJ impact of this Bill through incorporating recommended amendments or introducing companion legislation, the policy solutions highlighted by the CDC researchers in the study can be considered.

## CAVEATS

Two caveats to this racial equity and social justice impact statement should be noted.  First, predicting the impact of legislation on racial equity and social justice is a challenging analytical endeavor due to data limitations, uncertainty, and other factors.  Second, this RESJ impact statement is intended to inform the legislative process rather than determine whether the Council should enact legislation. Thus, any conclusion made in this statement does not represent OLO's endorsement of, or objection to, the bill under consideration.

## CONTRIBUTIONS

OLO staffer Janmarie Peña drafted this RESJ impact statement.

---

[1] Definition of racial equity and social justice adopted from "Applying a Racial Equity Lens into Federal Nutrition Programs" by Marlysa Gamblin, et.al. Bread for the World, and from Racial Equity Tools. https://www.racialequitytools.org/glossary

[2] Ibid

[3] John Gramlich, "What the Data Says about Gun Deaths in the U.S.," Pew Research Center, February 3, 2022. https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/

[4] Becky Sullivan and Nell Greenfieldboyce "Firearm-Related Homicide Rate Skyrockets Amid Stresses of the Pandemic, the CDC Says," Research News, NPR, May 10, 2022. https://www.npr.org/2022/05/10/1097916487/firearm-homicide-rates-soar-pandemic-cdc-says

[5] John Gramlich

[6] "Firearm Deaths Grow, Disparities Widen," CDC Newsroom, CDC, May 10, 2022. https://www.cdc.gov/media/releases/2022/s0510-vs-firearm-deathrates.html

[7] "On Gun Violence, the United States is an Outlier," Institute for Health Metrics and Evaluation," May 31, 2022. https://www.healthdata.org/acting-data/gun-violence-united-states-outlier

[8] "Governor Hogan Directs Maryland State Police to Suspend 'Good and Substantial Reason' Standard For Wear and Carry Permits," The Office of Governor Larry Hogan, July 5, 2022. https://governor.maryland.gov/2022/07/05/governor-hogan-directs-maryland-state-police-to-suspend-good-and-substantial-reason-standard-for-wear-and-carry-permits/

[9] Frederick Kunkle, "Supreme Court Ruling Sets Off Rush for Concealed Gun Permits in Maryland," Washington Post, July 18, 2022. https://www.washingtonpost.com/dc-md-va/2022/07/15/concealed-carry-maryland-guns-hogan/

[10] "Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly," Montgomery County, Maryland, July 12, 2022. https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2022/20220712/20220712_10A.pdf

[11] Ibid

[12] Racial Equity and Social Justice Impact Statement for Bill 4-21, Office of Legislative Oversight, Montgomery County, Maryland, February 8, 2021. https://montgomerycountymd.gov/OLO/Resources/Files/resjis/2021/RESJIS-Bill4-21.pdf

[13] Scott R. Kegler, Thomas R. Simon, et. al., "Vital Signs: Changes in Firearm Homicide and Suicide Rates – United States, 2019-2020," Morbidity and Mortality Weekly Report (MMWR), CDC, May 13, 2022. https://www.cdc.gov/mmwr/volumes/71/wr/mm7119e1.htm?s_cid=mm7119e1_w

[14] Racial Equity and Social Justice Impact Statement for Expedited Bill 30-21, Office of Legislative Oversight, Montgomery County, Maryland, September 9, 2021. https://montgomerycountymd.gov/OLO/Resources/Files/resjis/2021/Bill30-21RESJ.pdf

[15] Michael T. Light and Julia T. Thomas, "Segregation and Violence Reconsidered: Do Whites Benefit from Residential Segregation," American Sociological Review, July 9, 2019. https://journals.sagepub.com/doi/abs/10.1177/0003122419858731

[16] Jefferson T. Bennet, Lois K. Lee, et. al., "Association of County-Level Poverty and Inequities with Firearm-Related Mortality in US Youth," JAMA Pediatrics, November 22, 2021. https://jamanetwork.com/journals/jamapediatrics/article-abstract/2786452

[17] Blair T. Johnson, Anthony Sisti, et. al., "Community-Level Factors and Incidence of Gun Violence in the United States, 2014-2017," Social Science & Medicine, July 2021. https://www.sciencedirect.com/science/article/abs/pii/S0277953621003014

[18] David A. Larsen, Sandra Lane, et. al., "Spatio-Temporal Patterns of Gun Violence in Syracuse, New York 2009-2015," PLOS ONE, March 20, 2017. https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0173001

[19] Matthew Bennis, Matthew Ruther, et. al., "The Impact of Historical Racism on Modern Gun Violence: Redlining in the City of Louisville, KY," Injury, October 2020. https://www.sciencedirect.com/science/article/abs/pii/S0020138320305490

[20] Julia P. Schleimer, Shani A. Buggs, et. al., "Neighborhood Racial and Economic Segregation and Disparities in Violence During the COVID-19 Pandemic," American Journal of Public Health, January 2022. https://pubmed.ncbi.nlm.nih.gov/34882429/

[21] Keren Landman, "Guns Do More than Kill," Vox, June 6, 2022. https://www.vox.com/science-and-health/23151542/gun-deaths-firearm-injuries-violence-health-grief-mental-physical

[22] Latinx people are not included in other racial groups throughout this impact statement, unless where otherwise noted.

[23] "Healthy Montgomery Core Measures: Firearm Hospitalization," Healthy Montgomery, Montgomery County, Maryland, Accessed August 2, 2022. https://www.montgomerycountymd.gov/healthymontgomery/chart.html

[24] "Gauging the Effectiveness of Gun Control Laws," News from Columbia Law, Columbia Law School, March 10, 2016. https://www.law.columbia.edu/news/archive/gauging-effectiveness-gun-control-laws

[25] Elaine Bonner-Tompkins and Nataliza Carrizosa, OLO Report 2020-9: Local Policing Data and Best Practices, Office of Legislative Oversight, July 12, 2020. https://montgomerycountymd.gov/OLO/Resources/Files/2020%20Reports/OLOReport2020-9.pdf

[26] Bill 27-19, Administration – Human Rights – Office of Racial Equity and Social Justice – Racial Equity and Social Justice Advisory Committee – Established, Montgomery County Council

[27] Kegler, Simon, et. al.

# Economic Impact Statement

**Office of Legislative Oversight**

## Expedited Bill 21-22

## Weapons – Firearms In or Near Places of Public Assembly

### SUMMARY

The Office of Legislative Oversight (OLO) anticipates that enacting Bill 21-22 would have an insignificant impact on economic conditions in the County in terms of the Council's priority indicators.

### BACKGROUND

The goal of Bill 21-22 is to protect places in or near places of public assembly from gun violence.[1] The Bill would attempt to achieve this goal by amending the law regarding restrictions against firearms in the County in two ways. First, it would "prohibit the possession of firearms in or near areas of public assembly." Second, it would "remove an exemption that currently allows individuals with certain handgun permits to possess weapons within 100 yards of a place of public assembly."[2] If enacted, the change in law would take effect on the date it becomes law.[3]

### INFORMATION SOURCES, METHODOLOGIES, AND ASSUMPTIONS

Per Section 2-81B of the Montgomery County Code, the purpose of this Economic Impact Statement is to assess the impacts of Bill 21-22 on County-based private organizations and residents in terms of the Council's priority economic indicators and assess whether the Bill would likely result in a net positive or negative impact on overall economic conditions in the County.[4] It is doubtful that enacting Bill 21-22 would impact firearm sales from County-based gun shops. Moreover, while gun violence has direct and indirect economic costs for victims, perpetrators, and other stakeholders,[5] it is beyond the scope of this analysis to assess the effectiveness of the restrictions in preventing gun violence in the future. Thus, OLO does not anticipate the changes to the law regarding restrictions against firearms in the County to have significant economic impacts on private organizations, residents, or overall conditions in the County.

### VARIABLES

Not applicable

---

[1] Legislative Request Report.
[2] Bill 21-22.
[3] Ibid.
[4] Montgomery County Code, Sec. 2-81B.
[5] A State-by-State Examination of the Economic Costs of Gun Violence; Follman et al, "The True Cost of Gun Violence in America."

(16)

# Economic Impact Statement

## Office of Legislative Oversight

## IMPACTS

WORKFORCE  ▪  TAXATION POLICY  ▪  PROPERTY VALUES  ▪  INCOMES  ▪  OPERATING COSTS  ▪  PRIVATE SECTOR CAPITAL INVESTMENT  ▪
ECONOMIC DEVELOPMENT  ▪  COMPETITIVENESS

### Businesses, Non-Profits, Other Private Organizations

Not applicable

### Residents

Not applicable

## DISCUSSION ITEMS

Not applicable

## WORKS CITED

A State-by-State Examination of the Economic Costs of Gun Violence. U.S. Congress Joint Economic Committee, Democratic Staff. September 18, 2019.

Mark Follman, Julia Lurie, Jaeah Lee, and James West. "The True Cost of Gun Violence in America." *Mother Jones*. April 15, 2015.

Montgomery County Code. Sec. 2-81B, Economic Impact Statements.

Montgomery County Council. Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly. Introduced on July 12, 2022.

## CAVEATS

Two caveats to the economic analysis performed here should be noted. First, predicting the economic impacts of legislation is a challenging analytical endeavor due to data limitations, the multitude of causes of economic outcomes, economic shocks, uncertainty, and other factors. Second, the analysis performed here is intended to *inform* the legislative process, not determine whether the Council should enact legislation. Thus, any conclusion made in this statement does not represent OLO's endorsement of, or objection to, the Bill under consideration.

## CONTRIBUTIONS

Stephen Roblin (OLO) prepared this report.



**In Support of Expedited Bill 21-22, Weapons -Firearms In or Near Places of Public Assembly**
*On behalf of the Association of Independent Schools of Greater Washington*

July 20, 2022

I am submitting this testimony as Executive Director of the Association of Independent Schools of Greater Washington ("AISGW") in support of *Expedited Bill 21-22, Weapons-Firearms In or Near Places of Public Assembly*. AISGW represents 78 member schools in the greater D.C. area, and our schools educate over 10,000 students in Montgomery County alone. *Expedited Bill 21-22* would prevent an individual from possessing a firearm within 100 yards of a "place of public assembly" even when the individual has a wear-and-carry permit from the State of Maryland. The definition of public assembly includes schools. This restriction strengthens current County law, which currently exempts individuals with permits from the restriction against carrying weapons within 100 yards of places of public assembly.

We commend the Montgomery County Council for these efforts to stem acts of gun violence that have become shockingly all too common in our communities and on our school grounds. The recent mass shooting at the Robb Elementary School in Uvalde, Texas, along with the persistent and terrifying recurrence of mass shootings across our country, have left school leaders once again consoling and calming their communities while searching for solutions to keep their school communities safe. Indeed, one of our very own AISGW schools was subject to a harrowing act of gun violence in April of this year.

We understand that Maryland State law already prohibits the wear, carry and transport of handguns and firearms on public school grounds. *CR 4-102.* Extending that protection to *all* schools, as well as other community gathering places throughout the County, however, is an important and – unfortunately – very necessary next step as we see this wave of gun violence continue. Moreover, we urge the County to consider any other steps that would keep our children safe, whether those include broader prevention and education efforts, or prohibitions such as this proposed legislation, aimed at preventing this violence from reoccurring.

I appreciate the opportunity to comment on the proposed legislation on behalf of our AISGW member schools and would welcome any chance to support further the goals of keeping our children and our school campuses protected from this persistent threat.

On Monday, July 11th, County Council President Gabe Albornoz introduced Bill 21-22, to remove the exemption for W&C permit holders from the county's ban on possessing firearms "in or within 100 yards of a place of public assembly," which includes parks and churches, banning carry in those places. I oppose this bill as an infringement on our residents' recently affirmed constitutional rights as issued by the US Supreme Court(i.e., Bruen case).

The bill provides no requirement for the county to clearly mark which of these areas are to be "gun-free zones," which will result in confusion among law-abiding citizens who are permit holders.

The legislation also makes no mention of whether the county intends to guarantee the safety of disarmed citizens in those places with measures, such as metal detectors or police presence. Gun free zone declarations are soft targets for criminals and those intent on wrecking havoc. |

Also, this proposed bill like many of the Democratic Party and left wing gun control policies of extreme gun control over the years have and will not work given high crime and murder rates in many Maryland cities and towns – not be law abiding gun owners but by criminals and unstable persons.

This proposed bill  will not improve safety of our citizens. Armed criminals, who already illegally carry without any permits and illegally possess firearms in violation of state and federal laws, will likely ignore the arbitrary boundaries created by this ordinance.

This bill would create more targets of opportunity for criminals and  prevent responsible law abiding citizens from their right of self-defense.  Recent mall shooter in Indiana was terminated by a law abiding citizen with a legal carry permit, saving untold additional lives.  Good people carrying self-defense capabilities are far more effective at deterring crime and reducing crazed mayhem than any police presence can do.  I urge the council to vote No on Bill 21-22 to keep Montgomery County safer than if it was passed into law.  If the Council approves this measure then the Council needs to address the safety of unarmed citizens in these gun free zones and take measure to ensure access to these "gun free zones" provides control points to ensure the safety of us.

(19)

To the members of the council,


My name is Anthony Nelson, and I have been a resident of Montgomery county since roughly 2013. I previously lived in Prince George's County where I experienced more than my fair share of crime directly or indirectly including robbery, home break-ins, and car theft. That was precisely part of my desire to move out to an area that for most of my life, I considered to be relatively low in crime and safe.

