**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)**

MARYLAND SHALL ISSUE, INC., et al.,

*Plaintiffs*,

v.

MONTGOMERY COUNTY, MARYLAND,

*Defendant.*

Consolidated Civil Action Nos.
8:21-cv-01736-TDC (lead)
8:22-cv-01967-DLB

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY
IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

Barry J. Pollack (Bar. No. 12415)
Kramer Levin Naftalis & Frankel, LLP
2000 K Street NW, 4th Floor
Washington, D.C. 20006
Telephone (202) 775-4500
Fax: (202) 775-4510
Email: bpollack@kramerlevin.com

*Counsel for Amicus Curiae
Everytown for Gun Safety*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTEREST OF AMICUS CURIAE .............................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 2

ARGUMENT .................................................................................................................. 3

    I.     Plaintiffs Have Not Met Their Burden To Establish That The Second
          Amendment's Plain Text Covers Their Conduct .................................... 3

    II.    The Proper Focus For Analysis Of Historical Regulation Is 1868, Not 1791 ........ 6

    III.   This Court Should Reject Any Effort To Dismiss The County's Historical
          Analogues As "Outliers" ....................................................................... 12

CONCLUSION ............................................................................................................ 15

i

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
   910 F.3d 106 (3d Cir. 2018)................................................................................1

*Davenport v. Wash. Educ. Ass'n*,
   551 U.S. 177 (2007)...........................................................................................14

*Defense Distributed v. Bonta*,
   No. 2:22-cv-06200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ........................................5

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)......................................................................................2, 4, 11

*Drummond v. Robinson Twp.*,
   9 F.4th 217 (3d Cir. 2021) ...................................................................................7

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ..............................................................................7, 10

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) .................................................................................14

*Gould v. Morgan*,
   907 F.3d 659 (1st Cir. 2018)...................................................................................6

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) .................................................................... *passim*

*Jackson v. City & County of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) ...................................................................................6

*Kennedy v. Bremerton School District*,
   142 S. Ct. 2407 (2022).........................................................................................3, 4

*Maryland Shall Issue, Inc. v. Hogan*,
   971 F.3d 199 (4th Cir. 2020) ...................................................................................6

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010)....................................................................................4, 7, 10, 14

*New York State Rifle & Pistol Association v. Bruen*,
   142 S. Ct. 2111 (2022)........................................................................... *passim*

## TABLE OF AUTHORITIES—Continued

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019)...............................................................................2

*Rupp v. Becerra*,
  401 F. Supp. 3d 978 (C.D. Cal. 2019) *vacated and remanded*, No. 19-56004,
  2022 WL 2382319 (9th Cir. June 28, 2022) ...........................................1

*Teixeira v. County of Alameda*,
  873 F.3d 670 (9th Cir. 2017) (en banc) ..................................................5

*Teter v. Connors*,
  460 F. Supp. 3d 989 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir.
  May 19, 2020)...........................................................................................2

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019) .................................................................4

*United States v. Greeno*,
  679 F.3d 510 (6th Cir. 2012) ...................................................................7

*United States v. Tallion*,
  No. 8:22-po-01758-AAQ, 2022 WL 17619254 (D. Md. Dec. 13, 2022) ............................4, 5

*United States v. Tilotta*,
  No. 3:19-cr-04768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) .....................................4, 5

## Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv (1998) ...........................9

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:
  Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205
  (2018).................................................................................................10, 13

Everytown Center for the Defense of Gun Safety, *Sensitive Places*,
  https://everytownlaw.org/everytown-center-for-the-defense-of-gun-
  safety/sensitive-places/ (last visited Jan. 3, 2023) ...........................................12, 13

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*
  (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917
  .................................................................................................................9

Kurt T. Lash, *Re-speaking the Bill of Rights: A New Doctrine of Incorporation*, 97
  Ind. L.J. 1439 (2022)..................................................................................8, 9

**TABLE OF AUTHORITIES—Continued**

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) .........................................................................................................11

### INTEREST OF AMICUS CURIAE

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 48,000 in Maryland. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 13 cities and other localities in Maryland are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 60 amicus briefs in Second Amendment and other firearms cases, including in this District, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *Maryland Shall Issue, Inc. v. Hogan*, 1:16-cv-03311-ELH, Dkt. 129 (D. Md. Dec. 3, 2020); *Hirschfeld v. ATF*, No. 19-2250, Dkt. 21 (4th Cir. Feb. 19, 2020). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92,

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

992 n.11 (C.D. Cal. 2019) *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The firearms restrictions Plaintiffs challenge are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons Defendant Montgomery County (the "County") has set out in its Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order and Emergency Motion for a Preliminary Injunction, Dkt. 59-2 (Dec. 30, 2022) ("County Mem.").[2] Everytown submits this amicus brief to expand on three points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden, and they have not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. Although not directly implicated

---

[2] This amicus brief addresses only aspects of Plaintiffs' Second Amendment claims. The Court should deny Plaintiffs' motion for a temporary restraining order and emergency motion for a preliminary injunction in their entirety for the reasons the County set out.

here, given the County's robust historical record, we highlight that point in case the Court chooses to address it.

