**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., *et al*., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Case No. 8:21-cv-01736-TDC **(L)** |
| | ) Case No. 8:22-cv-01967-DLB |
| MONTGOMERY COUNTY, MD., | ) |
| | ) |
| *Defendant*. | ) |

**REPLY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A
TEMPORARY RESTRAINING ORDER AND
EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION**

As more fully set forth below and in Count VII, Bill 21-22E effectively eviscerates the ability of plaintiffs, who have been issued a wear and carry permit by the Maryland State Police, to exercise their fundamental Second Amendment right to carry a firearm in the County, as recognized in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). A TRO and a preliminary injunction are urgently needed to preserve the *status quo ante* and protect plaintiffs from unlawful enforcement.

**ARGUMENT**

I.    **PLAINTIFFS HAVE STANDING**

Ignoring the standing arguments set out in plaintiffs' Memorandum (P. Mem. at 31-35), the County argues that the Court should dismiss the Motion for a TRO and Preliminary Injunction ("TRO and PI Motion") because plaintiffs have "not identified any credible threat of prosecution under Chapter 57." (Def. Mem. at 8). The County does not dispute that *New York State Rifle Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022), holds that there is a general right to armed self-defense outside the home. The County does not dispute that Bill 21-22E impairs that right by effectively eliminating it in the County. The County admits that each of the individual plaintiffs (save one) have

alleged that they have wear and carry permits. (Def. Mem. at 3). The County likewise admits (Def. Mem. at 6), that Bill 21-22E repealed the prior exemption, set forth in Chapter 57, for holders of wear and carry permits and thus the County cannot dispute that persons with wear and carry permits who were not barred from exercising their constitutional right to carry firearms in public prior to the enactment of Bill 21-22E are now directly barred from doing so to the same extent by the enactment of Bill 21-22E.

By any measure, Bill 21-22E is specifically directed at carry permit holders and, plaintiffs, as permit holders, are the very object of bans inflicted by the Bill. Plaintiffs, including MSI members with permits, thus have been injured and have standing. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) ("Where "the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."). Plaintiff MSI likewise has representative standing to sue on behalf of its members who likewise have wear and carry permits. Unlike the one-off injury of an allegedly illegal chokehold suffered by the plaintiff in *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983), cited by the County (Def. Mem. at 9), Bill 21-22E inflicted harm to plaintiffs' constitutional rights on the day of enactment and *continues* to inflict this harm on a real and ongoing basis for every day in which Bill 21-22E remains in effect. There is nothing remotely "abstract" about that injury, as defendant erroneously contends. Def. Mem. at 9. These harms currently "actually exist" and are particularized and concrete "in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016).

This injury extends to the ban on the pre-existing use of carry permit holders to provide security at places of worship. The County does not dispute that such carry in churches and synagogues is now criminalized by Bill 21-22E. Plaintiff Eli Shemony regularly carried at his synagogue in the County but now has been advised by his synagogue that such carry is banned because of the enactment of Bill 21-22E. See Supplemental Declaration of Eli Shemony (attached as Exhibit A). Existing carry

permit holders are no longer providing security at their churches and synagogues because of Bill 21-22E. See id.; Supplemental Declarations of Alan Barall (Exhibit B) and John Smith (Exhibit C) (attached). Similarly, the named plaintiffs and MSI members with permits are inhibited from carry throughout the County because they fear prosecution. SAC ¶¶ 50, 51, 56-74.

Contrary to the County's belief, standing does not require "evidence" of prosecution. Thus, in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), the Supreme Court rejected essentially the same arguments made by the County here, holding "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." The Court further stressed that "'where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.'" Id. at 158-59, quoting *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128-29 (2007) (emphasis the Court's). The Court explained that "we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" Id. at 159, quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979).

The County does not dispute that plaintiffs have alleged that they intend to engage in a course of conduct that would violate Bill 21-22E. See TRO and PI Motion at 33. So, the only question is whether there is a "credible threat of prosecution." Sufficient "circumstances" of such a threat were presented in *Babbitt*, where "the plaintiffs' fear of prosecution was not 'imaginary or wholly speculative.'" Id. at 160 quoting *Babbitt*, 442 U.S. at 303. *Susan B. Anthony* also specifically rejected the lower court's holding that the risk of enforcement was "slim" in that case because the plaintiffs need only avoid engaging in the prohibited conduct. (573 U.S. at 163). That reasoning, the Court held, "misses the point" because there was nothing barring the government from finding "probable cause" for enforcement. Id. "Nothing in this Court's decisions requires a plaintiff who wishes to challenge

the constitutionality of a law to confess that he will in fact violate that law." Id. As to future enforcement, it was enough that the government had enforced its law in past and "have not disavowed enforcement" against the plaintiffs. Id. at 164. Indeed, in *Bryant v. Woodall*, 1 F.4th 280, 286-88 (4th Cir. 2021), the Fourth Circuit found a credible "threat of prosecution" even in the absence of prior enforcement, stating that "'[i]t would be unreasonable to assume that the [State] adopted the [the law] without intending that it be enforced.'" (Citation omitted). So too here.

