FOR PUBLICATION                                          [Docket No. 8]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

AARON SIEGEL, *et al.*,

                Plaintiffs,

     v.

MATTHEW PLATKIN, *et al.*,

                Defendants.

Civil No. 22-7464 (RMB/AMD)

**OPINION**

**APPEARANCES:**

Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, NJ 07450

       *On behalf of Plaintiffs*

Angela Cai, Deputy Solicitor General
Jean Reilly, Assistant Attorney General
David Chen, Deputy Attorney General
Amy Chung, Deputy Attorney General
Viviana Hanley, Deputy Attorney General
Chandini Jha, Deputy Attorney General
Samuel L. Rubinstein, Deputy Attorney General
Office of the New Jersey Attorney General
25 Market Street
Trenton, New Jersey 08625

       *On behalf of New Jersey State Defendants*

**BUMB, United States District Judge:**

       This matter comes before the Court upon the Motion for a Temporary

Restraining Order and Preliminary Injunction by individual plaintiffs Aaron Siegel,

Jason Cook, Joseph Deluca, Nicole Cuozzo, Timothy Varga, Christopher Stamos, Kim Henry, and the Association of New Jersey Rifle and Pistol Clubs, Inc. (collectively, the "Plaintiffs" or "Siegel Plaintiffs") against Defendants Matthew Platkin in his official capacity as Attorney General of New Jersey and Patrick J. Callahan in his official capacity as Superintendent of the New Jersey Division of State Police (the "State" or "Defendants").  On December 23, 2022, Plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion"). [Docket No. 8]

In addition to opposing the Motion, Defendants filed an Emergency Motion for Consolidation before the Honorable Karen M. Williams, U.S.D.J.  [Docket No. 7.] Judge Williams held a hearing on January 12, 2023, and thereafter granted the Motion to Consolidate, in part.  This matter has now been consolidated into Koons v. Reynolds, --- F.Supp.3d ---, Case No. 22-CV-7464, 2023 WL 128882 (D.N.J. Jan. 9, 2023), a case brought by individual plaintiffs Ronald Koons, Nicholas Gaudio, and Jeffrey Muller, Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society (together, the "Koons Plaintiffs") against the New Jersey Attorney General, Matthew J. Platkin, Superintendent of the New Jersey State Police, Patrick Callahan and County Prosecutors William Reynolds (Atlantic County Prosecutor), Grace C. Macaulay (Camden County Prosecutor), and Annemarie Taggart (Sussex County Prosecutor) (together, the "Koons Defendants").

On January 5, 2023, this Court heard oral argument on the Koons Plaintiffs'

separate Motion for a Temporary Restraining Order.  Like the Siegel Plaintiffs here, the Koons Plaintiffs challenged New Jersey's recently enacted legislation.  By Opinion and Order dated January 9, 2023, this Court agreed with the Koons Plaintiffs and entered an Order temporarily restraining the Koons Defendants, their officers, agents, servants, employees and attorneys from enforcing several provisions of Chapter 131 of the 2022 Laws of New Jersey, to wit, Section 7(a), Subparts 12, 15, 17, and 24, and Section 7(b)(1).

Unlike the Koons Plaintiffs, the Siegel Plaintiffs also assert challenges to additional "sensitive place" designations, as well as other new requirements applicable to concealed carry permit holders in Chapter 131.  On January 26, 2023, the Court held oral argument on the Siegel Plaintiffs' Motion.  For the reasons set forth below, the Motion will be granted, in part, and denied, in part.

## I.    BACKGROUND

The legislation at issue here, Chapter 131, was enacted in response to the United States Supreme Court decision in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, which held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."  597 U.S. ___, 142 S.Ct. 2111, 2122 (2022).  The Bruen Court struck down a New York statute that required an applicant for a concealed carry permit to demonstrate "proper cause," and acknowledged the unconstitutionality of analogous statutes in other states that required a "showing of some additional special need," such as New Jersey's law requiring that an applicant show "justifiable need" to obtain a license to carry.  Id. at

3

2124 n.2.

In response to <u>Bruen</u>, the New Jersey Legislature passed sweeping legislation. On December 22, 2022, New Jersey Governor Phil Murphy signed into law Chapter 131 of the 2022 Laws of New Jersey that imposed a new set of requirements, many of which became effective immediately, including declaring certain locations as "sensitive places" where handguns are prohibited even by licensed carriers, as well as a ban on carrying functional guns in vehicles.

The <u>Koons</u> Plaintiffs, licensed carriers, alleged that the newly-enacted legislation was unconstitutional as to several provisions; however, they did not challenge most provisions of the legislation.  The <u>Siegel</u> Plaintiffs, both licensed carriers and those in the process of obtaining licenses to carry, are not so surgical.  Both sets of Plaintiffs, however, contend that the legislation saps the <u>Bruen</u> ruling of any significance, as it makes the lawful carrying of arms effectively impossible in almost all of New Jersey.

## A.    Plaintiffs' Complaint

Plaintiffs challenge Chapter 131 on several constitutional grounds, including deprivation of Plaintiffs' rights under the Second and Fourteenth Amendments (Count One), Equal Protection (Count Two) and Due Process (Count Three) under the Fourteenth Amendment, and various First Amendment challenges (Counts Four,

Five, and Six).[1]  [Docket No. 1 (the "Complt."), at 47–58.]  According to Plaintiffs, the new legislation "renders nearly the entire State of New Jersey a 'sensitive place' where handgun carry is prohibited."  [*Id.* ¶ 49.]  They challenge fifteen Section 7 restrictions (unlike the Koons Plaintiffs who challenged five restrictions) that prohibit carrying a handgun in a location classified by the state legislature as a "sensitive place," including a vehicle.  Plaintiffs also seek to invalidate New Jersey laws that pre-date the newly enacted legislation, including statutes and regulations limiting firearms at parks, schools, casinos, and gaming properties.  See N.J.S.A. 2C: 39–5(e); N.J.A.C. 7:2-2.17(b);  N.J.A.C.  13:69D-1.13;  N.JA.C.  7:25-5.23  (a), (c), (f), (i), and (m) as unconstitutional sensitive place designations in light of the Supreme Court's dictate in Bruen.  Finally, Plaintiffs challenge several of the permitting requirements, insurance requirements (Section 4), and fee increases (Sections 2 and3) included in Chapter 131, but those challenges are not part of this emergent Motion for temporary restraints. Because the parties' arguments, particularly those by Defendants, essentially mirror

---

[1] Plaintiffs contend that Chapter 131 "creates a costly and onerous obstacle to the exercise of the right to bear arms - one with no precedent in American history." [Complt. ¶ 59.]  More specifically, in Count One of their Complaint, Plaintiffs assert Second Amendment claims against most (beyond those challenged in the Koons case) of the "sensitive place" provisions in Section 7, as well as against certain permitting provisions in Sections 2 and 3.  Count 2 asserts Equal Protection claims against Section 8's exemptions for judges, prosecutors and attorneys general and Section 7 (a)(24)'s private property default rule.  Count 3 asserts void-for-vagueness claims against certain provisions of Sections 2, 5, and 7, including Section (5)(a)(5) which makes it a crime of the fourth degree to engage in an "unjustifiable display of a handgun."  Count 4 asserts a First Amendment challenge again Section 7(a)(24).  Count 5 asserts a First Amendment challenge against certain permitting provisions in Section 3.  Count 6 asserts a First Amendment claim under Section 7(a)(12).

the arguments previously presented to this Court in <u>Koons</u>, the Court incorporates many of its applicable findings, as set forth below, from its earlier Opinion of January 9, 2023.

### B.   Plaintiffs' Motion for a Temporary Restraining Order

First, Plaintiffs seek to immediately and temporarily enjoin enforcement of Section 7(a) of the legislation, as it relates to the following enumerated "sensitive places":[2]

1.   Subpart 6 (prohibiting handguns "within 100 feet of a place for a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event");

2.   Subpart 9 (prohibition on carrying handguns at a zoo <u>only</u>[3]);

3.   Subpart 10 (prohibiting handguns at "a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety");[4]

4.   Subpart 11 (prohibiting handguns "at youth sports events, as defined in N.J.S.5: 17-1, during and immediately preceding in following the conduct of the event . . .");

5.   *Subpart 12 (prohibiting handguns in "a publicly owned or leased library or museum");

---

[2] Those provisions indicated with an asterisk ("*") were also challenged (and restrained by this Court) in <u>Koons</u>.

