IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | ) |
| *Plaintiffs*, | ) |
| v. | ) Case No. 8:21-cv-01736-TDC **(L)** |
| | ) Case No. 8:22-cv-01967-DLB |
| MONTGOMERY COUNTY, MD, | ) |
| *Defendant*. | ) |

**PLAINTIFFS' RESPONSE TO THE EVERYTOWN AMICUS BRIEF**

Over plaintiffs' opposition, on January 30, 2023, Everytown filed its amicus brief raising three arguments not raised by the defendant, Montgomery County, MD ("the County"). Plaintiffs reiterate their prior objections, specified in their opposition to Everytown's motion for leave to file its amicus brief, that an amicus brief may not submit new or additional arguments not raised by the party in support of which the amicus brief was filed. This Response is intended to address the three new arguments raised by the amicus brief. For the reasons set forth below, those arguments lack merit and should be rejected by the Court. The Court should thus enter a TRO and a preliminary injunction because County Bill 21-22E effectively eviscerates the ability of plaintiffs, who have been issued a wear and carry permit by the Maryland State Police, to exercise their fundamental Second Amendment right to carry a firearm in the County, as recognized in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022).

**ARGUMENT**

I.  **THE TEXT OF THE SECOND AMENDMENT COVERS POSSESSION AND TRANSPORT OF FIREARMS.**

Everytown, like the County, does not dispute that *Bruen* holds that there is a general right to armed self-defense outside the home. The Everytown brief argues, however, that plaintiffs bear the

initial burden of demonstrating that the text of the Second Amendment covers "the specific, enumerated areas" in which carry is banned by the County. Everytown Br. at 5. That is simply wrong. First, it is well-established that "[t]he government bears the burden to show that the regulation clearly falls outside the scope of the Second Amendment." *Hirschfeld v. BATF,* 5 F.4th 407, 417 (4th Cir.)*, vacated as moot*, 14 F.4th 322 (4th Cir. 2021), *cert. denied*, 142 S.Ct. 1447 (2022).[1] Second, plaintiffs need not show that the Second Amendment applies to "specific, enumerated areas." The right recognized in *Bruen* is that "the Second Amendment guarantees a general right to public carry," 142 S.Ct. at 2135, and that there is a "general right to publicly carry arms for self-defense." *Bruen*, 142 S.Ct. at 2134. A "**general** right" to carry in public cannot be reasonably limited to particular places, as Everytown would have it. *Bruen* explains that the "'textual elements' of the Second Amendment's operative clause— 'the right of the people to keep and bear Arms, shall not be infringed'— 'guarantee the individual right to possess and carry weapons in case of confrontation.'" 142 S.Ct. at 2134, quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The right to bear arms thus "naturally encompasses public carry" **because** confrontation "can surely take place outside the home." Id. The text of the Second Amendment is thus informed by the right of self-defense. Not even Everytown disputes that *Bruen* recognizes that the right of self-defense extends outside the home. See also *United States v. Rahimi*, No 21-11001, slip op. at 12 (5th Cir. Feb. 2, 2023) ("Rahimi's possession of a pistol and a rifle easily falls within the purview of the Second Amendment. The amendment grants him the right "to keep" firearms, and "possession" is included within the meaning of "keep."), quoting *Bruen*, 142 S.Ct. 2134–35.

---

[1] While the decision in *Hirschfeld* was vacated as moot when the plaintiffs no longer fell within the 18-20-year-old range, such decisions are still entitled to persuasive effect. See, e.g., *Russman v. Board of Educ. of Enlarged City School Dist. of City of Watervliet*, 260 F.3d 114, 121 n.2 (2d Cir. 2001); *Rosenbloom v. Pyott,* 765 F.3d 1137, 1154 n.14 (9th Cir. 2014) ("decisions vacated for reasons unrelated to the merits may be considered for the persuasive of their reasoning").

