**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,         *
                                              *
         Plaintiffs                           *
                                              *         Consolidated Case Nos.:
         v.                                   *         8:21-cv-01736-TDC (lead)
                                              *         8:22-cv-01967-DLB
MONTGOMERY COUNTY, MARYLAND                   *
                                              *
         Defendant                            *

**NOTICE OF SUPPLEMENTAL AUTHORITIES**

Defendant Montgomery County, Maryland, ("the County") by and through its undersigned counsel, respectfully submits this Notice of Supplemental Authorities to bring to the Court's attention two recent decisions issued after the completed briefing and oral argument on Plaintiffs' Emergency Motion for a Temporary Restraining Order and Emergency Motion for a Preliminary Injunction.

Specifically, the Eleventh Circuit and the U.S. District Court for the Southern District of New York both held that gun regulations in effect at the time of the Fourteenth Amendment's ratification are relevant historical analogues for courts to consider when evaluating Second Amendment challenges to gun regulations. *See NRA v. Bondi*, No. 21-12314, 2023 U.S. App. LEXIS 5672 at * 7-12 (11th Cir. March 9, 2023); *Frey v. Nigrelli*, No. 21-CV-05334 (NSR), 2023 U.S. Dist LEXIS 42067 at *38-39 (S.D.N.Y. March 13, 2023). Indeed, the Eleventh Circuit found that sources from the Reconstruction area are "[**m]ore probative** than those from the Founding Era on the scope of the Second Amendment Right." *See Bondi* at *12 (emphasis added).

Additionally, the *Frey* court found that New York City's Times Square is a sensitive location where guns may constitutionally be banned. The *Frey court* stated that laws from the

late 1800s cited by defendants support a finding that "there was an ongoing trend in American history of banning firearms in locations where people heavily congregate…for commercial, social, and cultural activities." *See Frey* at *49-50. The County notes that many laws relied upon by the *Frey* court in its finding that Times Square is a sensitive location are identical to those cited to this court with respect to many of the County's sensitive locations.

Defendant submits these cases are relevant to its arguments before this Court regarding Plaintiffs' Motion, and therefore submits them to aid the Court's determination of Plaintiffs' request. A copy of both opinions is attached for the Court's convenience.

Respectfully submitted,

JOHN P. MARKOVS
COUNTY ATTORNEY

_____/s/_____
Edward B. Lattner, Chief
Division of Government Operations
edward.lattner@montgomerycountymd.gov
Bar No. 03871

_____/s/_____
Erin J. Ashbarry
Associate County Attorney
erin.ashbarry@montgomerycountymd.gov
Bar No. 26298

_____/s/_____
Matthew H. Johnson
Associate County Attorney
matthew.johnson3@montgomerycountymd.gov
Bar No. 17678

Attorneys for Defendant Montgomery County, Maryland
101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 28, 2023, a copy of the foregoing was served on all

parties or their counsel of record through the CM/ECF system if they are registered users or, if

they are not, by serving a true and correct copy at the address(es) listed below:

> Mark W. Pennak
> Maryland Shall Issue, Inc.
> 9613 Harford Rd., Ste C #1015
> Baltimore, Maryland 21234-21502
> mpennak@marylandshallissue.org

/s/
_____
Erin J. Ashbarry

Neutral
As of: March 28, 2023 3:38 PM Z

# *NRA v. Bondi*

United States Court of Appeals for the Eleventh Circuit

March 9, 2023, Filed

No. 21-12314

**Reporter**

2023 U.S. App. LEXIS 5672 *; __ F.4th __

NATIONAL RIFLE ASSOCIATION, RADFORD FANT, Plaintiffs-Appellants. versus PAM BONDI, In her official capacity as Attorney General of Florida, et al., Defendants, COMMISSIONER, FLORIDA DEPARTMENT OF LAW ENFORCEMENT, Defendant-Appellee.

**Prior History:**  **[*1]** Appeal from the United States District Court for the Northern District of Florida. D.C. Docket No. 4:18-cv-00137-MW-MAF.

*NRA of Am., Inc. v. Swearingen, 545 F. Supp. 3d 1247, 2021 U.S. Dist. LEXIS 117837, 2021 WL 2592545 (N.D. Fla., June 24, 2021)*

**Disposition:** AFFIRMED.

## Core Terms

firearms, pistol, regulation, twenty-one, minors, arms, bear arms, deadly weapon, buy, gun, rights, age of majority, ratification, weapons, handguns, banned, public safety, bowie-knife, analogues, revolver, militia, barter, dangerous weapon, plain text, ratified, covers, self-defense, lend, selling, knife

## Case Summary

### Overview

HOLDINGS: [1]-Because Florida's Marjory Stoneman Douglas High School Public Safety Act, Fla. Stat. § 790.065(13), was at least as modest as the firearm prohibitions on 18-to-20-year-olds in the Reconstruction Era and enacted for the same reason as those laws, it was relevantly similar to those Reconstruction Era laws. As a result, it did not violate the *Second Amendment*.

### Outcome
Summary judgment affirmed.

## LexisNexis® Headnotes

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN1*[⬇] **Fundamental Rights, Right to Bear Arms**

Judicial precedent has already identified laws imposing conditions and qualifications on the commercial sale of firearms as longstanding and therefore presumptively lawful firearm regulations. Florida's law, *Fla. Stat. § 790.065(13)*, does just that by imposing a minimum age as a qualification for buying firearms.


Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN2*[⬇] **Fundamental Rights, Right to Bear Arms**

Under the *Second Amendment*, a well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed. *U.S. Const. amend II*. The  provision guarantees an individual right to possess and carry weapons in case of confrontation. But that right is not unlimited.


Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN3*[⬇] **Fundamental Rights, Right to Bear Arms**

Now, when the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To rebut that presumption, the government must demonstrate that a state's regulation of that conduct is consistent with this Nation's historical tradition of firearm regulation. In other words, if the *Second Amendment's* plain text covers an individual's conduct, then the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.


Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN4*[⬇] **Fundamental Rights, Right to Bear Arms**

The United States Court of Appeals for the Eleventh Circuit reads the Bruen analysis as articulating two analytical steps. First, the court considers the plain text of the *Second Amendment*, as informed by the historical tradition. Second, the court looks for a historical analogue, not a historical dead ringer, of the challenged law. The Bruen analysis therefore brings historical sources to bear on both inquires.


Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

Constitutional Law > Bill of Rights > State Application

*HN5*[⬇] **Fundamental Rights, Right to Bear Arms**

In the United States Court of Appeals for the Eleventh Circuit's view, the Reconstruction Era historical sources are the most relevant to the inquiry on the scope of the right to keep and bear arms. That is so because those sources reflect the public understanding of the right to keep and bear arms at the very time the states made that right applicable to the state governments by ratifying the *Fourteenth Amendment*.


Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

#### HN6[⬇] Fundamental Rights, Right to Bear Arms

Historical sources are relevant because the Constitution's meaning is fixed according to the understandings of those who ratified it, But when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Constitutional Law > Bill of Rights > State Application

#### HN7[⬇] Procedural Due Process, Scope of Protection

The ratification of the *Fourteenth Amendment* incorporated almost all of the provisions of the *Bill of Rights*. As a result, those rights now apply to the state and federal governments alike.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

Constitutional Law > Bill of Rights > State Application

#### HN8[⬇] Fundamental Rights, Right to Bear Arms

The key takeaway from the history of the *Fourteenth Amendment* is that the States are bound to respect the right to keep and bear arms because of the *Fourteenth Amendment*, not the Second.

Governments > Courts > Judicial Precedent

#### HN9[⬇] Courts, Judicial Precedent

An assumption is not a holding.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

Constitutional Law > Bill of Rights > State Application

#### HN10[⬇] Fundamental Rights, Right to Bear Arms

The individual rights enumerated in the *Bill of Rights* and made applicable against the states through the *Fourteenth Amendment* have the same scope as against the federal government. So the *Second Amendment* right to keep and bear arms (restricting the federal government) and the *Fourteenth Amendment* right to keep and bear arms (restricting State governments) share the same scope.

Constitutional Law > The Judiciary > Case or Controversy > Constitutional Questions

Governments > Legislation > Interpretation

Constitutional Law > State Constitutional Operation

## HN11[⬇] Case or Controversy, Constitutional Questions

As with statutes, when a conflict arises between an earlier version of a constitutional provision and a later one, the later-enacted provision controls to the extent it conflicts with the earlier-enacted provision.


Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

## HN12[⬇] Fundamental Rights, Right to Bear Arms

The Bruen analysis' first analytical step asks whether the *Second Amendment's* plain text covers an individual's conduct. This question has two components. A court begins by asking whether the individual is among the people whom the *Second Amendment* protects. If so, e court turns to whether the plain text of the *Second Amendment* protects that individual's proposed course of conduct.


Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

## HN13[⬇] Fundamental Rights, Right to Bear Arms

The second inquiry under the Bruen analysis entails reasoning by analogy to determine whether historical firearms regulations are relevantly similar the challenged modern regulation. The court evaluates two metrics to determine whether historical and modern firearms regulations are relevantly similar: how and why the regulations burden a law-abiding citizen's right to armed self-defense. The government need only identify a well-established and representative historical analogue, not a historical twin.


Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

## HN14[⬇] Fundamental Rights, Right to Bear Arms

Under the Bruen analysis, the United States Supreme Court looks to post-enactment history because a regular course of practice can liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution. When post-enactment practice differs from pre-enactment practice, the post-enactment practice cannot override the pre-enactment practice.


Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

## HN15[⬇] Fundamental Rights, Right to Bear Arms

Under the Bruen analysis, the discussion of the *Second Amendment* in public discourse after the Civil War can shed important light on the public understanding of a right at the time of the ratification of the *Fourteenth Amendment*. To ascertain widely held views, the United States Supreme Court has consulted, among other sources, newspaper editorials.


Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

## HN16[⬇] Fundamental Rights, Right to Bear Arms

The United States Supreme Court has directed courts to consult contemporaneous legal commentators to discern the public understanding of the right to keep and bear arms at the time of ratification.

Constitutional Law > The Judiciary > Case or Controversy > Constitutional Questions

HN17[⤓]  **Case or Controversy, Constitutional Questions**

Where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide the interpretation of an ambiguous constitutional provision.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

HN18[⤓]  **Fundamental Rights, Right to Bear Arms**

*Fla. Stat. § 790.065(13)* and its historical predecessors are relevantly similar under the *Second Amendment*. And for that reason, the Act does not infringe on the right to keep and bear arms.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

HN19[⤓]  **Fundamental Rights, Right to Bear Arms**

The *Second Amendment* protects an individual right unconnected with militia service.

Constitutional Law > The Judiciary > Case or Controversy > Constitutional Questions

HN20[⤓]  **Case or Controversy, Constitutional Questions**

Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.

**Counsel:** For NATIONAL RIFLE ASSOCIATION, Plaintiff - Appellant: John Parker Sweeney, Connor McCarthy Blair, Marc A. Nardone, Bradley Arant Boult Cummings, LLP, WASHINGTON, DC; Clifford Vincent LoCurto, The LoCurto Law Firm, PA, TALLAHASSEE, FL; Robert Craig Mayfield, Bradley Arant Boult Cummings, LLP, TAMPA, FL; James Wallace Porter, III, Bradley Arant Boult Cummings, LLP, BIRMINGHAM, AL; Kenneth Wayne Sukhia, Sukhia Law Group, PLC, TALLAHASSEE, FL.

For DOMINIC KELSEY, Plaintiff - Appellant: John Parker Sweeney, Bradley Arant Boult Cummings, LLP, WASHINGTON, DC.

For COMMISSIONER, OFFICIAL CAPACITY, FLORIDA DEPARTMENT OF LAW ENFORCEMENT, Defendant - Appellee: Christopher John Baum, Deputy Solicitor General, Attorney General's Office, MIAMI, FL; Florida Attorney General Service, Office of the Attorney General, TALLAHASSEE, FL.

For NRA CIVIL RIGHTS DEFENSE FUND, Amicus Curiae: Jeffrey Matthew Harris, Consovoy McCarthy, PLLC, ARLINGTON, VA.

For GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY, TEAM ENOUGH, ORANGE RIBBONS FOR GUN SAFETY, MARCH FOR OUR LIVES ACTION FUND, Amicus **[*2]** Curiaes: Madeline B. Jenks, Sullivan & Cromwell, LLP, WASHINGTON, DC.

For DISTRICT OF COLUMBIA, STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, Amicus Curiaes: Alex Hemmer, Illinois Attorney General's Office, CHICAGO, IL.

For EVERYTOWN FOR GUN SAFETY SUPPORT FUND, Amicus Curiae: Darren Laverne, Kramer Levin Naftalis & Frankel, LLP, NEW YORK, NY.

**Judges:** Before WILSON, ROSENBAUM, Circuit Judges, and CONWAY,[*] District Judge. WILSON, Circuit Judge, concurring in the judgment.

**Opinion by:** ROSENBAUM

# Opinion

ROSENBAUM, Circuit Judge:

In Ohio, a 19-year-old son shoots and kills his father to "aveng[e] the wrongs of [his] mother."[1] In Philadelphia, an 18-year-old "youth" shoots a 14-year-old girl before turning the gun on himself "because she would not love him."[2] In New York, a 20-year-old shoots and kills his "lover" out of jealousy.[3] In Washington, D.C., a 19-year-old shoots and kills his mother, marking another death due to "the careless use of firearms."[4] In Texas, a 19-year-old shoots a police officer because of an "[o]ld [f]eud" between the police officer and the 19-year-old's father.[5]

These stories are ripped from the headlines—the Reconstruction Era headlines, that is. But they could have been taken from today's news. Unfortunately, they illustrate a persistent societal problem. Even though 18-to-20-year-olds now account for less than 4% of the population, they are responsible for more than 15% of homicide and manslaughter arrests.[6]

And in the more than 150 years since Reconstruction began, guns have gotten only deadlier: automatic assault rifles can shoot sixty rounds per minute with enough force to liquefy organs.[7] Tragically, under-21-year-old gunmen continue to intentionally target others—now, with disturbing regularity, in schools. So along with math, English, and science, schoolchildren must become proficient in running, hiding, and fighting armed gunmen in schools. Their lives depend upon it.

But State governments have never been required to stand idly by and watch the carnage **[*4]** rage. In fact, during the Reconstruction Era—when the people adopted the *Fourteenth Amendment*, thereby making the *Second Amendment* applicable to the States—many States responded to gun violence by 18-to-20-year-olds by prohibiting that age group from even possessing deadly weapons like pistols.

Acting well within that longstanding tradition, Florida responded to a 19-year-old's horrific massacre of students, teachers, and coaches at Marjory Stoneman Douglas High School in a far more restrained way. The Marjory Stoneman Douglas High School Public Safety Act ("the Act") precludes those under 21 only from buying firearms while still leaving that age group free to possess and use firearms of any legal type. *See 2018 Fla. Laws 10, 1819* (codified at *Fla. Stat. § 790.065(13)*).

---

[*] The Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

[1] *The Walworth Tragedy*, HIGHLAND WEEKLY NEWS, June 26, 1873, at p.1.

[2] *Crimes and Casualties*, MILAN EXCHANGE (Milan, Tenn.), Oct. 18, 1884, p.6.

[3] *News Items*, JUNIATA SENTINEL & REPUBLICAN **[*3]** , Apr. 19, 1876, at p.2.

[4] *Accidental Shooting of a Lady, By Her Son*, EVENING STAR (D.C.), Jan. 23, 1872, at p.1.

[5] *Shooting Affray*, FORT WORTH DAILY GAZETTE, Nov. 7, 1884, at p.8.

[6] *Crime in the United States*, U.S. DEP'T OF JUST. (2019), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38#:~:text=Arrests%2C%20by%20Age%2C%202019%20In%202019%2C%2093.0%20percent,88.9%20percent%20of%20persons%20arrested%20for%20property%20crimes; *Age and Sex Composition in the United States: 2021*, U.S. CENSUS BUREAU (2021), https://www.cen-sus.gov/data/tables/2021/demo/age-and-sex/2021-age-sex-composition.html.

[7] *E.g.*, Scott Pelly, *What Makes the AR-15 Style Rifle the Weapon of Choice for Mass Shooters*, CBS NEWS (May 22, 2022), https://www.cbsnews.com/news/ar-15-mass-shootings-60-minutes-2022-05-29/.

That kind of law is consistent with our Nation's historical tradition of firearm regulation. *HN1*[⬆] Indeed, the Supreme Court has already identified "laws imposing conditions and qualifications on the commercial sale of firearms" as "longstanding" and therefore "presumptively lawful" firearm regulations. *District of Columbia v. Heller, 554 U.S. 570, 626-27, 128 S. Ct. 2783, 171 L. Ed. 2d 637 & n.26 (2008)*. Florida's law does just that by imposing a minimum age as a qualification for buying firearms.

Because Florida's law is consistent with our Nation's historical tradition of firearm regulation, we affirm the **[*5]**  district court's judgment.


**I**.

After a 19-year-old shot and killed seventeen people at Marjory Stoneman Douglas High School, the Florida Legislature enacted the Marjory Stoneman Douglas High School Public Safety Act, which bans the sale of firearms to 18-to-20-year-olds. *See 2018 Fla. Laws 10, 18-19* (codified at *Fla. Stat. § 790.065(13)*). In doing so, the Legislature sought "to comprehensively address the crisis of gun violence, including but not limited to, gun violence on school campuses." *Id.* at 10.

Shortly after the law passed, the NRA challenged it, alleging that the law violates the *Second* and *Fourteenth Amendments*. The parties eventually filed cross-motions for summary judgment, and the district court ruled in Florida's favor. The NRA then filed this appeal.[8]


**II**.

*HN2*[⬆] Under the *Second Amendment*, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *U.S. Const. amend II*. The Supreme Court has held that that provision guarantees an "individual right to possess and carry weapons in case of confrontation." *Heller, 554 U.S. at 592*. But that right "is not unlimited." *Id. at 626*.

