**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al*., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 8:21-cv-01736-TDC **(L)** |
| | ) | Case No. 8:22-cv-01967-DLB |
| MONTGOMERY COUNTY, MD., | ) | |
| | ) | |
| *Defendant*. | ) | |

**PLAINTIFFS' NOTICE
OF SUPPLEMENTAL AUTHORITY**

Plaintiffs respectfully submit this Notice of Supplemental Authority to bring to the Court's attention the decision of the district court in *Koons v. Platkin,* No. 22-7464 consolidated with No. 22-7463 (D. N.J. May 16, 2023) (slip opinion attached). In that case, the district court invalidated a New Jersey statute that imposed many of the same restrictions on public carry by permit holders imposed by the Montgomery County ordinance at issue in this case. The district court's decision is 230 pages long and comprehensively addresses the very same issues concerning the scope of the Supreme Court's decision in *New York State Rifle & Pistol* Association*, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), at issue in this case. Indeed, the court specifically rules on the very same arguments and the very same purported historical analogues that the County advances in this case.

**CONCLUSION**

A preliminary injunction should be granted without delay.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd
Ste C #1015
Baltimore, MD 21234-21502

mpennak@marylandshallissue.org
Phone: (301) 873-3671
District Court Bar No. 21033

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC.,** *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| **v.** | )   **Case No. 8:21-cv-01736-TDC (L)** |
| | )   **Case No. 8:22-cv-01967-DLB** |
| **MONTGOMERY COUNTY, MD,** | ) |
| | ) |
| *Defendant.* | ) |

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on March 18, 2023, the forgoing "Notice of

Supplemental Authorities" were served on opposing counsel listed below via ECF service:

Edward B. Lattner                    Patricia L. Kane                    Matthew H. Johnson
101 Monroe St.                       101 Monroe St.                      101 Monroe St.
Rockville, MD 20850                  Rockville, MD 20850                 Rockville, MD 20850

Patricia Lisehora Kane               Erin Jeanne Asbarry
101 Monroe St.                       101 Monroe St.
Rockville, MD 20850                  Rockville, MD 20850


*/s/ Mark W. Pennak*
_____
MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste, C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
Bar No. 21033
*Counsel for Plaintiffs*

Dated: May 18, 2023

[DOCKET NO. 8]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| RONALD KOONS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MATTHEW PLATKIN,<br>in his official capacity as Attorney General of the State of New Jersey, and<br>PATRICK CALLAHAN,<br>in his official capacity as Superintendent of the New Jersey State Police,<br><br>Defendants,<br><br>and<br><br>NICHOLAS SCUTARI,<br>President of the New Jersey Senate, and<br>CRAIG COUGHLIN,<br>Speaker of the New Jersey Assembly,<br><br>Intervenors-Defendants. | Civil No. 22-7464 (RMB/AMD)<br><br>*Consolidated with*<br>*Civil No. 22-7463 (RMB/AMD)*<br><br>**OPINION** |

**APPEARANCES:**

David D. Jensen, Esq.
David Jensen PLLC
33 Henry Street
Beacon, NY 12508

*On behalf of the Koons Plaintiffs*

Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, NJ 07450

*On behalf of the Siegel Plaintiffs*

Angela Cai, Deputy Solicitor General

Jean Reilly, Assistant Attorney General
David Chen, Deputy Attorney General
Amy Chung, Deputy Attorney General
Viviana Hanley, Deputy Attorney General
Chandini Jha, Deputy Attorney General
Samuel Rubinstein, Deputy Attorney General
Office of the New Jersey Attorney General
25 Market Street
Trenton, NJ 08625

*On behalf of Defendants Platkin and Callahan*

Leon J. Sokol
Cullen and Dykman, LLP
433 Hackensack Ave.
Hackensack, NJ 07601

Edward J. Kologi
Kologi Simitz, Counselors at Law
923 North Wood Ave.
Linden, NJ 07036

*On behalf of Intervenors-Defendants Scutari and Coughlin*

**Table of Contents**

I.   INTRODUCTION…………………………………………………………1
II.  FACTUAL AND PROCEDURAL BACKGROUND………………………6
     A.  The *Koons* Plaintiffs' Narrow Constitutional Challenge to Select Sensitive
         Place Designations in Chapter 131…………………………………………6
     B.  The *Siegel* Plaintiffs' Broad Constitutional Challenges to Chapter 131 and
         Preexisting State Firearm Laws……………………………………….…8
     C.  Plaintiffs' Pending Motions for a Preliminary Injunction…………….………9
     D.  The State's Opposition to a Preliminary Injunction…………………………13
III. GOVERNING LEGAL STANDARDS……………………………………........13
     A.  Procedural Legal Standard for a Preliminary Injunction……………………13
     B.  Substantive Legal Standards under *Bruen*……………………………………14
IV.  ANALYSIS……………………………………………………………………19
     A.  Overview of New Jersey's Firearm Permitting Scheme………………………19
         1.  Firearm Purchaser Identification Card……………………………….19
         2.  Permit to Purchase a Handgun…………………………….…………20
         3.  Permit to Carry a Handgun in Public…………………………………20
     B.  Chapter 131's Amendments to New Jersey's Firearm Permitting Scheme….21
     C.  The *Siegel* Plaintiffs' Constitutional Challenges to Chapter 131's New
         Requirements…………………………………………………………………23
         1.  The *Siegel* Plaintiffs' Standing to Bring a Second Amendment
             Challenge to Chapter 131's New Permitting Scheme…………………25
         2.  The *Siegel* Plaintiffs' Standing to Bring a First Amendment Challenge
             to Chapter 131's Carry Permit Application Requirements……………32
     D.  Constitutionality of Chapter 131's Application and Permit Process…………35
         1.  Historical Tradition: Chapter 131's Statutory Disqualifiers…………36
             a.  English History of Disarmament………………………………38
             b.  Colonial American History of Disarmament…………………41
             c.  State Constitutional Convention Proposals……………………45
             d.  Post-Ratification Disarmament Laws…………………………46
             e.  The State's "Unvirtuous Citizen" Justification for Chapter
                 131's Statutory Disqualifiers……………………………………49
             f.  The *Siegel* Plaintiffs' Void-for-Vagueness Challenge to Chapter
                 131's Public Safety Statutory Disqualifiers……………………52
         2.  Historical Tradition:  Chapter 131's Application Process……………56
             a.  Historical Laws on Reputable Persons Endorsement…………58
             b.  Historical Laws Requiring In-Person Meeting………………62
             c.  Historical Laws Allowing Licensing Authorities to Request
                 "Such Other Information"………………………………………64
     E.  The Constitutionality of Chapter 131's New Fee Schedule…………………66
     F.  Chapter 131's Insurance Mandate……………………………………………70
         1.  The *Siegel* Plaintiffs' Standing to Challenge the Insurance Mandate...72
         2.  Ripeness of the *Siegel* Plaintiffs' Challenge to the Insurance
             Mandate………………………………………………………………74
             a.  The Adversity of the Parties' Interests…………………………75

|  |  | b. | Conclusiveness of Judgment…………………………………76 |
|  |  | c. | Practical Utility of Judgment…………………………………78 |
|  | 3. | | Constitutionality of the Insurance Mandate……………………79 |
|  |  | a. | The Second Amendment's Text………………………………80 |
|  |  | b. | Historical Tradition: Chapter 131's Insurance Mandate……..81 |
|  |  |  | i. Historical Surety Laws…………………………………82 |
|  |  |  | ii. Tort Law: Strict Liability against Gun Owners……….87 |

G. New Jersey's "Sensitive Place" Laws…………………………………………89
   1. Plaintiffs' Standing to Challenge Chapter 131's Handgun Ban in "Sensitive Places" and Related New Jersey Laws that Pre-Date *Bruen*…………………………………………………………………89
      a. Whether Plaintiffs Have Shown a Prospective Injury that is Concrete, Particularized, and Imminent………………………92
      b. Plaintiffs' Demonstrated Injury is Likely Caused by the State………………………………………………………………102
      c. Plaintiffs' Demonstrated Injury is Redressable by Judicial Relief………………………………………………………………103
   2. Constitutionality of Chapter 131's Handgun Ban at the Challenged "Sensitive Places"………………………………………………………106
      a. Government Property………………………………………………106
         i. The Second Amendment Generally Applies on Government-Owned Property…………………………107
         ii. Government Buildings as "Sensitive Places" Where Carrying Firearms can be Prohibited Consistent with the Second Amendment…………………………………………115
      b. Private Property:  Chapter 131's Default Rule Prohibiting Firearms unless the Property Owner Expressly Consents…..117
         i. The Default Rule and the Second Amendment's Text………………………………………118
         ii. Historical Tradition:  The Default Rule………………131
         iii. The *Siegel* Plaintiffs' First Amendment Challenge to the Default Rule…………………………………………145
         iv. The *Siegel* Plaintiffs' Equal Protection Challenge to the Default Rule…………………………………………149
      c. Chapter 131's Enumerated "Sensitive Places" (and Related State Statutes that Pre-Date *Bruen*) Laws………………………………………………………………152
         i. Public Gatherings, Demonstrations, and Events Requiring a Government Permit………………………152
         ii. Zoos…………………………………………………………168
         iii. Parks, Beaches, Recreational Facilities, Playgrounds, and State Parks………………………………………172
         iv. Youth Sports Events……………………………………178
         v. Public Libraries and Museums…………………………179
         vi. Bars and Restaurants Serving Alcohol………………181
         vii. Entertainment Facilities………………………………182

    viii. Casinos (and N.J. Admin. Code § 13:69D–1.13)......185

    ix. Airports and Transportation Hubs.......................186

    x. Health Care Facilities (Medical Offices and
Ambulatory Care Facilities)...............................194

    xi. Public Film Sets..............................................197

    xii. Prohibition on Functional Firearms in Vehicles.......198

 H. The *Siegel* Plaintiffs' Equal Protection Challenge to Chapter 131's
Exemptions for Judges, Prosecutors, and Attorneys General.................206

 I. The Siegel Plaintiffs' Remaining Void-for-Vagueness Challenges to
Chapter 131.................................................................210

 J. The Siegel Plaintiffs' Second Amendment Challenge to New Jersey's Fish
and Game Restrictions................................................216

 K. Irreparable Harm to Plaintiffs...................…...........................221

 L. Harm to Other Interested Parties and the Public...............................223

V. CONCLUSION.........................................................229

**BUMB, Chief District Judge**

## I.   INTRODUCTION

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  For more than 200 years after the Second Amendment's ratification, the meaning of these words went largely unaddressed by the Supreme Court of the United States.  That all changed in 2008.

In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment guarantees a private, individual right to keep and bear arms for self-defense.  554 U.S. 570, 592 (2008).  At its core, the *Heller* Court found the Second Amendment guarantees "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Id.* at 635. Two years later, the Supreme Court found the Second Amendment's "right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty" and ruled the Amendment applies equally to the federal government and states.  *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010).

This past summer, the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen* held the Second Amendment's right to keep and bear arms extends beyond the home and allows law-abiding citizens to carry firearms in public for self-defense.  597 U.S. ____, ____, 142 S. Ct. 2111, 2122 (2022).  In doing so, the *Bruen* Court struck down as unconstitutional a law requiring law-abiding citizens to make a separate showing of need to carry a handgun in public.  *Id.* at 2156.  *Bruen* invalidated the law because "it prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."  *Id.  Bruen* also changed the landscape for Second Amendment challenges to firearm laws:  "when the Second Amendment's plain text covers an individual's conduct," the Constitution

1

presumptively protects that conduct and the government must then justify its firearm law by showing "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

In *Bruen*'s wake, New Jersey's Legislature sprang into action, amending the State's firearm laws in many ways. First, the Legislature dropped the State's firearm law requiring a person to show "justifiable need" to carry a handgun in public for self-defense—a requirement that *Bruen* explicitly struck down. Second, the Legislature created a list of 25 "sensitive places" where firearms are banned under threat of criminal prosecution. These places range from government-owned buildings, libraries, entertainment facilities, and restaurants that serve alcohol to all private property unless prior consent to carry is given. In enacting the sensitive places law, the Legislature purported to abide by *Bruen* by declaring the Nation's "history and tradition" supported banning firearms at these identified locations. 2022 N.J. Laws, ch. 131, § 1(g).

Plaintiffs—all law-abiding citizens who either had a permit to carry a handgun in public or could qualify for one—responded immediately to the new legislation and sought this Court's intervention to bar the State from enforcing it. In fact, before the new law, several Plaintiffs had lawfully and routinely carried their handguns in these now-designated "sensitive places." In particular, one Plaintiff—a kidnaping victim—had met the high "justifiable need" requirement to conceal carry in public for his own safety. Now, Plaintiffs could not conceal carry as they had before. The new legislation, in their minds, was nothing more than a sovereign's knee-jerk reaction to a Supreme Court ruling the State abhorred.[1]

---

[1] Plaintiffs' sentiments are well-grounded given the declaration of Assemblymen Joseph Danielsen, the law's primary sponsor: "[b]ecause of *Bruen*, more New Jerseyans will die as result of gun violence." *An Act concerning*

They contended the Legislature's drastic measures went too far:  that what the Supreme Court gave, the State took away.  In other words, although an individual seeking to carry a handgun for self-defense is no longer required to show a "justifiable need," the State's expansive list of "sensitive places" effectively prohibits the carrying of that handgun virtually everywhere in New Jersey.  To these Plaintiffs, the Legislature's message was clear:  leave your Second Amendment rights and guns at home.

Upon their initial applications, the Court agreed with Plaintiffs, temporarily enjoining certain provisions of the law, setting this matter down for a preliminary injunction hearing after the parties had engaged in discovery and a more complete record was developed. Remarkably, despite numerous opportunities afforded by this Court to hold evidentiary hearings involving the presentation of evidence, the State called no witnesses.  And despite assurances by the State that it would present sufficient historical evidence as required by *Bruen* to support each aspect of the new legislation, the State failed to do so.[2]  Finally, even the

---

the Sale and Possession of Firearms and Supplementing and Amending Various Parts of the Statutory Law:  Floor Debate on A4769 Before the Gen. Assemb., 2022-2023 Leg., 220th Sess. (N.J. Nov. 21, 2022) (statement of Assemblymen Joseph Danielsen), available at: https://www.njleg.state.nj.us/archived-media/2022/assembly-session-list/media-player?committee=A&agendaDate=2022-11-21-10:00:00&agendaType=S&av=V (marker 10:40 to 10:51).

[2] The legislative record reveals the Legislature paid little to no mind to *Bruen* and the law-abiding New Jerseyans' right to bear arms in public for self-defense.  Again, the law's primary sponsor declared that "Because of *Bruen*, more New Jerseyans will die as result of gun violence." *Id.*  When Assemblymen Brian Bergen asked the law's primary sponsor, Assemblymen Joseph Danielsen, if he had read *Bruen*, Danielsen responded "me reading the Court's decision is not part of the bill." *Id.* (questioning of Assemblymen Joseph Danielsen by Assemblymen Brian Bergen) (marker 33:39 to 33:50).  And when pressed by Bergen on whether the Founding Founders limited the Second Amendment to "town squares," "taverns," "public parks," and "beaches," Danielsen refused to answer the question, telling Bergen to "stay on the bill." *Id.* (questioning of Assemblymen Joseph Danielsen by Assemblymen Brian Bergen) (marker 35:20 to 35:50).  Throughout his questioning with Bergen, Danielsen evaded questions on the historical support for the new law.  At another hearing, when Assemblywomen Victoria Flynn simply asked Danielsen where law-abiding citizens could conceal carry, Danielsen's response included such statements as:  "reasonable persons exercising common sense have an expectation that guns are not being brought in except by law enforcement . . .  my job is not to tell you where guns can go . . . my job is to write common sense into this bill . . . you are not going to mindlessly put a loaded firearm on your person and just leave the house." *An Act concerning the Sale and Possession of Firearms and Supplementing and Amending Various Parts of the Statutory Law:  Hearing on A4769 Before Assemb. Jud. Comm.*, 2022-2023 Leg., 220th Sess. (N.J. Oct. 17,

social science studies, which the Legislature relied upon and the State adopted to support the new law (and to oppose preliminary injunctive relief here), are inapposite. At this preliminary injunction stage, the State has proceeded to justify the new legislation with "more of the same" that it had presented during the initial proceedings for temporary restraints. This has left the Court to do what the Legislature had said it had done, but clearly did not. The Court has conducted its own exhaustive research into this Nation's history and tradition of regulating firearms that *Bruen* mandates; its analysis follows. This has taken some time, and the State's effort to hurry this Court along is most unfortunate.[3]

Moreover, instead of presenting the compelling historical evidence they promised, the State and the Legislature-Intervenors have spent their resources writing a narrative that says, absent the Court's indiscriminate approval of the new legislation, "[t]he risk of dangerous and often fatal situations looms large." [State TRO Opp'n Br. at 36 (Docket No. 21).] It is rhetoric that is not productive, particularly for this Court's role here. This Court is painfully aware of the gun violence that has plagued our Nation. But what the State and the Legislature-Intervenors ignore, and what their empirical evidence fails to address, is that this legislation is aimed primarily—not at those who unlawfully possess firearms—but at law-abiding, responsible citizens who satisfy detailed background and training requirements and whom the State seeks to prevent from carrying a firearm in public for self-defense.

---

2022) (questioning of Assemblymen Joseph Danielsen by Assemblywomen Victoria Flynn), available at: https://www.njleg.state.nj.us/archived-media/2022/AJU-meeting-list/media-player?committee=AJU&agendaDate=2022-10-17-10:00:00&agendaType=M&av=A (marker 50:24 to 57:40). In response to a follow up question from Flynn again on where a law-abiding conceal carry permit holder could carry, Danielsen responded with his own question: "would you want them to carry in any of these sensitive places?" *Id.* Assemblywoman Flynn responded by saying that the proper inquiry was not what she wanted, but "what the Constitution says and what the Second Amendment says. . . and what the United States Supreme Court just said in *Bruen.*" *Id.*

[3] See Docket No. 104.

4

Our Founding Fathers were aware of the dangers such laws pose.  In his *Commonplace Book*, Thomas Jefferson quoted from Italian philosopher Cesare Beccaria's work, *On Crime and Punishment*, where Beccaria discussed the "False Ideas of Utility":

> Laws that prohibit the carrying of arms are laws of that nature. They disarm only those who are not inclined or determined to commit crimes . . . These laws worsen the plight of the assaulted, but improve those of the assailants.  They do not lessen homicides, but increase them, because the confidence of carrying out an assault against the disarmed is greater than against the armed.  These laws are not preventive ones, but born out of the fear of crime.[4]

Those words rang true then.  They ring true today.  Clearly, the State disagrees with *Bruen*, but it cannot disobey the Supreme Court by declaring most of New Jersey off limits for law-abiding citizens who have the constitutional right to armed self-defense.

That said, this Court finds that most of the new legislation's firearm permitting requirements are consistent with the Second Amendment.  This Nation has historically disarmed dangerous individuals or those who could endanger the public's safety if allowed to have a firearm.  The new legislation adheres to that historical tradition because it aims to keep firearms out of the hands of New Jerseyans who could threaten the public's safety.

Thus, for the reasons set forth below and after having conducted a thorough review of the complex issues presented by this new legislation, this Court grants, in part, and denies, in part, Plaintiffs' motions for a preliminary injunction.

---

[4] *The Commonplace Book of Thomas Jefferson: A Repertory of His Ideas on Government* 314 (Gilbert Chinard ed., John Hopkins Press, 1926); *see also* Cesare Beccaria, *On Crimes and Punishment*s 105 (Graeme R. Newman & Pietro Marongiu trans., Transaction Publishers 5th ed., 2009).  Thomas Jefferson originally transcribed the passage from Beccaria's work in its Italian form.

II.     FACTUAL AND PROCEDURAL BACKGROUND

The Court recites only those facts necessary to decide Plaintiffs' pending motions for a preliminary injunction ("PI").  The Court incorporates by reference its earlier two Opinions issued during the temporary restraining order ("TRO") phase of this litigation, including the background discussion on the history and implementation of the newly enacted state statute central to the current controversy:  Chapter 131 of the 2022 Laws of New Jersey ("Chapter 131").  [Docket Nos. 34, 51.]

Plaintiffs challenge the constitutionality of Chapter 131's new requirements and now criminalized acts, including those relating to the firearm permit process, fee increases for firearm permits, the minimum liability insurance requirement for carry permit holders, the new crime of an unjustified display of a handgun by carry permit holders, the vast majority of the 25 "sensitive place" designations where the law now criminalizes carrying a handgun by carry permit holders, and the law's new provision exempting judges, prosecutors, and attorneys general from the State's firearm laws, including the sensitive place restrictions. Some Plaintiffs also raise constitutional challenges to other firearm laws and regulations that predate Chapter 131, such as regulations applicable in state parks, casinos, and miscellaneous fish and game regulations.  [Docket No. 69; *Siegel* Docket No. 1.]

A.     The *Koons* Plaintiffs' Narrow Constitutional Challenge to Select Sensitive Place Designations in Chapter 131

The same day Chapter 131 became law, Plaintiffs Ronald Koons, Nicholas Gaudio, Jeffrey Muller, the Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society

(together, the "*Koons* Plaintiffs") sued challenging the constitutionality of Chapter 131.[5] [Docket No. 1.]  They asserted a single cause of action under 42 U.S.C. § 1983 ("Section 1983") for deprivation of civil rights, claiming that the challenged "sensitive place" designations in Chapter 131 violate the Second Amendment (as applied to the States through the Fourteenth Amendment).  [Docket No. 1 ¶¶ 67–69.]

Days later, the *Koons* Plaintiffs moved to temporarily restrain the State from enforcing certain provisions of Chapter 131 and for a preliminary injunction.   [Docket No. 8.]  The *Koons* Plaintiffs' constitutional challenge at the TRO phase was a narrow one, challenging only Chapter 131's handgun ban at:  (1) public libraries or museums; (2) bars and restaurants where alcohol is served; (3) entertainment facilities; and (4) private property unless the property owner expressly consents.[6]  N.J. Stat. Ann. §§ 2C:58-4.6(a)(12), (15), (17), and (24). They also challenged Chapter 131's prohibition on functional firearms in vehicles.[7]  *Id.* § 2C:58-4.6(b)(1).  Without conceding the constitutionality of any other of Chapter 131's new requirements, the *Koons* Plaintiffs stated they were challenging only these select sensitive place restrictions at the TRO phase because such provisions:  "(1) are plainly unconstitutional; (2) do not depend on other legislative acts, such as the enactment of a local ordinance or a state regulation; and (3) substantially interfere with a law abiding citizen's ability to carry a handgun for the purpose of protection."  [Docket No. 9, at 11.]  Following oral argument,

---

[5] References herein to the "*Koons* Plaintiffs" shall also be understood to include individual plaintiff Gil Tal, who joined as a party to the *Koons* matter upon filing of the Amended Complaint.  [Docket No. 69.]

[6] Chapter 131 makes it an offense in the third-degree "to knowingly carry a firearm" in any of the enumerated "sensitive places," punishable by up to five years imprisonment.  N.J. Stat. Ann. § 2C:58-4.6(a); *see also id.* §§ 2C:43-6(a)(3), 2C:44-1(f)(1)(d).

[7] Chapter 131 makes it a fourth-degree offense to transport or carry a firearm "while in a vehicle in New Jersey, unless the firearm is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle."  N.J. Stat. Ann. § 2C:58-4.6(b)(1).  A fourth-degree offense is punishable by up to 18 months' imprisonment.  *Id.* §§ 2C:43-6(a)(4), 2C:44-1(f)(1)(e).

this Court granted the *Koons* Plaintiffs' TRO Motion on the challenged provisions, but reserved on their request for a preliminary injunction. [Docket No. 35.]

### B. The *Siegel* Plaintiffs' Broad Constitutional Challenges to Chapter 131 and Preexisting State Firearm Laws

The same day the *Koons* Plaintiffs filed suit, Plaintiffs Aaron Siegel, Jason Cook, Joseph Deluca, Nicole Cuozzo, Timothy Varga, Christopher Stamos, Kim Henry, and the Association of New Jersey Rifle and Pistol Clubs, Inc. (the "*Siegel* Plaintiffs," and together with the *Koons* Plaintiffs, the "Plaintiffs") also sued, raising several constitutional challenges to Chapter 131 and other preexisting firearm laws. Besides raising a Second Amendment challenge, the *Siegel* Plaintiffs also raised First Amendment, Equal Protection, and Due Process challenges. [*Siegel* Docket No. 1.] They, too, sought a TRO and preliminary injunction barring the named State officials from enforcing certain provisions of Chapter 131 and related firearm laws predating *Bruen*.[8,9] [*Siegel* Docket No. 4.]

Following oral argument on the *Siegel* Plaintiffs' TRO application, the Court granted, in part, and denied, in part, their motion. [Docket No. 52.] The Court temporarily restrained the State from enforcing the same five "sensitive places" that the Court previously restrained in *Koons*—Chapter 131's handgun ban at public libraries or museums, bars and restaurants

---

[8] By stipulation among the parties, the claims against New Jersey prosecutors for Atlantic County, Camden County, and Sussex County—who were initially named as defendants in the *Koons* matter—were dismissed without prejudice. [Docket No. 73.] As explained in the parties' Consent Order, such prosecutors "must comply with the Court's orders and injunctions regarding the enforcement of Chapter 131 … regardless of whether they are parties to this action or not." [*Id.* at 1.] Further, on January 30, 2023, the Court granted the Motion to Intervene by Defendants Scutari, President of the New Jersey Senate, and Coughlin, Speaker of the New Jersey Assembly. [Docket No. 53.] Accordingly, for purposes of this Opinion, "the State" shall be understood to refer collectively to New Jersey officials Platkin, Callahan, Scutari, and Coughlin named as Defendants.

[9] The State filed an Emergency Motion to Consolidate the *Koons* and *Siegel* matters after this Court issued the TRO in *Koons*, but while the *Siegel* TRO was pending before the Honorable Karen M. Williams, U.S.D.J. [*Siegel* Docket No. 7.] Judge Williams held a hearing on January 12, 2023, and thereafter granted the Motion to Consolidate, in part, consolidating the *Siegel* matter into the *Koons* matter. [*Siegel* Docket No. 34.] Because this is a consolidated action, citations to "*Siegel* Docket" refer to Docket No. 1:22-cv-07463 and citations to "Docket" refer to Docket No. 1:22-cv-07464.

8

that serve alcohol, entertainment facilities, and private property unless consent is given—and the law's prohibition on functional firearms in vehicles. [*Id.*] This Court also temporarily restrained the State from enforcing Chapter 131's handgun ban at parks, beaches, and recreational facilities, and casinos, as well as related preexisting New Jersey laws restricting firearms in state parks (N.J. Admin. Code § 7:22.17(b)) and casinos (N.J. Admin. Code § 13:69D1.13). [*Id.*] This Court refused the *Siegel* Plaintiffs' request to bar the State from enforcing Chapter 131's handgun ban at playgrounds, youth sports events, zoos, public demonstrations requiring a government permit, health care facilities, airports, and public film sets, as well as certain preexisting fish and game laws, either because they lacked standing to challenge those laws or the State had come forward with some evidence to support the restrictions. [*Siegel* TRO Op. at 16–43 (Docket No. 51).]

### C.    Plaintiffs' Pending Motions for a Preliminary Injunction

While the PI motions were pending, the *Koons* Plaintiffs filed an Amended Complaint augmenting their Second Amendment challenge to Chapter 131's handgun ban, including the restrictions at parks and beaches, health care facilities, airports, and transportation hubs. [*Koons* Am. Compl. ¶ 38 (Docket No. 69).[10]]

Now before the Court are Plaintiffs' preliminary injunction motions to Chapter 131's handgun ban at the following "sensitive" places:[11]

- Subpart 6 (prohibiting handguns "within 100 feet of a place for a public gathering, demonstration or event is held for which a government

---

[10] The Amended Complaint specifies that the *Koons* Plaintiffs' prayer for relief includes a preliminary and/or permanent injunction with respect to each of the provisions they challenge therein. [*Koons* Am. Compl. p.22 (Docket No. 69).]

[11] The *Siegel* Plaintiffs have sought a PI as to each of the provisions set forth in this subsection, whereas the *Koons* Plaintiffs have moved for a PI only for those sensitive place designations indicated below with an asterisk ("*"). The *Koons* Plaintiffs have also challenged only certain aspects of certain provisions, as further indicated in the footnotes.

permit is required, during the conduct of such gathering, demonstration or event");

- Subpart 9 (prohibition on carrying handguns at zoos <u>only</u>);[12]

- *Subpart 10 (prohibiting handguns at "a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety");[13]

- Subpart 11 (prohibiting handguns "at youth sports events, as defined in N.J.S.5: 17-1, during and immediately preceding in following the conduct of the event . . .");

- *Subpart 12 (prohibiting firearms in "a publicly owned or leased library or museum");

- *Subpart 15 (prohibiting firearms in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises");

- *Subpart 17 (prohibiting firearms in "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held");

- Subpart 18 (prohibiting handguns at "a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment in recreational venues located within the casino property);[14]

- *Subpart 20 (prohibiting handguns at "an airport or public transportation hub");[15]

- *Subpart 21 (prohibiting handguns at "a health care facility, including

---

[12] None of the Plaintiffs have sought a PI as to any of the other "sensitive places" set forth in Subpart 9, namely, as to any "nursery school, pre-school, or summer camp."

[13] Relatedly, the *Siegel* Plaintiffs seek a PI as to N.J. Admin. Code § 7:22.17(b).  Further, as set forth in their Amended Complaint, the *Koons* Plaintiffs' "challenge to subpart 10 does not include the restriction on carrying in 'playgrounds.'"  [*Koons* Am. Compl. ¶ 37 (Docket No. 69).]

[14] Relatedly, the *Siegel* Plaintiffs seek a PI as to N.J. Admin. Code § 13:69D–1.13.

[15] As set forth in the Amended Complaint, the *Koons* Plaintiffs' "challenge to subpart 20 does not concern any secured area in an airport ([*i.e.*,] an area subject to security screening)."  [*Koons* Am. Compl. ¶ 37 (Docket No. 69).]

but not limited to a general hospital, special hospital, mental psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, or residential healthcare facility");

- Subpart 22 (prohibiting handguns in a "facility licensed or regulated by the Department of Human Services, Department of Children and Families or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services");

- Subpart 23 (prohibiting handguns at "a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose"); and

- *Subpart 24 (prohibiting firearms in "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6").

N.J. Stat. Ann. § 2C:58-4.6(a).

Plaintiffs also move to preliminarily enjoin the State from enforcing Chapter 131's prohibition on functional firearms in vehicles, reproduced in pertinent part below:

A person, other than a person lawfully carrying a firearm within the authorized scope of an exemption set forth in subsection a., c., or l. of N.J.S.2C:39-6, who is otherwise authorized under the law to carry or transport a firearm shall not do so while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle.

*Id.* § 2C:58-4.6(b)(1).

The *Siegel* Plaintiffs also move to preliminarily enjoin the State from enforcing other provisions of Chapter 131. For instance, they currently challenge language in Chapter 131

11

prohibiting firearms on "multiuse" properties, including each of the enumerated "sensitive places" and "any part of the buildings, grounds, or parking area" thereof.[16] [*Siegel* Compl. ¶¶ 261–62 (*Siegel* Docket No. 1).] The *Siegel* Plaintiffs also seek to preliminary enjoin the State from enforcing Chapter 131's new liability insurance requirement for carry permit holders, requiring private citizens who carry a handgun in public to maintain liability insurance against loss for any resulting bodily injury, death, or property damage in an amount or limit of no less than $300,000, among other things. [*Id.* ¶¶ 280–81.] And they challenge Chapter 131's new fee increases for various firearm permits. [*Id.* ¶ 282.] The *Siegel* Plaintiffs move to enjoin Chapter 131's new fourth-degree crime making it unlawful for carry permit holders to "engage in an unjustified display of a handgun," arguing the new law violates the Due Process Clause under the void-for-vagueness doctrine. [*Id.* ¶¶ 302–03.] They also seek to enjoin the State from enforcing Chapter 131's new firearm permit scheme, including two new statutory disqualifiers that bar certain individuals from obtaining a firearm permit in New Jersey, as well as the application process for a carry permit. [*Id.* ¶¶ 283–85, 301, 318–22.] Finally, the *Siegel* Plaintiffs seek to bar the State from enforcing Chapter 131's provision exempting judges, prosecutors, and attorneys general from the State's firearm laws, including Chapter 131's new sensitive place restrictions. [*Id.* ¶¶ 290–91.] Their remaining challenges focus on firearm laws that have been around for decades, such as laws restricting the type of ammunition a person may possess while in the woods, fields, marshlands, or on the water, or while hunting various game, N.J. Admin. Code § 7:25-5.23(a), (c), (f), (i), and (m) (collectively, the "Fish and Game Restrictions"). [*Id.* ¶ 278.]

---

[16] Relatedly, the *Siegel* Plaintiffs seek to preliminarily enjoin a preexisting New Jersey statute that prohibits firearms on multiuse properties that share a parcel of property with a school, college, university, or educational institution, codified at N.J. Stat. Ann. § 2C:39-5(e).

12

### D. The State's Opposition to a Preliminary Injunction

In response, the State argues that Plaintiffs cannot meet the demanding standard for injunctive relief. [State Opp'n Br. at 1–2 (Docket No. 91).] The State maintains that the challenged provisions of both Chapter 131 and preexisting New Jersey laws pass constitutional muster under *Bruen* because such laws "protect the safety of New Jersey residents and are consistent with the Second Amendment's text and tradition." [*Id.* at 1.] The State purports to have supplemented the record with additional historical evidence since the TRO phase to justify the State's new firearm restrictions given *Bruen*'s clear test, discussed in greater detail below. But as noted earlier, this Court finds it is of little persuasive value, leaving the Court to scour the history books. [*Id.*] Further, the State contends that several of the challenged provisions fall outside the ambit of the Second Amendment altogether, and thus, Plaintiffs' constitutional challenge fails. [*Id.*] The State's more specific arguments opposing preliminary injunctive relief will be detailed in the Court's Analysis.

## III. GOVERNING LEGAL STANDARDS

### A. Procedural Legal Standard for a Preliminary Injunction

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions. It is well-established that Plaintiffs must satisfy the following four requirements to obtain a preliminary injunction:

> (1) a reasonable probability of eventual success in the litigation, and (2) that [they] will be irreparably injured … if relief is not granted … [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (citing

*Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)).

The Third Circuit has also made clear that "[p]reliminary injunctive relief is 'an extraordinary

remedy' and 'should be granted only in limited circumstances.'" *Kos Pharms., Inc. v. Andrx

Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve

Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994)).

     With respect to the preexisting New Jersey firearm laws challenged by Plaintiffs (*i.e.*,

those laws predating *Bruen* and Chapter 131), the State is correct that "Plaintiffs, in seeking a

'preliminary injunction that will alter the status quo, bear[] a particularly heavy burden in

demonstrating its necessity.'" [Docket No. 91, at 83 n.80 (quoting *Acierno v. New Castle Cnty.*,

40 F.3d 645, 653 (3d Cir. 1994)).] Thus, to obtain a preliminary injunction against such laws,

Plaintiffs must "show a substantial likelihood of success on the merits and that their 'right to

relief [is] indisputably clear.'" *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir.

2020) (citations omitted).

## B.     Substantive Legal Standard under *Bruen*

     The Court restates its prior discussion of the substantive legal standard established by

the Supreme Court in *Bruen*:

     In *Bruen*, the Supreme Court rejected the two-step approach adopted by many of the

Courts of Appeals to assess Second Amendment claims, abandoning the second step of the

analysis at which courts "appl[ied] means-end scrutiny in the Second Amendment context."

142 S. Ct. at 2127.  Relying on its precedential decisions in *Heller* and *McDonald*, the Supreme

Court explained that it had not once, but twice, "declined to engage in means-end scrutiny

because 'the very enumeration of the right takes out of the hands of government—even the

14

Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.'" *Id.* at 2129 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008)); *see also McDonald v. City of Chicago*, 561 U.S. 742, 790–91 (2010) (explaining that the Second Amendment does not permit "judges to assess the costs and benefits of firearms restrictions" under a means-end scrutiny analysis).

By making "the constitutional standard endorsed in *Heller* more explicit," the *Bruen* Court clarified that:

> [T]he standard for applying the Second Amendment is as follows:  When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The Government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition.

*Bruen*, 142 S. Ct. at 2129–30.  Drawing an analogy to First Amendment jurisprudence, the *Bruen* Court reasoned that when the Government restricts constitutionally protected conduct like speech, "the Government bears the burden of proving the constitutionality of its actions." *Id.* at 2130 (citations omitted).  Thus, the State must be able to meet its burden of proof in the Second Amendment context and "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

The *Bruen* Court was clear in its instruction to this Court when undertaking a constitutional analysis of a state's gun control legislation.  This Court must rely on history to inform the meaning of constitutional text rather than make empirical judgments about the costs and benefits of firearms restrictions.  As the Court explained, "[i]f the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the

15

banner of 'intermediate scrutiny' often defer to the determinations of legislatures." *Bruen*, 142. S. Ct. at 2131.  And,

> while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here.  The Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. *Heller*, 554 U.S. at 635, 128 S.Ct. 2783.  It is this balance—struck by the traditions of the American people—that demands our unqualified deference.

*Id.* (emphasis removed).

The *Bruen* Court then applied the test set forth in *Heller* to the challenged legislation, further instructing District Courts considering Second Amendment challenges "to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.  The *Bruen* Court gave important examples indicating how District Courts might detect unconstitutional legislative overreach in Second Amendment terms:

> In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.*  By contrast, in "other cases implicating unprecedented societal concerns or dramatic technological changes," historical analogies will not be as easy to draw and "may require a

more nuanced approach." *Id.* at 2132.  Nevertheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* (citing *United States v. Jones*, 565 U.S. 400, 404–05 (2012)).

Thus, in keeping with *Heller*, District Courts must look to historical context because "it has always been understood that the Second Amendment . . . codified a *pre-existing* right." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 592). The *Bruen* Court also emphasized the important balance that District Courts must strike when considering statutes that plainly implicate the Second Amendment:

> [A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 ([3d Cir.] 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2133 (emphasis removed).

The *Bruen* Court further instructed "that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*  And as stated in those precedential cases, "individual self-defense is the central component of the Second Amendment right." *Id.* (internal quotations and citations omitted). Central to the consideration of a reviewing District Court is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* (citations omitted).

Of critical importance to the current controversy, the *Bruen* Court expressly considered and commented upon the permissibility of the type of "sensitive place" legislation at issue here:

> Consider, for example, *Heller's* discussion of "longstanding" laws forbidding the carrying of firearms in sensitive places such as schools and government buildings. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.
>
> Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

[*Id.* at 2133–34 (internal quotations and citations omitted).]

With these guiding instructions and principles in mind, the Court now turns to the

challenged state law provisions.

## IV.   ANALYSIS

### A.   Overview of New Jersey's Firearm Permitting Scheme

New Jersey has a robust firearm permitting scheme requiring individuals to obtain various permits to either purchase a firearm or to carry one in public.

#### 1.   Firearm Purchaser Identification Card

Generally, to buy a firearm in New Jersey, an individual first needs a Firearms Purchaser Identification Card ("FID").  N.J. Stat. Ann. § 2C:583(b)(1); *see generally Kendrick v. Bruck*, 586 F. Supp. 3d 300, 304–05 (D.N.J. 2022).  This process requires an applicant to, among other things, complete an online application, provide fingerprints, identify character references, and undergo a criminal background check.  *Kendrick*, 586 F. Supp. 3d at 304–05 (extensively detailing the requirements to obtain an FID and a permit to purchase a handgun). The permitting scheme contains age restrictions and many disqualifiers barring individuals from obtaining an FID, such as a felony conviction, a disorderly persons or misdemeanor conviction involving an act of domestic violence, an applicant's history of alcohol or controlled substance abuse problems, an applicant's physical defect or disease that would make it unsafe for the applicant to handle a firearm, and an applicant's present or prior confinement for a mental disorder.  N.J. Stat. Ann. § 2C:583(c) (listing 15 statutory disqualifiers).

Except for a handgun, FID holders can purchase a rifle or shotgun.  N.J. Stat. Ann. § 2C:583(b)(1).  Before Chapter 131's enactment, an individual seeking an FID had to pay a $5 application fee.  2022 N.J Laws ch. 58 (Assembly 4370), § 1 (N.J. Stat. Ann. § 2C:58-3(f)). An FID holder can obtain an unlimited number of rifles or shotguns so long as the holder

certifies to the firearms dealer, for each transaction, that he or she is not statutorily disqualified from obtaining an FID.  N.J. Stat. Ann. § 2C:58-3(i); *see also* N.J. Admin. Code § 13:54-1.9(b).

### 2.  Permit to Purchase a Handgun

To obtain a handgun in New Jersey, an individual needs a permit to purchase a handgun ("Purchase Permit") and an FID.  N.J. Stat. Ann. § 2C:58-3(a)(1); *see generally Kendrick*, 586 F. Supp. 3d at 304–05.  With additional restrictions, the requirements to obtain a Purchase Permit and the statutory disqualifiers are the same for an FID.  N.J. Stat. Ann. § 2C:58-3(c); *see also Kendrick*, 586 F. Supp. 3d at 306.  Besides law enforcement officers and licensed firearms dealers, a Purchase Permit allows the holder to obtain only one handgun per permit.  N.J. Stat. Ann. § 2C:58-3(i); *see also* N.J. Admin. Code § 13:54-1.9(a).  With some limited exceptions, a Purchase Permit holder cannot obtain more than one handgun within any 30-day period.[17]  *Id.*  Before Chapter 131's enactment, an individual seeking a Purchase Permit had to pay a $2 application fee.  2022 N.J Laws ch. 58 (Assembly 4370), § 1 (N.J. Stat. Ann. § 2C:58-3(f)).  Beginning in July 2022, an individual seeking either an FID or Purchase Permit must complete an instruction course approved by the State Police's Superintendent on "the lawful and safe handling and storage of firearms."  N.J. Stat. Ann. § 2C:58-3(c).

### 3.  Permit to Carry a Handgun in Public

To carry a handgun in public for self-defense in New Jersey, an individual must first obtain a permit to carry a handgun ("Carry Permit").  *Id.* § 2C:584(a).  Unless exempt from

---

[17] The one-handgun per permit and 30-day restrictions do not apply to:  (1) purchases by law enforcement officers or their agencies for "use by officers in the actual performance of their law enforcement duties"; (2) purchases by a federally licensed "collector of handguns as curios or relics"; (3) transfers among licensed retail dealers, registered wholesale dealers, and registered  manufacturers; (4) transfers from any person to a licensed retail dealer, registered wholesale dealer, or registered  manufacturer; (5) individuals seeking to exchange a purchased handgun for another from a licensed dealer within 30 days of the original purchase; and (6) transactions exempted by the State Police's Superintendent under N.J. Stat. Ann. § 2C:58-3.4, such as acquiring multiple handguns through inheritance or intestacy.  N.J. Stat. Ann. § 2C:58-3(i).

obtaining a Carry Permit, an individual caught possessing a handgun in public without a Carry Permit is guilty of a second-degree crime, *see id.* § 2C:39-5(e), and faces up to 10 years in prison, *see id.* § 2C:43-6(a)(2).[18]  Like an FID and a Purchase Permit, an individual seeking a Carry Permit must complete an application, provide character references, submit to fingerprinting, and undergo a criminal background check.  *Id.* § 2C:58-4(a) to (b).  The same statutory disqualifiers that bar individuals from obtaining FIDs and Purchase Permits likewise bar individuals from obtaining Carry Permits.  *Id.* § 2C:58-4(c).  In addition, an individual must be "thoroughly familiar with the safe handling and use of handguns," *see id.*, which may be shown by, among other things, completing a firearms training course "substantially equivalent to the firearms training approved by the Police Training Commission."  N.J. Admin. Code § 13:54-2.4(b)(1)*; see also* N.J. Stat. Ann. § 2C:39-6(j).

Before *Bruen* and Chapter 131's enactment, an individual could only obtain a Carry Permit in New Jersey by showing a "justifiable need" to carry a handgun in public.  2018 N.J Laws ch. 37 (Assembly 2758), § 1 (N.J. Stat. Ann. § 2C:58-4(c)).  That "justifiable need" requirement mandated individuals to prove an "urgent necessity for self-protection" evidenced by "specific threats or previous attacks [demonstrating] a special danger to the applicant's life that cannot be avoided by means other than issuance of a [Carry Permit]."  *Id.* Before Chapter 131's enactment, an individual had to pay a $50 fee to process a Carry Permit application.  N.J. Ct. R. 1-43.

### B.    Chapter 131's Amendments to New Jersey's Firearm Permitting Scheme

By enacting Chapter 131, the Legislature made several changes to the firearm

---

[18] N.J. Stat. Ann. § 2C:39-6 provides many categories of individuals who are exempt from obtaining a Carry Permit before carrying a handgun in public, such as current or retired law enforcement officers.

permitting scheme. 2022 N.J. Laws ch. 131. Besides jettisoning the "justifiable need" showing required to obtain a Carry Permit, the Legislature added statutory disqualifiers, modified the application requirements for FIDs and Purchase and Carry Permits, increased the number of references needed to endorse a Carry Permit application, imposed an in-person interview requirement for Carry Permit applicants and their endorsers, increased the fees for FIDs to $50, Purchase Permits to $25, and Carry Permits to $200, and imposed new insurance and firearm safety training requirements for Carry Permit applicants. N.J. Stat. Ann. §§ 2C:58-3, -4.

Under Chapter 131, FID, Purchase Permit, and Carry Permit applications are made to the chief law enforcement officer of the municipality in which the applicant resides, or in certain cases, the New Jersey State Police's superintendent. *Id.* §§ 2C:58-3(d), -4(c). If the applicant satisfies all Chapter 131's requirements and is not statutorily disqualified from obtaining a permit, the chief law enforcement or superintendent "shall" issue the requested permit. *Id.* §§ 2C:58-3(d), (f), -4(d). But if the chief law enforcement or superintendent denies an application, the officer must provide an applicant "with a written statement of the reasons for denial." *Id.* §§ 2C:58-3(d), (f), -4(e).

The applicant may appeal the denial of his or her application in the Superior Court of New Jersey, Law Division, and is entitled to a hearing on the appeal. *Id.* The state court judge reviews de novo the law enforcement officer's decision to deny a permit. *See generally In re M.U.'s Application for a Handgun Purchase Permit*, 291 A.3d 827, 841 (N.J. Super. Ct. App. Div. 2023); *accord In re Application of Boyadjian*, 828 A.2d 946, 955 (N.J. Super. Ct. App. Div. 2003). At the hearing, the law enforcement officer must show, by the preponderance of evidence, that "good cause" existed to deny the requested permit. *In re M.U.'s Application for*

*a Handgun Purchase Permit*, 291 A.3d at 172.  New Jersey state courts must engage in "a fact-sensitive analysis," and when appropriate, accept "relevant testimonial and documentary evidence, including from the [applicant] and the police." *Id.*; *see generally Weston v. State*, 286 A.2d 43, 45 (N.J. 1972).  The Legislature allows for appeals "[t]o guard against arbitrary official action" by law enforcement officers.  *Burton v. Sills*, 248 A.2d 521, 523 (1968).

**C.    The *Siegel* Plaintiffs' Constitutional Challenges to Chapter 131's New Requirements**

Only the *Siegel* Plaintiffs challenge Chapter 131's amendments to the application and permitting scheme.  They raise a Second Amendment challenge to Chapter 131's fee increases, N.J. Stat. Ann. §§ 2C:58-3(f), -4(c), and a challenge under *Cox v. New Hampshire*, 312 U.S. 569 (1941) to Chapter 131's requirement that all, or portions of, the $200 fee for a Carry Permit application be paid to the Victims of Crime Compensation Office, N.J. Stat. Ann. § 2C:58-4(c).[19]  [*Siegel* Compl. ¶ 282 (*Siegel* Docket No. 1); *see also Siegel* TRO Br. pp. 39-40 (*Siegel* Docket No. 8-1).]

They also assert Second Amendment and Due Process challenges to two statutory disqualifiers under N.J. Stat. Ann. § 2C:58-3(c).  [*Siegel* Compl. ¶ 282 (*Siegel* Docket No. 1).] First, they challenge Chapter 131's provision that allows a licensing authority to deny a FID, Purchase Permit, and Carry Permit application if the applicant "is known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a

---

[19] Where an individual applies for a Carry Permit determines the amount paid to the Victims of Crime Compensation Office.  If an applicant submits a Carry Permit application to the chief police officer of the applicants' municipality, then the municipality retains $150 of the fee "to defray the costs of investigation, administration, and processing" of a Carry Permit application.  N.J. Stat. Ann. § 2C:58-4(c).  The municipality must forward the remaining $50 of the fee to the State Police for deposit in the Victims of Crime Compensation Office's account.  *Id.*  If an applicant applies for a Carry Permit directly through the State Police, then the entire $200 fee is paid to the Victims of Crime Compensation Office.  *Id.*

danger to self or others." [*Id.* (citing N.J. Stat. Ann. § 2C:58-3(c)).][20]  Next, they challenge

the statutory disqualifier that the Legislature amended allowing a licensing authority to deny

a FID, Purchase Permit, and Carry Permit application if the "issuance would not be in the

interest of the public health, safety, or welfare <u>because the [applicant] is found to be lacking

the essential character of temperament necessary to be entrusted with a firearm</u>." [*Id.* (citing

N.J. Stat. Ann. § 2C:58-3(c)(5)) (emphasis added on amended language).]

The *Siegel* Plaintiffs also challenge on First and Second Amendment grounds the

following application and permit procedures for Carry Permit applications:

> The application shall be signed by the applicant under oath, and
> shall be endorsed by not less than four reputable persons who are
> not related by blood or by law to the applicant and have known
> the applicant for at least three years preceding the date of
> application, and who shall certify thereon that the applicant has
> not engaged in any acts or made any statements that suggest the
> applicant is likely to engage in conduct, other than lawful self-
> defense, that would pose a danger to the applicant or others. The
> reputable persons also shall provide relevant information
> supporting the certification, including the nature and extent of
> their relationship with the applicant and information concerning
> their knowledge of the applicant's use of drugs or alcohol.
>
> The chief police officer or the superintendent, as the case may
> be, shall also determine and record a complete description of
> each handgun the applicant intends to carry. The chief police
> officer, or the superintendent, as the case may be, shall interview
> the applicant and the persons endorsing the application under
> subsection b. of this section, and shall make inquiry concerning,
> and investigate to the extent warranted, whether the applicant is
> likely to engage in conduct that would result in harm to the
> applicant or others, including, but not limited to, whether the
> applicant has any history of threats or acts of violence by the
> applicant directed toward self or others or any history of use,
> attempted use, or threatened use of physical force by the
> applicant against another person, or other incidents implicating

[20] While this provision is limited to FIDs and Purchase Permits, an applicant seeking a Carry Permit must demonstrate that he or she is not disqualified under N.J. Stat. Ann. § 2C:58-3(c). N.J. Stat. Ann. § 2C:58-4(d)(2) (allowing licensing authority to deny a Carry Permit application if applicant is disqualified under N.J. Stat. Ann. § 2C:58-3(c)).

24

the disqualifying criteria set forth in subsection c. of N.J.S.2C:58-3, including but not limited to determining whether the applicant has been subject to any recent arrests or criminal charges for disqualifying crimes or has been experiencing any mental health issues such as suicidal ideation or violent impulses, and the applicant's use of drugs or alcohol.

The chief police officer or the superintendent may require such other information from the applicant or any other person, including but not limited to publicly available statements posted or published online by the applicant, as the chief police officer or superintendent deems reasonably necessary to conduct the review of the application.

[*Id.* ¶¶ 285, 318–24 (citing N.J. Stat. Ann. § 2C:58-4(b)–(c)).]

1.     **The *Siegel* Plaintiffs' Standing to Bring a Second Amendment Challenge to Chapter 131's New Permitting Scheme**

Before the Court reaches the merits of the *Siegel* Plaintiffs' various challenges to Chapter 131's permitting scheme, this Court must first determine whether they have standing to do so.  Because they bring multiple claims against Chapter 131's permitting scheme—namely First and Secondment Amendment challenges—they must show "standing for each claim [they] seek[] to press." *Fischer v. Governor of New Jersey*, 842 F. App'x 741, 748 (3d Cir. 2021) (alterations in original) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).

As this Court has stated, Article III standing requires a plaintiff to show:  "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, ____ U.S. ____, _____, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1993)).  The injury for standing must be "an invasion of a legally protected interest."  *Lujan*, 504 U.S. at 560.   While the required injury for standing "need not be actualized," the plaintiff must show that he or she

25

faces a threatened injury that "is real, immediate, and direct." *Davis,* 554 U.S. at 734. Hypothetical or speculative injuries cannot confer standing to sue. *Lujan*, 504 U.S. at 560.

For an individual to have standing to challenge a firearm permitting scheme like the *Siegel* Plaintiffs here, he or she must have applied for (and not been granted) a permit, made a "substantial showing" that doing so would have been futile, *Kendrick*, 586 F. Supp. at 308, or have shown that he or she was "able and ready" to apply for the sought-out permit, *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 206 (3d Cir. 2021). *See also Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166-67 (1972) (holding plaintiff lacked standing to challenge a discriminatory membership policy because plaintiff never applied to become a member).

Besides Plaintiffs Nicole Cuozzo and Kim Henry, all *Siegel* Plaintiffs obtained their Carry Permits before the Legislature enacted Chapter 131. The State contends the *Siegel* Plaintiffs with Carry Permits lack standing to challenge Chapter 131's new permit process because they obtained their Carry Permits before the Legislature changed the law. [State Opp'n Br. at 84 (Docket No. 91).] In other words, the *Siegel* Plaintiffs with Carry Permits did not suffer a harm caused by the new law. The *Siegel* Plaintiffs counter, arguing they have standing because they will have to comply with Chapter 131's new permit process—a process they assert violates the Second Amendment—when they must renew their Carry Permits. [*Siegel* Reply Br. at 70 (Docket No. 97).] Thus, the *Siegel* Plaintiffs claim a future injury.

When a plaintiff, like the *Siegel* Plaintiffs with Carry Permits here, seeks injunctive relief based on a future harm, the plaintiff must establish that the future injury is imminent— that is, the injury is "certainly impending" since "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). To be "sufficiently imminent" for standing

26

purposes, "there must be a realistic chance—or a genuine probability—that a future injury will occur." *N.J. Physicians, Inc. v. President of the U.S.*, 653 F.3d 234, 239 (3d Cir. 2011). The purpose of this imminence requirement is "to ensure that an alleged injury is not too speculative for Article III purposes." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 564 n.2).

A Carry Permit expires two years after it was issued. N.J. Stat. Ann. § 2C:58-4(a). Of all the *Siegel* Plaintiffs, only Plaintiff Timothy Varga provides any specific details on when he obtained his Carry Permit. [Varga Suppl. Decl. ¶ 2 (Docket No. 67).] Plaintiff Varga received his Carry Permit on December 13, 2022. *Id.* His permit will expire in December 2024. N.J. Stat. Ann. § 2C:58-4(a). So, in less than two years, Plaintiff Varga would have to renew his Carry Permit under Chapter 131's new permit process to continue carrying his handgun in public. *Id.* In this vein, courts have found similar or longer timeframes to be imminent enough for standing purposes. *LaRoque v. Holder*, 650 F.3d 777, 788 (D.C. Cir. 2011) (finding standing where the alleged injury causing-event was nineteen months away); *Thomas More Law Ctr. v. Obama*, 651 F.3d 529, 537 (6th Cir. 2011) (collecting cases from several courts that found injuries occurring three, six, and even thirteen years to be sufficiently imminent to confer standing), *abrogated on other grounds*, *Nat'l Fed'n of Indep. Bus v. Sebelius*, 567 U.S. 519 (2012); *Mead v. Holder*, 766 F. Supp. 2d 16, 26 (D.D.C. 2011) (finding plaintiffs had standing to challenge Affordable Care Act's individual mandate because future injury would occur in about three years).

Nothing in Plaintiff Varga's Declarations suggests that he will not renew his Carry Permit. In fact, all signs point toward renewal since he believes "that possession and carry of firearms is an important aspect of protecting [his] family and [his] church from the risk of

violent crime." [Varga Decl. ¶ 4 (*Siegel* Docket No. 8-6).] Varga applied for a Carry Permit because he "recognize[s] that violent crime can take place anywhere." [*Id.* ¶ 5.] He is also "an accomplished competitive shooter." [*Id.* ¶ 4.] And, of course, it bears noting that because there was no live testimony presented, there is nothing before the Court to call Plaintiff Varga's intentions into question.

When Plaintiff Varga renews his Carry Permit, he must comply with Chapter 131's new permit process that imposes more requirements than the law did when he first applied for his permit. Varga will have to, among other things, find four "reputable persons"— unrelated by blood and who knew him for at least three years before his renewal application— to endorse his application, and they must certify that he "has not engaged in any acts or made any statements that suggest [he] is likely to engage in conduct, other than lawful self-defense, that would pose a danger to [himself] or otherwise." N.J. Stat. Ann. § 2C:58-4(b). He will also have to show that he is not statutorily disqualified from obtaining a Carry Permit under Chapter 131's new disqualifiers, such as having to show that he does not lack the "essential character of temperament necessary to be entrusted with a firearm." *Id.* §§ 2C:58-3(c)(5), 2C:58-4(c)–(d). He will also have to provide the licensing authority with "other information" it "deems reasonably necessary" to review his renewal application. *Id.* § 2C:58-4(c). Without fulfilling these additional requirements (that the *Siegel* Plaintiffs contend violate the Second Amendment), Varga cannot exercise his constitutional right to armed self-defense in public when his current Carry Permit expires in December 2024, so there is a "realistic chance" that he will suffer a future injury.[21] *See N.J. Physicians*, 653 F.3d at 239.

_____

[21] At oral argument, this Court questioned the parties about whether the *Siegel* Plaintiffs who obtained their Carry Permits before the Legislature enacted Chapter 131 would even be subject to the law's new permit process

While this Court needs only to find that one *Siegel* Plaintiff has standing to challenge Chapter 131's permit process, *see Watt v. Energy Action Education Foundation*, 454 U.S. 151, 160 (1981), the Court finds that Plaintiff Cuozzo also has standing to challenge the law under the "able and ready" doctrine. Under that doctrine, a plaintiff has standing to challenge a law denying a benefit or opportunity that he or she did not actually apply for by showing that "he [or she] is 'able and ready' to apply." *Ellison*, 11 F.4th at 206 (quoting *Carney v. Adams*, ___ U.S ___, ____, 141 S. Ct. 493, 500 (2020)). The doctrine's application requires a fact-sensitive inquiry, and a plaintiff must show that he or she took some steps evidencing "a real interest in seeking the alleged benefit." *Id.* at 206–07. While a plaintiff who takes no steps to obtain an opportunity or benefit is not "able and ready," and therefore lacks standing, a plaintiff need not take every step necessary to have standing. *Id.* (collecting cases). A plaintiff seeking to

---

based on N.J. Stat. Ann. § 2C:58-4(a). [Tr. at 32:10–34:19, 59:22–61:10.] That provision, unamended by Chapter 131, unambiguously provides that all Carry Permits may be "renewed every two years in the same manner and *subject to the same conditions as in the case of the original applications*." N.J. Stat. Ann. § 2C:58-4(a) (emphasis added). This provision could be construed to mean that the *Siegel* Plaintiffs with Carry Permits would be subject to the law existing when they submitted their original Carry Permit applications. *Id.*

Both the State and the *Siegel* Plaintiffs argued against that construction at oral argument. [Tr. at 59:12–59:18, 61:21–61:28, 133:17–134:5.] The *Siegel* Plaintiffs contended the "subject to same conditions" language means that an applicant can renew his or her Carry Permit by following the requirements for the original application, [Tr. at 61:21–61:28]; that is, a person seeking to renew just needs to follow the process for the original application. The State offered a similar understanding of the syntax. [Tr. at 133:17–134:5.] The State also argued the Legislature never intended for the law in existence when the original application was submitted to apply for future renewals. [Tr. at 134:6–135:15.] The State asserted that, over the years, the Legislature added more statutory disqualifiers, such as the Terrorist Watchlist disqualifier, and the Legislature wanted those new disqualifiers to apply to future renewals. *Id.*

To accept the parties' construction of the "subject to the same conditions" language, the Court would have to ignore N.J. Stat. Ann. § 2C:58-4(b)'s language about "all applications for permits to carry handguns, and all applications for renewal of permits." If the Court accepts the parties' proffered interpretation, then the Court would render N.J Stat. Ann. § 2C:58-4(b)'s language on "renewal of permits" superfluous, which this Court must avoid doing. *H.M. ex rel. B.M. v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 451 (D.N.J. 2011). The Court, however, is persuaded by the State's argument that the Legislature never intended for the law on the books at the time of the original application to control future renewals. This could cause implementation problems for the licensing authority having to ascertain what law applied to each application and defeat the Legislature's intent of keeping firearms away from dangerous people such as those on a Terrorist Watchlist. Courts must avoid interpretations that "yield absurd or unjust results." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 302 (3d Cir. 2014) (quoting *United States v. Fontaine*, 697 F.3d 221, 227 (3d Cir. 2012)). Still, when enacting Chapter 131, the Legislature could have clarified N.J. Stat. Ann. § 2C:58-4(a)'s "subject to the same conditions" language to avoid interpretative problems.

invoke the doctrine must show that, at the time the lawsuit started, he or she was "able and ready" to apply in the "reasonably foreseeable future." *Carney*, 141 S. Ct. at 501.

Plaintiff Cuozzo declares she is "applying" for a Carry Permit because she recognizes "violent crime can take place anywhere," and that she is "currently in the process of completing [her] shooting range qualification for [her Carry Permit]," and "[o]nce completed, [she] will satisfy all of the requirements for a [Carry Permit]." [Cuozzo Decl. ¶ 5 (*Siegel* Docket No. 8-5).] The State never challenged Cuozzo's declaration—again, Cuozzo's credibility was never challenged at a hearing as the parties declined this Court's invitation for a testimonial hearing. Thus, there is nothing in the record to dispute Cuozzo's statements.

Given the above, this Court finds Plaintiff Cuozzo has shown that she was "able and ready" to apply for a Carry Permit, and so, has standing to challenge Chapter 131's new permit requirements. On top of declaring an intent to apply for a Carry Permit, she has taken some steps toward obtaining the permit by taking a firearms shooting qualification course. [*See* Cuozzo Decl. ¶ 5.] Taking the firearms shooting qualification course shows her "real interest" in obtaining a Carry Permit. *See Ellison*, 11 F.4th at 207; *see also Caulfield v. Human Res. Div. of Mass.*, 2015 WL 5190716, at *4 (D. Mass. Sept. 4, 2015) (finding plaintiff was "able and ready" to seek police officer position by taking a civil service exam and seeking reappointment to police academy). Chapter 131 requires applicants seeking a Carry Permit to complete a firearms training course to obtain a Carry Permit. N.J. Stat. Ann. § 2C:58-4(c), (d)(2)–(3); N.J. Admin. Code § 13:54-2.4(b). When a law, such as Chapter 131, imposes a precondition to obtain a benefit, a plaintiff that works to satisfy that condition has standing to challenge the law conferring that benefit. *See Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1161 (8th Cir. 2008) "([I]f a plaintiff is required to meet a precondition or follow

a certain procedure to engage in an activity or enjoy a benefit and fails to attempt to do so, that plaintiff lacks standing to sue because he or she should have at least taken steps to attempt to satisfy the precondition.").  According to Plaintiff Cuozzo, once she completes the firearms course, she will have satisfied all the requirements to obtain a Carry Permit.  [Cuozzo Decl. ¶ 5.]  Thus, Plaintiff Cuozzo has standing to challenge Chapter 131's permit process for Carry Permits because she is "able and ready" to apply for that permit.

For completeness, this Court has considered whether *Siegel* Plaintiffs Jason Cook, Kim Henry, and Aaron Siegel have standing to challenge Chapter 131's permit process for FIDs and Purchase Permits.  They do not.  Both Plaintiffs Cook and Siegel only declare that they "intend to apply" for more Purchase Permits.  [Cook Decl. ¶ 41 (*Siegel* Docket No. 8-30); Siegel Decl. ¶ 46 (*Siegel* Docket No. 8-2).]  Similarly, Plaintiff Henry only declares that she "qualif[ies] for and imminently intend[s] to apply for a[n] FID and one or more Purchase Permits."  [Henry Decl. ¶ 10 (*Siegel* Docket No. 8-8).]  Those Plaintiffs have not applied for a permit or shown that doing so would be futile.  *Kendrick*, 586 F. Supp. 3d at 308 (finding plaintiffs lack standing to challenge FID and Purchase Permit laws because plaintiffs never applied for permits); *accord Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 121–22 (2d Cir. 2020) (affirming dismissal of plaintiffs' claims challenging state's firearm permit laws for lack of standing because plaintiffs never applied for permits), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.  Plaintiffs Cook's and Siegel's Declarations that they intend to apply for more Purchase Permits—without providing this Court with any timeframe—are merely someday intentions that cannot confer standing.  *See Lujan*, 504 U.S. at 564.

Nor have they shown that they are "able and ready" to apply for those permits.  Besides declaring only a generalized intent to apply for their desired permits, their

31

declarations are silent on the steps they have taken to obtain the gun permits they want. Indeed, to obtain an FID and Purchase Permit, Plaintiff Henry must complete a firearms instruction course on "the lawful and safe handling and storage of firearms." N.J. Stat. Ann. § 2C:58-3(c). As confirmed by her counsel, Henry "hasn't done anything yet." [Tr. at 31:12–31:13.] Without taking any steps, those Plaintiffs are not able and ready. *See Ellison*, 11 F.4th at 207 (finding plaintiff lacked standing under the "able and ready" doctrine because plaintiff took no steps to enable him to take the desired exam); *see also Finkelman v. Nat'l Football League*, 810 F.3d 187, 195 (3d Cir. 2016) (finding plaintiff lacked standing because "he took no meaningful action to pursue" the sought-out opportunity). Therefore, those Plaintiffs lack standing to challenge Chapter 131's permit process for FIDs and Purchase Permits.[22]

### 2. The *Siegel* Plaintiffs' Standing to Bring a First Amendment Challenge to Chapter 131's Carry Permit Application Requirements

The *Siegel* Plaintiffs also bring a First Amendment challenge to Chapter 131's application requirements for Carry Permits requiring an in-person interview, the identification of reputable endorsers, and the law's "such other information" provision allowing licensing officials to review a Carry Permit applicant's public statements online. [*Siegel* Compl. ¶¶ 318–24 (*Siegel* Docket No. 1).] They contend those new requirements impermissibly chill their First Amendment rights to engage in expressive activity and enter private or intimate associations. [*Siegel* TRO Br. at 40–41 (*Siegel* Docket No. 8-1).]

---

[22] This Court also finds the organizational *Siegel* Plaintiff, the Association of New Jersey Rifle & Pistol Clubs, Inc., lacks standing to bring a challenge to Chapter 131's permit process for FIDs and Purchase Permits on behalf of its members because it has not identified a single member that has standing to challenge those provisions of the law. *N.J. Physicians*, 653 F.3d at 241 (ruling association lacked representative standing because association failed to identify a member who had standing).

"An impermissible chill is created when one is deterred from engaging in protected activity by the existence of a governmental regulation or the threat of prosecution thereunder." *Aiello v. City of Wilmington*, 623 F.2d 845, 857 (3d Cir. 1980); *see generally Laird v. Tatum*, 408 U.S. 1, 11 (1972). The impermissible chill doctrine, however, does not obviate a plaintiff's obligation to show Article III standing. *Laird*, 408 U.S. at 12–13 (explaining that First Amendment chilling cases "have in no way eroded the . . . 'established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action'") (quoting *Ex Parte Levitt*, 302 U.S. 633, 634 (1937)); *see also Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 962–63 (6th Cir. 2009). Hence, courts may only entertain a First Amendment chilling challenge to a law if the plaintiff shows a "specific objective harm or a threat of specific future harm." *Aiello*, 623 F.2d at 857 (citing *Larid*, 408 U.S. 13–14). Without an enforcement proceeding, a plaintiff must show "some likelihood that he has been or will be deterred from engaging in constitutionally protected activity by the operation of the regulations." *Id.*

Here, no *Siegel* Plaintiff has identified any intended protected speech or conduct that he or she has or will refrain from because of Chapter 131's new application requirements. This Court has poured over all the *Siegel* Plaintiffs' declarations (in some cases, multiple supplemental declarations). Those declarations are silent on Chapter 131's new application process and how the new law has or will deter them from engaging in activities protected by the First Amendment. Given that silence, this Court finds the *Siegel* Plaintiffs lack standing to bring their impermissible chill challenge to Chapter 131's new application requirements. *See Fieger*, 553 F.3d at 964 (holding plaintiffs lacked standing to bring First Amendment

33

challenge to attorney disciplinary rules based on impermissible chill because plaintiffs "made no attempt to articulate, with any amount of specificity, their intended speech or conduct"); *see also Coles v. Carlini*, 2012 WL 1079446, at *11 (D.N.J. Mar. 29, 2012) (dismissing plaintiffs' First Amendment impermissible chill challenge because plaintiffs failed to allege that they "have refrained from wearing their colors or associating with one another or that their expression has been chilled as a result of this [car stop]").   In short, this Court will not resort to guesswork to figure out how Chapter 131's new application requirements somehow impermissibly chill the *Siegel* Plaintiffs' First Amendment's rights.   That is the *Siegel* Plaintiffs' burden.   *See Lujan*, 504 U.S. at 561.   Their Complaint's "generalized allegations of chill" cannot confer standing.   *See Aiello*, 623 F.2d at 857.

Without any specific evidence of chill, this Court doubts that Chapter 131's new application requirements will, in fact, chill the *Siegel* Plaintiffs' First Amendment protected activities.   As the State points out, nearly all *Siegel* Plaintiffs obtained their Carry Permits before the Legislature passed Chapter 131.   [State Opp'n Br. at 89 (Docket No. 91).]   Under New Jersey's former law, a Carry Permit applicant had to identify "three reputable persons" to endorse his or her application "who shall certify thereon that the applicant is a person of good moral character and behavior."   2018 N.J. Laws ch. 37 (Assembly 2758) § 1. Apparently, New Jersey's old firearm permit law did not chill those *Siegel* Plaintiffs' First Amendment rights, otherwise it seems to the Court that they would have raised their chilling claim before now.   This fact alone serves to undermine the *Siegel* Plaintiffs' impermissible chill challenge and evidences their lack of standing.   *See Aiello*, 623 F.2d at 856-58 (affirming dismissal of First Amendment chilling claim based on lack of standing because plaintiff's conduct "directly contradicts his charges of chilling effect").   Plaintiffs, who are not chilled

but seek to vindicate the rights of others "they believe are so chilled"—like the *Siegel* Plaintiffs with Carry Permits here—lack Article III standing.  *See Laird*, 408 U.S. at 13 n.7.

Thus, this Court dismisses the *Siegel* Plaintiffs' First Amendment challenge to Chapter 131's application requirements without prejudice on standing grounds.

### D.   Constitutionality of Chapter 131's Application and Permit Process

As recounted above, under *Bruen* courts must first determine whether an individual's "proposed course of conduct" falls within the Second Amendment's plain text.  142 S. Ct. at 2126, 2135; *see also United States v. Kelly*, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) ("The first step under *Bruen*, therefore, is to determine whether the law at issue 'infringe[s]' on 'the right of the people to keep and bear Arms.'") (alteration in original).  The Second Amendment's text guarantees an individual's right to carry firearms in public for self-defense.  *Bruen*, 142 S. Ct. at 2134 ("[T]he 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'— 'guarantee the individual right to possess and carry weapons in case of confrontation.'" (quoting *Heller*, 554 U.S. at 592)).  The Second Amendment presumptively guarantees the *Siegel* Plaintiffs' "proposed course of conduct" of carrying handguns in public for self-defense. *See id.* at 2135.   Chapter 131's permit process implicates the right to armed self-defense in public because an individual must first obtain a Carry Permit to carry a handgun in public for self-defense, otherwise, the individual exposes him- or herself to criminal liability.  N.J. Stat. Ann. § 2C:39-5(b).

Since the Second Amendment's text "presumptively protects" the *Siegel* Plaintiffs' proposed course of conduct, the State must show Chapter 131's new permit process is "consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at

2126.  Because the *Siegel* Plaintiffs challenge multiple aspects of Chapter 131's permit process, this Court will first consider the statutory permit disqualifiers and then the application process.

### 1.     Historical Tradition: Chapter 131's Statutory Disqualifiers

As noted, Chapter 131 now allows a licensing authority to deny FID, Purchase Permit, or Carry Permit applications if:  (1) the applicant "is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others," or (2) issuing the permit "would not be in the interest of the public health, safety, or welfare because the [applicant] is found to be lacking the essential character of temperament necessary to be entrusted with a firearm."   N.J. Stat. Ann. § 2C:58-(c).   The *Siegel* Plaintiffs challenge these statutory disqualifiers.

The State first argues *Bruen* endorsed Chapter 131's statutory disqualifier on disarming individuals who lack the essential character of temperament to be entrusted with a firearm. [State Opp'n Br. at 86 (Docket No. 91).]  According to the State, the Legislature based that statutory language on a Connecticut firearm licensing statute that, interpreted by Connecticut's Supreme Court, allows licensing authorities to deny firearm licenses "to individuals whose conduct has shown them to be lacking the essential character or temperament necessary to be entrusted with a weapon."  [*Id.* (quoting *Bruen,* 142 S. Ct. at 2123 n.1 (quoting *Dwyer v. Farrell*, 475 A.2d 257, 260 (Conn. 1984)).]  The State asserts that the *Bruen* Court found such a licensing law permissible and, therefore, this Court should deny the *Siegel* Plaintiffs' challenge to New Jersey's equivalent law.  [*Id.*]

True, *Bruen* did mention the Connecticut licensing law when discussing "shall issue" firearm licensing laws that did not require an applicant to make a separate showing of need

to obtain a firearm carry permit. 142 S. Ct. at 2123 n.1. But *Bruen* did not pass on the constitutionality of the Connecticut law because that law was not before the Court. *Bruen* noted the Connecticut law and other "shall issue" jurisdictions' laws "appear[]" . . . designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). *Bruen* left open the possibility of constitutional challenges to "shall issue" statutory laws because "any permitting scheme can be put toward abusive ends." *Id.* This Court cannot accept *Bruen*'s passing reference to Connecticut's firearm law as the Supreme Court's wholesale approval of similar licensing laws. Rather, this Court must determine whether Chapter 131's statutory disqualifiers are supported by well-established and representative historical firearm laws. *Id.* at 2133.

Turning to history, the State argues that this Nation has historically disarmed individuals who pose a danger to the public safety. [State Opp'n Br. at 87.] Pointing to various colonial laws before the Revolutionary War, proposals from constitutional conventions, law review articles, and dissents and concurrences from judicial opinions, the State argues that the government can disarm dangerous individuals and "unvirtuous citizens"—that is, nonviolent individuals. [*Id.* at 87–88.]

This Court questions whether, after *Bruen*, the government can justify depriving citizens of their Second Amendment right based on pre-*Bruen* cases espousing the "virtuous citizen" theory of the Second Amendment. As explained below, the "virtuous citizen" theory of the Second Amendment views the right to right to keep and bear arms as a "civic" one, and those who lack respect for government authority, say by committing non-violent crimes, are deemed "unvirtuous" and unworthy to have arms. *See generally* Joseph G.S. Greenlee,

37

*The Historical Justifications for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 275–83 (2020).  That theory appears to lack historical support, rests on faulty justifications, and has come under fire.

In any event, based on the State's historical materials and the Court's own research, this Court finds this Nation has a historical tradition of disarming dangerous individuals and those who endanger the public safety.  From medieval England to early American colonial times to the Reconstruction era, the government disarmed people who posed a danger to others.  This Court finds Chapter 131's statutory disqualifiers seek to prevent individuals who pose a danger to the public from obtaining firearms.  Indeed, Chapter 131 allows a licensing authority to deny a firearm permit based on evidence that the applicant "would pose a danger to self or others."  N.J. Stat. Ann.  § 2C:58-3(c).  Likewise, this Court finds Chapter 131's statutory disqualifier on preventing individuals who lack "the essential character of temperament necessary to be entrusted with a firearm" from obtaining firearm permits to focus on whether the applicant, armed with a firearm, poses a danger to the public.  *Id.* § 2C:58-(c)(5).  While some of the below historical laws are repugnant and would be unconstitutional today, this Court must look to these laws to determine a historical tradition and the Founder's understanding of the right to keep and bear arms.  *Bruen*, 142 S. Ct. at 2129–30.

### a.    English History of Disarmament

English law is instructive because the Second Amendment "codified a right inherited from our English ancestors."  *Heller*, 554 U.S. at 599 (citation omitted); *see also Bruen*, 142 S. Ct. at 2127 (observing that because the Second Amendment codified a "pre-existing right," the *Heller* Court examined "English history dating from the late 1600s, along with American

38

colonial views leading up to the founding"). England has a long history of disarming dangerous people. Greenlee, 20 Wyo. L. Rev. at 257–61.

English common law punished individuals "who [went] armed to terrify the King's subjects" with imprisonment and forfeiture of their "armour." *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). The common law offense of "going armed to terrify the King's subjects" is tied to the 1328 Statute of Northampton. *Bruen*, 142 S. Ct. at 2141. Like the common law offense, the Statute of Northampton provided a person may not "bring force in affray of the peace, nor to go nor ride armed by night nor day, in fairs, markets, nor in the presence of the justices or other ministers, nor in part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." 2 Ed. III, c. 3 (1328). By 1686, English courts had considered the statute to "be almost gone in desuetudinem," *see Rex v. Knight*, 90 Eng. Rep. 330, 330 (K.B. 1686), but individuals "going armed" with evil intent could be liable under the statute, Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class*? 3 (2021). A person found to have gone armed to terrify the people were stripped of their arms and imprisoned "at the King's pleasure." C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 717 (2009) (noting that the Statute of Northampton "set the punishment for the common-law offense" of going armed to terrify the people).

Besides the common law and Statute of Northampton, England enacted a series of militia acts or other government decrees that banned certain people from having arms. In 1660, Charles II ordered government officials in London "to make strict search in the city and precincts for dangerous and disaffected persons, seize and secure them and their arms, and detain them in custody." Greenlee, 20 Wyo. L. Rev. at 259 (quoting 10 Calendar of State

39

Papers, Domestic Series, Domestic Series of the Reign of Charles II, 1660-1670, 237 (1895)).

Shortly thereafter, England's 1662 Militia Act allowed government officials to "seize all arms

in the custody or possession of any person" they judged to be "dangerous to the Peace of the

Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. English officials used the 1662 Militia

Act to disarm "dangerous and disaffected persons" until 1757—more than half-a-century after

England's Parliament adopted the English Bill of Rights of 1689 that expressly granted the

right to keep and bear arms (for Protestants only). Diarmuid F. O'Scannlain, *Glorious*

*Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre

Dame L. Rev. 397, 405 (2019). Indeed, when William of Orange and his wife Mary were on

the throne, William offered monetary rewards "for arms seized from dangerous or disaffected

persons." Patrick J. Charles, "*Arms for their Defence"? An Historical, Legal, and Textual Analysis*

*of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in*

*McDonald v. City of Chicago*, 57 Clev. St. L. Rev. 351, 382 (2009).

In addition, depending on who sat on the throne, England disarmed certain religious

groups—Catholics or Protestants. *See generally* Halbrook, *supra* at 66–87. England disarmed

Catholics because they were "presumptively thought to pose a . . . threat or terror." *Kanter*

*v. Banter*, 919 F. 3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting) (collecting scholarship).

Catholics could retain their arms provided they gave a "declaration against popery"—that is,

denouncing the tenets of Catholicism and swearing allegiance to the King. An Act for the

Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess.

1, ch. 15, §§ 2, 4 (Eng. 1688). Catholics who refused to swear allegiance were considered a

threat to the Crown. Marshall, 32 Harv. J.L. & Pub. Pol'y at 723 (explaining that "the stated

principle supporting [the arms] disability [for Catholics] was cause to fear that a person,

although technically an English subject, was because of his beliefs effectively a resident enemy alien liable to violence against the king").

### b.    Colonial American History of Disarmament

"[R]evolutionary and founding-era gun regulations are those that targeted particular groups for public safety reasons." *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Indeed, the early American colonies inherited England's practice of disarming dangerous citizens. Massachusetts, New Hampshire, North Carolina, and Virginia enacted statutes codifying the common law offense of bearing arms to terrorize the people—variants of the Statute of Northampton. Both Massachusetts' and New Hampshire's statutes "were substantively identical." *Bruen*, 142 S. Ct. at 2142.

Starting in 1692, Massachusetts authorized justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride, or go armed offensively . . . elsewhere by night or by day in fear or affray of their majesties' liege people" and "commit the offenders to prison until he find sureties for the peace and good behavior, and *seize and take away his armor or weapons.*" Act of Nov. 1, 1692, ch. 18, § 6, *reprinted in* 1 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 52-53 (Boston, Wright & Potter 1869) (emphasis added). For more than 100 years, Massachusetts allowed justices of the peace to disarm individuals who posed a danger to the public. 2 *Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807*, at 653 (Boston, Manning & Loring 1807) (1795 statute repealing forfeiture provision of the 1692 statute). Likewise, starting in 1699, New Hampshire authorized justices of peace to arrest anyone "who shall go armed offensively," imprison them until he or she found sureties to keep the peace, and "cause the

arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use." *Acts and Laws of His Majesty's Province of New Hampshire, in New England; with Sundry Acts of Parliament* 2 (Portsmouth, Daniel Fowle 1761).

Virginia and North Carolina had similar laws.  Starting in 1786, Virginia outlawed riding or going armed "by night [or] by day, in fairs or markets, or in other places, in terror of the country."  Act of Nov. 27, 1786, ch. 140 (Va.), *reprinted in* 1 *Revised Code of the Laws of Virginia: Being a Collection of All Such Acts of the General Assembly, Of Public and Permanent Nature, As Are Now in Force; with A General Index* 554 (Richmond, Thomas Ritche 1819).  The Virginia law authorized justices of the peace to arrest those who went armed to terrify the people and allowed the justices to strip the offenders of "their armour."  *Id.*  For sixty years, justices of the peace could disarm individuals who went armed to terrify the people.  1847 Va. Acts Ch. 14, § 16 (Docket No. 90-3) (eliminating arms forfeiture provision).  North Carolina likewise allowed government officials not only to arrest those who went armed by "night [or] days, in fairs, markets, . . . [or] in part elsewhere" to the terror of the people, but also to strip the offenders of their "armour."  *A Collection of the Statues of the Parliament of England in Force in the State of North Carolina* 60-61 (1792); *see generally State v. Huntly*, 25 N.C. 418 (1843) (per curiam) (discussing North Carolina's offense of "going armed" to the terror of the people).

Like England, some American colonies—Maryland, Virginia, and Pennsylvania—disarmed Catholics "on the basis of allegiance, not on the basis of faith" out of fear of an armed insurrection.  Robert H. Churchill, *Gun Regulation, the Police Power, and The Right to Keep Arms in Early America:  The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007); Greenlee, 20 Wyo. L. Rev. at 263–64.

42

As tensions between England and the colonies grew toward war, many colonies disarmed colonists who were "disaffected" with the cause of an independent America. Connecticut, Massachusetts, North Carolina, Virginia, and Pennsylvania enacted laws allowing government officials to disarm colonists who refused to swear allegiance to America. Greenlee, 20 Wyo. L. Rev. at 263–64 (collecting laws). "Although these Loyalists were neither criminals nor traitors, American legislators had determined that permitting these persons to keep and bear arms posed a potential danger." *Nat'l Rifle Ass'n,* 700 F.3d at 200 (collecting scholarship). In fact, in 1777, New Jersey empowered its Council of Safety to "deprive and take from such Persons as they shall judged disaffected and dangerous to the present Government, all Arms, Accoutrements, and Ammunition which they own or possess." Act for Constituting a Council of Safety, ch. 40, § 20 1777 N.J. Laws 90.

In addition, colonists routinely disarmed Native Americans and slaves. *Kanter*, 919 F.4d at 458 (Barrett, J., dissenting) ("Slaves and Native Americans . . . were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course."). As will be discussed later, several colonial governments passed laws requiring colonists to bring arms to church and public assemblies to defend against attacks from Native Americans and to suppress slave revolts. See *infra* Section IV.G.2.c.i.

The above English and American colonial disarmament laws show that the Founders did not hesitate to disarm individuals they found to be dangerous or a threat to the public safety. *Kanter*, 919 F.4d at 458 (Barrett, J., dissenting) (observing that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety"); *Binderup v. Att'y Gen.*, 836 F.3d 336, 369 (3d. Cir. 2016) (en banc) (Hardiman, J. concurring in part and in the judgments) (observing "the historical record leads us to conclude

43

that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed"); Greenlee, 20 Wyo. L. Rev. at 265 (stating for "all disarmament[] [laws] during the colonial period, the justification was always that those being disarmed were dangerous"); Marshall, 32 Harv. J.L. & Pub. Pol'y at 727-28 ("[T]o the extent that one can distill any guidance from the English disability and the Revolutionary disarmament, it would seem at most to be that persons who by their actions— not just their thoughts—betray a likelihood of violence against the state may be disarmed.").

Turning to *Bruen*'s "how" and "why," the above English and Colonial disarmament laws are "relevantly similar" to Chapter 131's statutory disqualifiers. 142 S. Ct. at 2133. For all laws, the "why" is the same: to keep arms out of the hands of dangerous people or those who would endanger the public if allowed to have arms. The "how" of the laws is also similar since they each focus on the arms bearer's conduct—an objective measure of an arm bearer's dangerousness and threat to the public safety.

Take, for example, the American colonial laws of disarming individuals who went armed to terrify the public. Those laws allowed a justice of the peace to strip a person of their arms "upon the view of [such] justices, confession of the party, or other legal conviction of any such offense." Act of Nov. 1, 1692, ch. 18, § 6, *reprinted in* 1 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 52-53 (Boston, Wright & Potter 1869); *Acts and Laws of His Majesty's Province of New Hampshire, in New England; with Sundry Acts of Parliament* 2 (Portsmouth, Daniel Fowle 1761). Similarly, the colonial laws disarming individuals who refused to take an oath of allegiance turned on the arm bearer's conduct. An arm bearer's failure to take an oath—an objective and verifiable act—resulted in disarmament. Greenlee,

44

20 Wyo. L. Rev. at 263–64.   Chapter 131's statutory disqualifiers too focus on objective criteria by allowing a licensing authority to consider the applicant's conduct to determine whether he or she would endanger the public if allowed to bear arms.   N.J. Stat. Ann.   § 2C:58-3(c), (c)(5).   *Bruen* does not demand a historical twin or dead ringer, rather, an analogues historical law suffices.   142 S. Ct. at 2133.

### c.        State Constitutional Convention Proposals

Three proposals from state constitutional ratification conventions in Pennsylvania, Massachusetts, and New Hampshire support the proposition that it was the Founders' understanding that the government could disarm dangerous individuals.   *See United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011) ("Debates from the Pennsylvania, Massachusetts, and New Hampshire ratifying conventions . . . confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses."), *overruled on other grounds by Binderup,* 836 F.3d at 349–50; Marshall, 32 Harv. J.L. & Pub. Pol'y at 728-29 (stating the three proposals that emerged from the Pennsylvania, Massachusetts, and New Hampshire ratification debates on the Constitution reveal the founders would have allowed disarmament of individuals posing a danger to others).

Starting with the Pennsylvania ratification convention, the minority proposal by the anti-federalists, which the *Heller* Court found "highly influential," 554 U.S. at 604, requested a bill of rights stating that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals."   2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971).   In Massachusetts, Samuel Adams, a Founding Father, proposed these additions to Governor John Hancock's proposed amendments to the Constitution:   the "Constitution be never construed to authorise Congress

45

. . . to prevent the people of the United States, who are peaceable citizens from keeping their own arms." *Id.* at 675, 681. The founding generation understood the term "peaceable" to mean nonviolent. *See* Greenlee, 20 Wyo. L. Rev. at 266 (reviewing contemporaneous dictionary definitions of the term "peaceable" and concluding that the term was understood to mean nonviolent). Over to New Hampshire, the State's constitutional convention requested the proposed constitution be amended to include a provision stating, "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." 1 Johnathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891). The convention included the "actual rebellion" language "with recent events in mind" after 200 hundred rioters, some armed with muskets, protested outside the General Court in Exeter, New Hampshire following a law allowing former Tories (Loyalists) to return to their estates. Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 213 (2008). The rebellion language in New Hampshire's proposal focuses on danger because "[r]ebels posed a risk of insurrection and so were dangerous." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting).

Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," the founding generation's understanding of the right to keep and bear arms is instructive. *Heller*, 554 U.S. at 625, 634–35. While the Pennsylvania, Massachusetts, and New Hampshire proposals never made their way into the Constitution, the proposals, taken together, are evidence of the founding generation's understanding about allowing dangerous individuals or those who would endanger the public safety to have firearms. *Kanter*, 919 F.4d at 456 (Barrett, J., dissenting). They did not.

46

###### d.    Post-Ratification Disarmament Laws

Post-ratification practices—"a critical tool of constitutional interpretation," *Heller*, 554 U.S. at 605—confirm the public's understanding of keeping guns away from dangerous people and those who would endanger the public.  *Bruen*, 142 S. Ct. at 2136–37 (discussing treatment of post-ratification laws).

As noted above, for more than 100 years, Massachusetts allowed justices of the peace to disarm individuals who went armed to terrify the public.  Act of Nov. 1, 1692, ch. 18, § 6, *reprinted in* 1 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 52-53 (Boston, Wright & Potter, 1869).  Starting in 1795, Massachusetts dropped the arms forfeiture provision of the 1692 law and, instead, imposed a conditional restriction on an arms bearer's ability to freely carry a weapon in public by requiring him or her to find sureties to keep the peace if he or she violated the law.  2 *Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807*, at 653 (Boston, Manning & Loring 1807).  Then, in 1836, Massachusetts enacted a new law on carrying arms in public that spread across about nine other jurisdictions.  *Bruen*, 142 S. Ct. at 2148.  As will be discussed later, these surety laws imposed a partial, conditional restriction on carrying arms in public.  If an individual complained that an arms bearer was reasonably likely to breach the peace or injure them, then the arms bearer had to post a surety bond to keep the peace unless he or she showed a special need to carry, such as self-defense.  See *infra* Section IV.F.3.b.i.  These surety laws "targeted only those threatening to do harm" and constrained an arm bearer if there "was just reason to fear that he purposes to make an unlawful use of [firearms]."  *Bruen*, 142 S. Ct. at 2148 (quoting William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829)).

This Nation's tradition of disarming dangerous individuals or those who would endanger the public continued during Reconstruction. For example, in 1866, a Union army general issued a decree aimed to preempt South Carolina's "Black Codes," declaring that "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms shall not be infringed," but that no "disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." *Id.* at 2152 (quoting Cong. Globe, 39th Cong., 1st Sess. 908–09 (1866)). A contemporaneous Freedman Bureau's publication declared that "[a]ny person, white or black, may be disarmed if convicted of making an improper or dangerous use of weapons." *Id.* (citation omitted).

The "how" and "why" behind these historical laws are not equivalent to those behind Chapter 131's statutory disqualifiers. The "why" of the surety laws is the same as Chapter 131's statutory disqualifiers: to protect the public from someone who may misuse a firearm. But the "how" of the laws is different. As discussed below, the surety laws typically restricted an arms bearer after an adversarial proceeding brought by someone who feared the arms bearer may cause the complainant harm. See *infra* Section IV.F.3.b.i. Chapter 131's statutory disqualifiers do not have a similar process. Surety laws also imposed only a partial, conditional restriction on arms bearers—if they posted a bond, they could continue to carry their firearms even if found to pose a danger to the public. *Id.* Yet *Bruen* does not require a historical twin; rather, the historical and modern laws need only "impose a comparable burden on the right to armed self-defense" and be "comparably justified." 142 S. Ct. at 2133. This Court finds the above post-ratification laws are similarly justified and impose like burdens as Chapter 131's statutory disqualifiers. The historical laws and Chapter 131's statutory disqualifiers all burden arms bearers to protect the public from a person who will

misuse a firearm.   The post-ratification laws also confirm the founding generation's understanding of the right to keep and bear arms:  the government can disarm or regulate arms bearing by dangerous individuals or persons who would endanger the public if allowed to have firearms.

The Second Amendment right to keep and bear arms is "not unlimited" and the Constitution leaves states "some measures" to combat handgun violence. *Heller*, 554 U.S. at 626, 636.   Indeed, the Second Amendment is not a "regulatory straightjacket" restraining states from adopting regulations on owning and carrying firearms in public. *Bruen*, 142 S. Ct. at 2133.   The State's research, coupled with the Court's own, reveal a historical tradition in this Nation of prohibiting dangerous individuals or those who would endanger the public from having firearms.  Chapter 131's statutory disqualifiers follow that historical tradition and furthers it.

Thus, for the above reasons, this Court finds that the *Siegel* Plaintiffs are unlikely to succeed on the merits of their Second Amendment challenge to Chapter 131's statutory disqualifiers and, therefore, their motion for a preliminary injunction on those provisions of the law is denied.

### e.   The State's "Unvirtuous Citizen" Justification for Chapter 131's Statutory Disqualifiers

A few words are in order on the State's claim that the Second Amendment right to keep and bear arms does not extend to "unvirtuous citizens."

Before *Bruen*, the Third Circuit (along with other Courts of Appeals) applied a "unvirtuous citizen" justification in Second Amendment challenges to 18 U.S.C. § 922(g)(1)—a federal law prohibiting individuals who were convicted of a crime punishable by more than one year from possessing firearms. *See Folajtar*, 980 F.3d at 902.   Under the

49

"unvirtuous citizen" justification, an individual—although not convicted of a violent crime—could be deprived of his or her constitutional right to keep and bear arms.  Greenlee, 20 Wyo. L. Rev. at 275–83.  The justification rests on the notion that individuals who commit crimes—even nonviolent felonies or misdemeanors—show a lack of respect for the law and thus are not entitled to their Second Amendment right.  *In re M.U.'s Application for a Handgun Purchase Permit*, 291 A.3d at 848–49.

Several judges and scholars have criticized the "unvirtuous citizen" justification for lacking historical support.  Judge Hardiman and four of his colleagues rejected the "unvirtuous citizen" theory, finding "no historical evidence on the public meaning of the right to keep and bear arms indicating that 'virtueness' was a limitation on one's qualification for the right."  *Binderup*, 836 F.3d at 372 (Hardiman, J., concurring in part and in the judgments).  Then-Judge Barrett rejected the "unvirtuous citizen" theory in her dissent in *Kanter*, finding it "associated with civic rights"—that is, the theory understands the Second Amendment right to be a "purely civic right."  919 F.3d at 462–63 (Barrett, J., dissenting).  Judge Barrett found the theory to contravene *Heller*'s holding that the Second Amendment "confer[s] an individual right to keep and bear arms."  *Id.* at 463 (alteration in original) (quoting *Heller*, 554 U.S. at 595).  Then, Judge Bibas in his dissent in *Folajtar* took the "unvirtuous citizen" theory to task by critically reviewing all the historical evidence underpinning the theory and the caselaw applying it.  908 F.3d at 915–20.  After an extensive review, Judge Bibas found no historical support for the "unvirtuous citizen" justification.  *Id.* at 919–20 (Bibas, J., dissenting) ("[A]ll these articles and cases show that the virtue theory is flimsy.  Most of the evidence dovetails with dangerousness.  The focus on virtue rests on strained readings of colonial laws and ratifying conventions perpetuated by scholars and courts' [sic] citing one another's faulty

analyses."). Another scholar reached the same conclusion as Judge Bibas. Greenlee, 20 Wyo. L. Rev. at 275–85.

Following *Bruen*, a Third Circuit panel applied the "unvirtuous citizen" justification to reject a constitutional challenge to Section 922(g)(1) by a convicted, nonviolent felon. *Range v. Att'y Gen.*, 53 F.4th 262, 273–74 (3d Cir. 2022). That decision, however, was short-lived because a majority of Third Circuit judges agreed to re-hear the case en banc and vacated the panel's decision. *Range v. Att'y Gen.*, 56 F.4th 992 (3d. Cir. 2023). Thus, the first *Range* decision lacks precedential support. *Id.*

A New Jersey appellate court recently employed the "unvirtuous citizen" justification to uphold the denial of a Purchase Permit and revocation of an FID by an individual with an arrest record for nonviolent offenses and convictions for disorderly persons property offenses (one expunged and one resolved by a conditional dismissal). *See In re M.U.'s Application for a Handgun Purchase Permit*, 291 A.3d at 835–37. In doing so, the appellate court determined that Chapter 131's predecessor "public health" statutory disqualifier is "well-rooted in the nation's history and tradition of firearm regulation" of disarming those who "evince[] a disrespect for the rule of law." *Id.* at 853.

Given the Third Circuit's decision to vacate *Range*, this Court questions the validity of the "unvirtuous citizen" justification following *Bruen*. Like Judge Hardiman, then-Judge Barrett, and Judge Bibas, this Court could not uncover any historical laws stripping away an individual's right to keep and bear arms based on his or her virtue (or lack thereof).

This Court, however, need not decide whether the "unvirtuous citizen" justification supports Chapter 131's statutory disqualifiers. When a plaintiff brings a facial challenge to a statute, like the *Siegel* Plaintiffs have done here, the plaintiff must show "that no set of

51

circumstances exists under which the [law] would be valid." *Mazo v. N.J. Sec'y of State*, 54

F.4th 124, 134 (3d Cir. 2022) (alteration in original) (quoting *United States v. Salerno*, 481 U.S.

739, 745 (1987)).  As noted above, Chapter 131's statutory disqualifiers are constitutional

under the Second Amendment when viewed through the lens of this Nation's historical

tradition of disarming dangerous individuals or those who endanger the public.  See *supra*

Section IV.D.1.  In any event, the dangerous tradition is likely subsumed in the "unvirtuous

citizen" theory.  Indeed, at least one Court of Appeals has tied the concept of "virtuousness"

to non-dangerousness.  *See United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) ("To be sure,

there is an ongoing debate among historians about the extent to which the right to bear arms

in the founding period turned on concerns about the possessor's "virtue," i.e., on a legislative

judgment that possession of firearms by a certain class of individuals would pose a serious

danger to the public.").

> f.   **The *Siegel* Plaintiffs' Void-for-Vagueness Challenge to
> Chapter 131's Public Safety Statutory Disqualifiers**

The *Siegel* Plaintiffs argue that Chapter 131's public safety statutory disqualifiers

violate the Due Process Clause because they are "too vague" or "encourage arbitrary

discretion by public officials."  [*Siegel* TRO Br. at 42 (Docket No. 8-1).]  At bottom, the *Siegel*

Plaintiffs contend Chapter 131's public safety disqualifiers are unconstitutional because the

law confers too much discretion on a licensing authority since the disqualifiers "are

standardless."  *Id.* at 43.  This Court disagrees.

To start, courts employ a "strong presumption that lawfully enacted statutes are valid."

*Amaya v. New Jersey*, 766 F. Supp. 2d 533, 538 (D.N.J. 2011) (citing *I.N.S. v. Chadha*, 462 U.S.

919, 944 (1983)).  "The void-for-vagueness doctrine reflects the fundamental principle that, in

order to comply with the requirements of due process, a statute must give fair warning of the

conduct that it prohibits." *United States. v. Portanova*, 961 F.3d 252, 262–63 (3d Cir. 2020)

(quoting *United States, v. Fontaine*, 697 F.3d 221, 226 (3d Cir. 2012)).  "The vagueness doctrine

aims to ensure the nondiscriminatory application of laws." *Bernard v. Cosby*, ____ F. Supp.

3d. ____, ____, 2023 WL 22486, at \*5 (D.N.J. Jan. 3, 2023) (citation omitted).  "A statute is

unconstitutionally vague under the Due Process Clause if it (1) fails to provide people of

ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or (2)

authorizes or even encourages arbitrary and discriminatory enforcement." *Fontaine*, 697 F.3d

at 226 (internal quotation marks omitted) (quoting *United States, v. Stevens*, 533 F.3d 218, 249

(3d Cir. 2008)); *accord Johnson v. United States*, 576 U.S. 591, 595 (2015).

The most "important aspect of the vagueness doctrine is . . . the requirement that a

legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461

U.S. 352, 358 (1983) (internal quotation marks omitted) (quoting *Smith v. Goguen*, 415 U.S.

566, 574 (1974)); *see Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("[I]f arbitrary and

discriminatory enforcement is to be prevented, laws must provide explicit standards for those

who apply them.").  Yet "[r]egulations need not . . . achieve meticulous specificity, which

would come at the cost of flexibility and reasonable breadth." *Betancourt v. Bloomberg*, 448

F.3d 547, 552 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Grayned*, 408 U.S.

at 110).

Here, Chapter 131's statutory disqualifiers provide enough standards to guide licensing

officials eliminating the risk of arbitrary enforcement.  As noted, both statutory disqualifiers

focus on an applicant's danger to him- or herself or others if allowed to have a firearm.  See

*supra* Section IV.D.1.  Indeed, Chapter 131 requires a licensing authority to determine

whether an applicant is "known" in his or her community "as someone who has engaged in

acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others." N.J. Stat. Ann. § 2C:58-3(c). This disqualifier requires licensing officials to examine objective evidence—the applicant's acts and statements—to determine whether he or she may engage in conduct that would endanger him- or herself or the public.

Likewise, Chapter 131's "not in the interest of public health, safety, and welfare" disqualifier requires licensing officials to determine whether an applicant lacks the "essential character of temperament necessary to be entrusted with a firearm." Again, this disqualifier requires an examination of the applicant's conduct with objective evidence. *See In re M.U.'s Application for a Handgun Purchase Permit,* 291 A.3d at 855–56, (upholding revocation of FID and denial of Purchase Permit under prior version of Chapter 131's "not in the interest of public health, safety, and welfare" disqualifier based on applicant's prior unlawful conduct). Since Chapter 131's statutory disqualifiers limit a licensing official's discretion to focus on the applicant's conduct to determine whether the applicant is dangerous or would endanger others, the disqualifiers are not impermissibly vague. *See Kuck v. Danaher*, 822 F. Supp. 2d 109, 134 (D. Conn. 2011) (rejecting void-for-vagueness challenge to Connecticut licensing law that allowed licensing authority to revoke firearm license if license holder was found not to be "suitable" to carry a firearm since law limited authority's discretion to "the enumerated factors for determination of an applicant's qualifications"), *abrogated on other grounds by Bruen* 142 S. Ct. 2111. Indeed, to violate due process, the law must be "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595.

Moreover, Chapter 131 has built-in procedural mechanisms to eliminate arbitrary enforcement by allowing applicants to appeal a denial of their FID, Purchase Permit, or Carry

Permit applications to the Superior Court of New Jersey.   N.J. Stat. Ann. §§ 2C:58-3(d), (f),

-4(e).   As noted, an aggrieved applicant is entitled to a hearing where the trial court reviews

the licensing official's decision anew.  See *supra* Section IV.B.  The licensing authority must

establish that "good cause" existed to deny the requested permit.  *In re M.U.'s Application for a*

*Handgun Purchase Permit*, 291 A.3d at 841–42.  These appellate procedures safeguard against

a licensing authority's arbitrary decision.  *See Kuck*, 822 F. Supp. 2d at 134–35 (denying void-

for-vagueness challenge based on arbitrary enforcement where licensing law provided appeal

process allowing de novo review of licensing official's decision).

In *Bruen*, the Court found New York's "proper cause" requirement to obtain a carry

permit troubling because, among other reasons, the state left aggrieved applicants "little

recourse if their local licensing officer denies a permit."  142 S. Ct. at 2123.  New York courts

would defer to a licensing official's decision "unless it was arbitrary and capricious."  *Id.*

(citation and internal quotation marks omitted).    Unlike New York's law, Chapter 131

provides meaningful appeal rights to aggrieved applicants.  See *supra* Section IV.B.

Finally, this Court finds Chapter 131 provides notice to persons of ordinary

intelligence to understand what conduct will prevent him or her from obtaining an FID or

Purchase or Carry Permit because the statutory disqualifiers focus on danger or risk of harm.

In fact, one court has rejected a void-for-vagueness challenge involving a substantially similar

licensing law to Chapter 131.  *See Kuck*, 822 F. Supp. 2d at 134 (rejecting void-for-vagueness

challenge to licensing law allowing licensing authority to revoke firearm permit to a not

"suitable" person—that is, a person who lacks "the essential character or temperament

necessary to be entrusted with a weapon"—because "a person of ordinary intelligence would

understand that his permit will be subject to revocation if he develops a condition or engages

55

in conduct which indicates that he may pose a danger to the public if he is allowed to carry a firearm in public" (quoting *Dwyer*, 475 A.2d at 260)).   Accordingly, this Court rejects the *Siegel* Plaintiffs' void-for-vagueness challenge to Chapter 131's public safety statutory disqualifiers.

## 2.  Historical Tradition:  Chapter 131's Application Process

The *Siegel* Plaintiffs also challenge certain of Chapter 131's new Carry Permit application requirements, more specifically, those requiring that:  (1) "not less than four reputable persons" to endorse a Carry Permit application "who shall certify thereon that the applicant has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others," including "relevant information" on "the nature and extent of their relationship with the applicant and information concerning their knowledge of the applicant's use of drugs or alcohol," N.J. Stat. Ann. § 2C:58-4(b);  (2) the licensing authority to hold an in-person interview of the applicant and his or her endorsers and "make inquiry concerning, and investigate to the extent warranted, whether the applicant is likely to engage in conduct that would result in harm to the applicant or others, including, but not limited to, whether the applicant has any history of threats or acts of violence by the applicant directed toward self or others or any history of use, attempted use, or threatened use of physical force by the applicant against another person, or other incidents implicating [the other statutory disqualifiers under N.J. Stat. Ann. § 2C:58-3(c)], including but not limited to determining whether the applicant has been subject to any recent arrests or criminal charges for disqualifying crimes or has been experiencing any mental health issues such as suicidal ideation or violent impulses, and the applicant's use of drugs or alcohol," *see id.* § 2C:58-4(c); and (3) the applicant to provide

"such other information . . . including but not limited to publicly available statements posted or published online by the applicant, as the [licensing authority] deems reasonably necessary to conduct the review of the application," *see id.*

The State has not come forward with any historical laws to support Chapter 131's new application requirements. Rather, the State argues the new requirements are permissible under the Second Amendment because "they serve to ensure that only law-abiding citizens who are not a danger to themselves or others are authorized to possess firearms." [State Opp'n at 89–90 (Docket No. 91).] The State notes that Chapter 131's new background checks "are precisely the type of legitimate regulation that *Bruen* spoke of approvingly." [*Id.* at 90.]

This Court agrees. Apart from Chapter 131's provisions allowing a licensing authority to request "such other information" from the applicant and the in-person interview requirement of the applicant's endorsers, the other application requirements seek to fetter out dangerous individuals or persons who would endanger the public safety with a firearm. Indeed, both the reputable persons and in-person interview requirements focus on the risk of danger to the applicant and the public if the applicant is allowed to have a firearm. N.J. Stat. Ann. § 2C:58-4(c) (character reference requiring endorsements on whether applicant "would pose a danger to [him- or herself] or others"); *id.* § 2C:58-4(d) (in-person interview process limited to gathering information on applicant's history of violence, relevant arrest record, suicidal ideations, pending criminal charges, and drug and alcohol use). This Court finds that Chapter 131's reputable persons endorsement and in-person interview requirements are "narrow, objective, and definite standards guiding licensing officials" to "ensure only those bearing arms in [New Jersey] are, in fact, law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9 (internal citations and quotation marks omitted).

57

As for Chapter 131's in-person interview requirement of the applicant's endorsers, the Court finds that such requirement is unduly burdensome.  The State has not justified this requirement or explained how, after receiving the endorsers' certifications, interviewing them in-person (or even how that is achieved in a nonburdensome way) will aid the licensing authority's review of a Carry Permit application.  And while Chapter 131's requirement allowing a licensing authority to request "such other information" the authority "deems reasonably necessary," including the applicant's online public statements, appears broad and unlimited.  However, this Court construes that provision to limit the information the licensing authority may obtain to only those objective facts bearing on the applicant's dangerousness or risk of harm to the public.

While the State has identified no historical evidence to support Chapter 131's new application process, this Court has.  Again, some of the below historical laws are repugnant and clearly unconstitutional today.  At the same time, this Court must look to these laws to determine a historical tradition and the Founders' understanding of the right to keep and bear arms.  *See Bruen*, 142 S. Ct. at 2129–30.

### a.      Historical Laws on Reputable Persons Endorsement

History reveals this Nation regulated gun ownership on a reputation-based perception of an individual's likelihood to endanger the public.

As noted above, American colonists disarmed certain religious groups.  See *supra* Section IV.D.1.b.  In 1637, colonial Massachusetts ordered the disarmament of about 75 religious dissidents based on "just cause" of suspicion that the dissidents would make a "[sudden eruption upon] those that differ from them in judgment."  1 Records of the Governor and Company of the Massachusetts Bay in New England 211–12 (1853).  Those identified to

58

be disarmed could retain their arms by admitting their supposed wrongdoing to two magistrates. *Id.* at 212. Virginia, in 1756, allowed "two or more" justices of the peace who knew, or "suspect[ed] any person to be a Papist, or shall be informed that any person is, or is suspected to be a Papist" to require the person to come before the justices to take "oaths appointed by act of [P]arliment." 7 William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, at 35-36 (Richmond, Franklin Press 1820). Virginia enacted this law because the government found it "dangerous . . . to permit Papists to be armed." *Id.* at 35. If the suspected Papist failed to take the required oath, the Virginia law prohibited him or her from having firearms. *Id.* at 36. The law was triggered by two or more justices of the peace knowing or suspecting a person of being a Papist—a reputation- or opinion-related inquiry.

Similarly, English and early American colonial governments disarmed "dangerous" or "disaffected persons." See *supra* Sections IV.D.1.a., b. For example, the Continental Congress recommended the colonies to disarm persons "who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies." 4 *Journals of the Continental Congress 1774–1789*, at 205 (1906). Several colonies did just that. See *supra* Section IV.D.1.b. These historical disarmament laws appear both reputation- and opinion-based.

As noted above, early American colonists disarmed slaves for public safety reasons because of fear of a slave revolt. *Id.* Even so, several colonies allowed slaves to carry arms in public or for hunting if granted permission. For example, colonial New York prohibited slaves from having or using any gun unless "in the presence or by the direction of his or her or their Master or Mistress." 2 *Colonial Laws of New York From the Year 1664 to the Revolution*

59

687 (Albany, James B. Lyon 1894).  Then, in 1704, Maryland prohibited slaves from carrying any firearm "from off their master's land without [license] from their said Master."  William H. Brown, *Proceedings and Acts of the General Assembly September 5, 1704–April 19, 1706*, at 261 (1906) (1704 law).  Virginia, in 1723, allowed enslaved or "free negro, mulatto, or [I]ndians . . . living at any frontier plantation . . . to keep and use guns" after "having first obtained a license for the same, from some justice of the peace . . upon the application of such free negros, mulattos, or [I]ndians, or of the owner or owners of such as are slaves."  4 Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, at 131 (Richmond, Franklin Press 1820).   North Carolina, South Carolina, and Georgia likewise prohibited slaves from carrying firearms in public without permission.  Halbrook, *supra* Section IV.D.1.a, at 136 (collecting laws).  While these racist laws certainly violate the Constitution's demand for equal protection and substantive due process, for the purposes of this inquiry, they suggest that a requirement to establish good character to carry firearms is not a novel one.

Starting in the 19th century, Delaware allowed "free negros and free mulattos" to have and possess firearms so long as they obtained a license from a justice of the peace.  Act of Feb. 10, 1832, ch. 172, § 1, 1832 Del. Laws 208 (1841).  To obtain that license, the applicant had to provide a "written certificate of five or more respectable and judicious citizens of the neighborhood" certifying the applicant "is a person of fair character."  *Id.*  Decades later, several municipalities adopted licensing laws requiring character endorsement.  *Ordinances of Jersey City, Passed by the Board of Alderman Since May 1, 1871*, at 86–87 (1873 ordinance allowing municipal court to issue permits to carry pistols in municipality if applicant obtains "a written endorsement of the propriety of granting a permit from at least three reputable freeholders");

*Ordinances of the Mayor, Alderman and Commonalty of the City of New York*, ch. 8, art. 25, § 265, p. 215 (1881) (allowing "officer in command" in police precinct where applicant resides to "make a recommendation to the superintendent of the police" to issue carry permit to applicant "the officer in command" finds "proper" and "law-abiding"); Brooklyn, New York, Common Council of the City of Brooklyn, *An Ordinance to Regulate the Carrying of Pistols* § 2 (Oct. 4, 1980) (substantially similar to New York City's ordinance requiring "officer in command" to make recommendation on carry permit application); *cf. Complied Ordinances of the City of Omaha*, ch. 31, § 6, p. 70 (1881) (providing that the municipality's concealed carry ban did not apply to "well known and worthy citizens, or persons of good repute, who may carry arms for their own protection in going to or from their place or places of business, if such business be lawful").

All in all, early American colonial laws reveal a historical tradition of disarming individuals based on reputational or opinion-based fears of danger.  Later laws required applicants to obtain character endorsements to carry a weapon in public.  While not perfect analogues to Chapter 131's reputable persons' endorsement requirement, this Court finds the above laws establish a historical tradition of firearm regulations based on reputation. *Antonyuk v. Hochul*, ____ F. Supp. 3d. ____, ____, 2022 WL 16744700, at *49–50 (N.D.N.Y. Nov. 7, 2022) (reaching a substantially similar conclusion and refusing to preliminarily enjoin nearly identical character reference requirement in New York's post-*Bruen* gun laws). Therefore, the *Siegel* Plaintiffs are unlikely to prevail on the merits of their Second Amendment challenge to Chapter 131's reputable persons endorsement provision, and so, their motion for a preliminary injunction on that provision of the law will be denied.

b.      **Historical Laws Requiring In-Person Meeting**

This Nation has a historical tradition of requiring arms bearers to appear in-person in connection with the right to keep and bear arms.  Many of the English and early American laws already discussed required in-person meetings with magistrates or justices of the peace relating to firearms.  As noted, individuals suspected of being "dangerous" or "disaffected"— either because of their religious beliefs or attitudes toward the impending Revolutionary War—had to appear in person to take various oaths to keep their firearms.  See *supra* Section IV.D.2.a.  Without doing so, they forfeited their arms.  *Id.*

Besides those disarmament laws, colonial mustering laws (admittedly not in the self-defense realm) required militiamen to appear in person with their weapons for inspection. *Antonyuk*, 2022 WL 16744700, at *57 (reviewing colonial militia mustering laws from Massachusetts, Pennsylvania, Maryland, North Carolina, Virginia, and New York); *see also* Churchill, 25 Law & Hist. Rev. at 161 & n.54 (collecting other militia laws).  In fact, "[s]ome colonials authorized door-to-door surveys of gun ownership." Churchill, 25 Law & Hist. Rev. at 161.

Mid- to late-nineteenth century laws also required individuals seeking to carry a handgun in public to appear in person.  For example, New Jersey's own Jersey City required individuals to make their applications for a carry permit "in open court." *Ordinances of Jersey City, Passed by the Board of Alderman Since May 1, 1871*, at 86–87.  Other jurisdictions imposed similar in-person requirements. *Antonyuk*, 2022 WL 16744700, at *57 (collecting laws).

The above history reveals a historical tradition of requiring individuals to appear in-person relating to possession or use of firearms. *Id.* (finding substantially similar laws "appear sufficiently established and representative to constitute a historical tradition" and

refusing to enjoin New York's gun law's in-person interview requirement of carry permit applicant). Because the in-person interview requirement is limited to determine the applicant's dangerousness or risk of harm to him- or herself and others, N.J. Stat. Ann. § 2C:58-4(c), this Court finds that Chapter 131's interview mandate adheres to this Nation's historical tradition of disarming dangerous individuals or those who would endanger the public safety if allowed to have a firearm. Therefore, the *Siegel* Plaintiffs are unlikely to prevail on the merits of their Second Amendment challenge to Chapter 131's in-person interview requirement of the Carry Permit applicant. Accordingly, this Court will not preliminarily enjoin the enforcement of that provision.

However, this Court could not uncover a single law preventing an arms bearer from exercising his or her right to keep and bear arms unless a government official interviewed an arms bearer's character references. To justify Chapter 131's new requirements, the State must show that historical laws (even analogous laws) imposed a comparable burden on the right to armed self-defense like Chapter 131 does. *Bruen*, 142 S. Ct. at 2133. The State has not made that showing, and the Court should not have "to sift the historical materials for evidence to sustain [Chapter 131]." *Id.* at 2150. The State also has not explained how interviewing an applicants' endorsers will assist a licensing authority to review an applicant's Carry Permit application. Despite ample opportunity, the State refused to call a single witness to justify this new and burdensome requirement. [Docket No. 74.] The State's failure is telling. Without any historical support, Chapter 131's provision requiring a licensing authority to interview a Carry Permit applicant's endorsers violates the Second Amendment. Thus, the *Siegel* Plaintiffs are likely to prevail on the merits of their Second Amendment challenge to Chapter 131's in-person interview requirement of a Carry Permit applicant's endorsers.

c.    **Historical Laws Allowing Licensing Authorities to Request "Such Other Information"**

The State has presented no historical laws supporting Chapter 131's requirement allowing a licensing authority to request "such other information from the applicant or any other person," including the Carry Permit applicant's publicly available statements, the authority "deems reasonably necessary to conduct the review" of a Carry Permit application. N.J. Stat. Ann.  § 2C:58-4(c).  This provision is overbroad and presents potential constitutional problems beyond the Second Amendment and privacy concerns.  *Antonyuk*, 2022 WL 16744700, at *54–55 (preliminarily enjoining similar provision under New York's new gun law).

Imagine a licensing authority requiring a Carry Permit applicant to submit to a blood test or provide a urine sample to determine whether the applicant is an alcoholic or uses controlled dangerous substances.  Chapter 131 allows a licensing authority to deny a Carry Permit to, among others, "any person with a substance use disorder involving drugs" or "any alcoholic."  N.J. Stat. Ann.  §§ 2C:58-3(c)(3), -4(c).  A urine sample or drug test might be "other information" needed to determine whether an applicant is statutorily disqualified from obtaining a Carry Permit under Chapter 131.  That poses thorny Fourth Amendment problems for sure.  Suppose a licensing authority demands a Carry Permit applicant to turn over his or her medical records because Chapter 131 allows a licensing authority to deny a Carry Permit to any applicant "who suffers from a physical defect or disease which make it unsafe for the person to handle firearms."  *Id.*  Such a request is likely an invasion into an applicant's privacy.  *Cf.* N.J. Stat. Ann.  § 2A:84A-22.2 (codifying New Jersey's patient-physician privilege).

64

Besides the lack of historical laws, the State has not explained, or even attempted to explain, how allowing a licensing authority to request "such other information" is necessary, given Chapter 131's other robust requirements, including criminal record checks, fingerprinting, character endorsements, interviewing the applicant, and firearms training, among others.   N.J. Stat. Ann. § 2C:58-4(c).   Again, the State refused this Court's request for an evidentiary hearing to explore such issues.  [Docket No. 74.]

At any rate, because courts must strive to interpret statutes to "avoid constitutional difficulties," *Off. of Senator Mark Dayton v. Hanson*, 550 U.S. 511, 514 (2007), this Court finds Chapter 131's provision allowing a licensing authority to request "such other information" is permissible under the Second Amendment only if the request is limited to objective evidence on the applicant's dangerousness and risk to the public safety.  As noted, this Nation has a historical tradition of keeping firearms out of the hands of dangerous individuals or those who would endanger the public's safety with a firearm.  See *supra* Section IV.D.1.  If appropriate, the licensing authority may request information that is "reasonably necessary" to determine whether the applicant poses a risk of danger to him- or herself or the public if allowed to carry a firearm in public.  This Court's construction provides "narrow, objective, and definite standards" consistent with this Nation's historical tradition to "guide[] licensing officials" to "ensure only those bearing arms in [New Jersey] are, in fact, law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9 (internal citations and quotation marks omitted).

Indeed, Alabama's firearm licensing scheme—acknowledge by the *Bruen* Court for apparent narrow and objective criteria, *see id.* at 2123 n.1, 2138 n.9—allows a licensing authority to request "additional information from the applicant" if the authority cannot determine whether the applicant is statutorily disqualified under the state's licensing law.  Ala.

65

Code § 13A-11-75(d)(2).  Alabama provides several statutory disqualifiers barring individuals from obtaining a carry permit, ranging from the applicant's mental capacity, criminal record, and whether the applicant "[c]aused or causes justifiable concern for public safety." *Id.* § 13A-11-75(c), (d)(1).  Alabama licensing officials' ability to request "additional information" is limited to explicit statutory provisions.  *Id.* § 13A-11-75(d)(2).

If the State wants its licensing officials to have more information to review a Carry Permit application, then the State must present historical laws supporting the request for that information and evidence on why the information is necessary.  The Court directs the parties to take discovery on that issue.  Until then, this Court will deny the *Siegel* Plaintiff's request for a preliminary injunction on Chapter 131's provision allowing licensing authorities to request "such other information" the authority "deems reasonably necessary" so long as the request seeks information on the applicant's dangerousness or risk to the public safety.

### E.   The Constitutionality of Chapter 131's New Fee Schedule

The *Siegel* Plaintiffs also challenge Chapter 131's new fee schedule, arguing the fees violate the Second Amendment and are unconstitutional under *Cox v. New Hampshire*.  [*Siegel* Compl. ¶ 282 (*Siegel* Docket No. 1); *see also Siegel* TRO Br. at 39–40 (*Siegel* Docket No. 8-1).] This Court declines to decide the constitutionality of Chapter 131's new fee schedule now for three reasons.

*First*, the *Siegel* Plaintiffs have not shown they would suffer irreparable harm if required to pay Chapter 131's new fees.  When a plaintiff seeks a preliminary injunction, like the *Siegel* Plaintiffs do here, the plaintiff must show "potential harm which cannot be redressed by a legal or an equitable remedy following a trial."  *Siemens USA Hold., Inc. v. Geisenberger*, 17 F.4th 393, 408 (3d Cir. 2021) (citation omitted).  If a court can remedy a plaintiff's alleged

injury by awarding monetary damages, then preliminary injunctive relief is improper. *See, e.g., Motron v. Beyer*, 822 F.2d 364, 372–73 (3d Cir. 1987). Chapter 131's fees are calculable damages, and thus payment of those fees (even if unconstitutional) can be remedied with an award of monetary damages if the *Siegel* Plaintiffs ultimately prevail. S*ee Cahill v. City of New Brunswick*, 99 F. Supp. 2d 464, 480–81 (D.N.J. 2000) (denying motion for preliminary injunction because plaintiffs failed to show irreparable harm since their alleged injury—$3.00 per hour wage reduction—"is clearly the type of injury which is readily calculated and remedied after the fact by monetary damages"). Thus, the *Siegel* Plaintiffs are not entitled to a preliminary injunction on Chapter 131's new fees.

*Second*, the Court has no information to examine the *Siegel* Plaintiffs' *Cox* challenge to Chapter 131's new fees. Constitutional "fee" jurisprudence has typically arisen in First Amendment challenges to licensing laws requiring a fee to engage in expressive activity, like a parade or rally. *See generally Cox*, 312 U.S. at 576–78; *see also Nationalist Movement v. City of New York*, 481 F.3d 178, 182–87 (3d Cir. 2007). In *Cox*, the Supreme Court considered a First Amendment challenge to a statute requiring individuals seeking to hold a parade to pay a fee. 312 U.S. at 576–77. In upholding the law, the Court found the fee necessary "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Id*. at 577. The Court observed that "there is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated." *Id.* Courts have applied *Cox* to determine the constitutionality of a fee to exercise a constitutional right "by examining whether those fees were designed to defray, and did not exceed, the administrative costs of regulating the protected activity." *Kwong v. Bloomberg*, 876 F. Supp.2d 246, 254 (S.D.N.Y. 2012) (collecting cases), *aff'd*, 723 F.3d 160 (2d. Cir. 2013), *abrogated on other grounds by Bruen*

67

142 S. Ct. 2111.  Several courts have applied *Cox* to determine the constitutionality of a fee to exercise the Second Amendment right to keep and bear arms.  *See, e.g.*, *Kwong*, 723 F.3d at 165 (collecting cases).

In *Kwong*, the Second Circuit found New York's $340 fee for a handgun license permissible under *Cox*.  *Id.* at 167.  There, the parties had engaged in discovery and the evidence showed the "$340 licensing fee [was] designed to defray (and [did] not exceed) the administrative costs associated with the licensing scheme."  *Id.* at 162–63, 166.  The government's evidence consisted of multiple government reports containing information ranging from the revenue generated by licensing fees to the costs associated with processing handgun permit applications.  *Id.* at 165.  Unlike *Kwong*, this Court has no evidence to determine whether Chapter 131's fees are permissible under *Cox*.  The Court is clueless as to revenues generated by firearm permits, the costs licensing authorities incur to process applications, the number of hours needed to process applications, or the staff required to review applications.  Again, despite ample opportunity, the parties declined this Court's invitation for an evidentiary hearing to explore such issues.   [Docket No. 74.]  The Court directs the parties to take discovery on those issues.  Until then, this Court has no basis to enjoin Chapter 131's new fees under *Cox*.

Finally, this Court doubts the merit of the *Siegel* Plaintiff's Second Amendment challenge to Chapter 131's new fees.  A law does not substantially burden a constitutional right simply because it makes the right more difficult or expensive to exercise.  *See Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (internal citation and quotation marks omitted) ("[T]hat a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot

68

be enough to invalidate it."); *see also Kovacs v. Cooper*, 336 U.S. 77, 88–89 (1949) (upholding city ordinance prohibiting the use of sound trucks on First Amendment grounds, explaining "[t]hat more people may be more easily and cheaply reached by sound trucks, perhaps borrowed without cost from some zealous supporter, is not enough to call forth constitutional protection").

In *Bruen*, the Court observed that licensing schemes that require "exorbitant fees" that "deny ordinary citizens their right to public carry" may be subject to constitutional attack. 142 S. Ct. at 2138 n.9.   While *Bruen* provided no guidance on when a fee would be "exorbitant," this Court doubts Chapter 131's new fees are unconstitutionally impermissible. Before *Bruen*, the Second Circuit found New York's $340 fee to obtain a handgun license did not violate the Second Amendment.   *Kwong*, 723 F.3d at 169.   In the First Amendment context, several courts have upheld permit fees higher than Chapter 131's fees.   *See, e.g.*, *729, Inc. v. Kenton Cnty. Fiscal Ct.*, 402 F. App'x 131, 133 (6th Cir. 2011) (rejecting "argument that the $3,000 licensing fee for businesses unconstitutionally deters the exercise of First Amendment rights"); *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1323–24 (11th Cir. 2000) (holding festival permit fees ranging from $95 to $6,500 depending on the size of the festival to be constitutionally permissible).

The *Siegel* Plaintiffs' attempt to show that Chapter 131's fees are impermissible given other jurisdictions' fees is unavailing.   [*Siegel* Post-Argument Br. at 3–5 (Docket No. 122).] That other jurisdictions charge significantly less fees than New Jersey for firearm licenses does not make Chapter 131's new fees unconstitutional.   *Kwong*, 723 F.3d at 166 (rejecting argument that other jurisdictions charge less for firearm permits because that "is simply not the test for assessing the validity of a license fee"); *see also 729,* 402 F. App'x at 133.

While this Court questions the merits of the *Siegel* Plaintiffs' Second Amendment challenge to Chapter 131's new fees, this Court will reserve on that challenge pending an evidentiary hearing. This Court will deny the *Siegel* Plaintiffs' motion for a preliminary injunction on Chapter 131's new fees.

### F.   Chapter 131's Insurance Mandate

As noted above, when enacting Chapter 131, the Legislature imposed a new insurance requirement for individuals seeking to obtain a Carry Permit to carry a handgun in public. 2022 N.J. Laws ch. 131 (Assembly 4769), §§ 3–4 (N.J. Stat. Ann. §§ 2C:58-4(d), -4.3). Starting in July 2023, to obtain a Carry Permit, an applicant must provide proof that he or she has an insurance policy with a $300,000 minimum amount of coverage "insuring against loss resulting from liability imposed by law for bodily injury, death, and property damage sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public." N.J. Stat. Ann. §§ 2C:58-4(d)(4), 2C:58-4.3(a) (the "Insurance Mandate"). An individual with a Carry Permit who wants to carry a firearm in public must also follow the Insurance Mandate. *Id.* § 2C:58-4.3(a).

More specifically, the Insurance Mandate requires a Carry Permit holder to provide proof of the required insurance following "any injury, death, or property alleged to have been caused by the person carrying the handgun in public." *Id.* § 2C:58-4.3(b). A Carry Permit holder caught carrying a handgun in public without the required insurance exposes him- or herself to criminal penalties, *id.* § 2C:58-4.3(c), including up to 18 months in jail and $10,000 in fines, *see id.* §§ 2C:43-3(b)(2), 2C:43-6(a)(4). Further, by not complying with the Insurance Mandate, a Carry Permit holder risks forfeiting his or her Carry Permit. *Id.* § 2C:58-4.3(c)

(providing that a violation of the Insurance Mandate "shall constitute full and sufficient grounds for revocation of a permit to carry a handgun").

Again, only the *Siegel* Plaintiffs challenge the Insurance Mandate. [*Siegel* Compl. ¶ 280 (*Siegel* Docket No. 1).] They contend the Insurance Mandate unreasonably burdens their Second Amendment right to carry a handgun in public for self-defense. [*Siegel* TRO Br. at 39 (*Siegel* Docket No. 8-1); *Siegel* Reply Br. at 66–67 (Docket No. 97).] They argue that under *Bruen*, the Insurance Mandate is unconstitutional because the mandate is a firearm regulation unsupported by historical evidence. [*Id.*]

The State argues the *Siegel* Plaintiffs lack standing to challenge the Insurance Mandate because those plaintiffs likely already satisfy the mandate. [State Opp'n Br. at 70 (Docket No. 91).] The State and its insurance expert, Peter Hochenberger, posit that home, rental, and personal insurance policies typically cover an accidental injury, loss, or death caused by a firearm unless coverage is excluded by the policy. [*Id.*; *see also* Hochenberger Decl. ¶¶ 10, 12 (Docket No. 87).] Thus, the State asserts the Insurance Mandate will not cause the *Siegel* Plaintiffs harm since their existing homeowners or renters insurance policies will likely satisfy the mandate. [State Opp'n Br. at 70.] The State further contends the *Siegel* Plaintiffs' challenge to the Insurance Mandate is not ripe because the mandate takes effect in several months, such that any costs the *Siegel* Plaintiffs may incur to comply with the mandate is speculative since the insurance market for firearm coverage may change. [*Id.* at 71.]

Accordingly, this Court must first determine whether the *Siegel* Plaintiffs have standing to challenge the Insurance Mandate, and whether their challenge is ripe for judicial review.

1.    The *Siegel* Plaintiffs' Standing to Challenge the Insurance Mandate

When a plaintiff brings a pre-enforcement challenge to a criminal statute, like the *Siegel*

Plaintiffs do here, the plaintiff will have standing to challenge the law by showing that:  (1)

he or she intends to engage in conduct "arguably affected with a constitutional interest," (2)

the conduct is "proscribed by a statute," and (3) "there exists a credible threat of prosecution

thereunder."  *Susan B. Anthony List, v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v.*

*Farm Workers*, 442 U.S. 289, 298 (1979)).  To have standing to challenge the law, a plaintiff

need not "expose himself to actual arrest or prosecution to be entitled to challenge a statute

that he claims deters the exercise of his constitutional rights."  *Steffel v. Thompson*, 415 U.S.

452, 459 (1974).  Nor does the plaintiff seeking to challenge such a law need to "confess that

he will in fact violate that law."  *Susan B. Anthony List*, 573 U.S. at 164.

With these principles in mind, the Court finds the *Siegel* Plaintiffs have standing to

bring a pre-enforcement challenge to the Insurance Mandate.  *First*, the *Siegel* Plaintiffs all

wish to engage in conduct affected with a constitutional interest:  carrying a handgun in public

for self-defense.  *Bruen*, 142 S. Ct. at 2134-35.  Before the Legislature enacted Chapter 131,

several *Siegel* Plaintiffs with Carry Permits carried their handguns in public without having

liability insurance as required by the Insurance Mandate, and such individuals have declared

that they would continue to carry in public if Chapter 131's new restrictions were lifted.  *See,*

*e.g.*, [Siegel Decl. ¶¶ 28-45 (*Siegel* Docket No. 8-2)]; *see also Holder v. Humanitarian Law Project*,

561 U.S. 1, 15–16 (2010) (finding plaintiffs had standing to bring pre-enforcement challenge

to criminal statute that outlawed providing material support to designated terrorist groups

where plaintiffs alleged they had provided support to certain designated terrorist groups and

would continue to do so "if the statute's allegedly unconstitutional ban were lifted").

72

*Second*, the *Siegel* Plaintiffs' intended future conduct—carrying a handgun in public for self-defense—is "arguably proscribed" by the Insurance Mandate. *Susan B. Anthony List*, 573 U.S. at 162. The "[a]rguably proscribed is not a stringent test." *N.J. Bankers Ass'n v. Att'y Gen.*, 49 F.4th 849, 855 (3d Cir. 2022). If a statute is broad enough to cover the intended conduct, then the "arguably proscribed" test is met. *Id.* (citing *Susan B. Anthony List*, 573 U.S. at 162). Since Chapter 131 penalizes Carry Permit holders for carrying a handgun in public without complying with the Insurance Mandate, *see* N.J. Stat. Ann. § 2C:58-4.3(c), the "arguably proscribed" test is satisfied, *see Susan B. Anthony List*, 573 U.S. at 162.

*Third*, the *Siegel* Plaintiffs face a credible threat of enforcement. *Id.* at 164. While the Insurance Mandate is not yet effective, the State has not disavowed prosecuting Carry Permit holders who violate the Insurance Mandate. *Id.* at 165; *see also Knife Rights, Inc. v. Vance*, 802 F.3d 377, 386–87 (2d Cir. 2015) (finding credible threat of enforcement where, among other things, defendants did not disavow prosecuting plaintiffs under the statute); *LSO, Ltd. v. Stroh*, 205 F. 3d 1146, 1155 (9th Cir. 2000) ("Courts have . . . considered the Government's failure to disavow application of the challenged provision as a factor in favor of a finding of standing."). The State's silence on its intent to prosecute Carry Permit holders not complying with the Insurance Mandate gives the *Siegel* Plaintiffs "some reason in fearing prosecution." *Babbitt*, 442 U.S. at 302.

The State's bald argument that the *Siegel* Plaintiffs lack standing because they likely satisfy the Insurance Mandate given their homeowners and renters insurance policies is pure speculation. Again, the State chose not to explore the insurance issue with the *Siegel* Plaintiffs through an evidentiary hearing. [Docket No. 74.] Instead, the State prods this Court to engage in the same speculation it did. Notwithstanding this, to accept the State's argument,

73

this Court would have to find that: (1) all the *Siegel* Plaintiffs have the required $300,000 minimum insurance coverage, which they do not; and (2) that their insurance policies will, in fact, cover injuries and property damage caused by the policy owners' use or possession of a firearm—a determination that will vary based on the explicit terms of each Plaintiff's policy.

In any event, two *Siegel* Plaintiffs—Cook and Cuozzo—do not have insurance policies satisfying the Insurance Mandate's minimum coverage amount. [Cook Second Supp. Decl. ¶ 2 (Docket No. 98); Cuozzo Supp. Decl. ¶ 2 (Docket No. 99).] So those Plaintiffs either must procure more insurance at additional cost or forgo their constitutional right to carry a handgun in public for self-defense. This Hobson's choice is enough to confer standing. *Peoples Rts. Org. v. City of Columbus*, 152 F.3d 522, 528–29 (6th Cir. 1998) (finding plaintiffs had standing to challenge city ordinance where plaintiffs faced a "Hobson's choice" to either "possess their firearms in Columbus and risk prosecution under the City's law, or, alternatively, they can store their weapons outside the City, depriving themselves of the use and possession of the weapons"); *see also Artway v. Att'y Gen.*, 81 F.3d 1235, 1246 (3d. Cir. 1996).

## 2. Ripeness of the *Siegel* Plaintiffs' Challenge to the Insurance Mandate

Like standing, ripeness stems from Article III's case-or-controversy requirement. *Susan B. Anthony List*, 573 U.S. at 158 n.5. "The ripeness doctrine serves to determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Siemens*, 17 F.4th at 412 (cleaned up) (quoting *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004)).

To determine whether a case is ripe for judicial review, courts must consider: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977).   When a plaintiff seeks declaratory relief, like the *Siegel* Plaintiffs here, Third Circuit courts employ a "somewhat refined test" by examining:   "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Khodara*, 376 F.3d at 196 (quoting *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 (3d Cir. 1996)).[23]

### a.      The Adversity of the Parties' Interests

"Parties' interests are adverse where harm will result if the declaratory judgment is not entered." *Plains*, 866 F.3d at 541 (quoting *Travelers Ins. Co v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995)).   When the plaintiff's claim involves a threatened government action, a plaintiff does not need to "expose himself to liability before bringing suit to challenge the basis for the threat." *Id.* (quoting *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007)).   If such a claim presents "a real and substantial threat of harm," the claim is ripe for review. *Siemens*, 17 F.4th at 412 n.25 (quoting *NE Hub Partners, L.P., CNG Transmission Corp.*, 239 F.3d 333, 342 n.9 (3d Cir. 2001)).   But if the claim rests on "contingent future events that may not occur as anticipated, or indeed may not occur all," then the claim is not ripe for judicial review. *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 580–81 (1985)).

---

[23] While this refined test "differs in form from the ripeness test articulated in *Abbott Labs* . . . , it is merely a different framework for conducting the same justiciability inquiry." *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 540 (3d Cir. 2017).   *Abbott Laboratories'* hardship and fitness factors still guide the ripeness inquiry. *Id.*

Here, the *Siegel* Plaintiffs' challenge to the Insurance Mandate is ripe because they face a real threat of harm.  Starting in July 2023, if the *Siegel* Plaintiffs do not follow the Insurance Mandate and obtain the required insurance, they cannot carry their handguns in public for self-defense without exposing themselves to criminal liability.  N.J. Stat. Ann. § 2C:58-4.3(c). That the Insurance Mandate does not become effective for several months does not diminish the threat of harm.  *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect.").

Moreover, the *Siegel* Plaintiffs' interests in carrying their handguns in public and the State's interests in enforcing the Insurance Mandate are diverse.  As noted above, the State has not disavowed prosecuting individuals with Carry Permits who violate the Insurance Mandate.  *See, e.g.*, *Pic-A-State,* 76 F.3d at 1299 (finding adversity among parties where government "has not expressly disavowed an intent to prosecute"); *see also Presbytery of N.J. v. Florio*, 40 F.3d 1454, 1468 (3d Cir. 1994) (holding parties' interest were sufficiently adverse where government refused to waive prosecution against plaintiff).  Thus, the Court finds that the parties' interests are adverse.

### b.    Conclusiveness-of-the-Judgment

The conclusiveness-of-the-judgment factor examines whether "a declaratory judgment definitively would decide the parties' rights."  *NE Hub Partners*, 239 F. 3d at 344.  Accordingly, the parties' dispute "must be based on a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts."  *Plains*, 866 F.3d at 542–43 (quoting

*Florio*, 40 F.3d at 1463).  To determine conclusiveness, courts must consider whether:  (1) "the legal status of the parties would be changed or clarified," and (2) "further factual development . . . would facilitate decision, so as to avoid issuing advisory opinions, or the question presented is predominantly legal."  *Mazo v. Way*, 551 F. Supp. 3d 478, 496 (D.N.J. 2021) (omission in original) (quoting *Travelers Ins. Co., v. Obusek*, 72 F.3d 1148, 1155 (3d Cir. 1995) and *NE Hub Partners*, 239 F.3d at 344), *aff'd sub nom. Mazo v. N.J. Sec'y of State*, 54 F.4th 124 (3d Cir. 2022); *see also Siemens*, 17 F.4th at 412 n.25 (observing purely legal issues are likely ripe for judicial review).

Here, declaratory relief would affect the "legal status of the parties" by determining whether the State may require individuals seeking to carry a handgun in public for self-defense to be insured.  *Travelers*, 72 F.3d at 1155.  A judgment now would determine that issue.

Moreover, the *Siegel* Plaintiffs' facial Second Amendment challenge to the Insurance Mandate presents a "purely legal" question with little need for factual development.  *See Susan B. Anthony List*, 573 U.S. at 167 (holding plaintiff's constitutional challenge to false statement statute was purely legal); *see also Florio*, 40 F.3d at 1468–69 (finding First Amendment facial challenge to anti-discriminatory law presented "largely legal issues" and that fact development was unnecessary).  The *Siegel* Plaintiffs' challenge focuses on whether the Insurance Mandate unreasonably burdens their Second Amendment right to carry a handgun in public for self-defense.  [*Siegel* Compl. ¶ 280 (*Siegel* Docket No.1); *Siegel* TRO Br. at 39 (*Siegel* Docket No. 8-1); *Siegel* Reply Br. at 66–67 (Docket No. 97).]  Despite the State's argument, their challenge does not turn on the costs of obtaining insurance required by the Insurance Mandate.  [State Opp'n Br. at 71 (Docket No. 91).]  The *Siegel* Plaintiffs' challenge to the Insurance Mandate will involve interpreting the Second Amendment's text and

determining whether historical firearm laws support it.  *Bruen*, 142 S. Ct. at 2126.  Resolving

the *Siegel* Plaintiffs' challenge to the Insurance Mandate now would determine whether it

infringes on their Second Amendment rights.  *See Florio*, 40 F.3d at 1469.[24]  Accordingly, the

conclusiveness-of-the-judgment factor favors reviewing the *Siegel* Plaintiffs' challenge now.

### c.    Practical Utility of Judgment

The practical utility factor examines whether the parties' conduct will be affected by a

declaratory judgment and the hardship the parties would suffer if the court withheld

judgment.  *Plains*, 866 F.3d at 543–44.   The factor also examines whether declaratory relief

"would be useful to the parties and others who could be affected."  *Id.* at 544 (quoting *Florio*,

40 F.3d at 1470).

Here, a declaratory judgment on the Insurance Mandate's constitutionality would be

useful to the parties and others.  *First*, declaratory relief would help the *Siegel* Plaintiffs

determine whether:  (1) they must obtain additional insurance required by the Insurance

Mandate; or (2) their existing insurance policies satisfy the mandate.  And if this Court were

to withhold judgment, the *Siegel* Plaintiffs with Carry Permits who do not have the required

insurance would suffer harm because they would need to obtain insurance by July 2023 so

they can continue to carry their handguns in public.   *Second*, declaratory relief would help

other Carry Permit holders and those seeking to obtain a Carry Permit because it would clarify

their rights and obligations.  *See Florio*, 40 F.3d at 1470.  *Third*, the State's efforts to enforce

---

[24] Even if this Court were to dismiss the *Siegel* Plaintiffs' challenge to the Insurance Mandate as unripe because the mandate is not yet effective, the *Siegel* Plaintiffs or others with Carry Permits (or seeking Carry Permits) "could easily assert substantially similar facial attacks" to the Insurance Mandate.  *Florio*, 40 F.3d at 1468.  Those future challenges will likely mirror the *Siegel* Plaintiffs' current challenge, and thus, whatever judgment this Court renders now will be determinative.  *See id.*

the Insurance Mandate will be affected by declaratory relief—either the State can enforce the law or not. *Id.* Therefore, a decision now will have practical utility.

To sum up, this Court finds that the *Siegel* Plaintiffs have standing to challenge the Insurance Mandate. The Court further finds that their challenge is ripe for judicial review.

### 3.   The Constitutionality of the Insurance Mandate

To determine whether the Insurance Mandate is constitutional, this Court must first determine whether the "Second Amendment's plain text covers an individual's conduct" sought to be regulated. *Bruen*, 142 S. Ct. at 2129–30. For this inquiry, courts must examine the individual's "proposed course of conduct." *Id.* at 2134. If the individual's conduct falls within the Second Amendment's text, the "Constitution presumptively protects that conduct," and the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

The State first contends the Insurance Mandate falls outside the Second Amendment's text "because it is not regulation of who can bear arms." [State Opp'n Br. at 72 (Docket No. 91).] The State equates the Insurance Mandate with regulations "appurtenant to carrying firearms" like criminal background checks, fingerprinting, and firearms training. [*Id.*] According to the State, the Second Amendment's text does not encompass those types of regulations. [*Id.*]

Next, the State argues the Insurance Mandate is constitutional based on historical laws that allocated the risk of injury caused by guns to the gun owner and away from the victim. [*Id.* at 73–77.] Pointing to 19th century state surety laws and strict liability tort law principles, the State asserts this Nation historically imposed liability on gun owners to compensate those injured by firearms. [*Id.*] Like those historical laws, the State contends the Insurance

79

Mandate ensures gun owners will compensate individuals injured by gun violence.   [*Id.*]
Relying on a decision from the United States District Court for the Northern District of
California upholding an insurance mandate on gun owners, the State asserts this Court should
also decline to enter injunctive relief on the Insurance Mandate.   *Id.* at 75 (citing *Nat'l Ass'n
for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp. 3d 901 (N.D. Cal. 2022)).   The Brady Amici
echo many of the State's arguments.   [Brady Amici Br. at 13–21 (Docket No. 96-1).]

### a.    The Second Amendment's Text

As noted, the Second Amendment's text guarantees an individual's right to carry
firearms in public for self-defense.   *Bruen*, 142 S. Ct. at 2134.   The Second Amendment
presumptively guarantees the *Siegel* Plaintiffs' "proposed course of conduct" of carrying
handguns in public for self-defense.   *Id.* at 2135.

Here, the Insurance Mandate implicates the right to carry firearms in New Jersey
because without complying with the mandate, an individual cannot bear arms in public for
self-defense.   N.J. Stat. Ann. § 2C:58-4.3(c); *cf. Nat'l Ass'n for Gun Rts., Inc.*, 618 F. Supp. 3d
at 915–16 (reviewing Second Amendment challenge under *Bruen* to city ordinance requiring
firearm owners to obtain firearm liability insurance, and finding the proposed course of
conduct of "owning or possessing a firearm without firearm liability insurance" to fall within
the scope of the Second Amendment's text).   Despite the State's argument, the Insurance
Mandate does regulate who can carry firearms in public:   only those insured Carry Permit
holders.   *See* N.J. Stat. Ann. §§ 2C:58-4(d)(4), 4.3(c).

The State mischaracterizes *Bruen* by arguing that the Insurance Mandate falls outside
the Second Amendment's text because the mandate is like background checks the *Bruen* Court
found likely permissible.   [State Opp'n Br. at 72 (Docket No. 91).]   The State's argument rests

on a footnote in the *Bruen* decision discussing "shall-issue" licensing regimes, which do not require a separate showing of need for self-defense before carrying a handgun in public. 142 S. Ct. at 2138 n.9. The *Bruen* Court repeatedly made clear that the Second Amendment protects "the right of *law-abiding*, responsible citizens to use arms for self-defense." *Id.* at 2122, 2131, 2134, and 2150 (emphasis added); *see also Heller*, 554 U.S. at 636. While not passing on the constitutionality of "shall issue" licensing schemes, the *Bruen* Court noted that those licensing schemes "require applicants to undergo a background check or pass a firearms safety course . . . *to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'*" 142 S. Ct. at 2138 n.9 (emphasis added) (quoting *Heller*, 554 U.S. at 635).

The Insurance Mandate, however, does little to ensure that those seeking to carry firearms for self-defense in New Jersey "are, in fact, law-abiding, responsible citizens." *Id.* Indeed, while a person disqualified from carrying a handgun—say because of a felony conviction, *see* N.J. Stat. Ann. §§ 2C:58-3(c), 4(d)(1)—could likely obtain insurance, the person's ability to obtain insurance does not mean they are law-abiding, responsible citizens with the right to carry handguns in public for self-defense, *see Heller*, 554 U.S. at 626 (noting "longstanding prohibitions on the possession of firearms by felons").

### b.    Historical Tradition:  Chapter 131's Insurance Mandate

Since the Second Amendment's text presumptively guarantees the *Siegel* Plaintiffs' right to carry their handguns in public for self-defense, the State must show that historical firearm regulations support the Insurance Mandate. *Bruen*, 142 S. Ct. at 2130. To make that showing, the State must come forward with "relevantly similar" historical regulations that imposed "a comparable burden on the right of armed self-defense." *Id.* at 2132-33.

Before the Court reviews the State's historical analogous to the Insurance Mandate, the Court examines "how" and "why" the Insurance Mandate burdens the *Siegel* Plaintiffs right to carry a handgun in public for self-defense. *Id.* at 2133. As explained above, the Insurance Mandate burdens an individual's right to armed self-defense by: (1) requiring proof of liability insurance to obtain a Carry Permit; and (2) criminalizing the failure to maintain the required insurance while carrying a handgun in public. N.J. Stat. Ann. §§ 2C:58-4(d)(4), - 4.3(a), (c). This burden is placed on all Carry Permit holders and those seeking a Carry Permit. *Id.* New Jersey imposes this burden on Carry Permit holders to compensate individuals or property owners injured by the Carry Permit holder's use or operation of a firearm in public. *Id.* -4.3(b); *see also* [State's Opp'n Br. at 73 (Docket No. 91).]

### i.        Historical Surety Laws

The State first relies on 19th century surety laws from various states to support the Insurance Mandate.[25] These surety laws were designed as crime prevention measures. *Bruen*, 142 S. Ct. at 2149 (internal citation and quotation marks omitted) (explaining "surety laws were intended merely for prevention and were not meant as any degree of punishment"); *see, e.g.*, 1836 Mass. Rev. Stat., ch. 134 (housing surety law in statute entitled "Of Proceedings to Prevent the Commission of Crimes"). The laws typically allowed a magistrate to require an arms bearer to post a surety bond to keep the peace if another individual complained that he or she had "reasonable cause to fear an injury" or "breach of the peace" by the arms bearer. *See, e.g.*, 1836 Mass. Rev. Stat., ch. 134, § 16.

---

[25] 1836 Mass. Rev. Stat., ch. 134, § 16 (Docket No. 90-12); 1838 Terr. Of Wisc. Stat. Rev. § 18 (Docket No. 90-13); Me. Rev. Stat., Ch. 169, § 16 (1840) (Docket No. 90-14); Mich. Rev. Stat., Ch. 162, § 16 (1846) (Docket No. 90-15); 1847 Va. Acts Ch. 14, § 16 (Docket No. 90-3); Terr. of Minn. Rev. Stat., ch. 112, § 18 (1851) (Docket No. 90-17): 1854 Ore. Stat. ch. 16, § 17 (1854) (Docket No. 90-18); D.C. Rev. Code ch. 141, § 16 (1857) (Docket No. 90-19); 1860 Pa. Laws p. 432, § 6 (Docket No. 90-20); W. Va. Code, ch. 153, § 8 (1868) (Docket No. 90-4).

Apart from Virginia and West Virginia, the surety laws required an individual to first bring a complaint against an arms bearer to bond the bearer over.[26]  *See, e.g.*, *id*; *see generally* Halbrook, supra Section IV.D.1.a, at 226–32.  The magistrate would take evidence from the complainant seeking protection and the arms bearer in defense of the complaint.  *See, e.g.*, 1836 Mass. Rev. Stat., ch. 134, §§ 2-4.  If the arms bearer could not show a special need to carry—such as self-defense or defense of others—the magistrate could require the arms bearer to post a bond.  *See, e.g.*, 1836 Mass. Rev. Stat., ch. 134, § 16.  The bond was generally limited to 6 months or a year.  *Id.*; *see also* Me. Rev. Stat., Ch. 169, § 16 (1840) (providing that bond "for keeping the peace for a term, not exceeding one year").  If required to post a bond, an arms bearer "could go on carrying without criminal penalty" and would forfeit the bond only "if he breached the peace or injured others."  *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017).  The forfeited bond was generally paid to the issuing authority. Sidney Childress, *Peace Bonds – Ancient Anachronisms or Viable Crime Prevention Devices*, 21 Am. J. Crim. L. 407, 413 (1994).  But even if required to post a bond, an arms bearer did not forfeit it if he acted in self-defense.  *Wrenn*, 864 F.3d at 661; *see also United States v. Rahimi*, 61 F.4th 443, 459 (5th Cir. 2023) ("If the party of whom surety was demanded refused to post surety, he would be forbidden from carrying a weapon in public absent special need." (citing *Bruen*, 142 S. Ct. at 2148–49)).

These surety laws were "akin to modern public safety infractions like speeding or jaywalking."  *Wrenn*, 864 F. 3d at 661 (quoting *Heller*, 554 U.S. at 633–34).  The laws also

---

[26] Both Virginia and West Virginia did not require a citizen to file a complaint to initiate surety bond proceedings. *See Bruen*, 142 S. Ct. at 2148 n.24 (citing 1847 Va. Acts Ch. 14, § 16 and W. Va. Code, ch. 153, § 8 (1868)).

allowed an arms bearer required to post bond to appeal the magistrate's determination. *See, e.g.*, 1836 Mass. Rev. Stat., ch. 134, § 16.

Given the above, both the "how" and "why" of the 19th century surety laws show the Insurance Mandate is not "relevantly similar" to those laws. Starting with the how, the surety laws only burdened arms bearers after a showing of "reasonable cause" by a complainant who feared injury or a breach of the peace by the arms bearer. Only if the arms bearer could not show a special need to carry would he be required to post a surety bond. Unlike the surety laws that imposed a conditional, partial restriction on an identified arms bearer found to be dangerous, the Insurance Mandate applies to all seeking to carry a handgun in public. And there is no carve-out for self-defense with the Insurance Mandate. Indeed, even if a magistrate required an arms bearer to post a surety bond, an arms bearer did not forfeit the bond if he or she acted in self-defense. *Wrenn*, 864 F.3d at 661.

Further, while the surety laws' burden was temporally limited to six months to a year,[27] the Insurance Mandate's burden here is indefinite. If a person wants to carry a handgun in public for self-defense, the person must be insured. N.J. Stat. Ann. § 2C:584.3. And the Insurance Mandate's stiff penalties—up to 18-months in jail, $10,000 in fines, and loss of the right to carry, *see id.* §§ 2C:43-3(b)(2), 2C:43-6(a)(4), and 2C:58-4.3(c)—are unlike the penalties for violating a surety bond, which are like public safety infractions such as speeding or jaywalking, *see Wrenn*, 864 F.3d at 661. Contrary to the State's argument, the Insurance Mandates' penalties illuminate how the mandate does not impose a burden comparable to the burden the surety laws imposed.

---

[27] *Compare* 1836 Mass. Rev. Stat., ch. 134, § 16, *with* 1847 Va. Acts Ch. 14, § 16.

Turning to the why, the surety laws were aimed to prevent criminal offenses by an identified arms bearer who presented a specific danger to others, *see Bruen*, 142 S. Ct. at 2149—not to shift the risk of gun violence away from victims to all arms bearers as the State claims, *see* State Opp'n Br. at 74 (Docket No. 91).

Moreover, this Court is unpersuaded by the *National Ass'n for Gun Rights* (*NAGR*) decision and declines to adopt that court's reasoning that an insurance requirement on firearm owners is like the above surety laws. 618 F. Supp. 3d at 915–18. The law at issue there was materially different from the Insurance Mandate here. And the court's reasoning rests on a faulty assumption about the insurance underwriting process relating to firearms. In *NAGR*, the City of San Jose passed a local ordinance requiring San Jose residents "who own or possess a firearm to obtain a homeowner's, renter's, or gun liability insurance policy covering losses or damages resulting from any accidental" use of a firearm. *Id.* at 907. The ordinance exempted "peace officers, persons with concealed carry licenses, and persons for whom compliance would create a financial hardship" from obtaining the required insurance. *Id.* (internal quotation marks omitted). Any resident who violates the ordinance's insurance provision was punished by a fine. *Id.* at 908. The city ordinance also contained an "impoundment" provision allowing city officials to impound a resident's firearm if the resident failed to obtain the required insurance. *Id.* But this impoundment provision was "inoperable" because the City of San Jose recognized that "there [was] no currently federal or state law authorizing the City to impound firearms" under the local law. *Id.* Thus, a violation of the insurance requirement was solely punishable by a fine. *Id.*

In declining to find the ordinance's insurance requirement to likely violate the Second Amendment, the *NAGR* Court found the mid-19th century surety laws—the same laws the

State relies on here—were "sufficient analogues" to the ordinance's insurance requirement. *Id.* at 916–17.   Focusing on the penalties, the court found both the surety laws and the insurance requirement were similar because both imposed the threat of financial consequences either through a surety bond or higher insurance premiums.   *Id.* at 917.   The court was unconcerned that the surety laws—unlike the insurance requirement that applies to all firearm owners—imposed a burden on the arms bearer after a magistrate found cause that the arms bearer posed a risk to another or the public.   *Id.*   According to the court, the ordinance's burden in the form of insurance premiums "involves a risk evaluation that *is* tailored to the individual and analogous to 'reasonable cause' determinations under surety statutes," and was therefore similar enough under *Bruen*.   *Id.* at 918 (citing Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance for Firearm Owners: Design Choices and Second Amendment Limits*, 14 Engage 18 (2013)).

Here, unlike the insurance requirement in *NAGR*, the Insurance Mandate does not impose mere financial penalties for failure to comply with the mandate.   As noted above, by flouting the Insurance Mandate, Carry Permit holders face over a year in jail, fines up to $10,000, and risk losing their right to carry in public.   Further, the *NAGR* court's finding—that the city's insurance requirement is like surety laws because of the risk evaluation insurers make when determining a premium—rests on a faulty assumption about the insurance underwriting process.   To make this determination, the *NAGR* court assumed that insurers' inquiry about gun ownership during the underwriting process.   But when determining the premium rates for homeowners and rental insurance policies, research reveals that insurers seldom ask about gun ownership or safe gun storage.   *See* Adam B. Shniderman, *Gun Insurance Mandates and the Second Amendment*, S.C. L. Rev. (forthcoming) (manuscript at 24), available

at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4316203 (last accessed May 10, 2023); *see also* Kristen Moore & Craig Reynolds, *Firearm Risk: An Insurance Perspective*, The Actuary Magazine (June/July 2018), available at: https://www.theactuarymagazine.org/firearm-risk/ (last accessed May 10, 2023). Indeed, the State's own insurance expert, Peter Hochenberger (whom the State did not call as a witness), recognizes that homeowners or renters insurance policies do not typically have firearm exclusions. [*See* Hochenberger Decl. ¶ 12 (Docket No. 87).] This, of course, suggests that those types of insurers do not ask about gun ownership. Thus, this Court does not accept the *NAGR* court's reasoning.

### ii.   Tort Law: Strict Liability against Gun Owners

Next, pointing to various 19th century judicial decisions imposing strict liability on firearm owners, the State contends that, because this Nation has historically required gun owners to compensate those they injure, the Insurance Mandate is justified accordingly. [State Opp'n Br. at 75–77 (citing *Cole v. Fisher*, 11 Mass. 137 (1814); *Moody v. Ward*, 13 Mass. 299 (1816); and *Welch v. Duran*, 36 Conn. 182 (1869)) (Docket No. 91).]

True, some jurisdictions imposed liability against gun owners who caused injury to another or to one's property under trespass or strict liability theories. *See, e.g.*, *Cole*, 11 Mass. at 138–39 (discussing trespass and strict liability theories for discharging firearms near highways, and stating that "the party injured, either in his person or property, by the discharge of a gun . . . is entitled to redress in a civil action"); *Welch*, 36 Conn. at 182, 185–86 (discussing trespass theory for liability against firearm owner who injured another). "Why" these jurisdictions burdened arms bearers overlap with the Insurance Mandate: to provide redress to those individuals injured by firearms.

87

But "how" these jurisdictions burdened an individual's right to keep and carry firearms is materially different from the Insurance Mandate.  Unlike the Insurance Mandate that applies to all Carry Permit holders  whether or not they caused an injury, the jurisdictions that historically imposed liability against gun owners did so only after an injury to another (or to property) and after an adversarial proceeding. *See, e.g.*, *Cole*, 11 Mass at 138–39.  Those 19th century jurisdictions did not take the prophylactic approach that New Jersey takes here with the Insurance Mandate.

All in all, the very existence of these 19th century tort law principles demonstrates that the Insurance Mandate is unconstitutional. *Bruen*, 142 S. Ct. at 2131 ("[I]f earlier generations addressed the societal problem, but did so through materially different means, that . . . could be evidence that a modern regulation is unconstitutional.").  Firearm injuries have occurred throughout this Nation since its founding.  Yet the State has not shown that earlier generations addressed this problem by mandating that all arms bearers obtain insurance or post a bond to prevent injuries that may not occur. *Bruen*, 142 S. Ct. at 2150 (explaining that courts "are not obliged to sift the historical materials to sustain" a modern firearm regulation because that is the government's "burden").   All the State has shown is that this Nation has provided means for those injured by firearms to seek redress through the courts after an injury. [State Opp'n Br. at 75–77 (Docket No. 91).]  But even without the Insurance Mandate, New Jerseyans injured by firearms still have that option by bringing a tort claim against the firearm owner causing the injury.  *See generally Palmino v. Ehrig*, 408 A.2d 1083, 1085 (N.J. Sup. Ct. App. Div. 1979) (recognizing that firearms are "inherently dangerous instrumentalities" and explaining that "[o]ne who possesses firearms is under a duty to use extraordinary care in their handling" that requires firearm owners to take measures to protect others).

While *Bruen* does not demand a historical firearm regulation to be a "dead ringer" or "twin" for a modern firearm regulation to pass constitutional muster, the modern law must still be "relevantly similar" to the historical law and impose a comparable burden on the right to armed self-defense. 142 S. Ct. at 2132–33. Comparing the "how" and "why" of the Insurance Mandate to the "how" and "why" behind the surety laws and tort principles the State rely on, this Court finds the Insurance Mandate is too dissimilar and imposes a greater burden on the right to self-defense than the historical laws the State has presented.

Accordingly, this Court finds the *Siegel* Plaintiffs have shown they are likely to prevail on their Second Amendment challenge to the Insurance Mandate.[28]

## G.   New Jersey's "Sensitive Place" Laws

### 1.   Plaintiffs' Standing to Challenge Chapter 131's Handgun Ban in "Sensitive Places" and Related New Jersey Laws that Pre-Date *Bruen*

The Court incorporates its earlier findings from the TRO phase of this litigation regarding whether Plaintiffs have met their burden to establish Article III standing as to each of the sensitive place laws they challenge. Plaintiffs' sworn declarations generally follow the same structure and affirm that such individuals obtained, or intend to apply for, a Carry Permit for the purpose of self-defense. For example, Plaintiff Muller was a victim of a vicious kidnapping and successfully obtained a Carry Permit pursuant to the State's previous

---

[28] This Court is unpersuaded by the State's reliance on various cases upholding insurance requirements in the First Amendment context and state compulsory auto insurance laws. [State Opp'n Br. at 73 n.72 (Docket No. 91).] First, the First Amendment cases the State relies on employed First Amendment means-end scrutiny tests to uphold the insurance or bond requirements. *See Thomas v. Chicago Park Dist.*, 227 F.3d 921 (7th Cir. 2000); *Gerritsen v. City of Los Angeles*, 994 F.2d 570 (9th Cir. 1993); *Jacobsen v. Harris*, 869 F.2d 1172 (8th Cir. 1989). *Bruen* forecloses the use of means-end scrutiny when reviewing a Second Amendment challenge to a firearm law. 142 S. Ct. at 2126. Second, the various cases upholding compulsory automobile insurance laws are inapposite because unlike the Second Amendment's right to keep and bear arms, there is no constitutional right to drive. *See, e.g., Thrasher v. Abernathy*, 2017 WL 735684, at *5 (S.D. Ind. Feb. 24, 2017) ("[T]here is not a fundamental right to drive a motor vehicle.").

"justifiable need" standard.  [Muller Decl. ¶ 36 (Docket No. 12).]  Generally, each of the sworn declarations filed and supplemented by the individual Plaintiffs:  (1) describes when such individual previously frequented or visited an enumerated sensitive place, as applicable; (2) explains that handguns were generally permitted in such place(s) until the amendments to Chapter 131; and (3) declares a fear of prosecution for carrying a handgun in any of the State's enumerated sensitive places going forward.  [*See*, *e.g.*, Koons Decl. ¶¶ 9–13 (Docket No. 10).] Plaintiffs also generally declare an intent to resume carrying handguns with them wherever lawfully permitted for self-defense.  [*Id.* at ¶ 14.]

The Court previously ruled that the *Koons* Plaintiffs had standing at the TRO phase as to each of the five sensitive places they challenged.  [*Koons* TRO Op. at 21–27 (Docket No. 34).]  However, the Court found that the *Siegel* Plaintiffs lacked standing as to certain challenged sensitive place laws at the TRO phase, namely those applicable at zoos, medical and treatment facilities, airports, movie sets, and the Fish and Game Restrictions.  [*Siegel* TRO Op. at 14–21 (Docket No. 51).]  To clarify this distinction, the Court provided the below rationale in discussing whether the prospective injury alleged by the *Koons* Plaintiffs and the *Siegel* Plaintiffs, respectively, was concrete, particularized, and actual or imminent:

> Both the *Koons* Plaintiffs and *Siegel* Plaintiffs allege, generally, that they have visited the challenged "sensitive places" in the past.  However, the Court is not satisfied that the threat of criminal penalty for not abiding by the requirements of Chapter 131 is imminent based on such allegations alone.  What distinguishes the limited, challenged "sensitive places" in *Koons* from the longer list of challenged places [in *Siegel*] is that in *Koons* the sensitive places were not only "generally open to the public and where ordinary persons like Plaintiffs would be expected to frequent upon occasion," but also places where the *Koons* Plaintiffs visited as part of their ordinary, daily routines.  Thus, the Court could determine from the *Koons* Plaintiffs' sworn declarations that the threat of criminal penalty was imminent if the Court did not temporarily enjoin enforcement of the

> applicable provisions.   Conversely, [in *Siegel*,] there is no
> imminent threat of criminal penalty in places infrequently visited
> by Plaintiffs or locations where Plaintiffs make plans far in
> advance to visit and thus, are not likely to be a part of or
> "happened upon" as part of the Plaintiffs' ordinary, daily
> routines.

[*Id.* at 15 (citations omitted).]  Also applicable at the PI phase of litigation is the Court's earlier finding that "once one plaintiff is found to have standing as to a claim, the Court need not inquire as to the standing of other plaintiffs on that claim for purposes of the Motion."[29]  [*Siegel* TRO Op. at 14–15 (citing *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 826 n.1 (2002)).]

On the one hand, "[s]tanding is not dispensed in gross," and Plaintiffs "must demonstrate standing for each claim," as well as "for each form of relief that is sought." *Davis*, 554 U.S. at 734 (first quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); then quoting *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).  Accordingly, Plaintiffs must demonstrate standing as to each of the sensitive places covered by the challenged provisions, including those that cover more than one category or subcategory of an enumerated "sensitive place" (such as N.J. Stat. Ann. § 2C:58-4.6(a)(21), which is applicable in over twenty different types of medical and treatment facilities).

On the other hand, Plaintiffs' declarations should not be held to some overly exhaustive standard to establish Article III standing, provided that the prospective injury they face is, in fact, (1) "concrete, particularized, and actual or imminent; ([2]) . . . likely caused by [the State]; and ([3]) . . . likely [redressable] by judicial relief." *Ramirez*, 141 S. Ct. at 2203

---

[29] It is also true that "[e]very class member must have Article III standing in order to recover *individual* damages." *Ramirez*, 141 S.Ct. at 2208 (emphasis added).  However, individual damages are not applicable at the current PI phase of litigation.

(citing *Lujan*, 504 U.S. at 560).  Again, the Court rejects the notion that Plaintiffs must allege

the precise date and time on which they intend to next visit each of Chapter 131's long list of

sensitive places.  Such a burden is not only too demanding given Article III standing

requirements as restated by the *Ramirez* Court, but also impractical.  As the Court explained

at the TRO phase, "people's lives do not necessarily lay out into a scheduling book that run[s]

six months or a year . . . into the future," and some provisions even contain catch-all

categories, including Chapter 131's handgun ban in all entertainment facilities "including but

not limited to" those enumerated.  [*Koons* TRO Op. at 25.]

The Court now considers, in turn, the three requirements to establish Article III

standing and whether Plaintiffs have met their burden with respect to the sensitive place laws

they challenge.

### a.      Whether Plaintiffs Have Shown a Prospective Injury that is Concrete, Particularized, and Imminent

Before considering whether Plaintiffs' sworn declarations demonstrate a prospective

injury that is concrete, particularized, and actual or imminent, the Court makes two initial

observations.  First, the individual Plaintiffs who assert standing to challenge these sensitive

place laws are persons who already hold valid handgun carry permits from the State.  Thus,

the Court incorporates its prior finding—which the parties do not dispute—that the

prospective injury alleged by Plaintiffs in the form of significant potential criminal penalties

is particularized.  [*See Koons* TRO Op. at 22 n.7.]  After all, the very same underlying conduct

of carrying a handgun, for which these individuals hold a license from the State to engage in,

generally, is now criminalized by the State.  Second, considering the procedural posture of

this case and what constitutes a sufficiently actual or imminent injury for purposes of the

pending motions, any preliminary restraints issued by this Court will remain in effect during

the pendency of any appeal or this Court's ruling on a permanent injunction after discovery has concluded, which could potentially take years.

The Court now considers whether Plaintiffs' prospective injury in each of the challenged sensitive places is sufficiently concrete and imminent, which Plaintiffs can establish by alleging an intent "to return to the places they had visited before—where they will presumably" be deprived of their Second Amendment rights to carry a handgun for self-defense. *Lujan*, 504 U.S. at 564. By contrast, "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be— do not support a finding of the 'actual or imminent' injury." *Id.* (citations omitted).

***Public Gatherings or Demonstrations Requiring a Government Permit:*** The Court finds that Plaintiffs have shown a sufficiently concrete and imminent prospective injury with respect to Chapter 131's handgun ban "within 100 feet of a place for a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event." N.J. Stat. Ann. § 2C:58-4.6(a)(6). In short, the parties no longer quarrel over whether a "public gathering" will even occur in New Jersey during the pendency of the next phase of litigation.[30] Many of the *Siegel* Plaintiffs also specifically aver that they regularly will encounter such public gatherings "from time to time." [*See, e.g.*, Siegel Decl. ¶ 23, (*Siegel* Docket No. 8-2).]

***Zoos:*** As to Zoos, Plaintiff Siegel has plans to take his son to the Turtle Back Zoo on May 25, 2023. [Siegel First Supp. Decl. ¶ 5 (Docket No. 64).] Plaintiff Cook also has concrete

---

[30] At oral argument on their TRO motion, the *Siegel* Plaintiffs previously withdrew their application for temporary restraints as to this provision. This concession was made after the State expressed a concern that a "public gathering" might not even occur during the relatively short TRO phase of litigation. [*See Siegel* TRO Op. at 19–20 (Docket No. 51).] In response, the State agreed to withdraw their standing challenge until the longer PI phase of litigation. [*Id.* at 20.]

plans to visit the Popcorn Zoo in Forked River on May 20, 2023.  [Cook First Supp. Decl. ¶ 2 (Docket No. 65).]  Plaintiff DeLuca plans to visit the Cape May Zoo with his wife over the upcoming Memorial Day weekend and will refrain from carrying his handgun because of Chapter 131.  [DeLuca First Supp. Decl. ¶ 2 (Docket No. 66).]  Accordingly, Plaintiffs have shown a concrete and imminent prospective injury at zoos.

*Parks, Beaches, Recreational Facilities, and Playgrounds:*  Both the *Koons* and *Siegel* Plaintiffs challenge Chapter 131's handgun ban at parks, beaches, recreational facilities, and playgrounds, N.J. Stat. Ann. § 2C:58-4.6(a)(10), and the *Siegel* Plaintiffs challenge a related, preexisting New Jersey regulation banning firearms in state parks, N.J. Admin. Code. § 7:2-2.17(b).  The Court is satisfied that these laws touch upon places frequented by Plaintiffs as part of their daily lives where they can no longer carry their handguns without fear of criminal prosecution.  For example, Plaintiff Siegel avers that he frequently hikes and walks his dog in public parks near his home and goes to publicly owned beaches, including Wildwood, in New Jersey.  [Siegel Decl. ¶ 11 (*Siegel* Docket No. 8-2).]  Plaintiff Cook also enjoys State parks and public beaches several times per month in Seaside, Avon, Belmar, Point Pleasant, and Manasquan New Jersey.  [Cook Decl. ¶ 8 (*Siegel* Docket No. 8-3).]  Plaintiff Tal, who joined as a *Koons* Plaintiff after the filing of the Amended Complaint, also lives near several parks, including Holmdel Park, Manasquan Reservoir, and Dorbrook Recreation Area (all part of the Monmouth County Park System).  [Tal Decl. ¶ 20 (Docket No. 70).]  Similarly, Plaintiff Gaudio lives near several parks in the Camden County Park System and submitted a supplemental declaration explaining that "around the time of Chapter 131's enactment, the Camden County Board of Commissioners" passed a restriction on carrying any firearm in any sensitive area within Camden County.  [Gaudio Supp. Decl. ¶ 3 (Docket No. 71).]

Importantly, they aver that they would carry a handgun when frequenting these places if permitted by New Jersey law.  Thus, the Court finds that Plaintiffs have met the first prong of the *Ramirez* standing inquiry to challenge to N.J. Stat. Ann. § 2C:58-4.6(a)(10) and N.J. Admin. Code § 7:2-2.17(b).

*Youth Sports Events:*  As to Chapter 131's handgun ban at Youth Sports Events, Plaintiff Siegel avers that he regularly takes his son to Tae Kwan Do classes at a martial arts school located in a strip mall, as well as to Tae Kwan Do competitions.  [Siegel Decl. ¶ 12 (*Siegel* Docket No. 8-2).  Based on these allegations, the Court is satisfied that Plaintiff Siegel's son will continue to participate in such Tae Kwan Do classes and competitions as this suit proceeds and, thus, that Plaintiffs have demonstrated a concrete and imminent injury to challenge that provision of Chapter 131, N.J. Stat. Ann. § 2C:58-4.6(a)(11).

*Public Libraries and Museums:*  Plaintiffs have also shown a concrete and imminent injury sufficient to challenge Chapter 131's handgun ban at public libraries and museums, N.J. Stat. Ann. § 2C:58-4.6(a)(12).  Although Plaintiff Muller does not recall visiting a museum since obtaining a concealed carry permit, he has carried a handgun "while visiting the library."  [Muller Decl. ¶ 10 (Docket No. 12).]  Plaintiff Siegel also "frequently take[s] [his] son to museums throughout New Jersey [and] the public library."  [Siegel Decl. ¶ 13 (*Siegel* Docket No. 8-2).].  In addition, the Court incorporates its prior finding that public libraries and museums are places "generally open to the public" and places where many individuals like Plaintiff Siegel can be "expected to frequent" as part of their ordinary, daily lives.  [*Koons* TRO Op. at 24 (Docket No. 34).]

*Bars and Restaurants Where Alcohol is Served:*  As to Chapter 131's handgun ban at bars and restaurants that serve alcohol, N.J. Stat. Ann. § 2C:58-4.6(a)(15), the *Koons* Plaintiffs each

95

aver that on many occasions they have carried their handguns at bars and restaurants that serve alcohol, and they have visited such locations even though some do not consume alcohol. [*See* Koons Decl. ¶ 9; Gaudio Decl. ¶ 9; Muller Decl. ¶ 9 (Docket Nos. 10–12).]  Plaintiff DeLuca's brother owns a restaurant at South Jersey Regional Airport in Lumberton, New Jersey, and DeLuca is allowed to carry a handgun there per the bar's own policies when he visits.  [DeLuca Supp. Decl. ¶ 3 (Docket No. 66).]  The Court is also convinced that bars and restaurants are establishments where ordinary members of the public, like Plaintiffs, will continue to frequent as a regular part of their day-to-day lives.

*Entertainment Facilities:*  For Chapter 131's handgun ban at entertainment facilities, N.J. Stat. Ann. § 2C:58-4.6(a)(17), Plaintiffs provide many examples of different types of entertainment facilities they frequent.  Plaintiff Muller has carried a handgun "at music events conducted in public arenas and in theaters."  [Muller Decl. ¶ 10 (Docket No. 12).]  Plaintiff Siegel and his family go to movies together "one or two times per month" and he also attends concerts at different venues throughout New Jersey.  [Siegel Decl. ¶ 16 (*Siegel* Docket No. 8-2).]  Sometimes, Plaintiff Siegel attends hockey games in Newark.  [*Id.* ¶ 17.]  From time to time, Plaintiff Cook goes to the movies, concerts, the Medieval Times theatre, and races at the Atco Dragway racetrack in Waterford Township, New Jersey.  [Cook Decl. ¶¶ 12, 16 (Siegel Docket No. 8-3).]  Accordingly, Plaintiffs face a concrete and imminent prospective injury at entertainment facilities.

*Casinos:*  As to Chapter 131's handgun ban at Casinos, N.J. Stat. Ann. § 2C:58-4.6(a)(18), as well as the related New Jersey's Division of Gaming regulation barring firearms in casinos, N.J. Admin. Code § 13:69D–1.13, the Court finds Plaintiffs have demonstrated a concrete and imminent prospective injury.  Plaintiffs Cook and DeLuca each

enjoy trips to the Atlantic City casinos once per month.  [Cook Decl. ¶ 15; DeLuca Decl. ¶ 10 (*Siegel* Docket Nos. 8-3, 8-4).]  Additionally, Plaintiff DeLuca visits a friend who lives on a boat in Farley State Marina and must traverse casino property to access the Marina. [DeLuca Decl. ¶ 11 (*Siegel* Docket No. 8-4).]  Plaintiff Siegel avers that he too enjoys regular trips to the Atlantic City casinos.  [Siegel Decl. ¶ 18 (*Siegel* Docket No. 8-2).]  Plaintiff Muller has carried a handgun "while attending trade shows at casinos . . . held in conference rooms away from the gambling floors."  [Muller Decl. ¶ 10 (Docket No. 12).]  Accordingly, Plaintiffs have set forth sufficient facts to establish standing as to casinos.

***Airports and Transportation Hubs:***  For Chapter 131's handgun bans at airports and transportation hubs, N.J. Stat. Ann. § 2C:58-4.6(a)(20), the Court find that Plaintiffs have met their standing burden.  Plaintiff Tal "would carry a handgun in connection with using [his] airplane," which he uses two to three times per week, weather permitting, and lands at airports throughout the region including in New Jersey.  [Tal Decl. ¶ 19 (Docket No. 70).] Plaintiff Tal asserts that, if permitted, he "would carry a handgun while using public transportation and public transportation hubs."  [*Id.* at 21.]  Plaintiff Gaudio avers that he has checked a gun in his baggage since becoming a non-resident carry permit holder in Florida in 2009, but now travels without a handgun because there is no longer a way to transport a handgun in New Jersey from a vehicle to the baggage counter.  [Gaudio Supp. Decl. ¶ 6 (Docket No. 71).]  "From time to time," Plaintiff Siegel drives friends and family to and from Newark Airport.  [Siegel Decl. ¶ 20 (*Siegel* Docket No. 8-2).]  Plaintiff Siegel also sometimes attends New Jersey Devils hockey games at the Prudential Center in Newark and takes the bus or train.  [*Id.* ¶ 17.]  When taking the train, his trip terminates at Newark Penn Station. [*Id.* ¶ 18.]  Plaintiff Cook will be dropping family off at the Newark Airport for a pre-planned

trip to Florida on June 22, 2023.  [Cook Supp. Decl. ¶ 3 (Docket No. 65).]  Plaintiff Varga

will be flying from Newark Airport in mid-June 2023 to attend a work event and would bring

his handgun to transport in checked baggage if he did not fear prosecution for violating

Chapter 131. [Varga Supp. Decl. ¶ 4 (Docket No. 67).]  Plaintiffs also submitted a Declaration

for Association of New Jersey Rifle & Pistol Clubs, Inc. member Ronald D'Angelo, who

owns and flies small airplanes once or twice per week at various New Jersey airports,

including Lakewood Airport, Old Bridge Airport, Trenton Airport, Cape May/Wildwood

Airport, and Atlantic City Airport; he also spends four or five days per week at Monmouth

Executive Airport maintaining his plane.  [D'Angelo Decl. ¶ 2 (Docket No. 100).]  The Court

concludes that Plaintiffs have met their standing burden as to airports and transportation

hubs.

*Health Care Facilities:*  The Court finds that Plaintiffs have standing to challenge

Chapter 131's handgun ban at health care facilities, N.J. Stat. Ann. § 2C:58-4.6(a)(21), but

<u>only</u> as to medical offices and ambulatory care facilities frequented by the individual

Plaintiffs.  The Court finds that the definition under the new legislation is undefined, is overly

broad, and, therefore, at this stage of the proceedings, the Court limits its standing analysis to

the facilities specifically named by Plaintiffs in this litigation.

As to medical offices, Plaintiff Muller has "carried [his] handgun during appointments

with both [his] physician and the dentist." [Muller Decl. ¶ 10 (Docket No. 12).]  Similarly,

Plaintiff Gaudio has carried a handgun while visiting health care facilities, including his

primary care physician, dentist, and his daughters' pediatrician, among others.  [Gaudio

Supp. Decl. ¶ 7 (Docket No. 71).]  Plaintiff Siegel also has upcoming appointments with his

dentist and anesthesiologist/pain management specialist for chronic degenerative disc disease

and spinal stenosis; he avers that he could carry his handgun with him to these appointments notwithstanding Chapter 131.  [Siegel Supp. Decl. ¶¶ 3–4 (Docket No. 64).]  Plaintiff Varga is regularly treated by a chiropractor, either weekly or biweekly, whose internal policies permit handgun carry notwithstanding the new law.  [Varga Supp. Decl. ¶ 5 (Docket No. 67).]

As to ambulatory care facilities, Plaintiff Siegel is a practicing nurse practitioner who works "variously at medical offices and medical boarding homes," including Skylands Urgent Care in Lake Hopatcong, New Jersey and Free Clinic Newton in Newton, New Jersey. [Siegel Supp. Decl. ¶ 2 (Docket No. 64).]  According to Siegel, Skylands Urgent Care would allow him to carry a handgun notwithstanding Chapter 131.  [*Id.* ¶ 8.]

General hospitals are indeed a closer call.  Plaintiffs do not specify whether visits to their general physicians occur in a general hospital or medical office.  Regardless, Plaintiffs attend routine chiropractor and dentist appointments, making it clear that there is an imminent and concrete threat at medical offices.  Plaintiff Gaudio made an unplanned trip to the emergency room after his daughter was in a car accident mid-December.  [Gaudio Supp. Decl. ¶ 7 (Docket No. 71).]  But notions of unplanned, medical emergencies undermine the requisite showing here that Plaintiffs face a concrete and imminent injury.  Plaintiff Tal "works at a men's health clinic in Parsippany, New Jersey."  [Tal Decl. ¶ 3 (Docket No. 70).] Chapter 131's handgun ban applies at "public health centers"; however, it is the Court's understanding that such institutions are commonly understood to refer to community-focused institutions run by the State to promote certain public health initiatives, which is distinct and separate from a men's health clinic.

The Court finds that Plaintiffs have <u>not</u> met their standing burden as to the following types of medical facilities listed in Chapter 131:  general hospital, special hospital, psychiatric

hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, and residential health care facility.   Further, nothing in Plaintiffs' Declarations supports their standing to challenge Chapter 131's handgun ban at medical facilities that provide addiction or mental health services and are licensed or regulated by applicable State agencies, N.J. Stat. Ann. § 2C:58-4.6(a)(22).  Thus, Plaintiffs lack standing to challenge that provision of Chapter 131, as well.

*Public Film Locations:*   The Court is satisfied that Plaintiffs have shown a concrete and imminent injury as to Chapter 131's handgun ban at public film sets, N.J. Stat. Ann. § 2C:58-4.6(a)(23).  Plaintiff Cook likes to visit movie sets, including filming in Middletown, New Jersey during March and April 2023 of "Mean Girls The Musical."  [Cook First Supp. Decl. ¶ 5 (Docket No. 65).]  He also would like to see filming for "Joker 2," which will occur in New Jersey this year.  [Cook Second Supp. Decl. ¶ 3 (Docket No. 98).]  And Plaintiff Cook recently stumbled on a filming location while lawfully carrying a handgun at the Monmouth Mall in Middletown, New Jersey, where scenes for the television show The Walking Dead were being filmed.  [Cook Third Supp. Decl. ¶¶ 2-3 (Docket No. 115).]  Plaintiff Cook "immediately turned around and left the mall" out of fear of arrest and prosecution.  [*Id.* at ¶¶ 3-4.]  The *Siegel* Plaintiffs also filed a declaration from Association of New Jersey Rifle & Pistol Clubs, Inc. member Ria Jairam, who has a Carry Permit and would use it while filming videos for YouTube.  [Jairam Decl. ¶¶ 6, 12 (Docket No. 68).]  Therefore, the Court finds that Plaintiffs have met their standing burden as to public film sets.

*Fish and Game Restrictions:*  As to the Fish and Game Restrictions, Plaintiff Siegel avers that "every year, I take my son deer hunting in the woods and fields of New Jersey." [Siegel Decl. ¶ 15 (*Siegel* Docket No. 8-2).]  At the TRO phase, the Court found that there was no imminent threat as to the Fish and Game Restrictions because "deer season in New Jersey is in the late autumn and early winter."  [*Siegel* TRO Op. at 19.]  However, such concern is no longer applicable, and the Court's ruling on the pending motions will likely be applicable at least through deer season this year.  Thus, the Court finds that *Siegel* Plaintiffs have shown a prospective injury that is imminent and concrete during the now relevant timeframe.

But this Court finds the *Siegel* Plaintiffs lack standing to challenge the Fish and Game Restrictions barring "firearm[s] of any kind . . . within the limits of a state game refuge."  N.J. Admin. Code § 7:25-5.23(i).  No *Siegel* Plaintiff, including Siegel himself, has declared an intent to visit a state game refuge (ever or during this lawsuit), so the *Siegel* Plaintiffs lack a cognizable interest in challenging that provision.  The Court also questions the propriety of the challenge, as the provision appears calculated to protect animals from hunters in designated state game refuges.  In any event, this Court dismisses the *Siegel* Plaintiffs' challenge to N.J. Admin. Code § 7:25-5.23(i), without prejudice.

*Private Property and Vehicles:*  Finally, the Court considers Chapter 131's handgun ban on all private property unless consent is given, and the law's prohibition on functional firearms in vehicles.  N.J. Stat. Ann. § 2C:58-4.6(a)(24), (b)(1).  This Court incorporates its earlier findings that such restrictions applicable on all private property without express consent and on carrying functional firearms in vehicles, respectively, both sweep so broadly that there is no doubt that Plaintiffs have demonstrated a concrete and imminent injury. [*Siegel* TRO Op. at 16.]  Not only are these provisions applicable to the vast majority of New

Jersey, but also Plaintiffs have averred that their daily routines have involved shopping, driving, and doing business at many privately-owned businesses throughout the State.  [*See, e.g.*, Koons Decl. ¶ 9 (Docket No. 10).]  Plaintiff Koons also specifically avers that once he received his Carry Permit in October 2022, he carried "while driving or riding in a car."  [*Id.* ¶ 9.]  Plaintiff Muller would also "normally" carry a handgun while driving in his car (or in anyone else's) and would carry the handgun in a holster on his person so that it was available and usable in case of an attack.  [Muller Decl. ¶ 13 (Docket No. 12).]  Obviously, § 2C:58-4.6(a)(24) covers locations generally open to the public where ordinary persons, including Plaintiffs, would be expected to frequent as part of their daily lives.  [*See Siegel* TRO Op. at 15.]  Accordingly, Plaintiffs' threatened prospective injury is both concrete and imminent with respect to both of these sweeping provisions.[31]

### b.  Plaintiffs' Demonstrated Injury is Likely Caused by the State

The Court finds that Plaintiffs have clearly met the second requirement of Article III standing, given that the named State officials are directly responsible for enforcing the criminal laws of New Jersey and the Intervenor-Defendants are directly responsible, in part, for Chapter 131's enactment.  At the TRO hearing in *Koons*, the Court further explored the threat of prosecution for violations of Chapter 131.  However, the State would not agree to forego prosecution of applicable laws, and their position remains unchanged.  [*Koons* TRO

---

[31] The *Siegel* Plaintiffs also challenge Chapter 131's language preceding the sensitive places designation that states the law's handgun ban applies "in or upon any part of the buildings, grounds, or parking area" of the designated sensitive place.  N.J. Stat. Ann. § 2C:58-4.6(a).  They also challenge N.J. Stat. Ann. § 2C:39-5(e)'s language making it unlawful to carry a firearm "*upon any part of the buildings or grounds* of any school, college, university, or other educational institution." (emphasis added on challenged language).  This Court specifically addressed these challenges at the TRO stage, denying them as moot given the State's interpretation of "school" and Chapter 131's exemption when traveling on a right-of-way that touches or crosses a designated sensitive place.  [*Siegel* TRO Op. at 41–43 (Docket No. 51).]  The Court sees no need to address the *Siegel* Plaintiffs' challenges again.

Op. at 26.]  Therefore, the Court concludes that the injuries that Plaintiffs have identified are likely caused by the State.

### c.    Plaintiffs' Demonstrated Injury is Redressable by Judicial Relief

The final prong Plaintiffs must satisfy to establish standing "requires a showing that 'the injury will be redressed by a favorable decision'" from this Court.  *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 1671 181 (2000)).  At the TRO phase, the Court previously found that the *Siegel* Plaintiffs' sworn declarations created a traceability issue with respect to zoos and medical facilities by alleging that they routinely visit certain, named institutions in New Jersey, but not explaining that these private institutions would otherwise permit Carry Permit holders like Plaintiffs to carry on the premises.  [*Siegel* TRO Op. at 17.]  It is true "that the traceability element is akin to 'but for' causation in tort."  *LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 284 (3d Cir. 2021).  At the same time, redressability does not require a degree of "mathematical certainty" and the requirement is met when there is a "substantial likelihood that the requested relief will remedy the alleged injury in fact."  *Toll Bros.*, 555 F.3d at 143 (citations omitted).

In its opposition brief, the State expands its traceability argument and suggests that Plaintiffs have similarly failed to demonstrate that they would be permitted to carry at Tae Kwon Do competitions, public libraries and museums, and bars and restaurants they frequent as part of their day-to-day lives.  [State Opp'n Br. at 42–46 (Docket No. 91).]  The traceability issue was also further compounded with respect to casinos when the State filed a certification after the TRO phase from the Director of the Division of Gaming Enforcement.  [Rebuck Supp. Cert. ¶¶ 2–5 (Docket No. 105-1).]  The State argues that Plaintiffs cannot meet the third

103

standing prong because "each of the nine casino hotels in Atlantic city have posted signage
prohibiting firearms on their premises." [*Id.* ¶ 4.]  However, at oral argument, the State made
an important concession regarding the traceability issue that undermines its position:

> THE COURT: The [Casino] says no firearms allowed, A18 is on
> the books. When Mr. Koons walks into the casino, is he getting
> prosecuted for trespassing or A18?
>
> [THE STATE'S COUNSEL]: It could be either, Your Honor.

[Tr. at 98:19–98:22.]

Which charging decision will ultimately be made by the State is especially critical to
Plaintiffs.  Before Chapter 131, the charge for carrying a handgun at a zoo, casino, public
library or museum, bar, restaurant, Tae Kwon Do competition, or medical facility where the
offender knew he or she was not licensed or privileged to do so was a petty disorderly persons
offense.  N.J. Stat. Ann. § 2C:18-3(b).  This includes such conduct at a private business that
posted a "no guns allowed" sign "in a manner prescribed by law or reasonably likely to come
to the attention of intruders."  *Id.* § (b)(3).  Petty disorderly persons offenses are punishable by
a maximum term of imprisonment of 30 days and fine not to exceed $500.  N.J. Stat. Ann. §§
2C:43-3, -8.   However, Chapter 131's new sensitive place restrictions, which became
effectively immediately, significantly increases the maximum criminal penalty for the same
offender who now knowingly brings a handgun to any sensitive place in New Jersey.  Under
Chapter 131, the State may choose to prosecute the same offender with a third-degree offense,
for which the potential penalty increases to between 3- and 5-years imprisonment and a
$15,000 fine.  N.J. Stat. Ann. §§ 2C:43-3, 6(a)(3).

The State's argument on the traceability issue is nothing more than a red herring.  That
New Jersey's casinos have banded together to declare that guns are unwelcome at their

gaming facilities does not defeat Plaintiffs' standing to challenge Chapter 131's handgun ban

at casinos and the related gaming regulation.  Courts examine a plaintiff's standing at the time

the "suit was filed" and "[e]vents that occur subsequent to the filing of a complaint will not

prevent a plaintiff from establishing standing which existed at the time of the pleadings."

*Roman Catholic Diocese of Dallas v. Sebelius*, 927 F. Supp. 2d 406, 416 (N.D. Tex. 2013)

(collecting cases).   The casinos' decision to affirmatively ban handguns from their facilities

came after Plaintiffs filed their lawsuits and, thus, the casinos' actions do not divest Plaintiffs

of their standing.  *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) ("We

have consistently held that if jurisdiction exists at the time an action is commenced, such

jurisdiction may not be divested by subsequent events.")

    In any event, the Court finds that there is a strong likelihood that the emergent

injunctive relief requested by Plaintiffs would remedy the injury they allege.   More

specifically, an injunction from this Court would undoubtedly remedy the potential and

significant criminal penalties that Plaintiffs now face for violating Chapter 131.  Put simply,

such significant potential penalties did not exist before the new law.  The State did previously

have sensitive place laws on the books banning firearms in casinos, state parks, and

educational institutions.  N.J. Admin. Code §§ 13:69D-1.13, 7:2-2.17; and N.J. Stat. Ann. §

2C:39-5(e).   Regardless, the inquiry is not whether Plaintiffs' handgun carry would be

endorsed or expressly permitted by any zoo in the State,[32] but whether the Court can remedy

---

[32] Like casinos, the State argues that zoos "maintain policies prohibiting firearms outright."  [State Opp'n Br. at
37 (Docket No. 91).]  However, the only supporting documentation provided in support is a webpage of rules
applicable at the Turtle Back Zoo, which among other things, prohibits "weapons" of any kind, including
"balloons, piñatas, radios, bikes, skateboards, scooters, coolers, and alcoholic beverages."  [Cia Decl., Vol. I,
Ex. 49A (Docket No. 88-49).]   At best, this establishes that handguns may be prohibited weapons at the Turtle
Back Zoo.  However, the zoo's internal policy does not establish that Plaintiffs' purported injury of significantly
heightened potential criminal penalties for such conduct is not capable of being redressed by judicial relief.   The

the prospective injury Plaintiffs face.  Because the Court can remedy the significant criminal penalties Plaintiffs now face under Chapter 131, Plaintiffs have also satisfied the final requirement to establish Article III standing.

> **2.      Constitutionality of Chapter 131's Handgun Ban at the Challenged "Sensitive Places"**

Having found standing, this Court next considers whether Plaintiffs are likely to prevail on their Second Amendment and other constitutional challenges to Chapter 131's handgun ban at the enumerated "sensitive places" and certain related firearm laws.  Before doing so, the Court first addresses two overarching arguments that the State advances to justify Chapter 131's "sensitive place" designations for government property.

> **a.      Government Property**

Specifically, the State argues that certain sensitive places—"like public libraries, airports and transit hubs, public buses, and government-owned entertainment facilities and hospitals"—are exempt from this Court's Second Amendment scrutiny because in such locations the government is acting as an ordinary proprietor and thus has the power to regulate (or prohibit) firearms on its property.  [State Opp'n Br. at 23, 24–28 (Docket No. 91).] Additionally, throughout its brief, the State contends that government-owned properties are akin to "government buildings" under *Bruen* (and its predecessors) and, thus, by virtue of this seemingly talismanic incantation, that they are "sensitive locations" in which a presumptive right to carry does *not* exist.  [*See, e.g.*, *id.* at 44, 62.]  The former argument is false; the latter argument is overstated.   The Court discusses each of these arguments in turn before

---

State also has failed to show that the other zoos the *Siegel* Plaintiffs have declared that they visit likewise prohibit firearms.

considering the challenged "sensitive places."

i.      **The Second Amendment Generally Applies on Government-Owned Property**

First, the State argues that Plaintiffs cannot meet their burden of demonstrating that their conduct—conceal carrying for self-defense—falls within the scope of the Second Amendment anywhere where the State is acting "as proprietor," rather than "as sovereign." [*See* State Opp'n Br. at 23–28.] By this the State means that it—"like private property owners—has the power to regulate conduct on its property," entitling it to control and to limit firearms without implicating a right protected by the Second Amendment. [*See id.* at 25 (quoting *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019)).] The State's claim to such sweeping power is without adequate foundation.

While it is certainly true that "the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers . . . . [just] as a private individual" may, *Camfield v. United States*, 167 U.S. 518, 524 (1897); *see also Adderley v. Florida*, 385 U.S. 39, 47 (1966) (stating, in context of First Amendment challenge, that the government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated"), the State is not *exempt* from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property. *Cf., e.g.*, *United States v. Kokinda*, 497 U.S. 720, 725 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business[.]"); *id.* at 732–33 (holding that United States Postal Service ("USPS") regulation prohibiting solicitation on postal premises does not violate the First Amendment because premises were construed as nonpublic forum and prohibition was reasonable to prevent disruption to USPS's business

operation).  This seems all too well-settled a proposition.  The following cases that the State cites are not to the contrary; they do not support its government-as-proprietor theory that the State has such plenary power.

In *Adderley*, a crowd of protesters gathered at a jail and blocked a non-public entrance and driveway, and after being asked to leave, some of the protesters were subsequently prosecuted for trespass.  385 U.S. at 45–46.  Finding that the First Amendment was not violated, the Court explained that one does not have the right to "propagandize protests or views" "whenever and however and wherever" one pleases.  385 U.S. at 48.  Thus, *Adderley* is merely an example of an instance in which individual free speech rights were afforded less protection where they were exercised at a non-public forum and interfered with other important governmental interests, not that the protesters were outside the scope of the First Amendment because the government owned the land.

In *Camfield*, the Supreme Court found that an 1885 act—that prohibited enclosing public lands with fencing on adjoining private property and that provided for the removal of such fencing—was constitutional because the government retains "police power" over its own lands and the defendant-landowners' enclosures, designed to discourage settlement on public lands, were clearly a nuisance permitting removal.  167 U.S. at 522, 524–25.  Similarly, *Camfield* involves an application of proprietary power that did not abridge the property rights of neighboring landowners; it hardly stands for the proposition that government action on public lands need not comply with the Constitution's individual guarantees.

In *Greer v. Spock*, candidates for political office sought to distribute campaign literature at Fort Dix Military Reservation ("Fort Dix") in central New Jersey but were denied access pursuant to a regulation barring such conduct without the prior written approval of the

Adjutant General.  424 U.S. 828, 831–33 (1976).  Challenging the regulation as violative of the First and Fifth Amendments, the candidates successfully obtained a permanent injunction "prohibiting the military authorities from interfering with the making of political speeches or the distribution of leaflets in areas of Fort Dix open to the general public."  *Id.* at 834. Reversing the judgment below, the *Greer* Court held that the candidates had no such right at Fort Dix because military bases are not "a place for free public assembly and communication of thoughts by private citizens." *Id.* at 838.  Just as before, *Greer* does not support the State's proposition.  As the antithesis of a public forum, a military base may enjoy broad powers to exclude, but the Court situated Fort Dix *within* its First Amendment jurisprudence; it did not hold that the government authorities are "not subject to" individual rights because Fort Dix is "government-owned." [State Opp'n Br. at 23–24.]

Finally, in *United States v. Ruckman*, agents of the Bureau of Land Management searched the defendant's makeshift "home" in a cave on federal lands in Utah and found various destructive devices.  806 F.2d 1471, 1471 (10th Cir. 1986).  Seeking to suppress the agents' search as a violation of the Fourth Amendment's protection against warrantless searches and seizures, the defendant argued that he had a reasonable expectation of privacy in his cave-home.  *Id.* at 1472.  Explaining that the defendant was a trespasser on federal lands and could have been ousted at any moment, the court found that any expectation of privacy was unreasonable and, thus, the agents' search did not violate the Fourth Amendment.  *Id.* at 1472–73.  But because the court relied on the defendant's status as a trespasser, it seems that *Ruckman* implicitly acknowledges that the government cannot conduct a search without a warrant simply because it owns the land.  *See id.* at 1473 ("the Fourth Amendment protects people, and not places") (quoting *Katz v. United States*, 389 U.S. 347, 353 (1967)).

As illustrated, the foregoing cases fail to establish that the State is free to ignore the Second Amendment merely because its act on the land it owns.  Rather, the proposition that the State appears to be searching for is much more nuanced and limited: when the government is acting *as an employer* to manage its internal affairs, its powers are broader than when it is acting as a sovereign.  *See Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598 (2008) ("[T]here is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.'") (quoting *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 896 (1961)); *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion) ("the government as employer indeed has far broader powers than does the government as sovereign").

For instance, "when *public employees* make statements pursuant to their official duties, . . . the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (emphasis added).  Similarly, "the Fourth Amendment does not require public employers to obtain warrants before conducting a search of *an employee's* office."  *O'Connor v. Ortega*, 480 U.S. 709, 721–22 (1987) (plurality opinion) (emphasis added).  Moreover, while the Due Process Clause does not protect a *public employee* from discharge merely because the employer made a mistake or acted unreasonably, *Bishop v. Wood*, 426 U.S. 341, 350 (1976) ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions."), it does require a *public employee* with a property interest in continued employment to be afforded notice and an opportunity to be heard prior to termination, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).   Accordingly, what is most relevant to this Court's analysis is that, though its

power is obviously not absolute, "government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large," *Engquist*, 553 U.S. at 599, which is the case here.

In the present case, the Court is not addressing whether the State can permissibly prohibit employees or contractors from carrying firearms on government property within the scope of their employment, nor whether such a right is presumptively protected by the text of the Second Amendment.  But these cases illustrate that, to the extent individual Constitutional rights are *diminished* where the government is acting as an "employer" or "proprietor" or "market participant," allegations of government infringement are nevertheless resolved according to the applicable analytic framework.  *See, e.g.*, *Garcetti*, 547 U.S. at 419, 421 (explaining that the test to determine whether an employee's speech is presumptively protected by the First Amendment where the government is acting as an employer is to ask whether the speech is about a matter of public concern or made pursuant to the employee's official duties).  In other words, the State cannot succeed in claiming that the scope of Plaintiffs' public carry right does not extend to government property simply because there the State is acting in its proprietary capacity to exclude firearms for some good reason.

Still, the State suggests that *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019), *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015), and *United States v. Tallion*, 2022 WL 17619254 (D. Md. Dec. 13, 2022)—all cases involving firearm restrictions on government property—support their government-as-proprietor theory.  They do not.

In *Class*, the D.C. Circuit considered whether a federal law prohibiting the possession of firearms on the grounds of the United States Capitol violated the Second Amendment as applied to the defendant who parked a car containing three firearms at a parking lot

approximately 1,000 feet from the entrance to the Capitol.  930 F.3d at 462.  It concluded that the defendant's conduct was outside the scope of the Second Amendment's protections because the parking lot was "*sufficiently integrated* with the Capitol," which it concluded was a sensitive place under *Heller*.  *Id.* at 464 (emphasis added); *see also id.* at 463 ("there are few, if any, government buildings more 'sensitive' than the 'national legislature at the very seat of its operations.'") (citation omitted).  That the defendant's conduct occurred on government property nearby an especially sensitive place served as the basis for the court's decision to construe the parking lot "as a single unit with the Capitol building" and, thus, to conclude that it too was sensitive and the prohibition presumptively lawful.  *Id.* at 464.  Here, the State asks this Court to ignore this critical inferential step of establishing that the government property at issue is, or is sufficiently integrated with, a sensitive place.  *Class* does not establish that carrying firearms for self-defense on government-property is presumptively outside the scope of the Second Amendment's protection.  The State reads too much into *Class*.

In *Bonidy*, a concealed carry permit holder sought to carry his firearm for self-defense in the parking lot of a U.S. Post Office in a remote ski town in Colorado, but a USPS regulation prohibited the storage and carriage of firearms on USPS property.  790 F.3d at 1122–23.  The court upheld the regulation for two separate reasons.  First, like in *Class*, it found that the U.S. Post Office was a "government building" and, thus, a sensitive place under *Heller*.  *Id.* at 1125.  Construing the parking lot and the building as one, the court found that the permit holder did not enjoy a Second Amendment right to carry on the government property.  *Id.*  Second, employing a means-ends approach that was subsequently abrogated by *Bruen*, the court afforded USPS greater latitude to justify its regulation, in part, because USPS was acting in its proprietary capacity to manage post offices.  *Id.* at 1126.  Like the State here,

112

the court further drew a comparison to the Supreme Court's Commerce Clause jurisprudence and distinguished between "States as market participants and States as market regulators." *Id.* (citing *Reeves, Inc. v. Stake*, 447 U.S. 429, 436 (1980)).  Finding that USPS was acting as a government-owned business in its proprietary capacity, the court concluded that its discretion was broad to adopt "the rules it deems appropriate."  *Id.* at 1127.  The regulation, the court explained, "applies only to discrete parcels of land owned by [USPS]," "affects private citizens only insofar as they are doing business with the USPS," and "is directly relevant to . . . providing a safe environment for its patrons and employees."  *Id.*  USPS thus demonstrated that the challenged regulation was substantially related to an important governmental interest.

By contrast, Judge Tymkovich would have found the USPS regulation unconstitutional as applied to the parking lot adjoining the U.S. Post Office building.  *Id.* at 1129 (Tymkovich, J., concurring in part, and dissenting in part).  Importantly, he questioned the *Bonidy* court's "presumption of lawfulness associated with sensitivity" in the adjacent parking lot, explaining that "the government's interest may be unusually weak regarding a particular subcategory of [] property—it is not enough to say that *every* government building, lot, or park will be treated the same."  *Id.* at 1129, 1135.  He further questioned whether *Heller's* enumeration of presumptively lawful restrictions on firearms at "sensitive places" entails that the Second Amendment does not extend to government buildings.  *Id.* at 1136 n.7.  The better reading of *Heller* (and presumably *Bruen* too), he suggested, is that the list describes presumptively permissible limitations on the Second Amendment right, not cases in which the right is not burdened at all.  *Id.*  He wrote: "To say the right has not been extended to government buildings is to imply no plaintiff could ever successfully challenge a restriction in any government buildings.  That goes too far."  *Id.*

113

As before, the State here would skip the *Bonidy* court's more searching determination that the government property at issue is a "sensitive place." They would conclude, as Judge Tymkovich discouraged, that all government property is sensitive. While a question remains whether the USPS regulation could survive scrutiny given *Bruen*, at least as applied to prohibition on public carry in USPS parking lots, this Court fails to see how the State's proposed approach would square with *Bonidy* itself.

Finally, *United States v. Tallion*, a post-*Bruen* case addressing a criminal defendant's Second Amendment challenge to a regulation prohibiting the possession of firearms at the National Institutes of Health ("NIH"), similarly fails to persuade this Court of the State's government-as-proprietor theory. There, the court upheld the regulation at *Bruen* Step Two, finding that prohibitions on carrying firearms in government buildings like the NIH campus were presumptively lawful (and that it need not conduct the historical analysis anew). *Tallion*, 2022 WL 17619254, at *7. The *Tallion* court, however, only assumed *arguendo* that the defendant's conduct implicated a right protected by the Second Amendment; it did not adopt any findings in this regard. *Id.* at *6. Importantly, the court *rejected* the government's argument that it enjoyed the "absolute right to exclude and manage persons on its lands." *Id.* at *4. Distinguishing *Class* and the government-as-proprietor theory, the Court explained that it "overstates its position." *Id. See also United States v. Marique*, 2022 WL 17822443, at *4 (D. Md. Dec. 20, 2022) (rejecting similar argument in Second Amendment challenge to regulation prohibiting firearms on NIH campus by government contractor).

Here, the Second Amendment cases that the State cites do not support the sweeping proposition that carrying for self-defense in public does not extend to any location in which the government owns the land. In each of the cases cited, the courts found that the

government property was integrally connected to a government building that it regarded as a "sensitive place" where prohibition on carrying firearms is presumptively lawful. *See Class*, 930 F.3d at 464; *Bonidy*, 790 F.3d at 1125; *cf. Tallion*, 2022 WL 17619254, at *8. The State cannot invoke their theory to skip this important inferential step. Additionally, to the extent that the challenged laws in *Class*, *Bonidy*, and *Tallion* all survive scrutiny under *Bruen*, Chapter 131 is much less tailored to achieving any given interest of the various government entities at issue here. In other words, the State has failed to demonstrate how Chapter 131 involves the government acting as a proprietor, rather than as a sovereign. Indeed, the challenged law applies indiscriminately to the conduct of private citizens on government property, whether they be invitees, licensees, or trespassers, and irrespective of the choices of any particular government entity at issue. Violation does not result in discharge or trespass, but rather constitutes a separate and significant criminal offense. In the end, the State's theory does not persuade this Court to approach *Bruen* Step One any differently.[33]

> ### ii.  Government Buildings as "Sensitive Places" Where Carrying Firearms can be Prohibited Consistent with the Second Amendment

Furthermore, the State suggests throughout its brief that under *Bruen* any prohibition on carrying firearms at a government building does not implicate a right presumptively protected by the Second Amendment. [*See, e.g.*, State Opp'n Br. at 44, 62.] Their position is

---

[33] The State also sets forth a different variation of its theory: that "when the government is acting as a 'market participant' rather than in its traditional sovereign/regulatory capacity—that is, when it is providing a good or service in the competitive private marketplace, like when it maintains a concert venue—the State is not subject to the ordinary constitutional restrictions that bind sovereigns." [State Opp'n Br. at 26 (Docket No. 91).] Analytically, the Court finds the State's theories to be without any relevant difference. They both seek to exempt government entities from the dictates of *Bruen* simply because they are acting as proprietors. But the Court has already explained why such a proposition lacks support. In this instance, the right of private actors to exclude firearms from their properties is beside the point; to the extent that a *government* entity can similarly exclude firearms, it is because a historical tradition justifies the exclusion. Market participation does not explain why *Plaintiffs'* conduct fails to come within the scope of the Second Amendment.

overstated.  Laws that prohibit firearms in sensitive places, such as schools and government buildings, typically comply with the Second Amendment; it is not the case necessarily that a right protected by the Second Amendment is not burdened at all, as the State would have this Court find.

In *Heller*, the Court explained that its opinion should not be read to cast doubt on "longstanding prohibitions" on carrying firearms in sensitive places.  554. U.S. at 626.  Citing *Heller*, the *Bruen* Court stated that it was "aware of no disputes regarding the lawfulness of such prohibitions" at, for example, legislative assemblies, polling places, and courthouses. 142 S. Ct. at 2133.  The *Bruen* Court further stated: "We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.*  But the Supreme Court's discussion of such laws is situated in the context of its command that lower courts engage in analogical reasoning to determine whether modern and historical regulations are relevantly analogous—*i.e.*, whether they impose a comparable burden on the right to armed self-defense and whether that burden is sufficiently justified. *Id*.  Just because there is little 18th- and 19th-century evidence justifying sensitive place laws, the Court explained, does not mean that they cannot survive scrutiny under the Second Amendment. *Id.*

Thus, this Court reads the *Bruen* discussion for the proposition that prohibitions on carrying firearms at government buildings tend not to violate the Second Amendment, but to the extent that a dispute arises concerning a prohibition at a particular government building, resolution will turn on whether analogies to historical regulations can justify the challenged law.  In his seemingly prescient concurring opinion, Judge Tymkovich essentially adopted this position, noting that a prohibition's presumption of lawfulness depends on the nature of

the government property at issue. *See Bonidy*, 790 F.3d at 1135 (Tymkovich, J., concurring in part, and dissenting in part) ("it is not enough to say that *every* government building, lot, or park will be treated the same."); *see id.* at 1136 n.7 ("To say the right has not been extended to government buildings is to imply no plaintiff could ever successfully challenge a restriction in any government buildings. That goes too far."). In other words, a USPS post office and parking lot are manifestly different from the U.S. Capitol and its surrounds. At this juncture, the Court does not attempt to categorize the relevant differences, as the *Koons* Plaintiffs urged during oral argument. [Tr. at 9–23.] Rather, this Court simply notes that it addresses the challenges to Chapter 131 involving government buildings independently and without resort to assuming that a right to carry for self-defense does not exist. To employ such assumption would seem to misunderstand and misrepresent the *Bruen* dicta. Whether the sensitive-place designations survive depends on whether the State can meet its burden of demonstrating a historical tradition that is well-established and representative as to such government buildings.

> **b.** **Private Property: Chapter 131's Default Rule Prohibiting Firearms unless the Property Owner Expressly Consents**

As described above, and subject to certain exceptions and qualifications, Chapter 131 prohibits the carrying of a concealed handgun on:

> [P]rivate property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.A. 2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.A. 2C:39-6[.]

N.J. Stat. Ann. § 2C:58-4.6(a)(24) (the "Default Rule"). In its prior TRO Opinions, the Court found that the *Koons* and *Siegel* Plaintiffs were likely to succeed in showing that the Default

Rule violates the Second Amendment because the law appears to implicate their right to carry for self-defense in public and the State could not demonstrate a sufficiently analogous historical tradition to justify the regulation. [*Koons* TRO Op. at 36–48 (Docket No. 34); *Siegel* TRO Op. at 36–41 (Docket No. 51).] Accordingly, the Court temporarily restrained enforcement of the Default Rule. *Id.* In its preliminary analysis, however, the Court did not consider the *Siegel* Plaintiffs' other arguments that the Default Rule constitutes separate, unconstitutional violations of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. At this stage, the Court revisits its analysis to address each of Plaintiffs' constitutional challenges, in turn.

Ultimately, the Court concludes that the Default Rule impermissibly burdens Plaintiffs' Second Amendment right to carry for self-defense in public as applied to private property that is held open to the public and for which an implied invitation to enter is extended, but not on private property *not held open to the public*. Although it is not clear to the Court that Plaintiffs advocate a Second Amendment right to carry on private property that is not held open to the public, this Court's Opinion clarifies this distinction anyways. As to such private property that is not held open to the public, an "anti-carry presumption" does not come within the scope of the right to carry for self-defense in public, and there the Default Rule does not violate the Second Amendment, nor does it violate the compelled speech doctrine or infringe the First Amendment or the Equal Protection Clause of the Fourteenth Amendment.

### i.      The Default Rule and the Second Amendment's Text

The standard bears repeating: in *Bruen*, the Supreme Court refined the framework for lower courts to determine whether a firearms regulation is constitutional under the Second

Amendment.  The threshold inquiry is to ascertain whether an individual's proposed course of conduct implicates the plain text of the Second Amendment.  *Bruen*, 142 S. Ct. at 2129–30. If it does, then "the Constitution presumptively protects that conduct," and the burden of persuasion shifts to the government to justify the regulation by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.  Though the framework is undisputed by the parties as a general legal matter, considerable disagreement nonetheless exists at Step One regarding how to frame Plaintiffs' conduct and the scope of their right to carry.

For their part, the State asserts that the text of the Second Amendment is *not* implicated because there is no right "to carry on another's private property in the absence of the property owner's affirmative consent."  [State Opp'n Br. at 5 (Docket No. 91).]  According to the State, the ability to carry a firearm on another's property is "entirely derivative of the property holder's choice to grant consent."  [*Id.*]  Because a private property owner has the fundamental right to exclude individuals from—and, indeed, to qualify or condition their entry upon—the owner's property, they argue that the Default Rule embodied in § 2C:58-4.6(a)(24) falls outside the scope of the Second Amendment.  [*Id.* at 5–6.]  Thus, Plaintiffs presumptively may carry "in public," but not on *private* lands.

Professors Ian Ayres and Fredrick Vars, as amici curiae, argue similarly.  They accuse the Court, in its TRO Opinions, of displacing "centuries-old property rights" by finding that the Second Amendment guarantees "an individual right to bear arms on another's property over that owner's objection."  [Br. of Profs. of Prop. Law as Amici Curiae in Support of the State at 2 (Docket No. 93-2) ("Prop. Law Br.").]  More specifically, the amici press that the Court must make one of two findings for Plaintiffs' conduct to be "covered" by the Second

Amendment's plain text: *either* (1) the Second Amendment provides a right to carry on private property over the owner's objection; *or* (2) the Second Amendment provides a right to a rebuttable presumption that one may carry onto private property unless the owner objects. [*Id.* at 14–15.] Cleverly framed in this dichotomous way, of course, the amici argue that neither survives scrutiny, as there is "no freestanding Second Amendment right to have a private owner's silence regarding the issue of guns construed in a particular direction." [*Id.* at 29.]

Plaintiffs, by contrast, employ a more straightforward reading of the Step One inquiry. They contend that the Second Amendment's text does not impose a "locational distinction." The test is whether the right to carry for self-defense is implicated. Period. Because Plaintiffs seek to carry bearable arms for self-defense, the "undisputed facts end the textual inquiry," [*Koons* PI Reply Br. at 4 (Docket No. 101)], and the Court should reject "New Jersey's constant attempts to bake in other considerations." [*Siegel* PI Reply Br. at 36 (Docket No. 97).] Whether the Default Rule is permissible, then, simply turns on whether the State can satisfy *Bruen*'s requirement at Step Two to demonstrate a historical tradition to justify the provision, as Step One is clearly satisfied, they argue.

The Supreme Court's discussion of the "textual elements" of the Second Amendment helps to focus this Court's consideration of what is, admittedly, a thorny question.[34] In *Heller*,

---

[34] The Court recognizes that the question presented is a matter of contemporaneous debate in academic circles, too. In fact, amici, though not necessarily the progenitors of the concept, have written extensively on the "no-carry" default rule and have urged states to adopt it as an allegedly constitutional "tool" to "flip" the right-to-carry presumption that otherwise exists in most jurisdictions. *See* Ian Ayres & Fredrick E. Vars, *Weapon of Choice: Fighting Gun Violence While Respecting Gun Rights* 84–93 (Harv. Univ. Press 2020) (setting forth their argument); Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 184 (2020) ("Reducing the number of places available for gun carriers to travel freely with their firearms might have knock-on effects, reducing preferences to carry and possess firearms more generally, as it becomes increasingly inconvenient to do so.") They argue that a "no-carry" presumption can be

the Court explained that "the people" means "all Americans," "Arms" is defined to include "all instruments that constitute bearable arms," and to "bear" means simply to "carry." *Heller*, 554 U.S. at 580–82, 584. In *Bruen*, the Supreme Court confirmed that the right to "keep and bear Arms" refers to one's right to "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 584). It further explained that "[n]othing in the Second Amendment's text draws a home/public distinction" and concluded that the text "naturally encompasses" an individual right to carry a firearm for self-defense in public. *Id.* Though the right to carry for self-defense extends beyond the home—where "confrontation can surely take place," *id.* at 2135—the

---

justified as a "form of majoritarian default rule" "for all private land." Ayres & Vars, *supra*, at 88–89 (discussing "gun-free" preferences *expressed* by landowners, including certain businesses like Costco and Whole Foods). They even suggest that landowners can bind each other, including successors-in-interest, to prohibit possession of firearms on their properties and in their neighborhoods through restrictive covenants and defeasible fee provisions. *See id.* 93–99. The argument raised by *Shelley v. Kraemer*, 334 U.S. 1 (1948), discussed *infra* Section IV.G.2.b.i., merely has "surface appeal." Ayres & Vars, *supra*, at 96–97. Noticeably absent from their analysis is *any* discussion of the Second Amendment's protection of the fundamental right to armed self-defense. After *Bruen*, they have suggested that the "no-carry" default remains constitutional. *See* Ian Ayres & Fredrick E. Vars, Opinion, *A New No-Carry Default for the U.S.: A Gun Law that Could Really Change Things*, N.Y. Daily News (July 20, 2022), https://www.nydailynews.com/opinion/ny-oped-no-carry-default-united-states-20220720-dseuu3jeljedlpn2nhkwibjrfq-story.html (defending New York's law that presumptively prohibits carrying firearms on private property unless "clear and conspicuous signage" grants permission to carry or the owner has provided express consent to do so). Scholars elsewhere have engaged with the question and discussed the constitutionality of default rules concerning carrying firearms on private property, in some cases reaching opposite conclusions. *Compare* Jake Charles, Bruen*, Private Property & the Second Amendment*, Duke Ctr. for Firearms Law (Dec. 2, 2022), https://firearmslaw.duke.edu/2022/12/bruen-private-property-the-second-amendment/ (critiquing the reasoning of *Antonyuk* and *Christian* and suggesting that New York's anti-carry presumption on private property survives Second Amendment scrutiny because carrying on private property is outside the scope of the text), *with* Robert Leider, *Pretextually Eliminating the Right to Bear Arms through Gerrymandered Property Rules*, Duke Ctr. for Firearms Law (Dec. 23, 2022), https://firearmslaw.duke.edu/2022/12/pretextually-eliminating-the-right-to-bear-arms-through-gerrymandered-property-rules/ (characterizing the "tool" identified by Professors Ayres and Vars as a "constitutional loophole to nullify the practical effect of *Bruen*" and arguing that New York's and New Jersey's default rules, which apply to ordinary citizens but expressly do not apply to retired law enforcement among others, are unconstitutional because they are grossly underinclusive—failing to accomplish either state's asserted end), *and* Andrew Willinger, *Private-Property Default Exceptions, Firearms Training, and Multi-Tiered Licensing*, Duke Ctr. for Firearms Law (Jan. 11, 2023), https://firearmslaw.duke.edu/2023/01/private-property-default-exceptions-firearms-training-and-multi-tiered-licensing/ (disputing Professor Leider's contention and arguing that good cause exists for each of the identified groups to be exempt from the anti-carry default rule).

right is not unlimited or absolute. *See id.* at 2162 (Kavanaugh, J., concurring) (stating that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose") (quoting *Heller*, 554 U.S. at 626).

Here, Plaintiffs seek to "carry" "Arms" for self-defense in public—at, for example, "grocery stores and other retail outlets" and otherwise in their daily lives. [*See, e.g.*, *Koons* Am. Compl. ¶ 43 (*Koons* Docket No. 69); *Siegel* Compl. ¶ 134 (*Siegel* Docket No. 1).] The Court thus finds that Plaintiffs' right to carry for self-defense in public naturally encompasses entry onto the property of another, *provided* that such property is held open to the public and entry is otherwise lawful. The proviso is crucial to understanding this Court's reasoning, and Plaintiffs would seem to have no quarrel with such proviso. Plaintiffs have not asserted a right to carry on every private parcel of land in New Jersey in *all* cases, nor have they asserted a right to *trespass* with firearms (*i.e.*, to carry "against an owner's wishes"). Rather, their conduct, and by extension the Default Rule, implicates the text and protections of the Second Amendment because of the broad way in which the *State* presumptively excludes them from carrying firearms where they would be ordinarily considered invitees or licensees. The "right to carry for self-defense in public" does not establish, by itself, that Plaintiffs' conduct falls within the scope of the Second Amendment; the right is not absolute. As Justice Kavanaugh stated, the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose". *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626). Here, because the Default Rule introduces an anti-carry presumption on property where Plaintiffs would otherwise be presumptively a lawful entrant, the Second Amendment protects such conduct unless the State can justify the firearms regulation.

The foregoing analysis is consistent with two specific findings.  First, the Default Rule implicates the text of the Second Amendment on private property that is held open to the public.  There, the public has the implied consent to enter, unless such consent is conditioned or subsequently revoked by the property owner (*e.g.*, 'no trespassing' or 'no guns allowed' signage).  Such property ordinarily includes, but is not limited to, retail establishments and the curtilage of residential property.  Second, the Default Rule does *not* implicate the text of the Second Amendment on property that is *not* held open to the public.  There, one does not customarily have the implied consent of the owner to enter.  Such property typically includes places such as private residential dwellings and some commercial, agricultural, or industrial property and/or facilities—where there exists some indicia that guests are *not* ordinarily invited without permission.  In this sense, the scope of the right to carry on private property appears to track the scope of the public's license to enter—whether it be express or implied—in analogous respects, and Plaintiffs appear to agree with this proposition as worded.  Another court that considered New York's so-called "anti-carry" presumption similarly distinguished between property that is (and is not) held open to the public.  *See Antonyuk*, 2022 WL 16744700, at *78.

Yet the State and its amici strongly dispute that Plaintiffs have *any* right to carry on private property.  They situate their proposition within property law's foundational right to exclude.  [*See* State Opp'n Br. at 5–9; Prop. L. Br. at 5–6, 15–22.]  But by framing the right in near absolute terms, they conveniently gloss over the well-developed concept of implied license, which operates to grant permission to enter another's premises according to custom

or other indicia of consent.[35]  Focusing only on the right to exclude and the undisputed power of a landowner to exercise that right,[36] and assuming lack of 'no trespassing' signage, the State and its amici would support a harsher punishment of trespass where one carries a firearm onto another's premises without express consent and no punishment for trespass where one enters another's premises without express consent.  This cannot be.  The only relevant difference is the carrier's exercise of his right to armed self-defense in public.

To be sure, the right to exclude is correctly described as "fundamental"; it is indeed "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  Property is so "sacred," that no one "can set his foot upon his neighbour's close without his leave."  *Entick v. Carrington*, 2 Wils. K.B. 275, 291, 95 Eng. Rep. 807 (K.B. 1765).  In practice, this means that "a guest is able to enter or stay on private property only with the owner's permission.  A guest is removable at the owner's discretion."  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1262 (11th Cir. 2012).  "In law this permission is called a license."  Thomas M. Cooley, *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract* 302 (Chicago: Callaghan & Co. 1879).  A "[l]awful license to enter one's premises may be given either, 1. Impliedly by the owner; 2. Expressly by the owner; [or] 3. By the law."  *Id.* at 303.

---

[35] Their gloss is surprising.  In their book, amici begin their argument by acknowledging that "[a]n implied condition of every invitation [onto another's property] is that the invitee is welcome to bring a firearm."  Ayers & Vars, *supra* note 34, at 84.  They further write that "[t]his right-to-carry default that comes with ordinary invitations to enter private property grows out of an older customary right of individual not just to carry firearms but also to hunt on land owned by someone else."  *Id.*

[36] The State and their amici misdirect the Court's attention insofar as they stress that "the Second Amendment does not give an individual a right to carry a firearm on [another's private] premises *against the owner's wishes* because such right did not pre-exist the Amendment's adoption."  [State Opp'n Br. at 6 (quoting *GeorgiaCarry.Org*, 687 F.3d at 1266) (emphasis added).]  Plaintiffs do not assert such a right, and the State's (and their amici's) disingenuous attempt to frame Plaintiffs' argument in such a way is unfair.  The Court need not adopt such a reading to find that Plaintiffs' desire to carry for self-defense on private property is implicated by the text of the Second Amendment.

Indeed, notwithstanding the "strict rule of the English common law as to entry upon a close," "[a] license [to enter] may be implied from the habits of the country." *McKee v. Gratz*, 260 U.S. 127, 136 (1922) (Holmes, J.). For this reason, "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard v. Alexandria*, 341 U.S. 622, 626 (1951). Absent notice of some kind, one is typically not considered a trespasser when one enters the curtilage or area immediately surrounding and associated with the home of another for a lawful purpose, *cf. Florida v. Jardines*, 569 U.S. 1, 8 (2013) ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."), nor is one a trespasser when one enters a retail establishment for the purpose for which the property is held open to the public, *see, e.g.*, *On Lee v. United States*, 343 U.S. 747, 751–52, 753 (1952) (finding that "no trespass was committed" in Fourth Amendment case where respondent "entered a place of business with the consent, if not by the implied invitation, of the petitioner"); *United Food & Commercial Workers Union Local 72 v. Borough of Dunmore*, 40 F. Supp. 2d 576, 589 n.24 (M.D. Pa. 1999) ("[W]here an individual complies with all of the lawful conditions attached to property open to the public, then a defiant trespass charge will not lie."); *see also* Cooley, *supra*, at 303 (stating that every "retail dealer impliedly invites the public to enter his shop," but that "the invitation is limited by the purpose" and "placard or otherwise" can condition the public's entry). By arguing that the Default Rule is a mere extension of landowners' right to exclude, the State and its amici do not seem to appreciate that it is the State's sweeping revocation of the public's longstanding limited implied license to enter others' property without trespass liability solely because of the exercise of a constitutional right.

125

This implied license that private property owners routinely extend to the public to enter their premises underlies the Court's prior discussion concerning trespass. [*See Koons* TRO Op. at 39–43 (Docket No. 34).]  In New Jersey, "[a] person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or surreptitiously remains in any research facility, structure, or separately secured or occupied portion thereof, or in or upon utility company property."  N.J. Stat. Ann. § 2C:18-3(a).  The offense is a disorderly persons offense, except for certain classes of property, such as a dwelling, in which case the offense is a crime of the fourth-degree.  *Id.*  Critical for liability under § 2C:18-3(a) is that the person is knowingly acting outside the scope of the permission that the landowner extends to others to enter.  *See id.* (providing that the person must "know[] that he is not licensed or privileged" to enter).  Such permission is not limited to affirmative or express consent to enter, as the amici seem to suggest, [*see* Prop. Law Br. at 9 n.2]; a landowner can impliedly invite others onto her property.  But, here, where a structure such as a research facility is not held open to the public (or implied consent to enter extended), a person is furnished with some notice that permission to enter has not been granted.  There, a person similarly has no right to carry for self-dense.

Under the defiant trespasser subsection, "[a] person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by: (1) [a]ctual communication to the actor; or (2) [p]osting in a manner prescribed by law or reasonably likely to come to the attention of intruders; or (3) [f]encing or other enclosure manifestly designed to exclude intruders."  N.J. Stat. Ann. § 2C:18-3(b).  "The theory of [§ 2C:18-3(b)] is that where a landowner wishes to assert his right to exclude from open land and to have the backing of the criminal law, it is

not too much to ask him to give notice."  *State v. Gibson*, 95 A.3d 110, 116 (N.J. 2014) (citation omitted).

New Jersey's trespass statute reveals that a person is not liable for trespass simply because the person enters onto the land of another without express consent.[37]  Otherwise, routine entrants onto private property would be criminal.  *See Jardines*, 569 U.S. at 8 ("Complying with the terms of [the] traditional [implied] invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.").  Rather, the person must knowingly act outside the scope of the permission granted, whether express or implied, *see* § 2C:18-3(a), or in disregard of a clear indication that permission is *not* extended, § 2C:18-3(b)(1)–(3).  The State and its amici would propose to treat firearm carriers as trespassers by default, to revoke firearm carriers' implied invitation to enter.  But this cannot be absent a historical tradition justifying the Default Rule.  The landowners must affirmatively modify the terms of the implied invitation to enter on their own, especially where the right to carry for self-defense is burdened with criminal sanctions just because it occurs on private property.

---

[37] Amici suggest that other states place the burden on the *entrant* to obtain express consent from the landowner to avoid trespass liability.  [Prop. Law Br. at 9–12.]  They cite to Mississippi's statute as an example:

> "Any person who knowingly enters the lands of another without the permission of or without being accompanied by the landowner or the lessee of the land, or the agent of such landowner or lessee, shall be guilty of a misdemeanor . . . ."

Miss. Code. Ann. § 97-17-93(1).  First, "permission" under the statute does not mean, necessarily, "express permission"; the term is not so qualified.  One may still have permission to enter another's property through implication, and courts have focused on facts that suggest the trespasser is acting outside the scope of the landowner's permission.  *See, e.g.*, *Ladd v. Mississippi*, 87 So.3d 1108, 1116–17 (Miss. Ct. App. 2012) (finding that, while defendant's act of walking through landowner's open garage door was not a "breaking" warranting a charge for burglary, such conduct warranted a charge for trespass).  Second, the statute expressly excludes from its scope, *inter alia*, "persons entering upon such lands for lawful business purposes."  Miss. Code. Ann. § 97-17-93(1).  The Court reads such language to implicate the well-settled rule that one is not a trespasser for entering land for a lawful purpose where such land is held open to the public.  Thus, the statute does not undermine the Court's findings here, nor is the Court persuaded that other states ignore the concept of implied license in their law of trespass.

127

Amici criticize this Court for constitutionalizing a "rebuttable presumption" to carry firearms on the property of another. In *Siegel*, the Court clarified its analysis in *Koons*, stating that Plaintiffs have a right to carry for self-defense on the property of another, unless the owner indicates otherwise (what it characterized as a "rebuttable presumption" to carry). [*Siegel* TRO Op. at 39 (Docket No. 51).] They contend that such a presumption is "divorced from the text of the Second Amendment" and that "nothing in the history of the Supreme Court's constitutional jurisprudence" hinges the right to carry in public for self-defense "on the permission of another private individual." [Prop. Law Br. at 22 (emphasis removed).] They stress that constitutional rights "end at the private-property line." [*Id.* at 20.]

The Court disagrees with amici's framing of its TRO Opinions. The right to armed self-defense follows the individual everywhere he or she lawfully goes. Here, the State, not private landowners, burdens carriers' lawful entry onto the property of another with a "no-carry" default. The Default Rule is thus state action insofar as the State is construing the sound of silence. While landowners can ratify or depart from that default, it is the State that is presumptively excluding firearms from private property in the first instance. In that regard, the Court finds that the presumption to carry onto the property of another only extends as far as the landowners' permission granted to the public to enter, which is often implied. In that sense, the presumption to carry is "rebuttable"—the owner can always withdraw consent. But the State cannot do so for the landowner. Doing so clearly implicates individual conduct plainly covered by the Second Amendment's text. Accordingly, amici's citations to *Shelley v. Kraemer*, 334 U.S. 1 (1948) and *Marsh v. Alabama*, 326 U.S. 501 (1946)—which address exceptions to the general proposition that the Constitution applies to government action and not private conduct—have no bearing on the question whether the Default Rule comes within

128

the scope of the Second Amendment.  Plaintiffs are protected from the State's rule unless a historical tradition can justify it.

Additionally, to explain why property default rules such as the Default Rule are within states' police powers, amici direct this Court to *Breard v. Alexandria*, cited *supra*, a case in which the Supreme Court considered a municipal law that presumptively prohibited door-to-door solicitation where a landowner had not expressly consented.  [Prop. Law Br. at 12, 23–24.] The structure of the rule is admittedly on point, but salient differences distinguish *Breard* from the instant case.

In *Breard,* the manager of a crew of door-to-door magazine salesmen was arrested for violating an ordinance that prohibited the practice of soliciting at private residences in the City of Alexandria, Louisiana without "having been requested or invited so to do" by the landowners.   341 U.S. at 624.   Apparently, the City Council had determined that "householders complained" that "solicitors were undesirable or discourteous" and that "they did not desire any uninvited intrusions into the privacy of their home."  *Id.* at 625.  The manager argued that the ordinance was unconstitutional under the Due Process Clause of the Fourteenth Amendment, the First Amendment, and the Commerce Clause.  *Id.*  The *Breard* Court first observed that entrants onto private property are ordinarily treated as invitees or licensees, not trespassers, unless some form of notice bars entry.  *Id.* at 626.  Nevertheless, the Court upheld the constitutionality of the ordinance.

Especially relevant here is the Court's discussion of the manager's argument that the ordinance violates the First Amendment because it placed an "undue burden" on the freedom of speech and press.  *Id.* at 641.  It acknowledged that the argument is *not* that a solicitor may go "'in or upon private residences' at will" (or against their wishes), but rather that

"distribution of periodicals" is entitled to First Amendment protection.  *Id.*  Rejecting the argument, the *Breard* Court balanced the conflicting interests of the "householders' desire for privacy" and the "publisher's right to distribute publications in the precise way that those soliciting for him think brings the best results" and determined that the ordinance did not violate the First Amendment.  *Id.* at 644.  Reaching this conclusion, the *Breard* Court emphasized the commercial nature of the activity and the alternative paths available to the solicitor, *id.* at 645, and it explained that "[t]he First and Fourteenth Amendments have never been treated as absolutes.  Freedom of speech or press does not mean that one can talk or distribute where, when and how one chooses[,]" *id.* at 642.

 *Breard* is distinguishable.  First, the *Breard* Court did not declare that the solicitors' First Amendment rights were unprotected at the landowners' doorstep, but rather that the landowners' interest in privacy outweighed their own right.  Traditional means-end scrutiny thus permitted the City of Alexandria to revoke solicitors implied license to enter residential property to practice their craft, even though it restricted their First Amendment rights.  But the Court in *Bruen* explicitly disavowed "applying means-end scrutiny in the Second Amendment context," 142 S. Ct. at 2127, offering an analytic framework whose principal focus is history and tradition, *id.* at 2129–30.  Accordingly, this Court is forbidden from considering whether the Default Rule is sufficiently tailored to achieve an asserted governmental interest and, relatedly, balancing the interests of different constituencies in its analysis.  *See id.* at 2131 ("The Second Amendment 'is the very *product* of an interest balancing by the people'") (quoting *Heller*, 554 U.S. at 635).  In any case, the *Breard* Court focused on the alternative options available to the solicitors to distribute their publications commercially; they did not have to approach private residences to do so.  *See* 341 U.S. at 644.  Unlike the

solicitors, Plaintiffs' conduct here—carrying for self-defense in public—is implicated everywhere they lawfully go.  The State cannot revoke their license on *all* private property unlike the municipality that could restrict soliciting on *residential* property.

In sum, for the foregoing reasons, because Plaintiffs have shown that the plain text of the Second Amendment covers their conduct—*i.e.*, carrying firearms for self-defense on private lands that are held open to the public—"the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30.  For the Default Rule to survive as applied to such lands, then, the State must justify the regulation by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.  As to private lands that are *not* held open to the public, the Default Rule—establishing a presumption that express consent is necessary to concealed carry—does *not* implicate the text of the Second Amendment.  The State's and amici's other arguments are unpersuasive.[38]

### ii.        Historical Tradition:  The Default Rule

Next, the Court addresses the historical evidence that the State sets forth to justify the Default Rule.  As identified above, because the Court finds that Plaintiffs' proposed course of conduct is presumptively protected by the text of the Second Amendment as to private property that is held open to the public, the burden of persuasion shifts to the State to justify

---

[38] For instance, the State and their amici argue that default rules are nothing new and that the Court should uphold the Default Rule as a law that "best reflect the most likely preferences of the owners themselves."  [State Opp'n Br. at 6; *see also* Prop. Law Br. at 9–12.]  For example, the State suggests that the Default Rule is like intestacy statutes, which provide for the disposition of a decedent's property "not effectively disposed of by [the decedent's] will."  [State Opp'n Br.at 7 (quoting N.J. Stat. Ann. § 3B:5-2).]  In other words, where a decedent dies without a will, the decedent's silence on disposition is answered with the State's background rules.  Additionally, the State points to contract law, which supplies terms by statute or common law where the parties' instrument is silent.  [*Id.* (citing Restatement (Second) of Contracts § 204 (1981)).]  But both contexts differ from the Default Rule in an important way.  The Default Rule, rather than filling a void *created* by a decedent or the contracting parties, subjects a licensed carrier to criminal penalties where a landowner has *not* expressed her wishes.  The alternative default rules cited do not implicate constitutionally protected conduct in the same way, nor do they persuade this Court why Plaintiffs' conduct is outside the scope of the Second Amendment.

its proposed firearms regulation.  *See Bruen*, 142 S. Ct. at 2130.  In this regard, the Court considers whether the Default Rule is "relevantly similar" to the historical evidence proffered: that is, "how" and "why" the regulations cited burdened an ordinary, law-abiding citizen's right to armed self-defense and whether the Default Rule imposes a comparable burden.  *See id.* at 2132–33.  Ultimately, the Court finds that the State's evidence is not sufficiently analogous to justify the Default Rule as to private property that is held open to the public.

First, the State argues that New Jersey has a longstanding tradition of prohibiting the carriage of firearms on private property without the express consent of the landowner.  [State Opp'n Br. at 10.]  They point to a colonial law from 1722 that they trace to the early twentieth century to establish, what they contend is, a particularly persuasive tradition justifying New Jersey's "no-carry" default rule.  [*See id.* at 10–15.]  As the New Jersey State Archives is responsible for preserving the State's official records, including copies of previously enacted legislation, the Court relies on and cites to the certification of Joseph R. Klett, Executive Director of the New Jersey State Archives.  [Klett Certif. ¶¶ 1–4 (Docket No. 76).]

The State begins with the 1722 law entitled, "An Act to prevent Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not qualified."  [*Id.* ¶ 7, Ex. A (Docket No. 76-1).]  Section 1 made it unlawful to kill any deer between January and June and provided for the assessment of a penalty of thirty shillings for every deer killed within those months, and Section 4 made it unlawful "to carry any Gun, or Hunt on the Improved or Inclosed Lands in any Plantation, and on other than his own, unless he have License or Permission from the owner of such Lands or Plantation."  [*Id.* §§ 1, 4.]  Violating Section 4 carried a penalty of fifteen shillings per infraction, but the 1722 law provided for a penalty of ten shillings if the offense occurred in the "Woods or Uninclosed Lands" for persons who

were not owners of one hundred acres of land. [*Id.*] Imprisonment could result for a term of five-to-eight days, depending on the nature of the offense, if an offender refused to pay (or, presumably, could not pay) the penalty and did not have any possessions that could be seized and sold. [*See id.*] The State believes that the text of Section 4 is analogous to the text of the Default Rule because a person would violate the law regardless of whether he carried a gun for the purpose of hunting game. [State Opp'n Br. at 12.]

The State next cites a 1751 law that supplemented the 1722 law. [*Id.* at 10.] In the preamble, the 1751 law noted that the 1722 law had "not fully prevented many Mischiefs and Inconveniences that have often happened by Persons setting of Steel Traps to catch Deer, whereby not only other Mens [sic] Cattle have been hurt, but People have been in Danger thereof," [Klett Certif. ¶ 8, Ex. B, § 1 (Docket No. 76-2)], so New Jersey's colonial legislature adopted a procedure for landowners to seize certain traps and provided for an assessment of fines upon conviction, [*see id.* §§ 2–6]. The 1751 law also enhanced the fine for carrying a gun or hunting or watching for deer or other game or letting any dog or dogs in to drive deer on another's property without the owner's written permission. [*Id.* § 7.] They also point to a 1769 law that further supplemented the 1722 law. [State Opp'n Br. at 10.] In "An Act for the more effectual Preservation of Deer in this Colony," New Jersey extended the operative language of the prohibition to all "land for which the Owners pay Taxes or is in his Lawful Possession," not only "Improved or Inclosed Lands in any Plantation." [Klett Certif. ¶ 9, Ex. C, § 1 (Docket No. 76-3).] According to Princeton University History Professor Hendrik Hartog, this change represented an extension in the scope of the presumption that would have applied to businesses, such as taverns and blacksmiths' shops, not simply land on which one might hunt. [Hartog Decl.¶¶ 32–38 (Docket No. 84).] Professor Hartog's opinion in this

133

regard, however, appears to be based on his interpretation of the law's theoretical application to such categories; the Court is not presented with primary evidence suggesting that the 1769 law (and the 1771 law discussed below) were enforced in, for instance, businesses held open to the public. The 1769 law also provided for the assessment of a penalty of 5 pounds and the forfeiture of the violator's gun(s) upon conviction. [Klett Certif. ¶ 9, Ex. C, § 2.] The remainder of the law is directed at various conservation and anti-poaching measures.

Next, the State again cites a 1771 law, [State Opp'n Br. at 10–11], which the Court previously discussed in its TRO Opinion. [*Koons* TRO Op. at 39–40 (Docket No. 34) (construing the 1771 law as designed to address the problem of poaching).] In 1771, the colonial legislature passed "An Act for the Preservation of Deer, and other Game, and to prevent trespassing with Guns." [Klett Certif. ¶ 11, Ex. D (Docket No. 76-4).] The 1771 law repealed and replaced the 1722 law, as amended. [*See id.* § 19; *see also* Klett Certif. ¶ 11.] Like its predecessors, the 1771 law made it unlawful "to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor." [Klett Certif. ¶ 12, Ex. F, § 1, Docket No. 76-6.] The offense carried a penalty of forty shillings. [*Id.*] In 1776, the New Jersey Constitution reauthorized the 1771 law and all other colonial laws contained in the New Jersey law compendium published by Samuel Allinson. [*See* Klett Certif. ¶ 12; *id.*, Ex. E, § 21 (N.J. Constitution) (Docket No. 76-5).] The 1771 law thus became part of the laws of the State of New Jersey and remained unchanged for decades.

An 1846 statute recodified the 1771 law and amended certain terms—for example, changing "forty shillings" to "five dollars." [*Id.*, Exs. H-I (Docket Nos. 76-8, 76-9).] The 1846 statute appears to have been supplemented by acts in 1852, 1859, 1866, 1867, and 1873,

which all added or modified poaching-related measures.  [*Id.*, Exs. J–O (Docket Nos. 76-10, 76-11, 76-12, 76-13, 76-14, & 76-15).]  For instance, the 1873 law prohibited persons from hunting for rabbits with ferrets.  [*Id.*, Ex. O, § 1.]  A statutory revision was published in 1876, which appears to have maintained the substance of the 1771 / 1846 law and set forth each of its multiple supplements.  [*Id.*, Ex. P (Docket No. 76-16).]

In 1895, the State adopted, "An Act to prevent trespassing with guns," which represented a fundamental shift away from the structure of the former laws.  [*Id.*, Ex. R (Docket No. 76-18).]  The 1895 law prohibited trespassing on another's lands while carrying a gun after "public notice" forbidding trespass had been "conspicuously posted" or "after being forbidden so to trespass" by the owner, occupant, lessee, or licensee of the land.  [*Id.* §§ 1, 2.]  The law provided for a fine of five dollars upon conviction or if the offender failed to pay, a term of imprisonment in the county prison for a period of not more than ten days.  [*Id.* § 3.]  The 1895 law was amended in 1911 to increase the penalty and to exempt "fresh-meadow land over which the tide has ebbed and flowed continuously for twenty years or more."  [*Id.*, Ex. S (Docket No. 76-19).]  In 1928, the State repealed the 1846 fish-and-game law, as amended.  [*Id.*, Ex. T (Docket No. 76-20).]  Director Klett points out that the 1895 law, as amended by the 1911 law, remains in effect today.[39]

--------

[39] The offense is reproduced as follows:

> Any person who, while carrying a gun, shall trespass on any lands, except fresh meadow lands over which the tide has ebbed and flowed continuously for 20 years or more, after (a) having been forbidden so to trespass by the owner, occupant, lessee or licensee of such lands or (b) after such owner, occupant, lessee or licensee has given public notice forbidding such trespass, which notice has been conspicuously posted adjacent to the highway bounding on such lands or adjacent to a usual entry way thereto, shall be deemed guilty of trespass at the suit of such owner, occupant, lessee or licensee, in a civil action and liable for damages of not less than $10.00.

N.J. Stat. Ann. § 2A:63–1.

The State contends that the foregoing laws are analogous to the Default Rule and demonstrate a tradition justifying the "no-carry" presumption. Citing Professor Hartog, the State stresses that the colonial-, Founding-, and Reconstruction-era laws established a presumption that carrying a gun on another's property without prior express consent constituted trespass, and that such presumption was to "'protect the powerful right of the property owners to prevent armed individuals from coming on to their property without license.'" [State Opp'n Br. at 11–12 (quoting Hartog Decl. ¶ 22).] While the State seems to acknowledge that the colonial and Founding-era laws were designed to ensure that "deer were not slaughtered out of season, at a time when deer were for many a crucial source of protein," [Hartog Decl. ¶ 18], the State stresses that 18th- and 19th-century statutes often included "multiple expressly stated purposes," [State Opp'n Br. at 13 (citing Hartog Decl. ¶ 23)]. Thus, the New Jersey laws should be read to support the "longstanding" exclusion of firearms from all private property by landowners.

Having carefully reviewed and analyzed the foregoing, the Court finds the State's evidence unavailing; it is not persuaded to depart from its prior interpretation. The New Jersey fish-and-game laws the State cites are not analogous to the Default Rule. The 1722 law and its progeny are clearly hunting regulations designed to discourage poaching. For example, the 1722 law principally addressed when one could lawfully hunt for deer and other game and banned the sale of "green Deer Skins or fresh venison" in this regard. [Klett Certif. ¶ 7, Ex. A, §§ 1–2.] In any case, the scope of the firearm prohibition was limited to "Improved or Inclosed Lands in any Plantation," and it provided for a lower penalty if the infraction occurred in another's "Woods or Uninclosed Lands." [*Id.* § 4.] That Section 4 prohibited carrying a gun on another's property without permission is not dispositive of *Bruen's* Step Two

136

inquiry.  The Court is not engaged in a purely textual analysis; rather, it must consider how and why a given law restricted the right to armed self-defense.  *See Bruen*, 142 S. Ct. at 2132–33.  It is clear that the Section 4 restriction was enacted principally to prevent hunting out of season.

This reading is further confirmed by the way in which the 1722 law changed over the years.  The 1751 supplement focused almost entirely on redressing the harms associated with setting traps and loaded spring guns on others' properties, [Klett Certif. ¶ 8, Ex. B, §§ 1, 2–6, 10], and the 1769 supplement extended the scope of the lands where the prohibitions of the prior law would be applicable to better preserve deer in the Colony, [*id.* ¶ 9, Ex. C].  The post-Founding supplements further suggest that the firearm regulation was designed to discourage poaching—the 1846 law and its amendments addressed various hunting-related measures.  [*See, e.g.*, *id.* ¶ 16, Ex. O, § 1 (prohibiting hunting rabbits with ferrets).]  The nature of these incremental changes cannot be ignored, nor do they suggest to the Court an intention to prohibit firearms, for instance, in taverns and blacksmith shops and all other private property in New Jersey.  [*See* Hartog Decl. ¶ 34.]  Theoretical applicability does not answer the key inquiry of why the legislation was enacted.

Additionally, the New Jersey laws that the State cites were all generally enforced against white colonists (and, eventually, citizens) by the assessment of a monetary penalty, not the force of the criminal law.[40]  [*See* Klett Certif., Ex. A (1722 law), § 4 (fifteen or ten

---

[40] The Court observes that the 1722 law, a product of its time, distinguished between white colonists and non-white persons (e.g., Indians and slaves).  On the one hand, white colonists who violated the law were liable to pay a monetary penalty per infraction, whereas, on the other hand, non-white persons who violated the law were exempt from imprisonment but were subjected to corporeal punishment *and* monetary penalties.  [*Compare* Klett Certif., Ex. A, § 4 (providing for fifteen or ten shillings per infraction, depending on the nature of the land at issue), *with id.*, § 6 (providing for twenty lashes per infraction at the "publick Whipping-post" and a penalty of three shillings).]

shillings); *id.*, Ex. B (1751 law), § 7 (bond of 10 pounds; judgment of 5 pounds); *id.*, Ex. C

(1769 law), § 2 (5 pounds); *id.*, Ex. F (1771 law), § 1 (forty shillings); *id.*, Ex. I (1846 law), § 1

(five dollars); *id.*, Ex. R (1895 law), § 3 (five dollars).]   The penalty-per-infraction varied

depending on the circumstances, and as illustrated, the monetary sum assessed generally

increased over the years.   But generally, none of the laws were enforced with the deterrent of

potential imprisonment.   [*Compare id.*, Ex. A (1722 law), § 4 (providing for payment of fifteen

or ten shillings per infraction to informer / complainant and to "the Poor of the Township or

Precinct where the Offence is committed," or forced sale of violator's goods, or commitment

to prison if violator refused to pay), *with id.*, Ex. F (1771 law), § 1 (providing for payment of

forty shillings per infraction directly to landowner or tenant-in-possession).]   *See also State v.*

*One 1990 Honda Accord*, 712 A.2d 1148, 1156 (N.J. 1998) (characterizing the 1722, 1751, 1769,

and 1771 laws, among others, as "fish and game acts" that were enforced with forfeiture and

penalty regimes).   The retributive nature of the penalties suggests that the laws were primarily

designed to compensate landowners for a perceived loss due to poaching, given the

significance attributed to private property ownership, not vindication of a communal interest

in excluding firearms.   In contrast, violation of the Default Rule is a crime of the third-degree,

which carries a potential term of imprisonment of three-to-five years and a presumptive

sentence of four years.   *See* N.J. Stat. Ann. §§ 2C:58-4.6(a), 2C:43-6(a)(3), 2C:44-1(f)(1)(d).

The New Jersey fish-and-game laws and the Default Rule are thus differently situated—they

restrict carrying firearms for different reasons, and they impose drastically different penalties.

Other courts have similarly found that the 1722 law and its progeny are anti-poaching statutes.

*See Antonyuk v. Hochul*, 2022 WL 5239895, at *21 (N.D.N.Y. Oct. 6, 2022) (finding that "the

purpose" of the 1722 law "appears to be merely to stop poaching); *Solomon v. Cook Cnty. Bd.*

*of Comm'rs*, 559 F. Supp. 3d 675, 691 n.10 (N.D. Ill. 2021) (noting that 1722 law is primarily a hunting regulation).

Next, the State contends that similar laws from Pennsylvania, New York, Massachusetts, and Maryland justify the Default Rule.  [State Opp'n Br. at 15–16.]  Passed in 1721, the Pennsylvania law, "An Act to Prevent the Killing of Deer Out of Season, and Against Carrying of Guns or Hunting by Persons not Qualified," made it unlawful to "carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation."  Act of Aug. 16, 1721, ch. 246, § 3, 3 1682-1801 Penn. Stat. 254-55 (1896) (Docket No. 88-33).  Passed in 1763, New York's law, "An Act to prevent hunting with Fire-Arms in the City of New-York, and the Liberties thereof," made it unlawful for "any Person . . . other than the Owner, Proprietor, or Possessor" to "carry, shoot, or discharge any . . . Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclosed Land whatsoever, within the City of New-York, or the Liberties thereof, without" obtaining prior written consent from such "Owner, Proprietor, or Possessor of such" land.  Act of Dec. 20, 1763, ch. 1223, § 1, 2 1691-1773 N.Y. Laws 442 (Docket No. 88-34).]  Enacting such law, the colonial government observed that "great Numbers of idle and disorderly persons" were hunting with firearms and "tread[ing] down the Grass, and Corn and other Grain standing and growing in the Fields and Inclosures" in the City.  *Id.*  Passed in 1790, Massachusetts' law, "An Act for the Protection and Security of the Sheep and other Stock on Tarpaulin Cove Island Otherwise Called Naushon Island and on Nennemessett Island, and Several Small Islands Contiguous, Situated in the County of Dukes County," made it unlawful to "be seen with any gun or guns" without "special license of the proprietors of the said Islands."  Act of Jan. 30, 1790, ch. 30,

1789 Mass Acts. 437-39 (Docket No. 89-1).  Enacting the law, the Commonwealth indicated that "great numbers of Sheep and Deer have been killed and other damages sustained" by "Gunners and Hunters" on the Islands.  *Id.*  Finally, passed in 1715, Maryland's law made it unlawful to, *inter alia*, "be seen to carry a gun, upon any person's land, whereon there shall be seated a plantation, without the owner's leave, having been once before warned."  [Cai Decl., Ex. 32, § 7 (Docket No. 88-32).]

Like the New Jersey laws discussed above, the foregoing colonial laws are not analogous evidence justifying the Default Rule.  Pennsylvania's law, like its New Jersey counterpart from 1722, specifically applies to the improved or enclosed lands of a plantation, not private property more generally.[41]  The structure and content of the law suggest that its limitation on carrying firearms was a prophylactic measure designed to prevent poaching. Similarly, New York's law seeks to prohibit hunting on the enclosed lands of the City of New York, including in orchards, gardens, and cornfields.  In fact, the law prohibited "passing through" such lands as well, even without firearms.  Act of Dec. 20, 1763, ch. 1223, § 1, 2 1691-1773 N.Y. Laws 442 (Docket No. 88-34).  The Massachusetts law was also designed to

---

[41] The State repeatedly suggests that the "improved or inclosed" language appearing in some of the early colonial laws does not refer to fenced-in property.  [State Opp'n Br. at 14.]  Rather, it refers to the way in which a landowner would have given notice of his possession or ownership of a parcel of land in a time in which landowners were only beginning to record their interests in county deed books and with tax authorities.  [*See* Hartog Decl. ¶¶ 36–37.]  Accordingly, the State argues that enclosing property with fencing was only one way for New Jersey's 1722 law, New York's 1763 law, and Pennsylvania's 1721 law, for example, to apply; other indicia of improvement or use would have sufficed, too.  [*See* State Opp'n Br. at 18–19.]  But the *Koons* Plaintiffs suggest that such language did refer to fenced-in lands.  [*Koons* PI Reply Br. at 18–19.]  The laws cited would not have applied to "taverns, shops, or dwelling houses," they argue.  [*Id.* at 18.]  They cite *State v. Hopping*, 18 N.J.L. 423 (1842), which explained that "improvements is a legal and technical word, and means inclosures, or inclosed fields: lands fenced in, and thus withdrawn and separated from the wastes or common lands." *Id.* at 424.  Though the Court finds the interpretation the *Koons* Plaintiffs offer compelling, as other courts have as well, *see Antonyuk*, 2022 WL 3999791, at *35 & n.46, this Court need not adopt one reading.  Each of the laws cited includes other language suggesting that these laws were more limited than the State would have this Court find.  New York's 1763 law referred to orchards, gardens, and cornfields in addition to "other inclosed Land whatsoever," and New Jersey's 1722 law and Pennsylvania's 1721 law were both limited to plantations.  These textual referents are persuasive indicators that carrying firearms was not prohibited on all private property, no matter its character.

prevent "gunning" and "hunting" and applied to relatively uninhabited islands in the Commonwealth, where "few persons residing on said Islands cannot give proper security to the stock [of sheep and deer] thereon."  Act of Jan. 30, 1790, ch. 30, 1789 Mass Acts. 437-39 (Docket No. 89-1).  Unlike the other laws where landowners' permission was paramount, the Massachusetts law exempted persons from the restriction if they could demonstrate sufficient justification for a license to carry.  *Id.*  Finally, the Maryland law was similarly limited: it appears to have been designed to prevent poaching and applied to plantations alone.  It also required prior notice for a firearm carrier to be found in violation of the law.  [Cai Decl., Ex. 32, § 7 (Docket No. 88-32).]

In contrast, the Default Rule is designed to exclude firearms from all private property in New Jersey, for whatever reason and regardless of the nature of the land at issue.  Only certain classes of public officials and law enforcement are exempt from the restriction.  The colonial hunting laws and the Default Rule are differently situated; they do not impose a comparable burden on licensed firearm carriers.[42]

---

[42] Distinguishing the hunting laws, the *Koons* Plaintiffs also argue that the hunting laws are not relevantly similar to the Default Rule because they focused on "long guns," whereas the Default Rule presumptively excludes "handguns."  [*Koons* PI Reply Br. at 14–18 (Docket No. 101).]  Because the hunting laws distinguished between "guns" and "pistols," and the latter were apparently outside the scope of such laws, they did not impose a comparable burden on the right to self-defense and, thus, cannot justify the Default Rule.  [*Id.*]  In support of their argument, the *Koons* Plaintiffs point to a dictionary definition of "gun" that excludes "pistols" from its scope.  [*Id.* at 15 (quoting *Gun*, Noah Webster's Am. Dictionary of the English Language (1828) ("GUN, noun. An instrument consisting of a barrel or tube of iron or other metal fixed in a stock, from which balls, shot or other deadly weapons are discharged by the explosion of gunpower.  The larger species of guns are called cannon; and the smaller species are called muskets, carbines, fowling pieces, etc. But one species of fire-arms, the pistol, *is never called a gun*.")).]  They also claim that New Jersey and other states routinely distinguished between "guns" and "pistols" in their firearm legislation.  [*Id.* at 15–17 (discussing New Jersey militia law mandating provision of musket or rifle for ordinary militiamen and pistols for horse troopers and Massachusetts law prohibiting the discharge of a "gun or pistol" in the town of Boston).]  Thus, by using the term "gun," such states did not mean to include "pistol."  In contrast, the State has provided a raft of dictionary definitions of "gun" that make clear that "gun" is a generic term for all firearms, including pistols.  [*See, e.g.*, *Gun*, Samuel Johnson, Dictionary of the English Language (1773), Docket No. 119, Tab 2 ("GUN. . . The general name for fire-arms; the instrument from which shot is discharged by fire."); *Gun*, N. Bailey, Dictionarium Britannicum (1736), Docket No. 119, Tab 4 ("GUN . . . a Fire-Arm or Weapon of several Sorts and Sizes.").]  In any case,

Next, the State argues that Reconstruction-era evidence from Louisiana, Texas, and Oregon imposed analogous limitations on the right to armed self-defense. [State Opp'n Br. at 16–17.] In 1865, Louisiana passed a law to prohibit "any person or persons to carry fire-arms on the premises or plantations of any citizen, with the consent of the owner or proprietor, other than in lawful discharge of a civil or military order." 1865 La. Acts No. 10, § 1, p. 14 (Docket No. 88-14). It also enacted a law to prevent trespassing on plantations, fining any person who "shall enter upon any plantation without the permission of the owner or agent." 1865 La. Acts No. 11, § 1, p. 16. Similarly, in 1867, Texas passed a law prohibiting any person "to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty." Act of. Jan 13, 1867, art. 6510, *reprinted in* 2 *A Digest of the Laws of Texas* 1321–22 (4th ed. 1874) (Docket No. 88-35). Finally, in 1893, Oregon passed a law prohibiting any person, "being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." [Cai Decl., Ex. 36, § 1, (Docket No. 88-36).] The State contends that these laws should be credited because they are consistent with the colonial- and Founding-era evidence it cites. [*See* State Opp'n Br. at 17.] Plaintiffs believe that the Louisiana, Texas, and Oregon laws are inconsistent with the prior evidence, should be construed as anti-poaching laws, or fail to establish a representative tradition. [*Siegel* PI Reply Br. at 42 (Docket No. 97); *Koons* PI Reply Br. at 22 (Docket

---

the historical laws that the State cites are not limited to "guns"; they include the term, "firearms," as well. [*See, e.g.*, Cai Decl., Ex. 34 (New York's 1763 law), § 1 (prohibiting carry of "any Musket, Fowling-Piece, *or other Fire-Arm whatsoever*) (emphasis added).] Even if "pistol" contained a meaning distinct from "gun," the Court reads "firearm" to be sufficiently generic to encompass both. Thus, the Court rejects the *Koons* Plaintiffs' argument.

No.101).]  The *Koons* Plaintiffs also urge this Court to find that only Founding-era evidence can satisfy *Bruen* Step Two.  [*Koons* PI Reply Br. at 6–9.]

The Court does not agree with Plaintiffs' assessment of the Reconstruction-era laws. Based on the record, the Louisiana, Texas, and Oregon laws do not appear to be designed to discourage hunting, so they are not distinguishable for the same reason as the other historical evidence proffered.  Rather, the three Reconstruction-era laws seem to support the State's position.  Though they are not directly comparable or "dead ringers," they are relevantly similar:  they prohibit carrying firearms on another's "premises" without the consent of the owner or possessor.  Still, the Louisiana and Texas laws refer to another's premises *or* "plantation," and the Texas and Oregon laws refer to "inclosed" premises.  So an equally availing interpretation is that these restrictions, as before, did not apply to all private property, such as "taverns," but only a subset.  Moreover, given the period in which the Louisiana and Texas laws were enacted—at the tail end of the Civil War and the early days of Reconstruction—the Court questions whether these measures were enacted against a unique backdrop:  one designed to quell sedition, protect public safety, and introduce a slate of civil rights for newly freed slaves.  Both laws, after all, specifically exempted a person from liability for entering onto in-scope property pursuant to a civil or military order.  [*See* Cai Decl., Ex. 14, § 1 ("other than in lawful discharge of a civil or military order"); *id.*, Ex. 35, Art. 6510 ("other than in the lawful discharge of a civil or military duty").]  Thus, the Louisiana and Texas laws could be construed as outliers.  In the end, while the Court finds that the Louisiana, Texas, and Oregon laws support the State and are analogous to the Default Rule, it concludes that they fail to establish a *representative* historical tradition to justify the Default Rule.  Three Reconstruction-era laws are insufficient in number to satisfy the Step Two

143

inquiry.[43]  *See Bruen*, 142 S. Ct. at 2142 ("we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation").

Finally, the State has again suggested that certain modern regulations establishing a "no-carry" presumption as to specific classes of property are analogous to justify the Default Rule.  [State Opp'n Br. at 7–8, 8 n.3 (citing Alaska Stat. Ann. § 11.61.220; D.C. Code § 7-2509.07; Ga. Code Ann. § 16-11-127(b)(4); La. Rev. Stat. § 40:1379.3(O); N.Y. Penal Law § 265.01-d(1); Ohio Rev. Code Ann. § 2923.126(B)(6); S.C. Code Ann. § 22-31-225).]  But these laws have limited relevance here.  As this Court previously explained, modern-day statutes do not establish a tradition of firearms regulation on their own; they are only relevant insofar as they are consistent with prior evidence defining the scope that the right was understood to have when adopted.  [*Koons* TRO Op. at 42-43 (Docket No. 34).]  In fact, *Bruen* refused to consider 20th century firearm laws because they provide no insight into the understanding of the Second Amendment.  142 S. Ct. at 2154 n. 28 (refusing to consider 20th century firearm laws offered by government and amici because those laws do not clarify the Second Amendment's meaning); *see also id.* at 2137.  In any case, the laws cited do not justify presumptively excluding the carriage of firearms by Carry Permit holders on all property that is held open to the public.  The scope of their "no-carry" defaults is much more limited than that of the Default Rule.

In sum, the evidence that the State has put forward does not persuade this Court that the Default Rule permissibly regulates the right to carry for self-defense in public.

---

[43] Because the Court finds that the Reconstruction-era evidence offered is insufficient to establish a representative tradition, it need not address whether such evidence could ever satisfy *Bruen* Step Two.

Accordingly, Plaintiffs are likely to prevail on their Second Amendment challenge to Chapter 131's handgun ban on private property that is held open to the public.

> ### iii. The *Siegel* Plaintiffs' First Amendment Challenge to the Default Rule

Next, the Court considers whether the Default Rule violates the First Amendment. Because the Court finds that the Default Rule violates the Second Amendment as applied to private property that is held open to the public, the Court limits its analysis here to property that is *not* held open to the public.[44] The *Siegel* Plaintiffs present three arguments. First, they contend that the Default Rule is a content-based regulation that requires them "to speak the [S]tate's preferred policy" and, as such, it violates the compelled speech doctrine. [*Siegel* PI Reply Br. at 44.] Second, they assert that the Default Rule is a content-based regulation because it requires them to speak a message that they would not otherwise speak. [*Id.* at 44–45.] Third, even if the Default Rule is not content based, they argue that it fails to survive intermediate scrutiny. [*Id.* at 46.] In reply, the State's argument is simple: the Default Rule does not implicate the compelled speech doctrine nor violate the First Amendment because the *Siegel* Plaintiffs are not coerced into speaking a particular message. [State Opp'n Br. at 21.]

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech. U.S. Const. amends. I, XIV. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v.*

---

[44] The Court does not intend to intimate that the distinction it found to be meaningful in its Second Amendment analysis is similarly material and applicable in its First Amendment analysis. Rather, the Court need not adopt findings that would be immaterial to its conclusion.

*Mosley*, 408 U.S. 92, 95 (1972).  Thus, when reviewing a law that is alleged to violate the First Amendment, courts ordinarily first determine whether the law is a content-based or content-neutral regulation of speech.  *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).  That is because the distinction is of analytic importance.  "Content-based laws— those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  Content-neutral laws are subject to intermediate scrutiny and may be justified only if they are "narrowly tailored to serve a significant governmental interest."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994); *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).

To determine whether a law is content based, courts ask whether the "law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed*, 576 U.S. at 163.  But facially content neutral laws that "cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message the speech conveys,'" must satisfy strict scrutiny.  *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (cleaned up).

Still, as a matter of first principles, a challenged law does not come within the scope of the First Amendment where it does not restrict "speech."  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (distinguishing between laws that restrict protected expression and laws that are directed at commerce or conduct and impose merely incidental burdens on speech).  Nor is there compelled speech where individuals are not coerced into speaking a *particular* message.  *See Spence v. Washington*, 418 U.S. 405, 410–11 (1974) (noting an "intent to convey a particularized message" by college student who displayed flag with peace symbol on private

property to protest Vietnam War in challenge to Washington's improper-use-of-flag statute). These propositions are practically self-evident from the text of the Amendment as well.

Consider the quintessential examples. In *West Virginia Board of Education v. Barnette*, the Court held that a law requiring schoolchildren to recite the Pledge of Allegiance and to salute the flag violated the First Amendment because of its inherently coercive nature in demanding fealty to a specific message. 219 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."). In *Wooley v. Maynard*, the Court invalidated a New Hampshire law that required drivers to display the state motto—"Live Free or Die"— on their license plates. 430 U.S. 705, 717 (1977). In both cases, the government was prohibited from "telling people what they must say." *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 61 (2006).

More recently, the Court invalidated a California law that required licensed clinics to inform patients regarding the availability of free or low-cost services, including abortions, and unlicensed clinics to notify patients that California had not licensed them to provide medical services. *Becerra*, 138 S. Ct. at 2376, 2378. To comply with the law, clinics were required to disseminate government-drafted notices. *Id.* at 2369–70. But the petitioners in *Becerra* allegedly opposed the practice of abortion and disputed the requirement that they share the government's words with patients. Discussing the licensed notice, the Court explained that, "[b]y compelling individuals to speak a particular message, such notices 'alter the content of their speech.'" *Id.* at 2371. The requirement was thus subject to strict scrutiny, *id.*, and the

state could not demonstrate that it was the least restrictive means of "educating low-income women about the services it provides," *id.* at 2375–76.

Here, the Default Rule does not compel property owners to speak a particular message, so it is not a regulation of speech within the scope of the First Amendment's protection. Unlike in *Barnette*, *Wooley*, and *Becerra* where the state required individuals to, *inter alia*, pledge allegiance, display the state's motto, and inform patients about free abortion services, property owners here are not required to express a specific message at all. Rather, the Default Rule sets a background rule and construes the sound of silence. Property owners can depart from the background rule by manifesting their consent to the entry of firearms on their property, or they can stay silent. Of course, they can withhold consent, too. Placing the burden on firearm carriers to seek consent to enter private property, the State does not mandate that property owners speak certain words to manifest or deny consent or to do so in any particular way. The Default Rule merely gives property owners the choice.[45]

Nor is it clear how the *Siegel* Plaintiffs are burdened by the Default Rule, or how they are forced to "speak the [S]tate's preferred policy." Plaintiffs Siegel, Cook, and DeLuca allege that, as homeowners, "they wish to allow the carry of handguns in their homes without posting a sign or engaging in express speech." [*Siegel* Compl. ¶ 314 (*Siegel* Docket No. 1).] This is the only allegation the Court can identify in their pleadings to ground their general arguments on behalf of private property owners. In other words, they object to an obligation placed on *other* individuals (*i.e.*, firearm carriers) because the result requires *them* to manifest consent. The Court fails to see how the *Siegel* Plaintiffs' free speech rights are burdened where

---

[45] As discussed above, see *supra* Section IV.G.2.b.i., this choice is acceptable on property that is not "held open to the public" or, in other words, on property which others are not customarily invited to enter by implication. Just as a Second Amendment right is not implicated in such cases, neither is a First Amendment right.

others (*i.e.*, firearm carriers) are required to seek permission to carry firearms in the *Siegel* Plaintiffs' homes. And the Default Rule does not require them to manifest their consent. They can deny firearm carriers entry into their homes, too. Thus, the identifiable "expressive content" at issue in First Amendment jurisprudence is not present here.

For these reasons, the Default Rule, as it applies to private property not held open to the public, does not violate the First Amendment because it does not regulate speech.[46]

### iv. The *Siegel* Plaintiffs' Equal Protection Challenge to the Default Rule

Finally, the Court considers whether the Default Rule violates the Equal Protection Clause of the Fourteenth Amendment. The *Siegel* Plaintiffs contend that the Default rule (and Chapter 131 for that matter) reveals the State's animus towards firearm carriers and discriminates against them on the basis of their exercise of a fundamental right. [*Siegel* PI Reply Br. at 48.] The State repeats that Plaintiffs do not have a Second Amendment right to carry on private property against the consent of the property owner and argue that the Default

---

[46] For this reason, the Court also disagrees with the *Siegel* Plaintiffs' other arguments. The Default Rule does not "[m]andate[e] speech that a speaker would not otherwise make." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974)). In *Tornillo*, for instance, the Court struck down a Florida law that required newspapers to provide political candidates whose character had been assailed space in their newspaper columns to respond free of charge (*i.e.*, a 'right of reply'). 418 U.S. at 244. The court explained that the law "exacts a penalty on the basis of the content" the newspaper published and "'dampens the vigor and limits the variety of public debate'" thereby. *Id.* at 256, 257 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964)). Here, unlike in *Tornillo*, the Default Rule does not require property owners to speak a specific message where they would otherwise stay silent; it places a burden on firearm carriers to seek express consent to enter another's property with their firearm, and it gives property owners a choice to manifest their right to exclude. Additionally, for the same reason, neither is the Default Rule a facially neutral restriction on speech. The Default Rule simply does not implicate either level of scrutiny because it does not regulate speech. *See, e.g., Club Madonna, Inc. v. City of Miami Beach*, 500 F. Supp. 3d 1304, 1310 (S.D. Fla. 2020) (refusing to apply First Amendment analysis to ordinance that required club to check identification of nude dancers to prevent human trafficking and child labor); *Las Vegas Police Protective Ass'n Metro Inc. v. Las Vegas Metro. Police Dep't*, 2017 WL 1246339, at *2 (D. Nev. Mar. 31, 2017) (rejecting challenge to legislation that did not "concern or regulate speech," but rather required employee organization to pay for time spent performing duties unrelated to local government employment).

149

Rule is merely about shifting the burden *from* landowners to revoke permission to enter *to* firearm carriers to seek such consent.  [State Opp'n Br. at 22–23.]

Though it previously concluded that the Default Rule appears to criminalize a right protected by the Second Amendment as to property held open to the public, the Court, unlike before, does not confine its analysis here to property that is not held open to the public. Ultimately, the Court concludes that the Default Rule does not abridge the Constitution's commitment to equal protection.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  This command "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, laws that distinguishes between persons based on "suspect classifications," such as race and national origin, or fundamental rights, such as the right to travel, marry, and vote, are subjected to "the most exacting scrutiny."  *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (collecting cases).  Intermediate scrutiny is applied to classifications based on sex or illegitimacy.  *Id.* Otherwise, legislation will survive constitutional scrutiny if it is rationally related to a legitimate government interest.  *Romer v. Evans*, 517 U.S. 620, 631 (1996); *see also Tolchin v. Sup. Ct. of New Jersey*, 111 F.3d 1099, 1113 (3d Cir. 1997) ("as a general matter, economic and social legislation is subject to rational basis review.") (citation and internal quotation marks omitted).

The *Siegel* Plaintiffs allege that the State subjects them to unequal treatment based on their exercise of a fundamental right to carry for self-defense.  "Merely infringing on a fundamental right, however, does not implicate the Equal Protection Clause."  *Teixeira v.*

*County of Alameda*, 822 F.3d 1047, 1052 (9th Cir. 2016), *aff'd on reh'g en banc*, 873 F.3d 670 (9th Cir. 2017). To demonstrate that a law treats similarly situated persons differently, a plaintiff must show that "he is being denied a fundamental right while others are permitted to exercise such right, and that there is no valid justification for the distinction." *Id.* (citing *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969); *Shapiro v. Thompson*, 394 U.S. 618 (1969), *overruled, in part, on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974)).

For instance, in *Teixeira*, retail firearm store owners argued that a county denial of their conditional use permit to sell firearms violated equal protection and the Second Amendment. 822 F.3d at 1050–51. Advancing their equal protection claim, they asserted that the county's denial was based on their engagement in assisting customers to exercise a Second Amendment right; other retailers that were not engaged in the sale of firearms were permitted to operate. *Id.* at 1052. Rejecting their claim, the court explained that the firearm store owners and "other general retailers" were not similarly situated, as the latter group was also "forbidden from engaging in the commercial sale of firearms absent compliance with the [county law]." *Id.* Accordingly, the law did not differentially distinguish between persons who exercise the fundamental right. *Id.*

Here, the *Siegel* Plaintiffs contend that the State subjects individuals who exercise their right to carry for self-defense to harsher penalties than individuals who exercise their First Amendment rights (for example, to protest). [*See Siegel* Pls.' Br. at 48.] The latter is subject to trespass liability pursuant to N.J. Stat. Ann. § 2C:18–3 whereas the former is subject to the Default Rule as well. Their argument has some persuasive force, as this Court discussed above. See *supra* Section IV.G.2.b.i. For equal protection purposes, however, the two groups

151

are not similarly situated because they involve the exercise of different rights.  This is not a situation where a state law treats one group of firearm carriers differently from another. Therefore, the *Siegel* Plaintiffs' equal protection challenge must fail.  *See Teixeira*, 822 F.3d at 1052 ("Because [the firearm store owners'] equal protection challenge is no more than a Second Amendment claim dressed in equal protection clothing, it is subsumed by, and coextensive with the former, and therefore is not cognizable under the Equal Protection Clause.") (cleaned up) (internal citation and quotation marks omitted); *see also Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 704 (N.D. Ill. 2021) (rejecting substantive due process and equal protection argument for repackaging Second Amendment claim) (citing *Culp v. Raoul*, 921 F.3d 646, 658 (7th Cir. 2019), *cert. denied*, 141 S. Ct. 109 (2020)).

### c.   Chapter 131's Enumerated "Sensitive Places" (and Related State Statutes that Pre-Date *Bruen*)

The Court now considers the constitutionality of the enumerated "sensitive places" in Chapter 131 and those other, related state laws challenged by the *Siegel* Plaintiffs that pre-date *Bruen*.

### i.   Public Gatherings, Demonstrations, and Events Requiring a Government Permit

Only the *Siegel* Plaintiffs challenge Chapter 131's prohibition on Carry Permit holders' bringing their handguns to public gatherings, demonstrations, or events requiring a government permit.  [*Siegel* Compl. ¶¶ 257–58 (*Siegel* Docket No. 1).]  This Court did not consider the merits of their challenge to this provision at the TRO stage.  [*Siegel* TRO Op. at 19–20 (Docket No. 51).]  With standing resolved, see *supra* Section IV.G.1., this Court considers the constitutionality of Chapter 131's ban on firearms at public gatherings.

Unquestionably, the *Siegel* Plaintiffs' proposed course of conduct of carrying their handguns in public for self-defense falls within the Second Amendment's text. *See Bruen*, 142 S. Ct. at 2134–35. Chapter 131's prohibition on carrying handguns at public gatherings infringes on their constitutional right to armed self-defense in public because the law requires Carry Permit holders to disarm before attending any public gatherings or events requiring a government permit. N.J. Stat. Ann. § 2C:58-4.6(a)(6). Because the Second Amendment presumptively protects the *Siegel* Plaintiffs' conduct, the State must show that "well-established" and "representative" historical firearm laws likewise prohibited firearms at public gatherings. *Bruen*, 142 S. Ct. at 2126, 2133.

At the outset, it is significant to note the State provided no historical firearm laws from the colonial generation that banned firearms at public assemblies. Rather, the State offers only 19th-century laws from southern and mid-western states that prohibited firearms at certain public assemblies. [State Opp'n Br. at 34–35 (Docket No. 91).] Yet Plaintiffs alluded to some colonial laws in their briefing suggesting that colonists were required to bring their arms to certain public gatherings. [*Koons* PI Reply Br. at 17 (Docket No. 101).]

To place the State's historical evidence in context, the Court reviews colonial firearm laws enacted before the Second Amendment's ratification. The colonial generation required the settlers to carry weapons during public assemblies to defend against hostilities from Native Americans, protect themselves from criminals and pirate raids, to curb slave rebellions, and to be ready for a potential foreign invasion. *See generally* Halbrook, *supra* Section IV.D.1.a, at 131–35; Clayton E. Crammer, *Colonial Firearm Regulation*, 16 J. on Firearms & Pub. Pol'y 1, 6–7 (2004). This history is relevant because the "Second Amendment . . . codified a pre-existing right." *Heller*, 554 U.S. at 592 (emphasis omitted).

Starting in 1619, Virginia's House of Burgesses passed a law requiring "all persons" attending church services on the Sabbath "to beare arms" and bring with them "their pieces, swordes, poulder and shotte."  Lyon Gardiner Tyler, *Narratives of Early Virginia, 1606–1625*, at 273 (Charles Scribner's Sons, 1907).  Then, in 1632, Virginia's General Assembly enacted a law requiring all men fit to bear arms to bring their weapons "to the church."  1 William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, at 174 (New York, R. & W. & G. Bartow 1823).  A decade later, in 1642, Virginia's legislature enacted another law requiring the "masters of every family [to] bring with them to Church on Sundays one fixed and serviceable gun with sufficient shot and powder."  *Id.* at 263.  Because of the threat posed against the early colonists by Native Americans—a pernicious problem for the settlers—in 1676, Virginia's governor required "all people be enjoined and required to go armed for their greate[r] security . . . in going to churches and court in these times of danger."  Halbrook, *supra* Section IV.D.1.a, at 125 (quoting An Act for the Safeguard and Defence of the County Against the Indians, 28 Car. II, 2).  About a hundred years later, in 1755, Virginia passed another law allowing each county's chief militia officer to order all enlisted militiamen "to go armed to their respective parish churches."  6 William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, at 534 (Richmond, Franklin Press 1819).

Virginia was not alone.  In 1636, Colonial Massachusetts required citizens to attend public assemblies with "their muskets or other peeces [sic] fit for service, furnished with match, powder, and bullets."  1 Nathaniel B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* 190 (Boston, William White Press 1853).  Rhode Island,

154

in 1639, likewise ordered that no "man shall go two miles from the Towne unarmed, [either] with Gunn or Sword; and that none shall come to any public Meeting without his weapon." 1 John R. Bartlett, *Records of the Colony of Rhode Island and Providence Plantations, in New England* 94 (Providence, A.C. Greene & Bros. 1856).  Like the other colonials, Maryland's colonists were familiar with violence from encounters with the Native Americans, and in 1642, Maryland provided that "noe man able to bear arms to goe to church or Chapell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott."  3 William Hand Browne, *Archives of Maryland: Proceedings of the Council of Maryland 1636–1667*, at 103 (Baltimore, Md. Hist. Soc'y 1885).  Connecticut followed step in 1643 by ordering that certain citizens bring muskets, pistols or some "peeces" with powder and shot when attending meetings on the Sabbath or "lecture" days. 1 J. Hammond Trumbell, *The Public Records of the Colony Connecticut, Prior to the Union with New Haven Colony* 95 (Hartford, Brown & Parsons 1850).

Within the decades before the Second Amendment's ratification, South Carolina, in 1740, passed a law requiring "every white male inhabitant of this Province . . . who is liable to bear arms in the militia of this Province" who attends "any church or any other public place of divine worship" to "carry with him a gun or a pair of horse pistols . . . with at least six charges of gunpowder and ball."  7 David J. McCord, *Statutes at Large of South Carolina* 417–19 (Columbia, A.S. Johnston 1840).  This law appears aimed at violence stemming from slave revolts.  *See id.*  Then, in 1770, Georgia enacted a law requiring "every white male inhabitant of this province . . . who is or shall be liable to bear arms in the militia . . . and resorting, on any Sunday or other times, to any church, or other place of divine worship" to "carry with him a gun or a pair of pistols."  Horatio Marbury & William A. Crawford, *Digest*

*of the Laws of the State of Georgia* 241–42 (Savannah, Seymour, Woolhopter & Stebbins 1802). The law required the churchgoer to bring his weapon "with him to the pew or seat." *Id.*

Given the above, the historical evidence demonstrates that six out of the thirteen original colonies required their citizens to go armed when attending religious services or public assemblies. *Heller*, 554 U.S. at 601 (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons"). The colonial generation recognized that citizens attending public gatherings exposed themselves to violent attack. While public assemblies might conjure the notion that there is "strength in numbers," history reveals that the more crowded the gathering, the greater the risk of attack. To abate that risk, American colonists obligated their citizenry to arm themselves for protection.

Against that colonial canvas, the State offers mid- to late-19th century laws from Texas, Tennessee, Georgia, Missouri, New Mexico, Arizona, and Oklahoma, as well as city laws from Columbia, Missouri, and Stockton, Kansas, to justify disarming Carry Permit holders within 100 feet of public gatherings, demonstrations, or events requiring government permits. [State Opp'n Br. at 34–35 (Docket No. 91).] The State also relies on various state court decisions it purports upheld the validity of those laws. [*Id.* at 35 (citing *English v. State*, 35 Tex. 473 (1871); *Hill v. State*, 53 Ga. 472 (1874); *State v. Shelby*, 90 Mo. 302 (1886); *Andrews v. State*, 50 Tenn. 165 (1871); *State v. Reando* (Mo. 1878)).][47] The State also contends the reasoning behind Chapter 131's firearm ban at public assemblies—to protect First Amendment interests—is similar to banning firearms at sensitive places such as polling places and courthouses. [*Id.* at 36].

---

[47] A copy of *State v. Reando* is annexed to the Declaration of Patrick J. Charles ¶ 14 n.4, Ex. 23. (Docket No. 86-23).

The Texas, Missouri, Oklahoma, and Arizona state laws, and the city laws the State relies on are virtually identical.   Those laws made it unlawful to carry firearms at:  (1) "any church or religious assembly," (2) "any school room or other place where persons are assembled for educational, literary or scientific purposes," (3) "ball room, social party or other social gathering composed of ladies and gentlemen," (4) "any election precinct on the day or days of any election, where any portion of the people of th[e] State are collected to vote at any election," (5) "any other place where people may be assembled to muster or to perform any public duty," or (6) "any other public assembly."   1870 Tex. Gen. Laws 63, § 1 (Docket No. 88-5); Tex. Penal Code tit. IX, ch. 4, art. 320 (1879) (Docket No. 88-9);[48] 1874 Mo. Laws 43, § 1 (Docket No. 88-45); 1879 Mo. Rev. Stat., ch. 24, Art. II,  § 1274, p. 224 (Docket No. 88-10); 1889 Ariz. Terr. Sess. Laws 17, § 3 (Docket No. 89-30); 1890 Okla. Terr. Stats., Art. 47, § 1, p. 496 (Docket No. 89-31); Columbia, Mo. Gen. Ordinances ch. XVII,  § 163 (1890) (Docket No. 86-16); and Stockton, Kan. Ordinances, no. 76, § 1  (1887), *reprinted in Stockton Review and Rooks County Record* (Stockton, Kan.), Vol. VIII, No. 26, July 1, 1887 (Docket No. 86-24).[49]   The Tennessee, Georgia, and New Mexico laws were narrower in scope.  The 1869 Tennessee law made it unlawful to carry firearms at "any election" in the state, "any fair, race course, or other public assembly of the people."   Act of Dec. 1, 1869, ch. XXII, § 2, 1870 Tenn. Acts 23 (Docket No. 88-8).  In 1870, Georgia outlawed the carrying of firearms at "any Court of Justice, or any election ground, or precinct, or any place of public worship, or any

---

[48] The Texas penal code codified the Act of April 12, 1871 that criminalized the carrying of arms in churches or other public assemblies.

[49] The laws varied slightly.  For example, the Oklahoma law banned firearms at "any political convention" and "any place where intoxicating liquors are sold."  1890 Okla. Terr. Stats., Art. 47, § 1, p. 496 (Docket No. 89-31). The Missouri laws, state and city, included "any court-room during the sitting of court."  1879 Mo. Rev. Stat., ch. 24, Art. II, § 1274, p. 224 (Docket No. 88-10); Columbia, Mo. Gen. Ordinances ch. XVII, § 163 (1890) (Docket No. 86-16)

other public gathering in this State."   Ga. Code pt. IV, tit. I, div. X, § 4528, p. 818 (1873)
(codifying 1870 act) (Docket No. 88-22).   The 1869 New Mexico law criminalized the
"draw[ing] and us[ing] of any deadly weapon"—that is, firearms—"in any ball, dance, or
other public gathering of the people, or near where any election authorized by law is being
held in any part of the Territory."   1869 N.M. Laws ch. 32, § 5 (Docket No. 90-49).

The Court finds that the above laws are not "well-established" and "representative"
historical firearm regulations to justify prohibiting Carry Permit holders from carrying their
handguns at public gatherings or demonstrations requiring a government permit.   *Bruen*, 142
S. Ct. at 2133.

First, Arizona's and Oklahoma's state laws, as well as the city laws from Columbia,
Missouri, and Stockton, Kansas, were enacted a decade before the turn of the 19th century,
and so under *Bruen,* they provide little insight into the public's understanding of the Second
Amendment's meaning either in 1791 or 1868.   142 S. Ct. at 2153–54.   Arizona, New Mexico,
and Oklahoma were also all territories.   These territorial restrictions "deserve little weight"
because they were often "transitory [in] nature," "rarely subject to judicial scrutiny," and only
governed small populations of those living in the regions.   *Id.* at 2154–55 (noting that Arizona,
Idaho, New Mexico, Oklahoma, and Wyoming combined for less than 1% of the entire
United States' population in 1890).   New Mexico's law deserves no consideration because
that law only criminalized using or drawing a firearm during public gatherings—not mere
possession of a handgun as Chapter 131 does here.   Thus, this Court gives little weight to the
Arizona's and Oklahoma's laws and the city laws, and no weight to the New Mexico law.

Turning to the 1870 Georgia law, this Court finds that the law's ban on firearms did
not apply across the board to all public assemblies and gatherings as Chapter 131's ban does.

The Georgia law proscribed possession of firearms at any courts, election grounds or precincts, places of public worship, and "any other public gathering in this State."  Ga. Code pt. IV, tit. I, div. X, § 4528, p. 818 (1873) (codifying 1870 act) (Docket No. 88-22).  Under statutory construction principles, the meaning of the phrase "any other public gathering" is to be construed by reference to the places previously identified—courts, election grounds, and religious institutions.  *Singh v. Uber Tech., Inc.*, 939 F.3d 210, 2020 n.3 (3d. Cir. 2019) (stating that *ejusdem generis* "is a statutory canon through which, 'when a statute sets out a series of specific items ending with a general term, [the] general term is confined to covering subjects comparable to the specifics it follows'") (quoting *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008)).  The key attributes of the specific public gatherings identified in the law concern the performance of a civic duty, such as voting, or exercising First Amendment religious rights, such as attending religious services, or accessing the courts.  Accordingly, the Georgia criminal law may have been inapplicable to other types of public gatherings, such as political conventions or protests.  *See, e.g.*, *United States v. Kaluza*, 780 F.3d 647, 661 (5th Cir. 2015) ("The limiting principle of *ejusdem generis* has particular force with respect to criminal statutes, which courts are compelled to construe rigorously in order to protect unsuspecting citizens from being ensnared by ambiguous statutory language.") (quoting *United States v. Insco*, 496 F.2d 204, 206 (5th Cir. 1974)).  Thus, it seems that the Georgia law may not have imposed a "comparable burden" on the right to armed self-defense as Chapter 131 does, which applies to all types of public gatherings, demonstrations, or events requiring a government permit.  *Bruen*, 142 S. Ct. at 2133.

In any event, the Supreme Court of Georgia's decision in *Hill* upholding the 1870 law rests on a militia-based reading of the right to keep and bear arms.  53 Ga. at 474 (stating that

"the language of the constitution of this state, as well as that of the United States, guarantees only the right to keep and bear the 'arms' necessary for a militiaman"). There, the defendant was indicted under the 1870 law for carrying a loaded pistol at a "court of justice, then in session." *Id.* at 473. He challenged the law's constitutionality, arguing that the law violated the Second Amendment and Georgia's constitutional provision on the right to keep and bear arms. *Id.* In refusing to find the law unconstitutional, the *Hill* court found that the arms referenced in Georgia's constitution applied only to arms belonging to militiaman. *Id.* at 474 ("The word 'arms,' evidently means the arms of a militiaman, the weapons ordinarily used in battle, to-wit: guns of every kind, swords, bayonets, horseman's pistols, etc. The very words, 'bear arms,' had then and now have, a technical meaning. The 'arms bearing' part of a people, were its men fit for service on the field of battle.").

Although dicta, the *Hill* court's reading of the Second Amendment misunderstood the right. *Heller*, 554 U.S. at 592. That court understood the Second Amendment to confer a collective right, not an individual private right. *Hill*, 53 Ga. at 474. While post-ratification history may help illuminate the public's understanding of the Second Amendment, *Heller*, 554 U.S. at 605, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text," *Bruen* 142 S. Ct. at 2137 (emphasis in original) (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Thus, because the *Hill* decision does not show how the 1870 law banning firearms at certain public gatherings complied with the Second Amendment's original understanding, the State's reliance is misplaced.

The Texas statutes and court decision the State relies on suffer the same demise. As noted above, the 1870 and 1871 Texas laws banned firearms at various locations where people

assembled.  1870 Tex. Gen. Laws 63, § 1 (Docket No. 88-5); Tex. Penal Code tit. IX, ch. 4, art. 320 (1879) (Docket No. 88-9).  In *English*, the Supreme Court of Texas considered, among other things, the constitutionality of the 1871 Texas law in reviewing a conviction of a man convicted of bringing a butcher knife to a church.[50]  Like Georgia's Supreme Court, the *English* court concluded that that "arms" referenced in the Second Amendment and Texas' constitution applied only to weapons "used for the purposes of war."  35 Tex. at 475, 478; *see also id.* at 477 ("The word 'arms' in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense.").  The Texas high court's interpretation of the Second Amendment as a militia-based right—a collective right—not a private, individual right for self-defense contravenes the original understanding of the right.  *Heller*, 554 U.S. at 592.  Accordingly, the *English* court's acceptance of the 1871 law provides little insight into whether banning firearms at public gatherings is permissible under the Second Amendment as originally understood.  *Bruen* 142 S. Ct. at 2155.   In fact, the *Bruen* Court found *English*'s rationale to be an "outlier."[51]  *Id.* at 2153.

The Missouri laws and the cases the State relies on to support Chapter 131's handgun ban at public assemblies fair no better.  One of the Missouri laws the State relies upon is

---

[50] In *English*, the Texas Supreme Court considered three separate convictions.  The court's opinion only discusses the facts of defendants English's and Daniels' convictions.  English was convicted for carrying a pistol in public while intoxicated.  Daniels did not file a brief.  The court's decision is silent on the facts surrounding defendant Carter's conviction because the court did not have a transcript and Carter did not file a brief.

[51] Courts should be cautious to give Texas' Constitution of 1869 and the resulting *English* decision much weight because that Constitution and *English* likely emerged from the miliary occupation of Texas following the Civil War.  *See Masters v. State*, 653 S.W.2d 944, 947 (Tex. Ct. App. 1983) (Powers, J., concurring) (explaining that the *English* "decision was made by the semicolon court, a court established by a State constitution (that of 1869) which was the product of military occupation and the disfranchisement of most of the State's inhabitants, circumstances which deprive that court's decisions of *stare decisis* effect").   Indeed, the author of the English decision, Justice Moses B. Walker, "had been a Union officer in the Civil War and worked in the military occupation of Texas after the war."  Halbrook, *supra* Section IV.D.1.a, at 278.

inapposite as it criminalized the carrying of concealed weapons at public assemblies.  1874 Mo. Laws 43, § 1 (Docket No. 88-45).  *State v. Reando*, the case the State relies upon, applied that law to uphold a criminal conviction for carrying a concealed weapon at a statutory designated location.  [Charles Decl. ¶¶ 14, 14 n.4, Ex. 23 (Docket No. 86-25).]  But as noted in *Bruen*, state laws banning concealed carry of weapons did not translate into complete bans on carrying weapons in public.  142 S. Ct. at 2146–47.  States that banned concealed carry "did not similarly prohibit open carry."  *Id.*  (collecting statutes and cases).

Indeed, the *Reando* court even recognized that the law punished only concealed carry and left Missourians with the right to open carry their firearms at the designated locations. [Charles Decl. ¶¶ 14, 14 n.4, Ex. 23 ("Under this statute the right to enter, even such places, by any person bearing arms openly and exposed to public view is not prohibited.").]  The court warned that a complete ban on firearms at the statutory public assemblies could run afoul of Missouri's state constitution.  [*Id.* ("If the statute in question had the effect of denying this right, and absolutely prohibiting the citizen from keeping and bearing arms, we would not hesitate to pronounce it void, as being violative of a constitutional right secured to every man by the constitution of the State.").]  But the court observed that the legislature might one day ban all firearms at the statutorily designated locations.  [*Id.* ("We do not say nor do we wish to be understood as saying that the legislature might not prohibit a person from bearing arms, even openly, in such places as are mentioned in the statute, without such prohibition to constitutional objections.").]

A few years later, in 1879, the acting legislature removed the concealed carry limitation on banning firearms at the public assembly locations.  1879 Mo. Rev. Stat., ch. 24, Art. II, §

1274, p. 224 (Docket No. 88-10).[52]  Thus, the law criminalized both concealed and open carry at the designated locations.  *Id.*  While the statute banned concealed carry everywhere in the state, the law did not prohibit open carry in locations other than those identified public assemblies.  *Id.*

In *Shelby*, the Supreme Court of Missouri upheld a conviction against an individual carrying concealed pistol at hotel while intoxicated.  2 S.W. at 469–70.  Despite the State's contrary interpretation, the *Shelby* court did not apply the portion of the law criminalizing the possession of firearms at public assemblies.  While the court observed that the 1879 law's ban on firearms at public assemblies was not limited to concealed carry, the court only addressed the constitutionality of the general concealed carry provision of the law and the provision on carrying guns while intoxicated.  *Id.*

*Shelby* tells this Court nothing about banning firearms at public assemblies.  In fact, given the Missouri Supreme Court's declaration in *Reando*—that complete bans on all firearms at public assemblies would likely violate the state's constitution, [*see* Charles Decl. ¶¶ 14, 14 n.4, Ex. 23]—this Court questions whether the 1879 law was permissible under Missouri's state constitution.  Because of the questionable constitutionality of the 1879 law, this Court also questions whether the law is a reliable historical analogue under *Bruen*.  *Cf.* 142 S. Ct. at 2131 (explaining that "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality").

---

[52] The Missouri legislature amended the law in 1883 to increase the criminal penalties.  1883 Mo. Laws 76, § 1 (Docket No. 89-29).

Turning to Tennessee, the state law's ban on possession of pistols at polling places, fair grounds, races courses, and "other" public assemblies appears to offer some support to Chapter 131's ban on handguns at public gatherings.  Tennessee amended its gun laws several times in the 19th century largely because of the Supreme Court of Tennessee's decision in *Andrews*.  *See generally Poe v. State*, 3 S.W. 658, 659–60 (Tenn. 1887) (reviewing changes to state's gun law).  In *Andrews*, the court considered the constitutionality of a state law banning the possession of, among other things, a "belt or pocket pistol or revolver."  50 Tenn. at 171.  The *Andrews* court concluded that the statute's ban on revolvers violated Tennessee's constitutional right "to keep and bear arms for their common defense" because a revolver could be a soldier's weapon.  *Id.* at 177, 187.  In doing so, the court construed Tennessee's constitutional right to keep and bear arms as a private right to ensure the "efficiency of the people as soldiers, when called into actual service for the security of the State."  *Id.* at 178.  Thus, the court found that the legislature could not ban possession of some weapons—such as long guns—because those are the arms used by soldiers.  *Id.* at 179.

In dicta, however, the court noted that the state's legislature could ban firearms—even those arms used by soldiers—at churches or other public assemblies because "carrying them to such places is not an appropriate use of them, nor necessary in order to his familiarity with them, and his training and efficiency in their use."  *Id.* at 182.  While the *Andrews* court did not specifically interpret the 1869 law the State relies on, the court's dicta suggests that Tennessee's high court would have allowed lawmakers to impose time and place restrictions on the state constitutional right to keep and bear arms.  *Id.*[53]

---

[53] Following *Andrews*, the Tennessee legislature amended the state's gun law to allow possession of an "army pistol" or pistols "commonly carried and used in the United States" only if "carried openly in [one's] hands." *Bruen*, 142 S. Ct. at 2147 n.21 (quoting 1871 Tenn. Pub. Acts. ch. 90, § 1).

In the end, then, the State offers only a handful of state laws of unknown duration and state court decisions mainly from southern and mid-western states (several of which relied on a flawed misunderstanding of the Second Amendment's original understanding) to justify Chapter 131's handgun ban at public gatherings.   Those laws, however, stray from this Nation's colonial history of arming citizens attending public assemblies for safety reasons. *Heller*, 554 U.S. at 601.   Even if those laws were established among the southern and mid-western states, it cannot be said that the laws were representative of the Nation.   Indeed, by 1890, the population across those states represented less than 15% of the entire nation.[54] *Antonyuk*, 2022 WL 16744700, at *67 (finding historical laws governing less than 15% of the nation's population were not representative of entire nation).   Put simply, those 19th century laws do not establish a historical tradition of banning firearms at public assemblies or gatherings.   *Cf. Espinoza v. Mont. Dep't of Revenue*, 591 U.S. ____, ____, 140 S. Ct. 2246, 2258-59 (2020) (observing that 30 states adoption of laws "in the second half of the 19th century . . . cannot by itself establish an early American tradition" to inform the understanding of the First Amendment).

The State also cannot justify Chapter 131's firearms ban at public gatherings by equating that law to firearm prohibitions at sensitive places such as polling places and courthouses.   In *Bruen*, the Court recognized that legislative assemblies, polling places, and courthouses were historically considered "sensitive places" where weapons could be prohibited altogether consistent with the Second Amendment.   142 S. Ct. at 2131.   History reveals that those places were considered sensitive places because either government officials

---

[54] By 1890, the United States had a total population of 62,622,250.   The combined populations of Arizona, Georgia, Missouri, New Mexico, Oklahoma, Tennessee, Texas, and Stockton, Kansas accounted for about 8.8 million inhabitants.   *See* Dept. of Interior, Compendium of the Eleventh Census:   1890, Part I. 2, 174 (1892).

met at those locations to perform core government administration (courthouses and legislative assemblies), or the location involved a citizen's fundamental right to participate in the political process (polling places).  *See generally* David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 206, 229–236, 244–247 (2018).  The common thread that runs through all these "sensitive" locations is that historically the government provided security at them, and so the need for armed self-defense was reduced.  *See Hardaway v. Nigrelli,* ____ F. Supp. 3d ____, ____, 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022) (noting that legislative assemblies and courthouse "are typically secured locations, where uniform lack of firearms is generally a condition of entry").

    For example, Delaware, by its state constitution, banned firearms at polling places and prohibited the mustering of the state's militia on election days.  Del. Const., art. 28 (1776).  Delaware also required sheriffs and other officials responsible for regulating certain elections "to attend, conduct, and regulate the election."  Act of Oct. 26, 1790, ch. CCXIV.b., § 1, 1700-1797 Del. Laws 984.  Georgia had a similar law requiring sheriffs and their deputies to attend elections to "enforce the orders of the presiding magistrates in preserving good order."  Robert & George Watkins, *A Digest of the Laws of the State of Georgia* 611 (Phila., R. Aitken 1800).  Other states, either by constitutional mandate or legislative enactment, required sheriffs or constables to attend elections.[55]  States also required security at legislative

---

[55] Md. Const. of 1776, art. 3, 14 (requiring sheriffs or their deputies to attend elections "for the preservation of the peace" and "be the judges of the election" for House of Delegates and Senate elections); Act of Dec. 11, 1778 (Va), *reprinted in Abridgement of the Public Laws of Virginia* 325 (1796) (a 1778 Virginia law requiring the sheriff to attend certain elections "to take the poll at such election, entering the names of the persons voted for in a distinct column"); Act of Nov. 16, 1807, § 8, 1800-1811 N.J. Laws 36 (a 1807 New Jersey law authorizing election officers, "for the preservation of good order" and "for the security of the election officers from insult and personal abuse," to "commit any person or persons who shall conduct in a riotous or disorderly manner" to the constable or jail keeper); The Hon. John Faucheraud Grimke, *The Public Laws of the State of South Carolina* 386–88 (Phila., R. Aitken & Son, 1790) (providing a table of fees outlining payment to, among others, the sheriff for, among other things, "all public services of the Sheriff" including "attending the Court of Claims, summoning

assemblies and courthouses in the form of sergeant-at-arms, door keepers, sheriffs, constables, or bailiffs.[56]  For example, South Carolina required sheriffs or their deputies to "attend all courts hereby appointed."  The Hon. John Faucheraud Grimke, *The Public Laws of the State of South Carolina* 271 (Phila., R. Aitken & Son 1790).  Likewise, New York required "sheriffs and their officers" to attend court proceedings "to do those things which to their offices shall pertain."   Act of Feb. 20, 1801 ch. VIII, § XI, 1807 N.Y. Laws 175-76.  Several states statutorily allocated funds to pay sergeant-at-arms and door keepers for attending legislative assemblies, and sheriffs and constables for attending court proceedings.[57]

Without considering the government-provided security feature of the recognized sensitive places, the State would stretch the sensitive places doctrine to cover all places of public congregation – this is a bridge too far.  *Bruen*, 142 S. Ct. at 2134 ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated

---

and [empaneling] grand juries, publishing writs of electing members to the General Assembly, taking the ballots and returning the writ, [and] serving all public orders of the Court").

[56] Act of June 14, 1793, ch. XIX.c., § 11, 1700-1797 Del. Laws 1091 (providing that the "Sheriff of Kent county . . . shall be the attendant  on the said High Court of Errors and Appeals during the sitting thereof, and be the officer for the purpose of executing  the orders and process of the said court"); Act of Mar. 15, 1798, § 3, 1800-1811 N.J. Laws 50-51 (a 1798 law providing that the "constables of the several townships in such county shall be the ministerial officers of the said court . . . and to perform all matters, acts, and things appertaining to their offices"); Act of Mar. 1, 1780, ch. DCCCLXXIX, § XI, *reprinted in* 10 Stat. at Large of Pa.  57 (Wm. Stanley Ray, 1904) (a 1780 law authorizing the court of errors and appeals "to require and compel the attendance of sheriffs, coroners, constables and other ministerial officers as fully as any court of justice in this commonwealth can or may do").

[57] ***Connecticut*** – 1784 Conn. Acts & Laws 63-65; ***Georgia*** – Robert & George Watkins, *A Digest of the Laws of the State of Georgia* 473-74 (Phila., R. Aitken 1800); ***Georgia*** – Act of Dec. 10, 1807, *reprinted in* Augustine Smith Clayton, *A Compilation of the Laws of the State of Georgia* 372–73 (Augusta, Adams & Duyckinck 1812); ***Massachusetts*** – 1786 Mass Acts and Laws, ch. 73, p. 235; ***New Hampshire*** – Act of Feb. 9, 1791 (N.H.), 1791 N.H. Laws 115-16; ***New Jersey*** – *Extracts from the Journal Proceedings of the Provincial Congress of New Jersey* 239-40 (Woodbury, Joseph Sailer 1835) (1775 law); ***New York*** – Act of Apr. 7, 1801, ch. CLXXIII, , § IV, 1807 N.Y. Laws 534.; ***North Carolina*** –  John Haywood, *A Manual of the Laws of North Carolina* 196 (Raleigh, J. Gales, 3d ed. 1814); ***Pennsylvania*** – Act of Dec. 27, 1781, ch. CMLVII, § II, *reprinted in* 10 Stat. at Large of Pa.  57 (Wm. Stanley Ray, 1904); ***South Carolina*** – The Hon. John Faucheraud Grimke, *The Public Laws of the State of South Carolina* 426–27 (Phila., R. Aitken & Son, 1790); ***Rhode Island*** – 1798 R.I. Pub. Laws 222; ***Vermont*** – Act of Oct. 25, 1798, ch. CVII, *reprinted in* 2  *The Laws of the State of Vermont* 387 (Randolph, Sereno Wright, 1808).

from law enforcement defines the category of 'sensitive places' far too broadly.").  Thus, for the above reasons, this Court finds the *Siegel* Plaintiffs have shown a reasonable likelihood of prevailing on the merits of their Second Amendment challenge to Chapter 131's prohibition on firearms at public gatherings, demonstrations, or events requiring a government permit.[58]

### ii.        Zoos

Like public assemblies requiring a government permit, this Court did not reach the merits of the *Siegel* Plaintiffs' challenge to Chapter 131's handgun ban at zoos at the TRO stage because of their lack of standing.  [*Siegel* TRO Op. at 17–18 (Docket No. 51).]  Having now found standing, this Court reviews the merits of their challenge.

The Second Amendment's text covers the *Siegel* Plaintiffs' proposed course of conduct of carrying a handgun in public for self-defense.  *Bruen*, 142 S. Ct. at 2134–35.  Chapter 131's prohibition on carrying handguns at zoos infringes on their constitutional right because the law penalizes Carry Permit holders who bring their handguns with them to going to a public zoo.  N.J. Stat. Ann. § 2C:58-4.6(a)(9).  The State must now show that historical firearm laws likewise prohibited firearms at zoos.  *Bruen*, 142 S. Ct. at 2126, 2133.

The State argues that zoos first appeared in this Nation during the Reconstruction era and were in public parks, such as New York City's Central Park, Philadelphia's Fairmount Park, and Chicago's Lincoln Park.  [State Opp'n Br. at 37].  Because those parks banned firearms, the argument goes, firearms were also banned at those zoos.  [*Id.* at 36-37.]  Those parks, and in effect zoos, did ban firearms.  *Fourth Annual Report of the Commissioners of the Central Park* 106 (1861) (Docket No. 88-23); *Acts of Assembly Relating to Fairmount Park* 18

---

[58] Given this Court's finding, the Court declines to reach the *Siegel* Plaintiffs' void-for-vagueness challenge to this provision of Chapter 131.

(1870) (Docket No. 88-24); 1881 Mun. Code of Chicago, art. 43, § 1690, p. 391 (Docket No. 88-26).

All that may be true, but the State ignores the fact that zoos were scattered throughout the Nation during and after the Reconstruction era. Indeed, Massachusetts, Maryland, Rhode Island, Ohio, Michigan, and the City of Los Angeles all had zoos.[59] And besides the Central Park Zoo, New York had the Buffalo Zoo.[60] History reveals that several of those states did not totally ban firearms in public. Rather, most of those states only banned concealed carry.[61] For example, in 1893, Rhode Island outlawed the concealed carry of firearms—more than 20 years after the Roger Williams Park Zoo opened in 1872. 1893 R.I. Acts & Resolves, ch. 1180, § 1, pp. 231–32. Thus, before 1893, Rhode Islanders could apparently carry their arms at the zoo without fear of criminal penalties. And after 1893, they had the option to open carry. Likewise, Annapolis, Maryland banned concealed carry of firearms in 1872, and all of Maryland followed suit in 1886 by prohibiting concealed carry—

---

[59] From 1860–1863, Bostonians could enjoy the "Boston Aquarial and Zoological Gardens" which featured marine animals and plants as well as "a moose, a leopard, an African python, and several seals." *The Boston Aquarial Gardens and Zoological Gardens*, New England Aquarium, available at: http://www.neaq.org/about_us/mission_and_vision/aquarium_history/boston_aquarial_and_zoological.php . The Baltimore Zoo, now known as the Maryland Zoo, originated in the early 1860s. *The Story of the Zoo*, Maryland Zoo, available at: https://www.marylandzoo.org/about-us/zoo-history/. The Rogers Williams Park Zoo in Providence, Rhode Island opened its gates in 1872. *History*, Roger Williams Park Zoo, available at: https://www.rwpzoo.org/history/. Starting in 1875, Cincinnatians could visit the Cincinnati Zoo & Botanical Gardens to view the zoos' exhibits of monkeys, grizzly bears, buffalo, an alligator, and even, a "talking crow." *Mission, Vision, and History*, Cincinnati Zoo & Botanical Gardens, available at: https://cincinnatizoo.org/about-us/history-and-vision/. In 1883, the original Detroit Zoo in Michigan opened. *Detroit Zoological Society*, Detroit Hist. Soc'y, available at: https://detroithistorical.org/learn/encyclopedia-of-detroit/detroit-zoological-society. Two years later, in 1885, the City of Los Angeles opened the Eastlake Zoo. E.J. Stephens & Marc Wanamaker, *Images of America: Griffith Park* 37 (2011).

[60] The Buffalo Zoo in New York dates to 1870, and the first building erected on the property in 1875 established the Buffalo Zoological Gardens. *A Zoo with a Long History*, The Buffalo Zoo, available at: https://buffalozoo.org/about/.

[61] The parties have presented no firearm laws from these states during the relevant timeframe suggesting that those states regulated firearms in public differently.

almost decades after the Baltimore Zoo opened its gates.  1872 Md. Laws, ch. 42, § 1, p. 57; 1888 Md. Laws art. 27, § 30, pp.  468-69 (codifying 1886 law).  Maryland only criminalized open carry if person carried the weapon "with the intent or purpose of injuring any person." 1888 Md. Laws art. 27, § 30, pp.  468-69.  Ohio, at the relevant time, only banned concealed carry.  1859 Ohio Acts § 1, p. 56 (1859) (Docket No. 90-10).   While Michigan had a surety law on the books in 1846 that required a citizen complaint to trigger bonding proceedings, *see* Mich. Rev. Stat., ch. 162, § 16 (1846) (Docket No. 90-15), Michigan started outlawing concealed carry in 1887, *see* 1887 Mich. Pub. Acts, no. 129, § 1, p. 144—about 4 years after the Detroit Zoo opened.  Thus, unless there was proof that a Michiganian posed a danger to an identified person or the public, he or she could openly carry a firearm in public for self-defense, which presumably includes at the zoo.

The above laws reveal a lack of consensus among the states about carrying firearms in public, particularly in states that had zoos.  This is especially true for New York.  The State has presented only one law from New York City, even though New York had multiple zoos throughout the state.  All and all, three localized restrictions do not establish a historical tradition of banning firearms at zoos. *See Bruen*, 142 S. Ct. at 2142; *see also id.* at 2154 ("[T]he bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry.").

Besides the local laws from New York City, Philadelphia, and Chicago, the State seeks to justify Chapter 131's prohibition of handguns at zoos by relying on the same laws it did to support Chapter 131's ban at firearms at public gatherings.  [State Opp'n Br. at 38.]  Pointing to an 1871 Texas law, the State notes that Texas banned firearms in places where people assembled for amusement or educational purposes, or circuses, shows, or public exhibitions

170

of any kind.  Tex. Penal Code tit. IX, ch. 4, art. 320 (1879) (Docket No. 88-9).  The Texas and other state laws support the handgun ban at zoos because zoos are places where people gather for amusement or educational purposes.  Still, for the reasons already discussed, those laws were not well-established or representative historical firearm laws under *Bruen*.  See *supra* Section IV.G.2.c.i.

Finally, the State equates zoos to schools because children are the primary visitors at zoos, and since *Heller* and *Bruen* recognized that laws banning firearms at schools are presumptively lawful, states can likewise ban firearms at zoos.  [State Opp'n Br. at 38].  Again, such an argument stretches the sensitive places doctrine too far.  The mere presence of children at a particular location does not mean that location is a "sensitive place" where firearms can be completely banned, especially where children are not the predominate visitors.  *See Antonyuk*, 2022 WL 16744700, at *64, *67–68 (rejecting government's attempt to equate zoos with schools and playgrounds).[62]

Because the State has not presented this Court with laws establishing a historical tradition of banning firearms at zoos, *see Bruen*, 142 S. Ct. at 2130, Plaintiffs are likely to prevail on the merits of their Second Amendment challenge to Chapter 131's handgun ban at zoos.[63]

---

[62] Finally, in a strained attempt to uphold Chapter 131's handgun ban at zoos, the State argues there is a risk of poaching at zoos, and thus, historical anti-poaching laws support Chapter 131's restriction for zoos.  [State Opp'n Br. at 38.]  The State has presented no evidence of poaching at zoos in the United States.  The article the State relies on concerns a poaching incident in France.  *AZA Statement on Rhino Poaching Incident at Zoo Near Paris, France*, Association of Zoos & Aquariums (March 7, 2017), available at: https://www.aza.org/aza-news-releases/posts/aza-statement-on-rhino-poaching-incident-at-zoo-near-paris-france.

[63] Nothing in this opinion should be construed to prevent zoo owners from adopting policies banning firearms from their premises.

iii.        **Parks, Beaches, Recreation Facilities, Playgrounds and State Parks**

As noted, this Court has already temporarily enjoined the State from enforcing Chapter 131's prohibition on firearms at parks, beaches, and recreational facilities, as well as the regulation on firearms at state parks.  [*Siegel* TRO Op. at 22-28 (Docket No. 51).]  This Court refused the *Siegel* Plaintiffs' request to prevent the State from enforcing Chapter 131's restriction on handguns at playgrounds.  [*Id.* at 23–24.]  Having reviewed the parties' added briefing and historical materials, this Court declines to deviate from its prior rulings.

To start, the State has presented no historical firearm laws regulating firearms at beaches or recreational facilities/areas even though beaches have existed throughout this Nation's history.  The lack of historical firearm laws shows the State's efforts to ban firearms at beaches conflicts with the Second Amendment.  *Bruen*, 142 S. Ct. at 2131 (providing that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment").

For playgrounds, the parties have not persuaded this Court to change its earlier ruling allowing the State to ban firearms at playgrounds during this litigation.  [*Siegel* TRO Op. at 23–24.]  The *Antonyuk* court reached a similar conclusion.  2022 WL 16744700, at *64–65 (declining to preliminarily enjoin New York's gun law ban on carrying firearms at public playgrounds).

Turning to parks, the State has presented many laws—mostly local ordinances—from

172

the 19th and 20th centuries restricting firearms at parks.  [State Opp'n Br. at 38–39.[64]]   The State contends those laws are enough to establish a historical tradition of banning firearms at public parks.  [*Id.* at 39–40.]  The *Koon* Plaintiffs, in turn, have presented several colonial era laws that only prohibited discharging firearms at areas that today would be considered public parks.  [*Koons* PI Reply Br. at 29–31.]  According to them, those laws presuppose individuals carried firearms in parks during the colonial era.  *Id.*

At colonial times, village greens, commons, gardens, and squares were the colonial forerunners to today's public park.  Anne Beamish, *Before Parks:  Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 14 (2021) ("Today's American public park is deeply rooted in the seventeenth- and eighteenth-century utilitarian village green, common, square, and parade ground.").  In fact,

---

[64] The State relies on the following laws:  1895 Mich. Local Acts, No. 436, § 44, p. 596 (Docket No. 89-2); 1905 Minn. Gen. Laws ch. 344, § 53, p. 620 (Docket No. 89-3); 1917 Wis. Laws, ch. 668 (Docket No. 89-4); 1921 N.C. Pub. Laws, ch. 6, § 3, p. 54 (Docket No. 89-5); 1937 N.J. Rev. Stat. tit. 32, § 14-13.1 (Docket No. 89-6); *Fourth Annual Report of the Commissioners of the Central Park* 106 (1861) (Docket No. 88-23); *Acts of Assembly Relating to Fairmount Park* 18 (1870) (Docket No. 88-24); Hyde Park Vill., Ill. Laws & Ordinances § 6, p. 310 (1876) (Docket No. 89-7); 1881 Mun. Code of Chicago, art. 43, § 1690, p. 391 (Docket No. 88-26); Danville, Ill., Ordinances, ch. 19, § 4, p. 83 (1883) (Docket No. 89-8); St. Louis, Mo., Tower Grover Park, Rules & Reg., § 1, p. 117 (1883) (Docket No. 89-9); Salt Lake City, Utah, Rev. Ordinances, ch. 27, § 6, p. 248 (1888) (Docket No. 89-10); St. Paul, Minn., Annual Reports of the City Officers and City Boards, § 6, p. 689 (1888) (Docket No. 89-27); St. Louis, Mo. art. 11, § 3, p. 635 (Docket No. 88-25); Williamsport, Pa., Laws and Ordinances, pt. III, Brandon Park, § 7, p. 91 (1890)  (Docket No. 89-11); Springfield, Mass., Park Ordinances, § 3 (1891) (Docket No. 89-12); Grand Rapids, Mich., Complied Ordinances, § 432, p. 163 (1891) (Docket No. 89-13); Lynn, Mass., Third Annual Report of the Park Commissioners, Ordinances, § 3, p. 23 (1891) (Docket No. 89-14); Peoria, Ill., Laws and Ordinances, art. 35, § 1724, p. 667 (1892) (Docket No. 89-15); Spokane, Wa., Mun. Code, Ordinance No. A170, § 4, p. 123 (1892) (Docket No. 89-16); Wilmington, De., Ordinances, and Rules, and Regulations, § 7 (1893) (Docket No. 89-17); Canton, Ill., Rev. Ordinances, § 26, p. 240 (Docket No. 89-18); Indianapolis, Ind., Gen. Ordinances, § 1971, p. 648 (1896) (Docket No. 89-19); Pittsburgh, Pa., Gen. Ordinances, § 5, p. 496 (1897) (Docket No. 89-20); Reading, Pa., Parks Rules and Regulations, art. II, § 20, p. 240 (Docket No. 89-21); Boulder, Co., Ordinance, no. 511, § 1, p. 157 (1898) (Docket No. 89-22); Oakland, Ca., Ordinance, § 9, p. 15 (Docket No. 89-23); Birmingham, Ala., Code, ch. 44, § 1544, p. 662 (1917) (Docket No. 89-24); and National Parks Service, *Firearms Regulations in National Parks: 1897–1936* (2008) (Docket No. 89-25).  In its post-argument submission, the State pointed to four more local laws that banned firearms at public parks.  *See* Park Comm'rs for the City of Brooklyn, *Annual Reports of the Brooklyn Park Commissioners*, 1861-1873, Park Ordinance, No. 1, art. I, § 4 p. 136 (1866); Bd. of Supervisors, *San Francisco Mun. Reports*, Park Comm'rs' Ordinances, Ordinance No. 2, § 2(2), pp. 886–87 (1872); *A Digest of the Ordinances of the Borough of Phoenixville* 135, § 4 (1906) (1878 ordinance); *City of Trenton, New Jersey, Charter and Ordinances* 390 (1903) (1890 law); and Bd. of Park Comm'rs, Rep of the Bd. of Park Comm'rs of the City of Rochester, N.Y., 1888-1898, 97-98, §4(25) (1898) (1896 ordinance).

colonists understood the term "park" to mean an enclosed area on private property where animals, such as deer, were allowed to graze. *Park*, Noah Webster's Am. Dictionary of the English Language (1828). As the *Koon* Plaintiffs note, today's modern parks evolved from the colonial greens, public commons, squares, and other areas the colonists set aside for common use, recreation, or public gatherings. [*Koons* PI Reply Br. at 29.]

For example, established in 1634, Boston Common is considered America's oldest park. Beamish, 40 Landscape J. at 3. Originally set aside for military training and animal grazing, Boston Common evolved into a site for recreation and leisure activities like horse and carriage riding, various lawn games, and shows and exhibitions. *Id.* at 3–6. And in New York, colonial governor Thomas Dongan issued a city charter in 1686 declaring that a common council would oversee the development of certain vacant lands—lands that became New York's first city parks. *The Earliest New York City Parks*, New York City Dep't of Parks, available at: https://www.nycgovparks.org/about/history/earliest-parks. Indeed, in 1733, New York City's then-common council established the Bowling Green Park for the "Recreation & Delight of the Inhabitants of this City." *Bowling Green*, New York City Dep't of Parks, available at: https://www.nycgovparks.org/parks/bowling-green/history. New Yorkers could enjoy lawn games such as lawn bowling and walks through Bowling Green. Beamish, 40 Landscape J. at 8. And by 1802, New York City's Battery Park became an area where New Yorkers could take strolls. *Id.* Over to Philadelphia, the city had several commercial pleasure gardens that Philadelphians could enjoy. *Id.* at 10–11.

Despite the existence of such common lands since the colonial period, the State has failed to come forward with any laws from the 18th century that prohibited firearms in areas that today would be considered parks. Consistent with the *Koons* Plaintiffs' findings, this

174

Court has only uncovered colonial laws that prohibited discharging firearms in areas that were the forerunners of today's public park.  *See* Churchill, 25 Law & Hist. Rev. at 162–63 (observing that colonial governments "exercised their police powers to restrict the time, place, and manner in which Americans used their guns" by enacting laws penalizing the discharge of firearms).

Although housing the nation's oldest park, Massachusetts did not outright ban possession of firearms in Boston during the 18th century.   Rather, colonial Massachusetts only barred the discharge "of any gun or pistol . . . in the town of Boston."  Act of May 28, 1746, ch. X, Acts and Laws of Mass. Bay, p. 208.  To be sure, Massachusetts in 1694, and then again in 1795, authorized justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."  *Bruen*, 142. S. Ct. at 2144 (quoting 1795 Mass. Acts and Laws, ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts); *see also id*. at 2142-43 (quoting 1692 Mass. Acts and Laws no. 6, pp. 11–12).  Those laws, however, only "prohibit[ed] bearing arms in a way that spreads 'fear' and 'terror' among the people."  *Id.* at 2145.  Said differently, those laws did not prevent Bostonians or other Massachusetts residents from carrying their arms peacefully, which would apparently include at the Boston Common. *Id.* (explaining that the phrase "fear or terror among the people . . . require[d] something more than merely carrying a firearm in public").   In fact, history reveals that a person in Massachusetts could peacefully carry a handgun in public until 1906 when Massachusetts began requiring a license to carry.  1906 Mass. Acts ch. 172, §§ 1–2, p. 150.  To obtain that license, a person seeking to carry a firearm in public had to show "good reason to fear an injury to his person or property" and that he "is a suitable person."  *Id.*  § 1.

Starting in 1763, New York City criminalized the firing or discharge of any gun by children and other individuals in areas that today would be considered parks.  Ordinances of the City of New York, § 6 (1763), *reprinted in Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City* 11 (1763) (outlawing the firing of gun or pistol or setting of fireworks by "Children, Youth, apprentices, Servants, or other persons . . . at any mark, or at random against any fence, pales or other place in any street, lane or alley, or *within any orchard, garden or other inclosure, or in any place where persons frequent to walk*") (emphasis added).  New York laws banning discharge of firearms dates to the 17th Century.  Churchill, 25 Law & Hist. Rev. at 162–63.  Besides the limited firearms ban in New York City's Central Park in 1861, history reveals that New York state only started regulating the carrying of firearms in 1881 when the state legislature enacted restrictions on the concealed carry of firearms.  N.Y. Penal Code § 412 (1881).

Likewise, in 1721, Pennsylvania only prohibited the firing of any gun (or setting of fireworks) in the City of Philadelphia without obtaining a license from the state's governor. Act of Aug. 26, 1721, ch. CCXLV, § IV, in 3 Stat. at Large Pa. 253–54 (1896).  In fact, history reveals that starting in 1850, Pennsylvania only outlawed the concealed carry of firearms in Philadelphia by individuals "with the intent therewith unlawfully and maliciously to do injury to any other person."  John Purdon, *A Digest of the Laws of Pennsylvania* 150 (Phila.: James Kay, Jun. & Brothers, 8th ed. 1853).  Ten years later, in 1860, Pennsylvania enacted a surety law that restricted arms bearing in public by arms bearers who, after a showing of reasonable cause that the arms bearer posed a danger to an identified complainant or the public, could

not show a reasonable cause to fear an injury.   1860 Pa. Laws p. 432, § 6 (Docket No. 90-20).   Thus, despite having various pleasure gardens, *see* Beamish, 40 Landscape J. at 10–11, Pennsylvania did not outright ban firearms in Philadelphia.

Against that historical landscape, the State offers mid- to late-19th and early 20th century laws the State claims banned firearms in parks.   [State Opp'n Br. at 38–39 (Docket No. 91).]   Like *Bruen*, this Court gives no weight to the various 20th century state and local laws because they provide no insight into the understanding of the Second Amendment.   142 S. Ct. at 2154 n.28 (refusing to consider 20th century firearm laws offered by government and amici because those laws do not clarify the Second Amendment's meaning); *see also id.* at 2137.   In fact, some laws the State points to that banned firearms at parks did so to prevent hunting there.   *See* 1921 N.C. Pub. Laws, ch. 6, § 3, p. 54 (Docket No. 89-5) (entitled "An Act to Protect Animals and Game in Parks and Game Reservations in Either Private or Public Parks or Places"); *see also* 1917 Wis. Laws, ch. 668 (Docket No. 89-4) (extensive fish and game regulations).   Indeed, the federal regulations for national parks were specifically enacted to protect animals in the National Parks—not parkgoers.   Nat'l Parks Serv., *Firearms Regulations in the National Parks: 1897–1936*, at 1–2 (2008) (describing history of banning firearms at Yellowstone National Park and providing reasons for prohibition).

For the rest of the State's historical materials, this Court gives less weight to laws enacted within a few years of the 20th century because they provide little insight into the public's understanding of the Second Amendment either in 1791 or 1868.   *Bruen*, 142 S. Ct. at 2154 (explaining that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence").   Again, some laws the State relies on banned firearms at parks to protect birds—not parkgoers.   St. Louis, Mo.

177

art. 11, § 3, p. 635 (Docket No. 88-25) (housing law banning firearms in St. Louis parks in section entitled "Protection of Birds").   And the territorial law—the Salt Lake City, Utah ordinance—deserves less weight.   *Bruen*, 142 S. Ct. at 2154-55.

That said, even if the State's mid- to -late 19th century historical laws banning firearms at parks were well-established, the laws do not appear to be representative of the entire nation. By 1890, those laws—one state law and about 25 local ordinances—governed less than 10% of the nation's entire population and thus are unrepresentative.[65]   *Antonyuk*, 2022 WL 16744700, at *67 (ruling historical laws governing less than 15% of the nation's population were unrepresentative of entire nation).   Said another way, those laws arising in the mid- to late-19th century do not establish a historical tradition of banning firearms at parks especially since the modern equivalent of parks existed during this nation's founding.   *Cf. Espinoza,* 140 S. Ct. at 2258-59.

Plaintiffs have thus established a reasonable likelihood of success on their Second Amendment challenge to Chapter 131's prohibition on handguns at parks, beaches, and recreation areas, as well as the state regulation banning handguns at state parks.   The Court, however, denies the *Siegel* Plaintiffs' request for a preliminary injunction on Chapter 131's handgun ban at playgrounds.

iv.     **Youth Sports Events**

Like playgrounds, this Court will not deviate from its prior ruling on Chapter 131's firearm ban at youth sports events.   As noted in its TRO Opinion, this Court finds that "youth

---

[65] As noted earlier, by 1890, the United States had a total population of 62,622,250.   The combined populations of Michigan and the various cities accounted for about 5.7 million inhabitants.   Dept. of Interior, Compendium of the Eleventh Census:  1890, Part I. 2, 74, 77, 86, 112, 114, 124, 128, 137, 206, 216, 234, 255, 278, 287-89, 339, 341, 344, 351, 354, 403, 416 (1892).

sport events fall within the sphere of schools," [*Siegel* TRO Op. at 28–29 (Docket No. 51)], where firearm bans are "presumptively lawful," *see Heller*, 554 U.S. at 626–27 n.26. The parties have not persuaded this Court to change its earlier ruling that youth sports events are like schools, and therefore denies the *Siegel* Plaintiffs' request for a preliminary injunction on that provision of Chapter 131.

v.      <b>Public Libraries and Museums</b>

To justify Chapter 131's handgun ban at public libraries and museum, the State rehashes the same arguments it made at the TRO stage. [State Opp'n Br. at 43–45.] That is, the State can ban firearms at public libraries and museums because they are: (1) like schools given the presence of children; (2) government buildings under *Heller* and *Bruen*, and so, handguns can be banned at those locations without violating the Second Amendment; and (3) like historical sensitive places, such as courts and polling places, because "constitutionally protected activity" occurs at libraries and museums. [*Id.* at 43–44.] The State also points to the same historical laws it relied on to support Chapter 131's handgun ban at public gatherings and demonstrations requiring a government permit. [*Id.* at 45–46.] The State has not persuaded this Court to change its prior rulings on the constitutionality of Gun Law's prohibition on handguns at public libraries and museums.

For starters, the State's attempt to equate libraries and museums to sensitive places such as schools and government buildings stretches the sensitive places doctrine too far. Again, the mere presence of children is not, by itself, enough to make a certain location like a school. See *supra* Section IV.G.2.c.ii. Likewise, the State cannot stretch every government building into a sensitive place without considering the building's function and historical laws banning firearms at those locations. See *supra* Section IV.G.2.a. As noted above, the common

179

feature that runs through the sensitive places the *Bruen* Court recognized—legislative assemblies, courthouses, and polling places (all government buildings)—was government provided security.  See *supra* Section IV.G.2.c.i.  Despite the State's contrary argument, those locations were not historically considered sensitive places just because they involve constitutionally protected activity like voting or petitioning the government.

 Turning to the State's historical laws, the State relies on mid- to late-19th century laws from Texas, Missouri, Arizona, Oklahoma, and Kansas, and a 20th century Montana law, as well two city laws, that banned firearms at, among other places, "place[s] where persons are assembled for educational, literary or scientific purposes."  [State Opp'n Br. at 45 (citing 1870 Tex. Gen. Laws 63, § 1 (Docket No. 88-5); Tex. Penal Code tit. IX, ch. 4, art. 320 (1879) (Docket No. 88-9); 1874 Mo. Laws 43, § 1 (Docket No. 88-45); 1879 Mo. Rev. Stat., ch. 24, Art. II, § 1274, p. 224 (Docket No. 88-10); 1889 Ariz. Terr. Sess. Laws 17, § 3 (Docket No. 89-30); 1890 Okla. Terr. Stats., Art. 47, § 1, p. 496 (Docket No. 89-31); 1903 Mont. Laws ch. XXXV, § 3, p. 49 (Docket No. 89-32); Columbia, Mo. Gen. Ordinances ch. XVII, § 163 (1890) (Docket No. 86-16); and Stockton, Kan. Ordinances, no. 76, § 1  (1887), *reprinted in Stockton Review and Rooks County Record* (Stockton, Kan.), Vol. VIII, No. 26, July 1, 1887 (Docket No. 86-24).]  While these laws support Chapter 131's handgun ban at public libraries and museums because they are locations where people gather for "educational, literary, or scientific purposes," the laws are not representative of the entire nation.  Indeed, apart from the 1903 Montana law, which comes too late, *see Bruen*, 142 S. Ct. at 2154 n.28, this Court considered these laws (and various court decisions on the laws) and found them insufficient to establish a historical tradition of banning firearms at public gatherings or assemblies.  See

*supra* Section IV.G.2.c.i.  For the reasons already stated, this Court finds that those laws do not support a historical tradition of banning firearms at public libraries and museums.

Plaintiffs are thus likely to prevail on the merits of their Second Amendment challenge to Chapter 131's prohibition on handguns at public libraries and museums.[66]

### vi.        Bars and Restaurants Serving Alcohol

To support Chapter 131's handgun ban at bars and restaurants that serve alcohol, the State largely makes a policy argument that guns and alcohol do not mix and points to various studies about the dangers of mixing firearms with alcohol.  [State Opp'n Br. at 46-48.]  The State argues that impaired Carry Permit holders can endanger the public either through an accidental discharge of their weapon, or in the event of self-defense, use their firearm unsafely.  [*Id.* at 47.]  Even so, this Court cannot consider such policy arguments when deciding a Second Amendment challenge to a firearm regulation.  *Bruen*, 142 S. Ct. at 2129, 2131.  *Bruen* closed that door.

The State's policy argument also ignores that Chapter 131's prohibition on handguns at restaurants or bars serving alcohol criminalizes a Carry Permit holder's *mere* presence at those locations with a handgun even if the Carry Permit holder does not consume alcohol.  N.J. Stat. Ann. § 2C:58-4.6(a)(15).  The Legislature specifically addressed the State's concerns about impaired Carry Permit holders by criminalizing the consumption of alcohol while carrying a handgun in public.  *Id.* § 2C:58-4.4(a)(1) (making it a fourth-degree offense).

For the historical laws, the State mainly relies on the same laws it does to support Chapter 131's handgun ban at public gatherings requiring a government permit.  [State Opp'n

---

[66] Given this finding, the Court declines to reach the *Siegel* Plaintiffs' First Amendment challenge to Chapter 131's handgun ban at public libraries.  [*Siegel* Compl. ¶¶ 325–28 (*Siegel* Docket No. 1).]

Br. at 46.]  Again, this Court finds those laws do not establish a historical tradition under *Bruen* to support Chapter 131.  See *supra* Section IV.G.2.c.i.  In any event, of those laws, only the Oklahoma law supports Chapter 131's handgun ban because that territory specifically banned firearms at "any place where intoxicating liquors are sold."  1890 Okla. Terr. Stats., art. 47, ch. 25, § 7, p. 496 (Docket No. 89-31).  But this Court cannot "stake [its] interpretation of the Second Amendment upon a law in effect in a single State, or a single city, 'that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms' in public for self-defense." *Bruen*, 142 S. Ct. at 2154 (quoting *Heller*, 554 U.S. at 632).

At the TRO stage, the Court considered the State's other historical laws—a 1867 Kansas law criminalizing the possession of pistols by intoxicated persons, 1867 Kan. Sess. Laws 25 (Docket No. 88-12), and a 1859 Connecticut law barring the sale of alcohol near a military encampment or military parade, 1859 Conn. Pub. Acts, ch. LXXXII, § 5, p. 62 (Docket No. 88-11)—and found them insufficient to establish a history or tradition of banning firearms in areas where alcohol is sold.  [*Koons* TRO Op. at 32–33 (Docket No. 34).]   Thus, the State has not shown that well-established and representative historical firearm laws support Chapter 131's handgun ban at bars and restaurants that serve alcohol.  *Bruen*, 142 S. Ct. at 2133.

As a result, Plaintiffs are likely to prevail on the merits of their Second Amendment challenge to this Gun Law's provision.[67]

### vii.        Entertainment Facilities

The State argues Chapter 131's prohibition on handguns at entertainment facilities is

---

[67] Nothing in this Opinion should be construed to prevent private restaurant or bar owners from banning firearms at their establishments on their own accord.

permissible given: (1) various 19th century laws from Texas, Missouri, Tennessee, and Georgia that barred firearms at certain public assemblies or events (already analyzed above); (2) Virginia and North Carolina laws codifying the common law offense of "affray" or going armed "to the terror of the people"—variants of England's Statute of Northampton; and (3) an 1816 New Orleans law banning certain weapons at "public ballrooms." [State Opp'n Br. at 49–50.]

To start, the Virginia and North Carolina laws are not "relevantly similar" to Chapter 131's handgun ban at entertainment facilities because those historical laws did not impose a comparable burden on the right to armed self-defense in public like Chapter 131 does. *Bruen*, 142 S. Ct. at 2132–33. Both laws prohibited an individual from carrying their arms in a manner to spread fear and terror among the people. *Id.* at 2144–45. A person did not violate those laws by peaceably carrying their firearms. Indeed, in *State v. Huntly*, North Carolina's Supreme Court construed the law the State relies on and concluded that it requires carrying a weapon with a "wicked purpose"—that is, to terrify the public. 25 N.C. 418, 423 (1843); *see also id.* at 421-22 (reviewing the English common law offense, the Statute of Northampton, and English commentaries and observing that the offense punished carrying arms aimed to terrify the people). The *Huntly* Court recognized that "carrying of a gun *per se* constitutes no offence." *Id.* at 422–23. Unlike the law in *Huntly*, Chapter 131 does make the mere carrying of a firearm at an entertainment facility a criminal offense. N.J. Stat. Ann. § 2C:58-4.6(a)(17).

This Court also finds the mid- to late-19th century laws from Texas, Tennessee, Missouri, and Georgia that the State points to cannot save Chapter 131's handgun ban at entertainment facilities. The 1870 Georgia Law likely does not encompass "entertainment facilities" because that law only banned firearms at election grounds, courts, "places of public

worship" and "any other public gathering."  Ga. Code pt. IV, tit. I, div. X, § 4528, p. 818 (1873) (codifying 1870 act) (Docket No. 88-22).  As already noted, the meaning of the phrase—"any other public gathering"—is defined and limited to the types of public gatherings listed in the statute.  See *supra* Section IV.G.2.c.i.  Thus, the State cannot stretch the statute's "any other public gathering" catch-all language to include entertainment facilities.  While the Tennessee, Texas, and Missouri laws support Chapter 131's prohibition on handguns at entertainment facilities, this Court already found those laws insufficient to establish a historical tradition under *Bruen*.  Indeed, as already noted, the Court questions whether some Missouri laws were constitutional under Missouri's state constitution given the Missouri Supreme Court's statements in *Reando*.  See *supra* Section IV.G.2.c.i.

Lastly, this Court does not find the New Orleans law that banned certain weapons only at public ballrooms supports banning firearms at all the entertainment facilities under Chapter 131—that is, concerts, theaters, arenas, racetracks, etc.  *See* N.J. Stat. Ann. § 2C:58-4.6(a)(17) (listing entertainment facilities).  Even if this Court considers the Georgia, Tennessee, Texas, and Missouri state laws along with the New Orleans city law, this Court still finds those laws are not enough to establish a tradition of banning firearms at entertainment facilities.  *See Bruen*, 142 S. Ct. at 2149 (stating a "handful" of examples of states enforcing surety statutes to be "too slender a reed to which to hang a historical tradition of restricting the right to public carry"); *cf. Espinoza,* 140 S. Ct. at 2258–59.  Thus, the State has failed to show a historical tradition of banning firearms at entertainment facilities.

The Plaintiffs have therefore established a reasonable chance of prevailing on the merits of their Second Amendment challenge to Chapter 131's handgun ban at entertainment facilities.

### viii.     Casinos (and N.J. Admin. Code § 13:69D–1.13)

The State first argues that modern casinos did not exist at the Founding or during Reconstruction and so, the lack of laws regulating firearms at casinos is not evidence that New Jersey's laws banning firearms at casino are unconstitutional.  [State Opp'n Br. at 51–52 (Docket No. 91).]  The State also argues that such laws are unlikely to exist because several states outlawed gambling.  *Id.*

While the Founding and Reconstruction generations may not have envisioned the shinning lights and slot machines of the casinos we have today, this Nation has a long history of gambling establishments.  In fact, in 1753, Louisiana established a government-run casino.  Jay Precht, *Legalized Gambling*, 64 Parishes (Nov. 16, 2011), available at: http://64parishes.org/entry/legalized-gambling.     Throughout the Founding and Reconstruction eras, Americans could bet on the horses at racetracks such as Hempstead Plain in Long Island, New York, or gamble on dice or card games at various saloons.  Ed Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, Colonial Williamsburg (Autumn                     2008),                     available                     at: https://research.colonialwilliamsburg.org/Foundation/journal/Autumn08/gamble.cfm.  Yet the State has presented no firearm law from states that allowed gambling that restricted firearms at gambling establishments.  Even if several states outlawed gambling, history shows that Louisiana did not.  And besides one law from New Orleans that banned firearms at public ballrooms, the State presented no law from Louisiana that banned firearms from its government-operated casino.

Instead, the State only offers laws it claims supports banning firearms at "crowded social assemblies and individuals with impaired judgment,"  [State Opp'n Br. at 52]—that is,

the same laws the State seeks to use to justify Chapter 131's handgun ban at public gatherings requiring a government permit, entertainment facilities, and bars and restaurants that serve alcohol, [*id.* at 52–53].

Again, this Court finds those laws insufficient and repeats its findings from the TRO stage. [*Siegel* TRO Op. at 33–36 (Docket No. 51).] As already noted, several laws did not impose a comparable burden on the right to armed self-defense in public, and for the laws that did, they were not well-established or representative historical firearm laws under *Bruen* to support Chapter 131's restrictions. See *supra* Sections IV.G.c.i, vii. Thus, even through historical analogues, this Court finds that the State has not shown a historical tradition to justify Chapter 131's handgun ban at casinos, as well as the gaming regulation barring firearms at casinos unless the Division of Gaming Enforcement approves the carrying of firearms at casinos, N.J. Admin. Code § 13:69D-1.13.

Accordingly, for these reasons, Plaintiffs have thus shown a likelihood of success on the merits of their Second Amendment challenge to New Jersey's laws restricting handguns at casinos.

### ix.        Airports and Transportation Hubs

At the TRO stage, this Court did not reach the merits of the *Siegel* Plaintiffs' challenges to Chapter 131's handgun ban at airports and transportation hubs. [*Siegel* TRO Op. at 18–19.] The *Koons* Plaintiffs have since joined this challenge. [*Koons* Am. Compl. ¶ 38 (Docket No. 69).] Having now found standing, see *supra* Section IV.G.1., this Court reviews whether the Second Amendment allows governments to ban firearms at airports and transportation hubs.

Again, the Second Amendment's text covers the Plaintiffs' proposed course of conduct of carrying a handgun in public for self-defense. *Bruen*, 142 S. Ct. at 2134–35. Chapter 131's prohibition on carrying handguns at airports and transportation hubs infringes on their constitutional right because the law requires Carry Permit holders to disarm at airports and transportation hubs, which are all in the public. N.J. Stat. Ann. § 2C:58-4.6(a)(20). The State must now show that historical firearm laws support Chapter 131's prohibition on handguns at airports and transportation hubs. *Bruen*, 142 S. Ct. at 2126, 2133.

The Court recognizes that the State cannot come forward with historical laws banning firearms at airports and is not likely to submit laws for transportation hubs because these locations emerged from "dramatic technological changes" that the Founders and the Reconstruction generations could not have contemplated when ratifying the Second Amendment in 1791 or adopting the Fourteenth Amendment in 1868. *Id.* In those cases, *Bruen* instructs courts to take "a more nuanced approach" when considering the constitutionality of such modern firearm laws. *Id.*

Under *Bruen*, a court can uphold a modern firearm law regulating firearms in areas stemming from "dramatic technological changes" through analogical reasoning of historical firearm laws. *Id.* at 2132-33. The modern and historical firearm laws must be "relevantly similar" by imposing a "comparable burden on the right to armed self-defense." *Id.* The *Bruen* Court instructed courts to look to historical laws barring firearms at government buildings, schools, legislative assemblies, courthouses, and polling places because the Court "assume[d] that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133. "[C]ourts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations

187

prohibiting the carry of arms in new and analogous sensitive places are constitutionally permissible." *Id.*

With these principles in mind, the Court turns to Chapter 131's restrictions on firearms at airports and transportation hubs.

- **Airports**

The key feature of the sensitive places the *Bruen* Court recognized—legislative assemblies, courthouses, and polling places—is that the government historically provided security at those locations.   See *supra* Section IV.G.2.c.i.   At courthouses and legislative assemblies, people are required to disarm as a condition of entry—usually enforced by sheriffs, bailiffs, door keepers, or sergeants-at-arms.   *Id.*   Because of the government-provided security, the need for armed self-defense is reduced at those locations.   *Id.*

Given *Bruen's* instruction to look to those historical laws, *see* 142 S. Ct. at 2133, this Court finds that those laws could support Chapter 131's handgun ban at airports given the government-provided security feature of those historically recognized sensitive places. Airports have many security measures such as Transportation Security Administration (TSA) officers, air marshals, police officers, metal detectors, and luggage scanners that all check people and their baggage for weapons and dangerous devices, like explosives.   Yet the parties have not provided this Court with any evidence on where, in the various airports located in New Jersey, those security measures take place.   And, of course, the parties declined this Court's invitation for an evidentiary hearing.   [Docket No. 74.]   While the State bears the burden under *Bruen* to support its firearm laws, the plaintiffs carry the ultimate burden to show they are entitled to a preliminary injunction.   *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).   Without the aid of an evidentiary hearing, this Court is unwilling to enjoin

Chapter 131's handgun ban at airports because some places in the airport may be secure while others are not.  The Court directs the parties to take discovery on that issue, and the Court will administratively terminate this portion of the motions pending a full record.

In the meantime, several Plaintiffs want to carry their handguns when dropping off or picking up relatives or friends at airports.  [*Siegel* Post-Argument Br. at 8 (Docket No. 122).]  At oral argument, the State argued that Carry Permit holders would not violate Chapter 131's handgun ban by merely dropping off family or friends outside the airport based on exemption in the law.  [Tr. at 108:9–108:22.]  That provision exempts Carry Permit holders from violating Chapter 131's prohibition if the holder is "traveling along a public right-of-way that touches or crosses" any of Chapter 131's enumerated sensitive places provided that the holder is carrying their handgun in compliance with Chapter 131.  N.J. Stat. Ann. § 2C:58-4.6(d).  Given Chapter 131's exemption and the State's representation at oral argument, this Court finds that Plaintiffs may carry their handguns while transporting their relatives or friends to and from airports provided that the Plaintiffs do not physically enter the airport with their handguns.  Simply stated, Plaintiffs may carry their handguns while dropping off or picking up their friends or relatives outside the airport's entrance or exit for passengers—nothing more.  This Court will address whether Plaintiffs may venture inside the airport with their handguns following an evidentiary hearing.

Several Plaintiffs also want to bring their handguns as checked luggage when traveling.  [*Siegel* Post-Argument Br. at 8.]  Federal law allows individuals to travel interstate with their firearms and ammunition so long as the firearm is unloaded and the firearm and ammunition are not readily accessible.  18 U.S.C.A. § 926A.  TSA regulations allow a passenger to transport a firearm on an airplane as checked luggage provided that:  (1) the firearm is

189

unloaded; (2) the "passenger declares to the aircraft operator, either orally or in writing, before checking the baggage, that the passenger has a firearm in his or her bag and that it is unloaded;" (3) the passenger keeps the firearm "in a hard-side container;" and (4) the container carrying the firearm "is locked, and only the passenger retains the key or combination." 49 C.F.R. § 1540.111(c).

At oral argument, the State contended that a Carry Permit holder could take his or her firearm to the airport as checked luggage only "[i]f that's all he is doing." [Tr. at 110:9–110:13.] The State expressed concerns about Carry Permit holders lingering in the airport with their firearms, for example, having a coffee in the pre-TSA screening area. [Tr. at 110:14–111:3.] The State also asserted merely dropping off a firearm at checked luggage areas, which according to the State, are "actually outside" the TSA pre-screening areas, would be "at least just a de minimis, if any, violation at all" of Chapter 131. [Tr. at 109:20–110:2.] The *Koons* Plaintiffs question the State's statement about checking their handguns as luggage, explaining that they must physically enter the airport to declare their weapon, such as at a ticket counter. [*Koons* Post-Argument Br. at 6 (Docket No. 123).]

Pending an evidentiary hearing, this Court will temporarily allow the Plaintiffs to check their firearms as checked luggage as allowed by federal law. The Plaintiffs must fully comply with the TSA regulations on checking firearms as luggage—that is, 49 C.F.R. § 1540.111(c). To address the State's concerns, this Court will require any Plaintiff seeking to check his or her firearm as checked luggage to have the weapon stored as required by 49 C.F.R. § 1540.111(c) <u>before physically entering the airport.</u> Upon entry, the Plaintiff must immediately proceed to the area that the TSA designated to check their firearms as luggage and he or she cannot travel to any other section of the airport until his or her weapon is

checked. This Court's limited relief should alleviate some of the State's concerns because no Plaintiff will be allowed to bring a loaded firearm into the airport and cannot linger in pre-TSA screening areas with a firearm unloaded or not.

- **Transportation Hubs**

The Legislature failed to define "transportation hubs" in Chapter 131. At oral argument, this Court prodded the State to define the term and asked about whether bus stops or marinas constituted a "transportation hub" under Chapter 131. [Tr. at 103:13–105:12.] The State asserted that transportation hubs "are places where multiple modes of transportation intersect" and stated that Trenton Transit Center would be an example of a transportation hub since "Amtrak and New Jersey Transit and . . . SEPTA . . . all intersect there."[68] [Tr. at 103:21–104:6.] The State denied that individual bus stops or a marina would be transportation hubs under Chapter 131. [Tr. at 104:17–104:19, 105:6–105:9.]

In its post-argument briefing, the State, pointing to state and federal laws, asserts that transportation hubs under Chapter 131 are "facilities that connect multiple modes of public transportation." [State Post-Argument Br. at 5–6 (citing N.J. Stat. Ann. § 52:9Q-15; 49 U.S.C. § 47101(b)(5)).] The State notes that federal and state courts have characterized Secaucus Junction and Newark Penn Station to be transportation hubs. [*Id.* at 6 (citing *Secaucus v. U.S. Dep't of Transp.*, 889 F. Supp. 779, 781, 783-85 (D.N.J. 1995) and *State v. Gartrell*, 2022 WL 6833767, at *6 (N.J. Super. Ct. App. Div. Oct. 12, 2022)).] The State doubled downed on its position from oral argument, asserting that individual "stops" or "stations" that do not connect to other modes of transportations are not transportation hubs. [*Id.*]

---

[68] SEPTA refers to the Southeastern Pennsylvania Transportation Authority.

The State's clarification on the meaning of "transportation hub" only illuminates the potential constitutional problems with Chapter 131's handgun ban at those locations. Using the State's definition, a Carry Permit holder can board a New Jersey Transit train, say at Bay Head train station—unconnected to other modes of transportation—and not violate Chapter 131. Under the State's definition, that individual train station does not qualify as a sensitive place. But if the Carry Permit holder rides the train, the moment the holder arrives at Newark Penn Station, he or she has potentially violated Chapter 131. The Carry Permit holder violates the law when he or she departs at Newark Penn Station because that station, according to the State, is a transportation hub under Chapter 131. At bottom, whether a Carry Permit holder violates Chapter 131 depends on the train line he or she takes in a given day and the ultimate destination. Indeed, Carry Permit holders are at the whim of the railway.

The only discernible difference between individual train stations and "transportation hubs" is there are more people at transportation hubs than individual train stations. That more people are present at transportation hubs because they need to transfer trains or hop on a bus does not make those locations "sensitive places" under *Bruen*. Crowded locations are not sensitive places. *Bruen*, 142 S. Ct. at 2134. While transportation hubs may have police officers, their presence is not enough. *Bruen*, 142 S. Ct. at 2134 ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly.")

The Court finds that the State cannot support Chapter 131's handgun ban at transportation hubs by relying on the same laws it did to support the law's firearm prohibition at entertainment facilities. [State Opp'n Br. at 57.] As noted, some laws did not impose a comparable burden on the right to armed self-defense in public like Chapter 131 does. *See*

*supra* Section IV.G.c.vii.  The other historical laws were not well-established or representative under *Bruen*.  See *supra* Section IV.G.c.i.  The only law that the State points to relating to trains—an 1867 Iowa law—only barred individuals from shooting at trains to prevent interference with railways.  Iowa Stat. tit. XXIV, ch. 3, § 1, p. 985 (1880) (codifying 1867 law) (Docket No. 88-15) (making it a misdemeanor "to present or discharge any gun, pistol, or other firearm at any railroad train, car, or locomotive engine").  And for the reasons already found, the State cannot support Chapter 131's handgun ban by relying on the "government-as-proprietor" theory.  See *supra* Section IV.G.2.a.i.

In any event, this Court could uphold Chapter 131's handgun ban at transportation hubs by drawing from the historically sensitive places the *Bruen* Court recognized—legislative assemblies, polling places, and courthouses.  As noted, the government historically provided security at those locations.  See *supra* Section IV.G.c.i..  But again, the parties have not come forward with any evidence about whether the government provides security at transportation hubs, and if so, the level of security (armed guards checking for weapons or metal detectors), and where those security measures take place.  Given the parties' evidentiary shortcomings, this Court is unwilling to enjoin Chapter 131's handgun ban at transportation hubs.  The Court will conduct an evidentiary hearing and directs the parties to take discovery on government-provided security at transportation hubs.[69]    This Court will administratively terminate this portion of Plaintiffs' motions pending a full record.

---

[69] In addition to lacking evidence is what exactly qualifies as a "transportation hub" because Chapter 131 does not define the term.  The problem with this was highlighted at oral argument when the State struggled to answer questions as to what exactly a transportation hub is.  If the State struggles to explain what a transportation hub is, how can Carry Permit holder expect to know what one is?

> **x.     Health Care Facilities (Medical Offices and Ambulatory Care Facilities)**

This Court did not reach the merits of the *Siegel* Plaintiffs' challenge to Chapter 131's handgun ban at health care facilities at the TRO stage because of their lack of standing.  [*Siegel* TRO Op. at 17–18 (Docket No. 51).  The *Koons* Plaintiffs have now joined in on the Siegel Plaintiffs' challenge.  [*Koons* Am. Compl. ¶ 38 (Docket No. 69).]  Having now found standing for the very limited health care facilities listed in Plaintiffs' declarations, namely medical offices and ambulatory care facilities, see *supra* Section IV.G.1.a., this Court reviews the merits of their constitutional challenge.[70]

The Second Amendment's text covers the Plaintiffs' proposed course of conduct of carrying a handgun in public for self-defense.  *Bruen*, 142 S. Ct. at 2134-35.  Chapter 131's prohibition on carrying handguns at health care facilities infringes on their constitutional right because the law bars Carry Permit holders from bringing their handguns when going to a medical appointment.  N.J. Stat. Ann. § 2C:58-4.6(a)(21).  The State must now show that historical firearm laws likewise prohibited firearms at health care facilities.  *Bruen*, 142 S. Ct. at 2126, 2133.

To start, the State claims that the Founders and the Reconstruction-era generation could not have contemplated today's medical facilities, and therefore the lack of historical firearm laws does not mean Chapter 131's handgun ban at health care facilities is unconstitutional.  [State Opp'n Br. at 59 (Docket No. 91).]  The State seeks to use *Bruen*'s

---

[70] Plaintiffs seek to enjoin the State from enforcing Chapter 131's handgun ban to all health care facilities listed in N.J. Stat. Ann. § 2C:58-4.6(a)(21), which is far reaching.  This Court declines to do so, and limits its ruling only to the health care facilities set forth in Plaintiffs' declarations.

reasoning by analogy to support Chapter 131's handgun prohibition at health care facilities. [*Id.*]

But hospitals and medical care facilities existed before and after this Nation's founding.  Indeed, opened in 1736, Bellevue Hospital—today known as NYC Health + Hospital/Bellevue—"is America's oldest operating hospital."  *Bellevue History*, NYC Health + Hospitals, available at: https://www.nychealthandhospitals.org/bellevue/history/.  And in 1791, New York Hospital opened its doors to the public—today known as Weill Cornell Medical Center.  *Historical Timeline*, Weill Cornell Medicine, available at: https://library.weill.cornell.edu/archives/historical-timeline.  Over to Pennsylvania, Benjamin Franklin worked with Thomas Bond, a physician and surgeon, to form the Pennsylvania Hospital in 1751.  Harriet Bailey, *Nursing Mental Diseases* 25-26 (1921).  Up north, Massachusetts opened the Boston Medical Dispensary in 1796—today Tufts Medical Center—and then the Massachusetts General Hospital in 1811.  *History of Tufts Medical Center*, available at: https://www.tuftsmedicalcenter.org/About-Us/History.aspx;  A Narrative History of Mass. General, Massachusetts General Hospital, available at: https://www.massgeneral.org/museum/history.

As noted above, Massachusetts, Pennsylvania, and New York did not outright ban the possession of firearms in their states in the 18th century.  Rather, history reveals those states only criminalized the discharge of firearms in certain cities.  See *supra* Section IV.G.c.iii.  In fact, those states only began to enact restrictions on carrying firearms in public in the late 19th or early 20th centuries.  *Id.*  This Court has uncovered no laws from the 18th or 19th centuries that banned firearms at hospitals, almshouses, asylums, or other medical facilities.  *See Antonyuk*, 2022 WL 16744700, at *60 (noting that "the medical profession existed in 18th and

19th century America; and certainly gun violence existed in 18th and 19th century America" and finding the government (and the court) could not discover any laws barring firearms in places such as "almshouses, hospitals, and physician's offices"). The lack of historical laws tends to support Plaintiffs' position that Chapter 131's handgun ban at health care facilities conflicts with the Second Amendment. *Bruen*, 142 S. Ct. at 2131. But the Court is unwilling to bar the State from enforcing Chapter 131 as to all the health care facilities listed in the law because such relief sweeps too broadly and Plaintiffs make no attempt to show that they will visit such facilities in the near future.

To justify Chapter 131's prohibition on handguns at health care facilities, the State relies on the same laws it did to support Chapter 131's handgun ban at public assemblies requiring a government permit, public libraries and museums, bars and restaurants that serve alcohol, and entertainment facilities. [State Opp'n Br. at 59-60.] Again, for the reasons already discussed, those laws were not well-established or representative firearm laws to justify Chapter 131's handgun ban at health care facilities. See *supra* Section IV.G.c.i. The Court also rejects the State's attempt to insulate state-owned health care facilities under the "government-as-proprietor" theory for the reasons already stated above. See *supra* Section IV.G.2.a. Thus, the State has not shouldered its burden under *Bruen*.

Plaintiffs are thus likely to succeed on the merits of their Second Amendment challenge to Chapter 131's handgun restrictions at health care facilities limited to the medical offices and ambulatory care facilities listed in Plaintiffs' declarations.[71]

---

[71] Nothing in this Opinion should be construed to prevent private health care facilities from prohibiting firearms at their facilities.

xi.          **Public Film Sets**

This Court did not reach the merits of the *Siegel* Plaintiffs' challenge to Chapter 131's

handgun ban at public film sets at the TRO stage because of their lack of standing.  [*Siegel*

TRO Op. at 18–19 (Docket No. 51).]  Having now found standing, see *supra* Section IV.G.1,

this Court reviews their challenge.

The Second Amendment's text covers the Plaintiffs' proposed course of conduct of

carrying a handgun in public for self-defense.  *See Bruen*, 142 S. Ct. at 2134–35.  Chapter 131's

prohibition on carrying handguns at a public movie or television set infringes on their

constitutional right because the law prevents Carry Permit holders from carrying their

handguns in public when they come across a film set.  N.J. Stat. Ann. § 2C:58-4.6(a)(23).  To

be clear, the *Siegel* Plaintiffs did not contend they have a Second Amendment right to bring a

handgun on filming locations where public access is restricted.  Rather, like other members

of the public, some *Siegel* Plaintiffs would like to watch the proceedings in an area set aside

for public viewing, such as a sidewalk.  Because Chapter 131 prevents those Carry Permit

holders from doing so, the State must show that historical firearm laws likewise prohibited

firearms at public locations used for making a motion picture or television show.  *See Bruen*,

142 S. Ct. at 2126, 2133.

This Court recognizes that such historical firearm laws are unlikely to exist because

motion pictures and television filming emerged from "dramatic technological changes" that

the Founders and the Reconstruction generation could not have envisioned.  *See Bruen*, 142

S. Ct. at 2132.  This Court must take a "nuanced approach" and look to whether historical

laws imposed a comparable burden on the right to armed self-defense in public as the modern

197

law does. *Id.* at 2132–33. The government does not need a "historical twin" or "dead ringer" but only a "well-established and representative historical analogue." *Id.* at 2133.

Even taking the nuanced approach, this Court finds the State has failed to support Chapter 131's restrictions on public film sets with historical analogues. The State offers the same laws to support Chapter 131's handgun ban at public gatherings requiring a government permit and entertainment facilities. [State Opp'n Br. at 60 (Docket No. 91).] As discussed, some laws did not impose a comparable burden on the right to armed self-defense in public as Chapter 131 does. See *supra* Section IV.G.c.vii. And the laws that imposed a comparable burden were not well-established or representative to pass muster under *Bruen*. See *supra* Section IV.G.c.i. Therefore, the *Siegel* Plaintiffs are likely to succeed on the merits of their Second Amendment challenge to Chapter 131's handgun ban at public film sets.

### xii.        Prohibition on Functional Firearms in Vehicles

As noted in this Court's earlier decisions, Chapter 131 requires gun owners seeking to carry or transport their handguns in a vehicle to keep the weapon "unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." N.J. Stat. Ann. § 2C:58-4.6(b)(1). This Court has already found the Second Amendment's text covers the Plaintiffs' proposed course of conduct carrying a handgun in public for self-defense. [*Koons* TRO Op. at 48–52 (Docket No. 34); *Siegel* TRO Op. at 41 (Docket No. 51).]

This law infringes on the Plaintiffs' right to armed self-defense in public because the law requires Carry Permit holders, in effect, to render their handguns inoperable when traveling in a vehicle in New Jersey. N.J. Stat. Ann. § 2C:58-4.6(b)(1). At the TRO stage, this Court ruled the State failed to support Chapter 131's functional firearms in vehicles ban

with well-established and representative historical firearm laws, and therefore, temporarily enjoined this law.  [*Koons* TRO Op. at 48–52 (Docket Nos. 34-35); *Siegel* TRO Op. at 41 (Docket Nos. 51-52).]  Besides a handful of new historical firearm laws, the State reiterates many of same arguments this Court already considered and rejected.  [State Opp'n Br. at 62–67.]

Before this Court considers the State's new arguments and asserted historical analogues, the Court expands on why Chapter 131's prohibition on functional firearms in vehicles is unconstitutional.  In *Heller*, the Supreme Court held that a law requiring handguns in the home to be "rendered and kept inoperable"—either by disassembly or inclusion of a "trigger-lock" on the weapon—violated the Second Amendment.  554 U.S. at 630.  The *Heller* Court found the law unconstitutional because the law made "it impossible for citizens to use [their handguns] for the core lawful purpose of self-defense."  *Id.*

Just like the law in *Heller* violated the Second Amendment, so, too, does Chapter 131's restriction on functional firearms in vehicles.  To comply with Chapter 131's requirements, the Carry Permit holder must in effect render his or her handgun inoperable while traveling in a vehicle in New Jersey.  N.J. Stat. Ann. § 2C:58-4.6(b)(1).  If encountered with a threat requiring armed self-defense while in a vehicle, the Carry Permit holder would have to remove the weapon from its secured case or gunbox if the weapon is stored in the vehicle's interior (or in the trunk if kept there) and then reassemble it for self-defense.  As the State could not disagree at oral argument, this restriction essentially eviscerates a Carry Permit holder's ability to defend him- or herself while in a car.  And, as Plaintiffs note, the need for self-defense may be more acute in a New Jersey vehicle given the State's unfortunately large number of carjackings.  From 2012 to 2016, New Jersey reported over 1,300 carjacking incidents.  State

of N.J., Dep't of Law & Pub. Safety, Div. of State Police, *Carjacking in New Jersey 2016* 12 (2016), available at: https://nj.gov/njsp/ucr/pdf/carjacking/2016_carjacking.pdf.  In 2016, New Jersey experienced over 180 carjackings with 71% of those incidents involving a perpetrator armed with a firearm.[72]  *Id.* at 12.  Hence, because Chapter 131's functional firearms in vehicles restriction makes "it impossible for citizens to use [their handguns] for the core lawful purpose of self-defense," the law is unconstitutional.  *Heller*, 554 U.S. at 630.

Setting aside the law's unconstitutionality under *Heller*, *Bruen*'s history-and-tradition inquiry also proves fatal to Chapter 131's ban on functional firearm in vehicles.  Indeed, early American history reveals that colonies protected carrying firearms on highways.  Churchill, 25 Law & Hist. Rev. at 162–63 (collecting laws and noting that in 1770, colonial Pennsylvania banned gunfire at or near the "King's highways" but the law did not apply to "any person carrying a gun on the public highway").  The State's own historical materials confirm that colonial New Jersey protected carrying firearms on roadways.  As noted above, in 1771, colonial New Jersey enacted a hunting law outlawing hunting on another's land without permission.  See *supra* Section IV.G.2.b.ii.  That law, however, explicitly protected carrying firearms on the highway.   Act of Dec. 21, 1771 ch. DXL, § 2, 1763-1775 N.J. Laws 344 (Docket No. 88-13) (stating that "nothing herein contained shall be construed to extend to prevent any Person carrying a Gun upon the King's Highway in this Colony").  The State apparently overlooked that provision of the law.

---

[72] While the handgun may be the "most popular weapon chosen by Americans for self-defense," *see Heller*, 554 U.S. at 629, the handgun appears to be the "most popular" weapon of choice for carjackers in New Jersey, *see* State of N.J., Dep't of Law & Pub. Safety, Div. of State Police, *Carjacking in New Jersey 2016* 15 (2016) (noting that of the 184 total carjackings in New Jersey in 2016, 129 carjackings involved a perpetrator armed with a handgun—70% of all carjackings that year).

Chapter 131's functional firearms in vehicles ban finds no support in the history compiled by the State. First, the State cannot justify this law for government-owned vehicles based on the "government as-proprietor" or "market participants" theories for the reasons this Court has already found. See *supra* Section IV.G.2.a.i. Second, the State cannot justify the ban on functional firearms in vehicles as to public transit vehicles (buses and vans) based on historical laws the State claims restricted firearms in crowded places such as entertainment facilities. As already discussed, those laws are not well-established or representative historical firearm laws within *Bruen*'s meaning. See *supra* Section IV.G.c.vii. Indeed, the State just rehashes a "crowded location" argument that cannot justify depriving law-abiding citizens of their right to armed self-defense in public. *See Bruen*, 142 S. Ct. at 2134.

Turning to the State's purported historical analogues to support Chapter 131's restrictions for private vehicles, the laws did not support a historical tradition of requiring gun owners to render their firearms inoperable while in vehicles. Because motor vehicles were not around in the 18th and 19th centuries, the State argues, the "Founders in 1791 or the Reconstruction generation in 1868," had no reason to be concerned about regulating firearms in motor vehicles. [State Opp'n Br. at 63.] The State misses the mark, and perhaps conveniently so. Before the advent of cars, colonists traveled by horse and carriage in the 18th and 19th centuries. And by the mid- to late-19th century, Americans could travel by train. Yet, despite ample opportunity, the State has not presented this Court with well-established and representative firearm laws banning firearms on those transportation modes, which would be analogous laws to compare to Chapter 131's prohibition on functional firearms in vehicles.

Indeed, the 1876 Iowa law the State relies on only prohibited shooting at trains to prevent interference with railways.  Iowa Stat. tit. XXIV, ch. 3, § 1, p. 985 (1880) (codifying 1867 law) (Docket No. 88-15) (making it a misdemeanor "to present or discharge any gun, pistol, or other firearm at any railroad train, car, or locomotive engine").  The other two laws on which the state relies—a 1917 Maine law and a 1929 Iowa law—were fish and game laws designed to prevent hunting from vehicles.  1929 Iowa Acts ch. 57, § 30, p. 90 (Docket No. 88-16) (except for pistols and revolvers, requiring firearms carried in vehicles to be "unloaded in both barrels and magazine, and taken down or contained in a case"); 1919 Me. Acts and Resolves ch. 180, p. 192–93 (Docket No. 88-17) (codifying 1917 law and providing "no person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while same is upon any highway or in the fields or forests").  The Iowa law exempted pistols and revolvers from the law's restrictions.  1929 Iowa Acts ch. 57, § 30, p. 90 (Docket No. 88-16).  These laws are not similar at all to Chapter 131's functional firearms in vehicles proscription.

The State cannot also support Chapter 131's prohibition on functional firearms in vehicles by pointing to laws regulating the storage of gun powder in vehicles.  [State Opp'n Br. at 65 (citing Portland, Or., Ordinance No. 1108, § 6 (1871) (Docket No. 90-5) and Lynchburg, Va., Code ch. XIX, § 6 19, p. 117 (Docket No. 90-48).]  States and local governments historically enacted gunpowder storage laws because gunpowder has "a dangerous potential to denotate if exposed to fire or heat" and regulation was necessary to prevent fires or explosions.  *See generally Boland v. Bonta*, 2023 WL 2588565, at *7–8 (C.D. Cal. Mar. 20, 2023) (citation omitted).  The State has presented no evidence that the same problems exist for firearms and encased ammunition stored in a vehicle.  *See NAGR*, 618 F.

Supp. 3d at 916 (explaining the gunpowder "regulations themselves were often specific to gunpowder and not easily translatable to firearm regulations"). Thus, gunpowder storage laws cannot sustain Chapter 131's functional firearms in vehicles restriction.

The State's reliance on various 19th century laws criminalizing concealed carrying of firearms and state court decisions construing the "travel" or "journey" exceptions to those laws also does not support Chapter 131's ban on functional firearms in vehicles. [State Opp'n Br. at 65-66 (citing Ga. Code § 4-1-4413 (1861) (Docket No. 90-11); Act of Mar. 18, 1859, § 1, 1859 Ohio Laws 56 (Docket No. 90-10), Act of Feb. 2, 1838, ch. 101, § 1, 1838 Va. Acts 76 (Docket No. 90-9); Ark. Rev. Stat. ch. XLIV, art. I, § 13 (1838) (Docket No. 88-18); Act of Feb. 1, 1839, no. 77, § 1, 1839 Ala. Acts 67 (Docket No. 88-19); Act of Jan. 14, 1820, ch. XXIII, § 1, 1820 Ind. Acts 39 (Docket No.90-8); Act of Mar. 25, 1813, § 1, 1813 La. Acts 172 (Docket No. 90-7), and Act of Feb. 3, 1813, ch. LXXXIX, § 1, 1813 Ky. Acts 100 (Docket No. 90-6).] As noted above and in *Bruen*, states that historically banned concealed carry of firearms did not similarly prohibit open carry. 142 S. Ct. at 2150 (collecting statutes and cases and noting that "States could lawfully eliminate one kind of public carry—concealed carry— so long as they left open the option to public carry"). And some states—such as Arkansas, Alabama, Indiana, and Kentucky—exempt those traveling or on a journey from the laws concealed carry prohibition. Ark. Rev. Stat. ch. XLIV, art. I, § 13 (1838) (Docket No. 88-18); 1841 Ala. Laws 148-49, ch. 7, § 4; Act of Jan. 14, 1820, ch. XXIII, § 1, 1820 Ind. Acts 39 (Docket No.90-8); and Act of Feb. 3, 1813, ch. LXXXIX, § 1, 1813 Ky. Acts 100 (Docket No. 90-6).[73] In other words, a person on a "journey" or "traveling" could conceal carry. The

---

[73] Kentucky's 1813 prohibition on concealed carry was short-lived. In *Bliss v. Commonwealth*, 12 Ky. 90, 93 (1822), Kentucky's highest court struck down the state's concealed carry ban as unconstitutional under the state's constitution.

State, and its historian, Dr. Brennan Gardner Rivas, Ph.D., contend that state courts construed the "journey" or "traveling" exemptions narrowly. [State Opp'n Br. at 65–66; Rivas. Decl. ¶ 12 (Docket No. 85).]   Pointing to state court decisions from Arkansas, Alabama, and Tennessee, the State argues those courts did not apply the "journey" or "traveling" exemptions to individuals traveling in their neighborhood or as part of their ordinary life routines. [State Opp'n Br. at 66 (citing *Carr v. State*, 34 Ark. 448 (1879), *Gholson v. State*, 53 Ala. 519 (1875), *Eslava v. State*, 49 Ala. 355 (1873), and *Smith v. State*, 50 Tenn. 511 (1871)).]

Even if those states construed the journey or traveler exemptions narrowly, several states still allowed open carry.  For example, in *State v. Reid*, 1 Ala. 612 (1840), the Supreme Court of Alabama upheld a conviction of a man convicted of carrying a pistol concealed on his person.  *Id.* at 622.  In finding Alabama's concealed carry law constitutional, the *Reid* court noted that the state's constitution allowed the legislature to enact laws on how a person may carry a firearm.  *Id.* at 616.  The court, however, noted that the "[l]egislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence."  *Id.* at 619.  And in Arkansas, a person could openly carry an army pistol, uncovered, in their hands without violating the state's concealed carry law.  *See generally Haile v. St*ate, 385 Ark.564 (1882).  So, whether on a journey or traveling, a person could still open carry.[74]

---

[74] In a footnote, the State, relying on its historian, Dr. Rivas, essentially challenges the *Bruen* Court's conclusion that states that banned concealed carry still allowed open carry.  [State Opp'n Br. at 65 n. 65 (asserting that "individuals generally did not view concealed carry laws as giving permission to openly carry in populated places during a person's ordinary activities." (quoting Rivas Decl. ¶ 9)).]  Dr. Rivas, in turn, supports her position by citing to two state court decisions – *State v. Huntly*, 25 N.C. 418 (1843) and *State v. Smith*, 11 La. 633 (1856) –

At any rate, those laws do not support Chapter 131's functional firearms in vehicles restriction.  None of those laws required the arms bearer to render his firearms inoperable—whether traveling or not—like Chapter 131 does here.

Turning to the Tennessee and Texas laws the State relies on, those laws offer some support to Chapter 131's ban on functional firearms in vehicles.  In 1821, Tennessee outlawed the carrying of "belt or pocket pistols" either publicly or privately.  Act of Oct. 19, 1821, ch. XIII, § 1, 1821 Tenn. Acts 15 (Docket No. 88-20).  In *Smith*, Tennessee's Supreme Court construed a nearly identical successor version of the 1821 law and upheld a conviction against a man carrying a pistol "while riding through the neighborhood."  50 Tenn. at 512.  And in 1871, Texas criminalized the possession of any pistol on one's "person, saddle, or in his saddle bags."  Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Texas Gen. Laws. 25 (Docket No. 85-11).  Thus, both laws regulated—in essence banned—firearms when traveling.

While both the Tennessee and Texas laws support Chapter 131's ban on functional firearms in vehicles, two state laws are not enough under *Bruen* to establish a historical tradition of states regulating firearms in vehicles the way Chapter 131 does.[75]  *See* 142 S. Ct.

---

and a law review article by Mark Anthony Frassetto, *The Myth of Open Carry*, 55 U.C. Davis 2515 (2022).  [Rivas Decl. ¶¶ 9, 9 nn.7-9 (Docket No. 85).]  This Court has reviewed those materials and declines to deviate from the *Bruen* Court's finding that states with concealed carry laws still permitted open carry.  In fact, the *Bruen* Court reviewed the *Smith* decision and other decisions from Louisiana's Supreme Court when making its observation about open carry.  142 S. Ct. at 2146 n. 19 (collecting cases).

[75] Again, in a footnote, the State cites to various laws purportedly supporting Chapter 131's functional firearms in vehicles ban.  State Opp'n Br. at 64 n.64 (citing 1887 W. Va. Code ch. 148, § 1 7, p. 897 (Docket No. 89-50), 1881 Kan. Sess. Laws ch. 37, § 23, p. 92 (Docket No. 90-1), An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, 1882 Ark. Acts § 1, p. 156 (Docket No. 90-2), 1847 Va. Acts Ch. 14, § 16, p. 129 (Docket No. 90-3), W. Va. Code, Ch. 153, § 8 (1868) (Docket No. 90-4), 1887 Terr. of Wyo. Rev. Stat. §§ 980-81, p. 296 (Docket No. 90-47); and  An Act Against Wearing Swords, &c, ch. 9, in Grants, Concessions, and Original Constitutions of the Province of  New Jersey, 289-90 (2d ed. 1881) (Docket No. 90-52).  Yet the State has not explained how any of these laws support or are like Chapter 131's prohibition on functional firearms in vehicles.  Although not obligated, this Court has done its best to sift through these historical materials to find a historical law to support Chapter 131's prohibition on functional firearms in vehicles.  But in the end, it is the State's burden to do so.  *Bruen*, 142 S. Ct. at 2150.

at 2142 (doubting whether "three colonial regulations could suffice to show a tradition of public-carry regulation"). In fact, the *Bruen* Court noted that the 1821 Tennessee law was "uniquely severe" and found the 1871 Texas law (and the two Texas Supreme Court decisions upholding that law) to be "outliers." *Id.* at 2147, 2153. Thus, the Court finds that the State has not shouldered its burden to support Chapter 131's functional firearms in vehicles ban with well-established and representative historical firearm laws.

Accordingly, for these reasons, Plaintiffs are therefore likely to prevail on the merits of their Second Amendment challenge to Chapter 131's prohibition on functional firearms in vehicles.

**H.    The *Siegel* Plaintiffs' Equal Protection Challenge to Chapter 131's Exemptions for Judges, Prosecutors, and Attorneys General**

The *Siegel* Plaintiffs challenge Chapter 131's new exemption for federal and state judges and prosecutors, and the state attorney general and deputy attorneys general. [*Siegel* Compl. ¶¶ 290–91 (*Siegel* Docket No. 1).] That exemption allows certain judges, prosecutors, and the state attorney general and his or her deputies, to, among other things, carry handguns in all Chapter 131's sensitive places, exempts them from Chapter 131's permit process, and allows them, if they should choose, to carry assault firearms or machine guns. N.J. Stat. Ann. §§ 2C:58-4.6(a), 2C:39-6(a)(12). Put simply, Chapter 131 now completely exempts certain judges, prosecutors, and attorneys general from New Jersey's restrictions on carrying firearms in public. *Id.* § 2C:39-6(a)(12) (providing New Jersey's law on unlawful possession of weapons, N.J. Stat. Ann. § 2C:39-5, "does not apply" to, among others, "[a] county prosecutor, assistant prosecutor, federal prosecutor, municipal prosecutor, Attorney General, assistant attorney general, deputy attorney general and federal, State, county, or municipal court judge, including a judge of the Tax Court and any other court of limited jurisdiction

206

established, altered, or abolished by law, a judge of the Office of Administrative Law, a judge of the Division of Workers' Compensation at all times while in this State"). Judges, prosecutors, and attorneys general now join the ranks of, among others, active law enforcement officers, certain correction officers, members of the armed services "while actually on duty," and certain employees working at nuclear power plants, who too are completely exempt from New Jersey's restrictions on carrying firearms in public. *Id.* § 2C:39-6(a)(1) to (11).

The *Siegel* Plaintiffs challenge the new exemption for judges and prosecutors, claiming the exemption violates the Federal Constitution's Equal Protection Clause. [Siegel Br. at 44–45 (*Siegel* Docket No. 8-1).] They contend Chapter 131's new exemption denies them equal protection of law because the law implicates their fundamental right of carrying a handgun in public for self-defense. [*Id.* at 44–45.] According to the *Siegel* Plaintiffs, "there are no relevant distinctions between judges, prosecutors, and attorneys general and the people except for the [Gun Law's] special exemption." [*Id.* at 44.] In other words, the *Siegel* Plaintiffs claim they are "similarly situated" to judges and prosecutors but they are denied the special status Chapter 131 now affords to judges, prosecutors, and attorneys general. [*Id.*]

As noted earlier, the Equal Protection Clause of the Fourteenth Amendment requires governments to treat "all persons similarly situated . . . alike." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 113 (3d Cir. 2018) (ANJRPC) (quoting *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005)), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. To sustain an equal protection claim, the plaintiff "must show that the Government has treated it differently from a similarly situated party and that the Government's explanation for the differing treatment does not satisfy the relevant level of

scrutiny." *Stradford v. Sec'y Pa. Dep't of Corr.*, 53 F.4th 67, 73–74 (3d Cir. 2022) (3d Cir. 2022) (quoting *Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 388, 348 (3d Cir. 2017). Similarly situated individuals are those who "are alike in all relevant respects." *Id.* at 74 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). The "dissimilar treatment of dissimilarly situated persons does not violate equal protection." *Woman Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 925 (D.C. Cir. 1996) (alteration removed) (quoting *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994)).

The *Siegel* Plaintiffs' equal protection challenge to Chapter 131's exemption for judges, prosecutors, and attorneys general fails because they have not shown they are "similarly situated" to them. *See ANJRPC*, 910 F.3d at 125–26 (finding New Jersey's exemption allowing law enforcement officers to possess large capacity magazines while prohibiting retired military members and private citizens from having those magazines did not violate the equal protection clause because law enforcement officers were not similarly situated to private citizens and former military members); *see also Kolbe v. Hogan*, 849 F.3d 114, 146–47 (4th Cir. 2017) (rejecting equal protection challenge to law that allowed law enforcement officers to keep and possess large capacity magazines and assault weapons even though law banned private citizens from having those weapons because plaintiffs were not similarly situated to law enforcement officers), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

As the State points out, judges and prosecutors are different from private citizens. [State Opp'n Br. at 92–93 (Docket No. 91).] They must undergo an extensive vetting process beyond regular criminal background checks such as nomination and confirmation proceedings before a legislative body. [*Id.* at 92 (collecting statutes for state officials)]; *see also*

208

U.S. Const. art. II, § 2, cl. 2 (requiring senate approval for the appointment of Article III judges and "Officers of the United States").

Further, as the State recognizes, their work as prosecutors and judges increases the risk of harm to them.  [State Opp'n Br. at 93.]  Prosecutors are tasked with enforcing the law and prosecuting individuals who violate it.  They must prove an accused's guilt, and when appropriate, argue for incarceration.  Their efforts to enforce the law can create vendettas from those they convict.  *See generally United States v. Hinskon*, 585 F.3d 1247 (9th Cir. 2009) (affirming conviction of defendant who solicited the murder of, among others, a federal prosecutor and federal judge); *United States v. Graves*, 11 F. App'x 384, 2011 WL 672099, at *1–2 (4th Cir. 2001) (affirming conviction of convict who mailed a series of threating letters to prosecutor responsible for securing convict's conviction).  Likewise, judges tasked with imposing sentencing or other penalties may create vendettas from the individuals they sentence.  *See United States v. Hale*, 448 F.3d 971 (7th Cir. 2006) (affirming conviction of defendant found guilty of soliciting the murder of a federal judge); *see also* David Heinzmann & Jeff Coen, *Federal Judge's Family Killed*, Chi. Trib. (Mar. 1, 2005), available at: https://www.chicagotribune.com/nation-world/chi-0503010123mar01-story.html (reporting on the murder of a federal judge's husband and mother).  And, in some high-profile cases, judges may make rulings that could elicit criminal behavior from individuals who disagree with those rulings.  *See generally United States v. Turner*, 720 F.3d 141 (2d Cir. 2013) (affirming conviction of defendant found guilty of threating to kill three federal court of appeals judges following a ruling in a Second Amendment case).  This Court is particularly aware of the dangers posed against judges.

Given the above, this Court finds that judges, prosecutors, and attorneys general are not similarly situated to private citizens like the *Siegel* Plaintiffs, and therefore, the *Siegel* Plaintiffs' equal protection claim fails. *See ANJRPC*, 910 F.3d at 125–26. Indeed, the "failure to identify similarly situated persons dooms an equal-protection claim." *Stradford*, 53 F.4th at 74. Accordingly, the *Siegel* Plaintiffs are unlikely to succeed on the merits of their equal protection challenge to Chapter 131's exemption for judges, prosecutors, and attorneys general.

## I.    The *Siegel* Plaintiffs' Remaining Void-for-Vagueness Challenges to Chapter 131

Besides challenging Chapter 131's public safety disqualifiers under the void-for-vagueness doctrine, they also invoke the doctrine seeking to invalidate Chapter 131's new crime of an "unjustified display of a handgun" and other provisions of the law. [*Siegel* Compl. ¶¶ 297-311 (*Siegel* Doc. No. 1).] Apart from their challenge to the "unjustified display of a handgun" crime, this Court declines to consider their other void-for-vagueness challenges.[76]

When enacting Chapter 131, the Legislature made a new fourth-degree offense criminalizing Carry Permit holders who "engage in an unjustified display of a handgun." N.J.

---

[76] The *Siegel* Plaintiffs also raise a void-for-vagueness challenge to Chapter 131's handgun ban at public gatherings, events, or demonstrations requiring a government permit and the law's functional firearm ban in vehicles. This Court has already found the *Siegel* Plaintiffs will likely prevail on the merits of their Second Amendment challenge to those provisions of Chapter 131. See *supra* Sections IV.G.2.c.i., xii. Accordingly, this Court declines to consider their void-for-vagueness challenges to those provisions. In any event, New Jersey's Criminal Code defines the term vehicle and, therefore, that provision of Chapter 131 is not vague. *See* N.J. Stat. Ann. § 2C:1-14. Likewise, the *Siegel* Plaintiffs' challenge to the term "carry" is meritless. As the State points out, no *Siegel* Plaintiff has claimed that he or she does not know what the term "carry" in Chapter 131 means. This Court does not find the word "carry" in Chapter 131 to be vague. *See Muscarello v. United States*, 524 U.S. 125, 128–39 (1998) (extensively reviewing definitions of term "carries" when interrupting federal firearms offense). Statutes that employ terms with everyday or common meanings—such as the term carry—are not vague because a person of ordinary intelligence would understand the term. *See United States v. Tykarsky*, 446 F.3d 458, 473 (3d Cir. 2006).

Stat. Ann. § 2C:58-4.4(a)(5).  A Carry Permit holder who engages in an unjustified display of a handgun faces up to 18 months in jail, $10,000 in fines, *id.* §§ 2C:43-3(b)(2), -6(a)(4), and risks forfeiting his or her Carry Permit, *id.* § 2C:58-4.4(a).  While the Legislature did not specify a *mens rea* element for this new offense, New Jersey's Criminal Code provides that the offense has a "knowingly" mental culpable state since there is no evidence "clearly indicating a legislative intent to impose strict liability."  *Id.* § 2C:2-2(c)(3) (providing that when "no culpable mental state is designated in a statute defining an offense," a "statute defining a crime . . . should be construed as a defining a crime with the [knowingly] culpability").  The Legislature did not define "unjustified" in Chapter 131.

The State agrees.  At oral argument, the State outlined the parameters of Chapter 131's prohibition on an unjustified display of a handgun.  The State explained that an "unjustified display is a knowing display of a firearm outside the holster for a purpose other than self-defense." [Tr. at 146:16–146:18, 147:17–147:18.]  The State contended this definition follows Chapter 131's carry and holster requirements.  [Tr. at 147:4–147:9.]  And the State asserted that the law's "unjustified" language stems from *Heller*'s and *Bruen*'s rulings that the "core of the Second Amendment" is the "right to self-defense."  [Tr. at 147:14–147:16.]  The State confirmed the new offense is not a strict-liability crime, explaining the crime must be a "knowing display."  [Tr. at 146:20–146:22.]

As noted above, vague laws offend the Due Process Clause's principles that laws must provide fair notice to those who will be subject to them and not encourage arbitrary or discriminatory enforcement.  See *supra* Section IV.D.1.f.  Again, "[a] statute is unconstitutionally vague under the Due Process Clause if it (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or (2)

authorizes or even encourages arbitrary and discriminatory enforcement." *Fontaine*, 697 F.3d at 226 (internal quotation marks and citation omitted).   On the one hand, a law is unconstitutionally vague for lack of fair notice when the law fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108–09.   On the other hand, a law is unconstitutionally vague because it invites arbitrary enforcement if it leaves judges, jurors, or law enforcement "free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Beckles v. United States*, 580 U.S. 256, 266 (2017) (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03 (1966)).

When a plaintiff brings a facial void-for-vagueness challenge to a law, like the *Siegel* Plaintiffs do here, historically the Supreme Court and Third Circuit have required the plaintiff to show "that the law is impermissibly vague in all of its applications." *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 631 (3d Cir. 2013) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)).   Recently, the Supreme Court has backed away from that standard, explaining that a law may be unconstitutionally vague on its face even if "there is some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 602; *see also Sessions v. Dimaya*, ____ U.S. ____, ____, 138 S. Ct. 1204, 1214 n.3 (2018). Thus, a statute can still be found vague even if the law is clear in some applications.  *Id.*

"In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." *Freeman v. Corzine*, 629 F.3d 146, 161 (3d Cir. 2010) (quoting *Flipside*, 455 U.S. at 494 n.5).  Courts should adopt a "proffered limiting construction when the statute is actually 'susceptible to a

construction that avoids constitutional difficulties.'" *Id.* (quoting *Brown v. City of Pittsburg*, 586 F.3d 263, 275 (3d Cir. 2009)).

Here, consistent with the Supreme Court's guidance in *Flipside*, this Court finds the State's proffered interpretation of an "unjustified display of handgun" appropriate because it provides:  (1) notice to Carry Permit holders on what conduct is prohibited; and (2) enough guidelines to avoid arbitrary or discriminatory enforcement. *Fontaine*, 697 F.3d at 226.  When a statute is facially challenged on vagueness grounds, say because of an undefined term, courts should provide a limiting construction rather than declaring the statute facially invalid. *United States v. Stupka*, 418 F. Supp. 2d 402, 414 (N.D. Iowa 2019) ("When a statutory term is the primary source of vagueness, the remedy is typically a limiting construction, not a finding of facial invalidity."); *see also Beckles*, 580 U.S. at 271 n.* (Ginsburg, J., concurring) (collecting cases and explaining that the "Court has routinely rejected, in a variety of contexts, vagueness claims where a clarifying construction rendered an otherwise enigmatic provision clear"). Indeed, "[s]imply because a criminal statute could have been written more precisely does not mean the statute as written is unconstitutionally vague." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992) (citing *United States v. Powell*, 423 U.S. 87, 94 (1975)).  This State's proffered construction here removes any unconstitutional vagueness from the new criminal offense.

First, under the State's proffered construction, Carry Permit holders with ordinary intelligence will understand what conduct is prohibited:  displaying a handgun outside their holster for a purpose other than self-defense.  As the State pointed out at oral argument, Chapter 131 requires a Carry Permit holder to carry his or her handgun in public in "a holster concealed on their person."  N.J. Stat. Ann. § 2C:58-4(a).  Chapter 131 defines a holster as

"device or sheath that securely retains a handgun which, at a minimum, conceals and protects the main body of the firearm, maintains the firearm in a consistent and accessible position, and renders the trigger covered and inaccessible while the handgun is fully seated in the holster." *Id.* – 4(h).   Thus, the State's proffered interpretation, coupled with Chapter 131's carry and holster requirements, "provides clear notice [to a Carry Permit holder] that a reasonably ascertainable standard of conduct is mandated." *United States v. Alexander*, 480 F. Supp. 3d 988, 998 (N.D. Cal. 2020) (rejecting void-for-vagueness challenge to federal law prohibiting possession of silencers because statute gave fair notice of what the law prohibited) (quoting *Powell*, 423 U.S. at 92).

Second, the unjustified display of a handgun is an offense requiring knowledge of the culpable conduct.  The offense's "knowingly" requirement "'alleviate[s] vagueness concerns' because a *mens rea* element makes it less likely that a defendant will be convicted for an action committed by mistake." *United States v. Moyer*, 674 F.3d 192, 211–12 (3d Cir. 2012) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007)); *see also Flipside*, 455 U.S. at 499 ("[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.").  This knowingly requirement is tied to the State's definition of unjustified display since the Carry Permit holder must display for "a purpose other than self-defense."  Under the State's definition, a Carry Permit holder will not face liability for knowingly displaying a handgun outside his or her holster unless the display is made for a purpose other than self-defense.  When a statute criminalizes acts "knowingly done with the purpose of doing that which the statute prohibits," like Chapter 131's new offense does under the State's construction, "the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Moyer*,

214

674 F.3d at 212 (quoting *Screws v. United States*, 325 U.S. 91, 102 (1945)).   The law's language—knowingly displaying for a purpose other than self-defense—limits the types of handgun displays that are punishable.   Indeed, Chapter 131 already renders certain "incidental" displays of a handgun—such as holstering the handgun or exposing the weapon because of the holder's body shifting—to be "a de minimis infraction" of the law.   N.J. Stat. Ann. § 2C:58-4(a).   The Due Process Clause does not demand that criminal offenses be meticulously specific, "which would come at the cost of flexibility and reasonable breadth." *Betancourt*, 448 F.3d at 552 (internal quotation marks omitted) (quoting *Grayned*, 408 U.S. at 110).

Third, the State's proffered interpretation of unjustified display of a handgun provides enough "guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358 (1983) (internal quotation marks omitted) (quoting *Smith*, 415 U.S. at 574).   The State's interpretation contains explicit standards for law enforcement officers, judges, and juries to follow that will eliminate arbitrary or discriminatory enforcement.   *Grayned*, 408 U.S. at 109.   That is, their discretion to charge or convict a Carry Permit holder for engaging in an "unjustified display of handgun" is cabined to Carry Permit holders who knowingly display their handguns outside their holsters for a purpose other than self-defense.   Again, to violate due process, the law must be "so standardless that it invites arbitrary enforcement," *Johnson*, 576 U.S. at 595, and under the State's proffered construction, this Court finds Chapter 131's new offense falls outside that criterion.

Given the State's construction and for the above reasons, this Court rejects the *Siegel* Plaintiffs' void-for-vagueness challenge to Chapter 131's new crime of an unjustified display

of a handgun and denies their request for a preliminary injunction on that provision of the law.

### J.      The *Siegel* Plaintiffs' Second Amendment Challenge to New Jersey's Fish and Game Restrictions

The *Siegel* Plaintiffs contend that various Fish and Game Restrictions violate the Second Amendment.  [*Siegel* Compl. ¶ 278 (*Siegel* Docket No. 1).]  The challenged regulations range from limitations on the types of ammunition and weapons used to hunt certain game to the number of arms a hunter may carry while hunting in New Jersey.  *See* N.J. Admin. Code § 7:25-5.23(a), (c), (f), and (m).  One challenged regulation requires firearms in motor vehicles to be unloaded and "enclosed in a securely fastened case."  *Id.* § 7:25–5.23(f)(5) ("Fish and Game Functional Firearm in Vehicle Ban").[77]

To start, this Court must determine whether the *Siegel* Plaintiffs have shown that their proposed course of conduct falls within the Second Amendment's text.  *See Bruen*, 142 S. Ct. 2126, 2135.  Only Plaintiff Siegel declares an intent to hunt "in the woods and fields of New Jersey."  [*Siegel* Decl. ¶ 15 (*Siegel* Docket No. 8-2).]  Plaintiff Siegel apparently seeks to carry his handgun while hunting in New Jersey.  [*Siegel* PI Reply Br. at 65 (Docket No. 97).]   He claims that he would bring his handgun for self-defense (and self-defense ammo) while hunting if the Fish and Game Restrictions were not on the books.  [Siegel Decl. ¶ 38 (*Siegel* Docket No. 8-2).]

At first blush, one may conclude the Second Amendment's text covers that course of conduct because it implicates the right to armed self-defense.  But on a closer examination, the Second Amendment's text may not cover that conduct.  The Second Amendment's text

---

[77] This Court has already found the *Siegel* Plaintiffs lack standing to challenge N.J. Admin. Code § 7:25-5.23(i)'s firearm ban at state game refuges.  See *supra* Section IV.G.1.a.

"guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592).  The text is silent on hunting, and some courts have held the Second Amendment's text does not confer a right to hunt.  *See, e.g., Hunters United for Sunday Hunting v. Pa. Game Com'n*, 28 F. Supp. 3d 340, 346 (M.D. Pa. 2014); *see also* Joseph Blocher, *Hunting and the Second Amendment*, 91 Notre Dame L. Rev. 133, 153–171 (2015) (canvassing arguments on whether the Second Amendment confers a right to hunt).  The "highly influential" proposal from the Dissent of the Minority of the Convention of Pennsylvania, *see Heller*, 554 U.S. at 604, requested the new Constitution provide that "the people have a right to bear arms . . . for the purpose of killing game."  Halbrook, *supra* Section IV.D.1.c, at 195 (citation omitted).  The Minority also proposed that "'[t]he inhabitants of the several states shall have liberty to fowl and hunt in seasonable times, on the lands they hold, and on all other lands in the United States not inclosed, and in like manner to fish in all navigable waters, and others not private property, without being restrained therein by any laws to be passed by the legislature of the United States."  *Id.* at 196 (citation omitted).  Neither proposal, however, made its way into the Constitution.

In any event, this Court must look to whether the Fish and Game Restrictions infringes on "the right to keep and bear arms."  *Kelly*, 2022 WL 17336578, at *2.  Apart from the Fish and Game Functional Firearm in Vehicle Ban, see *infra* Section IV.J., the other Fish and Game Restrictions likely do not infringe on Plaintiff Siegel's Second Amendment right to bear arms.   Unlike Chapter 131's complete handgun ban, the Fish and Game Restrictions only restrict the types of weapons and ammunition a hunter may use.  N.J. Admin. Code § 7:25-5.23(a), (c), (f), and (m).  Those regulations do not completely deprive Plaintiff Siegel of his ability to defend himself with a firearm in case of confrontation while hunting, say from a

wild bear or even a violent individual roaming through the fields and woods of New Jersey. Said another way, he still has arms—even if only a shotgun or rifle—for self-defense. Plaintiff Siegel's claim that he needs to bring his handgun while hunting rings hollow to the Court. This Court doubts whether Plaintiff Siegel has shown that his proposed course of conduct— carrying a handgun for self-defense while hunting—falls within the Second Amendment's text. *Bruen*, 142 S. Ct. 2126, 2135. Setting aside the Court's reservations nevertheless, the Court will consider whether historical firearm laws support the Fish and Game Restrictions.

The State has offered many fish and game laws from the 18th and 19th centuries. [State Opp'n Br. at 61–62 (Docket No. 91).]   Like the Fish and Game Restrictions, those historical laws restricted the method of hunting.  Earlier colonial laws restricted hunting of certain game to certain times.  Act of May 5, 1722, ch. 86, § 1, reprinted in *The Acts of the General Assembly of New Jersey* 122 (1722); Act of Aug. 26, 1721, ch. 246, § 1 (Pa.), *reprinted in* 3 Stat. at Large of Pa. 254-55 (1896) (Docket No. 88-33); *see also* Cramer, 16 J. on Firearms & Pub. Pol'y at 16–17.  Later colonial laws also imposed time and method restrictions on hunting.  Act of Dec. 21, 1771 ch. DXL, § 2, 1763-1775 N.J. Laws 344-45 (Docket No. 88-13) (restricting deer hunting to certain months and banning the use of traps "larger than what is usually and commonly set for Foxes and Muskrats"); *see also* Act of Dec. 10, 1790, no. 444, § 1(Ga.), *reprinted in* Robert & George Watkins, *A Digest of the Laws of the State of Georgia* 428 (Phila., R. Aitken, 1800) (Docket no. 89-43) (outlawing deer hunting with a  gun by "fire light").[78]  After the Second Amendment's ratification, the States continued to restrict methods of hunting.  1838 M.D. Laws, ch. 100, § 1, p. 1836 (Docket No. 89-44) (prohibiting the

---

[78] "Fire-hunting" or "fire light" hunting refers to a hunting practice where hunters set ablaze the field or "brush" in a circular manner forcing deer entrapped in the flaming circle to look for an opening to escape where armed hunters positioned themselves.  Clayton E. Crammer, *Colonial Firearm Regulation*, 16 J. on Firearms & Pub. Pol'y 1, 17 (2004).

carrying of "any offensive weapon, gun, musket, fowling piece or pistol" in any boat or canoe for hunting fowl in certain locations).

The states also restricted methods of hunting during and after Reconstruction. 1868 Ohio Rev. Stat. (Supplement), ch. 3, §§ 23, 25, pp. 12–13 (Docket No. 89-45) (imposing time restrictions on hunting deer and limiting firearms to hunt duck, geese, or other waterfowl to "common shoulder gun") (Docket No. 89-45); 1872 Wisc. Rev. Stat. ch. 183, § 37, p. 1960 Docket No. 89-46) (outlawing the killing of wild duck or geese "with or by means of the device, instrument or firearm known as punt or swivel gun, or with or by means of any gun or firearm other than such guns or firearms as are habitually raised at arm's length and fired from the shoulder"); 1872 Conn. Pub. Acts ch. 115,  §§ 1-2, p. 108 (Docket No. 89-47) (imposing time restrictions on hunting wild duck and geese and outlawing hunting those birds with "any instrument . . . other than such guns as are habitually raised at arm's length and fired from the shoulder"); 1872 Or. Laws 25-26, §§ 1-2, 4-6) (Docket No. 89-48) (imposing time restrictions on hunting various games and outlawing fishing with gunpowder or other explosive material); and 1873 S.C. Rev. Stat. ch. 77, §§ 10, 16 (Docket No. 89-49) (imposing time restrictions on hunting deer and outlawing hunting deer at night with "fire").

This Court finds the State has established a historical tradition of comparable laws to sustain the Fish and Game Restrictions. Again, unlike Chapter 131's handgun ban, the Fish and Game Restrictions do not deprive the *Siegel* Plaintiffs of firearms to defend themselves— the regulations only restrict the types of firearms and ammunition a hunter may use. *Bruen*'s "how" and "why" inquiry reveals that the historical game laws and Fish and Game Restrictions serve the same purpose:  restrict the manner, method, and time of hunting to preserve game.  Unsurprisingly, neither party has adequately explained how the Fish and

Game Restrictions deny Plaintiff Siegel of his right to bear arms for self-defense.[79]  When a plaintiff seeks to alter the status quo instead of preserving it, like Plaintiff Siegel attempts to do here, the plaintiff must show "a substantial likelihood of success on the merits and that [his] 'right to relief [is] indisputably clear.'"  *Hope*, 972 F.3d at 320 (second alteration in original) (quoting *Trinity*, 735 at 139).  The *Siegel* Plaintiffs have not met that "particularly heavy burden."  *Id.* (internal quotation marks and citation omitted).  So this Court denies the *Siegel* Plaintiffs' motion for a preliminary injunction as to N.J. Admin. Code § 7:25-5.23(a), (c), (f)(1) to (4), and (m).[80]

That said, this Court finds the Fish and Game Functional Firearm in Vehicle Ban to be unconstitutional.  Unlike the other Fish and Game Restrictions, this regulation does not relate to hunting.  Indeed, the other Fish and Game Restrictions are specifically tied to hunting—the types of weapons and ammunition a hunter may use based on the sought-out game.  *See* N.J. Admin. Code § 7:25-5.23(a), (c), (f), and (m).  This Court finds the Fish and Game Functional Firearm in Vehicle Ban indistinguishable from Chapter 131's prohibition on functional firearms in vehicles.  Both infringe on a Carry Permit holders' right to armed self-defense while in a vehicle.  The State's historical fish and game laws offer no support for the Fish and Game Functional Firearm in Vehicle Ban.  Thus, for the same reasons Chapter

---

[79] The Court is willing to revisit the *Siegel* Plaintiffs' challenge to the Fish and Game Restrictions upon adequate briefing from both parties.

[80] All the more reason to deny the *Siegel* Plaintiffs' motion for a preliminary injunction on those Fish and Game Restrictions is their failure to show irreparable harm.  As the State points out, the challenged Fish and Game Restrictions have been in effect for decades.  [State Opp'n Br. at 61 n. 58 (Docket No. 91).]  Yet the *Siegel* Plaintiffs waited until the Legislature passed Chapter 131 to challenge the Fish and Game Restrictions.  Their delay undermines their claim that those regulations are causing Plaintiff Siegel irreparable harm, and warrants denial of their motion for a preliminary injunction as to those regulations.  *See Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117-18 (3d Cir. 2013) (affirming denial of preliminary injunction for lack of irreparable harm since plaintiffs waited to challenge law, and explaining that "[d]elay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action") (omission in original, internal quotation marks and citation omitted).

131's functional handgun ban in vehicles is unconstitutional, so too is the Fish and Game Functional Firearm in Vehicle Ban. *See id.* The *Siegel* Plaintiffs are likely to prevail on the merits of their Second Amendment challenge to N.J. Admin. Code § 7:25-5.23(f)(5).

### K.      Irreparable Harm to Plaintiffs

The Court now turns to the irreparable harm factor. It is well-settled within the Third Circuit that the probability of success on the merits is but one of the "two most critical factors" a movant for preliminary equitable relief must demonstrate. *Reilly*, 858 F.3d at 179. The other critical fact Plaintiffs must show is whether they are "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* If both "critical factors" are met, then the Court must "consider[] the remaining two factors and determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

As explained in the Court's decisions on the *Koons* and *Siegel* TRO motions, Plaintiffs will likely suffer immediate and irreparable harm if Chapter 131's handgun ban at the supposed sensitive places is not preliminarily enjoined. In *Siegel*, the Court clarified that even if not every "bare" constitutional deprivation necessarily constitutes a *per se* irreparable injury in the context of emergent or preliminary injunctive relief, as argued by the State at the TRO phase, "**the threat of [criminal] prosecution for engaging in constitutionally protected conduct certainly is**." [*Siegel* TRO Op. at 43–44 (citing (*A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (explaining that "[i]n cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm").] To that end, "Plaintiffs do not allege a

bare constitutional deprivation, but that they fear the threat of severe criminal penalties if they choose to exercise their Second Amendment rights." [*Siegel* TRO Op. at 44.]

It is noteworthy that Chapter 131 is in sharp contrast to the Carry Permit laws that New Jersey had on the books before. In fact, most Plaintiffs successfully obtained a Carry Permit from the State giving them express *permission* to carry a handgun for self-defense purposes, including most of the areas the State has now declared to be gun-free "sensitive places." Once again, the Court echoes the many decisions finding that deprivation of a right otherwise secured by the Second Amendment is "not easily remediable by monetary damages or other non-injunctive relief." [*Id.* at 55 (citing *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (explaining that like the First Amendment, the "Second Amendment protects similarly intangible and unquantifiable interests," including the right to possess firearms for self-protection, since "[i]nfringements of this right cannot be compensated by damages"); *see also Spencer v. Nigrelli*, ____ F. Supp. 3d ____, ____, 2022 WL 17985966, at *13 (W.D.N.Y. Dec. 29, 2022); *Hardaway*, 2022 WL 16646220, at *17; *Antonyuk*, 2022 WL 3999791, at *36.]

Here, Plaintiffs have clearly shown that if the challenged sensitive places under Chapter 131 are enforceable, the harm they will likely suffer is noncompensable. Since Chapter 131 became law, Plaintiffs have resorted to leaving their handguns and Second Amendment rights at home because they may otherwise face significant criminal sanctions and jail time. This result is plainly inconsistent with *Bruen*, which affirmed the right to carry a firearm in public for self-defense. Unlike the exercise of other constitutional rights, the inability to exercise one's Second Amendment right when needed could be a matter of life or death. Because Chapter 131 forces Plaintiffs to choose between the noncompensable loss of their Second Amendment rights or face significant criminal penalties for exercising such

rights, the Court finds that Plaintiffs have clearly shown they are more likely than not to suffer irreparable injury if their motions for preliminary injunctive relief is not granted. *Rena v. Bonta*, _____ F. Supp. 3d _____, _____, 2023 WL 2846937, at *14 (S.D. Cal. Apr. 3, 2023) (granting preliminary injunction and explaining that "[i]t is well-established that loss of 'the enjoyment of Second Amendment rights constitutes irreparable injury'") (quoting *Duncan v. Becerra*, 256 F. Supp. 3d 1106, 1135 (S.D. Cal. 2017)).

### L.   Harm to Other Interested Parties and the Public Interest

Finally, the Court considers the possibility of harm to other interested parties, as well as the public interest, if it were to grant Plaintiffs' motions for a preliminary injunction, and whether all four PI factors, on balance, weigh in favor of granting the relief requested. Again, the Court incorporates its earlier TRO Opinions. Where, as here, a "challenged government action involves the exercise of constitutional rights, 'the public interest . . . tip[s] sharply in favor of enjoining' the law." *Renna*, 2023 WL 2846937, at *15 (omission and alterations in original) (quoting *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009)). The Court finds that preliminarily enjoining Chapter 131's unconstitutional provisions "will only impact individuals who have already gone through the State's vetting process" to obtain a Carry Permit, "so other interested parties will not be harmed if the requested relief is granted." [*Siegel* TRO Op. at 44.] "After all, neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." [*Id.* (citing *Am. C.L. Union v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003), *aff'd and remanded*, 542 U.S. 656 (2004)); *see also Koons* TRO Op. at 59.]

The last PI factor has been central to the argument advanced by the Legislature-Intervenors, New Jersey Senate President Nicholas P. Scutari and New Jersey General

223

Assembly Speaker Craig J. Coughlin, who ask this Court to deny preliminary injunctive relief.

At oral argument, the Intervenors concluded their argument by stating:

> My last point . . . is the possibility of harm to other parties and
> the public interest . . . [O]ur position is that those studies
> indicate, no matter how you read them, that the states that have
> let's say lightened up on the requirements of gun carrying have
> had an increase in gun-related incidents. I mean, I think it seems
> like a reasonable inference to be drawn. You're not going to have
> less inference – less of a problem. The more guns out there, [the
> number of gun-related incidents] shouldn't go down. It should,
> you know, likely go up. And these two studies that are cited in
> our brief support that proposition. If that's the case, we're talking
> about – I mean, guns only have two functions – to kill or to
> seriously injure.

[Tr. at 155:16–156:6.] The argument was telling, as it is best summed up as an "all guns are bad" one. This argument is problematic for several reasons.

*First*, individuals may own firearms unrelated to self-defense such as hunting or target shooting. Indeed, "[h]unting and recreational uses likes target shooting and 'plinking' have long been the primary reason for gun ownership in the United States." Blocher, 91 Notre Dame L. Rev. at 134 (citation omitted).

*Second*, the Intervenors' argument ignores the fundamental right of self-defense. Although the Intervenors cite to statistics involving gun violence, they do not cite to statistics involving law-abiding citizens with carry permits who used their firearms to save lives. For example, a concealed carry permit holder in Chicago heroically stopped "a gunman who opened fire on a crowd of people in Logan Square." Geoff Ziezulewicz, *Uber Driver, Licensed to Carry Gun, Shoots Gunman in Logan Square*, Chi. Trib. (Apr. 20, 2015), available at: https://www.chicagotribune.com/suburbs/lake-county-news-sun/ct-uber-driver-shoots-gunman-met-0420-20150419-story.html. As another example, a legal permit carry holder saved the lives of patrons and children in a barbershop in Philadelphia when he stopped a

224

man who brandished a handgun following a fight with another patron.  *Gunman Shot Dead Inside West Philadelphia Barbershop*, CBS News (Mar. 22, 2015), available at: https://www.cbsnews.com/philadelphia/news/man-shot-dead-inside-west-philadelphia-barbershop/.  These examples are just a few of many.  *See also* David Kopel, Opinion, *Guns in America:  Arming the Right People Can Save Lives*, L.A. Times (Jan. 15, 2013), available at: https://www.latimes.com/opinion/la-xpm-2013-jan-15-la-oe-kopel-guns-resistance-nra-20130115-story.html. The Intervenors' argument ignores these realities.

 *Third*, the social science studies the State and the Intervenors have brought before this Court to show that granting injunctive relief is not in the public's interest are not as clear-cut as they believe.  The Intervenors point to two studies conducted by researchers at Johns Hopkins University.  [Intervenor's Post-Argument Br. at 3 (Docket No. 121).]  In fact, the Legislature expressly referenced one of the John Hopkins' studies when passing Chapter 131.  In enacting Chapter 131, the Legislature declared that:

> Statistics show that expanding handgun carrying creates safety risks, helping to fuel the epidemic of gun violence.  For example, a study by researchers at the Johns Hopkins Bloomberg School of Public Health found that the estimated average rate of officer involved shootings increased by 12.9 percent in ten states that relaxed restrictions between 2014 and 2020 on civilians carrying concealed firearms in public.  Accordingly, evidence demonstrates that more guns on the streets can translate into more acts of gun violence.  To mitigate the impact of having more people carrying guns in public places, steps must be taken to better ensure that those who exercise the right to carry are responsible, law-abiding, and appropriately trained individuals who would not pose undue safety risks if armed in public places.

2022 N.J. Laws, ch. 131, § 1(c).

 When reviewed independently, this Johns Hopkins study is considerably more nuanced than the Legislature declared it to be.  *See* Mitchell L. Doucette et al., *Officer-Involved*

*Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020*, J. of Urban Health, June 2022, at 373–84, available at: https://doi.org/10.1007/s11524-022-00627-5.  In fact, what these researchers specifically examined was the relationship between concealed carry laws and officer-involved shootings from 2014 through 2020, finding a 12.9 percent increase in the victimization rate for officer-involved shootings within jurisdictions that had adopted a **permitless** concealed firearm carry regime.  *Id.*  Empirical studies that measure an increase in gun violence when adopting or moving away from a **permitless** regime—unlike Chapter 131 that contains numerous permit criteria and disqualifiers—are not germane to the serious inquiry presently before this Court.

The other social science studies the State and Intervenors point to are equally unpersuasive because the studies fail to specifically account for the role of law-abiding citizens in the increase of crime rates or gun violence.  Apart from the 2019 study from John J. Donohue and his colleagues, the other studies focus on crime increases in general in shall-issue firearm permitting regimes.  [*See* State Post-Argument Br. at 7–8 (Docket No. 120); *see also* Intervenors Post-Argument Br. at 3–6 (Docket No. 121).]  But whatever the permitting regime—shall, may, or permitless—opportunistic criminals and individuals bent on breaking the law will obtain firearms and use them unlawfully.  Indeed, criminals are not deterred by firearm laws.  *See Bruen*, 142 S. Ct. at 2159 (Alito, J., concurring) ("No one apparently knows how many of the 400 million privately held guns are in the hands of criminals, but there can be little doubt that many muggers and rapists are armed and are undeterred by the Sullivan Law.").

The 2019 study from Professor Donohue and his colleagues suggests that shall-issue firearm permitting laws "can lead to an increase in violent crime by increasing the likelihood

a generally law-abiding citizen will commit a crime or increasing the criminal behavior of others."   John J. Donohue et al., *Right to Carry Laws and Violent Crime: A Comprehensive Assessment Using Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198, 203 (April 2019).   In that study, Professor Donohue and his colleagues found that right-to-carry "laws are consistently shown to increase violent crime."   *Id.* at 234; *see also id.* at 240.   However, while the study mentioned incidents of law-abiding citizens engaging in violent acts with their firearms, *see id.* at 203, 206, the study's overall conclusions did not separate out violent crimes committed by law-abiding citizens from non-law-abiding citizens.

In fact, other studies point the other way, finding that shall-issue permitting laws did not lead to an increase in violent crime, or that carry permit holders are not responsible for the increases in violent crimes.   *See* John R. Lott, Jr., *What A Balancing Test Will Show for Right-to-Carry Laws*, 71 Md. L. Rev. 1205, 1212 (2012) ("The behavior of permit holders is the easiest question to answer. . . . The third edition of *More Guns, Less Crime* presents detailed data for 25 right-to-carry states, and any type of firearms-related violation is at hundredths or thousandths of one percent.") (citing John R. Lott, Jr., *More Guns, Less Crime: Understanding Crime and Gun Control Laws* (3d ed. 2010)); *see also* Carlisle E. Moody et al., *The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication*, 4 R. of Econ. & Fin. 33, 42 (2014) (replicating 2011 study conducted by Professor Donohue and his colleagues that found right-to-carry laws increased violent crime and explaining that their study "suffer[ed] from significant aggregation bias and significant omitted variable bias," and that "[t]he most robust result . . . is that the net effect of [right-to-carry] laws is to decrease murder"); Clayton E. Cramer & David B. Kopel, *"Shall issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679, 709 (1995) ("The experience of the carry reform states plainly shows that

homicide rates will not increase as a result of crimes committed by persons with carry permits. Carry reform legislation may or may not reduce the homicide rate, but reform legislation apparently does not raise the homicide rate."); *cf.* Nat'l Research Council, *Firearms and Violence: A Critical Review* 150 (2004) ("[T]he committee concludes that with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates.").

And herein lies the problem: despite ample opportunity for an evidentiary hearing, the State has failed to offer any evidence that law-abiding responsible citizens who carry firearms in public for self-defense are responsible for an increase in gun violence. The State's empirical evidence fails to consider, among other things, the permit requirements of the shall-issue jurisdictions the studies analyzed as compared to Chapter 131's permit requirements (or similar permitting laws). Such issues could have been explored at an evidentiary hearing. Nor has the State presented one example where a New Jersey Carry Permit holder committed a violent crime. In fact, there was about a six-month gap between *Bruen* and Chapter 131's enactment where more individuals obtained Carry Permits. Yet the State has not shown an increase in violent crimes during such period despite the increase of individuals obtaining Carry Permits.

While this Court's role is not to weigh the costs and benefits of shall-issue licensing laws or the merits of the various social studies presented by the State or Intervenors, this Court will not find the public interest will be harmed by granting injunctive relief based on the studies presented. To be sure, the Nation's recent experience with gun violence has weighed heavily on the Court. So, too, has the unconstitutionality of Chapter 131's "sensitive places" and the effect it has on the law-abiding citizens with Carry Permits before the Court. So, if

the State is going to argue that there will be an increase in gun violence absent Chapter 131

that regulates the conduct of law-abiding citizens to carry a firearm, it should at least make

an attempt to point to apposite statistics.  It has not done so.

Accordingly, on balance, the Court finds that the final PI factors weigh in favor of

granting Plaintiffs' motions for preliminary relief.

## V.     CONCLUSION

In conclusion, the Second Amendment's "right to bear arms in public for self-defense

is not a 'second-class right, subject to an entirely different body of rules than the other Bill of

Rights guarantees.'"  *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780).  That

does not mean, however, that the right is "unlimited."  *Heller*, 554 U.S. at 626.  The

Constitution leaves the States "some measures" to combat handgun violence.  *Id.* at 636.  But

what the Second Amendment prohibits the States from doing, and what the State of New

Jersey has done here with much of Chapter 131, is to "prevent[] law-abiding citizens with

ordinary self-defense needs from exercising their right to keep and bear arms."  *Bruen*, 142 S.

Ct. at 2156.  That is plainly unconstitutional.

*Bruen* required the State to bring its firearm laws in compliance with the Second

Amendment.  Chapter 131 was the State's response, but it went too far, becoming the kind of

law that Founding Father Thomas Jefferson would have warned against since it "disarm[s]

only those who are not inclined or determined to commit crimes [and] worsen[s] the plight of

the assaulted, but improve[s] those of the assailants."[81]

---

[81] *The Commonplace Book of Thomas Jefferson: A Repertory of His Ideas on Government* 314 (Gilbert Chinard ed., John Hopkins Press, 1926); *see also* Cesare Beccaria, *On Crimes and Punishment*s 105 (Graeme R. Newman & Pietro Marongiu trans., Transaction Publishers 5th ed., 2009).

That said, this Court finds that most of Chapter 131's firearm permitting requirements are consistent with the Second Amendment.  This Nation has historically disarmed dangerous individuals or individuals who could endanger the public with a firearm.  With some exceptions, Chapter 131's firearm permitting scheme generally adheres to that historical tradition and aims to keep firearms out of the hands of those who could harm the public.

Accordingly, this Court grants, in part, and denies, in part, Plaintiffs' motions for a preliminary injunction.  Because Plaintiffs are claiming a deprivation of their fundamental right to keep and bear arms, this Court waives Rule 65's bond requirement.  *See, e.g.*, *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right."); *see also Renna*, 2023 WL 2846937, at *15 (waiving bond requirement in Second Amendment challenge to state gun law).

An accompanying Order shall issue that embodies the Court's various rulings.


**May 16, 2023**                                          **s/Renée Marie Bumb**
Date                                                      RENÉE MARIE BUMB
                                                         Chief United States District Judge

230