IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 8:21-cv-01736-TDC **(L)** |
| ) | Case No. 8:22-cv-01967-DLB |
| MONTGOMERY COUNTY, MD., ) | |
| ) | |
| *Defendant*. ) | |

**PLAINTIFFS' NOTICE
OF SUPPLEMENTAL AUTHORITY CONCERNING
SENATE BILL 1 ENACTED BY THE MARYLAND GENERAL ASSEMBLY**

Plaintiffs respectfully submit this Notice of Supplemental Authority to bring to the Court's attention the enactment of Senate Bill 1 ("SB 1") by the Maryland General Assembly. See 2023 Maryland Session Laws, Ch. 680 (May 16, 2023), codified in part at MD Code, Criminal Law, §§ 4-111, 6-411. A copy of SB 1 is attached, as signed by the Governor. The defendant, Montgomery County, MD ("the County"), has relied on State law throughout its opposition to plaintiffs' motion for a preliminary injunction. It is therefore appropriate for this Court to be appraised of this development in State law. While plaintiffs believe that SB 1 is unconstitutional (at least in part) under the Second Amendment,[1] it is vastly different and far less restrictive in many ways than Montgomery County Code, Chapter 57 ("Chapter 57) challenged in this case.

SB 1 is tailored to regulate permit holders, as carry in public by non-permit holders is sharply limited by MD Code, Criminal Law, § 4-203(a). Permit holders are specifically exempt from Section 4-203(a) under subsection 4-203(b)(2). In contrast, the amendments made by Bill

---

[1] SB 1 has already been challenged as unconstitutional under the Second Amendment in two lawsuits filed in federal district court. *Novotny v. Moore*, No. 23-1295 (D.MD.) (filed May 16, 2023), and *Kipke v. Moore*, No. 23-1293 (D. Md.) (filed May 16, 2023. Plaintiff MSI is a named plaintiff in *Novotny*. The *Novotny* plaintiffs have filed a motion for a preliminary injunction which may well be decided prior to the Oct. 1, 2023, effective date of SB 1.

21-22E to Chapter 57 repealed the existing County's exception for permit holders previously set forth in Section 57-11(b)(5). Thus, both Chapter 57 and SB 1 regulate permit holders, but do so in radically different ways.

SB 1 presumptively bans the wear, carry and transport of firearms on privately owned "property," but defines "property" for this purpose as "a building" and expressly provides that "property" "does not include the land adjacent to a building." See Section 6-411(a)(6). That definition thus expressly allows a permit holder to possess and transport in such adjacent areas, such as parking lots and sidewalks. Unlike Chapter 57, SB 1 does not impose any 100-yard exclusionary zones. SB 1 also specifically and expressly allows not only the owner to carry on their private property, it also expressly permits possession of firearms by a person who has the owner's permission to carry firearms in such privately owned buildings, including areas in which such possession is banned by Chapter 57. See Section 6-411(d). Such permission may be either expressly stated or given via signage. Id. In contrast, Chapter 57 bans all possession in any privately owned location falling within one of the many 100-yard exclusionary zones identified by Chapter 57. The exception for "owners" of private businesses under subsection 57-11(b)(4) is very limited. Specifically, the owners of private buildings are limited to "one firearm" and "one authorized employee" and both the owner and the employee must have a carry permit. Such owners are not empowered to give permission to other people. In contrast to SB 1, which limits its ban to "a building," Section 57-11(a) bans firearms within 100 yards of its specified locations.

Similarly, while SB 1 incorporates a list of prohibited locations, including privately owned places, that list is much more restricted than that imposed by Chapter 57. For example, unlike Chapter 57, SB 1 does not ban firearms in any park, place of worship, library, recreational facility, or in any multipurpose exhibition facility such a fairgrounds or conference centers. SB 1 does ban the wear, carry and transport of firearms at public and private schools, places where alcohol is

served for on-site consumption, museums, video lottery facilities, racetracks and four defined health care facilities. See Section 4-111(a)(8). But in doing so, it further provides that private owners of these places may wear, carry and transport firearms and may, by "express agreement," allow others to do likewise. See Section 4-111(b)(9). Thus, for example, owners of places of worship may carry and may by simple express agreement, authorize other permit holders to do the same. Chapter 57 would ban such possessions. Chapter 57 is broader in its prohibitions, banning mere "possession" (including presumably all "constructive possession) while SB 1 bans only the wear, carry and transport in these locations. Chapter 57 is thus far more restrictive.

