**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al*., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 8:21-cv-01736-TDC **(L)** |
| | ) | Case No. 8:22-cv-01967-DLB |
| MONTGOMERY COUNTY, MD., | ) | |
| | ) | |
| *Defendant*. | ) | |

**PLAINTIFFS' EMERGENCY MOTION FOR A
RULE 8 INJUNCTION PENDING APPEAL**

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste, C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
Bar No. 21033
*Counsel for Plaintiffs*

Dated: August 30, 2023

**TABLE OF CONTENTS**

STATEMENT OF THE CASE ......................................................................................... 1

    A.    Introduction ........................................................................................... 1

    B.    Chapter 57, Bill 4-21 and Bill 21-22E ................................................ 3

    C.    Prior Proceedings ................................................................................ 4

ARGUMENT ................................................................................................................ 6

    A.    Plaintiffs Are Likely To Succeed On The Merits ................................ 7

        1.    The Founding Era Is Controlling ................................................... 7

        2.    The 100-Yard Exclusionary Zones ................................................ 15

        3.    Houses of Worship ......................................................................... 18

    C.    Plaintiffs Are Suffering Continuous Irreparable Injury ...................... 22

    D.    The Requested Relief Would Not Harm The County .......................... 23

    E.    The "Public Interest" Is Not Harmed ................................................. 25

CONCLUSION ............................................................................................................. 27

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 8:21-cv-01736-TDC **(L)** |
| | ) | Case No. 8:22-cv-01967-DLB |
| MONTGOMERY COUNTY, MD., | ) | |
| | ) | |
| *Defendant*. | ) | |

**PLAINTIFFS' EMERGENCY MOTION FOR A
RULE 8 INJUNCTION PENDING APPEAL**

Pursuant to Rule 8(a)(1)(C) of the Federal Rules of Appellate Procedure, plaintiffs respectfully move this Court for an injunction pending appeal. In support of this motion, plaintiffs incorporate and rely on the verification declarations supporting the Second Amended Complaint ("SAC") (Dkt #49), the declarations filed in support of plaintiffs' motion for a preliminary injunction, the supplemental declaration of Allan Barall and the supplemental declaration of Daniel Carlin-Weber (both as filed in the Court of Appeals), the transcript of the February 6, 2023 hearing, and Senate Bill 1, 2023 Maryland Session Laws, Ch. 680. Plaintiffs respectively request an immediate ruling on this motion.

**STATEMENT OF THE CASE**

**A.      Introduction**

At issue in this case are ordinances, Bill 4-21 and Bill 21-22E, enacted by Montgomery County, Maryland ("the County"), codified at County Code Chapter 57. Bill 4-21 was enacted in 2021 and Bill 21-22E was enacted on November 28, 2022, in response to *NYSRPA v. Bruen*, 142 S.Ct. 2111 (2022). As thus amended, Section 57-11(a) of Chapter 57 bans the possession, transport, sale, and transfer of all firearms within thousands of 100-yard exclusionary zones spread

1

throughout the County. Section 57-10 bans firearms, with minor exceptions, on the person or in a vehicle. Plaintiffs in this case are Maryland Shall Issue, Inc., a Section 501(c)(4) membership advocacy organization, Engage Armament, a State and Federally licensed firearms dealer, ICE Firearms, a firearms instruction business, and eight individuals who live and/or work in the County. Each of the individual plaintiffs has a Maryland wear and carry permit issued by the Maryland State Police pursuant to MD Code, Public Safety, § 5-306.

The Verified Second Amended Complaint was filed November 30, 2022, immediately after the enactment by the County of Bill 21-22E on November 28, 2022. In Count VII, plaintiffs challenged Chapter 57 of the Montgomery County Code ("Chapter 57"), as amended by Bill 4-21 and Bill 21-22E, as a violation of the Second Amendment as construed in *Bruen*. On December 6, 2022, plaintiffs filed an emergency motion for a TRO and preliminary injunction, seeking immediate relief. The district court held argument on February 6, 2023, and denied the motion five months later, on July 6, 2023. Plaintiffs filed a timely notice of appeal on July 7, 2023.

*Bruen* struck down a New York statute that required applicants for a carry permit to demonstrate "proper cause" for carrying a handgun in public. The Court held that the Second Amendment protected "the general right to publicly carry arms for self-defense," 142 S.Ct. at 2134, while also making clear that a State may condition that "Second Amendment right to public carry" on obtaining a carry permit from the State if the permit is issued on an otherwise reasonable and objective "shall issue" basis. *Bruen*, 142 S.Ct. at 2138 & n.9. Permits in Maryland are now issued on a "shall issue" basis. See *Matter of Rounds,* 255 Md.App. 205, 213, 279 A.3d 1048 (2022) (invalidating the "good and substantial reason" requirement found in MD Code, Public Safety, § 5-306(a)(6)(ii), as contrary to *Bruen*).

2

County officials reacted to *Buren* with defiance. The County Executive was vocal in opposing *Bruen*. https://bit.ly/3B9ucB4 (starting at 01:29), as was the sponsor of Bill 21-22E, the County Council President. https://bit.ly/3VvCf3u, who complained that the decision made it more difficult for the County to enact policies that "prevent someone's Second Amendment right from infringing on the right of me and my family to go to a movie theater without having to wonder or worry about someone sitting next to me is carrying a gun on them." https://bit.ly/3P1mmz9 (starting at 01:40). Those views were endorsed by the leadership of the Montgomery County Police Department, id., by the County Council, https://bit.ly/3VydQdF (starting at 02:04:13), and by the County Executive. https://bit.ly/3ET5bv3 (at 02:05). Bill 21-22E was enacted as emergency legislation and went into effect immediately upon the signature of the County Executive on November 28, 2023.