As a lifelong resident of Maryland, it has been a long frustrating road for the issue of self-defense and Maryland's views to the methods in which one chooses to defend themselves. For my entire adult life, I have had to accept lawfully, that I am not able to defend myself or my family to the best of my ability due to what many politician's refer to as "common-sense gun legislation." Up until July 5, 2022, Maryland has remained a "may issue" state in regards to the issuance of any type of permit to carry citing "good and substantial" reasoning which to most, felt like an arbitrary term that applied to a very small population. The recent Supreme Court Ruling and subsequent statement from Gov. Hogan suspending the "good and substantial" clause was an exciting time for many Marylanders and a restoration of a long  restricted constitutional right as well as the "unalienable right" to Life mentioned in the countries founding document. A right that governments were instituted to secure.

Despite the legislation that Maryland has upheld for all these years, touting some of the strictest gun laws on the books in the country, Maryland has remained competitive in the category of "most homicides by state" category. This can be partly contributed to Maryland's unwillingness to prosecute criminals who are in turn released and commit more heinous crimes; as well as enforce laws that are already on the books. As recent as June, Deputy First Class Glenn Hilliard was murdered by a man who should have been previously locked-up for being convicted of armed robbery. I would like to note that at the time of the armed robbery and at the time of the murder of Deputy Hilliard, the suspect was under the age of legal handgun ownership in the state of Maryland. At the time of this letter, just one week ago, a 15-year-old squeegee worker in Baltimore shot and killed a bat-wielding man in Baltimore. While all of the details of the case may never all be known, we know that a 15-year old boy was armed and it was stated that most of the boys who are on these corners providing this service are as well. This stands to show that no matter what laws are on the books, criminals will always willfully disobey them, and it is always the law-abiding citizen who is left at a disadvantage. This legislation is not aimed at keeping criminals from bringing guns into "public areas," because we all know that criminals will do it no matter what the law says. What we do know for sure is that criminals don't look for resistance or a fight, they look for victims and easy targets. This bill only creates more of the latter.

Driving into my home city of Olney now, there are road signs warning of car jackings. A January 2022 WTOP article titled "Homicides, carjackings up in Montgomery County" is a constant lingering thought in my head when I come to a stop light with my 3 small children who are under the age of 6 and wife all in the vehicle. The article denotes an 88% rise in homicides and 72% increase in carjackings. Average law-abiding citizens are tired of being a statistic. Having more trained citizens looking to protect themselves and their families suddenly becoming criminals because of a law based on no data is the exact reason why crime statistics in this county will continue to rise if this unconstitutional bill is passed.

Members of this council have stated that Marylanders want this bill passed; however I think it can be reasonably argued by the influx of applications for wear and carry permits, as well as the current backlog

of people trying to sign up for the class, is quite representative of the climate. This bill, while directly in opposition to the supreme court ruling and purpose for the ruling in the first place, stands to turn law-abiding citizens who took the time to get the training and spent upwards of $1000 in total to exercise a constitutional right into criminals.

I strongly urge the council to rescind this bill as it is in opposition to the recent supreme court ruling, as well as the basic human rights we all have, to defend ourselves and our families.


Thank you for your time and attention.


Sincerely,

Anthony Nelson

(21)

21 July, 2022

Mr. Gabe Albornoz
President, Montgomery County Council

Regarding Bill 21-22 to remove the exemption from Montgomery County Code § 57.11 for holders of Maryland Wear and Carry Permit from within 100 yards of "Place of Public Assembly.

Dear Mr. Albornoz,

I write to oppose Bill 21-22. This new bill would remove the existing exception for permit carry that has long existed in Montgomery County code, and is a clear violation of the Supreme Court's decision in *NYSRPA v. Bruen* as it would ban carry by a permit holder virtually everywhere including stores and businesses throughout Montgomery County. Carry permits will be useless in Montgomery County if this bill is enacted and allowed to stand.

I am a resident of Anne Arundel County; however, I frequent Montgomery County to access the wonderful care at a Johns Hopkins Wilmer Eye Institute in Bethesda. Unfortunately, I suffer from glaucoma, which has been difficult to control. While I am not allowed to carry within hospitals and medical clinics, Bill 21-22 would not allow me even to carry within the county in order to access quality health care. Why are you afraid of a law-abiding citizen, like me, who may find it necessary to find health care elsewhere should this law be passed?

Please do not vote for Bill 21-22.

Sincerely,
Cathy S. Wright

(22)

My name is Galen Muhammad and I am the State Director of Maryland and Washington, DC for the National African American Gun Association or NAAGA.  I am also the chapter president for the NAAGA chapter in Prince George's County – Onyx Sharpshooters.

I am **vehemently** opposed to this bill as I often travel through Montgomery County as a law-abiding citizen who is a concealed carry licensee. While I don't live in Montgomery County, the members of my gun club, others who are also concealed carry licensees and those who seek said license will be barred from conducting business or just traveling from Point A to Point B within Montgomery County.

As a certified firearms instructor, I also plan to visit my Montgomery County chapter and their events within the county and train residents of Montgomery County at locations in Montgomery County and I do travel with my concealed carry firearms.

This bill gives absolutely no consideration, nor does it mention the fact that those with the Wear & Carry license are **already prohibited** from many areas, including sporting events, federal, state, county and city buildings, public transportation, public schools, colleges and universities, banks, retail establishment with clearly posted signage, post offices **AND** their parking lots, etc. These are the proverbial "*bricks*" around which we, law-abiding citizens, who **legally** concealed carry legally navigate.  This *vague* bill being proposed seeks to be the "*mortar*" to fill in the gaps and add additional and unnecessary areas, creating and manufacturing a problem where there isn't one.

This bill also overlooks the mandatory firearms training that each licensee must attend to be qualified to receive the Wear & Carry license. During this training, we are taught that Maryland is **NOT** a Castle Doctrine state and that we have a duty to retreat, if possible.

I ask that this bill be given an unfavorable report.

To the Honorable Members of the County Council of Montgomery County, MD

Gabe Albornoz, Chairman
Andrew Friedson
Evan Glass
Tom Hucker
Will Jawando
Sidney Katz
Nancy Navarro
Craig Rice
Hans Riemer

From: Dr. Jack L. Rutner
Silver Spring MD

Re: Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly

This purpose of this testimonial letter is to raise questions to the Montgomery County Council about the constitutionality of the proposed legislation embodied in Bill 21-22.  This testimonial letter will cover three issues:

I.   The guidance provided by the Supreme Court to the Courts in the Bruen decision in how to adjudicate Second Amendment cases henceforth;
II.  The Supreme Court's discussion on sensitive places;
III. The Supreme Court's reference to D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 *Charleston L. Rev.* 205 (2018), and Brief for Independent Institute as *Amicus Curiae* and how they would affect the constitutionality of Expedited Bill 21-22.

I:  The Supreme Court in the Bruen decision (8: II) reviewed the two-step procedure Courts of Appeal have used since the *Heller* and *McDonald* decisions.  The Court held that, that was one step too many.  Specifically, the Court wrote:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. **To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.** Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." (My emphasis.)

The Court emphasizes this further when it writes (10: IIB):

> the government must affirmatively prove that its firearms regulation is part of the historical  tradition  that  delimits the outer bounds of the right to keep and bear arms.

On examining Expedited Bill 21-22 I find nowhere does it show how the proposed regulation expanding sensitive places to many places of public assembly falls within the scope of being consistent with "this Nation's historical tradition of firearm regulation." Absent such analysis Expedited Bill 21-22 appears to on infirm constitutional grounds.  On this basis alone a legal challenge to the constitutionality of 21-22 will prove successful in the federal courts.

II. With regard to sensitive places, the Court discussed the issue of sensitive places.  It wrote that expanding sensitive places to a large variety of places of public assembly is inconsistent with the

Second Amendment.  In particular, it writes (22) about New York State's view on sensitive places:

> In [New York State's] view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. **But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly.** Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. (My emphasis.)

Expedited Bill 21-22 does precisely what the Court counseled governments not to do, which is to expand the category of sensitive places to almost all places of public congregation.  According to the Court, that categorizes sensitive places far too broadly.  Indeed, based on the Court's language in Bruen, should the Council pass Expedited Bill 21-22, legal challenges to it would be successful because of the overly broad categorization of sensitive places.  When that is coupled with the absence of analysis demonstrating that 21-22 is consistent with this Nation's historical tradition of firearm regulation, then it would seem 21-22 is on very legally infirm constitutional grounds and will not be upheld in federal court.

III. The definition of public places in Expedited Bill 21-22 is derived from Bill 4-21.  They are:
> [A] place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as a fairgrounds or conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building."

Most of those places in 4-21 do not fall within the purview of public places based on the current references in its discussion in Bruen (21) regarding sensitive places.  There, it pointed to an article in *Charleston Law Review* from 2018 title the "Sensitive Places Doctrine" by Kopel and Greenlee (hereinafter, KG), and to the *Amicus Curia* Brief of the Independent Institute (hereinafter BII).  Both documents discuss sensitive places while the latter provides guidance on "longstanding" laws regarding such places/

In the KG article, there is a useful summary of the sensitive place doctrine (287*f.*), some of which I quote here (with my emphasis):
> *Extensions by analogy to schools and government buildings.* It is difficult to create a rationale for extending the "sensitive places" doctrine to places that are not schools or government buildings. As discussed above, there are few "longstanding" restrictions on other locations.
>
> Given the thin historical record, one can only guess about what factors make places "sensitive." Some of the guesses are: **places where most persons therein are minors (K-12 schools), places that concentrate adversarial conflict and can generate passionately angry emotions (courthouses, legislatures, polling places), or buildings containing people at acute personal risk of being targets of assassination (many government buildings).**
>
> **The answer cannot be that the places are crowded.** Sometimes they are, but no more so than a busy downtown sidewalk, and sidewalks are not sensitive places.

Rather than try to figure out analogies to "schools and government buildings," the better judicial approach for other locations is simply to give the government the opportunity to prove its case under heightened scrutiny.

**Buffer zones are not sensitive places.** Heller allows for carry bans "in" sensitive places—not bans "around" or "near" sensitive places. Accordingly, buffer zones are not sensitive places.

…

**Laws that broadly negate the right to arms are not legitimate precedents.** Laws that widely prohibit bearing arms are contrary to the text of the Second Amendment. Accordingly, they are not a legitimate part of the history and tradition of the right to bear arms.

In my opinion the critical passages for 21-22 in this summary by KG are those bolded. It is clear that Bill 21-22 would widely prohibit carrying arms in a large variety of places within the County. As KG observe, "Laws that widely prohibit bearing arms are contrary to the text of the Second Amendment." Moreover, as they suggest, an argument that such places are crowded will be insufficient to sustain the constitutionality of Bill 21-22 under heightened scrutiny.

Bill 21-22 defines places of public assembly to those listed in Bill 4-21. Most of those places though do not meet the criteria KG outline in their summary for sensitive places. The places I think that do not meet those criteria are places of worship, recreational facilities, hospital, community health centers, long-term facility, multipurpose exhibition facilities (e.g., fairgrounds or conference centers). Such places are not places where most persons are minors, they are not places which concentrate adversarial conduct and they are not places where passionate angry emotions are generated. Declaring them off limits to the legal carriage of guns therein again will prove to be on constitutionally infirm ground based the guidance in Bruen.

Another issue of Bill 21-22 is the creation 100-yard buffers zones around places of public assembly. Such buffer zones under Bruen are most likely not be justifiable for Second Amendment cases. KG reviewed several court cases regarding buffer zones around sensitive places of which I will summarize one. The case is an Illinois case termed, the *People v. Chairez*. The State of Illinois had made it illegal to carry a firearm within a 1,000-foot buffer zone around a state park. According to KG (269), the Illinois Supreme Court ruled: "that the law severely burdened the core of the right to bear arms, because it prohibited the carriage of weapons for self-defense and it affected the entire law-abiding population of Illinois." Moreover the Court found that the 'State was unable to support its "assertion that a 1000–foot firearm ban around a public park protects children, as well as other vulnerable persons, from firearm violence" ' (KG, 269*f.*). Bill 21-22 appears to contain both defects found in *People v. Chairez*: it affects the entire law-abiding population of Montgomery County; and the County will be unable to support an assertion that buffer zones protect children and vulnerable persons. Consequently, the buffer zones themselves are not sensitive places and would be ruled unconstitutional. Moreover, based on the guidance in the Bruen decision, even if the County could show that such buffer zones might protect children and vulnerable persons that would be insufficient to meet the criterion of being within "the historical tradition of firearm regulation" and so would be declared unconstitutional based solely on that.

We turn next to *Amicus Curiae* brief filed by Independent Institute (BII) in the Bruen Case for further guidance on the issue of sensitive places and longstanding traditions of restricting Second Amendment rights. In BII, there is a short review of American laws regarding sensitive places, which it sometimes terms, "gun-free zones." According to BII (11), in colonial America, "gun-free zones through the time of the Founding were limited …"

(26)

A notable exception was Maryland's ban on bringing weapons into houses of Assembly (government buildings).  According to BII (12) Virginia followed up on that a century later when it 'forbade most (but not all) people from "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms." … Virginia's law also barred citizens from carrying arms "in other places," but only when such carrying was done "in terror of the country," *id.*, thus respecting a general right to peaceably carry but carving out a narrow exception for courts.' Thus, according to BII, government buildings would meet the criterion laid down in Bruen of being consistent with "this Nation's historic tradition of firearm regulation" insofar as such bans are longstanding traditions.   On the other hand, a ban on firearms in a wide variety of places of public assembly, such as in 21-22, would not be consistent with that historic tradition because there is no longstanding tradition of banning firearms in such places.  Hence, the constitutionality of a such a bill would no doubt not be upheld in federal court based on the guidance the Court provided in Bruen.