## ARGUMENT

**I.     Plaintiffs Have Not Met Their Burden To Establish That The Second Amendment's Plain Text Covers Their Conduct**

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

Plaintiffs do not appear to contest that they have the burden on the initial, textual inquiry. *See* Corrected Memorandum in Support of Plaintiffs' Emergency Motion for a Temporary Restraining Order and Emergency Motion for a Preliminary Injunction, Dkt. 54-1 at 9, 12-13 (Dec. 6, 2022) ("Pl. Mem."). Nor could they, for at least two reasons. First, *Bruen* itself makes clear that the burden is on plaintiffs at the textual step, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of litigation—the Court would have said that the presumption exists from the outset. Second, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional issues. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement

of [their] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421.

Plaintiffs make little effort to carry their burden. First, they assert that they are challenging "the County's effective abolition of the right to carry a firearm in public that *Bruen* recognized," Pl. Mem. at 9, and then assert that their desire to possess and transport arms "as regulated by" the County's law is "indisputably" within the Second Amendment's text, *id.* at 12. But the law they challenge is no "effective abolition"; as the County explains, it restricts firearms only in or within 100 yards of an enumerated list of specific, sensitive locations. County Mem. at 4-5.[3] "[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places." *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (internal quotation marks omitted). The County's law thus stands in stark contrast to the laws struck down in *Heller* and *Bruen*—respectively, an unusually "severe" restriction that "totally ban[ned] handgun possession in the home," *Heller*, 554 U.S. at 628-29, and a carry regime that "prevented law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose," *Bruen*, 142 S. Ct. at 2150.[4] Accordingly, Plaintiffs cannot rest their textual claim on the simple assertion that they wish to carry handguns in public for self-defense, as the *Bruen* petitioners did. At the very least, Plaintiffs should be required to prove that

---

[3] The law also contains exceptions for (among other things) security guards licensed to carry firearms, at-home possession, and possession of unloaded firearms in public if they are in an enclosed case. *See id.* at 5.

[4] *See United States v. Tilotta*, No. 3:19-cr-04768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (noting that the firearm regulation at issue "is not equivalent to near total bans on the possession of handguns in the home or in public" as in *Heller*, *McDonald*, and *Bruen*, and that, "[t]herefore, the Second Amendment's text does not cover [the challenger]'s course of conduct"); *see also United States v. Tallion*, No. 8:22-po-01758-AAQ, 2022 WL 17619254, at *6 (D. Md. Dec. 13, 2022) (finding that federal regulation prohibiting firearms, explosives, and other weapons on the campus of the National Institutes of Health "is not a total prohibition on firearm possession comparable in geographic scope to those the Court struck down in *Heller* and *McDonald*").

the Second Amendment's text protects their "proposed course of conduct," *Bruen*, 142 S. Ct. at 2134, with respect to the specific, enumerated areas where the County's law restricts carry. *See Tallion*, 2022 WL 17619254, at *5 ("In this case, the question [under *Bruen*'s plain-text inquiry] is whether the Second Amendment includes a right to carry weapons onto government complexes like the NIH campus.").

Plaintiffs' assertion that the Second Amendment's text encompasses a right to *sell* or *transfer* a firearm within the specific, enumerated areas to which the County's law applies, *see* Pl. Mem. at 12-13, is even further from the mark. To begin with, the Second Amendment does not mention any right to "sell" or "transfer" arms.[5] Even granting, *arguendo*, Plaintiffs' premise that the right to "keep and bear" implies some subsidiary right to *acquire* arms, *see id.*, that still does not establish a textual basis for an individual right to *sell or transfer* firearms, *see id.* (asserting a "corresponding, ancillary right to sell firearms")—let alone to sell or transfer firearms within the specific, enumerated areas to which the County's law applies. Plaintiffs' first citation for their contention, *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc), in fact stated that "[n]othing in the text of the [Second] Amendment, as interpreted authoritatively in *Heller*, suggests the Second Amendment confers an independent right to sell or trade weapons." *Id.* at 683; *see also id.* ("Nothing in the specific language of the Amendment suggests that sellers fall within the scope of its protection."); *id.* ("Th[e] language [of the Second Amendment] confers a right on