Under this body of law all that is necessary is that the law "'on its face'" proscribe arguably constitutionally protected conduct, that the plaintiffs have engaged in such conduct "'in the past'" and have alleged an "'intention to continue'" that conduct. *Susan B. Anthony*, 573 U.S. at 160, quoting *Babbitt*, 442 U.S. at 298 & 301-302. This standard "sets a low threshold" and is "quite forgiving to plaintiffs seeking such pre-enforcement review" because "courts are generally 'willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund.'" *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (citations omitted). See also *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (the "State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise"); *Bryant*, 1 F.4th at 285-86 (finding standing even in the face of the State's "historic nonenforcement of the challenged statutes" for "nearly fifty years"). Indeed, the County passed Bill 21-22E on an emergency basis, asserting that the public safety required immediate action so as "to minimize the number of guns in our public space" and to prevent the exercise of the right to carry so that the citizens would not have to "wonder or worry" about whether an armed carry permit holder was nearby. See TRO and PI Motion at 14-15. Likewise in this Court, the County defends Bill 21-22E as justified by the County for the "public safety." Def. Mem. at 2, 42. These views were endorsed by the senior leadership of the Montgomery County Police Department. TRO and PI Motion at 15. There is every reason to believe that the County will enforce such an ordinance. Why else was the Bill passed? See *Bryant*, 1 F.4th at 286-86.

While the County argues that it has yet to arrest anyone under this new ordinance, Bill 21-22E has only been in effect for a little over a month so the absence of an arrest or prosecution is neither surprising nor probative. "[P]ast enforcement" is merely "good evidence that the threat of enforcement is not 'chimerical.'" *Susan B. Anthony*, 573 U.S. at 164, quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). The **test** is whether the threat of enforcement is "chimerical," and that term is defined as "unreal; imaginary" or "wildly fanciful" or "highly unrealistic." https://bit.ly/3CxqFxi. Plaintiffs' fears of enforcement are hardly "chimerical." Counsel for the County *expressly* refused to forego enforcement in the December case management conference with this Court and there would have been little point to the emergency enactment of the Bill if the County did not intend to enforce it. See *Bryant*, 1 F.4th at 286-86. Given these facts, "the prospect of future enforcement is far from 'imaginary or speculative.'" *Susan B. Anthony*, 573 U.S. at 165, quoting *Babbitt*, 442 U.S. at 298.

This case is thus far different than that presented in *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 217-18 (4th Cir. 2020). There, the Fourth Circuit applied *Babbitt* and *Susan B. Anthony* and held that there was no standing on *one* claim where the State Police had *affirmatively disavowed* the very type of enforcement feared by the plaintiffs and the plaintiffs had "not alleged any concrete intention" to engage in the conduct. 971 F.3d at 218. Here, the County has *refused* to disavow enforcement and plaintiffs with carry permits fully intend to continue to carry in places in which carry is expressly (and arguably) banned by Bill 21-22E, just as they carried in such places before the enactment of Bill 21-22E. See also *Koons v. Reynolds*, No. 22-07464, slip op. at 25 (D.N.J. Jan. 9, 2023) (finding standing and issuing a TRO against New Jersey's "sensitive places" post-*Bruen* legislation) (attached).

The County purports to distinguish *Hardaway v. Nigrelli*, --- F.Supp.3d ---, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022), and *Hardaway v. Nigrelli*, --- F.Supp.3d ---, 2022 WL 11669872 (W.D.N.Y. Oct. 20, 2022), arguing that standing was appropriate in *Hardaway* because the strong

threats of enforcement issued by the Governor of New York and others. The Governor's extreme conduct in New York certainly made the standing inquiry easier but such conduct is hardly the *sine qua non* of standing under *Susan B. Anthony, Babbitt* and *MedImmune.* Thus, in *Antonyuk v. Hochul,* --- F.Supp.3d ---, 2022 WL 3999791 at *16-17 (N.D.N.Y. 2022), the court initially held that there was no standing where the plaintiff had not alleged that he intended to carry in violation of the New York law. The plaintiff thereafter filed a new complaint with that allegation and standing was thereafter sustained. *Antonyuk v. Hochul,* --- F.Supp.3d ---, 2022 WL 16744700 at *12, *15, *21-*24, *26 (N.D.N.Y. 2022). The County ignores *Antonyuk.* See also *Koons,* slip op. at 26-27.

The County also argues that MSI and Engage "lack organizational standing." Def. Mem. at 13. But MSI is suing on behalf of its members, not on its own behalf, so MSI's organizational standing is irrelevant. See TRO and PI Motion at 32. The County does not dispute that MSI has satisfied all the elements of such representational standing set forth in *Hunt v. Washington State Apple Advert. Com'n.,* 432 U.S. 333, 342 (1977). See TRO and PI Motion at 32. The Court merely argues that MSI members would themselves lack standing because of "any credible threat of prosecution." Def. Mem. at 14. That argument is wrong for the reasons set forth above.

Similarly, Engage is a corporate entity, not an association, so "organizational standing" is irrelevant for Engage as well. In a holding ignored by the County, the Fourth Circuit ruled that a firearms dealer, such as Engage, has standing to sue on its own behalf and third-party standing to sue on behalf of its customers and other similarly situated persons. See *MSI,* 971 F.3d at 215. Engage is injured because, as a Type I dealer and a Type VII federally licensed firearms manufacturer, it engages in the sale and transfer of firearms and ammunition and major components, conduct which is expressly banned by Section 57-11(a). It is likewise injured by the possession and transport bans as such activities are at the very core of its business. Engage's owners and employees thus have carry

permits. SAC ¶¶ 55-72. The business location of Engage is arguably within 100 yards of one or more of the "sensitive places" designated by Bill 21-22E. SAC ¶ 56.