[3] Plaintiffs have not sought temporary restraints as to any of the other "sensitive places" expressly listed in Subpart 9, namely any "nursery school, pre-school, or summer camp."

[4] Relatedly, Plaintiffs challenge N.J.A.C. 7:22.17(b).

6.  *Subpart 15 (prohibiting handguns in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises");

7.  *Subpart 17 (prohibiting handguns in "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held");

8.  Subpart 18 (prohibiting handguns at "a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment in recreational venues located within the casino property);[5]

9.  Subpart 20 (prohibiting handguns at "an airport or public transportation hub");

10. Subpart 21 (prohibiting handguns at "a health care facility, including but not limited to a general hospital, special hospital, mental psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, or residential healthcare facility");

11. Subpart 22 (prohibiting handguns in a "facility licensed or regulated by the Department of Human Services, Department of Children and Families or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services)

12. Subpart 23 (prohibiting handguns at " a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose") ; and

---

[5] Relatedly, Plaintiffs challenge N.J.A.C. § 13:69D–1.13.

13.    *Subpart 24 (prohibiting handguns in "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6").

2022 N.J. Laws c. 131.

Also in Section 7(a), Plaintiffs challenge Subpart 7, which prohibits handguns "in a school, college, university or other educational institution," because, they contend, the restriction could apply to multi-use properties that offer classes and the like might fall under the umbrella of this restriction.  Id.  Because they fear they will be exposed to criminal liability for carrying concealed in these multi-purpose properties, Plaintiffs challenge this restriction as well.

Moreover, Plaintiffs (like the Koons Plaintiffs) challenge Section 7(b) of the legislation that imposes an additional "sensitive place" ban on functional firearms in vehicles, and more specifically, making it a fourth degree offense to transport or carry a firearm "while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." *Id.* The maximum sentence for this crime is 18 months' imprisonment. *See* N.J.S.A. §§ 2C:43-6(a)(4).  Like the Koons Plaintiffs, Plaintiffs here point out the unconstitutional effect of Section 7(b):  that licensed handgun carriers such as themselves now must transport a handgun in a vehicle the same way as

8

someone who does not have a permit to carry from the State.

Finally, Plaintiffs seek a temporary restraining order barring the enforcement of several statutes and regulations that existed before <u>Bruen</u> was decided to the extent they restrict the type of ammunition a person may possess while in the woods, fields, marshlands, or on the water, or while hunting various game. Those are N.J.A.C. 7:25-5,23(m), N.J.A.C. 7:25-5.23(i), N.J.A.C. 7:25-5.23(a),(c), and (f) (to the extent they restrict the type of ammunition a person may possess while In the woods, fields, marshlands, or on the water, or while hunting various game and N.J.A.C. 7:25-5.23(f)(5)(requiring firearms to be unloaded and enclosed in a securely fastened case when in a motor vehicle). (Collectively the "Fish and Game Restrictions").

## C.    Plaintiffs' Declarations, Backgrounds, and Daily Routines

In support of their request, Plaintiffs have submitted the sworn declarations of each individual Plaintiff. [<u>See</u> Docket No. 8.] Below, the Court has highlighted certain averments by some of the individual Plaintiffs most central to resolving the pending Motion.

Plaintiff Siegel, a handgun permit holder, lives in Hopatcong, New Jersey and is a registered nurse and a volunteer New Jersey Medical Reserve Corps. [Docket No. 8-2 ¶ 2–4.] He previously served as an Emergency Medical Technician, and in the course of his employment works "variously at medical offices and medical boarding homes." [<u>Id.</u> ¶ 7–8.] Prior to the passage of Chapter 131, he frequently carried his handgun in the course of his medical work. [<u>Id.</u> ¶ 9.] He frequently hikes and walks his dog in public parks and publicly owned beaches. [<u>Id.</u> ¶ 11.] He takes his son to

Tae Kwan Do classes at a martial arts school located in a strip mall and takes his son to participate in youth Tae Kwan Do competitions. [Id. ¶ 12.] He also frequently takes his son to "museums throughout New Jersey, the public library, the Turtle Back Zoo in West Orange, New Jersey and the Van Saun Zoo in Paramus, New Jersey." [Id. ¶ 13.] Every year he takes his son deer hunting. [Id. ¶ 15.] They go to movie theaters frequently. [Id. ¶ 16.] He "sometimes" attends New Jersey Devils Hockey games at the Prudential Center in Newark, New Jersey and, in doing so, "sometimes" takes the bus or train. [Id. ¶ 17.] He enjoys trips to the casinos in Atlantic City, New Jersey and dining out. [Id. ¶¶ 1819.] "From time to time" he drives his friends and family to the Newark Airport. [Id. ¶ 20.] Now that the law is in effect, he avers, he can carry his handgun "virtually nowhere outside [his] home." [Id. ¶ 45.]

Plaintiff Cook, a Handgun Carry Permit holder, is the general manager of a pharmacy in Willingboro, New Jersey. [Docket No. 8-3 ¶ 3.] He obtained a handgun carry permit because he is concerned about the area where he works, "which is an area that experiences elevated levels of crime." [Id. ¶ 6.] Similar to the other Plaintiffs, prior to the passage of Chapter 131, he carried his firearm to almost everywhere he went including medical appointments where he did not need to disrobe. [Id. ¶ 7.] Several times per month, he enjoys walking trails in State parks, and during the summer, the public beaches of the State. [Id. ¶ 8.] Several times per year, he enjoys "the Popcorn Park Zoo in Forked River, New Jersey, the Adventure Aquarium in Camden, New Jersey, and Jenkinson's Aquarium in Point Pleasant Beach, New Jersey. [Id. ¶ 11.] He enjoys dining out, going to the Atlantic City casinos, the theater,

10

and Atco Dragway racetrack at Waterford Township, New Jersey.  [Id. ¶¶ 15 17.]  He avers because of the extensive prohibitions set forth in Chapter 131, he "can carry [his] handgun virtually nowhere outside [his] home."  [Id. ¶ 11.]

 Plaintiff DeLuca, a Handgun Carry Permit holder, is an automotive repair mechanic in Marlton, New Jersey.  [Docket No. 8-4 ¶ 3.]  He avers many of the same routines and concerns similar to Plaintiffs Siegel and Cook.

Plaintiff Cuozzo, a firearms owner who is applying for Handgun Carry Permit, lives in New Egypt, New Jersey and is a member of the Bible Baptist Church there. [Docket No. 8-5 ¶¶ 3 6.]  He is applying for his carry permit because he recognizes the violent crime that can take place anywhere including in places of worship.  [Id. ¶ 5.]

Plaintiff Varga, a firearms owner who is applying for a Handgun Carry Permit, lives in Wall Township, New Jersey and is a Deacon of the Grace Bible Church there . [Docket No. 8-6 ¶¶ 1–3.]  He is applying for his carry permit because, like Plaintiff Cuozzo, he recognizes the violent crime that can take place anywhere, including in places of worship.  [Id. ¶ 5.]  His church also has a "meager" budget for security.  [Id. ¶ 17.]

Plaintiff Stamos, a Handgun Permit Holder, lives in Bayonne, New Jersey and is a data analyst. [Docket No. 8-7 ¶¶ 2 4.]  He annually accompanies his wife to the Paddle the Peninsula event at 16th Street Park in Bayonne and enjoys the park several times per year.  [Id. ¶ 6 7.]  From "time to time" he takes his nephew to the park and the Cottage Street Park, but he has refrained from carrying his handgun to these parks

11

because of the legislation.  [Id. ¶ 9.]

Plaintiff Henry resides in Pemberton, New Jersey.  She does not own and firearm but desires to apply for one. [Docket No. 8-8 ¶¶ 89.]  She is a single mother of two children and lives "in constant fear from death threats from [her] ex-boyfriend." [Id. ¶ 9.]