Everytown's argument was also recently rejected in *Siegel v. Platkin*, 2023 WL 1103676 (D.N.J. Jan. 30, 2023) (submitted as supplemental authority on January 30, 2023). In that case, the court enjoined New Jersey bans on the carrying of firearms in parks, beaches, recreational facilities, public libraries, museums, bars, restaurants, where alcohol is served, entertainment facilities, in vehicles and on private property without the prior permission of the owner. In each instance, the court found that "the Second Amendment's plain text covers the conduct in question (*carrying a concealed handgun for self-defense in public*)." Slip op. at 23, 29, 30, 31, 32, 46 (emphasis added). In so holding the court relied on the very "textual elements" identified in *Bruen*, *viz*., the right to be armed "'in a case of conflict with another person,'" noting that "this definition naturally encompasses one's right to public carry on another's property, unless the owner says otherwise." Id. at 38. The same analysis applies, *a fortiori,* to the possession and carry on public property, such as on a public sidewalk or in other public places where confrontation can take place.

The text thus encompasses a broad right to possess and carry outside the home *anywhere in public*, subject to restrictions that may be imposed by the government for the five, very specific sensitive places identified by *Bruen*. See *Bruen*, 142 S.Ct. at 2133-34. Under the Court's approach, the government may ban firearms in other places only if it can show an appropriate, well-established and representative historical analogue for that restriction. Id. at 2134. Under Everytown's approach, the text would not permit carry in *any* public place unless the plaintiff could show that there was support for carry in that specific place. Everytown's approach thus contravenes the Court's holding that it is the *government's* burden to justify additional sensitive places, not the plaintiffs. See *Bruen*, 142 S.Ct. at 2150 ("Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden.").

Here, Bill 21-22E bans all firearms at and within 100 yards of places that the County has defined to be places of "public assembly." The Bill thus indisputably bans possession and carry "in

public" and thus negates the very "general right" upheld in *Bruen*. Indeed, the principal exception to the bans imposed by County Code Section 57-11(a) is for possession "in the home," found in Section 57-11(b). Bill 21-22E was plainly intended to encompass all places outside the home. It is the County's burden to justify these restrictions, not plaintiffs' burden.

Everytown does not dispute that the text of the Second Amendment protects the right to acquire a firearm. Everytown Br. at 5. That concession is well-taken as this Court has already held as much. See *Maryland Shall Issue v. Hogan*, 566 F.Supp. 3d 404, (D. MD 2021) ("The requirements for the purchase of a handgun, as set out in the HQL law, undoubtedly burden this core Second Amendment right because they "make it considerably more difficult for a person lawfully to acquire and keep a firearm ... for the purpose of self-defense in the home.") (citation omitted). Rather, Everytown asserts that there is no Second Amendment right to sell a firearm. Everytown Br. at 5. That assertion is also wrong because if there is a right to acquire then there is an ancillary right to sell. See, e.g., *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair."); *Teixeira v. City of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc), *cert. denied*, 138 S.Ct. 1988 (2018) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms").

Ignoring *Andrews*, Everytown argues that *Teixeira* did not hold that there was an "independent right" to sell, but that statement is just playing with words. *Teixeira* made clear that the right to sell is *ancillary* to the right to acquire and that ancillary right would have been violated if the county ordinance in that case would have "impede[d] Alameda County residents from acquiring firearms." 873 F.3d at 678. Here, plaintiffs Engage Armament and ICE Firearms are arguably within at least one of the County's 100-yard exclusion zones and thus could be made to close under Bill 21-

22E. SAC ¶¶ 57, 70. Engage is a State and federally licensed dealer and there are very few retail dealers in the County. It is quite plausible that all or most such dealers would likewise fall within a 100-yard exclusion zone. Neither the County nor Everytown disputes that there are literally thousands of such zones created by Bill 21-22E. But that inquiry lies in future as the Motion for a TRO and a Preliminary Injunction focuses solely on the right to possess and carry. There is no dispute that Engage's owners and employees possess wear and carry permits and move around in the County during daily activities, as do the other plaintiffs, including the owners of ICE Firearms. SAC ¶¶ 57-74. The right to possess and carry are unquestionably covered by the Second Amendment, as *Bruen* makes clear. Whether Bill 21-22E has also "impeded" the right to acquire is not necessary to decide on this Motion and the Court should therefore decline to do so.