After the Supreme Court decided *Heller*, we applied a two-part test to analyze the *Second Amendment's* limits. First, we asked whether the *Second Amendment* protected the conduct that the government sought **[*6]**  to restrict. *GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012)*. If so, we then evaluated the law under the appropriate level of means-end scrutiny. *Ibid.*

But the Supreme Court abrogated step two of this framework in *New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111, 2127, 213 L. Ed. 2d 387 (2022)*. *HN3*[⬆] Now, "when the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id. at 2126*. To rebut that presumption, "the government must

---

[8] We appreciate and respect our colleague Judge Wilson's position that he would rather wait to resolve this appeal until the Florida legislature completes its consideration of *H.B. 1543, 2023 Leg., Reg. Sess. (Fla. 2023)*, to see whether any new legislation moots the pending appeal. But most respectfully, we see things differently. We issue our opinion today because the opinion resolves a case that remains very much alive, and the parties have come to us to resolve it.

First, this case is not (and may never become) moot. For it to become moot at some point down the road, several contingencies would need to occur. For starters, the bill must pass out of the House Committee, pass the House floor, pass out of the Senate Committee, pass the Senate floor, and be signed by the Governor. None of these things have yet occurred and they may never happen. And the mootness scenario is even less likely than that because H.B. 1543 is at the very beginning of the legislative process (having been filed two days ago). So even if some form of H.B. 1543 is eventually enacted, we do not know whether the enacted version would completely moot this case. For instance, the legislature could amend the bill and decide to enact a version of H.B. 1543 that changes the minimum age for buying firearms to twenty or nineteen as some type of compromise position. Either way, the resulting law would not moot this case.

Add to that the fact that this case has been pending for some time, and the parties have endured two rounds of briefing (before and after the Supreme Court issued *Bruen*) and oral argument to have us resolve it. Neither party has asked us to stay our consideration of this case pending resolution of H.B. 1543. Given these circumstances—the speculative nature of any possible mootness scenario and the fact that neither party has asked us to wait to see whether any mootness potentiality materializes—we think we should resolve the parties' disagreement without further delay.

demonstrate that" a state's "regulation" of that conduct "is consistent with this Nation's historical tradition of firearm regulation." *Id.* In other words, if "the *Second Amendment's* plain text covers an individual's conduct," then "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id. at 2126-27.*

Like the Fifth Circuit, **HN4**[⬆] we read *Bruen* as articulating two analytical steps. *See United States v. Rahimi, 59 F. 4th 163, 173 (5th Cir. 2023)* (observing that "*Bruen* articulated two analytical steps"). First, we consider the plain text of the Amendment, as informed by the historical tradition. Second, we look for a historical analogue—not a historical "dead ringer," *Bruen, 142 S. Ct. at 2118*—of the challenged law. *Bruen* therefore brings historical sources to bear on both inquires.

**HN5**[⬆] In our view, though, the Reconstruction Era historical sources are the most relevant to our inquiry [*7] on the scope of the right to keep and bear arms. That is so because those sources reflect the public understanding of the right to keep and bear arms at the very time the states made that right applicable to the state governments by ratifying the *Fourteenth Amendment*.

**A. Historical sources from the Reconstruction Era are more probative of the *Second Amendment's* scope than those from the Founding Era.**

We begin by explaining why historical sources from the Reconstruction Era are more probative of the *Second Amendment's* scope than those from the Founding Era. In short, because the *Fourteenth Amendment* is what *caused* the *Second Amendment* to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the *Fourteenth Amendment*—is what matters.

**HN6**[⬆] To start, the Supreme Court has explained that historical sources are relevant because the Constitution's "meaning is fixed according to the understandings of those who ratified it," *Bruen, 142 S. Ct. at 2132.* But "when it comes to interpreting the Constitution, not all history is created equal." *Id. at 2136.* As the Supreme Court itself has declared, "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* (emphasis added by *Bruen* Court) (quoting *Heller, 554 U.S. at 634-35*).

It is that [*8] understanding—the one shared by those who ratified and adopted the relevant constitutional provision—that serves as originalism's claim to democratic legitimacy. *See, e.g., Heller, 554 U.S. at 634-35* (describing the "enumeration of a right" as "the very product of an interest balancing by the people"); Michael C. Dorf, *Integrating Normative and Descriptive Constitutional Theory: The Case of Original Meaning*, *85 Geo. L.J. 1765, 1810 (1997)* ("The traditional view of originalism perceives legitimacy as deriving from the act of lawmaking."). In other words, we must respect the choice that those who bound themselves to be governed by the constitutional provision in question understood themselves to be making when they ratified the constitutional provision.

The people who adopted the *Second Amendment* shared the understanding that it "applied only to the Federal Government." *McDonald v. City of Chicago, 561 U.S. at 742, 754 (2010)* (plurality opinion); *see also id.* at 806 (Thomas, J., concurring in part and concurring in the judgment).

But when the States ratified the *Fourteenth Amendment* during the Reconstruction Era, they made the *Second Amendment* applicable to the States. **HN7**[⬆] As the Supreme Court has explained, the ratification of the *Fourteenth Amendment* "incorporated almost all of the provisions of the *Bill of Rights*." *Id. at 764* (plurality opinion). As a result, those rights now apply to the state [*9] and federal governments alike. *Id. at 765-66.*[9]

**HN8**[⬆] The key takeaway from this bit of history is that the States are "bound to respect the right to keep and bear arms because of the *Fourteenth Amendment*, not the Second." *Bruen, 142 S. Ct. at 2137* (citing *Barron ex rel. Tiernan v. Mayor of Baltimore, 32 U.S. (7 Pet.) 243, 250-51, 8 L. Ed. 672 (1833)*). And so the understanding of the *Second Amendment* right that ought to control

---

[9] The "one exception to this general rule" permits states to convict criminal defendants without a unanimous jury, even though "the *Sixth Amendment* right to trial by jury requires a unanimous jury verdict in federal criminal trials." *Id. at 766 n.14.*

in this case—where a State law is at issue—is the one shared by the people who adopted "the *Fourteenth Amendment*, not the Second." *Id.*[10]

The Supreme Court has not yet decided this question, although it has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the *Bill of Rights* was adopted in 1791," *Bruen, 142 S. Ct. at 2137*, *HN9*[⬆️] But an assumption is not a holding. *See, e.g., Brown v. Electrolux Home Prods., Inc., 817 F.3d 1225, 1239 (11th Cir. 2016)* (explaining that the Supreme Court's "assumptions are not holdings"). To the contrary, the Supreme Court in *Bruen* expressly declined to decide whether "courts should primarily rely on the prevailing understanding [*10] of an individual right when the *Fourteenth Amendment* was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *142 S. Ct. at 2138*.

The *Bruen* Court did not need to decide the question because it read the historical record to yield the conclusion that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry"—the specific *Second Amendment* right at issue there. *Id.* Yet even if that is true for public carry, "the core applications and central meanings of the right to keep and bear arms . . . were very different in 1866 than in 1789." Amar, *The Bill of Rights: Creation and Reconstruction, supra*, at 223. Because the understanding of the right to keep and bear arms in 1866 generally differed from the understanding of that right in 1789, *Bruen* is likely an exception in its ability to assume away the differences. *142 S. Ct. at 2138*. For most cases, the *Fourteenth Amendment* Ratification Era understanding of the right to keep and bear arms will differ from the 1789 understanding. And in those cases, the more appropriate barometer is the public understanding of the right when the States ratified the *Fourteenth Amendment* and made the *Second Amendment* applicable to the States.

*HN10*[⬆️] What the Supreme Court has said, though, is that the "individual rights enumerated [*11] in the *Bill of Rights* and made applicable against the states through the *Fourteenth Amendment* have the same scope as against the Federal Government." *Bruen, 142 S. Ct. at 2137*. So the *Second Amendment* right to keep and bear arms (restricting the federal government) and the *Fourteenth Amendment* right to keep and bear arms (restricting State governments) share the same scope.

Yet the right's contours turn on the understanding that prevailed at the time of the later ratification—that is, when the *Fourteenth Amendment* was ratified.

*HN11*[⬆️] This is necessarily so if we are to be faithful to the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *142 S. Ct. at 2136* (citation omitted). As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the *Second Amendment*) and a later one (here, the *Fourteenth Amendment* and the understanding of the right to keep and bear arms that it incorporates), "the later-enacted [provision] controls to the extent it conflicts with the earlier-enacted [provision]." *See Miccosukee Tribes of Fla. v. U.S. Army Corps of Eng'rs, 619 F.3d 1289, 1299 (11th Cir. 2010)* (explaining the rule as it applies to statutes).

The opposite rule would be illogical. After all, it makes no sense to suggest that the States would have bound themselves to an understanding of the *Bill of Rights*—including that of the *Second Amendment*—that they did not share when [*12] they ratified the *Fourteenth Amendment*.

---

[10] Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, "the *Second Amendment's* scope as a limitation on the States depends on how the right was understood when the *Fourteenth Amendment* was ratified." *Ezell v. City of Chicago, 651 F.3d 684, 702 (7th Cir. 2011)* (Sykes, J.); *see also, e.g.*, Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 223 (1998) (observing "that when we 'apply' the *Bill of Rights* to the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789"); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment was Ratified in 1868: What Rights are Deeply Rooted in History and Tradition?*, *87 TEX. L. REV. 7, 115-16 (2004)* (asserting that "Amar is exactly right"—"the question is controlled not by the original meaning of the *first ten Amendments* in 1791 but instead by the meaning those texts and the *Fourteenth Amendment* had in 1868"); Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, *8 Geo J.L. & Pub. Pol'y 1, 52-53 (2010)*.

**B. For purposes of this opinion, we assume without deciding that the *Second Amendment's* plain text covers persons between eighteen and twenty years old when they seek to buy a firearm.**

Having concluded that historical sources from the Reconstruction Era are more probative than those from the Founding Era on the scope of the *Second Amendment* right, we now apply *Bruen*'s two analytical steps.

*Bruen*'*HN12*[⬆] s first analytical step asks whether "the *Second Amendment's* plain text covers an individual's conduct," *Bruen, 142 S. Ct. at 2126*. This question has two components. We begin by asking whether the individual—here, an 18-to-20-year-old—is among "'the people' whom the *Second Amendment* protects." *Id. at 2134* (citation omitted); *see also Heller, 572 U.S. at 579* (observing that the "first salient feature of the [*Second Amendment's*] operative clause* is that it codifies a 'right of the people.'"). If so, we "turn to whether the plain text of the *Second Amendment* protects" that individual's "proposed course of conduct" (here, buying firearms). *Bruen, 142 S. Ct. at 2134*.

Once both components are satisfied, we advance to *Bruen*'s second step. There, the burden shifts to the government to demonstrate that its regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id. at 2130*.

As to the first component of *Bruen*'s first step, it's not clear whether 18-to-20-year-olds "are part **[*13]** of 'the people' whom the *Second Amendment* protects," *id. at 2134* (citation omitted). In *Bruen*, the "pleadings" described the petitioners as "law-abiding, *adult citizens* of Rensselaer County, New York." *Id. at 2124-25* (emphasis added). The Court then repeated that description of the petitioners before concluding that the petitioners "[we]re part of 'the people' whom the *Second Amendment* protects." *Id. at 2134*. But the historical record reveals that 18-to-20-year-olds did not enjoy the full range of civil and political rights that adults did. *See infra* at 30-31. And even today, 18-to-20-year-olds do not share all the rights that those over 21 do. For instance, the drinking age and tobacco-use age in most states is 21.[11]

In this case, Florida does not dispute the NRA's contention that 18-to-20-year-olds are part of "the people" whom the *Second Amendment* protects. So we will assume that 18-to-20-year-olds are part of the people whom the *Second Amendment* protects.

Next up is the second component of *Bruen*'s first step. The question there is whether the *Second Amendment's* "plain text" covers 18-to-20-year-olds' "proposed course of conduct"—that is, buying firearms. *Bruen, 142 S. Ct. at 2134*. Of course, the *Second Amendment's* plain text includes only a right "to keep and bear arms," not a right to buy them. *U.S. Const. amend II*. That said, our sister circuits have found **[*14]** that the right to keep and bear arms includes the right to acquire them. *See Teixeria v. Cnty of Alameda, 873 F.3d 670, 677 (9th Cir. 2017)* (en banc); *Ezell, 651 F.3d at 704*.

We need not decide this question today. Rather, we can assume for now that "the *Second Amendment's* plain text" covers 18-to-20-year-olds when they buy firearms. *Bruen, 142 S. Ct. at 2126*.

**C. The Act's restriction on the sale of firearms to 18-to-20-year-olds is consistent with this Nation's relevant historical tradition of firearm regulation.**

Given our assumption that the *Second Amendment's* plain text provides some level of coverage for (a) 18-to-20-year-olds who seek (b) to buy firearms, we move on to *Bruen*'s second analytical step. Here, Florida "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen, 142 S. Ct. at 2127*.

*HN13*[⬆] This inquiry entails "reasoning by analogy" to determine whether historical firearms regulations are "relevantly similar" the challenged modern regulation. *Bruen, 142 S. Ct. at 2132* (quoting Cass Sunstein, *On Analogical Reasoning*, *106 Harv. L. Rev. 741, 773 (1993)*). We evaluate two metrics to determine whether historical and modern firearms regulations are

---

[11] *See., e.g.*, *23 U.S.C. § 158* (directing the Secretary of Transportation to withhold money from states with a drinking age of under 21); *South Dakota v. Dole, 483 U.S. 203, 107 S. Ct. 2793, 97 L. Ed. 2d 171 (1987)* (holding that *28 U.S.C. "§ 158* is a valid use of the spending power").

"relevantly similar": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id. at 2133*. The government need only "identify a well-established and representative historical *analogue [\*15]*, not a historical *twin*." *Id.*

Here, "a well-established and representative historical analogue" exists for Florida's challenged law. *Id.* In fact, the historical record shows that regulations from the Reconstruction Era burdened law-abiding citizens' rights to armed self-defense to an even greater extent and for the same reason as the Act does. In other words, at *Bruen*'s second step, Florida has satisfied its burden as to both the "how" and the "why."

We begin with the "how"—that is, how the Act's historical analogues similarly (and, in most cases, more severely) burdened *Second Amendment* rights for 18-to-20-year-olds. Alabama, Tennessee, and Kentucky led the charge in passing laws that prohibited 18-to-20-year-olds from buying (or even possessing) arms. Twelve years before the *Fourteenth Amendment's* ratification—and continuing through the Reconstruction Era[12]—Alabama prohibited selling, giving, or lending, "to any male minor, a bowie knife, or knife, or instrument of the like kind or description, by whatever named called, or air gun, or pistol," 1855 Ala. Laws 17. At that time, the age of majority in Alabama was twenty-one years.[13] In other words, in 1856, Alabama law prohibited the sale (and even the giving or lending) of handguns and other handheld, **[\*16]** smaller arms to 18-to-20-year-olds.

Two years later, Tennessee codified a similar law. Tennessee's law prohibited selling, loaning, giving, or delivering "to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in traveling," TENN. CODE § 4864 (1858), *reprinted in* 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858). At that time, the age of majority in Tennessee was twenty-one years old.[14] Like Alabama's law, Tennessee's law persisted through the Reconstruction Era. *See State v. Callicutt, 69 Tenn. 714, 714 (1878)* (explaining that Section "4864 of the Code . . . makes it a misdemeanor to sell, give, or loan a minor a pistol or other dangerous weapon").

Kentucky followed suit within a year. It enacted a law that prohibited selling, giving, or loaning "any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon . . . to any minor," 1859 Ky. Acts 245, § 23. The law contained an exception that allowed parents or guardians to give, lend, or sell deadly weapons to their minor children. *See id.* At that time, the age of majority in Kentucky was twenty-one **[\*17]** years old.[15] Kentucky's law prohibiting the sale of firearms to minors also persisted through the Reconstruction Era. *See* ch. 29 KY. CODE § 1 (1877), *reprinted in* The General Statutes of Kentucky 359 (J.F. Bullitt & John Feland eds. 1877).

In sum, then, Alabama and Tennessee generally prohibited selling, loaning, or even giving handguns and other handheld arms to 18-to-20-year-olds in the years leading up to the *Fourteenth Amendment's* ratification. Because those laws made it unlawful not only to sell those types of arms to 18-to-20-year-olds, but also to lend those arms to that age group, those laws imposed a greater burden on the right to keep and bear arms than does the Act, which (as Florida concedes) leaves 18-to-20-year-olds free to obtain firearms through legal means other than purchasing. *See Fla. Stat. § 790.065(13)* ("A person younger than 21 years of age may not *purchase* a firearm.") (emphasis added).

On that score, Florida's law and Kentucky's law impose similar burdens on the right to keep and bear arms for self-defense: Kentucky left parents and guardians free to provide a "pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon" to their minor child, 1859 Ky. Acts 245, § 23, while Florida allows anyone to give **[\*18]** or loan (but not sell)

---

[12] *See, e.g.*, ALA. CODE. § 4230 (1876), *reprinted in* The Code of Alabama 1876 901 (Wade Keyes & Fern. M. Wood eds. 1877).

[13] *See, e.g., Brown v. Beason, 24 Ala. 466, 466 (1854)* (discussing the plaintiff's "several children, some of whom were over twenty-one years of age, and some minors"); *Saltonstall v. Riley, 28 Ala. 164, 172 (1856)* (describing "a minor under the age of twenty-one years"); *Vincent v. Rogers, 30 Ala. 471, 473 (1857)* (explaining that the plaintiff "was a minor, under twenty-one years of age" when she entered the disputed contract; "that she became and was of age before this suit was instituted; and that after she became twenty-one years of age," she reaffirmed the contract).