      Similarly, while both SB 1 and Chapter 57 regulate firearms by permit holders in a "health care facility," SB 1 defines a health care facility by incorporating other statutory provisions to limit its application to (1) hospitals, (2) nursing homes, (3) surgical centers and (4) places "primarily" devoted to rehabilitation. See Section 4-111(a)(2)(iii). In contrast, Chapter 57 bans the possession of firearms in "any health care facility" that is "licensed by the Maryland Department of Health." See Section 57-1 (1)(g). As thus defined, Chapter 57 bans the mere possession of firearms in walk-in clinics, pharmacies, out-patient facilities, diagnostic and laboratory locations, and the like. Since physicians and their professional assistants, like nurses, must be licensed by the Department of Health, the bans imposed by Chapter 57 might even include private offices of individual health care providers. See MD Code, Health Occupations, § 14-301 *et seq*. Similarly, Chapter 57 bans the possession of firearms at any "childcare facility," Section 57-1 (1)(J), but SB 1 does not specifically mention such facilities thus permitting private owners and others (by permission) to carry in such locations. SB 1 bans the wear, carry and transport of firearms at "a preschool or prekindergarten facility" and its grounds. See Section 4-111(a)(2)(i). But again, even at these places, SB 1 expressly exempts private owners and other persons who are authorized to carry pursuant `to an "express agreement" with the owner. See Section 4-111(b)(9). This arrangement

allows private owners to enlist permit holders to provide armed security at these locations. That is impossible under Chapter 57.

Chapter 57's restrictions on the geographic areas in which carry permit holders may carry are fundamentally at odds with the comprehensive system of regulation of wear and carry of firearms on which SB 1 is built. Maryland carry permits are issued to Maryland residents and non-residents by the Maryland State Police which has **exclusive** control over the availability of carry permits under MD Code, Public Safety, § 5-306. These permits are effective State-wide. That authority of the State Police was expressly addressed by Senate Bill 1, which amended MD Code, Public Safety, § 5-307(b) to **repeal** (effective Oct. 1, 2023), the existing authority of the State Police, found in subsection 5-307(b), that allows the State Police to "limit the geographic area, circumstances, or times of the day, week, month, or year in which a permit is effective."

SB 1 made corresponding changes to MD Code, Criminal Law, § 4-203(b)(2), the subsection that exempts carry permit holders from the bans otherwise imposed by subsection 4-203(a). Under current law, the exception for carry permit holders under subsection 4-203(b)(2) must be "in compliance with any limitations imposed under § 5–307 of the Public Safety Article." Effective October 1, 2023, SB 1 repeals the quoted language from subsection 4-203(b)(2). That amendment, coupled with the repeal of the language in subsection 5-307(b), effectively means that, effective October 1, 2023, carry permit holders are no longer subject to the limitation, currently placed on every permit, that the permit is "not valid where firearms are prohibited by law." See SAC ¶ 39. As explained by the Chair of the House Judiciary Committee, these amendments to subsection 5-307 and subsection 4-203(b)(2), were necessary to comply with *NYSRPA v. Bruen*, 142 S.Ct. 2111 (2022). See https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jud&clip=JUD_4_6_2023 _meeting_2&ys=2023rs at 1:15 through 1:23 (April 6, 2023). Ironically by imposing limits on the

"geographic area" in which carry permit holders are allowed to carry, the County has exercised a power that the General Assembly has expressly **denied** to the State Police **on constitutional grounds**.

There are more differences. Chapter 57 bans are applicable to any "government building, including any place owned by or under the control of the County." Facially, that ban includes buildings owned or operated by the federal government.[2] That assertion of power over federal property includes property over which the federal government exercises **exclusive** jurisdiction under Article I, § 8, cl. 17 of the Constitution. See 18 U.S.C. § 7. Examples of such exclusive jurisdiction areas include military installations, federal buildings, post offices, and some high-value or security-sensitive sites (which are abundant in the County). See, e.g., *United States v. Tucker,* 122 F. 518 (W.D. Kentucky 1903). To be sure, federal law may incorporate State laws under the Assimilative Crimes Act, 18 U.S.C. § 13 ("ACA"). See *United States v. Irvin*, U. 21 M.J. 184 (U.S. Ct. of Military Appeals) (detailing the elements for ACA incorporation). However, incorporation is not appropriate if the State law is contrary to federal policy. See, e.g., *United States v. Kelly*, 989 F.2d 162, 164 (4th Cir.), *cert. denied,* 510 U.S. 114 (1993) ("federal courts have consistently declined to assimilate provisions of state law through the ACA if the state law provision would conflict with federal policy"). Moreover, the ACA specifically refers to incorporating "the law of a State, territory, possession, or District." 18 U.S.C. § 13(a). We know of no case in which *local* law (rather than State law) has been incorporated under the ACA. Thus, if State law, such as Senate Bill 1, does not ban possession in a federal location, then it would be

---

[2] . The verb "including" already "implies" that the ensuing "list is only partial." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 287 (1987). See also MD Code, General Provisions, § 1-110 ("'Includes' or 'including' means includes or including by way of illustration and not by way of limitation.").

contrary to common sense to allow a County to impose a ban at such location. See *United States v. Dotson*, 34 F.3d 875 (9th Cir. 1994) (replying on State law to reverse a conviction under the ACA).