### B.    Chapter 57, Bill 4-21 and Bill 21-22E

A major change made by Bill 21-22E was to amend Section 57-11(b) of Chapter 57 to eliminate the exemption for permit holders from the bans on firearms otherwise imposed by Section 57-11(a). (SAC ¶ 85). Bill 21-22E also altered the definition of "place of public assembly," as used in Section 57-11(a) of Chapter 57. Specifically, Bill 21-22E replaced the definition of "place of public assembly" imposed by Bill 4-21 and redefined the phrase to mean:

> (1) a publicly or privately owned:
> (A) park; (B) place of worship; (C) school; (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility, including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility;
> (2) government building, including any place owned by or under the control of the County;
> (3) polling place;
> (4) courthouse;
> (5) legislative assembly; or
> (6) a gathering of individuals to collectively express their constitutional right to protest or assemble.

(SAC ¶ 11).

Bill 21-22E further defined the "place of public assembly" to mean: "A 'place of public assembly' includes all property associated with the place, such as a parking lot or grounds of a building." Id.

Section 57-11(a), as thus amended, provides that "[i]n or within 100 yards of a place of public assembly, a person must not: (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms." Similarly, Section 57-10 of Chapter 57 provides that "[i]t shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition" subject to limited exceptions.[1] No exception is made for permit holders and this prohibition in Section 57-10 is County-wide. Under Section 57-15 "[a]ny violation of this Chapter … is a Class A violation to which the maximum penalties for a Class A violation apply." Under Section 1-19 of the County Code, the maximum penalties applicable for a violation of Chapter 57 are a $1,000 fine and 6 months in jail. Under Section 1-20(c) of the County Code, "[e]ach day any violation of County law continues is a separate offense."

## C.    Prior Proceedings

On May 28, 2021, plaintiffs filed the Complaint in this matter, challenging Bill 4-21. On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment and supporting memorandum, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Count

_____

[1] One of the exceptions from Section 57-10 is for persons on "a lawful mission" which presumably included persons who had a wear and carry permit. After *Bruen*, a permit holder is certainly on a "lawful mission," as such a person is simply exercising a constitutional right. Bill 21-22E's repeal of the exception for permit holders effectively removed that exception from Section 57-10, thus subjecting permit holders to the bans imposed by Section 57-10 as well as to the bans imposed by Section 57-11(a). An injunction pending appeal as to the 100-yard exclusionary zone bans imposed by Section 57-11 should be sufficient to accord relief from enforcement of Section 57-10.

I challenged Bill 4-21 as unconstitutional under Maryland's Constitution. Count II alleged that Bill 4-21 conflicted with numerous State laws and preemption statutes. Count III alleged that Bill 4-21 was a Taking under the State Constitution. Count IV alleged that parts of Bill 4-21 were unconstitutionally vague under the federal and State Constitutions. On July 12, 2021, the County removed the entire case to federal district court. On February 7, 2022, this Court remanded Counts I, II and III to State court. *Maryland Shall Issue, Inc. v. Montgomery County*, 2022 WL 375461 (D. Md. Feb. 7, 2022).

Shortly thereafter, the Supreme Court decided *Bruen*, striking down a New York statute that required applicants for a carry permit to demonstrate "proper cause" for carrying a handgun in public. The Court held that the Second Amendment protected "the general right to publicly carry arms for self-defense," 142 S.Ct. at 2134, while also making clear that a State may condition that "Second Amendment right to public carry" on obtaining a carry permit from the State if the permit is issued on an otherwise reasonable and objective "shall issue" basis. *Bruen*, 142 S.Ct. at 2138 & n.9.

*Bruen* identified three locations (polling places, legislative assemblies, and courthouses) where a state may completely ban firearms, noting that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." 142 S.Ct. at 2134. Such an analogue must be a "well-established and representative historical analogue." Id. Outlier statutes are to be disregarded (id. at 2133, 2153), as are statutes from the Territories (id. at 2154-55) as are statutes from the "late-19th-century evidence, the 20th-century." Id. at 2154 n.28. The Court looked to the Founding Era in conducting this analysis.

On July 22, 2022, plaintiffs filed, in State court, the "First Amended Verified Complaint," adding a new Count V alleging that Bill 4-21 was unconstitutional under the Second Amendment as

construed in *Bruen*. On August 8, 2022, the County promptly removed the First Amended Complaint to federal district court. On November 28, 2022, the County enacted Bill 21-22E. On November 30, 2022, plaintiffs filed a Second Amendment Complaint, directly challenging Chapter 57, as thus altered, and amended by Bill 21-22E. On December 6, 2022, plaintiffs filed an emergency motion for a TRO and preliminary injunction on Count VII of the Second Amended Complaint, contending that Chapter 57's bans on carry by permit holders were facially unconstitutional under *Bruen*. Oral argument was held February 6, 2023, and this Court issued its order and opinion denying that motion on July 6, 2023. On July 7, 2023, plaintiffs filed a notice of appeal of that ruling and on July 8, 2023, plaintiffs filed a Notice with this Court seeking leave to file a Rule 8 motion seeking an injunction pending appeal. On August 29, 2023, this Court granted plaintiffs leave to file this Rule 8 motion.

## ARGUMENT

Plaintiffs' Rule 8 motion seeks an injunction pending appeal **only** with respect to permit holders and **only** with respect to: (1) the County's bans on possession and transport of firearms within the County's 100-yard exclusionary zones as regulated by Section 57-11(a), (2) the bans imposed by Chapter 57 at or within houses of worship. This Rule 8 motion does not seek relief with respect to firearms **inside** all the rest of the locations identified by the County's definition of a "place of public assembly" or at any place where firearms are otherwise banned by State law. This limited request is thus narrower than the preliminary injunctive relief sought in plaintiffs' original motion for a preliminary injunction.

Rule 8 relief is governed by *Nken v. Holder*, 556 U.S. 418, 434 (2009), which makes clear that the standard for a preliminary injunction and the standard for relief pending appeal, while "similar" and "overlap[ping]," are not the same. See *Grimmett v. Freeman*, 2022 WL 3696689 at *1 (4th Cir. 2022) (*per curiam*). A Rule 8 motion is considered *de novo* because whether to grant

relief **pending appeal** is a question legally and logically distinct from the underlying merits of the appeal. See, e.g., *Does 1-3 v. Mills*, 39 F.4th 20, 24 (1st Cir. 2022); *Priorities USA v. Nessel*, 978 F.3d 976, 982 (6th Cir. 2020). Thus Rule 8(a) commands that such a request must first be made in district court despite the rule that an appeal (including an interlocutory appeal) otherwise divests the district court of any jurisdiction over any "aspect" of the matter on appeal. *Coinbase, Inc. v. Bielski*, 143 S.Ct. 1915, 1919 (2023). This Court is thus not bound by and is not reconsidering its decision denying a preliminary injunction in adjudicating this Rule 8 motion.