BII does indicate certain narrow conditions under which government can ban firearms consistent with the Second Amendment (see BII, 22).  It writes:

> The most obvious way is to limit modern gun-free zones to areas in which the government has demonstrated a serious commitment and a realistic ability to ensure public safety. This can be accomplished by ensuring that would-be criminals are prevented by more than the normative power of a legal prohibition to remain unarmed through, *e.g.*, the provision of law enforcement officers and armed security, along with metal detectors or other defensive instruments.

It writes further (BII 24):

> If the government cannot (or chooses not to) provide protection similar to that at airports in other areas, then designating those areas as "gun free" necessarily evicerates (*sic.*) the self-defense right and, accordingly, constitutes a Second Amendment violation.

 It would appear from BII, that if the Council bans firearms in public places without its supplying adequate security and specifically by supplying adequate law enforcement personnel and metal detectors, it will have eviscerated the self-rights of the citizens of Montgomery County and anyone else who comes into the County.  Hence, I think that under the current guidance found in Bruen, Expedited Bill 21-22 is on infirm constitutional grounds and will be found unconstitutional in federal court.

(27)



**The Institute for Forensic Psychology**

**Jack Leeb, PsyD**
Police & Public Safety Psychology
*Associate Member, International Association of Chiefs of Police*
*Associate Member, Maryland Chiefs of Police Association*
*Certified Force Science Analyst*

914 Brentwood Lane
Silver Spring, MD 20902
(301) 452-4900 voice
(301) 593-9191 fax
www.policetest.com
drleeb1@gmail.com

Date:   19 July 2022
To:      Montgomery County Council
Re:      Bill 21-22

As a police psychologist, firearms instructor, and MD Wear and Carry permit holder for over 20 years, I am very concerned about County Council bill 21-22, which would effectively negate the recent US Supreme Court decision affirming the right of law-abiding citizens to carry a firearm in public. As a police psychologist I have received threats over the years related to my work; I have also studied criminal behavior. As a firearms instructor I transport firearms to and from classes and the range and have witnessed firsthand over the past 25 years just how serious the average citizen who desires to possess a firearm is with regard to its use and safety in general. I have been comforted by the fact that I have the option to carry a firearm to protect myself and my family when out and about, and I have been proud of my fellow law-abiding citizens' clear desire to do the right thing with regard to the possession and use of a firearm.

I would remind Council members that, in general, concealed carry permit holders across the United States are far more law abiding than those who do not possess a permit. CCW permit holders do NOT commit crime; rather, law-abiding citizens who have the ability to defend themselves STOP crimes from occurring hundreds of times every day in the US, in most cases without firing a shot. Since criminals routinely ignore laws, these events would more frequently end in victimization of the law-abiding if we do not have the means to defend ourselves. If passed, not only would bill 21-22 deprive law-abiding citizens of the right to defend themselves and their families, but it would make anyone who is legally permitted to carry a firearm elsewhere in Maryland a criminal in Montgomery County. Expecting W&C permit holders to stop, unload their firearms before crossing the Montgomery County line, and store the firearm in a lock box is not only unrealistic, but also *unsafe*.

In addition, given Maryland's stringent background checks and training requirements, it is even less likely that a Marylander who legally carries a firearm would use it inappropriately or unlawfully. I respectfully ask that you re-consider bill 21-22 and not eliminate my right, and the right of other law-abiding citizens, to defend ourselves. I would be happy to discuss this matter with the Council as a whole, or with any members who might wish speak with me about this important topic.

Thank you.

Jack Leeb PsyD
Police and Public Safety Psychology
301 452-4900

I feel it is uncostitutional and unsafe for the general public to create unlimited gunfree zones to keep legally o
with little or no resistance or fear of being stopped or caught. Everyone that creates these laws are

Thank you

e surrounded by their own armed security and don't have to defend theirselves or family on their own.

My name is James P. Tully. I am 55 years old and have been a Montgomery County Resident my Entire life. I have served in the Military, and for the past 22 years I have been a Uniformed Diplomatic Security Officer at the U.S. Department of State. I have been sworn in, as a Special Deputy U.S. Marshal, and have received training in Active Shooter Response. I am well acquainted with Gun Valence, and come to the conclusion that additional legislation does nothing to address criminal activity.

As a Maryland Ware and Carry Permit Holder, which I have had since 1995. I have strong Objections to Bill 21-22. By not allowing a permit holder to come within 100 yards of any place of public Assembly. This proposed bill will Make it impossible to travel any ware in Montgomery County with out being in violation of the law. An illegal weapons charge would result in criminal charges and having my Maryland Gun Permit revoked. These two actions would have an adverse effect on my current employment.

Bill 21-20 will not allow me to travel in my car, or by foot, in my own neighborhood without passing within 100 yards of a school or state park. I would not even be able to stand in my own back yard because my property is within 100 yards of a Montgomery County Park.

In addition, I object to definition of public venues, to including privately own property. This is an example of extreme Government over reach. To Include Houses of worship is pure insanity. Multiple churches in this country have been the targets of active shooters. The reason being is that it is a soft target. The Active Shooters only has one mission, that is to kill as many people as they can. Not allowing people to defend themselves in their house of worship only would help facilitate another tragedy.

It is foolish to believe our local police departments can do any thing to prevent this sort of gun violence. Police resources are extreamly limited. The school Resource Officer was Removed from McGruder High School a few weeks before that school shooting. If I am not Mistaken, I believe a budget cut was cited as the reason. It is a tragedy that Montgomery County government took absolutly no responsibility for their lack of insight. The School Resource Officer would not have been in the school in the first place if there was not a clear and present known danger.

As a current Maryland Gun Permit Holder, I can say there is absolutely nothing wrong with the current restrictions that have been in place for many years. Most of the civilian gun violence does not involve permitholders anyway. This proposed Bill dose noting to stop Gun Violence and would only help facilitate more violence by preventing law abiding citizens from defending themselves. There is so much to say on this topic more to say on this topic. Brevity is of the upmost importance and I believe I made my point. In conclusion there is no reason this bill 21-22 be made into law.

> **Commented [JT1]:** It

Hello,

I'm writing regarding Bill 21-22. I understand this bill removes the exemption for holders of Marylands Wear and Carry permit. This would make it illegal for permit holders to be within 100 yards of "Place of Public Assembly", which equates to everywhere in the county.

According to Data.montgomerycounty.md, from 6/1/2022 to 7/15/2022 there were over 4,800 founded crimes in Montgomery County. This equates to 106 crimes per day in the 45 day period. A quick internet search proves these are not legal permit holders committing these crimes. Bill 21-22 would leave me unable to protect myself from assault, burglary, theft, robbery and all such crimes were reported within the county. Why can a criminal have a weapon to commit these crimes but I, being a law abiding American citizen, cannot have one to protect myself from such crimes?

The Supreme Court upheld our right to defend ourselves outside our homes in the recent ruling of Bruen. Why are you attempting to subvert the Supreme Court and the constitution?

I have lived in WV, OH, PA and CO over my life. Maryland is the first place I have lived that I am afraid to be out of my home for an extended time. I am a law abiding citizen and I've completed all the necessary training and requirements in Maryland for a Wear and Carry permit. Carrying a weapon for protection is an overwhelming responsibility for the permit holder. Criminals have no requirements to meet and feel no such responsibility. It is reprehensible that a criminal is more protected than I am.

Bill 21-22 impacts my travel as I live in an adjoining county. I will no longer be able to see my physicians or patronize restaurants and shops in the county. I hope the officials of Montgomery County use statistics and facts and support their law abiding citizens.

Janice Hess Frederick County

1

(32)

July 15, 2022

Montgomery County Council
Legislative Branch
Bill 21-22

Gentlemen, I would respectfully vote against this bill. I have lived in Burtonsville,
Maryland for 16 years. I have seen an alarming rise in crime in this area, especially over
the last 4 years. This past week on July 10th, 2022 there was a shooting just down the
street from my house at the Briggs Chaney Market place. Over 60 shots were fired and
one innocent bystander was wounded by gunfire. This shooting happened within 2 hours
of a STRING of robberies in down town Silver Spring. Bill 21-22 would prevent law
abiding citizens from protecting themselves and their families and would do NOTHING
to prevent criminals from obtaining firearms and committing violence. I understand law
makers are desperate to solve gun violence but these laws don't affect criminals. There
are so many guns in this country, barring the banning of ALL guns, we need to be
smarter with possible solutions. Energy would be better spent on training and vetting of
carry applicants. Examining credentials and references for carry applicants would go a
long way to keeping us all safe.
Why do citizens need carry rights :
Unfortunately, there is a response time for police response. There are occasions when a
citizen will not have time to call and wait for the police. If I'm walking and attacked by
dogs I will not be able to call the police for help. If I'm walking and a robber threatens
me with a knife, I will not have the luxury of calling the police. Last year I called the
police to report a trespasser on my property. It took 40 minutes for the police to show up.

Respectfully,

John Murphy

(33)

Montgomery County Council                                    July 21, 2022
Legislative Branch
Bill 21-22

I would respectfully vote against this bill. Here are two examples why I feel this way.

On July 17, 2022 a gunman walked in to the food court of Greenwood Park Mall in Indiana. Shot and killed 3 innocent bystanders and wounded another 3. Elishjah Dicken, a 22 year old legally carrying, killed the gunman and was declared by local police and the Mayor a Hero who saved countless lives. YOUR bill would have prevented this intervention. WHERE WERE THE POLICE ???
WHERE WERE THE POLICE IN UVALDE ???

Closer to home in MONTGOMERY COUNTY yesterday, Wednesday July 20th  at 1pm an elderly man out for a walk was attacked by a pit bull in Silver Spring. The owners had trouble stopping the attack even hitting the dog with their car. The victim is in the hospital. How many times does this happen ??  Google how many people are attacked by dogs every year. More than 4.5 million people are bitten by dogs in the USA each year. Many victims are killed.
I am elderly and walk every day in Burtonsville. I have been chased by stray dogs twice. You want to make Montgomery County safer ? How about banning pit bulls ? A breed known for vicious unprovoked attacks.
My house is close to 2 schools, a church, and the Burtonsville Library. No matter which direction I choose to walk I will be walking past one of these "Places of Public Assembly".
Every time I walk I fear being attacked by dogs. I am completely defenseless thanks to your carry laws.

John Murphy

(34)

My name is Jonathan Wrieden and I am a resident of Montgomery County. Bill 21-22 is blatantly unconstitutional and directly infringes on my right to self-defense. I was in the United States Army Infantry for ten years and am a combat veteran. I have more training than most police officers, yet this bill would prevent me from carrying a firearm in public for protection. Because of my extensive military training, I am an asset to society. If any of you were in a mass shooting scenario, you would want me there with a gun to save you. I do not trust the police to protect me or my wife in one of these situations. In most cases, mass shootings are over and the damage is already done before police can arrive. And even if police do arrive in time, I do not want to have to hope and pray they possess the courage to act, unlike the police officers in Uvalde. Furthermore, this bill will not stop criminals from carrying guns. That's why they're called criminals, because they break the law. If a criminal wants to carry out a mass shooting, then they are going to do it anyway and this bill will not stop them. This bill will only affect the law-abiding citizens. It will strip them of their right to protect themselves and their families. All law-abiding citizens can be assets to society. The solution is to properly train and equip them, not to strip them of their right to carry a firearm so that they are left defenseless against criminals. On July 17, 2022, an armed bystander shot a mass shooter who opened fire in a mall in Indiana. If it wasn't for this responsible citizen, the criminal would have killed many others. There are countless other examples of armed law-abiding citizens taking down mass shooters and thereby saving many lives while waiting for police to arrive. Do not let the recent sensationalizing of shootings in the media make you feel like you have to pass laws to make it look like you care enough to do something. This bill is nothing more than an emotional reaction to NYSRPA v. Bruen and it will not stand up in court. This bill does not pass the history and traditions test for constitutionality established by the Supreme Court in NYSRPA v. Bruen. You're going about it the wrong way. Focus on keeping guns out of the hands of criminals and keeping them in the hands of law-abiding citizens, the assets of society. That's the solution. I urge you not to pass Bill 21-22. It will cost lives, not save them. Thank you for your consideration.

Testimony regarding EXPEDITED BILL NO. 21-22,
Amending Montgomery County Code Chapter 57, Weapons, Section 57-11

Michael Burke

**I rise in opposition to the language of the proposed Expedited Act to prohibit the possession of firearms in or near places of public assembly.**

As written -

**Section b) (2)** *(does not) apply to a law enforcement officer, or a security guard licensed to*

*carry the firearm…*

Please consider the extremely adverse consequences of your proposed bill.  Thousands of retired law enforcement officers reside in Montgomery County, while thousands more routinely travel through the county daily from across the greater DC Metropolitan Area.  You (the Council) and both the Montgomery County Police Department (MCPD), Montgomery County Sheriff's Office (MCSO) and the Maryland State Police (MSP) rely on these highly trained, well vetted, and experienced law enforcement veterans to assist them in maintaining the peace and responding to violent incidents (such as an active shooter).  Those retired officers, who carry their handguns under Maryland State Police Handgun Permits (issued at no cost to all former/retired Maryland officers and deputies) and retired Federal Agents and Officers (ATF, FBI, Secret Service, US Marshals, Military Police, Military Intelligence, and other counter-terrorist agencies) are prepared today, and tomorrow, to step in and STOP violent crime as it develops.  These men and women with decades of skills have been performing these public safety roles for decades.  I'm one of them.