---

[5] *See Tilotta*, 2022 WL 3924282, at *5 (explaining that, "textually, the ordinary meaning of 'keep and bear' does not include 'sell or transfer'"); *Defense Distributed v. Bonta*, No. 2:22-cv-06200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (concluding that the Second Amendment's plain text "quite-clearly" does not include any "implicit[]" right to "acquire and manufacture firearms" or "to purchase arms" (internal quotation marks omitted)), *adopted by* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022); *see also Tallion*, 2022 WL 17619254, at *2 (citing *Tilotta*'s plain-text analysis favorably, and further noting that "*Bruen* … preserved the idea that the government could '[impose] conditions and qualifications on the commercial sale of arms'" (alteration in *Taillon*) (quoting *Bruen*, 142 S. Ct. at 2162).

the 'people' who would keep and use arms, not those desiring to sell them.").[6] Given these principles, and given that individuals can acquire firearms to "keep and bear" through sales or transfers conducted *outside* the specific areas the County's law regulates, there is no reasonable argument that the text of the Second Amendment protects selling or transferring guns within those areas.

In sum, because Plaintiffs have failed to establish that the conduct in which they seek to engage is protected by the Second Amendment's text, they are not entitled to relief.

## II.   The Proper Focus For Analysis Of Historical Regulation Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

Several circuits reached this conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[7] *See Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time

---

[6] The other cases Plaintiffs cite for this supposed "ancillary" right are inapposite. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 214 & n.5 (4th Cir. 2020), considered whether a firearms seller had standing to challenge a Maryland law that forbade sales or transfers to anyone who did not present a state-issued "handgun qualification license"—not the merits question of whether the Second Amendment's text confers a right to sell or transfer firearms. And *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014), considered whether a purchaser had standing to challenge a San Francisco law and whether the Second Amendment encompasses ammunition—again, it did not hold that the Second Amendment's text grants a right to sell or transfer firearms (or ammunition).

[7] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations ...." (emphasis added)).

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868); *see also* Pl. Mem. at 10 (acknowledging that Court did not resolve the time-period issue). Moreover, *Bruen* concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the County's brief, this Court can uphold the challenged law under a historical analysis without deciding whether it should focus that analysis on the period around 1791 or the period around 1868. *See* County Mem. at 19-38.[8] But if this Court prefers to settle the issue the Supreme Court left open, it should conclude that 1868 is the correct focus.

---

[8] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the County's evidence), it should rely on 19th-century (and even 20th-century) history to clarify that meaning. *See infra* pp. 11-12.

7

To begin with, in a case involving a state or local law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states or local governments under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state or local government, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to

the public understanding … in 1791." *Id.* But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[9] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

---

[9] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against states and localities does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[10]

---

[10] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Furthermore, *Bruen* recognized that new societal concerns may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868,

11

for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern societal concern that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical restrictions addressing the condition to be found in that period.

Here, state and local laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the County's law. *See* County Mem. at 20-38.[11] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, it should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like the County's.

## III.   This Court Should Reject Any Effort To Dismiss The County's Historical Analogues As "Outliers"

Plaintiffs assert that, under *Bruen*, "historical outlier requirements of a few jurisdictions or of the Territories are to be disregarded." Pl. Mem. at 11 (internal quotation marks omitted).[12] Even if that assertion were correct, it is not implicated in this case, given the County's robust and extensive record of historical laws. *See* County Mem. at 20-38.[13] But to the extent this Court

---

[11] To be clear, whether laws precisely like the challenged law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

[12] Challengers in other recent Second Amendment cases have similarly sought to dismiss historical regulations as "outliers" insufficient to establish a historical tradition under *Bruen*. *See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers").

[13] *See also, e.g.*, Everytown Center for the Defense of Gun Safety, *Sensitive Places*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/   (last

chooses to address the issue here, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843). Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single state, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[14] Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[15]

---

visited Jan. 3, 2023) (citing, excerpting, and linking to a selection of historical sensitive places laws); Everytown Center for the Defense of Gun Safety, *Parks Restrictions*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ (last visited Jan. 3, 2023) (same, for a selection of additional restrictions on guns in parks).

[14] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* p. 14 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

[15] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

---

show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given the Supreme Court's discussion of sensitive places.

**CONCLUSION**

The Court should deny Plaintiffs' motion for a preliminary injunction.


Dated: January 6, 2023                    Respectfully submitted,

                                          */s/ Barry J. Pollack*
                                          Barry J. Pollack (Bar. No. 12415)
                                          Kramer Levin Naftalis & Frankel, LLP
                                          2000 K Street NW, 4th Floor
                                          Washington, D.C. 20006
                                          Telephone (202) 775-4500
                                          Fax: (202) 775-4510
                                          Email: bpollack@kramerlevin.com

                                          *Counsel for Amicus Curiae*
                                          *Everytown for Gun Safety*