The County takes umbrage (Def. Mem. at 14) at the four John Doe declarations submitted by plaintiffs, arguing that such declarations "violate the spirit and letter" of 28 U.S.C. § 1746. But no rule bars anonymous non-party declarations and nothing in Section 1746 says that the declarant must be identified by name. Indeed, it is well-established that actual *parties* may proceed anonymously in certain situations. See, e.g, *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993) (whether to allow a *party* to proceed anonymously is a matter of discretion for the trial court). The County also cites *Patterson v. Cty. of Oneida,* 375 F.3d 206, 223 (2d Cir. 2004), but that decision merely held that the Rule 56(e)'s "specific facts" requirement on summary judgment motions was not satisfied in that case. No such situation is presented here. Here, each of these declarants has a carry permit, a status protected from public disclosure by State law. MD Code, General Provisions, § 4-325(a). Each of these declarants prefers to remain anonymous because if their identity were to be revealed it would threaten their ability to make a living, and/or would obviously undermine their future ability to provide armed security to their place of worship, and/or would expose themselves and their children to demonizing by persons who are intolerant of Second Amendment rights, hardly a rarity in Montgomery County, as the enactment of Bill 21-22E demonstrates. See ¶ 1 in each declaration.

"The public's interest in knowing who is prosecuting or defending a civil suit is substantially greater than its interest in knowing the identity of a witness*." Manasco v. Best In Town, Inc.,* 2022 WL 816469 (N.D. Ala. 2022) (allowing anonymous declarants); See also *Braswell v. Homesite Insurance Co.,* 2019 WL 5420585 at *2 (N.D. Ohio. 2019) (denying motion *in limine* as to anonymous declarants). The County has not asserted any prejudice or disputed the facts stated in those submissions. Those submissions are also supported by identified declarants, including the declarations of Alan Barall and David Sussman as well as by the verified allegations of plaintiff Eli

Shemony. SAC ¶¶ 74. They are further supported by the Supplemental Declarations of plaintiff Shemony (Exhibit A), Alan Barall (Exhibit B), and John Smith (Exhibit C), submitted with this Reply.

Contrary to the County's contention, none of these declarations are intended to "inflame the court." Def. Mem. at 14. Rather, the declarations detail the urgent need for the armed security previously provided *by these declarants* for their *own* places of worship in the County, a matter obviously relevant to plaintiffs' motion. Bill 21-22E has disarmed these individuals who now feel like "sitting ducks" for the next murderous rampage at a place of worship. (Barall Supp. Decl. ¶ 7). The County does not dispute that the Maryland State Police granted permits *to these declarants* prior to *Bruen* in recognition that armed protection for places of worship was a "good and substantial reason" for a permit under MD Code, Public Safety, § 5-306(a)(6)(ii).

## II.    BILL 21-22E VIOLATES THE SECOND AMENDMENT

### A.  The 100-Yard Exclusion Zones Are Unconstitutional Under *Bruen*

The County asserts the authority to enact exclusion zones "in places of public assembly, or where large groups of persons are likely to be gathered and therefore more likely vulnerable to gun violence." (Def. Mem. at 19). But nothing in the bans enacted by Bill 21-22E is, in any way, limited to "large groups" or even actual "gatherings." The County expressly defines a "place of public assembly" to include all privately owned property at the specified locations *regardless* of whether the property is even open to the public and *regardless* of the number of persons there located. SAC ¶ 11. Such broad regulation is flatly inconsistent with *Bruen*. There, the Court abrogated the "two-step," means-end analysis previously followed by the lower courts and held that "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest." 142 S.Ct. at 2126. The Court thus stressed that "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." (Id.). The law must be "enduring," not merely transitory. *Bruen*, 142 S.Ct. at 2154.

Applying this standard, the Court expressly rejected New York's attempt to regulate in all places of "where people typically congregate and where law-enforcement are usually presumptively available," holding that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 142 S.Ct. at 2133-34. The County's attempt to regulate all places where people "are likely to gather" is simply another term for places where people "typically congregate" and thus fails for that reason alone. See *Koons*, slip op. at 28 (holding that "'sensitive place' is a term within the Second Amendment context that should not be defined expansively"); id., slip op. at 34 (finding no historical analogue for gun bans in locations "where crowds gather").

The County asserts that its 100-yard exclusion zones are constitutional because similar zones have been sustained prior to *Bruen* but those pre-*Bruen* cases are easily distinguishable. For example, in *United States v. Class*, 930 F.3 460 (D.C. Cir. 2019), the D.C. Circuit sustained as a sensitive place the zone around the United States Capitol Building. (Def. Mem. at 21). Yet, because *Class* was decided before *Bruen*, the court never conducted an historical inquiry, but rather simply concluded that "there are few, if any, government buildings more 'sensitive' than the 'national legislature at the very seat of its operations.'" 930 F.3d at 463 (citation omitted). *Class* also stressed that "nothing about the ban prevents a person who wishes to carry a firearm for self-defense from taking an alternate route that avoids the Capitol Grounds." Id. at 466.

Such ad hoc, *ipse dixit* conclusions are no longer permissible after *Bruen*. Indeed, the *Bruen* Court cites *Class* with express disapproval. 142 S.Ct. at 2127 n.4. After *Bruen*, the County must justify its exclusion zone with an historical analogue. None of the places specified in the County's long list of exclusion zones are remotely like the Capitol Building in sensitivity, much less so justified by an historical analogue. And, unlike in *Class*, where it was easy to avoid the Capitol

zone, the County's list of exclusion zones effectively makes it impossible for a permit holder to move throughout the County. See TRO and PI Motion at 18.