### D.    Defendants' Response

Defendants oppose the Motion, arguing first that Plaintiffs fail to establish Article III injury redressable by the issuance of a temporary restraining order.  [See Docket No. 15 ("Defs.' Opp'n").]  They argue that each Plaintiff has failed to establish a sufficiently imminent injury, and therefore, that standing is lacking such that the Court's jurisdiction is defective.  [Id. at 1121.]

As to the merits of the Motion, Defendants contend that many of the provisions Plaintiffs challenge "fall outside the scope of the Second Amendment entirely."  [Id. at 1.]  Even if covered by the Second Amendment, Defendants also assert that the challenged provisions are supported by a historical tradition of firearm regulation consistent with the dictates of Bruen.  [Id.]  Defendants put the restrictions for which they claim there are supporting historical analogues into four categories:  (1) locations for Government and constitutionally-protected activity; (2) locations where crowds gather; (3) locations where vulnerable or incapacitated people gather; and (4) private

property without express permission of the property owner. [6]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders and preliminary injunctions. In the Third Circuit, the four requirements Plaintiffs must satisfy to obtain the emergent injunctive relief sought are familiar ones:

> (1) a reasonable probability of eventual success in the litigation, and (2) that [they] will be irreparably injured ... if relief is not granted.... [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

Reilly v. City of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017), as amended (June 26, 2017) (citing Del. River Port Auth. v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 919–20 (3d Cir. 1974) (citations omitted)). The Third Circuit has also made clear that "[p]reliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (quoting American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir.1994)).  Temporary restraining orders have the same requirements and are "stay-put orders … designed to maintain the status quo during the course of proceedings. They 'function[ ], in essence as an automatic

---

[6] The Court reiterates its observation made in Koons that while the State dedicates a significant portion of its opposition discussing the benefits of firearms regulations, the Bruen Court was clear that this Court shall not venture into or consider interest balancing in this context.

13

preliminary injunction.'" <u>J.O. ex rel. C.O. v. Orange</u> <u>Twp. Bd. of Educ.</u>, 287 F.3d

267, 272 (3d Cir. 2002) (quoting <u>Drinker v. Colonial Sch. Dist.</u>, 78 F.3d 859, 864 (3d

Cir.1996)). However, relevant for purposes of appeal, "a party cannot be a prevailing

party if the interim relief received is not merit-based." <u>Id.</u> at 273 (citations omitted).

## III.   ANALYSIS

### A.   Standing

For there to be a case or controversy before this Court under Article III,

Plaintiffs must first satisfy their burden to establish standing. Plaintiffs must show "(i)

that [they] suffered an injury in fact that is concrete, particularized, and actual or

imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the

injury would likely be redressed by judicial relief. <u>TransUnion LLC v. Ramirez</u>, 141

S. Ct. 2190, 2203 (2021) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560–561

(1992)). As this Court found in <u>Koons</u>, the State's demand that Plaintiffs allege a

future, concrete time and date as to when they will visit each of Chapter 131's

enumerated "sensitive places" is too demanding. After all, risk of future harm is

sufficient "so long as the risk of harm is sufficiently imminent and substantial." <u>Id.</u> at

2210 (citations omitted). "[T]he injury required for standing need not be actualized.

A party facing prospective injury has standing to sue where the threatened injury is

real, immediate, and direct." <u>Davis v. Fed. Election Comm'n</u>, 554 U.S. 724, 734, 128

S. Ct. 2759, 2769 (2008). The State is correct that Plaintiffs must demonstrate standing

as to each claim. <u>Id.</u>  However, once one plaintiff is found to have standing as to a

claim, the Court need not inquire as to the standing of other plaintiffs on that claim for purposes of the Motion.  See Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, 536 U.S. 822, 826 n.1 (2002).

The Court now takes the opportunity to clarify its standing analysis.  Both the Koons Plaintiffs and Siegel Plaintiffs allege, generally, that they have visited the challenged "sensitive places" in the past.  However, the Court is not satisfied that the threat of criminal penalty for not abiding by the requirements of Chapter 131 is imminent based on such allegations alone.  What distinguishes the limited, challenged "sensitive places" in Koons from the longer list of challenged places here is that in Koons the sensitive places were not only "generally open to the public and where ordinary persons like Plaintiffs would be expected to frequent upon occasion," but also places where the Koons Plaintiffs visited as part of their ordinary, daily routines. Koons, 2023 WL 128882, at *24.  Thus, the Court could determine from the Koons Plaintiffs' sworn declarations that the threat of criminal penalty was imminent if the Court did not temporarily enjoin enforcement of the applicable provisions. Conversely, here there is no imminent threat of criminal penalty in places infrequently visited by Plaintiffs' or locations where Plaintiffs make plans far in advance to visit and thus, are not likely to be a part of or "happened upon" as part of the Plaintiffs' ordinary, daily routines.

As to the other two standing requirements, four of the Plaintiffs (Siegel, Cook, DeLuca, and Stamos) have concealed carry permits and have sufficiently shown that the threatened injury they would suffer (i.e., the threat of criminal prosecution) is

redressable by judicial relief, and that each Defendant is a proper party for the reasons stated in their Complaint, affidavits, motion papers, and oral argument. [See Docket Nos. 8, 8-1, 8-2, 8-3, 8-7.]  However, as noted earlier, unlike the Koons Plaintiffs who challenged a narrow category of sensitive places that are a part of their daily, ordinary life (public libraries and museums, bars/restaurants where alcohol is served, entertainment facilities, in vehicles, and on private property such as businesses), the Siegel Plaintiffs challenge far more restrictions.  The Court now examines standing as to the challenged restrictions.

### i.   The Overlapping "Sensitive Places" Restrained in Koons

As in Koons, each of four Plaintiffs who hold permits to carry handguns has submitted a sworn declaration that prior to Chapter 131, he exercised his carry permit in his day-to-day life, which included regularly going (typically by vehicle) to public libraries and museums, bars/restaurants where alcohol is served, entertainment facilities, and on private property such as commercial businesses.  [Id.]  Similar to what the Court found in Koons, the Siegel Plaintiffs' Complaint is that, at least as to these provisions, the restrictions are "so sweeping and comprehensive so as to make it largely impossible for most people to carry a handgun during the course of their typical day."  [Complt. ¶ 55.]  Each Plaintiff also has averred credible threats of prosecution, and there has been nothing presented to this Court to suggest that Defendants do not intend to enforce this legislation.  Thus, the Court finds that, as holders of concealed carry permits, these Plaintiffs have standing to pursue the current relief as to Sections 7(a) Subparts 12(public libraries and museums), 15 (bars or restaurants where alcohol

16

is served), 17 (entertainment facilities), and 7(a)(24)(private property), as well as
7(b)(1)( vehicles).

### ii.        Zoos and Medical/Treatment Facilities

Plaintiff Siegel avers that he frequently visits two specific zoos in New Jersey,
namely, "the Turtle Back Zoo in West Orange, New Jersey and the Van Saun Zoo in
Paramus, New Jersey."  [Docket No. 8-3 ¶ 13.]  Plaintiff DeLuca avers that "[f]rom
time to time" he enjoys Cape May Zoo.  [Docket No. 8-4 ¶ 8.]  Similarly, Plaintiff
Cook visits the Popcorn Park Zoo in Forked River, New Jersey.  With respect to the
long list of medical/treatment facilities at Subparts 21 and 22, Plaintiff Siegel, who
works as a nurse practitioner and previously served as an EMT, makes these same
kinds of specific allegations in relation to his standing; naming Skylands Urgent Care
in Lake Hopatcong, New Jersey, and Free Clinic Newton, in Newton, Jersey as the
facilities where he works.

However, the Defendants are correct that this level of specificity in Plaintiffs'
declarations, without more, creates a traceability or redressability issue as to zoos, and
medical or treatment facilities.  What is conspicuously absent from Plaintiffs'
declarations are allegations that but for Chapter 131, Section 7(a), Subparts 9, 21, and
22, they would conceal carry at Turtle Back Zoo, Van Saun Zoo, Cape May Zoo,
Popcorn Park Zoo, Skylands Urgent Care, and Free Clinic Newton.  In fact, the Court
even suspects that several of these places maintain policies prohibiting firearms
outright, in which case, Plaintiffs certainly would not be able to claim they would carry

17

at these institutions "but for" Chapter 131. [7]  Plaintiff Siegel also avers that he visits the homes of his patients in the course of his work, but the provision that addresses this aspect is Section 7(a)(24)'s broad prohibition against having firearms on all private property unless express permission is given by the owner (which Plaintiffs have standing to challenge, no doubt).  Because of this traceability issue,[8] the Court finds that Plaintiffs have failed to show standing to challenge these three provisions in this Motion for temporary restraints.