## II.  1791 IS THE CONTROLLING PERIOD

Everytown argues that the Court "should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states." Everytown Br. at 6. *Bruen* did not resolve the "ongoing scholarly debate" on the appropriate period, finding it unnecessary to do so because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Bruen*, 142 S.Ct. at 2138. The district court in *Siegel* and *Koons* likewise found it unnecessary to reach this question. See *Siegel v. Reynolds*, 2023 WL 1103676 at *11 n.13 (D.N.J. 2023), *Koons v. Platkin*, 2023 WL 128882 at *12 n.13 (D.N.J. 2023). This Court should likewise decline to do so here for the same reasons.

In any event, Everytown's assertion is mistaken, as the relevant date for historical analogues is 1791, when the Bill of Rights was adopted. See *Bruen*, 142 S.Ct. at 2136 ("when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."). Thus, the Supreme Court

has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S.Ct. at 2137. *Bruen* thus looked primarily to 1791 in conducting its historical analysis. *Bruen*, 142 S.Ct. at 2144-46. The Court also examined and rejected New York's reliance on post-Civil War history, stating "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" 142 S.Ct. at 2137, quoting *Heller*, 554 U.S. 614. The appropriate line is thus the Civil War, not, as Everytown suggests, the late 19th century. Everytown Br. at 10.

That line is fully consistent with the Court's reliance on the "relatively few 18th- and 19th-century" laws in identifying the five sensitive places found by the Court. 142 S.Ct. at 2133. Given the Court's reluctance to rely on post-Civil War laws, that reference to "relatively few 18th- and 19th-century" laws can only be reasonably understood to refer to laws in the 1700s and *early* 1800s. Indeed, the Court cautioned "against giving post-enactment history more weight than it can rightly bear." 142 S.Ct. at 2136. Thus, as Justice Barrett noted in concurrence, "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Bruen*, 142 S.Ct. at 2163 (Barrett, J., concurring). In short, Everytown's assertion that 1868 is the only relevant time frame simply ignores the Court's analysis.

Second, as Everytown concedes, the Second Amendment cannot mean one thing for the States and another thing for the federal government. Any such suggestion was squarely rejected in *McDonald v. City of Chicago*, 561 U.S. 742, 783-84 (2010). There, the Court held that "if a Bill of Rights guarantee is fundamental from an American perspective, then . . . that guarantee is fully binding on the States." *Bruen* thus held that "individual rights enumerated in the Bill of Rights and

made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S.Ct. at 2137. Everytown acknowledges that the Second Amendment cannot mean something different for the States but argues that the 1868 meaning "bind[s]" both the federal government and State governments alike on the theory, pushed by an academic, that when the people adopted the 14th Amendment, they "invested those original 1791 texts with new 1868 meanings." Everytown Br. at 9.

That argument fails. First, it ignores the reason the Second Amendment was incorporated in *McDonald*, which was because the Court found that Second Amendment rights were "fundamental to our scheme of ordered liberty and system of justice." *McDonald*, 561 U.S. at 764. Nothing in that analysis speaks to "investing" 1791 rights with "new 1868 meaning" or the intent of the "people" in 1868. Quite to the contrary, the right was "fundamental" because "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." Id. The incorporation of the Second Amendment into the 14th Amendment is by operation of law; it does not rely on any legal fiction that the "people" desired to incorporate the Bill of Rights when the 14th Amendment was adopted. The incorporation doctrine emerged long after 1868, as *McDonald* makes clear. 561 U.S. at 759-60.