[14] *See, e.g., Warwick v. Cooper, 37 Tenn. 659, 660-61 (1858)* (describing "an infant under the age of twenty-one"); *Seay v. Bacon, 36 Tenn. 99, 102 (1856).*

[15] *See, e.g., Newland v. Gentry, 57 Ky. 666, 671, 18 B. Mon. 666 (1857).*

firearms to 18-to-20-year-olds. Because both laws leave pathways for 18-to-20-year-olds to acquire weapons, both laws impose similar burdens.

As for the "why" of those historical regulations, it is also "relevantly similar" to the "why" of the Marjory Stoneman Douglas High School Public Safety Act. Both "regulations burden a law-abiding citizen's right to armed self-defense" for the same reason: enhancing public safety. *Bruen, 142 S. Ct. at 2132-33*. Indeed, Tennessee and Kentucky passed their regulations in tandem with laws that prohibited giving spirits to minors,[16] demonstrating those states' understandings that alcohol and firearms both represented dangers to minors' safety. *See also infra* at 25-27 (discussing the public's understanding that these laws aimed to advance public safety). By passing the Act, Florida also aims to "enhance public safety" by addressing "gun violence on school campuses." *2018 Fla. Laws 10*.

And that is well in keeping with traditional firearm regulations. Public universities have long prohibited students from possessing firearms on their campuses. On August 9, 1810, for instance, the University of Georgia passed a resolution that prohibited students from keeping "any **[\*19]**  gun, pistol," or "other offensive weapon in College or elsewhere," meaning that students could not possess such weapons even while they were away from college.[17] Just over a decade later, the University of Virginia passed a resolution—with supporting votes from Thomas Jefferson and James Madison—that prohibited students from keeping or using "weapons or arms of any kind, or gunpowder," on school grounds.[18] The University of North Carolina similarly prohibited students from keeping "firearms, or gunpowder" by the mid-nineteenth century.[19]

That context serves as the backdrop for the flurry of state regulations, enacted soon after the *Fourteenth Amendment's* ratification, that banned the sale of firearms to all 18-to-20-year-olds—on or off a college campus. Between the *Fourteenth Amendment's* ratification and the close of the nineteenth century,[20] at least sixteen states and the District of Columbia joined Alabama, Kentucky, and Tennessee—a total of at least twenty jurisdictions—in banning sales of firearms to 18-to-20-year-olds. *See* Appendix (collecting laws). These regulations, like their pre-ratification predecessors, were state **[\*20]**  responses to the problem of deaths and injuries that underage firearm users inflicted.

Many of those post-ratification regulations were similar, if not identical, to their pre-ratification predecessors in Alabama, Tennessee, and Kentucky. Maryland, for example, made it "unlawful" for anyone "to sell, barter, or give away any firearm whatsoever or other deadly weapon, except for shot guns, fowling pieces and rifles to any person who is a minor under the age of twentyone years." 1882 Md. Laws 656; *see also, e.g.*, 1875 Ind. Acts 59 (making it "unlawful for any person to sell, barter, or

---

[16] *See* TENN. CODE § 4863 (1858), *reprinted in* 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858) (prohibiting the selling, giving, or delivering "to any minor, or any other person for the use of such minor, any of the liquors specified" elsewhere in the code); 1859 Ky. Acts 245, §§ 22, 24 (prohibiting selling, giving, or loaning "spiritous liquors" or "playing cards" to minors).

[17] *See* University of Georgia Libraries, *The Minutes of the Senatus Academicus 1799-1842* (Nov. 4, 1976), https://perma.cc/VVT2-KFDB.

[18] *University of Virginia Board of Visitors Minutes*, ENCYC. VA. (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/.

[19] Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina 15 (1838).

[20] *HN14*[🔼] The Supreme Court looks to post-enactment history because "a regular course of practice can liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution." *Bruen, 142 S. Ct. at 2136* (cleaned up); *see also NLRB v. Noel Canning, 573 U.S. 513, 525, 134 S. Ct. 2550, 189 L. Ed. 2d 538 (2014)* (explaining how the Supreme "Court has treated practice as an important interpretive factor . . . even when that practice began after the founding era"); *cf. The Pocket Veto Case, 279 U.S. 655, 689, 49 S. Ct. 463, 73 L. Ed. 894, 68 Ct. Cl. 786 (1929)* (explaining that "settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions"). Of course, when post-enactment practice *differs* from pre-enactment practice, the post-enactment practice cannot override the pre-enactment practice. *Cf. Bruen, 142 S. Ct. at 2137*. But both *Heller* and *Bruen* used post-enactment practice as "confirmation of what the Court thought had already been established." *Id.* (citation omitted); *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 312, 128 S. Ct. 2531, 171 L. Ed. 2d 424 (2008)* (Roberts, C.J., dissenting) ("Although we have sometimes looked to cases postdating the founding era as evidence of common-law traditions, we have never done so . . . where the practice of later courts was so divergent."). Here, the post-enactment laws were similar to (and in some cases, the same as) the pre-enactment laws.

give to any other person, under the age of twenty-one-years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon").

Unlike those laws, the Act leaves 18-to-20-year-olds free to acquire firearms of any legal type—so long as they don't buy them.

True, the Act and its Reconstruction Era analogues apply to overlapping, but not coextensive classes of arms. But for two reasons, the Reconstruction Era statutes are "similarly relevant" and no less burdensome to 18-to-20-year-olds' *Second Amendment* rights than the Act.

First, the Reconstruction Era statutes and the Act are "similarly relevant" because both **[*21]** apply broadly to many—though not all—types of "arms" under the *Second Amendment*. The term "arms" has long been understood to include "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller, 554 U.S. at 581* (quoting 1 A New and Complete Dictionary). Besides firearms, this definition included "bows and arrows" and other weapons suited for self-defense. *Ibid.* So while the Act covers all firearms and thus handguns, *see Fla. Stat. § 760.065(13)*—but not "arms" that are not firearms—we assume for purposes of this opinion that the Reconstruction Era laws applied to handguns (but not long guns) and non-firearm types of deadly weapons like dirks and bowie knifes.[21] *See, e.g.,* 1883 Wis. Sess. Laws 290 (covering only "pistol[s]" and "revolver[s]"); 1884 Iowa Acts 86 (covering only "pistol[s], revolver[s] or toy pistol[s]"); 1881 Ill. Laws 73 (covering only "pistol[s], revolver[s], derringer[s], bowie knife[s], dirk[s] or other deadly weapon[s] of like character"). In other words, both the Act and its Reconstruction Era predecessors apply to the sale of handguns and some other class of arms to minors.

And second, the Reconstruction Era statutes prohibited selling, giving, or loaning handguns—the **[*22]** "quintessential self-defense weapon," *Heller, 554 U.S. at 630*—to 18-to-20-year-olds. As a result, those statutes are at least as burdensome to 18-to-20-year-olds' *Second Amendment* rights as the Act. For while the Act also bans the sale of handguns to 18-to-20-year-olds, unlike its Reconstruction Era predecessors, the Act leaves open avenues for 18-to-20year-olds to acquire that "quintessential self-defense weapon," *id.*, (as well as long guns). Thus, we have no trouble concluding that the Reconstruction Era statutes serve as historical analogues for the Act. We are not concerned that the Act and its Reconstruction Era predecessors are not precisely the same because they need be only analogues, not twins, *Bruen, 142 S. Ct. at 2133*, and for the reasons we've discussed, they surely are that.

Our conclusion that Florida's "firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen, 142 S. Ct. at 2127*, finds further support from Reconstruction Era newspapers. **HN15**[⬆] As the Supreme Court has explained, the "discussion of the *Second Amendment* . . . in public discourse after the Civil War" can shed important light on the public understanding of a right at the time of its ratification of the *Fourteenth Amendment*. *Id. at 2128* (citation and quotation marks omitted). **[*23]** To ascertain "widely held" views, the Supreme Court has consulted, among other sources, newspaper "editorial[s]." *See, e.g., Heller, 554 U.S. at 615* (relying on "an editorial" to conclude that a "view . . . was . . . widely held"). We follow the Supreme Court's lead.

Based on newspapers from the Reconstruction Era, historians have confirmed that the public did not understand the right to keep and bear arms to protect the rights of 18-to-20-year-olds to purchase such weapons. In fact, much of the public at the time supported restrictions. *See* Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 156 (2019) (noting that "lawmakers and the public supported" "laws restricting the sale of dangerous weapons to minors" "in the hopes of stemming the tide of firearm-related injuries at the hands of minors"); *see also, e.g., id.* at 172 (noting that "the general public" did not view laws "prohibiting minors from using firearms" as "a violation of the *Second Amendment* or the right to arms"); *The Law Interferes*, N.Y. Trib., Feb. 22, 1884, p.4 (urging the legislature to "regulate the sale of . . . so-called toy-

---

[21] Some might suggest that the catch-all phrase "other deadly weapons of like character" includes long guns. Good arguments exist on both sides of the question. For instance, at least one state had an explicit carveout for long guns. *See, e.g.,* TENN. CODE § 4864 (1858). That might indicate that the drafters of the provision saw the catch-all phrase as covering long guns, or else there would have been no need to expressly exclude them. But on the other side of the coin, the ejusdem generis canon counsels against construing the statutes as covering long guns, *see, e.g.,* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195-98 (2012), because the class of weapons that precedes the catch-all phrase includes only smaller, handheld arms. So long guns, which are neither smaller nor handheld, are not of the same type as the list of weapons preceding the catch-all phrase. We need not resolve that debate here. Instead, we simply assume for purposes of this opinion that the statutes do not cover long guns.

pistols" because minors "ought not to be trusted with deadly weapons");[22] *Law in the Interest [\*24] of Civilization*, KENOSHA TEL., Feb. 9, 1883, p.2 ("The bill introduced in the early part of the present session, prohibiting the selling of pistols or revolvers to minors, and forbidding the carrying of such by minors, ought not to fail of becoming a law."); *General Gossip*, SALT LAKE HERALD, Feb. 22, 1884, p.8 (describing "toy pistols" as "murderous nuisances" and opining that "[t]he Legislative Council did a wise and proper thing in passing the bill to prevent the sale of giving away of toy pistols to minors"); *The City Law Business*, DAILY GAZETTE (Wilmington, Del.), July 16, 1880, p. 1 ("As the Legislature will meet during next winter, I suggest that a committee on legislation be appointed at an early day so that mature consideration may be given to matters on which it may be deemed important to invoke the aid of the Legislature; such as . . . the sale of fire-arms and toy pistols to minors . . . ."); *Monmouth Musings*, MONMOUTH INQUIRER, June 14, 1883, p.3 ("The first conviction in the State under the new law to prevent the sale of pistols to minors, took place in Paterson recently, where a junk dealer was fined ten dollars and costs for its violation. It should be strictly enforced **[\*25]** in this County."); *The Deadly Toy Pistol*, EVENING STAR (D.C.), July 21, 1881, p.4 (expressing approval of "[t]he first arrest for selling dangerous toy pistols to minors"); *Our Harvest*, MOWER CNTY. TRANSCRIPT, Sept. 6, 1882, p.2 ("The LeRoy *Independent* thinks there ought to be a law against the carrying of pistols and revolvers by minors . . . .").

It would be odd indeed if the people who adopted the *Fourteenth Amendment* did so with the understanding that it would invalidate widely adopted and widely approved-of gun regulations at the time.

The courts generally shared the public's approval of laws that prohibited providing handguns and other dangerous weapons to minors. Take the Supreme Court of Tennessee. In 1871, that court "held that a statute that forbade openly carrying a pistol . . . violated the state constitutional provision (which the court equated with the *Second Amendment*)." *Heller, 554 U.S. at 629* (citing *Andrews v. State, 50 Tenn. 165, 187 (1871)*). Seven years later, that same court described Section 4864 of Tennessee's Code—which prohibited "the sale, gift, or loan of a pistol or other like dangerous weapon to a minor"—as "not only constitutional . . . but wise and salutary in all its provisions." *Callicutt, 69 Tenn. at 716-17*; *see also Dabbs v. State, 39 Ark. 353, 357 (1882)* (placing a law that **[\*26]** banned the sale of firearms in the same permissible "category" as laws regulating "gaming, the keeping of bawdy-houses," and "the sale of spirituous liquors").

*HN16*[↑] The Supreme Court has also directed us to consult contemporaneous legal commentators to discern the public understanding of the right at the time of ratification. *Bruen, 142 S. Ct. at 2128*. Here, legal commentators viewed the Reconstruction Era statutes as constitutional. Thomas Cooley "wrote a massively popular 1868 Treatise on Constitutional Limitations." *Heller, 554 U.S. at 616*. Cooley's treatise espoused the view that states could use their police power to prohibit the sale of arms to minors. Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883).

Given these facts, it should come as no surprise that our research indicates that laws prohibiting the sale of arms to minors went virtually "unchallenged," *Bruen, 142 S. Ct. at 2137*, from their enactment through the middle of the nineteenth century. In fact, our research suggests that a litigant challenged a law banning the sale of arms to minors only once during that time frame. *See Callicutt, 69 Tenn. at 716-17* (rejecting a challenge to Tennessee's statute, which banned selling, loaning, or even giving handguns and other arms to minors). *HN17*[↑] And the Supreme **[\*27]** Court has recognized that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision" (quoting *Noel Canning, 573 U.S. at 572* (Scalia, J., concurring in the judgment)). We can see no reason why, when we are construing a constitutional provision incorporated against the States by the *Fourteenth Amendment* the rule should be any different where a governmental practice has been open, widespread, and unchallenged since the early days of the Reconstruction Era ratification. Indeed, the fact that there was apparently only a single challenge to these twenty statutes' constitutionality until well into the twentieth century suggests that the public understanding at the time of the ratification considered the statutory prohibitions constitutionally permissible.

Based on the historical record, we can distill two key points. First, several states burdened 18-to-20-year-olds' rights to keep and bear arms—both before and after the *Fourteenth Amendment's* ratification—by making it unlawful even to give or lend handguns

---

[22] Despite the moniker "toy guns," in the Reconstruction Era, little difference existed between so-called "toy guns" and real guns. *See* Catie Carberry, *The Origins of Toy Guns in America*, DUKE CTR. FOR FIREARMS L. (July 18, 2019), https://firearmslaw.duke.edu/2019/07/the-origin-of-toy-guns-in-america/ (observing that "states initially struggled to differentiate between toy guns and real guns"); *see also id.* (noting, for instance, that under a "Pennsylvania statute from 1883, toy (or imitation guns) were 'arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls and being exploded, fired off and discharged'").

and other deadly weapons to minors. In total, at least nineteen states and the District of Columbia banned the sale **[\*28]** and even the giving or loaning of handguns and other deadly weapons to 18-to-20-year-olds by the close of the nineteenth century. Second, those states did so to enhance public safety.

These points show that the Marjory Stoneman Douglas High School Public Safety Act "is consistent with this Nation's historical tradition of firearm regulation." *Bruen, 142 S. Ct. at 2126*. To begin with, the Act is no more restrictive than its forebearers: while the Act burdens 18-to-20-year-olds' rights to buy firearms, unlike its Reconstruction Era analogues, it still leaves 18-to-20-year-olds free to acquire any type of firearm—including "the quintessential self-defense weapon," the handgun, *Heller, 554 U.S. at 630*—in legal ways, as long as they don't buy the weapons.

The Act also aims to improve public safety just like its historical analogues sought to do—that is, the Act has an analogous "why."

*HN18*[⬆] So the Act and its historical predecessors are "relevantly similar under the *Second Amendment*." *Bruen, 142 S. Ct. at 2132*. And for that reason, the Act does not infringe on the right to keep and bear arms. *See id. at 2161* (Kavanaugh, J., concurring) (explaining that *Bruen* articulates the test "for evaluating whether a government regulation infringes on the *Second Amendment* right to possess and carry guns for self-defense").

Trying **[\*29]** to avoid this conclusion, the NRA responds that Founding Era federal law obliged 18-to-20-year-olds to join the militia. *See, e.g., Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271* (requiring "each and every free able-bodied white citizen" that is over "the age of eighteen years, and under the age of forty-five years" to "enroll[] in the militia"). In other words, the NRA contends that the fact that Congress required 18-to-20-year-olds to muster for the militia is compelling evidence that 18-to-20-year-olds had the right to an unimpeded ability to purchase firearms.

*HN19*[⬆] The NRA's conclusion is incorrect. The NRA mistakes a legal obligation for a right. *See Heller, 554 U.S. at 605* (explaining that the *Second Amendment* "protect[s] an individual right unconnected with militia service"); *see also id. at 582, 601, 608, 610, 611, 612, 613, 616, 617*. The fact that federal law obliged 18-to-20-year-olds to join the militia does not mean that 18-to-20-year-olds had an absolute right to buy arms.

To the contrary, the historical record shows that merely being part of the militia did not entitle 18-to-20-year-olds to enjoy the same political and civil rights as adults. *See, e.g.,* Corinne T. Field, *The Struggle for Equal Adulthood: Gender, Race, Age, and the Fight for Citizenship in Antebellum America* 55 (2014) (explaining that, during **[\*30]** the early nineteenth century, the "relevance of chronological age stood out most sharply in the celebration of age twenty-one as a transition to full citizenship for white men"). For instance, the Tennessee Supreme Court expressly rejected the argument that "every citizen who is subject to military duty has the right 'to keep and bear arms,' and that this right necessarily implies the right to buy or otherwise acquire, and the right in others to give, sell, or loan to him" firearms and concluded instead that Tennessee's prohibition on the sale, gifting, or lending of firearms to those under 21 "d[id] not in fact abridge, the constitutional right of the 'citizens of the State to keep and bear arms for their common defense.'" *Callicutt, 69 Tenn. at 716*.