The County's attempt to exercise control over federal buildings is also in conflict with federal law. The presence of firearms in federal facilities is controlled by 18 U.S.C. § 930, which imposes a much different regulatory scheme than the flat bans imposed by Chapter 57. For example, under Section 930, a federal facility is defined by whether "Federal employees are regulatory present for the purpose of performing their official duties," not simply by mere ownership or control. 18 U.S.C. 930(g)(1). Unlike Chapter 57, Section 930 provides that "[n]otice of the provisions of subsections (a) and (b) shall be posted conspicuously at each public entrance to each Federal facility," and that "no person shall be convicted … if such notice is not so posted at such facility, unless such person had actual notice" of this law. 18 U.S.C. § 930(h). Congress obviously intended to establish one "set of standards" for the possession of firearms in federal buildings. Such standards imply "a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012). Chapter 57 disregards these limitations imposed by Section 930 and thus directly conflicts with federal law. "It is a bedrock rule, of course, that federal law preempts state law when the two conflict." *Glacier Northwest, Inc. v. International Brotherhood of Teamsters Local Union No. 174*, 143 S.Ct. 1404 2023, citing U. S. Const., Art. VI, cl. 2 (Supremacy Clause).

Not surprisingly, the Maryland General Assembly is better informed than the County and thus SB 1's regulation of government buildings is much more restrained. Specifically, SB 1 bans the wear, carry or transport of a firearm in "a building, or any part of a building owned or leased *by a unit of State or local government*," thus excluding federal buildings. See Section 4-111(a))(4)(i) (emphasis added). Unlike Chapter 57, SB 1 also does not purport to regulate any

building "controlled" by a local or State entity; it is limited to buildings "owned or leased" by State or local governments. Moreover, unlike Chapter 57, SB 1 provides, in Section 4-111(d)(2), that "a government or public infrastructure area specified under subsection (a)(4)(i) of this section **must display** a clear and conspicuous sign at the main entrance of the building or the part of a building that is owned or leased by the unit of state or local government indicating that it is not permissible to wear, carry, or transport a firearm in the building or that part of the building." (Emphasis added). SB 1 thus gives notice and impliedly conditions the restriction for State and local government buildings on such notice, much like Section 930 does for federal buildings. Chapter 57 does not.

There are still more differences. Chapter 57 contains no *mens rea* requirement and thus imposes strict criminal liability for any violation, regardless of the state of mind, knowledge, or intent of the person. This absence of a *mens r*ea requirement raises profound due process issues given that no notice is given of whether a given building is "owned or controlled" by the "government." See *Lambert v. California*, 355 U.S. 225, 227 (1957); *Lawrence v. State*, 475 Md. 384, 421, 257 A.3d 588 (2021) (discussing *Lambert*). For example, Chapter 57 never defines what is meant by a building "controlled" by a government entity. Given the absence of any *mens rea* requirement and the enormous scope and inherent vagueness associated with the thousands of 100-yard exclusion zones imposed by Section 57-11(a), Chapter 57 creates massive traps for the unwary, thereby ensuring arbitrary and unfair enforcement. In contrast, SB 1 expressly includes a *mens rea* requirement in both Section 4-111(f) and in Section 6-411(e) under which a violation is not criminal unless the person "willfully violates" the prohibitions imposed by these two sections. See, e.g., *Bryan v. United States,* 524 U.S. 184, 191-92 (1998) ("in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'") (citation omitted). This *mens rea* requirement thus avoids the due process problems created by the County's strict liability statute.

## CONCLUSION

A preliminary injunction should be granted without delay.

                                           Respectfully submitted,

                                           */s/ Mark W. Pennak*

                                           MARK W. PENNAK
                                           MARYLAND SHALL ISSUE, INC.
                                           9613 Harford Rd
                                           Ste C #1015
                                           Baltimore, MD 21234-21502
                                           mpennak@marylandshallissue.org
                                           Phone: (301) 873-3671
                                           District Court Bar No. 21033