### A.  Plaintiffs Are Likely To Succeed On The Merits

The party seeking Rule 8 relief pending appeal must show that they are "'likely to succeed on the merits.'" Id., quoting *Nken*, 556 U.S. at 426. Under this element, the movant "must establish a material probability of success on the merits." *Vialva v. Watson*, 975 F.3d 664, 666 (7th Cir. 2020). However, *Nken* "did not suggest that this factor requires a showing that the movant is 'more likely than not' to succeed on the merits." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 37 (2d Cir. 2010). Thus, "[a] 'strong' showing thus does not mean proof by a preponderance." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).

#### 1.  The Founding Era Is Controlling

Relying exclusively on post-Civil War historical analogues, including some statutes and local ordinances from the Territories and from the late 19th and 20th centuries, this Court sustained Chapter 57's ban on firearm possession and transport by permit holders. In so holding, the court relied (slip op. 18-19) exclusively on *NRA v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023), a decision that was vacated and withdrawn shortly after this Court issued its July 6, 2023, order denying a preliminary injunction in this case. See *NRA v. Bondi,* 72 F.4th 1346 (11th Cir. July 14,

2023). This Court "agree[d] with the Eleventh Circuit's reasoning" in *Bondi* that the Reconstruction Era was the "more probative" period than the Founding Era for conducting the historical analogue inquiry required by *Bruen*. Slip op. at Rehearing en banc was sought and granted on precisely this holding. See Petition for Rehearing, *NRA v. Bondi*, No. 21-12314 Dkt. 68-1 (11th Cir. March 30, 2023). With the panel decision now vacated and withdrawn it can no longer serve as persuasive precedent.

That now-vacated panel holding in *Bondi* also conflicted with *Hirschfeld v. ATF,* 5 F.4th 407, 419 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), which held that 1791 is the "'critical year'" for conducting the historical inquiry required under the Second Amendment. Quoting *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). While *Hirschfeld* involved a challenge to a federal statute, its analysis is fully applicable to State law challenges. That is because *Bruen* expressly held that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government." 142 S.Ct. at 2137 (emphasis added). *Hirschfeld* remains good law.[2]

*Bruen* made explicit that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," and "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137 (internal quotation marks omitted). Likewise in *McDonald v. City of Chicago*, the Court held that "incorporated Bill of Rights protections

---

[2] *Hirschfeld* involved the federal ban on handgun sales to 18-to-20-year-olds and the decision was vacated as moot when the plaintiffs no longer fell within that age range. A decision vacated for such non-merit reasons, while non-binding, is still persuasive precedent. *Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 n.14 (9th Cir. 2014) ("decisions vacated for reasons unrelated to the merits may be considered for the persuasive of their reasoning").

are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." 561 U.S. 742, 765 (2010) (internal quotation marks omitted). And *Heller* established that, as applied against the Federal Government, the Second Amendment has the same scope today as at the Founding. *See Heller*, 554 U.S. at 576–77. In sum, it would be an error to apply a different standard for a municipal regulation than applicable to federal regulations.

Although the *Bruen* Court noted an "academic" debate surrounding whether courts should look to 1791 or 1868 to determine the scope of the Second Amendment right as incorporated by the Fourteenth Amendment, the Court found no need to resolve that question because it had no bearing on the case at hand. *Id.* at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry.") (emphasis added). *Bruen* therefore did not disturb the Court's established precedent holding that 1791 is the relevant date when applying the Bill of Rights to the Federal Government and that the Bill of Rights applies the same ay to both the States and the Federal Government.

Moreover, the *actual analysis* in *Bruen* focused on Founding-era practice. The Court stressed that the "post-Civil war discussion of the right to bear arms, [which] 'took place 75 years after the ratification of the Second Amendment, . . . do[es] *not provide as much insight* into its original meaning as earlier sources.'" *Id.* at 2137–38 (quoting *Heller*, 554 U.S. at 614) (emphasis added). *Bruen* likewise stated that courts should "guard against giving post-enactment history more weight than it can rightly bear." *Id.* at 2136. Justice Barrett, in her concurring opinion, stressed that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 2163 (Barrett, J., concurring). This analysis aligns with the Court's broader precedent, where, as *Bruen* noted, the Court

has "assumed that the scope of the protection Applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*. at 2137. Thus, in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2258–59 (2020), the Court held that "more than *30*" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions were not grounded in Founding-era practice (emphasis added).

In all events, "to the extent later history contradicts" the text of the Second Amendment, "the text controls" and the text did not change in 1868. *Bruen*, 142 S. Ct. at 2137. "'[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id*. (quoting *Heller v. District of Columbia*, 670 F.3d 1224, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). 20th-century and late-19th-century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 2154 & n.28. Thus, restrictions on the right to keep and bear arms adopted during or after the Reconstruction era may be confirmatory of earlier legislation but cannot alone provide the historical analogue required by *Bruen*. In other words, only "enduring" and "well-established" restrictions with roots in the Founding are relevant in assessing whether the challenged restrictions comport with the Second Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

While the Second Amendment extends to the States via the Due Process Clause of the Fourteenth Amendment, that is true of *every* Bill of Rights provision that has been incorporated against the States. To accept 1868 as "more probative" would be contrary to virtually every decision that has incorporated the Bill of Rights as against the States. *See McDonald*, 561 U.S. at 764–65 & nn.12, 13. *Bruen* relied on two recent decisions, *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and

*Timbs v. Indiana*, 139 S. Ct. 682 (2019). *Ramos* held that the Sixth Amendment right to a unanimous jury verdict was incorporated against the States and overruled prior precedent that had allowed the States to adopt a different rule under a "dual track" approach to incorporation. The relevant historical benchmark for the Court's analysis was 1791. *See* 140 S. Ct. at 1396 (discussing the history in "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791).