Your bill would order thousands of women and men to DISARM and cease to function as unpaid auxiliary forces to safeguard the citizens of the County, and prevent them from coming to the aid and assistance of MCPD, MCSO, and MSP for fear of being arrested, detained, and prosecuted for unlawful possession of their handguns.  Is this what you truly desire?

Consider the cases of Deputy Chief State Fire Marshal Sander Cohen, and FBI Supervisory Special Agent Carlos Wolff.  These men took the extreme risk, both "off duty," to come to the aid of a Montgomery County citizen in distress, on Friday, December 8, 2017.  Both were killed that night.  Sander Cohen also served as a volunteer firefighter with the Rockville Volunteer Fire Department.  They died on I-270, near Great Falls Road, serving the citizens of Montgomery County, knowing the risks they faced by serving – you.

Consider the shooting at Magruder High School, in May 2022.  Off duty and retired law enforcement officers residing in the area responded to the report of "active shooter" at the school, knowing that meant placing their lives at risk – to potentially save CHILDREN, while the local precinct was short-staffed.  MCPD has 27 unfilled sworn positions, though brass and union leadership express concern for a "crisis" in the future.  Between April 2020 and April 2021,

(36)

Testimony regarding EXPEDITED BILL NO. 21-22,
Amending Montgomery County Code Chapter 57, Weapons, Section 57-11

Michael Burke

police resignations rose 26 percent, from 19 to 24, over the preceding 12 months. Retirements increased 18 percent, from 28 to 33, department data show.

The Law Enforcement Officers Safety Act (LEOSA) is a United States federal law, enacted in 2004, that allows two classes of persons—the "qualified law enforcement officer" and the "qualified retired or separated law enforcement officer"—to carry a concealed firearm in any jurisdiction in the United States, regardless of state or local law.  It is codified within the provisions of the Gun Control Act of 1968 as 18 USC § 926B and USC § 926C.  LEOSA also covers state and public university and/or college campus law enforcement officers (such as University of Maryland Police, Montgomery Community College Police, and approximately 20 other colleges and universities that have armed law enforcement officers).


18 USC § 926B

(a) Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b).

(b)This section shall not be construed to supersede or limit the laws of any State that—

(1) permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or

(2) prohibit or restrict the possession of firearms on any State or local government property, installation, building, base, or park.

(c), "qualified law enforcement officer" is defined as any individual employed by a governmental agency, who:

1. is authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law, and has statutory powers of arrest, or apprehension under section 807(b) of title 10, United States Code (article 7(b) of the Uniform Code of Military Justice); This includes state and public college/university police officers.
2. is authorized by the agency to carry a firearm;
3. is not the subject of any disciplinary action by the agency which could result in suspension or loss of police powers;
4. meets standards, if any, established by the agency which require the employee to regularly qualify in the use of a firearm;
5. is not under the influence of alcohol or another intoxicating or hallucinatory drug or substance; and
6. is not prohibited by Federal law from receiving a firearm.

(d) the individual must carry photographic identification issued by the governmental agency for which the individual is employed that identifies the employee as a police officer or law enforcement officer of the agency.

Testimony regarding EXPEDITED BILL NO. 21-22,
Amending Montgomery County Code Chapter 57, Weapons, Section 57-11

Michael Burke

In 2013, LEOSA was amended by the National Defense Authorization Act (NDAA) for Fiscal Year 2013, effective January 2, 2013, after **President Obama** signed Public Law 112-239 (H.R. 4310).

**Senator Patrick Leahy**, a key sponsor of the bill, remarked "The Senate has agreed to extend that trust to the law enforcement officers that serve within our military. They are no less deserving or worthy of this privilege and I am very pleased we have acted to equalize their treatment under the federal law". He further stated "The amendment we adopt today will place military police and civilian police officers within the Department of Defense on equal footing with their law enforcement counterparts across the country when it comes to coverage under LEOSA."

I cannot imagine that this Council wishes to oppose President Obama or Senator Leahy in recognizing the vast importance of recognizing these men and women as extremely valuable members of the community, people that you would disarm and render ineffective if you pass this bill as written.  Your statute seeks to nullify unknown thousands of Handgun Permits issued lawfully by the Maryland State Police, following deep and detailed background investigations, extensive training in the Use of Force, Marksmanship, and other legal education required by the General Assembly and the Maryland Police and Correctional Training Commissions (MPTC).

These well trained, well-armed County residents and visitors, individuals possessing handgun permits from around the DC Metropolitan Region, are NOT a threat to public safety- they are an unnoticed, unappreciated asset to protecting and serving the communities under your care.

(38)

William Adams


Opposition to Bill 21-22

How any elected official may feel personally about guns is not what they are obliged to act on. As an elected official, trusted to honor the US Constitution, the Maryland Constitution, and the collective wants of their constituents, they must be true to their responsibilities and act according to the wishes of their constituents within the bounds of the US Constitution. Therefore, the only right thing to do is to reject this bill as it clearly violates the 1st, 2nd, and 14th Amendments and is simply a dangerous bill.

Setting aside for a moment the Constitutional violations this bill presents; the question is why? Why do you feel compelled to deny a properly permitted firearm holder freedom of travel simply because they are now permitted to carry a firearm when previously there was no prohibition from doing so?  Is there evidence that anyone is now in greater danger, or is it simply speculation based on some misinformed notion that gun holders are dangerous? Handgun Permit (HGP) holders in this state have complied with the rigorous training and background checks requirements to obtain a permit, and as such, are shown to be safer, law-abiding, and even-tempered individuals.

This proposed law does NOTHING to improve the safety of Maryland citizens that may reside, work, or pass through your county.  As we have seen most recently at the Greenwood Park Mall in Indiana, an armed citizen legally carrying a concealed firearm stopped a mass shooter on a shooting rampage in the mall.  How many more lives would have been lost had a law like Bill 21-22 is proposing been in place in this Indiana town.  Bill 21-22 will prevent a legally armed citizen from responding to such an event in Montgomery County.

Anyone saying that the freedom to carry a firearm outside the home for self-defense or the protection of others is unnecessary and claiming that firearms in the public space is unsafe, is simply misinformed or ignoring the facts.  If you are truly concerned about the safety of the residents, workers, and visitors to Montgomery County, please direct your energies to stopping gang crime in your county and leave the law-abiding citizens of Maryland alone.

PLEASE, reject this bill!

Sincerely,
William Adams

Please allow law abiding citizens to exercise their constitutional rights in Montgomery county. Clearly, the statistics show that criminals are getting more and more brazen as we've felt the crime wave in our communities. We are already at a disadvantage against criminals. Please give us the opportunity to defend ourselves.

Testimony in support of Bill 21-22

Prohibiting firearms in or Near Places of Public Assembly

Good afternoon. My name is Mindy Landau, I am a resident of Potomac, MD in Montgomery County and I've lived and worked here as a federal employee, now retired, for 40 years. I am a co-lead of Brady United's Montgomery County Chapter and also represent Brady Maryland and our state executive committee. Thank you to the Montgomery County Council for giving me this opportunity to testify.

Bill 21-22 **will protect Montgomery County residents from an armed threats to our citizens in places where they work, play and socialize.** Our children should not have to fear that someone with a gun will invade their "safe" space for learning.  Government workers and concertgoers should be able to go to work, concerts and parks without worrying whether the person next to them is carrying a gun.  Our citizens don't want to feel anxious, intimidated, or afraid. We just want to be free and feel safe in the places we visit that give us joy. The presence of guns at or around these public places poses a danger to citizens' emotional and physical well-being. We must protect the citizens of this county and their ability to visit places of worship and parks freely and without fear of being shot.

Let's call it what it is - guns in public places represent armed threats, clear and simple.  And intimidation is not what Montgomery County is about. This is why Brady United Against Gun Violence appreciates and strongly supports Council President Albornoz' bill.

By prohibiting firearms within 100 feet of a gathering place, this bill will help to ensure we are protecting the sacred right to assemble for our generation, and generations to come.

Although we respect the Second Amendment and rights of gun owners under the constitution and laws of Maryland, that right must be exercised so as not to infringe on constitutional rights of others, including the right to assemble peacefully. Gun laws are designed to do more than to protect physical safety alone. They can and do help preserve public order and the freedom of others to peaceably assemble, speak, and worship without fear and intimidation.

As a country, much work has been done over the last 100 years to ensure that freedoms, as represented by the right to assemble peacefully, is accessible by all - regardless of their race, socioeconomic class or disability. We must continue this work today. Thank you.

Good afternoon:  I am writing to express my concern with Bill 21-22.  The bill is problematic and worrisome in quite a few ways, but some more than others – and, of course, some more personally than others as well.

I expect to receive my Wear and Carry Permit later this year, as do many others now that the Supreme Court, in its *Bruen* ruling, has declared the "Good and Substantial Reason" portion of the permitting law to be unconstitutional. Currently, Montgomery County law forbids carrying a firearm within one hundred yards of any place of public assembly, specifying public parks as one such location, and makes an exception for those who have carry permits.  Bill 21-22 would remove this exemption, making it unlawful even for permit holders to carry in such areas.

My apartment lies about twenty yards from the border of a park owned by Montgomery County.  Although Bill 21-22 does make an exception for carrying within one's home, it would seem to make it impossible for me to walk out of my own front door while carrying my firearm. For me to comply with this bill, I would apparently have to unload my firearm, walk or drive to a location deemed suitable for carry by Montgomery County, then reload my firearm and go about my day.  (And, of course, I would need to perform the same procedure in reverse on my way home.)  This would make it so inconvenient to use my carry permit that it would effectively make my permit useless – which would defeat the purpose of getting the permit in the first place.

I urge you not to pass this bill.  If you do, someone in my circumstances will undoubtedly file a lawsuit against Montgomery County, and while I am not a lawyer, I find it difficult to see how the county could possibly win.  You could, in fact, end up having other restrictions besides this one thrown out by the court, leaving you with fewer carry restrictions than you had in the first place.

Very truly yours,


{signed}
Parrish S. Knight



16005 Frederick Road, 2nd Floor          Office: 443-325-5076
Woodbine, MD 21797                        Fax: 410-696-2022
Website: www.sillengineering.com     Email: info@sillengineering.com
            Civil Engineering for Land Development

## SILL ENGINEERING GROUP, LLC

July 13, 2022

**Montgomery County Council**
Montgomery County, Maryland 21043

                    Re:     Council Bill 21-22
                            OPPOSE

To Whom It May Concern,

    As I read this proposed bill I am very concerned for my right to self-protection.  I have had a
Maryland Wear and Carry Permit and other State's carry permits for many years now and routinely carry
a firearm and travel into Montgomery County for business and personal reasons.  I believe this bill as
worded will effectively ban firearm possession in the entire county, stripping me of my Constitutional
Right to self-protection.  Please OPPOSE this bill.
    Should you have any questions or comments regarding this matter, please do not hesitate to
contact this office.

                            Sincerely,
                            SILL ENGINEERING GROUP, LLC


                            Paul M. Sill, PE, LEED AP

(43)

The United States is founded on laws. We as a people, follow the laws. When the government decided to not follow the laws, it is no longer a government.

To place the county under a gun free zone, will not serve law abiding citizens.  No one will be safe, crime will continue to rise.  There will be no reason to live in Montgomery County as it will be run by criminals and gangs.

Since  you are infringing on my right afforded to me by the Constitution of the United States. I am requesting that this bill be removed or voted down. It serves no law abiding citizens in Montgomery County.

Robert Utley

(44)

Simeon Pollock

Dear Mr. President,

I am writing to you as President of the Montgomery County Council, to ask the council through you, to please reconsider passing the ill advised bill 21-22 - Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.

Not only is this bill illegal following the Supreme Court's ruling in Bruen, it will only make criminals of otherwise law abiding citizens. It tries to superseded Maryland State law as well as tell the Maryland State Police (MSP) that it does not know how to vett and process Concealed Carry Permits.

The State of Maryland, through the MSP, already has in place an age limit - 21, a thorough vetting process for anyone wanting a Concealed Carry Permit (CCW). There are classes required for an HQL, more class time & testing for a CCW. This state process allows concealed handguns to be in the hands of responsible adults.

The bill before the council will only serve to make vetted, trained, responsible adults into criminals in MoCo.  Why do that?  The criminals who will attack the public won't follow this law. So what purpose does it serve? It will only put a burden on law abiding citizens.

As a religious Jew who makes his home in the USA & in Montgomery County, I am becoming increasingly alarmed at the rise in anti-semitism, plain old Jew hatred that is on display in this country and recently in our county, in the heavily Jewish neighborhood of Kemp Mill. I want to be able to fight back should anyone come and try to kill Jews just for being Jews and congregating in a synagogue. *Never Again,* means that we won't be attacked & slaughtered without fighting back.

In Israel where guns of all kinds are common place, it's usually a private citizen that stops an attack before the police or army can respond.  That can be here as well.

In many cases where synagogues were attacked in America, trained & armed congregants may have ended the attacks easily as most attackers are not trained in any way to use firearms if they are fired upon or face an armed citizen. Even in schools across the country, students & teachers are dying because no one is trained & armed to confront the attacker.  They are forced to wait for the police who will hopefully come & stop the attack.

Concealed guns grant the element of surprise to any would be attacker & just the knowledge that citizens may be trained & armed may prevent a future attack.

Please don't pass this legislation & make life for law abiding citizens more difficult.

Sincerely,

Simeon Pollock

Please follow the recent Supreme Ruling on firearms carry permits. You all took an oath to uphold the Constituion.

**Vincent C. McGinnis**

July 18, 2022

Dear Montgomery County Council,

**RE: Bill 21-22**

Montgomery County Bill 21-22 as written could restrict law-abiding citizens with a Maryland issued "wear and carry" permit from exercising their right, if they <u>live</u> "within 100 yards of a place of public assembly".  My issue with that is, I live between 1 to 2 blocks from Seneca Valley High School (SVHS) and cannot avoid the high school.  This law could nullify my right to bring a firearm outside my house; let alone carry one for personal protection, because of living in such close proximity to SVHS.