Nor is the 100-yard exclusion zone remotely consistent with the post-*Bruen* analysis of any court. See *Antonyuk v. Hochul*, --- F.Supp.3d ----, 2022 WL 16744700 at *86 (N.D.N.Y. Nov. 7, 2022); *Antonyuk v. Hochul*, --- F.Supp.3d ----, 2022 WL 5239895 at *20-21 (N.D.N.Y. Oct. 6, 2022) (invaliding numerous New York location bans); *Christian v. Nigrelli,* --- F.Supp.3d ---, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) (invaliding New York's presumptive ban on possession on private property); *Hardaway* (invalidating New York's ban on possession in places of worship); *Spencer v. Nigreilli,* 2022 WL 17985966 (W.D.N.Y. Dec. 29, 2022) (same); *Koons* (invaliding New Jersey's post-*Bruen* gun bans in public libraries and museums, in bars and restaurants where alcohol is served, in vehicles and presumptive ban on private property). It is telling that not even New York and New Jersey attempted to include exclusion zones in their post-*Bruen* legislation struck down in these cases. The New York and New Jersey sensitive area restrictions generally addressed areas open to the public while the County's law is even more extreme, regulating "privately owned" property regardless of whether it is open to the public.

The County's reliance on *Bonidy v. United States*, 70 F.3d 1121 (10th Cir. 2015), and the *per curium* opinion in *United States v. Dorosan,* 350 Fed. Appx. 874 (5th Cir. 2009), likewise fail. In these cases, the sole issue was whether Postal Service property was a "government building" and thus a sensitive place under *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008). Neither court performed an historical analysis and neither ruling purported to endorse the County's unbounded view that all public and private places where people may "gather" constitute "sensitive places." As in *Class*, such restrictions on postal property addressed a "'small pocket of the outside world' where a ban imposes only 'lightly' on the right to carry a weapon." *Class*, 930 F.3d at 465-66, quoting *Dorosan*, 350 F.App'x at 876. See *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir.

2012) ("when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places").

The County likewise fails to provide a "well-established, representative historical analogue" for its 100-yard exclusion zones for its "publicly and privately owned" places. The County has not disputed plaintiffs' point (TRO and PI Motion at 10 n.1) that the relevant date for assessing historical analogues is 1791. In *Bruen*, the Court stated that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct. at 2137, quoting *Heller*, 554 U.S. at 614. With a single exception, the County's cited list (Def. Mem. at 23) of analogous regulations all involved regulations enacted well after the Civil War and are thus inapposite under *Bruen*.

The sole pre-Civil War regulation cited by the County (Def. Mem. 22) is an 1837 regulation enacted for the protection of waterfowl in Somerset County, Maryland. That law banned arms in the "Holland's Straits" and only then "within 50 yards of any blind for shooting fowl, with the intent to shoot or molest any wild fowl within the region aforesaid." As the County admits, the law was enacted for the protection of wild fowl, not as a restriction on the right to self-defense. Undaunted, the County asserts that such regulations are appropriate analogues because if Maryland could protect waterfowl, then "certainly human life in areas of public assembly can similarly be protected by a buffer zone." (Def. Mem. at 24). That argument borders on the frivolous.

*Bruen* holds that the analogue inquiry is controlled by two "metrics," *viz.,* "how and why the *regulations burden a law-abiding citizen's right to armed self-defense*." 142 S.Ct. 2133 (emphasis added). The Court thus ruled that "whether modern and historical regulations impose a *comparable burden on the right of armed self-defense* and whether that burden is *comparably justified* are 'central' considerations when engaging in an analogical inquiry." (*Id.*) (emphasis

added). See *Koons*, slip. Op. at 15-16. While the Court remarked that the analogue inquiry might be different where the regulation was prompted by some "unprecedented societal concerns or dramatic technological changes" id. at 2132, here the County has conceded (Def. Mem. at 19) that Bill 21-22E was based on "the same alleged societal problem addressed in *Heller:* handgun violence, primarily in urban area[s]." Id. at 2131. In such cases, the analysis is "straightforward" and controlled by "the lack of a distinctly similar historical regulation." Id. The County's suggestion that other metrics are applicable (Def. Mem. at 18) is flatly wrong.

Under this test, game laws, like the 1837 Maryland law, cannot be used as an historical analogue because such laws were intended to protect game, not restrict the right of self-defense. See *Antonyuk*, 2022 WL 3999791 *35 (holding that "anti-poaching laws" are inapposite); *Koons*, slip op. at 39-41 (same). Likewise, the relatively few local park regulations cited by the County (Def. Mem. at 23-24), banned firearms and "cattle, horses, goats or swine" and prohibited harming "trees, shrubs, plants, turf" and shooting birds, and throwing "stones or other missiles." Such laws were for the protection of the flora and fauna in the parks. All were enacted well after the Civil War. These local "park" regulations are also not "representative" of regulations of regulations existing during the Founding Era. See *Bruen*, 142 S.Ct. at 2133, 2153, 2156 (rejecting outlier regulations). The Connecticut 1859 law, cited by the County (Def. Mem. at 24), is particularly inapposite, as it banned the sale of *liquor* within a mile of a military field and thus did not even involve firearms. See *Koons*, slip op. at 33.