### iii.  Airports and Movie Sets

With respect to the challenge to airports and movie sets, Plaintiffs' averments as to standing are also lacking.  Such locations are clearly not locations where Plaintiffs frequent as part of their ordinary, daily lives.  The Court also finds that averments of a past encounter, without more, do not establish that a revisit or reencounter is imminent.  In fact, only two of the Plaintiffs declare that they have ever previously

---

[7] As to Subparts 20 and 21, the Court notes that even if Plaintiff Cook had standing based on a "guns allowed" policy at either Skylands Urgent Care or Free Clinic Newton, the relief he seeks – invalidating the entirety of both subparts – is overbroad. At most, Plaintiff Cook could challenge only those types of medical facilities he works at (*e.g.*, a clinic) and not the many other types of medical facilities listed (*e.g.*, a mental psychiatric hospital, rehabilitation center, nursing home, tuberculosis hospital, dispensary, etc.).

[8] To be sure, the same traceability issue was not present in <u>Koons</u>.  The limited challenges to the sensitive place restrictions there clearly involved locations that were not only clearly a part of at least one of the <u>Koons</u> Plaintiffs' daily lives, but also because those provisions swept so broadly and applied to hundreds of locations (*e.g.*, anywhere that serves alcohol) judicial relief obviously alleviated the Plaintiffs' threatened injury.

encountered a movie being filmed out in public, and *if* they encountered such a scene again, they would likely be deterred from carrying their handgun.

As to airports, Plaintiff Siegel declares that "[f]rom time to time" he drives his friends and family and drops them off and pick them up from Newark Airport. [Docket No. 8-2 ¶ 20.]  This does not swear a sufficiently a concrete intention to go in the immediate future.  Plaintiff Cook's Declaration fares no better as he swears that "[a]t least once per month," he drives his family members and drops them off or picks them up at Newark Airport or Atlantic City Airport.  This does not set forth an intent to conceal carry in the immediate future. [Docket No. ¶ 18.]  Air travel does not appear to be a part of any of the Plaintiffs' daily lives, but instead, depends on the lives and plans of others, to wit, their families and friends.  Thus, the Court will also deny the Motion with respect to these specific provisions for lack of standing.

### iv.       Fish and Game Restrictions

Plaintiffs also lack standing to seek emergency restraint of the Fish and Game Restrictions pre-dating <u>Bruen</u>.  At most, Plaintiff Siegel alleges he goes deer hunting with his son annually.  [Docket No. ¶ 15.]  Yet, deer season in New Jersey is in the late autumn and early winter.  N.J. DEP'T ENV'T PROT., N.J. FISH & WILDLIFE, *Deer Season and Regulations*, https://dep.nj.gov/njfw/hunting/deer-season-and-regulations/ (last updated Jan. 13, 2023).  Thus, there is no imminent threat.

### v.        Public Gatherings and Events

At oral argument, Plaintiffs withdrew their application for a temporary

restraining order as to Section 7(a)(6), prohibiting handguns "within 100 feet of a place for a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event." The parties generally agree that Plaintiffs' averments as to public gatherings are limited to past attendance, and the Defendants expressed a concern that such a public gathering or event might not even occur during the relatively short TRO phase of litigation. [Tr. at 51.] However, because Plaintiffs were willing to withdraw their Motion as to this "sensitive place," Defendants withdrew their standing challenge for purposes of the longer, PI phase.[9]

### vi.    Remaining Challenged "Sensitive Places"

As to the remaining challenged provisions, the Court is satisfied that Plaintiffs have standing because such places are clearly part of at least one Plaintiffs' daily life.

With regard to parks and beaches,[10] the Court is satisfied that such places are part of several of the Plaintiffs' daily lives. Plaintiff Siegel avers that he frequently hikes and walks in public parks near his home; he also goes to publicly owned beaches

---

[9] The Court finds Plaintiffs' void for vagueness argument convincing but leaves the issue for another day. Moreover, it seems Plaintiffs would be unduly burdened, or even unable, to determine whether a particular public gathering or event is one for which a government permit is required.

[10] As in Koons, the Court reserves on the definitive question as to whether it should parse each "sensitive place" in the relevant provisions of the statute to find standing. However, Plaintiffs raise a good point that the legislature made an intentional decision as to how to group the sensitive places enumerated in the respective subparts of Section 7(a).

including the Wildwood, New Jersey beach.  [Docket No. 8-2 ¶ 11.]  Plaintiff Cook enjoys walking trails in State parks several times per month.  [Docket No. 8-3 ¶ 8.] Plaintiff DeLuca "regularly" enjoys walking his dog in State parks and on public beaches.  [Docket No. 8-4 ¶ 7.]

With regard to youth sports events, Plaintiff Siegel declares that takes his son to Tae Kwan Do classes at a martial arts school near his home and he takes his son to participate in youth Tae Kwan Do competitions.  [Docket No. 8-2 ¶ 11.]

With regard to casinos, Plaintiff Cook avers that "[o]nce per month" he enjoys trips to the casinos in Atlantic City.  [Docket No. 8-2 ¶ 15.]  Although a close call, the Court finds that this is sufficient to have standing for purposes of temporary relief. Further, Plaintiff DeLuca weekly visits a friend and must traverse through the waters owned by a casino.  [Docket No. 8-4 ¶ 11.]

Like the Court found in <u>Koons</u>, these remaining "sensitive places" in Chapter 131 are places where these Plaintiffs ordinary routines often take them.  They require little planning, and are integrated into the Plaintiffs' daily lives, as their Declarations demonstrate.  As a result, they have shown an immediate threat of injury if they were to resume carrying their concealed handguns with them as they did prior to the law's enactment.   Having determined that Plaintiffs have standing as to some of the challenged restrictions, the Court turns next to the merits of the Motion.

**B.    Likelihood of Success on the Merits and <u>Bruen</u>'s Dictate of Historical Tradition**

With respect to the challenged provisions of New Jersey law for which Plaintiffs

have met their standing burden, the Court next considers Plaintiffs' likelihood of success on the merits.

The analysis by which the Court determines this prong is familiar to the parties. The Supreme Court in <u>Bruen</u>, in making "the constitutional standard endorsed in <u>Heller</u> more explicit," clarified that:

> the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The Government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition.

<u>Bruen</u>, 142 S. Ct. at 2129–30. The Court's role is a straightforward one: first, does the conduct being challenged fall within the text of the Second Amendment? If so, is there historical support for the conduct being restricted? Defendants must justify the provisions of Chapter 131 by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." <u>Bruen</u>, 142 S. Ct. at 2126.[11]

### i. Subpart 10 (Parks, Beaches, Recreation Facilities, and Playgrounds); N.J.A.C § 7:2–2.17(b)

Section 7(a)(10) prohibits the carry of a firearm onto "a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety." 2022 N.J. Laws

---

[11] By stating that Defendants must justify the regulation at issue, the Court does not mean to shift the burden that Plaintiffs have to obtain injunctive relief. Rather, it is a factor that this Court considers as to whether Plaintiffs have met their burden as to the likelihood of success on the merits prong.

c. 131 § 7(a)(10).  Plaintiffs contend that Subpart 10 violates their right to public carry.[12]

First, the Second Amendment's plain text covers the conduct in question (carrying a firearm in public for self-defense in the places identified in Subpart 10), so the threshold inquiry articulated in Bruen is met. As a result, Defendants must be able to rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. The Court proceeds in reverse order.