*Bruen* relies on two very recent decisions, *Ramos v. Louisiana*, 140 S.Ct. 1390 (2020), and *Timbs v. Indiana*, 139 S.Ct. 682 (2019), in holding that the Bill of Rights is the same for both the federal government and the States. *Ramos* held that the Sixth Amendment right to a unanimous jury verdict was incorporated against the States and overruled prior precedent that had allowed the States to adopt a different rule under a "dual track" approach to incorporation. In so holding, the Court relied on 1791 as the relevant historical benchmark. *Ramos*, 140 S.Ct. at 1396. Similarly, in *Timbs*, the Court held that the Excessive Fines provision of the Eighth Amendment was incorporated as against the States. *Timbs*, 139 S.Ct. at 686-87. In so holding, the Court once again looked to the scope of the right

as it existed in 1791. Id. at 688. The *Timbs* Court found that this scope was simply confirmed by "an even broader consensus" in 1868. Id. *Ramos* and *Timbs* make clear that 1791 is the controlling inquiry and that later understandings may be viewed as confirmation, not changing the right itself. In all cases, the text is controlling over history. *Bruen*, 142 S.Ct. at 2137 ("the extent later history contradicts what the text says, the text controls") (citation omitted). The text of the Second Amendment thus controls over history and that text did not change in 1868.

Everytown's assertion that the 1868 meaning is binding for both the federal government and the States also has no support. No court, including the pre-*Bruen* cases cited by Everytown (Br. at 6-7), has suggested that the 1868 meaning "binds" the federal government. The few cases cited by Everytown looked to 1868 in State law cases without examining whether 1868 is controlling as to the federal government. Those prior decisions pre-date not only *Bruen*, but two of the three decisions cited by Everytown also came before *Ramos* and *Timbs*, where the Court made clear that the Bill of Rights mean the same thing for both the federal government and the States. While the Third Circuit's 2021 decision in *Drummond v. Robinson Township,* 9 F.4th 217, 227 (3d Cir. 2021), made a reference to "the Second and Fourteenth Amendments' ratifiers," it did not address, much less resolve, the question of whether the 1868 meaning is controlling, even as to State laws. It certainly did not suggest that 1868 was controlling for federal laws, the assertion made by Everytown here. Indeed, if 1868 is controlling, as Everytown suggests, there would have no point to the court's reliance on Second Amendment "ratifiers." Likewise, *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018), on which Everytown also relies, never addressed whether the 1868 meaning was controlling for the federal government.

Everytown's argument is also contrary to the case law. In *Hirschfeld* (decided in 2021), the Fourth Circuit held that "[w]hen evaluating the original understanding of the Second Amendment, 1791—the year of ratification—is 'the critical year for determining the amendment's historical

meaning.'" Id. at 419. In so holding, *Hirschfeld* quotes and relies on *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), where the Seventh Circuit looked to 1791 as the "critical" period in invalidating a State law (Illinois) that had restricted the right to the home. That decision in *Moore* came after the Seventh Circuit's decision *in Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), on which Everytown heavily relies.

*Hirschfeld* and *Moore* are not alone in looking to 1791. See *NRA v. BATFE,* 714 F.3d 334, 339 n.5 (5th Cir. 2013) (Jones, E., J. dissenting from the denial of rehearing en banc and joined by six other circuit judges) (quoting *Moore*'s holding that 1791 is the "critical year" and further noting that "*Heller* makes plain that 19th-century sources may be relevant to the extent they illuminate the Second Amendment's original meaning, but they cannot be used to construe the Second Amendment in a way that is inconsistent with that meaning"); *United States v. Rowson*, 2023 WL 431037 at *22 (S.D.N.Y. Jan. 26, 2023) ("Viewing these laws in combination, the above historical laws bespeak a 'public understanding of the [Second Amendment] right' in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness."); *United States v. Connelly*, 2022 WL 17829158 at *2 *n.5 (W.D. Tex. Dec. 21, 2022) (rejecting the government's reliance on "several historical analogues from 'the era following ratification of the Fourteenth Amendment in 1868'"); *United States v. Stambaugh,* --- F.Supp.3d ---, 2022 WL 16936043 at *2 (W.D. Okl Nov. 14, 2022) ("And since '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them,' the government must identify a historical analogue in existence near the time the Second Amendment was adopted in 1791.") (citation omitted); *United States v. Price* --- F.Supp.3d ----, 2022 WL 6968457 at *1 (S.D. W.Va, Oct. 12, 2022) ("Because the Second Amendment was adopted in 1791, only those regulations that would have been considered constitutional then can be constitutional now.").