In other words, Congress imposed upon 18-to-20-year-olds a specific obligation to serve in the militia but did not give them all the rights associated with full citizenship (like, at that time, the right to vote). So we can't infer from the fact that 18-to-20-year-olds had a specific obligation that they had a specific right.

Plus, even assuming that the Founding Era federal mustering obligations could be viewed as entitling 18-to-20-year-olds to buy firearms in **[\*31]** 1791, that's not the public understanding that prevails here. Rather, it's clear that the public understanding of the *Second Amendment* at the time of the *Fourteenth Amendment's* ratification—as demonstrated by the wealth of *Fourteenth Amendment*-Ratification Era analogues for Florida's law—permitted the states to limit the sale of firearms to those 21 and older. *See* Appendix (collecting laws that banned 18-to-20-year-olds from buying or possessing firearms). So even if federal law obliged 18-to-20-year-olds to muster for the militia, laws banning that same group from buying firearms do not infringe on the right to keep and bear arms. And the fact that Congress required 18-to-20-year-olds to muster for the militia cannot overcome the litany of historical analogues that are relevantly similar to the Marjory Stoneman Douglas High School Public Safety Act.

**III.**

Unfortunately, firearm violence among some 18-to-20-year-olds is nothing new. Tragically, all that has changed since the Reconstruction Era is the amount of carnage a single person can inflict in a short period because of the advances made in firearm technology over the last 150, or so, years.

_HN20_[⬆️] But "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people [\*32] adopted them*." _Bruen, 142 S. Ct. at 2136_ (quoting _Heller, 554 U.S. at 634-35_). And as our history shows, the states have never been without power to regulate 18-to-20-year-olds' access to firearms. Going back to the Reconstruction Era, that is exactly what many states around the country did. Indeed, many states, when the _Fourteenth Amendment_ was ratified, banned 18-to-20-year-olds from buying and sometimes even possessing firearms. And they did so to address the public-safety problem some 18-to-20-year-olds with firearms have long represented.

Florida enacted the Marjory Stoneman Douglas High School Public Safety Act—as its name indicates—for precisely the same reason as states in the Reconstruction Era adopted their firearm restrictions for 18-to-20-year-olds—to address the public-safety crisis some 18-to-20-year-olds with firearms represent. Because Florida's Act is at least as modest as the firearm prohibitions on 18-to-20-year-olds in the Reconstruction Era and enacted for the same reason as those laws, it is "relevantly similar" to those Reconstruction Era laws. _Bruen, 142 S. Ct. at 2132_. And as a result, it does not violate the _Second Amendment_.

We therefore affirm the district court's order granting summary judgment in Florida's favor.

**AFFIRMED**.

## Appendix

### Appendix 1: Reconstruction Era Laws [\*33]  Banning the Sale of Firearms to 18-to-20-year-olds (Ordered Chronologically)

| State | Citation(s) |
|---|---|
| Alabama | 1855 Ala. Laws 17 (making it unlawful to "sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol"); *see also* _Brown v. Beason, 24 Ala. 466, 466 (1854)_ (discussing the plaintiff's "several children, some of whom were over twenty-one years of age, and some minors"); _Saltonstall v. Riley, 28 Ala. 164, 172_ (1856) (describing "a minor under the age of twenty-one years"); _Vincent v. Rogers, 30 Ala. 471_, 473-74 (1857) (explaining that the plaintiff "was a minor, under twenty-one years of age" when she entered the disputed contract; "that she became and was of age before this suit was instituted; and that after she became twenty-one years of age," she reaffirmed the contract). |
| Tennessee | TENN. CODE § 4864 (1858), *reprinted in* 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858) (making it unlawful to sell, loan, or give, "to any minor a pistol, bowie-knife, dirk, Arkansas |

**Appendix 1: Reconstruction Era Laws [*33]  Banning the Sale of Firearms to 18-to-20-year-olds (Ordered Chronologically)**

| State | Citation(s) |
|-------|-------------|
| | tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in traveling"); *see also Warwick v. Cooper*, 37 Tenn. (5 Sneed) 659, 660-61 (1858) (referring to twenty-one as the age of majority); **[*34]**  *Seay v. Bacon*, 36 Tenn. (4 Sneed) 99, 102 (1856) (same). |
| Kentucky | 1859 Ky. Acts 245, § 32 (making it unlawful for anyone, "other than the guardian," to "sell, give, or loan any pistol, dirk, bowie-knife, brass-knucks, slung-shot, cold, cane-gun, or other deadly weapon . . . to any minor"); *see also, e.g., Newland v. Gentry,* 57 Ky. (18 B. Mon.) 666, 671, 18 B. Mon. 666 (1857) (referring to twenty-one as the age of majority). |
| Indiana | 1875 Ind. Acts 59 (making it "unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one-years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon"). |
| Georgia | 1876 Ga. Laws 112 (making it unlawful "to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife or sword cane"); *see also* McDowell v. Georgia R.R, 60 Ga. 320, 321 (1878) (noting that "age of legal majority" in Georgia was "twenty-one years; until that age all persons [were] minors"). |
| Mississippi | 1878 Miss. Laws 175 (making it unlawful "for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any" "bowie knife, pistol, brass knuckles, slung shot, or other deadly weapon of like kind or description); *see also Rohrbacher v. Jackson*, 51 Miss. 735, 744 , 746 (1875) (observing that a provision, which authorized "female citizens over eighteen years of age" to vote, "authoriz[d] females, some **[*35]**  of whom are minors, to have a voice in the election"); *Acker v. Trueland, 56 Miss. 30, 34 (1878)* (providing an exception for widows and children "until the youngest child shall be twenty-one years of age"). |

NRA v. Bondi

**Appendix 1: Reconstruction Era Laws [*33]  Banning the Sale of Firearms to 18-to-20-year-olds (Ordered Chronologically)**

| State | Citation(s) |
|---|---|
| Missouri | MO. REV. STAT. § 1274 (1879), *reprinted in* 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879) (making it unlawful to "sell or deliver, loan or barter to any minor" "any deadly or dangerous weapon" "without the consent of the parent or guardian of such minor"); *see also id.* § 2559 (setting the age of majority at twenty-one for males and eighteen for females). |
| Illinois | 1881 Ill. Laws 73 (making it unlawful for anyone other than a minor's father, guardian, or employer to "sell, give, loan, hire or barter," or to "offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character"); *see also* ch. no. 64 ILL. COMP. STAT. § 1 (1881) (setting the age of majority at twenty-one for males and eighteen for females). |
| Nevada | NEV. REV. STAT. § 4864 (1885) (making it unlawful for anyone "under the age of twenty-one (21) years" to "wear or carry any pistol, sword in case, slung shot, or other dangerous or deadly weapon"). |
| Delaware | 16 Del. Laws 716 (1881) (making it unlawful to "knowingly sell a deadly weapon to a minor other than [*36]  an ordinary pocket knife"); *see also* Revised Statutes of the State of Delaware 60 (The Mercantile Printing Co. ed. 1893) (setting the age of Majority at twenty-one for males and eighteen for females); Revised Statutes of the State of Delaware 484-85 (James & Webb ed. 1874) (same). |
| Maryland | 1882 Md. Laws 656 (making it "unlawful for any person . . . to sell, barter, or give away any firearm whatsoever or other deadly weapon, except for shot gun, fowling pieces and rifles to any person who is a minor under the age of twenty-one years."). |
| West Virginia | 1882 W. Va. Acts 421 (making it unlawful for a person to "sell or furnish" "any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character" "to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the |

**Appendix 1: Reconstruction Era Laws [*33]  Banning the Sale of Firearms to 18-to-20-year-olds (Ordered Chronologically)**

| State | Citation(s) |
|---|---|
| | age of twenty-one years"). |
| Kansas | 1883 Kan. Sess. Laws 159 (making it unlawful to "sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol . . . or any dirk, bowieknife, brass knuckles, slung shot, or other dangerous weapon[] to any minor"); *see also Burgett v.* *Barrick, 25 Kan. 526, 527-28 (Kan. 1881)* (referring to twenty-one as the age of majority) |
| Wisconsin | 1883 Wis. Sess. Laws 290 (vol. 1) (making it "unlawful for any dealer **[*37]**  in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state"); *see also Hepp v.* *Huefner, 61 Wis. 148, 20 N.W. 923, 924 (Wis. 1884)* (referring to twenty-one as the age of majority) |
| Iowa | 1884 Iowa Acts 86 (making it "unlawful for any person to knowingly sell, present or give any pistol, revolver or toy pistol to any minor"); *see also In re* *Mells, 64 Iowa 391, 20 N.W. 486 (Iowa 1884)* (referring to twenty-one as the age of majority); *Hoover v. Kinsey* *Plow Co., 55 Iowa 668, 8 N.W. 658 (Iowa 1881)* (referring to twenty-one as the age of majority). |
| Louisiana | 1890 La. Acts 39 (making it unlawful "for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years"). |
| Wyoming | 1890 Wyo. Terr. Sess. Laws 140 (making it "unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person"); *see also* Revised Statutes of Wyoming 1253 (J.A. Van Orsdel & Fenimore Chatterton eds. 1899) (codifying the same). |
| District of Columbia | *27 Stat. 116-17 (1892)* (making it unlawful to "sell, barter, hire, lend or give to any minor under the age of twenty-one years" "any deadly or dangerous **[*38]** weapons, such as daggers, air-guns, pistols, |

**Appendix 1: Reconstruction Era Laws [*33]  Banning the Sale of Firearms to 18-to-20-year-olds (Ordered Chronologically)**

| State | Citation(s) |
|-------|-------------|
| | bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles"). |
| North Carolina | 1893 N.C. Sess. Laws 468 (making it "unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot"); *see also State v. Kittelle, 110 N.C. 560, 15 S.E. 103, 103-04 (N.C. 1892)* (referring to twenty-one as the age of majority). |
| Texas | 1897 Tex. Gen. Laws 221-22 (making it unlawful to "knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof"); *see also* 2 Sayles' Annotated Civil Statutes of the State of Texas 1009 (John Sayles & Henry Sayles eds. 1898) (setting the age of majority at twenty-one for males and unmarried females). |

**Concur by:** WILSON

# Concur

WILSON, Circuit Judge, concurring in the judgment:

I would wait to issue an opinion until the current session of the Florida legislature **[*39]**  completes its consideration of H.B. 1543, 2023 Leg., Reg. Sess. (Fla. 2023), which may render the issue moot. If passed, H.B. 1543 would reduce the minimum age in the law at issue from 21 to 18. However, I concur in the judgment given the law as it exists today.

---

**End of Document**

 Neutral

As of: March 28, 2023 3:40 PM Z

## *Frey v. Nigrelli*

United States District Court for the Southern District of New York

March 13, 2023, Decided; March 13, 2023, Filed

21 CV 05334 (NSR)

**Reporter**

2023 U.S. Dist. LEXIS 42067 *; 2023 WL 2473375

JASON FREY, BRIANNA FREY, JACK CHENG, and WILLIAM SAPPE, Plaintiffs, v. STEVEN NIGRELLI, Acting Superintendent of the New York State Police, in his official capacity, NEW YORK CITY, New York, and KEECHANT SEWELL, in her official capacity as NYPD Commissioner, Defendants.

**Prior History:** *Frey v. Bruen, 2022 U.S. Dist. LEXIS 31053, 2022 WL 522478 (S.D.N.Y., Feb. 22, 2022)*

## Core Terms

license, firearms, concealed, handgun, preliminary injunction, carrying, regulations, Plaintiffs', subway, guns, MTA, restrictions, arms, alleges, injunction, intend, standing to challenge, private property, Declaration, banning, rails, challenging, DENIES, courts, irreparable harm, self-defense, concrete, schools, places, travel

**Counsel:** **[*1]** For Jason Frey, Brianna Frey, Jack Cheng, William Sappe, Plaintiffs: Amy L Bellantoni, The Bellantoni Law Firm, LLP, Scarsdale, NY.

For Kevin P. Bruen, Acting Superintendent of the New York State Police, in his official capacity, Defendant: Ian Ramage, LEAD ATTORNEY, NYS Office of The Attorney General, Litigation Bureau, New York, NY; Neil Shevlin, LEAD ATTORNEY, New York State Office of the Attorney General (28 Liberty), New York, NY.

For New York City, New York, Dermot Shea, in his official capacity as NYPD Police Commissioner, Defendants: Rachel Kane Moston, LEAD ATTORNEY, New York City Law Department, New York, NY.

For AAG New York Attorney General's Office, Interested Party: Ian Ramage, NYS Office of The Attorney General, Litigation Bureau, New York, NY.

**Judges:** NELSON S. ROMÁN, United States District Judge.

**Opinion by:** NELSON S. ROMÁN

## Opinion

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiffs Jason Frey, Brianna Frey, Jack Cheng, and William Sappe bring this action against the Acting Superintendent of the New York State Police, Steven Nigrelli ("Acting Superintendent" or "State Defendant"), and New York City and the NYPD Police Commissioner, Keechant Sewell (together, the "City Defendants"), **[*2]** alleging various violations of the *Second Amendment*. (ECF No. 47.) Presently before the Court is Plaintiffs Jason Frey, Brianna Frey, and William Sappe's (hereinafter, "Plaintiffs") motion for preliminary and permanent injunction seeking to enjoin the enforcement of the following New York

State and New York City gun laws: *N.Y. Penal Law §§ 400.00(6)*, *400.00(15)*, *265.01*, *265.01-b*, *265.01-d*, *265.01-e*, *265.03(3)*, and *NYC Admin. Code § 10-315*. (ECF No. 48.) For the following reasons, Plaintiffs' motion is DENIED in part and STAYED in part.

## BACKGROUND

### I. NEW YORK STATE AND NEW YORK CITY FIREARM LAWS

On September 1, 2022, the State of New York amended its existing gun laws via the Concealed Carry Improvement Act ("CCIA"). On July 1, 2022, the CCIA had been passed by the New York State Legislature in a special session, then promptly signed into law by Governor Kathy Hochul. The bill was designed "to align with the Supreme Court's recent decision in []*Bruen*" *See* Press Release, Governor Kathy Hochul, Governor Hochul Signs Landmark Legislation, https://on.ny.gov/3BM6Hz7 (July 1, 2022). The CCIA updated New York's licensing framework to eliminate the "proper cause" requirement that was held unconstitutional in *Bruen*, to clarify the requirement of "good moral character," and to establish additional requirements, **[\*3]** as discussed below.

New York maintains a general prohibition on the possession of firearms without a license. *See* *N.Y. Penal Law §§ 265.01-265.04*, *265.20(a)(3)*. New York State's firearm licensing law is codified in *New York Penal Law § 400.00*. Aside from licenses connected to particular employment or professions, New York has two general types of licenses: a premises license for the home or place of business and a concealed carry license. *N.Y. Penal Law § 400.00(2)(a)-(b)*, *(c)-(f)*. Because New York permits concealed carry, it does not permit the open carry of firearms. A violation of licensing restrictions is a Class A misdemeanor under *N.Y. Penal Law § 400.00(15)*.

All licensees must meet general eligibility requirements, including, *inter alia*, requirements that the licensee is over twenty-one years of age, "of good moral character," and has not been convicted of a felony or a serious offense. *N.Y. Penal Law § 400.00(1)*.

Licensing is a largely local process in New York State. *See* *Sibley v. Watches, 194 A.D.3d 1385, 1386, 148 N.Y.S.3d 574 (4th Dep't 2020)*. Applications for a license are adjudicated by local licensing officers, who are local judges throughout most of the State. *N.Y. Penal Law § 265.00(10)*. In New York City, Nassau County, and Suffolk County, local police officials serve as licensing officers. *Id.* The State Police formulate the application form throughout most of New York, and concealed carry licenses issued in New York are valid **[\*4]** throughout the State, with the exception of New York City. Pursuant to *§§ 400.00(3)(a)* and *(7)*, New York City may devise its own licensing application, and it requires that any handgun owner seeking to conceal carry in the City obtain "a special permit . . . issued by the police commissioner." *N.Y. Penal Law § 400.00(6)*. New York City has its own regulations pertaining to the issuance of handgun licenses and provides for premises licenses and different forms of concealed carry licenses. *See* *38 RCNY §§ 5-01*, *5-02*.

Part of the CCIA enacted the new "Private Property Provision," which prohibits individuals from possessing "a firearm, rifle or shotgun" on private property without the express consent of the property owner or lessee. *N.Y. Penal Law § 265.01-d*. Additionally, *New York Penal Law § 265.01-e* enumerates a set of "sensitive locations" in which individuals may not possess "a firearm, rifle or shotgun." As with the Private Property Provision, this section contains exceptions for police officers, registered security guards, active-duty military, and other designated persons.

### II. THE PLAINTIFFS

#### A. Jason and Brianna Frey

Jason and Brianna Frey are both United States citizens who reside in Westchester County. (*See* ECF No. 47, Second Amended Complaint ("SAC") ¶¶ 12-13; Declaration of Jason Frey ("Jason Frey **[\*5]** Decl.") ¶ 2, annexed as Exhibit ("Ex.") 1 to the Declaration of Amy L. Bellantoni in support of Plaintiffs' Motion for Preliminary Injunction ("Bellantoni Decl."); Declaration

Frey v. Nigrelli

of Brianna Frey ("Brianna Frey Decl.") ¶ 2, annexed to the Bellantoni Decl. as Ex. 2). Before the *Bruen* decision, both Freys applied for and were granted concealed carry licenses by a Westchester County judge. (Brianna Frey Decl. ¶ 3; Jason Frey Decl. ¶ 3.) The licenses were restricted "sportsman" licenses, limiting possession of their handguns to the inside of their home, to and from target shooting, and during sporting activities. (Brianna Frey Decl. ¶ 6; Jason Frey Decl. ¶ 7.)