While there may be an "academic" debate, there is no such debate in the case law. *Hirschfeld* and *Moore* held that 1791 is the "critical year" and these decisions are not alone in looking to 1791. The Fifth, Seventh and Ninth Circuits have recently done likewise. See *United States v. Daniels*, --- F.4th ----, 2023 WL 5091317 at *8 (5th Cir. 2023) ("Even if the public understanding of the right to bear arms did evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791."); *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) ("The pertinent question, the Court [in *Bruen*] explained, is what the Founders understood the Second Amendment to mean."); *Teter v. Lopez*, --- F.4th ----, 2023 WL 5008203 (9th Cir. 2023) (holding that butterfly knives were protected arms and that the State had failed to show that a ban was justified by a historical analogue dating back to the Founding).

The district courts have also uniformly looked to 1791 in a wide variety of challenges to State and federal laws, including one recent challenge to a Hawaii "sensitive places" law in which the district court "respectfully disagree[d]" with this Court's reliance on late 19th and 20th century analogues. *Wolford v. Lopez*, 2023 WL 5043805 at *22-*23 (D. Haw. Aug. 8, 2023). See also *Rocky Mt. Gun Owners. v. Polis,* 2023 WL 5017253, at *18 (D. Col. Aug. 7, 2023), *Rule 8 stay motion denied*, No. 23-1251 (10th Cir. Aug. 29, 2023) ("because the Governor fails to point to any evidence during the founding era that a total prohibition on the sale of firearms to minors was consistent with the right to bear arms, the Court gives little weight to evidence from the time of the Fourteenth

11

Amendment's ratification to limit the scope of the right to keep and bear arms"): *United States v. Alston*, 2023 WL 4758734, at *5 (E.D.N.C. July 18, 2023) ("The further a historical practice strays from 1791—the year in which the Second Amendment was adopted—the less probative it is when determining whether a law complies with the Amendment's command."); *United States v. Bartuci*, 2023 WL 2189530, at *6 (E.D. Cal. Feb. 23, 2023) ("the best way to do the historical analysis is by understanding the scope the Second Amendment had when it was adopted in 1791 and to look to 1868 when the Fourteenth Amendment was adopted as potentially confirmative evidence"); *United States v. Rowson*, 2023 WL 431037, at *22 (S.D.N.Y. Jan. 26, 2023) ("Viewing these laws in combination, the above historical laws bespeak a 'public understanding of the [Second Amendment] right' in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness."); *United States v. Connelly*, 2022 WL 17829158, at *2 n.5 (W.D. Tex. Dec. 21, 2022) (rejecting the government's reliance on "several historical analogues from 'the era following ratification of the Fourteenth Amendment in 1868'"); *United States v. Stambaugh*, 2022 WL 16936043, at *2 (W.D. Okla. Nov. 14, 2022) ("the government must identify a historical analogue in existence near the time the Second Amendment was adopted in 1791") (citation omitted); *United States v. Price*, 2022 WL 6968457, at *1 (S.D. W. Va. Oct. 12, 2022) ("Because the Second Amendment was adopted in 1791, only those regulations that would have been considered constitutional then can be constitutional now."); *FPC, Inc. v. McCraw*, 625 F. Supp. 3d 740, 756 (N.D. Tex. 2022), *appeal dismissed sub nom. Andrews v. McCraw,* 2022 WL 19730492 (5th Cir. 2022).

Indeed, even before the en banc order in *Bondi* vacating the panel decision, other courts had expressly rejected the approach followed by the *Bondi* panel. Thus, in *Worth v. Harrington*, the court noted, *contra Bondi*, the "rather clear signs that the Supreme Court favors 1791 as the date

for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters." 2023 WL 2745673, at *11 (D. Minn. Mar. 31, 2023). As that court explained, *Bruen* "made no small effort to distance itself from even *Heller's* reliance on post-enactment history except to the extent that such history was consistent with the founding era public meaning." *Id.* at *11 (citing *Bruen*, 142 S. Ct. at 2136–37); *see also Fraser v. ATF*, 2023 WL 3355339, at *15 & n.21 (E.D. Va. May 10, 2023) (following *Hirschfeld* and *Worth* and rejecting *Bondi*). In short, with the panel decision in *Bondi* now vacated, there is zero support for this Court's ruling that post-Civil War analogues are "more probative."

To be probative, historical analogues from the Founding also must be "representative." Historical "outlier" requirements from a few jurisdictions or from territorial governments must be disregarded. *Bruen*, 142 S. Ct. at 2133, 2153, 2147 n.22, 2154 n.28, & 2156. Regulations from only a handful of States or that covered only a small portion of the population are not enough to demonstrate that modern regulations are consistent with a national regulatory tradition. *Id.* at 2155 (rejecting regulations applying to only 1% of the American population); *see also Koons*, 2023 WL 3478604, at *78, *85 (finding regulations covering 10% and 15% of American population insufficient). *Bruen* also categorically rejected reliance on laws enacted in the Territories, including "Arizona, Idaho, New Mexico, Oklahoma," holding that such laws "are *most unlikely* to reflect 'the origins and continuing significance of the Second Amendment'" and thus are not "'instructive.'" *Bruen*, 142 S. Ct. at 2154 (quoting *Heller*, 554 U.S. at 614) (emphasis added).[3]

---

[3] Specifically, *Bruen* rejected New York's reliance on three colonial statutes (1686 East New Jersey, 1692 Massachusetts, and 1699 New Hampshire), *see* 142 S. Ct. at 2142–44; three late-18th-century and early-19th-century state laws that "parallel[ed] the colonial statutes" (1786 Virginia, 1795 Massachusetts, and 1801 Tennessee), *id*. at 2144–45; four additional 19th-century state laws (1821 Tennessee, 1870 and 1871 Texas, and 1887 West Virginia), *id*. at 2147, 2153; five late-19th-century regulations from the Western Territories (1869 New Mexico, 1875