<u>Background:</u>  I moved into the 'Olde Seneca Woods' development 35 years ago. I am 62 year old and I enjoy the convenient location and walking as much as possible.  I walk to the FNB ATM on the corner of Crystal Rock Drive/118.  I walk to the grocery store, the Post Office, the dry cleaners, and really anywhere I can.  All this helps me get exercise and reduces dependence on my car.  Though I love this location for all its convenience, I try to walk during the day; and not too late at night.  That's because my house is located in the Crystal Rock Drive area (near The Hampton Apartments) and is one of the worst crime areas in Germantown.  Just ask any Montgomery County Police Officer who has worked in Germantown.  For this and other reasons, I applied for a Maryland State issued wear and carry permit.

Bill 21-22 as currently written could nullify my right to bring a firearm outside my house; let alone carrying one for protection; because I live in such close proximity to SVHS.  This would gut the intent of recent change in the law for me and others who live so close to designated gun-free zones.

Thanks for listening my concern.  I hope you can address this issue in the bill before its voted on.

Please feel free to call me with any questions you have.

Sincerely,

*Vincent C. McGinnis*

(48)

July 15, 2022

Reg:  Bill 21-22

Dear Council Members:

I do not support Bill 21-22.  I believe the bill is driven by the mistaken belief that "more guns on the street means more crime."

The Bill is intended to outlaw concealed carry almost everywhere in Montgomery County.

One needs only to know what happened in the 44 states that have either "shall issue" or "constitutional" (no permit required) concealed carry. The law-abiding who do not carry guns today, do not become criminals tomorrow after personal defense is permitted by the government.

No State that has permissive concealed carry has seen an increase in gun crimes by the law-abiding (source AWR Hawkins, John Lott Jr., et. al.)

Self-defense is a natural right.  A "belief" that concealed carry by the law abiding means more crime is unfounded and is subordinate to the natural right to survive.

I support Maryland law as it stands for concealed carry.  That is enough for public safety.  Bill 21-22 is not required.

Best Regards,

Cs//

Cary Secrest

(49)

**Public Testimony In Response to Bill 21-22, Weapons-Firearms In or Near Places of Public Assembly- July 26, 2022**

Good afternoon,

I am a resident of Montgomery County, MD (Gaithersburg/Damascus to be exact) and a law-abiding firearms owner.  I am also an attorney and a staunch believer in civil rights.  I am writing to express my grave concerns with the efforts of the county to curb exercise of civil rights by law-abiding firearms owners, as made plainly evident in the text of Bill 21-22.

As the Council is no doubt aware, the Bill of Rights to the US Constitution recognizes certain key and fundamental civil rights of US Citizens that the founders thought so profoundly important they bore being enumerated.  The Second Amendment to the Constitution protects the right of individuals to keep and bear arms.  The Supreme Court has continually held that this is a protected civil right.  Citizens have a constitutional right to keep and bear arms; to keep and bear arms of those types in ordinary use; and to keep and bear arms *in public* for purposes of self-defense and other lawful ends.  The Maryland Charter makes the US Constitution the supreme law of Maryland so, quite clearly, Marylanders have a constitutional right to wear and carry firearms in public.  As recognized by Governor Hogan, Marylanders no longer need convince the government that they should be allowed to exercise a civil right.  The proposed bill's definition of places of public assembly would act to essentially deprive those in or visiting Montgomery County of a right to defend themselves, even on private property.  This is in direct contravention to the recent Supreme Court decision in NYSRPA v. Bruen, but you are aware of this fact as the bill is in direct response to the decision in Bruen.

The Council is, nonetheless, pursuing a bill that directly and intentionally flies in the face of constitutional rights.  Section 4-209 of the Maryland Criminal Law Code also prohibits local governments from imposing certain restrictions on possession of firearms.  Bill 21-22 goes well beyond the exceptions permitted under Section 4-209.

Given that the Council is fully aware of the Constitutional rights that it seeks to intentionally infringe through attempted imposition of Bill 21-22, I want to draw your attention to 42 US Code Section 1983.  Section 1983 is a federal statute which provides a right for individuals to sue local government officials directly when those officials violate civil rights in the course of their duties. Given that the Council is aware that this bill would violate civil rights (it is clearly written with that express intent) Council members likely lose any defense of qualified immunity and become personally liable for their unconstitutional actions.   I for one would consider seeking a 1983 action if the Council passes a bill directly aimed at infringing my civil rights.

Putting the above aside for the moment, what is it that frightens the Council so much about the lawful exercise of civil rights?  Does the Council also intend to ban prayer within 100 yards of a place of public assembly? Does the fifth amendment not apply

within 100 yards of a place of public assembly?  Does the Council believe that individuals should lose their fourth amendment rights if within 100 yards of a place of public assembly?

Will the Council ban armed security or law enforcement at Council meetings or is it ok for the Council to be protected by firearms as long as the rest of us are not?  Given that gun control is really the last vestige of Jim Crow laws, maybe the Council is scared of minorities being able to defend themselves?  Is that it?

Representative Jamie Raskin, of whom I am no fan, recently publicly pointed out the ridiculousness of Bill 21-22 and that it is just a waste of precious taxpayer resources and likely to be overturned in court.  That said, he also called protection of constitutional civil rights draconian and foolish, so maybe he's not a great example.

I truly encourage you to listen to your better angels and recognize the foolishness of 21-22 and, instead, embrace an approach that protects civil liberties of all Montgomery County residents and guests.

Respectfully,


Matthew Hoffman

(51)

Members of the County Council

I am writing to express my opposition to Bill 21-22 as drafted.

As written, this proposed ordinance would effectively prohibit use of a Maryland wear and carry permit in any of the built up areas of Montgomery County as it would be nearly impossible to drive or walk up or down a major street (e.g., Georgia Avenue, Wisconsin Avenue, New Hampshire Avenue) without coming within 100 yards of any property attached to a place of public assembly.  Moreover, any Montgomery County resident with a wear or carry permit who lived or owned a business within 100 yards of any property attached to a place of public assembly would be barred from using the Maryland wear and carry permit while entering or exiting his residence or business.  Additionally, there are places in Montgomery County where the Beltway and U.S/ 29, for example, come within 100 yards of property attached to a place of public assembly.  Thus, this ordinance would criminalize use of a wear and carry permit while traveling through Montgomery County on the Beltway or U.S. 29.  It should not be difficult to see why the breath of this ban is inconsistent with the recent Supreme Court decision allowing legislatures to ban guns only in narrowly defined sensitive spaces.

There is also a problem with the vagueness of the definition of place of public assembly. By use of the term "including" the ordinance reads as if there are other unlisted places that may be considered a place of public assembly. With a criminal statute, the citizen is not supposed to have to guess what may or may not be included – particularly with a term that is broad enough to include, for example, any store.

There is a saying, "Bad cases make bad law."   Passing this ordinance as written will undoubtedly result in rejection by the courts and may very well result in a court decision that further restricts the right of a legislature to ban guns from sensitive spaces and thus winds up making gun control harder rather than easier.  In addition, passage of this ordinance as written will unnecessarily run up County legal fees with money that could be spent on productive initiatives.

In my 31-year career (1966-1997) in criminal justice (including positions as a police officer, probation officer, and parole officer in New York State, Staff Director of the U.S. Parole Commission, and Principal Technical Advisor of the U.S. Sentencing Commission), I have seen quite a few pieces of criminal justice legislation that were not well thought out and/or not well drafted.   In my opinion, this proposed ordinance, as written, falls in this category. Thus, I recommend strongly this proposed ordinance not be enacted as written. 1

Sincerely,

Peter B. Hoffman

Silver Spring, MD

1. If the "within 100 yards of" language were removed from this bill (so as to limit the prohibition to the actual property of the place of public assembly), and if the definition of place of public assembly was tightened to remove its vagueness, it might ameliorate the above noted issues.  Whether the proposed legislation is needed to address a real problem is another issue on which I take no position other than to note that during my career in criminal justice, I reviewed more than 25,000 files of convicted offenders and I remember only one case involving a crime committed with a handgun carried by a person having a permit to carry a handgun (not including offenses committed by persons who were authorized to vary a handgun because they were law enforcement officers).

Dear Counsel Members and constituents,

I am writing in regards to Bill Bill 21-22. Please allow me an opportunity to voice my concerns and kindly accept it for consideration. I will try to make this short and sweet.

I have lived in Montgomery County, Maryland for my whole life, except when I went to college. I am almost 42 years of age. Although I was a knucklehead growing up, I earned a Master's degree, volunteered for the fire department, am a member of a chamber of commerce, am Senior Home Safety Specialist, Client Liaison Manager and Marketing Coordinator and served on the community board of directors. Not to mention, my wife and I work hard, very hard. We have also been steadily employed our whole lives and we pay all our taxes on time.

As you make your decision, please take this into consideration, how is it fair that a criminal will be able to go to a mall with a gun, like it happened in 2016, but someone with my background has to be unarmed? Would that really make you feel safer? I live across the street from the mall. When I walk my dog, how do I know the proximity of when I am committing a crime by being 100ft of 100 people?

This approach will either force me to be unarmed, or deal with a subjective approach of a police officer. Why is it that the Supreme Court of the United States just made me, you and a lot of others like us more equal and you are voting to take that away? Please excuse me, but the laws you are considering will not make us safer.

Even if I don't carry arms, I feel a lot safer knowing that others who are responsible carry their arms. Montgomery County is a great county, but it's not in a secret bubble. Criminals are all over the place and they will not follow this law, nor will the criminals from neighboring counties who will flock here knowing how rich and unarmed our citizens are.

There have been many mass killings. The numbers are staggering. It's obvious some of you want to make guns go away. I honestly wish we could disarm all of America too, but we can't. It's ingrained in the constitution and the Supreme Court just clarified that. The law being considered will undoubtedly be challenged by many and it may end up being a very costly decision for our county. Please consider putting that time and money into schools, our infrastructure, and placing real criminals behind bars.

Please give me and other responsible citizens of Montgomery County the right and chance to defend ourselves if the unlikely, but life threatening, situation happens to arise. The elements of this law should be left up to private establishments on whether to allow or not allow arms.

It's great to require proper training and background checks. Maryland has good laws right now. Please, please, please do not create a law to punish the responsible citizens. This law can harm a responsible citizen with their lack of safety and/or having unfair legal repercussions.

(54)

Thank you for your open-mindedness and consideration. Please make that right decision and give the responsible citizens the equality that they deserve and that the rest of the country already has.

Respectfully,

Renan Augusto

Statement regarding Bill 21-22

Good afternoon, my name is Michele Walker.  I am a native of Maryland.  My husband and I have raised four children in Montgomery County since 1990.  Like our parents, we taught our children to respect our country and every person in it no matter their financial or educational status.  Sadly, there are those among us who do neither of those things.

Every American has the right and responsibility to defend not just themselves but their family, neighbors and other Americans whom they do not know personally.  The 2nd Amendment of the United States Constitution does not restrict American Citizens from wearing and carrying their firearms.  The Supreme Court has recently ruled against legislature that demands reason or need applications.  The courts have ruled against many restrictions that would infringe upon our  citizens rights.  There's an extremely low percentage of people using firearms to commit crimes or harm to others in comparison to the number of people who own one or more firearms that do not use them for those purposes.

There are numerous cases where a law abiding gun owner saved the day as a crime was happening.  Some were in convenience stores and saved the clerk or another customer from robbery and possible death.  A judge in Ohio was able to save himself from a criminal who was attempting to kill the judge right outside of the courthouse. In a mall a gunman was stopped by a citizen who had a permit.  None of us have the ability to know if we will be in one of those situations where a gun will be used with harmful intent but all of us would be grateful to be saved by someone who had our backs.  To those who want to push gun control, close your eyes and imagine yourself in one of those situations where there is an angry or upset person with a gun.  Now imagine if you have no one there to save your life because of these laws.  How would you feel if your close family member were just an innocent bystander harmed or killed because of the gun control law that prevented the possibility of someone to stop it from happening? None of us are exempt from the potentiality of being harmed by people who just don't care about the law or who are  out of their mind. None of us, that includes you too.

Please stop trying to unarm the law abiding citizens.  We have been taught  to respect the gun and use it properly.  Gun control does NOT work.   Look at the localities that have the strictest laws on the books and see that things have gotten progressively worse.  Chicago, New York and Philadelphia are shining examples of those cities.  Law abiding citizens do not have intent to go shoot up people or places.  We intend to protect ourselves and those around us from others who either have criminal intent or have a mental illness.  Address the real issues mentioned in the last sentence because it is not the gun, it's the person holding the gun.

(56)

To the Honorable Members of the County Council of Montgomery County, MD,

I urge you to vote against Expedited Bill 21-22, Weapons – Firearms in or Near Places of Public Assembly. I know you want to make me safer, but this bill does the exact opposite.

Antisemitic incidents are on the rise in the county, particularly by white supremacists[i]. White supremacists are the most likely of all extremists to use violence[ii]. They target synagogues because these facilities serve the Jewish community and assure the presence of a significant number of Montgomery County citizens at certain times of the week. Furthermore, In the orthodox community, Sabbath synagogue attendees do not carry their phones, so there would be a delay in alerting police to an active threat.

An additional factor impacting incident response is that Montgomery County police are understaffed and recruitment is down. Our sworn officers per capita is only half the national average[iii]. It is unrealistic to expect police to be able to engage with an active threat fast enough to prevent mass casualties.