The County likewise relies on an 1887 law enacted by the Territory of New Mexico that banned firearms within three miles of an inhabited house. (Def. at 23-24). Yet, *Bruen* expressly rejected reliance on laws enacted in the Territories, including expressly "Arizona, Idaho, New Mexico, Oklahoma" (142 S.Ct. at 2154), holding that such laws "are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them

'instructive.'" Id., quoting *Heller*, 554 U.S. at 614. See also *Bruen*, 142 S.Ct. at 2155 ("we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population"). In short, the County's exclusion zones are unsupported by any remotely applicable "well-established, representative historical analogue."

### B.  Private Schools and Private Child Care Facilities

The County argues that private schools are no different than public schools and thus the County may ban all firearms at all such schools where "children" gather for education. The County does not address and thus concedes plaintiffs' point that "schools" as amended by Bill 4-21 and as used in Bill 21-22E are not limited to "elementary or secondary schools" (the type previously regulated by the County). SAC ¶ 6. Thus, the bans arguably include *all* schools, including trade schools and colleges and universities where "children" are **not** in attendance. Yet, the County does not argue that schools for adults are sensitive places as the term is used in *Bruen*.

The County cites post-Civil War laws in four jurisdictions, Texas, Missouri and the Territories of Oklahoma and Arizona, that purported to ban weapons in any school (Def. Mem. at 25), but these laws were all enacted on or after 1870 and thus far post-date the Founding Era. Two of these four jurisdictions were Territories at the time and Territorial laws are, as noted, flatly inapposite under *Bruen*. Post-Civil War laws in the remaining **two** jurisdictions cannot serve as a "well-established, representative historical analogue" for the reasons set forth above. In the 1870 Census, Texas and Missouri had a combined population of 2,539,874 out of total U.S. population of 38,558,371 or 6.6%. https://bit.ly/3XaqhfS. These laws were not representative of an enduring tradition.

Moreover, none of these laws specifically address *private* schools. The lack of such an historical analogue for private schools matters intensely because modern private schools are typically on the grounds of churches, synagogues and other religious institutions and thus must be viewed as

part of religious institutions, not merely as "schools." Such private schools, for example, do not have access to publicly funded, armed "school resource officers." See MD Code, Education, § 7-1508; MD Code, Education, § 7-1501(j),(k); MD Code, Education, § 26-102. As the six declarations submitted with the TRO and PI Motion and the supplemental declarations submitted with this Reply attest, such religious institutions are under real threat and thus provide for their own security, as they have historically. See TRO and PI Motion at 23. And nothing in any of the laws cited by the County imposed an exclusion zone for schools of any type. No such exclusion zone is imposed by State law which is limited to public school property. MD Code, Criminal Law, § 4-102.

The County also relies on (Def. Mem. at 23) an 1892 Mississippi law that banned the *concealed carry* of weapons within two miles of a university, college or school, but that law expressly applied only to possession by a "*student or pupil*," not to possession by teachers, much less to possession by other adults. Current Mississippi law contains no buffer zone and likewise specifically covers only students who are allowed to carry in vehicles and otherwise if the firearm is not brandished in a threatening manner. Miss. Code, § 97-37-17. *One* 1892 law banning concealed carry by students or pupils cannot serve as a proper historical analogue for an exclusion zone that bans *any* possession by *anyone* of *any* firearm. See TRO and PI Motion at 13-14. See *Bruen*, 142 S.Ct. at 2155 ("We have already explained that we will not stake our interpretation of the Second Amendment upon a law in effect in a single State, or a single city"). That point applies with even greater force where the *one* law far post-dates the Civil War and is far less restrictive than the County's law and thus does impose a "comparable" burden on the right of self-defense. The County has not even attempted to show that the 1892 law was "enduring."

These points apply equally to the County's ban on firearms at and within 100-yards of a privately owned childcare facility, a term that is left totally undefined. The County does not identify any historical analogue for this vaguely worded ban, but argues, *ipse dixit,* that such facilities are like

schools and thus may be regulated in the same way. But that argument fails because the County makes no attempt to confine the coverage of this term to analogous school-like settings, much less to justify the 100-yard exclusion zone. For example, a childcare facility could include care for infants or toddlers in a private home. Such a facility could hardly be analogized to an historical definition of a "school," as the term is used in *Bruen*.

More fundamentally, adults do not lose Second Amendment rights merely because they happen to come within 100-yards of a place that cares for children. See *Johnson v. Lyon*, 406 F.Supp.651 (W.D. Mich. 2018) (State regulation invalid under the Second Amendment where it prevented foster parents of children from using firearms to protect their homes). The County relies on (Def. Mem. at 27) *Miller v. Smith*, 2022 WL 782735 *12 (C.D. Ill. 2022), but *Miller* was decided before *Bruen,* and the court there sustained a ban on possession in daycare facilities *only* after applying intermediate scrutiny, the very type of scrutiny abrogated in *Bruen*. 142 S.Ct. at 2127. And *Miller* did not involve an exclusion zone. Unlike the County's bans, the federal gun-free, school zone law, 18 U.S.C. § 922(q), expressly exempts possession on private property or where the person has a State-issued carry permit. 18 U.S.C. § 922(q)(2)(i),(ii). We know of no law, and the County has cited none, modern or historical, that is comparable to any of the County's exclusion zones.

### C. The Ban At Or Within 100-Yards Of A Place Where Constitutional Rights Of Assembly Are Being Exercised

The County relies (Def. Mem. at 28-29) on the laws of four States, Tennessee, Georgia, Missouri and Texas, and two Territories, Arizona and Oklahoma, to justify its ban on firearms at and within 100 yards of "a gathering of individuals to collectively express their constitutional right to protest or assemble." (Def. Mem. at 28). The earliest of these State laws is an 1869 Tennessee law that banned carrying a *pistol* to any place of public assembly, followed by an 1870 Georgia

law that was likewise was limited to a ban on a "pistol or revolver." The Missouri and the Texas laws were broader, applying to a "gun" or "firearm." These laws were enacted after the Civil War.