To begin, this Court will not grant the restraints Plaintiffs seek with respect to playgrounds.  In Bruen and Heller, the Supreme Court expressly identified restrictions at certain sensitive places (such as schools) to be well-settled, even though the 18th- and 19th-century evidence has revealed few categories in number.  Bruen, 142 S.Ct. at 2133 (citing Heller, 554 U.S. at 626)).  The inference, the Court suggested, is that some gun-free zones are simply obvious, undisputed, and uncontroversial.  These are: (a) certain government buildings (such as legislative assemblies or courthouses or where the Government is acting within the heartland of its authority), (b) polling places, and (c) schools.  Id.  Bruen further instructs courts to consider analogies to such sensitive places when considering whether the Government can meet its burden of showing that

---

[12] Plaintiffs also claim that an existing New Jersey law similarly restricts their right to public carry, as the statute prohibits the possession of firearms and other weapons "while on State Park Service property without the specific approval of the Superintendent or designee." [Pls.' Br. at 14 (quoting N.J.A.C. § 7:2–2.17(b)).] Because such law involves the same analysis as Subpart 10, the Court addresses them together.

a given regulation is constitutionally permissible.  Id.

Here, Defendants subsume playgrounds within their discussion of historical statutes that regulate firearms where crowds gather and where the vulnerable or incapacitated are located.  [See Defs.' Opp'n at 34–35.]  Unfortunately, Defendants neither point to a particular or analogous prohibition on carrying firearms at playgrounds nor provide a more meaningful analysis, despite this Court's persistent invitation.  In particular, Defendants have done no analysis to answer the question Bruen leaves open: is it "settled" that this is a location where firearms-carrying could be prohibited consistent with the Second Amendment?  Where the right to self-defense and sensitive place designations could be read in harmony under the Second Amendment?  For that matter, nor have Plaintiffs.  This issue must be explored at the preliminary injunction stage.  Despite these shortcomings, the Court concludes that schools and playgrounds intersect, that is, playgrounds fall within the sphere of schools.  Therefore, under Bruen, the Court "can assume it settled" that playgrounds are a "sensitive place."  See Bruen, 142 S.Ct. at 2133.  Accordingly, because Plaintiffs cannot meet their burden as to their challenge to playgrounds in Subpart 10, the Motion will be denied as to playgrounds.

Second, the Court considers "recreational facilities," another exceptionally broad catch-all.  Defendants again situate their discussion of the historical evidence supporting a restriction on carrying firearms at such facilities under the banner of laws that restrict firearms where crowds gather and where the vulnerable or incapacitated are located.  The Court observes that Defendants rely upon the same historical

24

evidence that they invoked in <u>Koons</u> to support Subpart 17 (entertainment facilities).

But the Court already explained why such evidence should be rejected.  See <u>Koons v.</u>

<u>Reynolds</u>, 2023 WL 128882, at *14–*15.  Finding that there is no reason to reach a

different application here, the Court will grant Plaintiffs' Motion as to this restriction

of Subpart 10 with respect to such facilities.

Third, the Court considers public beaches.  Defendants have not come forward

with any historical evidence at all to suggest that the right to public carry for self-

defense on beaches is within our history or tradition, nor have Defendants put forward

an analogue from which this Court could conclude that Subpart 10 is constitutional

with respect to beaches.  Without more, the Court finds that Plaintiffs' have shown a

likelihood of success on the merits as to beaches.  <u>Bruen</u>, 142 S.Ct. at 2130.

Fourth and finally, the Court considers public parks, which requires greater

discussion as the State has provided something more for the Court to consider.

Defendants cite to the following as historical analogues for the State's authority to

restrict firearms in parks that are publicly owned or controlled.  First, Defendants rely

upon a Central Park Ordinance in New York from 1861.  [<u>See</u> Defs.' Opp'n at 35

(citing <u>Fourth Annual Report of the Commissioners of the Central Park</u> 106 (1861)).]

In that Ordinance, the Board of Commissioners of Central Park forbade all persons

"[t]o carry firearms or to throw stones or other missiles within [the park]." The

Ordinance set forth other prohibited activities as well, such as no climbing or walking

up on the wall; no livestock; entry by gateways only; and no injury to any parts of the

park.  [<u>Id.</u>]  Defendants also cite to an Ordinance regarding Fairmount Park in

25

Philadelphia.  [See id. (citing Acts of Assembly Relating to Fairmount Park 18 (1870) ("No persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof, or throw stones or missiles therein.")).]  The other provisions are similar to those of the Central Park Ordinance.  Finally, Defendants present evidence that firearms were prohibited in parks in St. Louis, Missouri (1881), Chicago, Illinois (1881), St. Paul, Minnesota (1888), and Pittsburgh, Pennsylvania (1893).[13]  Id.

The Court acknowledges that Defendants have attempted to comply with Bruen insofar as they have introduced several historical analogues from which this Court could conclude that Subpart 10 accords with our historical tradition of firearm regulation, as it relates to public parks.  However, because Defendants' evidence is not convincing for at least three reasons, the Court will temporarily enjoin the prohibition on carrying in public parks.  First, the statutes Defendants cite all refer to public parks *in a city* (*i.e.*, New York, Philadelphia, St. Louis, Chicago, St. Paul, and Pittsburgh). Thus, while there may be some historical precedent for restricting public carry in parks located in densely populated areas, Subpart 10 goes much further.  It forbids firearms in any park "owned or controlled by a State, county or local government unit." 2022

---

[13] As in Koons, there is uncertainty regarding whether the key time period for this Court's analysis of historical evidence is when the Second Amendment was adopted (*i.e.*, 1791) or when the Fourteenth Amendment was adopted (*i.e.*, 1868).  [Compare Pls.' Br. at 37–38, with Defs.' Opp'n at 40–41 n.24.] "Because New Jersey's lack of support for its newly enacted legislation fails in either time period, . . . at this stage the Court need not decide this issue that had been left unresolved in Bruen." Koons, 2023 WL 128882, at *12 n.13 (citing Bruen, 142 S. Ct. at 2163 ("Here, the lack of support for New York's law in either period makes it unnecessary to choose between them.") (Barrett, J., concurring)).

N.J. Laws c. 131 § 7(a)(10).  The New Jersey State Park Service alone "administers over 452,000 acres of land comprising parks, forests, historic sites, and other recreation areas."  N.J.  DEP'T  ENV'T  PROT.,  N.J.  STATE  PARK  SERV., https://www.nj.gov/dep/parksandforests/ (last updated Jan. 26, 2023). Accordingly, the evidence cited does not support the sweeping proposition that New Jersey may prohibit law-abiding firearm owners from carrying their firearms in *all* public parks; Subpart 10 is not constitutional as drafted.

Second, Defendants' city laws do not establish a historical *tradition* of restricting firearms in all public parks because the practice of restricting firearms in city parks is not representative of the nation.  Accord Antonyuk v. Hochul, --- F.Supp.3d ---, 2022 WL 16744700, at *67 (N.D.N.Y. Nov. 7, 2022).  Six cities do not speak for, what was by 1893, 44 states.  [Pls.' Reply Br. at 19–20.]  Under Bruen, the state's evidence is not sufficient for the broader proposition that carrying firearms can be forbidden in all public parks in the State of New Jersey.

Third, it is worth noting that even before Bruen, other courts have recognized that overbroad restrictions on carrying a firearm in or near public parks for self-defense may violate the Second Amendment.  See, e.g., People v. Chairez, 104 N.E.3d 1158, 1176 (Ill. 2018) (ruling that prohibition on carrying a firearm within 1,000 feet of a public park is unconstitutional and observing that "the State [of Illinois] conceded at oral argument that the 1000-foot firearm restriction zone around a public park would effectively prohibit the possession of a firearm for self-defense within a vast majority

of the acreage in the city of Chicago because there are more than 600 parks in the city"); <u>Bridgeville Rifle & Pistol Club v. Small</u>, 176 A. 3d 632, 654 (Del. 2017) (finding that, under Delaware's Constitution, the State's designation of public parks as gun-free zones did "not just infringe—but destroy[ed]—the core . . . right of self-defense for ordinary citizens").

In light of these cases, and the reasons identified above, the Court finds that Defendants' have not put forward sufficient evidence at this juncture to justify their regulation of firearms in public parks.  The analogous, existing restriction of N.J.A.C § 7:2–2.17(b), which requires the "specific approval" of the State Park Service to public carry on State Park Service lands, must be temporarily enjoined for the same reason. Accordingly, the Court finds that Plaintiffs have met their burden at this stage of showing a likelihood of success that the restrictions of Subpart 10 are unconstitutional as to public parks, beaches, and recreational facilities; they have not shown a likelihood of success with respect to playgrounds.