*Hirschfeld* involved a federal statute (the ban on sales of handguns to 18-20-year-olds codified at 18 U.S.C. § 922(b)(1)), but the court's holding that 1791 was the "critical" period and its reliance on *Moore* is plainly at war with Everytown's notion that the 1868 meaning controls the scope of the right for both the federal government and the States. Tellingly, Everytown never cites *Hirschfeld* or *Moore*, much less addresses these holdings. This Court should follow *Hirschfeld*.

### III.     THE COUNTY'S LAW IS AN OUTLIER

Everytown acknowledges *Bruen*'s holding and plaintiffs' argument that the courts should disregard historical outlier laws and Territorial laws (Br. at 12) but argues that "a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places." (Id. at 13). Everytown's argument is revealing, as it is an implicit acknowledgment that the County has produced scant support for its bans on firearms at the many and varied places specified by Bill 21-22E. More importantly, as detailed below, Everytown's argument misses the forest (the collective effect of the County's bans on the right to carry) for the trees (the bans on specific places). The County has not historically justified the individual areas on which it imposes bans. It has not even attempted to justify the cumulative effect on the "general right" to carry created by the thousands of exclusion zones enacted by Bill 21-22E.

Everytown first argues that the *Bruen* Court's holding that such bans were presumptively permissible in schools, government buildings, polling places, legislative assemblies and courthouses was not supported by numerous historical analogues. Therefore, Everytown argues, the County's multitude of bans imposed by Bill 21-22E need only likewise be minimally supported. That argument fails. As noted above, *Bruen* holds that the text and history of the Second Amendment establish a "general right" to public carry subject only to the five exceptions specified by the Court. While *Bruen* did not rule out other locations, the Court made clear that the burden is on the government to justify additional locations by reference to Founding era laws that were "relevantly similar" and

"comparable" under the two metrics specified by the Court. See *Bruen*, 142 S.Ct. at 2132-34. Those two metrics are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 2133. Historical laws that did not or were not intended to burden that right in comparable ways are simply not analogues. Such "[a]nalogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances." *Bruen*, 142 S.Ct. at 2133 n.7. That approach "is not an invitation to revise" "the balance struck by the founding generation" "through means-end scrutiny." Id.

Bill 21-22E bans firearms at and within 100 yards of so many places that it effectively nullifies the "general right" to carry in public recognized in *Bruen*. See P. Supp. Mem. at 19-21. Neither the County nor Everytown dispute that reality. In essence, the County has attempted to abrogate *Bruen*'s recognition of a "general right" to carry in public with the imposition of thousands of 100-yard exclusion zones that, collectively, make it impossible to carry in public. The County has not remotely justified such a law. *Bruen* holds that courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." 142 S.Ct. at 2133 (citation omitted). That point is particularly applicable to legislative schemes, like the County's, that effectively do away with the "general right" to carry in public. Our "ancestors" would have "never accepted" such a law. The County's law is a true outlier.