In 2019, both Freys applied for an amendment to allow for unrestricted concealed carry licenses. (Brianna Frey Decl. ¶ 7; Jason Frey Decl. ¶ 8.) The licensing officer denied the applications because neither Frey had met the governing "proper cause" standard. (Brianna Frey Decl. ¶ 7; Jason Frey Decl. ¶ 9.) The requirement that concealed carry license applicants show "proper cause" in order to be eligible to get a license was struck down by the Supreme Court on June 23, 2022 in a decision captioned *New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2156, 213 L. Ed. 2d 387 (2022)*.

Jason Frey does not allege that he applied **[*6]** for a concealed carry license after the *Bruen* decision, or after the enactment of the CCIA legislation, to obtain an unrestricted license to carry his handgun. Brianna Frey alleges that "[i]n July 2022, [she] applied to have the restrictions on her handgun license removed to allow for 'full carry', which was denied in September 2022." (SAC ¶ 54.) Brianna Frey does not allege that she appealed that decision through an Article 78 proceeding in New York State court. Neither Brianna or Jason Frey alleges that he or she sought to obtain a separate handgun license in New York City, and Jason Frey states that he is not going to apply for a separate handgun license to legally carry in New York City. (Jason Frey Decl. ¶ 26.)

As of October 14, 2022, Brianna Frey alleged that she intended "to carry her handgun concealed on her person on a daily basis for self-defense everywhere she goes, on public and private property, commercial and residential, where ordinary people travel, congregate, shop, fill up their cars with gas, and simply exist and she intends to continue such protected conduct on a regular basis until her natural death." (SAC ¶ 52.) As of the date of her declaration, on October 16, **[*7]** 2022, she continued to indicate that she intended on carrying a handgun outside of her licensing restrictions. (*See* Brianna Frey Decl. ¶¶ 11-13.) Mr. Frey declares that he has begun to "regularly carry a handgun concealed on [his] person in public—not only to and from target shooting or when [he is] engaging in sportsman activities like camping and hiking, for the protection of [him]self and [his] family—but during [his] everyday life...." (Jason Frey Decl. ¶ 14.) He also states that he "intend[s] to start carrying [his] handgun open and holstered . . . at times when [he is] not carrying the same handgun concealed." (*Id.* ¶ 21.) Mr. Frey states that he carries his handgun to go shopping centers, restaurants subject to the alcohol and beverage control laws, movie theaters, various parks, and gas stations. (*Id.* ¶ 14.) Mr. Frey alleges that he travels to New York City in order to "get goodies at Junior's," travel to Murray's Bagel's on 8th Avenue, and visit friends in Williamsburg. (*Id.* ¶ 27.) Brianna Frey does not allege that she has traveled to, or intends to travel to, New York City.

### B. William Sappe

William Sappe is a resident of Orange County. *See* Declaration of William **[*8]** Sappe ("Sappe Decl."), ¶ 3, annexed to the Bellantoni Decl. as Ex. 3.) He is self-employed and alleges that his business involves transporting "substantial amounts of cash, diamonds, and jewelry for high-end jewelers . . . between the Diamond District and various locations in the 5 boroughs of New York City, throughout New York State, and to other states, including California and Nevada." (*Id.* ¶ 7.) Mr. Sappe is licensed as an Armed Guard in New York. (*Id.* ¶ 4.) He holds a valid license to carry a concealed handgun everywhere in New York State, with the exception of New York City, which was issued by a judicial licensing officer in Orange County. (*Id.* ¶ 3.)

Mr. Sappe states that he "previously applied to the NYPD Licensing Division to obtain a separate concealed carry license, as required by statute, and [his] application was denied." (*Id.* ¶ 9.) He does not allege when he applied for the license, when his license was denied, or the reason for the denial. Mr. Sappe has not alleged whether he has applied for a license to carry his handgun in New York City since the Supreme Court's decision in *Bruen*, or since the enactment of the CCIA.

Mr. Sappe alleges that "[b]eginning [on October 14, **[*9]** 2022], Mr. Sappe intends to carry his handgun open and exposed on his person for self-defense everywhere he goes, including New York City, every day that he does not otherwise carry his handgun concealed." (SAC ¶ 81.) Mr. Sappe alleges that he "intend[s] to begin carrying my handgun open and exposed on those days that [he is] not carrying a handgun concealed on my person, both inside New York City and throughout the state." (*See* Sappe Decl. ¶ 19.) Mr. Sappe also alleges that as part of his daily employment, he travels through Times Square. (*Id.* at ¶ 13.) He states that "I am going to carry my handgun in the Times Square area for self-protection." (*Id.*)

## III. PROCEDURAL BACKGROUND

Plaintiffs commenced this action on June 16, 2021. (ECF No. 1.) Plaintiffs requested leave to file a Motion for Preliminary Injunction, which was filed and fully briefed on September 21, 2021. (ECF No. 20.) On October 14, 2021, City Defendants filed their Answer while State Defendant filed a Motion to Dismiss on January 3, 2022. (ECF No. 31.) Oral arguments on the Preliminary Injunction were held on February 1, 2022, and the Court subsequently issued a decision denying the injunction on February 22, 2022. (ECF **[*10]**  No. 37.)

On June 23, 2022, the Supreme Court issued its decision in *Bruen*, and on August 22, 2022, Plaintiffs requested permission to file a Second Motion for Preliminary Injunction based on the holding in *Bruen*. (ECF No. 42.) On September 1, 2022, the Court issued a Decision and Order denying Plaintiffs' request for a Second Preliminary Injunction and granted State Defendant's Motion to Dismiss as to them. (ECF No. 44.) Plaintiffs filed an Amended Complaint and a Second Amended Complaint on October 4 and October 14, 2022, respectively, along with a stipulation signed by all parties agreeing to the filing of the amended complaints.[1] (*See* ECF Nos. 46 and 47.) Plaintiffs Jason Frey, Brianna Frey, and William Sappe filed the present motion on October 20, 2022, styling it as an "Emergency Order to Show Cause," but which the Court construed as a Third Motion for Preliminary Injunction.[2] (ECF No. 48.) The parties fully briefed their arguments on the Third Motion for Preliminary Injunction on December 15, 2022.

On March 20, 2023, the Court held oral argument on Plaintiffs' challenge to *N.Y. Penal Law § 265.01-e* (banning guns in sensitive places), with a focus on *§ 265.01-e(2)(n)* which bans firearms in public transportation, including **[*11]** Metropolitan Transit Authority ("MTA") subway cars and train cars and *§ 265.01-e(2)(t)* which bans the carrying of firearms in the Times Square area.


## LEGAL STANDARD


## I. PRELIMINARY AND PERMANENT INJUNCTION STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. A party seeking a preliminary injunction "must demonstrate that it will suffer irreparable harm absent injunctive relief and either (1) that it is likely to succeed on the merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party." *Mullins v. City of New York, 626 F.3d 47, 52-53 (2d Cir. 2010)* (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 34-35 (2d Cir. 2010)*).

Where "a party seeks an injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the plaintiff must typically show a likelihood of success on the merits—a serious question going to the merits is usually insufficient[.]" *Mullins, 626 F.3d at 53*. However, where a party seeks a mandatory injunction "altering, rather than maintaining, the status quo," such as in this case, that party "must meet [a] more rigorous standard." **[*12]** *Almontaser v. N. Y. City Dep't of Educ., 519 F.3d 505, 508 (2d Cir. 2008)* (internal alterations omitted); *see also* *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33 (2d Cir. 1995)* ("[W]e have required the movant to meet a higher standard where . . . an injunction will alter, rather than maintain, the status quo . . . ."). The moving party must establish "a clear showing that the moving party is entitled to the relief requested," or show that "extreme or very serious damage" would result in the absence of preliminary relief. *Tom Doherty Assocs., 60 F.3d at 34*.

---

[1] The Second Amended Complaint, which was filed 10 days after the First Amended Complaint was filed, replaces formerly named Defendant Kevin Bruen, the former Superintendent of the New York State Police, with Steven Nigrelli, the Acting Superintendent of the New York State Police, and adds a new count challenging *NYC Admin. Code 10-315* and NYPD rules promulgated thereunder. (SAC ¶¶ 245-48.)

[2] Plaintiff Jack Cheng is not a party to the instant preliminary injunction motion.

## II. ANALYSIS FOR *SECOND AMENDMENT* CLAIMS POST-*BRUEN*

On June 23, 2022, the U.S. Supreme Court announced a new standard of review when evaluating whether a regulation violates the *Second Amendment*, and expressly rejected the previous approach widely used by federal courts. *See Bruen, 142 S. Ct. at 2126*.

Finding that the second step was inconsistent with the principles articulated in *District of Columbia v. Heller, 554 U.S. 570, 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)* and *McDonald v. City of Chicago, Ill., 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*, the Court pronounced a new standard consistent with the approach used in Heller: (i) "[w]hen the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; (ii) "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen, 142 S. Ct. at 2129-30*. In other words, at the second step, "the government must affirmatively prove that its firearms regulation is part of the **[\*13]** historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id. at 2127*.

The "historical inquiry . . . will often involve reasoning by analogy . . ." *Bruen, 142 S. Ct. at 2132*. Such "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id. at 2133*. Moreover, to "enabl[e] [courts] to assess which similarities are important and which are not" during this analogical inquiry, they must use at least "two metrics," which are "central" considerations to that inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen, 142 S. Ct. at 2132-33*. More specifically, courts must consider the following: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"; and (2) "whether that [regulatory] burden is comparably justified." *Id. at 2133*.

In addition, when courts review historical sources, those that arose around when the *Second Amendment* was adopted (1791) and when the *Fourteen Amendment* was adopted (1868) are particularly instructive, whereas laws that **[\*14]** long predated the adoption of the Constitution or long post-dated the enactment of the *Fourteenth Amendment* are given less weight, though courts may still consider them:

> "We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them. The *Second Amendment* was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for courts to reac[h] back to the 14th century for English practices that prevailed up to the period immediately before and after the framing of the Constitution. It is quite another to rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies."

*Bruen, 142 S. Ct. at 2136* (internal quotations and citations omitted).

> "Similarly, we must also guard against giving post-enactment history more weight than it can rightly bear. It is true that in *Heller* we reiterated that evidence of how the *Second Amendment* was interpreted **[\*15]** from immediately after its ratification through the end of the 19th century represented a critical tool of constitutional interpretation. We therefore examined "a variety of legal and other sources to determine *the public understanding* of [the *Second Amendment*] after its . . . ratification. And, in other contexts, we have explained that a regular course of practice' can 'liquidate & settle the meaning of disputed or indeterminate 'terms & phrases in the Constitution."

*Id. at 2136* (internal quotations and citations omitted) (emphasis in original)

Lastly, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen, 142 S. Ct. at 2132*. This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Nonetheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

## DISCUSSION [3]

Plaintiffs are requesting a preliminary and permanent injunction that will enjoin Defendants from enforcing *N.Y. Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, 265.03(3),* and *NYC Admin. Code § 10-315* against those who (i) possess a valid New York State handgun license and who carry a handgun [*16]  open and exposed (holstered) on their person, and (ii) possess a valid unrestricted New York State concealed carry handgun license who carry a handgun concealed on their person within New York City. (*See* ECF No. 52 (Pls.' Br.) and ECF No. 74 (Pls.' Reply")). Defendants argue that Plaintiffs do not have standing to assert claims against several of the statutes and have otherwise failed to satisfy their burden for a preliminary injunction. The Court will first examine Plaintiffs' standing, and then will discuss the merits of Plaintiffs' injunctive request.

## I. STANDING

The Supreme Court has called the doctrine of standing "perhaps the most important" of the case-or-controversy doctrines. *Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).* The doctrine requires a plaintiff to have a "personal stake," in the outcome of the action. *Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009).* That is, a plaintiff must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen, 468 U.S. at 751.* "[T]he 'irreducible constitutional minimum' of standing consists of three elements[:] [t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to [*17]  be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016)* (quoting *Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*). The party seeking to invoke federal jurisdiction has the burden of establishing each element. *Id. at 561.*

To have standing to seek injunctive relief, a plaintiff must establish a "real or immediate threat" of injury. *City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983); see also Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016)* ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury.").

Mere "allegations of possible future injury are not sufficient"; the "injury must be certainly impending." *Izquierdo v. Panera Bread Co., 450 F.Supp.3d 453, 460 (S.D.N.Y. 2020)* (quoting *Daniel v. Tootsie Roll Indus., LLC, No. 17 CIV. 7541 (NRB), 2018 U.S. Dist. LEXIS 129143, 2018 WL 3650015, at *6 (S.D.N.Y. Aug. 1, 2018)*). Justiciable injury for purposes of Article III must be "real and immediate" and not purely speculative and abstract. *City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed 2d 675 (1983).* Moreover, with respect to pre-enforcement challenges to statutes, a credible threat of prosecution cannot rest on fears that are "imaginary or speculative." *Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979)* (quoting *Younger v. Harris, 401 U.S. 37, 42, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971)*). That being said, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159, 134 S. Ct. 2334, 2342, 189 L. Ed. 2d 246 (2014)* (quoting *Babbitt, 442 U.S. at 298*). In addition, "courts are generally willing to presume that the government will enforce the law as long [*18]  as the relevant statute is recent and not moribund." *Picard v. Magliano, 42 F.4th 89, 98 (2d Cir. 2022)* (citing *Cayuga Nation v. Tanner, 824 F.3d 321, 331 (2d Cir. 2016)* (quoting *Hedges v. Obama, 724 F.3d 170, 197 (2d Cir. 2013)*).

**A. Standing to raise a challenge against** *N.Y. Penal Law §§ 265.01, 265.01-b, & 265.03(3)*

---

[3] In addition to the parties' moving papers and accompanying exhibits, the Court has considered the amicus brief filed by Everytown for Gun Safety (ECF No. 72) as well as the Declaration of Dr. Brennan Rivas, a historian and independent scholar on behalf of defendant Nigrelli. (ECF No. 64.)

The City Defendants point out that Plaintiffs do not state why they seek an injunction against *NPYL §§ 265.01*, *265.03(3)*, and *265.01-b*, but it appears that Plaintiffs do so because they seek to prevent enforcement of these laws against the following conduct: (i) carrying a handgun open and exposed; and (ii) carrying concealed firearms outside the restrictions placed on the licenses of Jason Frey and Brianna Frey. (ECF No. 63 ("City Defs.' Opp.") at 6.)

The Court finds, like it did in denying Plaintiff's first motion for preliminary injunction, that Plaintiffs continue to lack standing to challenge *N.Y. Penal Law §§ 265.01(1)*, *265.01-b*, and *265.03(3)* because they have not and cannot be injured by those statutes. These three provisions impose misdemeanor and felony penalties for the illegal carrying of firearms without a license. *See N.Y. Penal Law §§ 265.01(1)*; *265.01-b*; *265.03(3)*. For the reasons discussed below, the Court agrees and DENIES Plaintiffs' preliminary and permanent injunction motion as to their challenge against these three statutes.

The Court previously found that Plaintiffs failed to establish standing to challenge *N.Y. Penal Law §§265.01(1)*, *265.01-b*, and *265.03(3)* in its Order and Opinion on Plaintiff's first **[\*19]** motion for preliminary injunction, dated February 22, 2022. *See Frey v. Bruen, No. 21 CV 05334 (NSR), 2022 U.S. Dist. LEXIS 31053, 2022 WL 522478, at \*6 (S.D.N.Y. Feb. 22, 2022)*. There the Court reasoned that, *inter alia*, as "each Plaintiff has been issued such a license, they do not and will not face criminal liability under *Section 265*." *Id.* As previously discussed by the Court in the prior Order and Opinion, "*Section 265.20(a)(3)* explicitly states that these Sections 'shall not apply' to '[p]ossession of a pistol or revolver by a person to whom a license therefor has been issued as provided under *section 400.00* or *400.01*.'" *Id.* (citing *N.Y. Penal Law § 265.20(a)(3)*. "In addition, *Section 400.00(17)* states:

> "[t]he provisions of article two hundred sixty-five of this chapter relating to illegal possession of a firearm, shall not apply to an offense which also constitutes a violation of this section by a person holding an otherwise valid license under the provisions of this section and such offense shall only be punishable as a class A misdemeanor pursuant to this section."

*N.Y. Penal Law § 400.00(17)*.

As each Plaintiff has been issued such a license, they do not and will not face criminal liability under *Section 265*." (*Id.* (citing *N.Y. Penal Law § 400.00(17)*).

That same reasoning continues to apply here in the instant motion for preliminary and permanent injunction. The Court agrees with the State Defendant that since neither Plaintiffs' circumstances, as **[\*20]** expressed in their recent declarations, nor those statutes have changed since the Court's prior ruling on February 22, 2022, Plaintiffs still face no criminal penalties or threats of prosecution for violating *§§ 265.01*, *265.01-b*, and *265.03(3)*. (*See* State Def's Opposition at 12.).[4]

Plaintiffs fail to present any meaningful arguments to the contrary. In their opening brief, Plaintiffs merely argue that they have announced "their intention to carry a firearm in violation of the challenged laws sufficient to confer Article III standing," (Pls.' Br. at 6), but they fail to provide any arguments countering the State Defendant's point that those statutes will not apply to the Plaintiffs as firearms license holders. Nor do Plaintiffs satisfy their burden of establishing standing as to these statutory provisions in their reply brief. In their reply brief, Plaintiffs appear to argue that they only have standing to assert the constitutionality of all of the statutes, including *§§ 265.01*, *265.01-b*, and *265.03(3)*, with respect to the purported right to open carry, (Pls.' Reply at 17), and state that "[t]he ambiguity in the law, and risk of arrest, calls for a judicial declaration before finding that Plaintiffs do not have standing to challenge **[\*21]** *Penal Law 265.00, et seq.*" (*Id.*) Plaintiffs fail to cite to any legal authorities for their statement. The Court therefore finds that Plaintiffs fail to satisfy their burden to establish standing to challenge *§§ 265.01*, *265.01-b*, and *265.03(3)*.