Where the challenged law addresses "a general societal problem" of a type also present during the Founding, *Bruen*, 142 S. Ct. at 2131-32, the historical analogues must also be "distinctly similar" to the challenged regulation, which is to say that the analogues must have burdened ordinary, law-abiding citizens' right to carry for self-defense in a distinctly similar manner and for distinctly similar reasons as the challenged regulation. *Id.* at 2132. *See Daniels*, 2023 WL 5091317 at *4 (holding that the "kind of similarity" is dependent on whether the challenged regulation "'addresses a general societal problem'" or an "'unprecedented societal concern' that the Founding generation did not experience"). "The lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen,* 142 S. Ct. at 2131. Here, the County has not asserted any "unprecedented societal concern" as justification for Chapter 57 and thus the burden is on the County to show "distinctly similar" analogues from the Founding sufficient to establish a "national tradition" present at that time.

*Bruen* also explained that the analogical inquiry is guided by two "metrics": "how and why" any restriction was historically imposed during the Founding era. *Id.* at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* (emphasis in original) (quoting *McDonald*, 561 U.S. at 767). For example, historical poaching and hunting restrictions are generally insufficient to demonstrate the constitutionality of a modern-day restriction on carrying firearms during day-to-day life. Both *how* hunting laws burdened the right to carry firearms for self-defense (when hunting) and *why* they did so (to regulate hunting and reduce the taking of certain animals in certain places during certain seasons) have nothing to do

---

Wyoming, 1889 Idaho, 1889 Arizona, and 1890 Oklahoma), *id*. at 2154–55; and one 19th-century Western state law (1881 Kansas), *id*. at 2155–56.

with restricting the right of self-defense in modern-day Maryland. *See, e.g.*, *Koons*, 2023 WL 3478604, at *64–*65.

### 2.      The 100-Yard Exclusionary Zones

Chapter 57 bans firearms at and within 100 yards of any location defined by the County to be a "place of public assembly," which is defined to include ten broadly encompassing privately **or** publicly owned types of places as well as at an additional five other types of locations (government buildings, polling places, courthouses, legislative assemblies, and gatherings of persons expressing constitutional rights). The bans extend to "all property associated with the place, such as a parking lot or grounds of a building," meaning that the 100-yard zone is measured from the edge of the grounds, or any parking lots associated with each of the challenged locations. Thus measured, these bans create thousands of often interlocking 100-yard exclusionary zones that effectively ban carry by a permit holder throughout the County, including on all major roads and many side roads and sidewalks as well as vast acreage of private property otherwise open to the public. The 100-yard zones extend to adjoining streets and sidewalks where people walk or drive daily and where the law accords special recognition of their right to go about their business. *See Heffron v. Int'l Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981) (observing that a public street serves "a necessary conduit in the daily affairs of a locality's citizens").

The Maryland State Department of Education website lists 1,218 childcare facilities in Montgomery County. *Child Care Inspection Search Results*, MD. STATE DEP'T OF EDUC. (last visited Aug. 21, 2023), https://bit.ly/43XOwRq. According to GIS Open Data official sources, there are 1,262 public bikeways, https://bit.ly/43XYB0M, 605 houses of worship, https://bit.ly/3OLbfvG, 693 public parks, https://bit.ly/3qjHLfb, 260 private schools, https://bit.ly/3rWuj1g, 136 public elementary schools, https://bit.ly/3DKgyoV, 40 public middle

schools, https://bit.ly/3KsT8bF, 25 high schools, https://bit.ly/3DJZjnK, 42 public recreation centers, https://bit.ly/457wXzA, 24 public libraries, https://bit.ly/45cUwab, 17 hospitals, https://bit.ly/3Olu9Tw, 14 County health centers, https://bit.ly/3OINW5I and 11 colleges and universities, https://bit.ly/3KvzjQK.

GIS Open Data also lists 106 local governments, https://bit.ly/47xT18H, 40 Post Offices, https://bit.ly/3DI3Ert, 38 fire stations, https://bit.ly/3YjY08F, 13 Metro stations, https://bit.ly/3OlQNjH, and 11 MARC commuter train locations, https://bit.ly/451ctsz. These links show the address of each location and thus permit a 100-yard boundary to be drawn around each such location using Google Maps. Supp. Decl. of John Smith No. 1 ¶5. Those thousands of prohibited locations only scratch the surface. Chapter 57 also prohibits any firearm at or within 100 yards of "any health care facility" licensed by the Maryland Department of Health. According to the Maryland Board of Physicians, there are 4,508 active physicians practicing primarily at 1,307 unique addresses just in the cities of Bethesda, Gaithersburg, Rockville, and Silver Spring. https://bit.ly/3DKRbU8. This data also does not include many "privately owned" locations, such as "recreational facilities," "conference centers," urgent care centers, and pharmacies offering clinical services. It is impossible for the average permit holder to be aware of many of these locations as he or she moves about in the County.

The scope of that coverage is illustrated in the maps that identify these thousands of locations, attached to the Supplemental Declaration of Daniel Carlin-Weber, previously filed with the Fourth Circuit and filed herewith. This is what Montgomery County looks like with the Section 57-11(a) 100-yard exclusionary zones (red shaded areas):



Id. at 9. Additional maps for particular areas are also set forth in the Carlin-Weber Declaration.

As these maps make plain, it is literally impossible to drive in or through the County, including on Interstate Highways, like I-495 and I-270 and other thoroughfares without quickly entering one or more of these 100-yard exclusionary zones. The downtown areas in the County are almost completely "no go" zones. Indeed, plaintiffs Brandon Ferrell, Joshua Edgar, Deryck Weaver and Nancy and Ronald David cannot even carry outside their homes **at all** with their permits. SAC ¶¶ 64, 66, 69, 71, 73. The same is true for declarant Allan Barall. See Second Supplemental Declaration of Allan Barall. That effect cannot be reasonably disputed by the County. That result is reinforced by Section 57-10, which, as noted, makes it unlawful for any

person to have a gun "on his person, concealed or exposed, or in a motor vehicle where it is readily available for use." That provision is not subject to any 100-yard limitation.