Furthermore, turning places of worship (and essentially the entirety of the county) into gun free zones would do the precise opposite of its intent. It would serve as a welcome sign for potential mass murderers as to which locations they can "safely" unleash their mayhem[iv] — and there'll be nobody there (with a gun) to stop them! This is because the only people who will comply are law-abiding, licensed gun owners. Do you really think someone intent on mass murder will leave their gun at home because of this law?

Lastly, the expedited basis of this bill is unjustified. The CCW permit application process takes 90 days from submission to approval[v] plus a few days to mail the permit to the applicant.  This provides the MDSP sufficient time to perform a background investigation and interview up to three character witnesses. Before you can do that, you have to schedule and attend a 16-hour training class. You also need to take a live fire test with your instructor at a range to prove your proficiency firing a handgun. You also need to schedule and have your fingerprints taken to submit along with your application and fee. Then your CCW permitted citizen would have to select and purchase an appropriate concealed carry weapon, which in Maryland involves a minimum 7 day waiting period. Therefore, you have 90 to 120 days before the impact of additional CCW permit holders will be seen in the county.

CCW permit holders should be allowed to carry their concealed weapon to their place of worship specifically because of the heightened threat against places of worship. This bill will make it illegal for them to protect themselves specifically at the place they need it most. Therefore, I strongly urge you to vote against Expedited Bill 21-22.

Larry Jaffe
Silver Spring, MD

---

[i] "Sharp rise in anti-Semitism in Maryland, Virginia and D.C., ADL reports"
https://www.washingtonjewishweek.com/sharp-rise-in-anti-semitism-in-maryland-virginia-and-d-c-adl-reports/
and "ADL H.E.A.T. Map™ (Hate, Extremism, Antisemitism, Terrorism)" https://www.adl.org/resources/tools-to-track-hate/heat-map

ii "Domestic Extremism in America: Examining White Supremacist Violence in the Wake of Recent Attacks"
https://www.humanrightsfirst.org/resource/domestic-extremism-america-examining-white-supremacist-violence-wake-recent-attacks Relevant excerpt below:

In Pittsburgh, Pennsylvania, the killer who attacked worshippers in a synagogue wrote that he believed Western Civilization was facing "extinction" and that refugees were "invaders";[5]

The Christchurch, New Zealand killer titled his writings "The Great Replacement" and targeted Muslims in a country he was initially only visiting;[6]

The shooter in El Paso, Texas targeted Latinx people in the United States but wrote that he "supported" the racist screed from Christchurch;[7]

In Poway, California, the shooter first targeted a mosque and then a month later opened fire in a synagogue, claiming that Jews were orchestrating a "planned genocide of the European race";[8]

And most recently, the killer in Buffalo, New York, spent weeks identifying a locale in which to murder Black Americans. His own screed was largely a plagiarism of the Christchurch shooter's "Great Replacement" text, but was so sloppy that at times he merely swapped out terms for one victimized community for another.[9]

This heartbreaking trail of violence illustrates how fluidly the Great Replacement conspiracy theory travels across borders and populations.

Unfortunately, these mass casualty attacks are only one element in the larger phenomenon of violent white supremacism and domestic extremism.

Over the last decade in available data, white supremacist terrorism in the United States has increased many times over. Of the 100 white supremacist attacks between 2000 and 2019, 80 of them occurred after 2009, according to the Global Terrorism Database (GTD).[10] And while these terrorist attacks have increased, they have also become more lethal. Mass casualty attacks perpetrated by white supremacist terrorists like the horrific attack in Buffalo, used to be a rare occurrence. Now, they are frequent tragedies.

iii "Departures, sagging recruitment plague Montgomery County police (bethesdamagazine.com)"
https://bethesdamagazine.com/bethesda-beat/police-fire/departures-sagging-recruitment-plague-montgomery-county-police-even-as-crime-soars/
iv "Mass Public Shootings keep occurring in Gun-Free Zones: 94% of attacks since 1950"
https://crimeresearch.org/2018/06/more-misleading-information-from-bloombergs-everytown-for-gun-safety-on-guns-analysis-of-recent-mass-shootings/
v "Wear and Carry Permit (maryland.gov)"
https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Firearms/WearandCarryPermit.aspx

My name is Gary Simon. I am a lifelong resident of Montgomery County. I am a law-abiding MD Wear and Carry Permit holder as well as a MD Qualified Handgun Instructor (QHIC). While I think it fair to say that my viewpoints and philosophies are not very similar to the majority of the esteemed council, I do wish to thank you for the time that each of you dedicate to serving our county. I am here today to ask that you do so from a perspective of practicality and one that adheres to the laws that make our country what it is today.

You have proposed a law, 21-22, in response to a decision of the Supreme Court in the NYSRPA v. Bruen matter. In doing so, you present a code that directly defies the majority opinion written by the Honorable Judge Thomas. I offer a portion of that decision for the record here today. I offer only text, removing citation and reference in the essence of time and brevity.

"Consider, for example, Heller's discussion of "longstanding" laws forbidding the carrying of firearms in sensitive places such as schools and government buildings. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons are altogether prohibited-e.g., legislative assemblies, polling places, and courthouses- we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying cold be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible. Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law enforcement and other public-safety professionals are presumptively available. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" too broadly. Respondent's argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York Police Department,".

I am a permit holding, law-abiding citizen who will certainly be effected by this error-filled piece of legislation. What I believe gives me the greatest concern is that a body such as yourselves would propose such a piece of legislation that you know would be challenged and likely overturned. Rather than focusing on laws that focus on criminal conduct and are centered on the solving of an issue at hand, you propose something that is nothing more than window dressing to your constituency so that you are able to say we tried to do something. Perhaps if this type of energy was directed at criminals rather than law-abiding citizens exercising their constitutionally protected rights, you might garner the support of people like myself.

Thank you for your time and consideration.

**Edward Walker**

### Why I Oppose Bill 21-22 (and you should too)

I oppose Bill 21-22 for many reasons. The being that it doesn't just turn a right into a privilege, it completely removes this constitutional right from the people. For example even with a Maryland wear and carry permit, I would be unable to leave my place of residence with a legally owned firearm, 100 yards from the ground of a place of public assembly would extend into the street. There is a library, a church and a bank a few blocks from my house on the main road. Which means I'd have to break the law to exercise my RIGHT to carry even if was not intending to carry in Montgomery county.

Another reason I oppose this bill, as we have seen time and time again the police fail to act and to defend civilians, the Uvalde shooting is a prime example of law enforcements inability, unwillingness and cowardice to act in the event of a mass shooting or violent encounter. There's also an old saying which comes to mind in these cases "when seconds count, cops are minutes away". Throughout the years and as recently July 17, 2022 we saw a law abiding citizen, good guy with a gun, stop a cold hearted criminal, bad guy with a gun, in 15 seconds. 15 seconds and the horrendous atrocity was ended. 15 seconds. The officers at Uvalde waited 1 hour and 15 minutes. 1 hour and 15 minutes compared to 15 seconds. This shouldn't even need to be discussed. The answer is clear the people deserve to maintain their RIGHT to carry in public.

This bill will turn law abiding citizens who would like to exercise their right to carry a firearm, legally with a permit, for defense into criminals, while criminals would still be criminals who don't care about our laws and will still carry because they are criminals. This bill is bad legislation that will only effect lawful gun owners.

Thank you for your time, even if you don't actually care what the people think and only give us this opportunity to make us feel as if our opinions actually matter to you. We'll see you in court if this passes. Have a nice day.

(60)

Good afternoon. I'm Deborah Miller, the Director of Maryland Government and Community Relations for the JCRC of Greater Washington. The JCRC represents over 100 social services agencies, synagogues, and Jewish schools throughout the region. We work to build strong relationships and coalitions with other communities in pursuit of justice, tolerance, and equity for all. I am here today in support of Expedited Bill 21-22, which aims to reduce the dramatic rise in gun violence we are witnessing every day not only across the country, but in our county.

At the JCRC, one of our highest priorities is the safety and security of all faith-based institutions, particularly Jewish houses of worship, given the unprecedented increase in antisemitism- up 34% across the nation and 17% in Maryland according to the ADL. Additionally, MCPD's latest report on religious bias incidents shows that more than 85% targeted Jews, although they only make up only 10% of the County population. The Jewish community knows all too well the devastating impact of gun violence. In addition to the horrific targeting of African Americans, Asian Americans, and the LGBT Community throughout the country, we remember the Tree of Life tragedy in where 11 members of the Jewish community were murdered.

The importance of this legislation at this time cannot be underestimated. The JCRC is deeply disappointed by the Supreme Court's ruling striking down NY's concealed weapon permit law. We believe it will pose increased risk to public safety.  Houses of worship should be left to establish their own security plans. We do not want individuals who could walk in off the street with a weapon acting in their own individual capacity. It could lead to chaos and create an even more potentially deadly situation.

We will continue to advocate for common-sense gun safety measures throughout our region, because we know that the senseless violence, can only be stemmed by limiting easy access to such deadly weapons. While the Supreme Court taken a step backward to curb violence and ensure safety, we are grateful that in Montgomery County, our leaders are taking a step forward to counter this dangerous trend.  Fewer guns near or inside our places of assembly will create a safer environment for all of our residents. We thank the lead sponsor, Council President Gabe Albornoz as well as the entire council for its co-sponsorship.

(61)



Testimony of Montgomery County Young Democrats in Support of
Expedited Bill 21-22–Weapons–Firearms In or Near Places of Public
Assembly

July 25, 2022

Members of the County Council:

The Montgomery County Young Democrats strongly support Councilmember Albornoz's
Bill 21-22, which would ban the possession of guns in or near places of public
assembly, with a few exceptions. It would also remove an exemption that allows certain
people with permits to have guns within one hundred yards of these places. Gun
violence is a major problem in our county and country, resulting in tens of thousands of
deaths every year, and residents should not live in fear when they are out in public. This
proposal will tighten restrictions on guns and help ensure that people can participate in
public life without being intimidated.

Currently Maryland law allows people with wear-and-carry permits to possess guns
when they are within one hundred yards of or in parks, churchs, schools, public
buildings, and other places of public assembly. This bill bans people from selling,
transferring, possessing, or transporting guns in those areas. It includes reasonable
exemptions for police officers or security guards, business owners, residents who live
within 100 yards of a place of public assembly, and instructors for firearm safety and
use.

In order for people to thrive in Montgomery County and engage in its civic and
commercial life, they should feel welcome and not be subject to menacing threats. The
goal of this bill is to promote public safety and ease of mind. We want to minimize
concerns and worries that people have about people carrying weapons in and around
these places. People should be able to go to school, their places of worship, the mall, or

community centers without having to constantly look over their shoulder and worry about shooters.

Recently we have seen a troubling trend of people showing up with openly carried weapons outside polling places and other locations; these are blatant attempts to intimate people, discouraging them from voting and exercising their other political rights. And various authoritarian groups have shown up to various events, most notably Drag Queen Story Hour, and tried to disrupt them.

Bill 21-22 would help reduce acts of violence in county public spaces, counter attempts to intimidate people, and keep people safer. MCYD urges the County Council to vote yes on this bill.

Sincerely,

The Montgomery County Young Democrats

Montgomery County Council
Council Office Building
100 Maryland Avenue, 6th Floor
Rockville, MD 20850

July 25, 2022

Re: OPPOSE Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.


Esteemed Council Members:

I am writing you as a Maryland native, a Montgomery County business owner, and a registered Montgomery County voter to oppose Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly. I am also a Maryland Wear and Carry permit holder, earned with a substantial amount of background checks and training. While I understand your intent is to protect the lives of innocent people, this bill is vague and will create confusion for law-abiding citizens with carry permits.

Under this proposed bill, there is no definition of "places of public assembly," which can be construed as something as simple as a grocery store or bank without context. Since many of us with carry permits are frequently traveling from work and the primary purpose of the permit is to keep us safe in the disposition of our duties as a business owner while banking or traveling to and from our home, this vague wording places us at risk for breaking the law within the county where Maryland has provided us the right to protect our lives.

For instance, the specific addition of school parking lots places many of us at risk as we travel home from work while legally carrying a firearm. With the current cost of gasoline, it is ridiculous to expect us to go miles out of our way to return home.

The most substantial reason for my opposition to this bill is that it creates a patchwork regulation within the state of Maryland, which creates a challenging structure for law-abiding citizens of Montgomery County and Maryland to comply. This would also set a precedent where law-abiding citizens are placed at risk for prosecution from laws within a smaller jurisdiction without any type of signage to identify that legal firearm carrying is prohibited. It is challenging enough to recall which states have which specific laws and which areas are restricted.

In addition, there has been an inadequate amount of time since Bill 21-22 was introduced and the hearing date of July 26, 2022. Many Montgomery County residents are unaware of the aforementioned bill and have not had an opportunity to read or speak their affirmation or opposition to it. This quick vote seems underhanded and sneaky, something I am certain none of you wishes to be, particularly with the upcoming election.

Please oppose this bill and let us address gun violence from root cause mitigation. I would be honored to help with supporting the council with data and statistics on root cause mitigation and public awareness.


Sincerely,

Rachel King

(64)

## Testimony in Opposition of Council Bill 21-22

I submit this petition hosted on change.org in opposition of Council Bill 21-22.

https://chng.it/bKmKQXGq


Regards,
Katie Novotny

(65)

Dear Councilmembers,

I'm writing you as a resident of Montgomery county to let you know that I strongly oppose bill 21-22. I've lived here in Montgomery county for over 20 years now, I've seen the area go though lots of changes some good, some bad. Over the years, crime in the area is slowly getting worse and worse, from shootings happening less than a mile away from me, to muggings and armed assaults'. While I appreciate your efforts to try keep citizens safe, all this bill is doing is sending a message to criminals that the county is leaving its citizens defenseless. Stripping your law abiding citizens rights to protect themselves even when they've gone through the training, the background checks showing that the police approve of them to conceal a weapon is not a well thought out idea.