The Tennessee and Georgia post-Civil War statutes are not proper historical analogues because these laws are too far removed from the Founding Era *and* were limited to *handguns* at such places and thus are not "comparable" in its "burdens" to the County's total ban on *any* type of firearms within 100 yards of such places of assembly. *Bruen*, 142 S.Ct. at 2132. Missouri law, enacted in 1879, and Texas statute, enacted in 1870, purported to ban all guns, but for the reasons discussed above, these *two* post-Civil War statutes are unrepresentative and were enacted too late to be historical analogues. These laws also simply did not impose comparable burdens on the right. See *Koons*, slip op. at 34-35 (discussing the Texas, Tennessee and Missouri laws). The County also relies on laws enacted by two Territories, Arizona and Oklahoma, enacted even later, in 1889 and 1890, but again *Bruen* makes clear that such territorial laws are entitled to no weight. Not surprisingly, *Antonyuk* rejected all these same statutes. See *Antonyuk*, 2022 WL 16744700 at *69. The municipal laws for the then-tiny towns of Columbia, MO, and the City of Huntsville, MO, cited by the County (Def. Mem. at 29), were both enacted in 1890, and are even less representative of the Founding Era tradition. None of these laws established an exclusion zone at a place of public assembly. The County has not shown that any of these laws endured over time.

### D.  Privately and Publicly Owned Parks

The County (Def. Mem. at 29-30) makes no attempt to distinguish the pre-*Bruen* precedent (TRO and PI Motion at 26-30), that held public parks were not "sensitive places." The County likewise does not dispute or discuss *Antonyuk* at *65-*67, which invalidated New York's ban on carry in "public parks" by permit holders. The *Antonyuk* court examined each of the historical regulations cited by the County here, including the 1870 Texas law, the 1883 Missouri law, along with park laws for Philadelphia law, New York Central Park law, 'Chicago, St. Louis and St. Paul

city laws, and ruled that these laws were not "representative of the Nation," the inquiry required by *Bruen*. See *Antonyuk*, at *67. The *Antonyuk* court reasoned that the two States (Texas and Missouri) contained "only about 6.6 percent of the American population" in 1870 and "the burdensomeness of this [New York] regulation" was "unreasonably disproportionate to that of its historical analogues." Id. The same analysis applies here. See *Bruen*,142 S.Ct. at 2133 (the burdens must be "comparable"). Again, the County's ban at or within 100 yards of all privately and publicly owned parks is even more extreme than the New York statute.

The County's reliance (Def. Mem. at 30) on the bans on firearms in Fairmount Park in Philadelphia and in Central Park in New York is also misplaced for another reason. As noted, these laws banned "cattle, horses, goats or swine" and prohibited harming "trees, shrubs, plants, turf" and shooting birds, and on throwing "stones or other missiles." The St. Paul regulation and the Wilmington regulation cited by the County, likewise banned shooting birds. Again, these park laws were intended to protect park flora and fauna rather than restrict self-defense and are thus not appropriate analogues under the "metrics" specified in *Bruen*. These park regulations also far post-date the Civil War as the Wilmington regulation was enacted in 1893, the Williamsport regulation in 1891, the Reading regulation in 1897, the Trenton regulation in 1903, the Chicago regulation in 1905, the New York regulation in 1906 and the Staunton regulation in 1910.

### E.  Places of Worship

The County relies on the same Reconstruction Era statutes enacted between 1870 and 1894, discussed above as support for its ban on firearms at or within 100 yards of a place of worship. That reliance fails for the same reasons discussed above. The court in *Antonyuk* canvassed all these laws, concluding that they were not "representative of the Nation's laws given that they came from states that contained only about 12.9 percent of the national population." *Antonyuk*, 2022 WL 16744700 at *61. These laws have since been repealed or substantially changed. See, e.g., Georgia

Code Title 16. Crimes and Offenses § 16-11-127; Tx. Acts 1973, 63rd Leg., p. 883, ch. 399, §1 eff. Jan 1, 1974. None of these laws have been shown to be "enduring." *Bruen*, 142 S.Ct. at 2154.

Likewise, in *Hardaway*, the court found that "places of worship and religious observation exclusion thus finds no analogy in *Bruen*'s recognized sensitive places." 2022 WL 11669872 at *13. The court rejected the same statutes cited by the County here, holding that "the State has not met its burden to show *endurance over time*." Id. at 15 (emphasis the court's). The court thus concluded that "[t]hese enactments are far too remote, far too anachronistic, and very much outliers—insufficient, then, in the search for an American tradition." Id. *Spencer* likewise held that there is no "American tradition supporting the houses of worship exclusion," ruling that "the State has not met is burden to show *endurance* (of any sort) *over time."* 2022 WL 1785966 at *11 (emphasis the court's).

The County admits that the colonies in the Founding Era required that arms be brought to places of worship (Def. Mem. at 32 n.12) but asserts that was because of the need "to thwart slave revolts." The County's effort to denigrate these laws is ironic given that the Reconstruction Era statutes on which the County relies are themselves tarred with racist Jim Crow motivations. See *Heller*, 554 U.S. at 614-16; *McDonald v. City of Chicago*, 561 U.S. 742, 771-77 (2010); id, at 847-48 (Thomas, J., concurring). But the reasons are ultimately irrelevant as the mere existence of such laws makes clear that there was no Founding Era tradition comparable to the County's bans. See *Hardaway*, 2022 WL 11669872 at *15 (these "outlier enactments" "contrast with colonial-era enactments that, in fact, mandated such carry at places of worship." See *Spencer*, 2022 WL 17985966 at *11 (finding "no analogy in *Bruen*'s recognized sensitive places").