### ii.        Subpart 11 (Youth Sports Events)

Plaintiffs also challenge Section 7(a), subpart 11, which bans handguns "at youth sports events, as defined in N.J.S.A. 5:17-1, during and immediately preceding and following the conduct of event."   2022 N.J. Laws c. 131 § 7(a)(11).[14]  As defined in Section 5:17-1(a), a "youth sports event" means "a competition practice or

---

[14] For reasons not clear to this Court, Plaintiffs challenge this restriction but not the restriction regarding "summer camps" in Section 7(a)(9).

instructional event involving one or more interscholastic sports teams or sports teams organized pursuant to a nonprofit or similar charter or which are member teams in a league organized by or affiliated with a county or minutes or recreation."

First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).

"Bruen made clear that schools are paradigmatic sensitive locations where firearms can be banned." [Defs.' Opp'n at 35.]  However, just as they argue with respect to playgrounds, Defendants also argue that the standard should be more broadly applied to any place where "great numbers of defenseless people (e.g., children) gather." [Id. at 36.]

As discussed above, the Supreme Court has recognized the permissibility of a restriction when it applies to "schools." See Bruen, 142 S. Ct. at 2133; Heller, 554 U.S. at 626.  As the Court in Heller stated, "[n]othing in our opinion should be taken to cast doubt on long-standing prohibitions on … laws forbidding the carrying of firearms in sensitive places such as … schools"). Heller, 554 U.S. at 626. Unfortunately, again, Defendants have done no meaningful analysis to answer the question as to whether this is a location that already is—or should be considered— settled, as Bruen discusses.  Both sides will need to explore this issue more fully at the preliminary injunction stage.  For purposes of this Motion, the Court concludes that schools and youth sports events intersect, that is, youth sports events fall within the sphere of schools.  Therefore, under Bruen, the Court "can assume it settled" that youth sports events are a "sensitive place." See Bruen, 142 S.Ct. at 2133. Accordingly,

because Plaintiffs cannot meet their likelihood of success burden regarding their challenge to the youth-sports-events restriction, this part of the Motion is denied.

### iii.        Subpart 12 (Public Libraries and Museums)

Section 7(a), subpart 12 bans handguns in "a publicly owned or leased library or museum." 2022 N.J. Laws c. 131. First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public). For similar reasons set forth by this Court in <u>Koons</u>, the Court finds that the historical analogues provided by the State are not sufficient to rebut the presumption of Second Amendment protection.

Defendants point out that this Court appeared to have overlooked the scope of New Jersey's law when it stated that the restriction "does not limit libraries and museums to government-owned ones." [Docket No. 25 ("Defs.' Suppl. Br."), at 7 n.3.] It is true that the Court did, but that does not change the Court's conclusion. Defendants contend that the Second Amendment does not limit the Government's right to exclude from its own property those persons who do not conform with conditions of their license. [Defs.' Suppl. Br. at 7.] But this argument shortcuts their obligation under <u>Bruen</u> by claiming that the State may prohibit the carrying of handguns on government property as the owner. Nothing in the approach <u>Bruen</u> dictates says that the analysis depends upon whether or not the State is the owner of the property. Nothing in <u>Bruen</u> allows that. The cases that Defendants rely upon pre-date <u>Bruen</u>. Those cases also applied intermediate scrutiny in considering whether the Government could show that the regulation was substantially related to the

30

achievement of an important governmental interest. Bruen, 142 S. Ct. at 2127. This is now precluded and is no longer the test.

If the Government had to prove prior to *Bruen* that the regulation was narrowly tailored to achieve a compelling governmental interest, and after Bruen it must prove that the regulation is consistent with historical tradition, then what is clear is that the fact that whether the Government is the proprietor is not relevant before and after Bruen. Under the State's theory, any property it owned could be designated as gun-free. Yet, no one could seriously contend, for example, that the State could impose a gun-free highway system simply because it owns the infrastructure. Thus, before a state's regulation can pass constitutional master, it must satisfy Bruen regardless of whether the Government is the proprietor. Defendants have failed to rebut the presumption that Second Amendment protection applies here. The Court finds that Plaintiffs have therefore met their burden of showing that they will likely succeed in showing that this restriction is unconstitutional based upon the lack of historical evidence offered by the State.

### iv.        Subpart 15 (Bars, Restaurants, Where Alcohol is Served)

Subpart 15 bans handguns in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises." 2022 N.J. Laws c. 131 § 7(a). First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public). As a result, Defendants must rebut the presumption of protection against this regulation by

demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Defendants make the same arguments here that they did in <u>Koons</u>.  Since nothing has changed since the Court's Opinion and Defendants have not offered any additional historical analogues despite this Court's instruction, the Court finds for the same reasons expressed in <u>Koons</u> that Plaintiffs have met their burden of showing that they are likely to succeed on their constitutional challenge as to this provision.

### v.       Subpart 17 (Entertainment Facilities)

The Court repeats its impression noted in <u>Koons</u>, that is, subpart 17 of the statute is exceptionally broad, which makes it is a criminal offense to carry handguns in "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held." 2022 N.J. Laws c. 131 § 7(a).

First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).  As a result, Defendants must rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. Defendants make the same arguments here that they did in <u>Koons</u>, nothing has changed since the Court's Opinion, and Defendants have not offered any additional historical analogues since then, despite this Court's invitation.  Accordingly, for the reasons the Court expressed in <u>Koons</u>, Plaintiffs have met their burden of showing that

they are likely to succeed on their constitutional challenge as to this provision.

### vi.  Subpart 18 (Casinos); N.J.A.C. § 13:69D–1.13

Section 7(a), Subpart 18 prohibits firearms in "a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located with the casino property." 2022 N.J. Laws c. 131 § 7(a)(18). Similarly, N.J.A.C. § 13:69D–1.13 prohibits firearms in casinos by establishing a default exclusionary rule, similar in structure to Subpart 24 (private property), which is discussed below. See infra § III.B.vii. Section 13:69D–1.13(a) provides the following:

> No person, including the security department members, shall possess or be permitted to possess any pistol or firearm within a casino or casino simulcasting facility without the express written approval of the Division provided that employees and agents of the Division may possess such pistols or firearms at the discretion of the director of the Division. At the request of the casino licensee's security department and upon its notification to the State Police, a law enforcement officer may, in an emergency situation, enter a casino or casino simulcasting facility with a firearm.

N.J.A.C. § 13:69D–1.13(a). Additionally, the law provides that, to obtain permission from the Division of Gaming Enforcement to possess a firearm at a casino, the individual must demonstrate that: (1) "He or she has received an adequate course of training in the possession and use of such pistol or firearm"; (2) "He or she is the holder of a valid license for the possession of such pistol or firearm"; and (3) "There is a compelling need for the possession of such pistol or firearm within the casino or casino simulcasting facility." Id. § 13:69D–1.13(b). Finally, the law provides that casino licensees must post a conspicuous sign stating the following: "By law, no person shall

33

possess any pistol or firearm within the casino or casino simulcasting facility without the express written permission of the Division of Gaming Enforcement." Id. § 13:69D–1.13(c). Plaintiffs contend that Subpart 18 violates their right to public carry, [see Pls.' Br. at 36–38], and they argue that N.J.A.C. § 13:69D–1.13 is unconstitutional for the same reason, [see id. at 14–15]. Accordingly, they ask the Court to temporarily enjoin both laws.

First, the Second Amendment's text plainly covers the conduct in question (carrying a firearm in public for self-defense, at casinos), so the threshold question is met. See Bruen 142 S. Ct. at 2126, 2129–30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). Accordingly, the burden to justify Subpart 18 and N.J.A.C. § 13:69D–1.13 rests with Defendants. See id. at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.").

Defendants have not come forward with strong historical evidence that the State may prohibit firearms at casinos or related facilities. Defendants point to the same statutes restricting firearms "where crowds gather," but the Court has already discussed, and distinguished, such evidence above. See supra §§ III.B.i (recreational facilities), III.B.v (entertainment facilities). It is not any more convincing as applied here. Because the State has not met its burden of showing that Subpart 18 or N.J.A.C. § 13:69D–1.13 is within our Nation's historical tradition of firearm regulation, under Bruen the Court must temporarily enjoin such laws. See 142 S. Ct. at 2130.