In contrast to the County's approach, the five locations specified in *Bruen* are easily identified, discrete and quite limited in scope. The Court was willing to accept these five locations only because there was solid support *from the Founding era* for such very limited exceptions to the "general right" to carry and the Court was "aware of no disputes regarding the lawfulness of such prohibitions." 142 S.Ct. at 2133. Again, these discrete five locations do not materially detract from the "general right" to carry in public, as they can be easily identified and avoided by a permit holder. To be comparable, the County would need to make a similar historical showing for each of its banned locations using the

Court's two metrics *and* demonstrate that the County's bans do not materially and adversely affect the "general right" to carry in public. Laws that "eviscerate the general right to publicly carry arms for self-defense" are not acceptable under any circumstances. *Bruen*, 142 S.Ct. at 2134. Bill 21-22E plainly "eviscerates" that right by making it impossible to legally travel throughout the County with a carry permit. It is undisputed that Bill 21-22E was enacted for the very purpose of "minimizing" the right to carry, a manifestly illegitimate purpose. See P. Supporting Mem. at 14-19. In short, Everytown's abstract argument is divorced from the reality presented here and thus need not be entertained by the Court.

Everytown next argues that the County's actions are "consistent with bedrock federalism principles" which supposedly "entitle a state to effectuate the policy choice of its citizens within constitutional bounds." Everytown Br. at 14. That argument fails for multiple reasons. First, the argument begs the question of whether the County's actions fall "within constitutional bounds." For all the reasons identified by plaintiffs, Bill 21-22E falls well short of these "bounds." Second, and more fundamentally, "federalism principles" do not control the scope of the Second Amendment. *McDonald* holds that federalism principles are simply irrelevant under the incorporation doctrine. See *McDonald*, 561 U.S. at 784 (noting that "[t]ime and again, however, those pleas [to federalism] failed" in prior cases). Certainly, the test adopted in *Bruen* leaves no room for consideration of federalism principles. Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2126.

Everytown also badly errs in placing heavy reliance (Br. at 14) on Judge Easterbrook's pre-*Bruen* opinion in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). There, the Seventh

Circuit sustained a city's ban on so-called assault weapons and "large capacity" magazines under intermediate scrutiny, stating that the city's ordinance "may increase the public's sense of safety" and that determination should be "left to the legislative process" under federalism principles. 784 F.3d at 412. That approach was squarely rejected by *Bruen*, which abrogated such "means-ends" scrutiny and held that "while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here." 142 S.Ct. at 2131. The Court held that "the Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.'" *Bruen*, 142 S.Ct. 2131, quoting *Heller*, 554 U.S. at 635. The Court stressed that "[i]t is this balance—struck by the traditions of the American people— that demands our unqualified deference." Id.

After *Bruen* was decided, the Supreme Court vacated and remanded the Fourth Circuit's decision sustaining Maryland's ban on assault weapons for reconsideration in light of the decision in *Bruen*. *Bianchi v. Frosh*, 142 S.Ct. 2898 (June 30, 2022). The Court likewise vacated and remanded decisions from the Ninth Circuit, Third Circuit and First Circuit for reconsideration in light of *Bruen*. See *Morin v. Lyver*, 143 S.Ct. 69 (Oct. 3, 2022) (First Circuit, sustaining a denial of a license to carry); *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S.Ct. 2894 (June 30, 2022) (Third Circuit, sustaining a ban on large capacity magazines); *Duncan v. Bonta,* 142 S.Ct. 2895 (9th Cir. June 30, 2022) (Ninth Circuit, same); *Young v. Hawaii*, 142 S.Ct. 2895 (June 30, 2022) (Ninth Circuit, sustaining denial of carry permit). In short, *Bruen* applies across the board, including applying to bans on the very type of firearms at issue in *Friedman*. *Friedman* itself conditioned its resort to federalism, noting that the constitutional limits on federalism "is in the end a question for the Justices." 784 F.3d at 712. *Bruen* has now answered that question. Everytown's resort to federalism fails for all these reasons.

## CONCLUSION

A TRO and a preliminary injunction should be granted without delay.

                                               Respectfully submitted,

                                               */s/ Mark W. Pennak*

                                               MARK W. PENNAK  
                                               MARYLAND SHALL ISSUE, INC.  
                                               9613 Harford Rd., Ste C #1015  
                                               Baltimore, MD 21234-21502  
                                               mpennak@marylandshallissue.org  
                                               Phone: (301) 873-3671  
                                               District Court Bar No. 21033

Dated: February 2, 2023