**B. Standing to raise a challenge against *N.Y. Penal Law §§ 265.01-d* and *265.01-e***

---

[4] To the extent that Plaintiffs point to these statutes as possibly being enforced against them in the event that they open carry their firearms, Plaintiffs' concerns are misplaced. As discussed in the Court's previous Order and Opinion, "if Plaintiffs were to carry their weapons openly, they would at best be committing a violation of their handgun license restrictions, and subject to potential penalties under *N.Y. Penal Law Section 400.00(15)*." *Frey, 2022 U.S. Dist. LEXIS 31053, 2022 WL 522478, at \*7*.

State Defendant concedes that the *N.Y. Penal Law § 265.20(a)(3)* exception does not apply to newly added a *N.Y. Penal Law §§ 265.01-d* and *N.Y. Penal Law §§ 265.01-e*, both of which did not apply at the time of the Court's prior ruling. (*See* ECF No. 66 ("State Def.'s Opp.") at 12 n.5). Therefore, the Court will assess whether Plaintiffs have standing to raise a challenge against *N.Y. Penal Law § 265.01-d* and *N.Y. Penal Law § 265.01-e*.


**1. Standing to challenge *N.Y. Penal Law § 265.01-d***

The City Defendants argue that Plaintiffs do not have standing to assert a claim challenging *N.Y. Penal Law § 265.01-d*, which states that one shall not carry firearms onto private property without permission of the owner or lessee of that property. *N.Y. Penal Law § 265.01-d*. The City Defendants mainly argue that "[i]f Plaintiffs ask and obtain permission from private property owners and/or lessees, they would not be aggrieved by the statute." (City Defs.' Opp. at 13.)

However, recently, district courts have found standing to challenge *N.Y. Penal Law § 265.01-d* where plaintiffs, like Plaintiffs do here, state that they intend to carry arms into private property without obtaining permission. *See Christian v. Nigrelli, No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652, 2022 WL 17100631, at \*4 (W.D.N.Y. Nov. 22, 2022)* (finding [\*22] that individual with concealed carry license established standing where (i) he swore that he would typically bring his firearm on private property open to the public and to establishments that neither prohibit the carrying of firearms nor post signage consenting to the carry of firearms; and where (ii) New York Governor Kathy Hochul and Police Superintendent Nigrelli publicly announced enforcement action against gun law violations). *Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at \*39 (N.D.N.Y. Nov. 7, 2022)* ("Based on the fact that Plaintiffs Johnson and Leman have sworn that they have frequently carried concealed in privately owned, open-to-the-public locations and will do so again soon (regardless of the absence of CCIA signage), the Court finds they have asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.").

The Court finds that Plaintiffs Jason and Brianna Frey meet the injury-in-fact element of standing to challenge this particular statute. When challenging a law prior to its enforcement, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat [\*23] of prosecution thereunder.'" *Susan B. Anthony List, 573 U.S. at 158-59, 134 S.Ct. 2334*. (quoting *Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)*). Jason Frey states he will not "seek permission" or refrain from carrying because there is no "conspicuous signage" granting permission to carry. (Jason Frey Decl. ¶ 16.) Likewise, Brianna Frey declares that "I am not going to ask permission from the above locations, or from every property owner or lessee or refrain from going about in public to all of the places that members of the general public go — on public and private property, residential and commercial — just because there is no 'conspicuous sign' granting me permission to exercise my right to be armed for self-defense." (Brianna Frey Decl. ¶ 16). In addition, as Plaintiffs discuss, both N.Y. Governor Hochul and First Deputy State Police Superintendent Steven Nigrelli (now Acting Superintendent and Defendant) announced a "zero tolerance" policy to violations of gun law violations, and indicated that New York State, troopers "are standing ready" to ensure that "all laws are enforced." (Pl.'s Br. at 10-11 (citing Governor Hochul's August 21, 2022 press conference at 38:00-25).[5] Therefore, the Court finds that there is a credible threat of prosecution regarding this statute. In addition, [\*24] given the recency of the law and lack of any indication that it will be repealed, the Court is and should be "willing to presume that the government will enforce" it. *See Picard, 42 F.4th 89* (quoting *Cayuga Nation, 824 F.3d at 331*).

The Court notes that Mr. William Sappe fails to provide any statement like the Freys do indicating that he will not seek permission before carrying in a private property, so the Court finds that he fails to establish injury-in-fact as to his challenge of this statute. (*See generally*, Sappe Decl.).

With respect to the other two elements to establish standing—traceability to the conduct of the Defendants and redressability—the Court finds that Plaintiffs Jason and Brianna Frey meet these elements, given that the named Defendants are specifically

---

[5] "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," (Aug. 31, 2022), available at https://www.youtube.com/watch?v=gC1L2rrztQs.

tasked with enforcing the gun laws. *See Antonyuk, No. 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at \*39* (finding traceability and redressability against officials who "each has the specific duty to enforce [*N.Y. Penal Law § 265.01-d]*.").

### 2. Standing to challenge *N.Y. Penal Law § 265.01-e*

Plaintiffs do not allege that they seek to carry their handguns in the vast majority of locations deemed "sensitive" under *Penal Law § 265.01-e(2)(a)-(t)* - *e.g.*, places of worship, zoos, nursery schools, etc. (City Defs.' Opp. at 10-11; State Def. Opp. at 23-24.) Plaintiffs therefore cannot demonstrate an injury-in-fact with a "fairly **[\*25]** traceable connection" to the entirety of *Penal Law § 265.01-e*, *see Lujan, 504 U.S. at 560*; *Penal Law § 265.01-e(2)(a)-(t)*, but only those sensitive locations where they have alleged or sworn "sufficiently concrete intention to carry." *See Antonyuk v. Hochul, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at \*11* (denying preliminary injunction motion for lack of standing in challenge of *N.Y. Penal Law § 265.01-e(2)(a)* [prohibiting firearms "any place ... under the control of federal, state or local government, for the purpose of government administration . . . "] because plaintiffs failed to allege or assert a concrete intention to carry concealed on government property or in a government building in the immediate future.); *see 2022 U.S. Dist. LEXIS 201944, [WL] at \*8* ("'someday' intentions—without any description of concrete plans, or indeed even any specification of when the 'someday' will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

Per their declarations, Plaintiffs have only indicated that they currently have or plan on violating the current gun laws in parks, theaters, restaurants with on-premise alcohol consumption, the MTA subway and train cars, and Times Square. (Jason Frey Decl. ¶¶ 14-15, 18-19; Brianna Frey Decl. ¶¶ 12-14, 17-18; William Sappe Decl. ¶¶ 7, 13.). Therefore, they only have standing to challenge those specific sensitive locations. **[\*26]** *See §§ 265.01-e(2)(d)* [public parks]; *e(2)(p)* [theaters]; *e(2)(n)* [subway and Metro North train cars); *e(2)(o)* [restaurants with on-premises alcohol consumption; *e(2)(t)* [Times Square].

### C. Standing to Raise a Challenge Under *N.Y. Penal Law §§400.00(6)* and *400.00(15)*

#### 1. Standing to Invalidate Restrictions Placed on the Concealed Carry Licenses Issued to Jason Frey and Brianna Frey

The City Defendants argue that Plaintiffs Jason and Brianna Frey do not have standing to challenge restrictions placed on their concealed licenses. (City Defs.' Opp. at 11-12.). A violation of the restrictions on the firearm licenses would derogate *N.Y. Penal Law § 400.00(15)*. Defendants mainly argue that the City and State Defendants cannot remove the alleged violations—in other words, the City and State Defendants cannot redress the restrictions given that they were put in place by Westchester County licensing officials, and Plaintiffs Jason and Brianna Frey should instead undergo the appropriate administrative process to seek to remove restrictions on their licenses (*i.e.* applying to upgrade their licenses and/or commencing an Article 78 proceeding in New York State Court to appeal a denial of a license upgrade. For the reasons stated below, the Court agrees and DENIES preliminary and **[\*27]** permanent injunction to the extent that Plaintiffs Jason and Brianna Frey seek to challenge restrictions placed on their concealed licenses.

Mr. Jason Frey, who was issued a New York State pistol license by a judicial licensing officer in Westchester County, fails to allege that he applied to the Westchester County licensing official to remove the restrictions on his license. (SAC ¶¶ 23, 25.) Brianna Frey, who holds a firearms license limited to sportsman activities that was issued by an officer in Westchester County, applied to remove restriction on her carry license to allow for full carry, but her application was denied in September 2022. (SAC ¶ 54.) The City Defendants argue that to the extent that these Plaintiffs challenge restrictions placed on their licenses under *Bruen*, they should apply to the applicable judicial licensing officers in Westchester County to upgrade their licenses. (City Defs.' Opp. at 12.) In addition, the City Defendants argue that Plaintiff Brianna Frey should challenge the Westchester County judicial licensing officer's determination denying her application in September 2022 in New York State Supreme Court, pursuant to *N.Y. C.P.L.R. 78*. (*Id.*)

The "case or controversy" limitation **[\*28]** of Art. III of the Constitution requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court. *See Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at \*9*. Because the named Defendants cannot remove the licensing restrictions that were imposed pre-*Bruen*, and the Westchester County officials

who are responsible for licensing are not named as defendants, Plaintiffs Brianna and Jason Frey therefore do not have standing with respect to this challenge.

**2. Standing to Challenge _N.Y. Penal Law § 400.00(6)_ and _400.00(15)_ with respect to carrying in New York City**

The Court finds, and Defendants do not contest, that Plaintiffs William Sappe and Jason Frey have standing to challenge _N.Y. Penal Law §§ 400.00(6)_ (requiring a special permit in New York City) and _400.00(15)_ (criminalizing carrying of firearms outside of licensing restrictions) with respect to carrying in New York City.[6] The Court finds that Plaintiffs William Sappe and Jason Frey have sufficiently alleged their concrete and imminent intention to carry their firearms in New York City based on their following statements:

> "Now that the _Bruen_ case established a clear test for analyzing _Second Amendment_ challenges, I intend to carry my handgun concealed **[*29]** in New York City for self-defense on a daily basis. I also intend to carry my handgun to work every day because the number of random incidents of violent criminal attacks in New York City have risen sharply. Based on my work, including its location in the Diamond District where I am coming in and out of high-end jewelry stores, and the merchandise and cash that I carry."

Sappe Decl. ¶ 10.

> "I am going to carry my handgun in the Times Square area for self-protection even though such constitutionally-protected activity had been made unlawful by New York State and New York City."

Sappe Decl. ¶ 13.

> I carry my handgun concealed when I travel to New York City. Whether alone or with my family, I take the Metro North Train into Grand Central and the number 4 train to Times Square to get goodies at Junior's, and sometimes to Murray's Bagels on 8th Avenue. I also visit friends in Williamsburg, taking the shuttle to the L train, then to the 14th Street stop. I intend to continue being armed when I travel to New York City for my own protection and my family's.

Jason Frey Decl. ¶ 27.

Because both Plaintiffs Jason Frey and William Sappe indicate that they have or plan to carry a handgun when **[*30]** in New York City, even though they do not have a permit allowing them to lawfully do so, the Court finds that they have alleged a sufficiently concrete and imminent intention of violating _N.Y. Penal Law §§ 400.00(6)_. See _Knife Rights, Inc. v. Vance, 802 F.3d 377, 386-87 (2d Cir. 2015)_ (finding standing for pre-enforcement challenge to statute banning certain types of knives where the plaintiffs alleged that "they have in the past carried, and wish again to carry, common folding knives")

For the reasons discussed above with respect to public announcements by relevant government officials that gun laws will be enforced, the Court finds that the Plaintiffs have established that there is a credible threat of prosecution. _See supra_. In addition, traceability and redressability are established here, given that the named Defendants are tasked with enforcing the gun laws. See _Antonyuk, No. 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *39_.

**3. Standing to Challenge _N.Y. Penal Law § 400.00(15)_ With Respect to Open Carry**

Regarding Plaintiffs' challenge to _N.Y. Penal Law 400.00(15)_ with respect to open carry, the Court finds that Plaintiffs do not have standing. Brianna Frey provides no allegations that she has a concrete and imminent intention of carrying her firearm in an open manner. _See generally_, Brianna Frey Decl. While Jason Frey and William Sappe allege an intention to open carry, they fail **[*31]** to allege that such intention is concrete and imminent, as required in pre-enforcement suits. _Lujan, 504 U.S. at 564_.

Jason Frey alleges as follows: "I intend to start carrying my handgun open and holstered at the above locations at times when I am not carrying the same handgun concealed." Jason Frey ¶ 21. William Sappe similarly alleges as follows: "("I intend to begin carrying my handgun open and exposed on those days that I am not carrying a handgun concealed on my person, both inside New York City and throughout the state." William Sappe Decl. ¶ 19

---

[6] In her declaration, Brianna Frey provides no indication that she has a concrete or imminent intention to carry her firearms in New York City. (_See generally_, Brianna Frey Decl.).

Their allegations are also slightly contradictory or at least they are unclear about their actual intentions to carry open. William Sappe, for example, states that he "intend[s] to carry [his] handgun *concealed* in New York City for self-defense on a daily basis." (Sappe Decl. ¶ 10) (emphasis added). Sappe also states he regularly carries his handgun concealed while not in New York City, but he gives no concrete indication of when he plans to carry open. (Sappe Decl. ¶ 3). Jason Frey states he intends to carry open, but also states that "[t]he only reason I do not exercise the right to open carry in New York City is the fear of arrest, jail and the other criminal **[*32]** and civil penalties that will follow," (Jason Frey Decl. ¶ 31), and he otherwise gives no specific allegations regarding when he intends to carry open.

In any event, regarding Jason Frey's and William Sappe's statements that they "intend to" violate the open carry ban, such "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury" that is required." *Lujan, 504 U.S. at 564*; *see also San Diego Cty. Gun Rights Comm. v. Reno, 98 F.3d 1121, 1127 (9th Cir. 1996)* (holding the plaintiffs' assertions that they "wish and intend to engage in activities prohibited" by the Crime Control Act, which prohibited the manufacture, transfer or possession of semiautomatic assault weapons, was insufficient to establish a genuine threat of imminent prosecution); *see, c.f. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 161, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)* (petitioners sufficiently alleged intention to violate law by pleading specific statements they intend to make in future election cycles).

Therefore, the Court DENIES Plaintiff's preliminary injunction motion challenging *N.Y. Penal Law 400.00(15)* with respect to open carry.

**D. Standing to raise a challenge under *NYC Admin. Code § 10-315* and the NYPD Rules promulgated thereunder**

The City Defendants argue that Plaintiffs have no basis of challenging *NYC Admin. Code § 10-315* and rules **[*33]** promulgated thereunder because that law was repealed by operation of law when Local Law 91 became effective, and there are not any current rules implementing or expounding upon *Administrative Code § 10-315*. (*See* City Defs.' Opp. at 25 n.20.) In addition, as the City Defendant persuasively state, *Administrative Code § 10-315*, however, simply determined the boundaries of the area commonly known as Times Square, and Plaintiffs do not allege that the City improperly defined Times Square." (*Id.*) Plaintiff presents no arguments to the contrary and does not mention challenging *NYC Admin. Code 10-315* anywhere in their reply papers. Therefore, the Court determines that Plaintiff concedes to the City Defendant's argument. *Vann v. Persico, No. 20-CV-628 (KMK), 2022 U.S. Dist. LEXIS 171104, 2022 WL 4368110, at *9 (S.D.N.Y. Sept. 20, 2022)* ("'[b]y failing to respond to that argument in its Reply Memorandum, [Riggs] concedes the point for purposes of [its Motion].'") (citing *Cornelius v. Macy's Retail Holdings, Inc., No. 18-CV-678, 2019 U.S. Dist. LEXIS 131907, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019)* (collecting cases).

Accordingly, the Court DENIES Plaintiff's motion for preliminary injunction challenging *NYC Admin. Code § 10-315*.

**II. PRELIMINARY AND PERMANENT INJUNCTION**

**A. Likelihood of Success on the Merits**

**1. Challenge to *N.Y. Penal Law § 400.00(6)***

Plaintiffs contest the constitutionality of *N.Y. Penal Law § 400.00(6)* under *Bruen*, arguing that the law is not consistent with the Nation's historical tradition of firearm regulation. (Pls.' Reply at 10.) In relevant part, *N.Y. Penal Law § 400.00(6)* states that "[a] license to **[*34]** carry or possess a pistol or revolver, or to purchase or take possession of a semiautomatic rifle, not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city. *See N.Y. Penal Law § 400.00(6)*. At its core, Plaintiffs wish to possess a firearm in New York City without the need for a separate

license from the NYPD. For the reasons discussed below, the Court denies Plaintiffs' preliminary injunction motion challenging *N.Y. Penal Law § 400.00(6)*.

First, Plaintiffs do not contest anything about the requirements of obtaining a New York City gun permit, rather, they just complain that they have to get a permit in the first place. Nothing in *Bruen* suggested that the *Second Amendment* protects the right to carry a firearm without a license, and concurring opinions indicate the opposite. *See, e.g., Bruen, 142 S. Ct. at 2157* (Alito, J., concurring) (the holding "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun . . . . Nor have we disturbed anything that we said in *[D.C. v. Heller, 554 U.S. 570, 595, 128 S. Ct. 2783, 2799, 171 L. Ed. 2d 637 (2008)]* or *McDonald v. Chicago, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*, about restrictions that may be imposed on the possession or carrying **[*35]** of guns."); *Bruen, 142 S. Ct. at 2157* (Kavanaugh, J., concurring) (Justice Kavanaugh wrote separately to "underscore . . . the Court's decision does not prohibit . . . the imposition of licensing requirements for carrying a handgun for self-defense.").