That result is indefensible. *Bruen* held that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place'" as that "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." 142 S.Ct. at 2134. The island of Manhattan occupies approximately 23 square miles. Montgomery County occupies over 506 square miles. Carlin-Weber Decl. at 3. If New York may not "effectively" ban carry on the island of Manhattan or in cities, the County may not "effectively" ban carry throughout the County. *Bruen* held that there is a "general right" to carry in public, 142 S.Ct. at 2135, 2134, 2135, but the County has extinguished that right, exactly as its officials intended.

Section 57-11(a) and Section 57-10 ban firearms over vast tracts of privately owned land otherwise open to the public and those bans are thus analogous to New Jersey's presumptive ban, found in N.J.S.A. § 2C:58-4.6(a)(24), on carry on private property at issue in *Koons,* 2023 WL 3478604 at *68. The district court preliminarily enjoined that presumptive ban and, on appeal by New Jersey, the Third Circuit refused to stay that part of the district court's order. *Koons v. Attorney General of New Jersey*, No. 23-1900, slip op. 2 and n.1 (June 20, 2023). In this case, Chapter 57, with its 100-yard exclusionary zones (Section 57-11(a)) and ban on possession on the person and in a vehicle (Section 57-10), effectively prohibits carry by permit holders much more extensively than the New Jersey statute enjoined in *Koons*.

### 3.    Houses of Worship

There is no Founding-era support for regulating firearm carry at houses of worship. Full stop. This Court's decision instead rests on late-19th-century and Territorial analogues, but even

those relatively few statutes did not impose "distinctly similar" restrictions comparable to the Chapter 57's destruction of the right to armed self-defense confirmed in *Bruen*. Three other district courts—*Koons v. Platkin*, 2023 WL 3478604 at *73-*74 (D.N.J. 2023); *Antonyuk v. Hochul*, 2022 WL 16744700 at *60-*63 (N.D.N.Y. 2022), and *Hardaway v. Nigrelli,* 2022 WL 16646220 at *13-*17 (W.D.N.Y. 2022)—have already examined this issue in great detail and rightly enjoined state laws that banned firearms in places of worship.

Houses of worship in the County have turned to armed security provided by permit holders who are members of their congregations, like plaintiff Eli Shemony, SAC ¶ 74, and MSI member declarants Allan Barall, David Sussman, and the other MSI members who submitted declarations in support of plaintiffs' motion for a preliminary injunction. These individuals were accorded permits by the Maryland State Police for the *express purpose* of providing security at their own houses of worship. *Id.* Chapter 57 strips these churches and synagogues of that protection, rendering these places and their congregants "sitting ducks" for mass murderers. Supp. Barall Decl. ¶ 4, Exh. B to P.Reply on the PI Motion. The Second Circuit has accordingly refused to stay district court injunctions against similar restrictions for "persons who have been tasked with the duty to keep the peace at places of worship." *Hardaway v. Nigrelli*, No. 22-2933, Dkt.#53 (2d Cir. 2023); *Antonyuk v. Hochul,* 2022 WL 18228317 (2d Cir. 2022).

In fact, "the historical evidence demonstrates that six out of the thirteen original colonies *required* their citizens to go armed when attending religious services or public assemblies." *Koons*, 2023 WL 3478604, at *73 (emphasis added); *see also Heller*, 554 U.S. at 601 ("Many colonial statutes required individual arms bearing for public-safety reasons."). This Founding-era evidence of an American tradition allowing carry in places of worship cannot be contradicted by later 19th-century evidence. *Bruen*, 142 S. Ct. at 2154 (citing *Heller*, 554 U.S. at 614).

19

Like the County in this case, New Jersey in *Koons* and New York in *Antonyuk* relied on late-19th-century laws from Georgia (1870), Texas (1870), and Missouri (1875); the Territories of Arizona (1889) and Oklahoma (1890); and two municipal ordinances, one from Columbia, Missouri (1890) and one from Stockton, Kansas (1887). *Koons*, 2023 WL 3478604, at *74; *Antonyuk*, 2022 WL 16744700, at *61, *64. The Court here addressed many of the very same laws in upholding the County's restrictions at places of worship. The court in *Koons* ruled that the "above laws are not 'well-established' and 'representative' historical firearm regulations to justify prohibiting Carry Permit holders from carrying their handguns at public gatherings." *Koons*, 2023 WL 3478604, at *75. Similarly, *Antonyuk* afforded the territorial laws of Arizona and Oklahoma "little weight," noting that *Bruen* had instructed that statutes from the Territories were "deserving of 'little weight' because they were 'localized' and 'rarely subject to judicial scrutiny' and 'short lived.'" *Antonyuk*, 2022 WL 16744700, at *64.

In particular, the court in *Koons* dismissed New Jersey's reliance on an 1870 Georgia law, noting that the decision sustaining that law, *Hill v. State*, 53 Ga. 472 (1874), "rests on a militia-based reading of the right to keep and bear arms." 2023 WL 3478604, at *76. The same flaw afflicted the decision of the Texas Supreme Court in *English v. State,* 35 Tex. 473, 477–78 (1872), which sustained the 1870 and 1871 Texas statutes on the mistaken premise that "arms" referred only to arms possessed by the militia and used solely for military purposes. That premise was rejected by *Heller*'s holding that the Second Amendment protects an individual right apart from militia membership, *Heller*, 554 U.S. at 592, and *English* and the Texas laws were thus rejected as outliers in *Bruen*, 142 S. Ct. at 2153. Such laws cannot serve as appropriate historical analogues to restrict the individual rights recognized in *Heller*, *McDonald* and *Bruen*.

20

That leaves the Missouri (1875) and Virginia (1878) laws, but these statutes imposed a ban only on *concealed* carry, not a complete ban on all firearms, like Chapter 57. Specifically, the Missouri statute banned a person only from "having concealed about his person" firearms and other weapons. County PI Exh. 23. Likewise, the Virginia statute applied only if "a person habitually carry about his person, hid from common observation," a pistol or other weapon. County PI Exh. 24. These statues thus did not "impose a comparable burden on the right of armed self-defense" which is the "'*central'* consideration when engaging in an analogical inquiry." *Bruen*, 142 S. Ct. at 2133 (citations omitted).