Someone that conceal carry's a firearm should be of sound mind and an upstanding citizen, there are checks and balances in place to restrict who can and cannot own and even conceal carry a firearm already in place. Thorough training is required, background checks are in place police have references to double check people who are applying. These should be more than enough. This is not going to be the wild west with people carrying a weapon exposed on their hip, These are going to be law abiding citizens, concealing a weapon, knowing it's a last line of defense incase something were to happen. With crimes going up, police response time going up, its not enough to solely rely on the police. I've had friends be victims of violent hate crimes, I've been in a situation where there was an attempted murder and was run to for help, in those 8-9 minutes of waiting for police to hopefully respond can often mean life or death for some.

I urge you to reconsider going through with this bill. Criminals will never listen to the letter of the law. Criminals see gun free zones as easy targets. Allowing your citizens the option to carry with a concealed carry permit is a deterrent in itself. Criminals may think twice, and move along not knowing who may or may not be able to defend themselves. Freedom is a two way street. Its often said ignorance of the law does not make you innocent. I've seen a lot of arguments that people should not have to worry who around them may or may not legally be carrying a weapon, well, ignorance of the law on their part does not make me a criminal. There have been a large number of situations where legal residents carrying a concealed firearm have kept horrible things from happening. A perfect example of this would be what just happened in Indiana. A mall where a "gun free zone" was in place 2 people broke that rule, one with the intent to cause harm to as many as he could, the other, a citizen with a concealed carry permit and a firearm out of sight. That citizen was able to save countless lives that day due to his training and fast thinking. While that is an extreme example it's also a realistic one.

In closing. Please reconsider passing this. I appreciate your attempts to make this county a "safer" place, but this will not accomplish it and will only hurt its citizens, and possibly even turn perfectly law abiding citizens into criminals just by wanting to legally protect themselves by carrying WITH a permit that has been issues by the police.

Thank you for your time,

Luke Roetman.

(66)

Testimony on Expedited Bill 21-22

Councilmembers,

My name is Daniel Sangaree and I'm a Montgomery County resident in Glenmont, a member of my community's home owners' association's board of directors, a married gay man, a registered and voting Democrat, and a Maryland Handgun Wear and Carry permit holder. My firearms training and experience includes handgun training by the Greene County (Missouri) Sheriff's Department as part of my university's criminal justice degree program, competitive handgun shooting as part of the American Criminal Justice Association, years of experience as a concealed weapons permit holder before moving to Maryland, Maryland's Handgun Qualification License training, and Maryland and DC's 16+ hours of concealed handgun permit training. This letter is my testimony in opposition to expedited Bill 21-22 currently under your consideration.

Bill 21-22 proposes to remove the exemption for Maryland handgun permit holders to the county's places of public assembly restrictions. As a permit holder this bill will affect me to a rather extreme degree. It is, in fact, a de facto ban on legal firearm carry throughout the populated areas of the county. Under even the much more objective definitions that existed before Bill 4-21, which this council previously passed, with the exemption removed I will not be able to do any of the following while otherwise legally armed:

- travel more than a block from my home in any direction on foot, Metro rail, or by car

- inspect, as a director, all of the property that is under my HOA's jurisdiction

- shop at my primary grocery store, the Safeway in Wheaton, or almost any of the grocery stores in the area, including: Giant in Aspen Hill, Lidl in Glenmont, Aldi in Glenmont, H-Mart

in Glenmont, Giant in Norbeck, Safeway in Norbeck, Giant in Wheaton, Target in Wheaton,

Safeway in Kensington, and so many more.

- walk my dog on his normal route which was chosen entirely for conflict avoidance
- defend myself in my car during a rising trend of violent, armed carjackings in the county that
  police, by the laws of physics, are unable to defend us from

While I am only speaking for myself, as an HOA board member I have also noted that there are
households within my HOA that, due to their proximity to a park, residents won't be able to legally leave
their house at all while armed, either walking or by car. Many are likely even unaware that they are
affected in this way. This specific scenario applies to many people in the county and that's before
applying the vague definitions as provided in Bill 4-21.

The vague definitions for a place of public assembly brought by 4-21 add a truly dystopian lens
through which to view this bill. This bill will allow police to arrest anyone who is otherwise legally armed
nearly anywhere in the county based purely on the personal discretion and biases of the officer. It takes
absolutely zero imagination to figure out exactly how that will be abused and what groups will be
victimized by the wide latitude this bill would give police. But just to be absolutely clear, it will be people
of color, queer people, and other oppressed minorities that bear the brunt of abuses by police from this
just as they bear the brunt of all police abuses. This is exactly why The Black Attorneys of Legal Aid, the
Bronx Defenders, and Brooklyn Defender Services, three public-defender groups in New York, filed an
amicus brief in support of NY State Rifle and Pistol Association in NYSRPA v Bruen. To quote that brief,
"virtually all our clients whom New York prosecutes for exercising their Second Amendment right are
Black or Hispanic. And that is no accident. New York enacted its firearm licensing requirements to
criminalize gun ownership by racial and ethnic minorities. That remains the effect of its enforcement by
police and prosecutors today." ("Brief amici curiae of Black Attorneys of Legal Aid, et al. ", 2021)

(68)

Which brings me to the biggest problem with this bill. Either the members of this council have never visited a county jail, prison, or other place of incarceration or they came away from it with a wholly different takeaway than I did when I visited jails and prisons as part of my criminal justice program. This bill intends to send upstanding members of our community, vetted by the state police as law abiding and trained, to jail for up to six months for an act with no element of malice and likely an honest mistake or a matter of police/prosecutorial discretion. This result, which is explicitly what this bill demands, is cruel and honestly horrific. This is the exact opposite of criminal justice reform that the Democratic Party has called for over the past multiple decades.

I ask that the members of this council reject this bill which will only serve to criminalize upstanding, and disproportionately minority, members of our community.

Sincerely,

Daniel Sangaree

References

"BRIEF OF THE BLACK ATTORNEYS OF LEGAL AID, THE BRONX DEFENDERS, BROOKLYN DEFENDER SERVICES, ET AL. AS AMICI CURIAE IN SUPPORT OF PETITIONERS", July 2021. Accessible via Supreme Court of the United States website, Docket 20-843.

(69)

**Testimony for the Montgomery County Council**
**July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near**
**Places of Public Assembly**
**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Lisa Morris. I am a volunteer with Maryland Moms Demand Action and I live in North Potomac. I am submitting written testimony in support of Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.

I have lived in Montgomery County my entire life. I am also a gun violence survivor as my life intersected with gun violence two times. I feel and believe our safety as a community and individuals/families are more at risk then ever.

The very dangerous decision made by the Supreme Court to weaken states permitting systems is already seeing ripple effect in states across the country, including in Maryland. States see that a weakened permitting system has a 13-15% increase in the rate of violent crimes. Research shows that when it is easier for people to carry guns in public, violent crime goes ups.

Montgomery County is experiencing a rise in gun violence; the last thing our county needs is guns where people gather.
The increased prevalence of guns outside the home only increases the risk of violence in public places. This will further endanger the public in Montgomery county and Maryland putting families, children, individuals and law enforcement in danger in what is already a gun violence and mass shooting epidemic.

Now the burden is more then ever on state and local officials to define the spaces in our community where guns are not permitted

and to provide strong public safety and gun reform legislation to keep all of us safe from gun violence in our communities as we go about our daily lives.

 I urge you and the council to pass Bill 21-22.

Thank you and the all of the council members for all you do for our county.

Lisa Morris
Volunteer
Moms Demand Action for Gun Sense in America, Maryland Chapter

**Testimony for the Montgomery County Council**

**July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly**

**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

I am Peter Benjamin, a former mayor of the Town of Garrett Park.  I am submitting written testimony in support of Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.

I agree with the legislation proposed and respectfully suggest two additions:

1. Include within the definition of places of public assembly all modes of public transportation, including vehicles and facilities as well as school buses.

2. I believe that New York, in its action in response to the Bruen decision, dealt with weapons carried into private business.  I would propose a similar provision that would ban weapons in all places of business, including stores, offices, and service facilities unless the owner or operator chooses to allow weapons in its place of business, in which case the exemption must be posted prominently and publicly at all entrances.

Thank you for your consideration,

Peter Benjamin



**President**
Mark W. Pennak

July 21, 2022

## WRITTEN TESTIMONY OF MARK W. PENNAK, PRESIDENT, MSI, IN OPPOSITION TO BILL 21-22

I am the President of Maryland Shall Issue ("MSI"). Maryland Shall Issue is a Section 501(c)(4), all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. I am also an attorney and an active member of the Bar of the District of Columbia and the Bar of Maryland. I recently retired from the United States Department of Justice, where I practiced law for 33 years in the Courts of Appeals of the United States and in the Supreme Court of the United States. I am an expert in Maryland Firearms Law, federal firearms law and the law of self-defense. I am also a Maryland State Police certified handgun instructor for the Maryland Wear and Carry Permit and the Maryland Handgun Qualification License and a certified NRA instructor in rifle, pistol, personal protection in the home, personal protection outside the home, muzzle loading, as well as a range safety officer. This letter is submitted in opposition to Bill 21-22.

In Bill 21-22, the County would amend Section 57.11(b) of the County Code to eliminate the existing exemption for carry permit holders from the prohibitions found in Section 57.11(a). Section 57.11(a) provides: "In or within 100 yards of a place of public assembly, a person must not: (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or (2) sell, transfer, possess, or transport a firearm created through a 3D printing process." The County code defines the term "place of public assembly" extremely broadly to mean: "a place where the public may assemble, whether the place is publicly or privately owned." This definition goes on to include, but is not limited to, any "park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as fairgrounds or a conference center." See County Code Section 57.1 (definitions).

The County invokes as its authority for this bill, an exception provision to a State preemption statute, MD Code, Criminal Law, § 4-209(a). That statute provides: "(a) Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun." Section 4-209(b) contains exceptions to this general preemption, one of which is that a "county, municipal corporation, or special taxing district may regulate the purchase, sale, transfer, ownership, possession, and transportation of the items listed in subsection (a) of this section:

*** (iii) * * * within 100 yards of or in a park, church, school, public building, and other place of public assembly." MD Code, Criminal Law, 4-209(b)(1)(iii).

That exception provision is narrow and strictly construed. In *Mora v. City of Gaithersburg*, 462 F.Supp.2d 675, 689 (D.Md. 2006), *modified on other grounds,* 519 F.3d 216 (4th Cir. 2008), a federal district court here in Maryland held that "the Legislature" has "occup[ied] virtually the entire field of weapons and ammunition regulation," holding further there can be no doubt that "the exceptions [in Section 4-209(b)] to otherwise blanket preemption [in Section 4-209(a)] are narrow and strictly construable." As thus construed, Section 4-209(b)(1)(iii) does not authorize this legislation. Indeed, the extent of the County's power under this provision is currently in litigation in *MSI v. Montgomery County*, Case No.: 485899V (Mont. Co. Cir. Ct), where MSI and other plaintiffs have challenged the County's enactment of Bill 4-21 last year. Cross-motions for summary judgment in that case were filed and oral argument conducted on July 19, 2022. Bill 21-22 builds on the framework established by Bill 4-21 and effectively negates carry permits issued by the State Police throughout the County. If the County loses the Bill 4-21 suit, such a decision would necessarily mean that the County likewise lacks the authority to enact Bill 21-22, as currently drafted. The County would be well-advised to await a decision before doubling down on its misguided reliance on Section 4-209(b)(1)(iii).

But even assuming *arguendo* that the County has the power it claims under Section 4-209(b)(1)(iii), Bill 21-22 still fails as it is blatantly unconstitutional under the Second Amendment, as construed by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). In *Bruen*, the Supreme Court held that the Second Amendment right to bear arms means "a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." Slip op. at 24-25 n.8. Specifically, the Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. The Court went on to reject the "means-end," two step, intermediate scrutiny analysis used by the lower courts to sustain gun regulations, holding that "[d]espite the popularity of this two-step approach, it is one step too many." The Court ruled that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Any such historical analogue would have to date from 1791 or, at the latest, 1868, when the 14th Amendment was adopted. See *Bruen*, slip op. at 25-26. That is because "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, slip op. at 25, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-635 (2008).

*Bruen* also holds that governments may regulate the public possession of firearms at "legislative assemblies, polling places, and courthouses" and notes that governments may also regulate firearms "in" schools and government buildings. *Bruen*, slip op. at 21, citing *Heller*, 554 U.S. at 599. *Bruen* states that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive

(74)

places are constitutionally permissible." (Id.). But nothing in *Bruen* can be read to allow a State (or a municipality) to regulate or ban firearms at every location where the "public may assemble" regardless of whether the place is "publicly or privately owned." Indeed, the Court rejected New York's "attempt to characterize New York's proper-cause requirement as "a 'sensitive-place' law," ruling that "**expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly**." Slip op. at 22. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." (Id.).

In a courtroom, the County will bear the burden of proof to show the historical presence of such analogous regulations. See *Bruen*. at 52 ("we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). *Ipse dixit* declarations or avowed public safety concerns will not do. Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Slip op. at 8. Here, the text of the Second Amendment indisputably covers the "possession, sale, transport, and transfer" of firearms and ammunition, as regulated by Section 57.11(a) of the County Code. **In such cases, "the government may not simply posit that the regulation promotes an important interest," but rather "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."** Id. In short, under *Bruen*, "**the Second Amendment guarantees a general right to public carry.**" *Bruen*, slip op. at 24.