### F.  Privately and Publicly Owned Recreational and Exhibition Facilities

The County makes the same errors with respect to recreational and exhibition facilities. These County's bans are not even limited to places open to the public and thus the sweep of these

bans is immense. With the sole exception of a New Orleans ordinance and a Territory of New Mexico statute, all the State and Territorial laws cited by the County post-date the Civil War. These laws are no more representative than the statutes that banned firearms in churches. These laws also did not impose comparable burdens. As *Koons* holds, slip op. at 37-38, 42-43, there is a "presumption" that the Second Amendment right to carry extends to private property, including the "privately owned" locations in which possession and transport are banned by the County. See also *Antonyuk*, 2022 WL 16744700 at *78-*81 (same).

The New Mexico and New Orleans laws do not establish a Founding Era analogue. The Territory of New Mexico 1852 law cited by the County (Def. Mem. at 35) is inapposite because *Bruen* holds that Territory laws, like New Mexico's, are entitled to no weight in this analysis. The 1817 New Orleans ordinance imposed a duty on sponsors to prohibit a person from entering "into a public ballroom" with any weapon, requiring the weapon to be seized and then returned to the person upon departure. This requirement is hardly "comparable" to the bans imposed by the County. *Bruen*, 142 S.Ct. at 2133. The 1817 New Orleans law is also an outlier. The population of New Orleans in the 1820 census was 27,000, out of a total U.S. population of 9.6 million, or about three ten-thousandths of 1%. See https://bit.ly/3GKpw7T. Any law from such a tiny jurisdiction cannot be "representative" of any era. See *Bruen*, 142 S.Ct. at 2154; *Koons*, slip op. at 36.

### G.  Hospitals, Health Care Facilities, Long Term Facilities And The Like.

The County cites even fewer statutes for its bans on firearms in privately or publicly owned hospitals, health care facilities, long term facilities and the like. (Def. Mem. 36). The County relies on the same 1870 Texas statute discussed above, but that statute does not even mention these facilities, banning only firearms in places where persons are assembled for "educational, literary or scientific purposes." The County's vague bans sweep much broader and are more burdensome by far and thus not comparable. See *Koons*, slip op. at 34. That statute is also not representative.

In 1870, the population of Texas was only 564,119, a mere 1.7% of the total U.S. population of 33,203,128. https://bit.ly/3X49efO. Again, there is presumptive right to carry on private property, noted in *Koons* and *Antonyuk*, and that right cannot be negated by one 1870 Texas law.

The County also relies on a 1901 Arizona Territory law banning firearms at places of "amusement" or for "education or scientific purposes," and a similar 1890 Territory of Oklahoma law. Neither Territorial law can be given weight under *Bruen*. The County also relies on a 1903 Montana statute, but any law enacted in the 1900s simply comes far too late to be a proper historical analogue. *Bruen*, 142 S.Ct. at 2135-36, 2153. The County also argues that statutes that disqualified the mentally ill from militia service or from possessing arms are analogous to its total bans. (Def. Mem. at 37). That argument fails because the County's law imposes its restrictions on places, not classes of people, and is applicable to everyone, not merely those persons who are disqualified. It is thus not remotely comparable.

### H. Publicly and Privately Owned Libraries

The County justifies its flat ban on possession at or within 100 yards of any privately or publicly owned "library" by relying on the same, post-Civil War State law and Territory laws in which bans were imposed on a "place where persons are assembled" for education or scientific purposes. None of those laws are current. See, e.g., Tex. Penal Code § 46.03; § 571.107 R.S.Mo; 1998 Ariz. HB 2041. The County makes no effort to demonstrate how long these laws continued in force and thus fails to show any "enduring" tradition. In any event, the County's reliance on these statutes fails for the same reasons it fails elsewhere, *viz.,* such statutes either post-date the Civil War, or is a Territory law, is unrepresentative or do not impose comparable burdens. See *Koons*, slip op. at 29-31. Indeed, the County's bans on libraries, publicly or privately owned, are not analogous or "comparable" to laws addressing places where people "are assembled" because the County's bans apply regardless of whether the library is open to the public, including bans on

possession and transport within 100 yards of a library in a private home or office. No statute from any era is remotely comparable to such a ban. See *Koons*, slip op. at 37-38.

## III.     EQUITABLE RELIEF IS APPROPRIATE

The County asserts (Def. Mem. at 38) that plaintiffs have not shown irreparable harm but does not dispute that an ongoing deprivation of constitutional rights is *per se* irreparable harm under controlling precedent. See TRO and PI Motion at 7-8; *Koons*, slip op. at 54-59. Permit holders, including persons who had previously demonstrated a good and substantial reason to the satisfaction of the State Police and who previously carried with carry permits, are effectively no longer able to do so because of Bill 21-22E. That harm qualifies as "irreparable." See *Koons*, slip op. at 21. Such harm is particularly acute in places of worship where permit holders had been issued carry permits for the express purpose of providing security. See, e.g., *Spencer*, 2022 WL 17985966 at *12 (irreparable harm found because if plaintiffs elected to exercise their right to worship, "they risk being victimized by violence with no means to protect themselves"). See Supplemental Declarations of plaintiff Shemony (Exhibit A), Alan Barall (Exhibit B), and John Smith (Exhibit C). In *Hardaway*, the Second Circuit expressly preserved the district court's injunction for "persons who have been tasked with the duty to keep the peace" at places of worship. See Plaintiffs' Notice of Supp. Authorities, filed Dec. 7, 2022.