The Court will make a few additional observations. Section 13:69D–1.13 reflects a blend of firearm regulation principles that have come into focus in this litigation thus far. The law represents a default rule forbidding a firearm owner from carrying his or her firearm at a designated location (*i.e.*, casinos), unless he or she has obtained permission to do so (here, it is "express written approval" from the Division of Gaming Enforcement). N.J.A.C. § 13:69D–1.13(a) (emphasis added). A default exclusionary rule for all casino licensees that situates approval authority in a government entity cannot cohere with the Second Amendment test articulated in <u>Bruen</u>. The law wrests from casino licensees the power to exclude (or permit) firearms on their property. Additionally, Section (b) articulates threshold requirements that an individual must meet for the Division of Gaming Enforcement to approve a request to public carry at a casino. While the State of New Jersey may certainly condition the approval of a license to carry a firearm on any number of rational requirements, <u>see</u> <u>Bruen</u>, 142 S.Ct. at 2157 ("[<u>Bruen</u>] decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun") (Alito, J., concurring), it may not empower bureaucrats with the discretion to thereafter restrict the exercise thereof based on their assessment of an individual's "compelling need for the possession of such pistol or firearm." N.J.A.C. § 13:69D–1.13(b). Finally, casino licensees are free to restrict firearms on their property, <u>see</u> <u>GeorgiaCarry.Org, Inc. v. Georgia</u>, 687 F.3d 1244, 1264 (11th Cir. 2012), and the conspicuous notice is an established method of accomplishing that goal. But the State may not compel casino licensees to prohibit firearms on their property, nor to post a notice to accomplish the

same.   N.J.A.C. § 13:69D–1.13(c).   For these additional reasons, the Court temporarily enjoins N.J.A.C. § 13:69D–1.13.

Ultimately, Plaintiffs have met their burden of demonstrating a likelihood of success on the merits of their challenge to Subpart 18 and N.J.A.C. § 13:69D–1.13.

### vii.        Subpart 24 (Private Property Unless Indicated Otherwise by Owner)

Subpart 24 of the statute deals with private property, which is broadly defined as:

> [P]rivate property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.A. 2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.A. 2C:39-6.

2022 N.J. Laws c. 131 § 7(a)(24).

First, the plain text of the Second Amendment covers the conduct in question, so the threshold inquiry articulated in Bruen is met.  See 142 S. Ct. at 2126, 2129–30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.").   Accordingly, the burden to justify Subpart 24 rests with Defendants.  See id. at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.").  Defendants make the same arguments that they did in Koons to justify Subpart 24 and offer no additional historical analogues.  For the same reasons that this Court rejected Defendants' arguments in Koons, it rejects them

here.

Likewise, the Court rejects as unpersuasive Defendants' supplemental arguments claiming that the Court erred in its prior analysis.  First, Defendants argue that the Court's conclusion in <u>Koons</u> as to Subpart 24 "springs from its mistaken premise that the Second Amendment 'presumes the right to bear arms on private property' that belongs to another."  [Defs.' Suppl. Br. at 6.]  No such presumption exists, they claim, because <u>Bruen</u> only held that " 'the Second Amendment's plain text . . . presumptively guarantees . . . a right to bear arms in *public* for self-defense.' "  [<u>Id.</u> (citing <u>Bruen</u>, 142 S. Ct. at 2135).]  Drawing a distinction thus, Defendants seek to persuade this Court that the Second Amendment's text does not cover the right to public carry on someone else's private property, notwithstanding the Government's historical evidence.  [<u>Id.</u>] At Oral Argument, Defendants doubled down and insisted that <u>Bruen</u>'s articulation of the right makes evident that self-defense "in public" necessarily excludes private property, ostensibly because one cannot be "in public" on private lands.  [<u>See</u> Tr. at 67 ("And there's no question that whether or not it's a private residence or a small business or any other private property, that's not what the Court was talking about when it said [']in public.[']"); <u>see also</u> <u>id.</u> at 67–76.]  Second, they state that "there is simply no support in precedent for the idea that there is a presumptive right enshrined in the Constitution to bear arms on someone else's *private* property simply because the carrier does not know, and did not try to ascertain, whether the owner would consent."  [Defs.' Suppl. Br. at 6.]  And third, Defendants argue that the Court misread or overlooked their historical evidence.  [<u>Id.</u> at 10–11.]

The Court addresses each point in turn.

First, in their argument lurks a paralogism.  The Second Amendment's text draws *no* distinction between one's right to bear arms for self-defense on either *public* or *private* property.  Rather, as the Court confirmed in <u>Bruen</u>, the "textual elements" of the Second Amendment confirm that the right to "keep and bear arms" "outside the home" refers to one's right to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.' "  142 S. Ct. at 2134 (quoting <u>Heller</u>, 554 U.S. at 584).  Addressing the confrontation concern, this definition naturally encompasses one's right to public carry on another's property, unless the owner says otherwise.  After all, the Second Amendment in no way "abrogated the well[-]established property law, tort law, and criminal law that embodies a private property owner's exclusive right to be king of his own castle." <u>GeorgiaCarry.Org, Inc.</u> <u>v. Georgia</u>, 687 F.3d 1244, 1264 (11th Cir. 2012) (collecting historical citations).  In other words, "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place . . . *against the owner's wishes*." <u>Id.</u> (emphasis added).  Thus, because the Second Amendment covers the conduct at issue, it is presumptively protected, unless Subpart 24 is consistent with this Nation's historical tradition of firearms regulation.  <u>Bruen</u>, 142 S. Ct. at 2135.

Furthermore, Defendant's principal argument—that <u>Bruen</u> held the plain text of the Second Amendment guarantees the right to bear arms in *public*, and therefore

*public* means *not private*—is wishful thinking.  Bruen does not so hold.   In discussing the right to carry, the Supreme Court distinguished between the need for self-defense in the home versus in public.  And while the Court recognized that the need for self-defense is perhaps "most acute" in the home, it did not hold that the need was insignificant "elsewhere," or "outside the home."  Bruen, 142 S. Ct. at 2135 (quoting Heller, 554 U.S. at 628).  In fact, the Court observed that if the Second Amendment applied only to the home, half of the Amendment would be nullified.  Id. at 2134–35. By similar reasoning, if the Second Amendment applied only to *publicly*-owned property, half of the Amendment (or more) would be nullified.  In our state, the vast majority of property is privately owned.

Next, Defendants' second point is a misdescription of this Court's analysis.  In Koons, the Court did not find that there is a presumptive right to bear arms on someone else's private property simply *because* the firearm carrier did not try to ascertain whether the land owner would consent.  Instead, this Court applied the analytical structure endorsed in Bruen and concluded that (a) the Second Amendment's text plainly protected the Koons plaintiffs' right to public carry for self-defense, including on the private property of others, unless the owners state otherwise (*i.e.*, "that a rebuttable presumption to carry exists"), and (b) Defendants' purported historical evidence fell short of establishing that Subpart 24 is consistent with our history and tradition of firearms regulations.  Koons, 2023 WL 128882, at *16.  As the Court further explained, a regulation that mandates a lawful permit holder "try to

ascertain" the owner's consent transforms the presumption in favor of allowing the right to bear arms into a presumption against that right. Defendants are, "in essence, criminalizing the conduct that the <u>Bruen</u> Court articulated as a core civil right." <u>Id.</u>

Finally, Defendants' position has no basis in this country's history and tradition of firearms regulation. Generally, the historical practice of establishing sensitive place designations—or "gun-free zones"—has centered on a few distinct locations: (a) government buildings (such as legislative assemblies or courthouses or where the State is acting within the heartland of its authority), (b) polling places, and (c) schools. <u>Bruen</u>, 142 S.Ct. at 2133–34 (citing <u>Heller</u>, 554 U.S. at 626); <u>see also</u> Brief of Indep. Inst. as Amicus Curiae in Support of Petitioners at 7–8, <u>Bruen</u>, 142 S.Ct. 2111 (No. 20-843) (hereinafter, "<u>Brief of Indep. Inst.</u>"). In the colonial and Founding era in particular, restrictions on the right to carry firearms in public appears to have been quite limited. The " 'settlers had the liberty to carry their privately-owned arms openly or concealed in a peaceable manner,' and nine of the thirteen original colonies declined to regulate the keeping or bearing of arms whatsoever." Brief of Indep. Inst., <u>supra</u>, at 12 (citing Stephen P. Halbrook, The Right to Bear Arms: A Constitutional Right of the People or a privilege of the Ruling Class? 109 (2021)). Following Independence from Britain and throughout the 19th Century, some states began to experiment with gun-free zones, but aside from the categories outlined above, many of these restrictions were short-lived. <u>See</u> Brief of Indep. Inst., <u>supra</u>, at 11–17. Here, Defendants' rehash the same arguments regarding a 1771 New Jersey law and an 1865 Louisiana law that the Court analyzed, and disposed of, in <u>Koons</u>. [Defs.'