It is clear that governments can impose firearm restrictions so long as they are consistent with individuals' *Second Amendment* rights. *See Heller, 554 U.S. at 595* ("There seems to us no doubt, on the basis of both text and history, that the *Second Amendment* conferred an individual right to keep and bear arms. Of course the right was not unlimited, just as the *First Amendment's* right of free speech was not . . . . Thus, we do not read the *Second Amendment* to protect the right of citizens to carry arms for any sort of confrontation, just as we do not read the *First Amendment* to protect the right of citizens to speak for any purpose."); *Bruen, 142 S. Ct. at 2128* ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.") (quoting *Heller, 554 U.S. at 626*). Plaintiffs' attempt to dismantle that long-standing rule by indicating that the City cannot impose its own permitting requirements goes too far.

In any event, the Court will also evaluate this issue under **[*36]** the *Bruen* analysis. At the first step, the Court finds that *N.Y. Penal Law § 400.00(6)* does implicate the text of the *Second Amendment* because it pertains to the right to keep and bears arms. Here, the law implicates the right to carry arms while in New York City. *See Bruen, 142 S.Ct. at 2134* ("As we explained in Heller, the "textual elements" of the *Second Amendment's* operative clause—"the right of the people to keep and bear Arms, shall not be infringed"—"guarantee the individual right to possess and carry weapons in case of confrontation.") (citing *Heller, 554 U.S. at 592*).

At the second step of the *Bruen* analysis, Defendants are able to establish in their papers that there is a historical tradition of firearm regulations, and in particular, firearm regulations at the municipal and town level. *See* ECF No. 65, Declaration of Suzanna Publicker Mettham (hereinafter "SPM Decl."), Exh. A at 2 (Brooklyn licensing ordinance, 1880); SPM Decl., Exh. B at 176-77 (Buffalo licensing ordinance, 1891); SPM Decl. Exh. C at 3 (Elmira licensing ordinance, 1892); SPM Decl. Exh. D at 243 (Syracuse licensing ordinance, 1892); SPM Decl. Exh. E at 425 (Troy licensing ordinance 1905); SPM Decl. Exh. F at 337 (Lockport licensing ordinance, 1909); and Albany, SPM Decl. Exh. G at 849-50 (Albany licensing ordinance, **[*37]** 1905); *see also* ECF No. 67, Ciappetta Decl., Exh. 3 (collecting laws from Pennsylvania in 1750, Tennessee in 1821, Virginia in 1847, Arizona in 1867, Texas in 1871, and North Carolina in 1899); *see also* Ciappetta Decl., Exh. 4 (collecting laws that regulated or empowered municipalities to regulate storage, sale, or transport of gunpowder from Pennsylvania in 1782, Connecticut in 1836, New Jersey in 1837, Florida in 1838, Iowa in 1846, and Nebraska in 1867 and 1869); *see also* Ciappetta Decl., Exh. 5 (collecting laws prohibiting public carry in populated areas from Colorado in 1862; Montana in 1864; New Mexico in 1869; Maryland in 1872 addressing only the city of Annapolis; Wyoming in 1875; Kansas in 1881; Idaho in 1889). In addition, more than two dozen various municipalities required an individual to obtain written permission from the local mayor, town marshal, or other authority figure to carry a weapon between 1881 and 1910. *See* Patrick J. Charles, Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry 156 & n.219 (2018) (collecting ordinances from more than two dozen cities, passed between the mid-19th century and early 20th century, requiring a person **[*38]** to carry firearms in cities across the United States subject to the discretionary determination of a local official).

Plaintiffs argue that the examples provided by the Defendants showing city-based licensing regulations should be rejected because they do not reflect "founding-era tradition." (Pls.' Reply at 10.). Plaintiffs argue that the scope of *Second Amendment* protections are "pegged to the public understanding of the right when the *Bill of Rights* was adopted in 1791, not the mid-late 1800s and beyond." (*Id.* (citing *Bruen, at 2137-38*)). However, Plaintiff's argument is overstated. The Supreme Court in *Bruen* indicated that while the Court "generally assumed" that the reference point should start at laws in 1791, there is also an

Frey v. Nigrelli

"ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of an individual right when the *Fourteenth Amendment* was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Bruen, 142 S.Ct. at 2138* (emphasis added). In other words, as the City Defendants persuasively argue, the Supreme Court's language demonstrates that there is an open question regarding how much importance to attribute to historical evidence from the *Fourteenth Amendment's* ratification period, and not whether **[*39]** that evidence deserves any weight. (City Defs.' Opp. at 16.). Therefore, the Court finds no issue in considering the abundance of examples provided by the Defendants regarding the existence of municipal gun regulations from 1750 to the late 19th century. *See also D.C. v. Heller, 554 U.S. 570, 605, 128 S. Ct. 2783, 2805, 171 L. Ed. 2d 637 (2008)* (indicating that post-enactment history that sheds light on "the public understanding of a legal text ... is a critical tool of constitutional interpretation.").

For the aforementioned reasons, the Court denies the preliminary injunction as to *N.Y. Penal Law § 400.00(6)*.

## 2. Challenge to *N.Y. Penal Law § 400.00(15)* Regarding Open Carry

In their preliminary injunction motion (and in their Second Amended Complaint), Plaintiffs want the Court to find that they have a right to open carry, and that the criminalization of open carry is unconstitutional. (*See* Pls.' Br. at 14-17.) As explained above, New York state prohibits open carry, though individuals may public carry as long as they carry their firearm in a concealed manner and if they have a valid gun permit.

As indicated above, *see*, Discussion I.C.3, *supra*, the Court finds that Plaintiffs do not have standing to challenge *N.Y. Penal Law § 400.00(15)* with respect to open carry. Even assuming, arguendo, that Plaintiffs had standing to bring this challenge and **[*40]** request a preliminary injunction, their request would be denied.

Undertaking the first step of the *Bruen* analysis, the Court agrees with Plaintiffs' point that the text of the *Second Amendment* does plainly cover Plaintiffs' purported right to publicly carry, as indicated by the Court in the *Bruen* decision. *Bruen, 142 S.Ct. at 2135* ("The *Second Amendment's* plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense."). While the text of the *Second Amendment* itself does not explicitly say anything about open or concealed carry, it is not difficult to find that the term "'bear' arms" means to cover either public concealed or public open carry. *See id.* (the *Second Amendment* guarantees a general right to public carry).

Regarding the second step of the *Bruen* analysis — a review of historical traditions, Plaintiffs argue that the manner of public carry was not regulated in 1791, and that "[i]t was not until "the early to mid-19th century, [that] some States began enacting laws that proscribed the concealed carry of pistols and other small weapons." (Pls.' Reply at 7-8.) However, as correctly pointed out by the Defendants, the Supreme Court has already stated that "[t]he historical evidence from antebellum America does demonstrate **[*41]** that the *manner* of public carry was subject to reasonable regulation . . . . State's could lawfully eliminate one kind of public carry — concealed carry — so long as they left open the option to carry openly." *Bruen, 142 S. Ct. at 2150* (emphasis in original). Because New York does allow concealed carry so long as the individual has a proper license, Plaintiffs cannot properly argue, as they try to do, that New York has no way to allow people to public carry. (*See* Pls. Br. at 18.) The fact that the manner in which New York allows public carry — concealed rather than open — is not to Plaintiffs' liking does not mean that enforcement against open carry is unconstitutional. Therefore, the Court finds that the Plaintiffs are unlikely to succeed on the merits with respect to their challenge to enforcement against open carry.

Accordingly, the Court denies Plaintiff's motion for preliminary injunction as to its challenge *N.Y. Penal Law § 400.00(15)* regarding open carry.

## 3. Challenge to *N.Y. Penal Law § 265.01-d*

Plaintiffs challenge *N.Y. Penal Law § 265.01-d* [the "Private Property Provision"], which covers the following two locations: (1) all privately owned property that is not open for business to the public (and that is not a "sensitive location" under *N.Y. Penal Law § 265.01-e*); and (2) all privately owned property **[*42]** that is open for business to the public (and that is not a "sensitive location" under *N.Y. Penal Law § 265.01-e*). The law criminalizes a license holders' entrance into, or remaining on, those retail commercial establishments in New York State that "(1) have not been deemed "sensitive locations" by [*N.Y. Penal*

Frey v. Nigrelli

*Law § 265.01-e*], (2) operate on privately owned property, and (3) are unable for whatever reason (such as time constraints) to give express consent to each license holder at her doorstep other than by posting a sign containing a controversial message that must (by definition) be visible to all persons passing by (including potential "anti-gun" customers)." *Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *78*.

It bears noting that two courts in this Circuit have already issued a preliminary injunction enjoining the enforcement of *N.Y. Penal Law § 265.01-d*. *Christian v. Nigrelli, No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652, 2022 WL 17100631, at *12 (W.D.N.Y. Nov. 22, 2022)* ("Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction, are enjoined, effective immediately, from enforcing all of *N.Y. Penal Law § 265.01-d* with respect to private property open to the public, and their regulations, policies, and practices implementing it.")); *Antonyuk v. Hochul, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *86* (enjoining prohibition on carrying in "the 'restricted locations' provision contained in Section 5 of the CCIA except for fenced-in [*43] farmland owned by another or fenced-in hunting ground owned by another).

Both cases are currently on appeal before the Second Circuit. *See Antonyuk et al., v. Hochul et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022); *Christian v. Nigrelli*, C.A. No. 22-2987 (2d Cir. filed Nov. 23, 2022). As of the date of this Opinion, the Second Circuit has stayed the Northern District of New York's injunction pending resolution of the appeal, which was affirmed by the Supreme Court. *See Antonyuk et al., C.A. No. 22-2908 at ECF No. 76, 2022 U.S. App. LEXIS 36240 (issued Dec. 7, 2022), affirmed, 598 U.S. __, 143 S. Ct. 481, 214 L. Ed. 2d 381 (issued 2023)* (No. 22A557).

Because the same issue regarding the constitutionality of *N.Y. Pen. L. § 265.01-d* is currently being reviewed by the Second Circuit, the Court will STAY resolution of this portion of Plaintiffs' Motion for Preliminary injunction in the interests of judicial economy, pending resolution of the appeal in *Antonyuk* and *Christian* as to this issue. *See McCracken v. Verisma Sys. Inc., No. 6:14-CV-06248, 2018 U.S. Dist. LEXIS 152008, 2018 WL 4233703, at *2 (W.D.N.Y. Sept. 6, 2018)* ("It is within the sound discretion of a district court to enter a stay pending the outcome of independent proceedings that are likely to affect a case on its calendar") (citations omitted); *see also Christian v. Nigrelli*, No. 22-CV-695 (JLS), ECF No. 60 (W.D.N.Y. Dec. 21, 2022) (staying resolution of portions of plaintiffs' motion for preliminary injunction pertaining to public parks and public transportation pending resolution by the Second Circuit in *Antonyuk v. Hochul*).

**4. Challenge to specific portions of *N.Y. Penal Law § 265.01-e***

As indicated above, *see supra*, Plaintiffs have standing to challenge several provisions [*44] in *N.Y. Penal Law § 265.01-e*, which prohibits carrying in certain "sensitive locations," based on their allegations on where they have or intend to frequent. (*See* Jason Frey Decl. ¶¶ 14-15, 18-19, 27; Brianna Frey Decl. ¶¶ 12-14, 17-18; William Sappe Decl. ¶¶ 7, 13.) Specifically, the Court will consider their challenge to the following provisions: (i) public parks, *§ 265.01-e(2)(d)*; (ii) theaters, *§ 265.01-e(2)(p)*; (iii) public transportation (MTA subway and train cars), *§ 265.01-e(2)(n)*; (iv) restaurants with on-premises alcohol consumption, *§ 265.01-e(2)(o)*; and (v) Times Square, *Penal Law § 265.01-e(2)(t)*.

Currently, in *Antonyuk et al., v. Hochul et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022), the Second Circuit is reviewing an appeal by the State Defendant and other officials that overlaps with issues presented in this subsection, namely and among other things, the injunction imposed by the court in *Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022)* against the enforcement of *§ 265.01-e(2)(d)* [prohibiting guns in pubic parks]; *265.01-e(2)(o)* [prohibiting guns in restaurants with on-premises alcohol consumption]; and *§ 265.01-e(2)(p)* [prohibiting guns in theaters]. The Court will stay resolution of this portion of Plaintiffs' Motion for Preliminary injunction in the interests of judicial economy, pending resolution of the appeal in *Antonyuk* with respect to these three provisions. It is worth noting that the Second Circuit has stayed the Northern District of New York's injunction [*45] against enforcement of the gun laws with respect to *§§ 265.01-e(2)(d)*, *(o)*, and *(p)* pending resolution of the appeal, which was affirmed by the Supreme Court. *See Antonyuk et al., C.A. No. 22-2908 at ECF No. 76, 2022 U.S. App. LEXIS 36240 (issued Dec. 7, 2022), affirmed, 598 U.S. __, 143 S. Ct. 481, 214 L. Ed. 2d 381 (issued 2023)* (No. 22A557).

Therefore, the only subsections that the Court will evaluate are *§ 265.01-e(2)(n)* which bans firearms in public transportation, including MTA subway cars and train cars and *§ 265.01-e(2)(t)* which bans the carrying of firearms in the Times Square area.

For the foregoing reasons, the Court DENIES the preliminary and permanent injunction as to _§ 265.01-e(2)(n)_ and _§ 265.01-e(2)(t)_.

### a. _N.Y. Penal Law § 265.01-e(2)(t)_: **Times Square**

On the first step of the _Bruen_ analysis, the Court finds that Plaintiffs met their burden of showing that the prohibition against carrying arms in the Time Square area implicates the text of the _Second Amendment_. _See Bruen, 142 S.Ct. at 2134_.

Moving on to the second step of the _Bruen_ analysis, the Court finds that Defendants have sufficiently met their burden of establishing that there is a historical tradition of banning firearms in regularly congested commercial areas. For this reason, the Court DENIES Plaintiffs' motion for preliminary and permanent injunction with respect to _N.Y. Penal Law § 265.01-e(2)(t)_.

Known to many as the "Crossroads of the World," the iconic Times Square is a major hub for commercial and cultural activities, known for its plentiful shopping, [*46] street vendors, entertainment, and displays of public art, which attracts residents and visitors alike. _See_ https://www.timessquarenyc.org/locations/shopping and http://arts.timessquarenyc.org/times-square-arts/index.aspx (last visited November 21, 2022). Times Square is also recognized as an important space for public gatherings and is often highly congested—for example, in September 2022, there were an average of 312,611 daily visitors to Times Square (Ciappetta Decl., Exh. 17) and in 2021, Times Sq-42 St was the busiest of the 472 subway stations in New York City's transit system. _See_ https://www.nyc.gov/site/cecm/permitting/times-square.page.[7]

The State and City Defendants present a number of laws between 1328 to 1903 that show a historical tradition of banning firearms in "fairs" or "markets" or areas that large crowds, which appears to address places with characteristics akin to those found in Times Square. First, Defendants point to a 1328 law from Northampton, England barring arms in "fairs, markets..." Statute of Northampton, 2 Edw. 3, ch. 3 (1328), reprinted in 1 THE STATUTES OF THE REALM 258 (_See_ SMP, Exh. AA). A 1328 law from England is too remote from the relevant time period [*47] to shed light on the public understanding of the _Second Amendment_ in 1791 and/or of the _Fourteenth Amendment_ in 1868, _see Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *37 n.66_, but as the City Defendants point out, there are two additional laws—a 1786 law in Virginia and a 1792 law in North Carolina—which also contains a "fairs" and "markets" prohibition and that traces in relevant part the 1328 Northampton, England law with the same or similar language. (City Defs.' Opp. at 25-26; Ciappetta Decl., Exh. 12.); _see also_ 1786 Va. Laws 33, ch. 21, An Act Forbidding and Punishing Affrays ("[N]o man, great nor small, [shall] go nor ride armed by night nor by day, in fair or markets ... in terror of the Country...."); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) ("[N]o man great nor small ... except the King's servants in his presence . . . be so hardy to . . . ride armed by night nor by day, in fairs [or] markets . . . ."). According to 1790 census data (_i.e._ from the founding era period), Virginia contained about 17.6% of the American population (691,737 people out of 3,929,214 people), and North Carolina contained about 11% (393, 751 out of 3,569,100 people). _See_ Richard L. Forstall, Dep't of Commerce, Population [*48] of States and counties of the United States: 1790-1990, available at https://www2.census.gov/library/publications/decennial/1990/population-of-states-and-counties-us-1790-1990/population-of-states-and-counties-of-the-united-states-1790-1990.pdf. The fact that around 28.6 % (as estimated by this Court) of total American population in the founding era period "were governed by such laws regulating the carrying of firearms in 'fairs' or 'markets' lends support to Defendants' arguments that the tradition of prohibiting arms in places resembling "markets" and "fairs" was sufficiently well-established and representative during the founding era. _See also Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, *37 n.66_ ("The fact that 31.9 percent of Americans in 1791 were governed by such laws regulating the carrying of firearms in "fairs" or "markets" (albeit one of which was limited to terroristic behavior) would appear to shed some light on the public meaning of the words "keep and bear arms" in _Second Amendment_ when it was adopted. ").