Moreover, at the Founding, Virginia allowed "each county's chief militia officer to *order* all enlisted militiamen 'to go armed to their respective parish churches,'" *Koons*, 2023 WL 3478604, at *73 (emphasis added), and, as this Court noted, that did not change until 1878. By skipping over Founding-era evidence, the Court failed to account for this tradition and, by doing so, failed to heed *Bruen*'s teaching that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." 142 S. Ct. at 2154. The same point applies to the 1875 Missouri statute. And regardless, courts must "not give disproportionate weight to a single state statute" nor "stake [their] interpretation of the Second Amendment upon a law in effect in a single State." *Id.* at 2153–54.

Multiple declarants in this case provided security for their places of worship in the County prior to the enactment of Bill 21-22E and attest to the urgent and indisputable need for security. See Declaration of David Sussman, the Declaration and Supplemental Declaration of Allan Barall and the anonymous Declarations of John Doe 1, John Doe 2, Thomas Paine and the anonymous Declaration and Supplemental Declaration of John Smith, all submitted with plaintiffs' motion for a preliminary injunction or reply. In further support, attached to this Motion is the Second

21

Supplemental Declaration of Allan Barall. These rulings in *Koons, Hardaway* and *Antonyuk*, by three district courts and two different courts of appeals indicate that plaintiffs have a strong likelihood of success.

### C.    Plaintiffs Are Suffering Continuous Irreparable Injury

*Nken* also requires a showing of irreparable harm. 556 U.S. at 434. Plaintiffs suffer continuing irreparable harm by the County's denial of plaintiffs' constitutional right to carry in public. See *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("the denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction"); *Grimmett*, 2022 WL 3696689 at *2 ("Infringing constitutional rights generally constitutes irreparable harm") (citing *Ross*). See also *Koons v. Reynolds*, 2023 WL 128882 at *23 (D.N.J. Jan. 9, 2023). That harm is "irreparable" under *Nken*. This Court seemed to accept this point but found it insufficient. Slip op. 38.

Instead, the Court suggested that plaintiffs were not irreparably harmed because they had not demonstrated "a specific incident of violence for which a firearm would be necessary for self-defense is imminent or likely." Slip op. 39. But "[t]he right to 'keep and bear Arms' historically encompassed an "individual right to possess and carry weapons *in case of confrontation.*'" *Bruen* 142 S.Ct. at 2176 (emphasis added) (citation omitted). The point of carry "in case of confrontation" is lost if plaintiffs must wait until a deadly threat is "imminent or likely." The Supreme Court disallowed that sort of reasoning in *Bruen* in rejecting New York's argument the government should be allowed to "condition handgun carrying in areas 'frequented by the general public' on a showing of a nonspeculative need for armed self-defense in those areas.'" 142 S.Ct. at 2135. No

court since *Bruen* has required a plaintiff to show an "imminent" need for self-defense. That very notion is antithetical to the "general right" recognized in *Bruen*.

This Court stated that "[p]laintiffs also have not persuasively demonstrated how the Second Amendment right to armed self-defense extends to a right to act as an armed security guard for private institutions." Slip op. 40. But the connection to self-defense is tragically obvious. Plaintiff Shemony alleges in the verified Second Amended Complaint that "he regularly carries a loaded firearm while attending services at his synagogue **for his own self-defense** and for the defense of others." (SAC ¶ 74) (emphasis added). The same is true of the declarants who provided armed security while present at their own places of worship. The declaration of Allan D. Barall (Exhibit O) details the threats to which Jewish synagogues are subject and those threats apply directly to the permit holder **member** of the synagogue no less than any other member of that community. Full time security guards at small synagogues are both not affordable and less effective, as explained in the Declaration of John Doe No. 1 (Exhibit P ¶ 8) and in the Barall Declaration ¶ 6 (Exh. O). The same points obviously apply no less to churches, which are also under threat of attack. See Declaration of John Smith No.1 (Exhibit S). This incontestable evidence cannot be ignored. The need for such security was, after all, the very "good and substantial reason" that these MSI members were given permits by the Maryland State Police under MD Code, Public Safety, § 5-306(a)(6)(ii), before *Bruen* invalidated such a "proper cause" requirement. See *Bruen*, 142 S.Ct. 2124 n.2. This Court should not second-guess such determinations.

### D.    The Requested Relief Would Not Harm The County

Finally, *Nken* requires consideration of whether the relief sought will "substantially injure" other parties. 556 U.S. at 434. This factor is less important than the likelihood of success and irreparable injury. See *Nken*, 556 U.S. at 434 ("The first two factors of the traditional standard are

the most critical."). Contrary to the district court's ruling (slip op. 39), relief simply cannot be denied just because the County (or the court) believes (or fears) that public safety might be impaired by allowing trained and vetted permit holders to exercise their constitutional rights. See *Bruen*, 142 S.Ct. at 2126 n.3 ("'[t]he right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications'") (citation omitted). See also *Bruen*, 142 S.C. 2160-61 (Alito, J., concurring).

The Court noted rising crime in Montgomery County (slip op. 39-40), but no part of this rise can be remotely attributed to thoroughly vetted **permit holders** who are, as a group, probably the most law-abiding persons in the United States. See https://bit.ly/3O02TPA. Prior to the enactment of Bill 21-22E in November 2022, the County expressly exempted permit holders from its regulations See slip op. 5. Likewise, prior to *Bruen*, the Maryland State Police issued carry permits to members of churches and synagogues to provide security at these places of worship under MD Code, Public Safety, § 5-306(a)(6)(ii), the "good and substantial reason" requirement invalidated under *Bruen*. See Barall Decl. (Exh. O). Allowing permit holders to continue to provide security cannot possibly harm the County. Carry at churches is fully consistent with the historical tradition at the time of the Founding. See *Koons v. Platkin*, 2023 WL 3478604, at **72–73 (D.N.J. May 16, 2023).