The County has not and cannot make any such showing that eliminating the right to carry under a permit issued by the State Police "is consistent with this Nation's historical tradition of firearm regulation." Indeed, the very suggestion is nonsensical. There is no historical analogue that would permit the County to ban all possession of firearms in a church or a park, much less in any "other place of public assembly" as vastly defined by the County to include any place where the public "may assemble" regardless of whether such place is on public or private land. Montgomery County is no more a "sensitive place" than is Manhattan. Under the Second Amendment, the County may presumptively enact otherwise reasonable firearms regulations for these five, specific locations identified in *Bruen* and *Heller*, *viz*, in schools, public buildings, polling places, courthouses and legislative assemblies, **to the extent such regulation is otherwise authorized by State law**. As noted, the State has generally barred local regulation of firearms under Section 4-209(a). For example, the County has no authority to enact its own, "shall issue" licensing system that would supersede or conflict with that established by State law. Nor would it make any practical sense for the County to attempt to duplicate State law on such matters.

The State Police may continue to regulate public possession of handguns under its existing permit system as long as it issues permits on an objective, "shall issue" basis and the permitting system does not operate in such a way as to "deny ordinary citizens their right to public carry." See *Bruen*, slip op. at 30 n.9. But, there is no historical analogue that could justify regulating within 100 yards of those locations

(75)

or beyond those places. *Bruen* holds that the "Second Amendment guarantees a general right to public carry," and thus the County may not purport to ban the "possession, sale, transport, and transfer of firearms" within 100 yards of any location. Again, the burden is on the County to prove an historical analogue to the contrary.

Such bans are particularly nonsensical for persons who have obtained a wear and carry permit from the Maryland State Police. Under State law, MD Code, Public Safety, § 5-306(b), such individuals are subject to highly intrusive background investigations (including fingerprinting) conducted by the State Police and must undergo extensive training by State certified instructors, including passing a scored live-fire proficiency test. The undersigned is such a State Police-certified instructor. The State Police will continue to enforce those requirements even after *Bruen*. See Maryland State Police Advisory, LD-HPU-22-002 (July 5, 2022). Permit holders are among the most law-abiding individuals there are. They are not the problem. That has been true in all of the 43 States and the District of Columbia that issue permits on a "shall issue" basis. https://www.dailywire.com/news/report-concealed-carry-permit-holders-are-most-law-aaron-bandler/. Eliminating the exception for permit holders currently found in Section 57.11(b) of the County Code is utterly senseless from any calm, rational perspective.

Stated simply, regardless of the personal views of members of the Council County, this County is bound by the decisions of the Supreme Court, including decisions involving the Second Amendment. The County needs to rethink this Bill. If the County persists with the enactment of Bill 21-22, it will not survive judicial review. Defying the Supreme Court did not work for the racist proponents of segregation who refused to accept *Brown v. Board* in the 1950s and 1960s, and it will not work for any County attempt to defy *Bruen*. The Second Amendment is not a "second class right" that the County is free to ignore. *Bruen*, slip op. at 62. The sooner that members of the Council are able to put aside their personal opinions and accept that reality, the better. As stated in *Heller*, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. County taxpayer dollars have better uses than litigation that will most certainly ensue from any enactment of Bill 21-22. When plaintiffs prevail in such litigation (and they will), the County will also be on the hook for plaintiffs' attorneys' fees and costs under federal law, 42 U.S.C. § 1988, and those sums could well be substantial. The County Council should stop and think carefully before it goes down that road. Responsible, adult stewardship of the County requires nothing less. The County cannot say it was not put on notice or acted in ignorance of State law or the Second Amendment.

Respectfully,

Mark W. Pennak
President, Maryland Shall Issue, Inc.
mpennak@marylandshallissue.org

**Testimony for the Montgomery County Council**
**July 26, 2022**

**Expedited Bill 21-22, Weapons—Firearms In or Near Places of Public Assembly**
**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Jennifer Stein, and I am a long-standing volunteer with Maryland Moms Demand Action. I have lived in Montgomery County since 1995 and currently live in the Town of Chevy Chase. Together with my husband, Michael, we have raised a family here. I am submitting written testimony in support of Expedited Bill 21-22, Weapons—Firearms In or Near Places of Public Assembly.

Gun violence in our country has become a public health crisis of epic proportions. The statistics are so monumental—110 deaths and 200 more injuries every day—it is possible to become numb unless directly affected. But none of us is immune to the scourge of gun violence, which destroys lives, families, and communities. So far, Montgomery County has avoided a mass shooting in a sensitive public space, but this is not a matter of luck. Maryland's strong concealed carry permitting system was appropriate and necessary for public safety. Meanwhile, Montgomery County is experiencing a rise in gun violence—the last thing our county needs is guns where people gather. And no one should have to worry about gun violence when they take their kids to a playground, to a park, or drop them off at school.

The Supreme Court's dangerous decision striking down the "proper cause" discretionary requirement to conceal carry a firearm has already increased the risk of tragic mass shootings in our community. When permitting systems are weakened and more people may carry concealed weapons into sensitive public spaces, the research shows that deadly violence rises. States with no such discretion in issuing concealed carry permits have homicide rates 11% higher than states like Maryland and New York.

Now that the Supreme Court's concealed carry decision is the law of the land, Maryland and its local governments must take all reasonable action to protect children and adults from senseless gun violence within its borders. Expedited Bill 21-22, Weapons—Firearms In or Near Places of Public Assembly would be a commonsense, constitutional measure to help ensure public safety in the post-*Bruen* era. Montgomery County has the power under Maryland state law to regulate firearms as set forth in Expedited Bill 21-22. I urge the passage of this life-saving bill.

Sincerely,
Jennifer Stein
State Data Co-Lead
Moms Demand Action for Gun Sense in America, Maryland Chapter

Dear Sir or Ma'am -

In reference to Bill 4-21:

It is inherently dangerous to signal to criminals that the entire county is, in effect, a giant gun-free zone... "a place where the public may assemble" is literally and figuratively anywhere.

Please be reminded that the Colorado theater shooter specifically chose the particular theater because of it being in a gun-free zone, that is to say, free of law-abiding citizens capable of defending themselves. In doing so, he knew he could maximize the most damage in the least amount of time without a worry that someone, anyone could fight back.

Now, what are the chances of that happening here? That's the wrong question to ask. It's not about the chances, it's about the stakes - my life, and that of my family, is too great to risk.

I am open to any question or comments.

Very sincerely,

- Ben Figueroa

**Testimony for the Montgomery County Council**

**July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly**

**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Melissa Ladd. I am a volunteer with Maryland Moms Demand Action and I am a resident of Olney, and have lived in Montgomery County for 20 years. I am submitting written testimony in support of **Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.** Thank you for writing this bill in response to the misguided decision of the Supreme Court.

**The breadth of studies on concealed carry permitting show that when permitting restrictions are eased, the rate of violent crime increases.** A 2019 Study from Journal of Empirical Legal Studies shows that "RTC (Right to Carry) laws are associated with 13–15 percent *higher* aggregate violent crime rates 10 years after adoption".[1] Also, the Johns Hopkins School of Public Health research indicates that "By years 7 through 10 following the adoption of a RTC law, violent crime rates were 11% to 14% higher than predicted had such laws not been in place."[2] From a study by Duke University we learn that "increases in violent gun crime (29 percent), gun robbery (32 percent), and gun theft (35 percent) following the introduction of shall-issue concealed carry permit laws."[3]

We know that sensitive area prohibitions keep people safe where the risk of gun violence is elevated. Maryland law grants counties and other local authorities the power to regulate firearms in and near certain sensitive places, like those listed in this ordinance. The county must

---

[1] https://onlinelibrary.wiley.com/doi/abs/10.1111/jels.12219
[2] https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-violence-prevention-and-policy/_archive-2019/_pdfs/concealed-carry-of-firearms.pdf
[3]
https://www.nber.org/system/files/working_papers/w30190/w30190.pdf?utm_source=The+Trace+mailing+list&utm_campaign=b670a8e418-EMAIL_CAMPAIGN_2019_09_24_04_06_COPY_01&utm_medium=email&utm_term=0_f76c3ff31c-b670a8e418-112434573

do all it can to keep guns out of these sensitive locations where our children and families gather, and where we and our elected representatives take part in the democratic process.

 Thank you for addressing this issue and I strongly urge you to pass Bill 21-22.

Sincerely,

Melissa Ladd

Chapter Leader

Moms Demand Action for Gun Sense in America, Maryland Chapter

**Testimony for the Montgomery County Council**
**July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly**
**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Joanna Pearl. I am a volunteer with Maryland Moms Demand Action, and I live in Kensington. I submit this written testimony in support of Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.

I recently moved to this area, and my family chose to live in Maryland because we hope and believe it will be a safe place to raise my four-year-old daughter. Every day, I worry that even here in our state, we and our children are not safe from gun violence as we do everyday things like go to a park, a synagogue, a library, or a community center.

Montgomery County is experiencing a rise in gun violence, and the last thing we need is guns where people gather. Maryland law grants counties and other local authorities the power to regulate firearms in and near certain sensitive places, like those listed in the ordinance. The county should do all it can to keep guns out of these sensitive locations where our children and families gather, and where we and our elected representatives take part in the democratic process.

A growing body of research shows that when it is easier for people to carry guns in public, violent crime goes up. Sensitive area prohibitions, however, keep people safe where the risk of gun violence is elevated. It is a myth that mass shooters target gun-free zones: a study of 30-year of shootings showed no evidence that a single mass shooter chose to target a place because it prohibited guns. Rather, studies have shown that most mass shooters were connected to the location or were motivated by hate, a perceived grievance, or an interpersonal conflict. Keeping guns out of sensitive areas, as this bill would do, will make us all safer.

I hope the Committee will pass Expedited Bill 21-22 and protect everyone in our community from gun violence. Thank you for your attention to this critically important issue.

Sincerely,
Joanna Pearl
Montgomery County Local Group Co-Lead
Moms Demand Action for Gun Sense in America, Maryland Chapter

I would like to submit brief testimony in opposition to Expedited Bill 21-22, Weapons - Firearms In or Near Places of Public Assembly.  I have four reasons for opposing this legislation:

It will not make me and my family less susceptible to violent crime.

While the legislation's intended purpose is to improve safety and protect county residents from violent offenders, I fail to see how this provision does that. Literally, all Montgomery County residents, including legally armed residents deemed responsible by the state police, will be more vulnerable to violent crime. Criminals will know they have the tactical advantage when pursuing targets in places of public gatherings such as bus stops, train stations, parks and shopping center parking lots. I found it ironic this bill was announced the same day county police announced the arrest of district residents performing armed robbery of MontCo residents waiting at bus stops. This type of crime will continue.

The legislation will place a greater burden on police officers

At a time when police officers are retiring at record paces and the number of recruits failing to meet those losses, current officers will be forced to bear a greater burden to prevent and respond to crimes, particularly violent crime, before and when they occur. As a native New Yorker, I have personally experienced moments of tranquillity turn to chaos in a matter of seconds. The time chaos ensues to the time when the police arrive seems like an eternity whether it is 30 seconds or three minutes. The truth is every individual is their own first responder.

The legislation will place greater liability costs on businesses

Businesses will bear additional costs to ensure occupants to their businesses are safe from criminal elements. Liability and security

(82)

insurance will increase as businesses look to protect themselves from lawsuits stemming from crimes committed on their premises.
Public officials need to reevaluate their objective and not target law abiding citizens.

It appears to me this legislation is not addressing the problem it is trying to solve: gun-related crime.

There is a process in place to ensure firearms are not in the hands of law abiding citizens who may not be suitable for owning firearms; are criminals looking to circumvent the law, and/or are individual with emotional or mental health issues. The county needs to trust this process and not disarmed county residents the state police deem responsible to legally own and carry firearms. There are also many laws in place designed to prevent the illegal purchase, use and distribution of firearms. Elected officials must trust the process and laws in place and only make changes which ensure law abiding citizens are protected not punished.

Thank you.

(Slip Opinion)          OCTOBER  TERM,  2021          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL. *v.* BRUEN, SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 20–843.   Argued November 3, 2021—Decided June 23, 2022

The State of New York makes it a crime to possess a firearm without a license, whether inside or outside the home.  An individual who wants to carry a firearm outside his home may obtain an unrestricted license to "have and carry" a concealed "pistol or revolver" if he can prove that "proper cause exists" for doing so.  N. Y. Penal Law Ann. §400.00(2)(f ). An applicant satisfies the "proper cause" requirement only if he can "demonstrate a special need for self-protection distinguishable from that of the general community."  *E.g., In re Klenosky*, 75 App. Div. 2d 793, 428 N. Y. S. 2d 256, 257.

Petitioners Brandon Koch and Robert Nash are adult, law-abiding New York residents who both applied for unrestricted licenses to carry a handgun in public based on their generalized interest in self-defense. The State denied both of their applications for unrestricted licenses, allegedly because Koch and Nash failed to satisfy the "proper cause" requirement.  Petitioners then sued respondents—state officials who oversee the processing of licensing applications—for declaratory and injunctive relief, alleging that respondents violated their Second and Fourteenth Amendment rights by denying their unrestricted-license applications for failure to demonstrate a unique need for self-defense. The District Court dismissed petitioners' complaint and the Court of Appeals affirmed.  Both courts relied on the Second Circuit's prior decision in *Kachalsky* v. *County of Westchester*, 701 F. 3d 81, which had sustained New York's proper-cause standard, holding that the requirement was "substantially related to the achievement of an important governmental interest."  *Id.,* at 96.