The County argues that its bans are authorized by MD Code, Criminal Law, § 4-209(b), and are akin to a few State bans under existing law. But the Second Amendment trumps State law, just as it trumps the County's law, so the County's point is irrelevant. SAC ¶ 154. In any event, Bill 21-22E imposes its bans in far more places than those areas regulated by State law. There is no State imposition of 100-yard exclusion zones or in the multitude of private property locations at which the County bans all firearms. As plaintiffs' declarants make clear, permit holders have

been disarmed at places of worship even though they had been issued permits for the express purpose of providing security at such places.

The County asserts (Def. Mem. at 42) that its interest in public safety is more important than the irreparable harm suffered by plaintiffs but the County ignores the controlling case law that holds that no government has any *legitimate* interest, compelling or otherwise, in enforcing an unconstitutional statute. See TRO and PI Motion at 8. The County then fatuously argues (Def. Mem. at 43) that plaintiffs suffer no harm because County Police are not parked outside the homes of the named plaintiffs and do not pull over drivers without probable cause. But the courts may "not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010). See also *McDonnell v. United States*, 579 U.S. 550, 576 (2106) (same); *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011) (same). The Fourth Circuit has thus held that "laws that are 'recent and not moribund' typically *do present* a credible threat" of enforcement. *Bryant*, 1 F.4th at 286, quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (emphasis added). "This is because a court presumes that a legislature enacts a statute with the intent that it be enforced." Id. The County has no response.

Such enforcement could easily occur at a routine traffic stop where officers may (and do) ask about weapons without having particularized suspicion. See, e.g., *Muehler v. Mena*, 544 U.S. 93, 101 (2005); *United States v. Campbell,* 26 F.4th 860, 883 (11th Cir. 2022). Or an officer may exercise the authority bestowed by MD Code, Criminal Law, § 4-206, and conduct an investigatory stop if the person happens to be "printing" (a bulge in clothing caused by a concealed firearm) or acting suspiciously as informed by the "officer's observations, information, and experience." Id. After all, MD Code, Criminal Law, § 4-203(a), bans *any* "wear, carry or transport" of a handgun, subject to limited exceptions. See *United States v. Robinson,* 846 F.3d 694, 696 (4th Cir.), *cert.*

*denied*, 138 S.Ct. 379 (2017) ("It is also inconsequential that the passenger may have had a permit to carry the concealed firearm.").

Enforcement could also easily occur if the permit holder had to use the carried weapon in otherwise lawful self-defense. The County admits (Def. Mem. at 26) that there are "over a thousand" childcare facilities alone in the County and there are undoubtedly many thousands more exclusion zones associated with the other prohibited places. If a lawful resort to force happened to occur within any one of these zones, charges under both Section 57-11(a) and Section 4-203 are likely. That reality effectively defeats the right to carry under *Bruen*, just as the County intended. The County does not dispute that it is impossible to identify and avoid these thousands of 100-yard zones in which firearms are banned. Both Section 4-203 and Section 57-11(a) are strict liability statutes and punish conduct regardless of whether the violation was knowing. SAC ¶¶ 25, 76. See *Koons*, slip op. at 47 (discussing *mens rea*), id. at 53 ("when a constitutional right becomes so burdensome or unwieldy to exercise, it is, in effect, no longer a constitutional right").

The prospect of such enforcement creates a tremendous *in terrorem* effect (TRO and PI Motion at 18-19) and inflicts irreparable harm that is no less real than in the First Amendment context. See *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (irreparable injury found where there is a risk "of self-censorship"), quoting *Babbitt*, 442 U.S. at 298. See also *Koons*, slip op. at 56 (applying First Amendment irreparable harm precedent). As noted in *Davison v. Randall*, 912 F.3d 666 679 (4th Cir. 2019) "'the "mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused.'" (Citation omitted). The County does not dispute that any violation could easily lead to prosecution under State law as well and thus result in a lifetime firearms disqualification under both federal and State law. See TRO and PI Motion at 19; SAC ¶ 147. See also *Koons*, slip op. at 47.

Instead, the County asserts that the exercise of Second Amendment rights "is outweighed by the fear the non-permit holding public may have that a stranger standing next to them – of unknown current mental state or temperament – is carrying a loaded firearm as they exercise their First Amendment right to assemble in a place of public assembly." Def. Mem. at 44. Utter nonsense. Unpopular constitutional rights may not be suppressed merely because their exercise might cause discomfort in others. *Kenney v. Bremerton School District*, 142 S.Ct. 2407, 2427-28 (2022) (rejecting a "heckler's veto"). See also *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) ("Speech cannot be ... punished ... simply because it might offend a hostile mob."). *Bruen* abrogated "means-end," interest-balancing under which the County's policy concerns might have been relevant and made clear that "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S.Ct. at 2156 (citation omitted). See *Koons*, slip op. at 49 ("a balancing of interests" is something "this Court cannot do" under *Bruen*).

## CONCLUSION

A TRO and a preliminary injunction should be granted without delay.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd
Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
District Court Bar No. 21033

Dated: January 9, 2023