40

Suppl. Br. at 10–11; see 2023 WL 128882, at *17.] They have provided no persuasive reason for this Court to reconsider its conclusions today.

In the end, Plaintiffs have met their burden of showing that they will likely succeed in proving that Subpart 24 is unconstitutional.

### viii.        Section 7(b) (Functional Firearms in Vehicles)

Section 7(b) of Chapter 131 makes a vehicle essentially a prohibited sensitive place "unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." 2022 N.J. Laws c. 131. First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public). As a result, Defendants must be able to rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. Defendants make the same arguments that they did in <u>Koons</u> and offer no additional historical analogues. For the same reasons this Court rejected Defendants' arguments in <u>Koons</u>, it rejects them here. Plaintiffs have met their burden of showing that they will likely succeed in proving that this provision is unconstitutional.

### ix.        Subpart 7 (Multi-Purpose Facilities Relating to Schools)

Finally, Plaintiffs seek immediate relief against the State's restrictions on multi-use properties. In the lead-in to the enumerated list of "sensitive places" in Section 7(a) of Chapter 131, the statute also specifies that is applies "in any of the following places, including in or upon any part of the buildings, grounds, or parking area of…"

41

2022 N.J. Laws c. 131.  Another New Jersey statute, pre-dating <u>Bruen</u>, makes it a crime to "enter upon any part of the buildings or grounds of any school, college, university, or other education institution."  N.J.S.A. 2C:39-5(e).  Plaintiffs' argument goes that, read in connection with Section 7(a)(7) which prohibits firearms in "a school, college, university or other educational institution," the restriction could include properties or places where "classes" that Plaintiffs attend.  For example, Plaintiff Siegel is concerned that his presence at his son's Tae Kwon Do classes in a strip mall might fall within the restricted location.

At oral argument, the State alleviated Plaintiffs concerns that the law would be enforced against them in this unpredictable manner.  Although the legislature did not include a new set of definitions as part of Chapter 131's long list of "sensitive places," there should be no doubt that the notion of what is and what is not a "school" for purposes of New Jersey law remains unchanged:

> THE STATE:   [W]hat I can tell you is this: The school, college, university or other educational institution language has existed in Section 2C:39-5 for at least 30 years. And [P]laintiffs have never challenged it before, at least these plaintiffs as far as I know. So it cannot be a genuine issue to say I'm confused now by what the word "school" means.  I will tell Your Honor that we think "school" means the meaning that it has in other parts of the New Jersey code. So it means places where people are regulated by other things that schools must have.

[Tr. at 30.]  Going through the other classes Plaintiffs expressed a concern about being able to attend with their firearms (motorcycle classes, firearms training, Sunday school within a church, Tae Kwon Do, and bagpipe lessons), the State conceded that none of these classes fell within the tradition legal definition as to what constitutes a "school."

[Tr. at 32.]

With respect to properties that have both restricted and non-restricted uses, the State clarified that other parts of the statute contain applicable exceptions as to common grounds:

> Section 7(d) talks about how a person would not be in violation if they're traveling along a public right-of-way that touches or crosses any of the places enumerated as sensitive, if they abide by the other carry provisions, you know, like carrying it on a holster and all that, which plaintiffs don't challenge.

[Tr. at 25.] Thus, Chapter 131 is only appliable in buildings or the part(s) of a building that have a restricted use, and thus, are a "sensitive place" when used as such. Further, the law excepts shared, public grounds, which includes parking areas and walkways.

Accordingly, the Court will deny the Motion as to Plaintiffs' challenges concerning multiuse property as moot.

## C.    Plaintiffs Have Met the Requirements for Emergent Relief

Plaintiffs have made a strong showing of irreparable harm if the emergent relief is not granted. As discussed above, Plaintiffs have made a strong showing of constitutional injury given their Second Amendment rights as secured by the Fourteenth Amendment. This Court also agrees that "[i]n cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." A.H. by & through Hester v. French, 985 F.3d 165, 176 (2d Cir. 2021).   Defendants argue that violation of constitutional rights is insufficient to show irreparable harm. [Defs.' Opp'n at 23

43

(arguing that "neither the Supreme Court nor the Third Circuit has ever expanded Elrod to cover all alleged violations of constitutional rights").  However, Defendants' argument mischaracterizes the harm that Plaintiffs allege.  Plaintiffs do not allege a bare constitutional deprivation, but that they fear the threat of severe criminal penalties if they choose to exercise their Second Amendment rights.  Even if constitutional deprivations are not *per se* irreparable injuries, the threat of prosecution for engaging in constitutionally protected conduct certainly is.  Thus, the Court is satisfied that the first and second requirements for emergent relief have been met.

Finally, the Court finds that temporary restraints will only impact individuals who have already gone through the State's vetting process to obtain a concealed carry permit, so other interested parties will not be harmed if the requested relief is granted. After all, "neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." Am. C.L. Union v. Ashcroft, 322 F.3d 240, 251 n.11 (3d Cir. 2003), aff'd and remanded, 542 U.S. 656 (2004).  The Court also finds that the State's interest, the possibility of harm, and the public interest all tip in a favor of granting Plaintiffs the relief they seek as to the applicable laws discussed above.

Further, Plaintiffs are excused from giving security because the Court is satisfied that there is no risk that a Defendant will sustain "costs and damages" if "found to have been wrongfully enjoined or restrained" pursuant to Fed. R. Civ. P. 65(c). The Court also finds that based on the showing made by Plaintiffs, good cause exists to extend the duration of this Temporary Restraining Order beyond fourteen (14) days

44

pursuant to Fed. R. Civ. P. 65(b)(2).  Thus, this Temporary Restraining Order will be in effect pending a hearing on Plaintiff's motion for a preliminary injunction (which shall occur as expeditiously as possible once a briefing schedule for such motion has been set).

## IV.   CONCLUSION

Plaintiffs have demonstrated a probability of success on the merits of their Second Amendment challenge to certain provisions of Chapter 131 Section 7(a), specifically: Subparts 10 (parks, beaches, and recreational facilities/areas), 12 (public libraries or museums), 15 (bars, restaurants, and where alcohol is served), 17 (entertainment facilities), 18 (casinos), and 24 (private property); Section 7(b)'s ban on functional firearms in vehicles; and related pre-Bruen New Jersey statutes—N.J.A.C. 7:2–2.17(b) and N.J.A.C. 13:69D–1.13.  The State may regulate conduct squarely protected by the Second Amendment only if supported by a historical tradition of firearm regulation.  Here, Defendants cannot demonstrate a history of firearm regulation to support these challenged provisions for which they have demonstrated Article III standing.  The threat of criminal prosecution for exercising their Second Amendment rights, as the holders of valid permits from the State to conceal carry handguns, constitutes irreparable injury on behalf of Plaintiffs, and neither the State nor the public has an interest in enforcing unconstitutional laws.

Accordingly, good cause exists, and the Court will **GRANT**, in part, and **DENY**, in part, the Motion for temporary restraints.   [Docket No. 8.]   An

45

accompanying Order of today's date shall issue.


<u>January 30, 2023</u>                                    <u>s/Renée Marie Bumb</u>
Date                                                      Renée Marie Bumb
                                                          United States District Judge