The Court also considers other laws from the latter half of the 19th Century that prohibited firearms involving instances where there are public gatherings engaged in recreational, entertainment, or expressive purposes. While not as [*49] persuasive as the founding era laws described above (particularly those coming from the late 19th century), these laws support Defendants' arguments that there was an ongoing trend in American history of banning firearms in locations where people heavily

---

[7] The boundaries of Times Square are set forth in the emergency rules signed by New York City Mayor Eric Adams and NYPD Commissioner on Sewell on August 23, 2022, and published in The City Record on August 31, 2022 (Ciappetta Decl., Exh. 1.).

congregate. For example, the Defendants point to an 1869 Tennessee law that prohibited both open and concealed carry at any "fair, racecourse, or other public assembly of the people...." (Ciappetta Decl., Exh. 13.) The City Defendants also present a similar 1870 Texas law that encompassed churches, schools, ballrooms, social parties, election sites, and the catchall language "other public assembly" (Ciappetta Decl., Exh. 14), and which also appears to have served as a model for other laws such as follows: Missouri (1883) (prohibiting concealed carry "where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary, or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other assemblage of persons met for any lawful purpose . . ."), Arizona (1889 and 1901), Oklahoma (1890), and Montana [*50]  (1903). (*See* Ciappetta Decl., Exh. 15; *see also* SPM Decl. Exhs. V (1870 Texas law), X (1889 Arizona law), Y (1890 Oklahoma law). Lastly, the City Defendants provide copies of laws in Georgia (1879) and Idaho (1889), which adopted their own sensitive location statutes prohibiting firearms in places of public assembly or public gatherings. (Ciappetta Decl., Exhs. 5 and 16.)

The Court is therefore persuaded by the Defendants' argument that *N.Y. Penal Law § 265.01-e(2)(n)* is in line with the historical tradition of banning firearms in locations where large groups of people are congregated for commercial, social, and cultural activities. These laws appear to recognize that the presence of groups of people, often in confined spaces, renders a location uniquely vulnerable to firearm violence.

During oral argument, Plaintiffs' counsel argued that *N.Y. Penal Law § 265.01-e(2)(n)* is overly burdensome, and pointed to the fact that William Sappe often needs to drive through Times Square while employed as an armed guard for businesses in the New York City Diamond District (which falls just outside of Times Square), and that Sappe and similarly situated individuals would be at risk of facing felony charges. Putting aside the fact that Sappe did not allege in [*51]  his declaration that he has attempted to secure a New York City gun permit at all since the enactment of the CCIA, the Court would not find it burdensome for similarly situated individuals who do have permission to carry guns in New York City to drive around the congested Times Square area in order to avoid running afoul of *§ 265.01-e(2)(n)*. The Court also notes that *N.Y. Penal Law § 265.01-e* provides numerous exceptions for individuals who need to have guns on them in sensitive locations, including the following: (i) persons licensed under *N.Y. Penal Law § 400.00 2(c)* ("have and carry concealed while so employed by a messenger employed by a banking institution or express company") while in the course of his or her official duty; and (ii) security guards as defined by and registered under article seven-A of the general business law, who have been granted a special armed registration card, while at the location of their employment and during heir work hours as such a security guard. *See N.Y. Penal Law § 265.01-e(3)(e)* and *(g)*. While neither of the parties argued whether Sappe could fall under any of the exceptions had he carried a valid New York City gun permit, the fact that these exceptions exist belies Plaintiffs' argument that *N.Y. Penal Law § 265.01-e* is overly burdensome. Therefore, the Court does not [*52]  find that Plaintiffs have established a substantial likelihood of success on the merits to challenge *N.Y. Penal Law § 265.01-e(2)(n)*.

**b. *N.Y. Penal Law § 265.01-e(2)(n)*: Subway and Rails**

The Court finds that the *Second Amendment's* plain text covers the conduct in question (*i.e.* carrying a concealed handgun for self-defense in public in "subways" and "train cars"). *Bruen, 142 S.Ct. at 2134*. Therefore, under *Bruen*, Defendants must rebut the presumption of protection against the regulation by showing that the law is consistent with the Nation's historical tradition of firearm regulation.

As the City Defendants indicate, the New York City subway system consists of 6,455 subway cars, 665 miles of track and 472 stations, the most of any public transit subway system in the world. *See* https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021 (last visited Nov. 28, 2022). The first stage of the New York City subway system opened in October 1904, with nine miles and twenty-eight stations. *See* HISTORY, The Race to Construct the First Subway: The Engineering that Built the World (S1), at 05:22, YOUTUBE, https://www.youtube.com/watch?v=cVBhvKxw4ow. On an average weekday in 2019, the last year before the Covid-19 pandemic, the system's ridership was nearly 5.5 million, and in the same [*53]  year, there were almost 1.7 billion total riders. *See id.*

In summary, the Defendants argue that *N.Y. Penal Law § 265.01-e(2)(n)* should be upheld as to the MTA subway system and train rails because: (i) the government has the right to control whether firearms are allowed on its property; (ii) there is historical support for firearm prohibition on trains; (iii) subways and the rails are also places where large crowds are gathered;

and (iv) the MTA system plays an integral role in the school system and must be afforded the same protections as schools, which are paradigmatic sensitive places because of the presence of children. (State Def.'s Opp. at 37-43; City Defs.' Opp. at 38-40.)

As discussed during oral argument, the City Defendants are correct that the MTA subway system and rails, which obviously did not exist during the founding era or during the enactment of the *Fourteenth Amendment*, presents an issue that implicates "unprecedented societal concerns or dramatic technological changes [that] require a more nuanced approach," *Bruen, 142 S. Ct. at 2132*. As indicated by the City Defendants, however, the Supreme Court did not explain what such an approach would entail. The City Defendants argue that the "nuanced approach" should entail "identify[ing] historical **[*54]** laws that have a similarity of purpose to the modern regulation, even if the historical analogue regulated a different subject. (City Defs.' Opp. at 37.) *See also Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at \*41* ("nuanced approach" "essentially mean[s] broaden its conception of what constitutes an "analogue" and focus its attention on the justification for, and burden imposed by, it"). As such, the Court will consider historical laws that are analogous in purpose.

### *Government-as-proprietor*

First, the State and City Defendants argue that just as it is well-established that the government has the power to exclude firearms from "government buildings" such as courthouses and legislative buildings, such right should also extend to the MTA's subway cars and rails, all of which are quasi-governmental. (*See* Ciappetta, Exh. 23)[8] (City Defs.' Opp. at 35.) *See Heller, 128 S. Ct. at 2786* ("The Court's opinion should not be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as . . . government buildings . . . ."); *Bruen, 142 S. Ct. at 2118* ("courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible."). **[*55]**  The City Defendants aver that the application of *§ 265.01-e* to relatively modern forms of public transportation, simply continues the longstanding tradition of allowing the government to regulate gun carrying on its own property.[9]

During oral argument, the State Defendant's counsel argued that "government buildings" should stretch to encompass the MTA's subways and rails. The State Defendant's counsel highlighted *Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1126 (10th Cir. 2015)*, where the Tenth Circuit found that the government could prohibit guns in a U.S. Postal Service building as a "government building." *Id. at 1125*. The State Defendant's counsel, moreover, emphasized that the Tenth Circuit had found that the government could also prohibit guns in the parking lot adjacent to the U.S. Postal Service building. *Id. at 1126* ("the fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business, is often relevant to constitutional analysis. The government often has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office) than when it is acting as a sovereign (such as when it regulates private activity unconnected to a government service)."). Notably, however, the Tenth Circuit's finding **[*56]**  with respect to the building's adjacent parking lot was made under the pre-*Bruen* standard, *i.e.* an intermediate scrutiny analysis. *Id. at 1126*. In its opposition papers, the State Defendant also cites to *United States v. Class, 930 F.3d 460, 442 U.S. App. D.C. 257 (D.C. Cir. 2019)*, where the D.C. Circuit found that a federal statute prohibiting possession of firearms on U.S. Capital grounds, as applied to the facts of that case, did not violate *Second Amendment* rights, and stated that "as the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property."). *Id. at 464*. The court came to that conclusion after finding, *inter alia*, that "Maryland Avenue lot has been set aside for the use of government employees, is in close proximity to the Capitol building, and is on land owned by the government," and therefore could "consider the lot as a single unit with the Capitol building, and conclude that the lot is a 'sensitive' place where firearms prohibitions are presumptively lawful." *Id. at 464*.

---

[8] The New York City subway system is owned by the City of New York and leased to the New York City Transit Authority, a public-benefit corporation, to operate. This arrangement is pursuant to a lease that was first executed in 1953. (Ciappetta Decl., Exh. 23.).

[9] The State Defendant makes similar arguments with respect to public parks, averring that because federal, state, and local governments have long prohibited deadly weapons in government-owned parks, and several statutes contain language covering public functions, that subways and rails should fall within that purview. As indicated, this issue is on appeal before the Second Circuit in *Antonyuk et al., v. Hochul et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022).

Frey v. Nigrelli

Two interesting questions arise: (i) whether the MTA subway and rail system should be considered a "government building" and therefore a *per se* a sensitive area; and (ii) whether post-*Bruen*, the government, as proprietor, can prohibit guns in any of its [*57] property without regard to any historical tradition consideration and regardless of whether such property can be properly deemed a "government building." The Court, however, finds that neither question needs to be answered, because Defendants have established a sufficient historical tradition, in the specific context of the rail systems, showing that proprietors of rail systems had authority to lay out their own gun-carrying restrictions within their train cars.

As discussed by the State Defendant's historian, there was no public transportation as such during the relevant time period; instead, train travel was provided by private transportation systems until the 20th century, sometimes operating under a government charter. (Rivas ¶¶ 13-17.). As indicated by Rivas, "carriage would have been would have been subject to any rules laid out by the private transportation company in question. Private companies would have had the authority to decide where and how legally transported weapons." (*Id.* ¶ 13.)

While admitting that the opportunity to conduct thorough historical research was limited due to the time constraints of a preliminary injunction schedule and the fact that certain of the historical [*58] research involves in-person review of in paper archives, (State Def. Opp. at 43), the State Defendant and his expert historian, Brennan Rivas, provide examples of gun-carrying restrictions imposed by private rail companies against passengers on their trains. For example, the State Defendant's expert points to the North Pennsylvania Railroad's June 1875 "rules and regulations" which stated that that conductors must prevent passengers from taking "into the cars guns, dogs, valises, large bundles or baskets." (Rivas. ¶ 13.) Rivas also describes that rail companies tended to ship sporting firearms for hunters and treat them like baggage, therefore separating them from the passenger. (*Id.* ¶ 14.) Lastly, Rivas describes that several states, including Georgia, Ohio, and Pennsylvania, set out parameters in the late 19th century allowing railway personnel to possess and exercise powers of policemen or to employ their own police forces in order to enforce relevant laws, including laws regarding firearms, to ensure peace and safety of passengers in transit. (*Id.* ¶¶ 15-16.)

Taking the "nuanced approach" required in this context of the MTA subway and rails, the Court finds that an adequately analogy [*59] could be made between (i) the fact that historically, the rail systems were privately owned and that "[p]rivate transportation companies possessed the power to create their own reasonable customer/passenger rules, which in at least some instances included prohibitions against the presence of guns in passenger cars" (Rivas ¶ 20) and (ii) the fact the MTA subway and rails are government owned and operated, and therefore the government as proprietor can impose its own restrictions on gun-carrying upon its passengers.[10]

Coupled with the indication, as discussed directly below, that there is a tradition of prohibiting firearms in highly congested settings presenting a high risk of violence (which undoubtedly describes the MTA subway system), the Court finds that a preliminary injunction is not warranted here with respect to *N.Y. Penal Law § 265.01-e(2)(n)*.

### *Prohibition of Firearms in Congested Locations*

The City Defendants argues that the Court should look at laws that regulated the presence of firearms in populated spaces, stating that doing so is more informative than trying to analogize this law with regulations concerning early forms of transportation such as trolleys, omnibuses, or horse carts. (City Defs.' Opp. at [*60] 37.) The City Defendants aver that this approach "recognizes the unique nature of modern life and eliminates the need to make comparisons between things that only bear a superficial similarity (trolleys and subway cars)." (*Id.*)

---

[10] State Defendant and Rivas also point to several cases involving laws that prohibited carrying guns on one's person except for during long-distance travel. (State Def. Opp. at 41-42; Rivas ¶¶ 6-13.) The Court points out that two of the cases cited do not support the State Defendant's arguments that guns were completely prohibited while traveling short distances in certain jurisdictions. *See Willis v. State, 105 Ga. 633, 32 S.E. 155 (1898)* ("Any person having or carrying about his person, unless in an open manner and fully exposed to view, any pistol, dirk, sword in a cane, spear, bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense, shall be guilty of a misdemeanor."); *Eslava v. State, 49 Ala. 355* ("If the necessity existed only while he was travelling, then, if after he reached the city and had a reasonable opportunity of divesting himself of the weapon, or of changing the manner of carrying it so as not to offend the statute, he continued to bear it concealed about his person, he is guilty as charged).

Frey v. Nigrelli

The State Defendants point to the same laws described above in the *N.Y. Penal Law § 265.01-e(2)(t)*: Times Square (Discussion II.A.4.a, *supra*), arguing that there is a historical tradition of banning firearms in highly crowded locations where the risk of violence is high. While those laws do not relate to public transportation, the Court does find persuasive Defendants' argument that *N.Y. Penal Law § 265.01-e(2)(n)* is consistent with those laws, considering that a main concern animating the gun restrictions in the MTA subways and rails is the high amount of foot traffic and related safety issues. (City Defs.' Opp. at 37-38; State Def. Opp. at 31-33.)

### *Subways as part of the school system*

The Court is less persuaded by Defendant's argument that because the MTA public transportation system "plays an integral role in the school system," it "must be afforded the same protections as the school system." (State Def. Opp. at 39.) On one hand, schools are a paradigmatic sensitive place because of the presence of children. *See Class, 930 F.3d at 465*; *Heller, 554 U.S. at 626*; *McDonald, 561 U.S. at 786*. **[\*61]** Indeed, *Bruen* "assume[d] it settled" that" schools full of children "were 'sensitive places' where arms carrying could be prohibited consistent with the *Second Amendment*." *142 S.Ct. at 2133*; *see also id. at 2157* (Alito, J., concurring).

In addition, Defendants present data indicating that New York City has over 1.1 million students at more than 1,800 schools, *see* Explore NYC Schools, N.Y. City Council, https://council.nyc.gov/data/school-explorer/ (last accessed on Nov. 29, 2022), and conjectures that "there could be over 1.1 million students traveling on the MTA system." (State Def.'s Opp. at 40.) The Court also recognizes that the MTA system plays an important indirect role in the school system. The Court is nonetheless not prepared to state the MTA subway and rails should be considered "sensitive places" just by virtue of its connection with the school system, particularly as Defendants do not show that the MTA subways and rails are "densely populated" by children the way schools are. *See, e.g., Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at \*25* ("the State Defendants adduce no evidence that those shelters are as densely populated by children as are schools").

### B. Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a **[\*62]** preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)* (citing *Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)*). "[T]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)*). The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991)*.

In addition, "[i]n the Second Circuit ... [the] presumption of irreparable harm arising from a constitutional deprivation is not automatic." *Joglo Realties, Inc. v. Seggos, 16-CV-1666 (ARR)(CLP), 2016 U.S. Dist. LEXIS 113057, 2016 WL 4491409, at \*16 (E.D.N.Y. Aug. 24, 2016)*. Instead, "[b]ecause the violation of a constitutional right is the irreparable harm asserted [ ], the two prongs of the preliminary injunction threshold merge into one" and "in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giuliani, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000)*. As the Second Circuit has held that it is "more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights," **[\*63]** *Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 924 (2d Cir. 1997)*, the alleged violations of Plaintiffs' *Second Amendment* rights, by themselves, are not sufficient to show irreparable harm.

As discussed above, Plaintiff has failed to show a likelihood of success with respect to its challenges against *N.Y. Penal Law §§ 400.00(6)*, *400.00(15)*, *265.01*, *265.01-b*, *265.03(3)*, *§§ 265.01-e(2)(n)* and *265.01-e(2)(t)*, and *NYC Admin. Code § 10-315*, Plaintiff therefore fails to show that they will suffer irreparable harm without an injunction against those statutes.

### C. Balance of Hardships and Public Interest

Putting aside the issues which the Court stays its resolution on pending Second Circuit review in analogous cases, the Court otherwise finds that a preliminary injunction is not in the public interest.

When the Government is the opposing party, irreparable harm and public interest factors merge. *See Nken v. Holder, 556 U.S. 418, 435, 129 S. Ct. 1749, 1762, 173 L. Ed. 2d 550 (2009)*. As stated above, because Plaintiffs failed to show a likelihood of success of the merits with respect to the aforementioned statutes, Plaintiffs therefore cannot show that the balance of hardships tips in their interest.


## CONCLUSION

For the foregoing reason, Plaintiffs' motion for preliminary injunction is DENIED in part, and STAYED in part, as follows:

• The Court DENIES a preliminary injunction with respect to Plaintiffs' challenge of *N.Y. Penal Law §§ 400.00(6), 400.00(15)*, *265.01*, *265.01-b*, *265.03(3)*, and *NYC Admin. Code § 10-315*.

• The Court DENIES a preliminary injunction **[*64]** with respect to Plaintiffs' challenge of *N.Y. Penal Law §§ 265.01-e(2)(n)* (with regards to the MTA subway and rails) and *265.01-e(2)(t)*.

• The Court STAYS its decision on the preliminary injunction motion with respect to Plaintiff's challenge of *N.Y. Penal Law §§ 265.01-d*, *265.01-e(2)(d)*, *265.01-e(2)(p)*, and *265.01-e(2)(o)* pending resolution by the Second Circuit in *Antonyuk et al., v. Hochul et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022).

The parties are DIRECTED to submit a letter to the Court once a resolution is reached in *Antonyuk et al., v. Hochul et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022), which may impact the Court's resolution on the preliminary injunction motion with respect to Plaintiff's challenge of *N.Y. Penal Law §§ 265.01-d*, *265.01-e(2)(d)*, *265.01-e(2)(p)*, and *265.01-e(2)(o)*.

Dated: March 13, 2023

White Plains, New York

SO ORDERED:

/s/ Nelson S. Román

NELSON S. ROMÁN

United States District Judge