Allowing permit holders to carry pending appeal would thus reinstate the *status quo ante* that existed prior to the enactment of Bill 21-22E. A preliminary injunction or an injunction pending appeal restoring the *status quo ante* is fully appropriate under equitable principles. See *Aggarao v. MOL Ship Mgmt. Co*., 675 F.3d 355, 378 (4th Cir. 2012) ("The status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the 'last uncontested status between the

parties which preceded the controversy.'"), quoting *Stemple v. Bd. of Ed. of Prince George's Cnty.*, 623 F.2d 893, 898 (4th Cir.1980). The relief sought here would "restore" that ability to carry pending appeal.

Carry by permit holders did not harm the County prior to the enactment of Bill 21-22E and it cannot now. While *Bruen* allows more people to obtain carry permits under "shall issue" laws, 142 S.Ct. at 2138 n.9, that is because "the people" have a constitutional right to bear arms. "A state is 'in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.'" *Centro Tepeyac v. Montgomery Cty.,* 722 F.3d 184, 191 (4th Cir. 2013), quoting *Giovani Carandola, Ltd. v. Bason,* 303 F. 3d. 507, 521 (4th Cir. 2002). See also *Hispanic National Law Enforcement Association NCR v. Prince George's County*, 535 F.Supp.3d 393, 428-29 (D. Md. 2021) (Chuang, J.) (same). *Nken* requires no more.

E.     **The "Public Interest" Is Not Harmed**

Finally, *Nken* requires consideration of whether the relief sought will be "in the public interest." 556 U.S. at 434. "[U]pholding constitutional rights is in the public interest." *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011). See also *Giovani Carandola,* 303 F. 3d. at 521 (stating that "upholding constitutional rights surely serves the public interest"). The right of self-defense is well-recognized in the law and is not contrary to the public interest.

The Court gave controlling weight to the County's argument that Bill 21-22E "serve[s] the public interest of reducing the risk of gun violence." Slip op. 39. That unsupported *ipse dixit* view is contradicted by Senate Bill 1 ("SB 1"), State-wide legislation regulating carry by permit holders enacted by the Maryland General Assembly this year. 2023 Maryland Session Laws Ch. 680. SB 1 affirmatively *allows* carry by private owners (and by persons with whom the owner has an

"express agreement") in the Bill's list of privately owned "sensitive" areas, including private schools. Id., amending MD Code, Criminal Law, § 4-111(b)(9). The bans in government areas are restricted to buildings or parts of buildings which "must" be posted. Id. at § 4-111(d)(2). SB 1 does **not** ban firearms in any park, place of worship, library, recreational facility, or in any multipurpose exhibition facility such as fairgrounds or conference centers and regulates firearms in far fewer types of health care facilities than the County.  Owners of such private locations, **including places of worship**, are free to "wear, carry and transport" firearms and may likewise allow permit holders to do likewise, either by "express permission" or via a "conspicuous" sign. Id. at § 6-411(d). **None** of these areas include a buffer zone.[4]

SB 1 also affirmatively allows fully armed permit holders to carry in a vehicle. Id. § 6-411(b)(11). Unlike Chapter 57, SB 1 expressly applies only to "building[s]" and allows carry (by permit holders) in areas "adjacent to" such private property. Id., § 6-411(b)(6). These determinations of the "public interest" by the General Assembly warrant consideration. Yet the Court did not consider SB 1, even though it was briefed by plaintiffs. (Dkt #80). This is not to say that all of SB 1 is constitutional (parts of it have already been challenged by MSI and others), only that the General Assembly's assessment of the public interest trumps the County's assessment as a matter of law. See Maryland Constitution, Article XI-A, § 3 (providing that "in case of any

---

[4] Non-permit holders remain subject to MD Code, Criminal Law, § 4-203(a), which broadly prohibits a person from wearing, carrying, or transporting a handgun in public or in a vehicle, subject to the exceptions set forth in MD Code, Criminal Law, § 4-203(b). Subsection 4-203(b)(2) expressly exempts permit holders from the general bans imposed by subsection 4-203(a). The transport of long guns in public is not regulated by Maryland law, other than to prohibit the transport of a *loaded* long gun in a *vehicle*, a restriction from which permit holders are likewise expressly exempted. See MD Code, Natural Resources, § 10-410(c)(1).

conflict between said local law and any Public General Law now or hereafter enacted the Public General Law shall control").

The Supreme Court rejected means-ends scrutiny in *Bruen*, 142 S.Ct. at 2126-27. Prior to *Bruen*, that means-end approach balanced the State's asserted "compelling interest" in public safety with the right guaranteed by the Second Amendment in what amounted to "rational basis review." See *Silvester v. Becerra*, 138 S.Ct. 945 (2018) (Thomas, J., dissenting from the denial of certiorari) (noting that means-end scrutiny "was indistinguishable from rational-basis review"). *Bruen*, 142 S. Ct. at 2131 ("The Second Amendment is the very *product* of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense.") (internal quotation marks omitted).

Just as the courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry," *Bruen*, 142 S.Ct. at 2133 n.7, courts may not engage in means-ends scrutiny under the guise of balancing the right to armed self-defense in undertaking the analysis required for equitable relief. Doing so would effectively "eviscerate the general right to publicly carry arms for self-defense," just as means-ends scrutiny did prior to *Bruen*. Id. at 2134. "'The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S.Ct. at 2156 (citation omitted).

## CONCLUSION

The motion for an injunction pending appeal should be granted.

*/s/ Mark W. Pennak*

_____

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste, C #1015

Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
Bar No. 21033
*Counsel for Plaintiffs*

Dated: August 30, 2023

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on August 30, 2023, the forgoing "Plaintiff's Emergency Motion For A Rule 8 Injunction Pending Appeal" and accompanying exhibits were served on opposing counsel listed below via ECF service.

*s/ Mark W. Pennak*

_____
MARK W. PENNAK
*Counsel for Plaintiffs-Appellants*

Dated: July 17, 2023

29