**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | Consolidated Case Nos. |
| v. | * | 21-cv-01736-TDC (L) |
| | * | 8:22-cv-01967-DLB |
| MONTGOMERY COUNTY, MARYLAND | * | |
| | * | |
| Defendant. | * | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR A RULE 8 INJUNCTION PENDING APPEAL**

Defendant Montgomery County, Maryland ("the County"), by and through its undersigned counsel, requests that this Court deny Plaintiffs' Emergency Motion for a Rule 8 Injunction Pending Appeal ("Emergency Motion")[1] because (1) it presents argument beyond what Plaintiffs described, and this Court subsequently permitted, in their Notice of Intent to File a Motion, (2) it improperly seeks to introduce new facts and evidence, and (3) Plaintiffs have not meet the high burden of demonstrating they are entitled to injunctive relief pending appeal.

**INTRODUCTION**

The Second Amended Complaint challenges Chapter 57 of the Montgomery Cnty. Code (MCC), as amended by County Bills 4-12 and 21-22E (the "County Firearms Law") on a variety of grounds. On July 6, 2023, the District Court denied the Plaintiffs' Emergency Motion for TRO/PI (Temporary Restraining Order/Preliminary Injunction). That Motion sought to enjoin the County from enforcing MCC § 57-11(a) (generally prohibiting the possession of a firearm in and with a 100-yard buffer zone around of a defined place of public assembly, with various exceptions) against persons who have been issued a wear and carry gun permit by the Maryland State Police.

---

[1] The County will refer to docket entries in this Court as "ECF," and will use "Doc." to reference docket entries in the interlocutory appeal before the Fourth Circuit.

(ECF 54, 82).[2]

On July 7, 2023, Plaintiffs took an interlocutory appeal from this Court's July 6, 2023, Order denying Plaintiffs' Emergency Motion for TRO/PI. No. 23-1719. On July 8, 2023, in accordance with this Court's Case Management Order (ECF 11), Plaintiffs filed a Notice of Intent to File a Motion with this Court, seeking permission to file a motion for injunction pending appeal under Fed. R. App. P. 8 "**only**" (emphasis in original) as to the restrictions on possession of firearms in the County's 100-yard buffer zone under 57-11(a). (ECF 87). When this Court failed to respond to Plaintiffs' request in accordance with their timetable, Plaintiffs filed a broader Emergency Motion for a Rule 8 Injunction Pending Appeal with the Fourth Circuit, seeking an injunction pending appeal with respect to State permit holders not only as to County restrictions on possession of a firearm in a 100-yard buffer zone under 57-11(a), but also as to (1) keeping guns on persons or in vehicles under MCC § 57-10 and (2) possession firearms in houses of worship. (Doc. 10-1 at 8).

The Fourth Circuit denied the Plaintiffs' Motion "without prejudice to consideration of a future, timely motion" on August 3, 2023. Doc. 21. On August 25, 2023, in response to a request from the Plaintiffs, the Fourth Circuit issued the following clarification: "In light of the district court's inaction on the request for conference, as well as the notation suggesting that the district court proceedings may be stayed, this Court defers consideration of the instant motion [for an injunction pending appeal] in order to permit Appellants to seek clarification from the district court regarding the status of the proceedings." (Doc. 31).

The following day, Plaintiffs filed a Motion for Clarification regarding the status of the

---

[2] As alternative relief, Plaintiffs sought to enjoin § 57-11(a) only as to two specified places of public assembly—houses of worship, private schools—and within 100 yards of any place of public assembly.

proceedings in this Court. (ECF 91). On August 29, this Court issued an Order addressing Plaintiffs' Notice of Intent (ECF 87) and Motion for Clarification (ECF 91). This Court granted the Plaintiffs' request to file a Motion for Injunction Pending Appeal and established a briefing schedule. (ECF 92).

This Court specified that the Plaintiffs' Motion for Injunction Pending Appeal must be limited to the motion Plaintiffs described in their Notice of Intent. "All briefs must be docketed in the present case in the United States District Court, must directly address the relief sought by Plaintiffs from this Court, as opposed to the relief sought from the United States Court of Appeals, and must conform to the current Local Rules for the United States District Court for the District of Maryland and this Court's Case Management Order, ECF 11." (ECF 92). Plaintiffs filed their Emergency Motion for Injunction Pending Appeal on August 30. (ECF 93).

## SUMMARY OF ARGUMENT

This Court should deny Plaintiffs' Emergency Motion on both procedural and substantive grounds. The Emergency Motion should be denied on procedural grounds for the following reasons:

- It is not in compliance with this Court's Case Management Order (ECF 11) or this Court's August 29 Order. (ECF 93). In their Notice of Intent, Plaintiffs told this Court that its proposed Motion for Injunction Pending Appeal would "**only**" (emphasis in original) address the restrictions of possession of a firearm in the County's 100-yard buffer zone under MCC § 57-11(a). (ECF 87). Plaintiffs' Motion challenges restrictions on carry in places of worship, an issue outside their Notice of Intent.

- The Emergency Motion improperly attempts to include new factual allegations in the form of two supplemental declarations and maps that were not previously before this

Court and should therefore be stricken. (ECF 93 at 15-18); ECF 93-1; ECF 93-2).

The Emergency Motion should be denied on substantive grounds because Plaintiffs have not met the heavy burden of showing they are entitled to the extraordinary remedy of an injunction pending appeal.

## STANDARD OF REVIEW

A request for an injunction pending appeal under FRAP 8 "[d]emands a significantly higher justification" than a request for a stay, because unlike a stay, an injunction "does not simply suspend judicial alteration of the status quo but grants judicial intervention…" *Respect Me. PAC v. McKee*, 562 U.S. 996 (2010) (citing *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U. S. 1312, 1313 (1986)).

The "**demanding**" four-part test for evaluating a Rule 8 request for injunction articulated by the U.S. Supreme Court is: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 433-434 (2009) (citation omitted); *Grimmett v. Freeman*, No. 22-1844, 2022 U.S. App. LEXIS 24124, at *1 (4th Cir. Aug. 23, 2022) (*per curiam*) (emphasis added). The first two factors of this standard are the most critical, and it is not enough to show some "possibility of irreparable injury" or that the chance of success on the merits be "better than negligible." *Nken*, 556 U.S. at 434-35 (citations omitted); *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021) ("the mere possibility of success is not enough; [a plaintiff] must make a "strong" showing on the merits.")

Preliminary injunctions are "extraordinary remed[ies] involving the exercise of very far-reaching power," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (preliminary

injunction is "an extraordinary remedy"); *Direx Isr., Ltd. v. Breakthrough Med Corp.,* 952 F.2d 802, 811 (4th Cir. 1992).

This Court should deny Plaintiffs' Emergency Motion because it does not meet the "demanding" four-part test for an injunction pending appeal.

## ARGUMENT

**I.      Plaintiffs' Motion Does Not Comply with This Court's Previous Orders.**

The District Court's Case Management Order requires a party to file a Notice of Intent to File a Motion (in the form of a letter to the Court) before filing a motion. (ECF 11 at 2.) A party's required Notice of Intent must contain "a brief description of the motion sought to be filed, a brief summary of the particularized factual and legal support for the motion [and] … shall contain sufficient information to demonstrate that it is premised on colorable, good-faith arguments and is not frivolous or brought for any improper purpose…" (ECF 11 at 2-3).

Plaintiffs did file a Notice, but they requested permission to seek "an injunction pending appeal **only** with respect to the County's bans on possession and transport of firearms in the County's 100-yard exclusionary zones by a person who has a wear and carry permit issued by the Maryland State Police." (ECF 87 at 1) (emphasis in original). Plaintiffs' Notice goes on to promise this Court and the County that their "Rule 8 motion thus **will not seek relief** as to whether the County may ban possession of all firearms within the specific locations identified by the County's definition of a 'place of public assembly.'" (ECF 87 at 3) (emphasis added).

In direct contradiction to the Letter, the Plaintiffs' Emergency Motion seeks to enjoin firearms restrictions within a place of worship, which the County Firearms Law defines as a place of public assembly. (ECF 87). At no time did Plaintiffs inform this Court or the County that they intended to seek relief or offer arguments exceeding the scope of their Notice.

Accordingly, this Court should summarily deny the relief sought in the Emergency Motion pertaining to the County's restriction of firearms in places of worship under MCC § 57-11.[3]

## II.     This Court Should Strike Plaintiffs' New Factual Allegations and Exhibits.

Plaintiffs' Emergency Motion improperly attempts to introduce before this Court new factual allegations and evidence not offered in conjunction with their underlying Motion for TRO/PI, which is the subject of their interlocutory appeal. This includes new factual allegations and maps (ECF 93 at 15-18), the 32-page expert report of Daniel Carlin-Weber, which Plaintiffs are attempting to submit for the first time to this Court as a "Declaration" (ECF 93-1), and the Second Supplemental Declaration of Allan Barall (ECF 93-2).

This Court should strike Plaintiffs' improper attempt to introduce new factual allegations and evidence, all of which were available to Plaintiffs at the time they filed their Motion for TRO/PI. Plaintiffs offer no explanation for their late and improper attempt to supplement their argument.

"After an appeal has been filed, a district court reviewing a [Rule 8] motion … generally is 'not permitted to examine new evidence' that was available to the party at the briefing stage." *Dmarcian, Inc. v. Dmarcian Eur. BV*, 2021 U.S. Dist. LEXIS 150517, *7) (W.D. N.C., August 11, 2021) (citing *Graveline v. Johnson*, No. 18-12354, 2018 U.S. Dist. LEXIS 148436, 2018 WL 4184577, at *3 (E.D. Mich. Aug. 30, 2018) (citation omitted)). Notably, each of these supplemental factual allegations and exhibits were previously available to the Plaintiffs; this Court should strike them as "an improper attempt to "backfill" the record. *See Dmarcian, Inc.,* 2021 U.S.

---

[3] Wisely, the Plaintiffs have abandoned in this Court their claim for injunctive relief (presented to the Fourth Circuit) as to MCC § 57-10. Not only is that claim unaddressed in their Notice of Intent, it is also unaddressed in (1) their Motion for TRO/PI, the denial of which they are appealing and (2) their Second Amended Complaint.

Dist. LEXIS 150517 *7. None of Plaintiffs' "new" factual allegations contain any "new" information or recent developments that was not available at the time they filed their Motion for TRO/PI. This court should not consider Plaintiffs' supplemental evidence that they "simply overlooked or forgot the first time around." *Newspaper, Newsprint, Mag. & Film Delivery Drivers, Helpers, & Handlers, Int'l Bhd. of Teamsters, Loc. Union No. 211 v. PG Publ'g Co.,* No. 2:19-CV-1472-NR, 2019 U.S. Dist. LEXIS 232000, 2019 WL 9101872, at *3 (W.D. Pa. Dec. 27, 2019).

The Declaration of Daniel Joseph Carlin-Weber is the most egregious example of Plaintiffs' attempt to offer supplemental evidence. (ECF 93-1). Carlin-Weber has a background in "various computer technologies" and executed his declaration on July 17, 2023 (11 days after this Court's Order denying Plaintiffs' Motion for TRO/PI) (ECF 93-1 at 1). Notably, Carlin-Weber's Declaration is 32 pages long (longer than the Emergency Motion) and so long that it required its own Table of Contents to navigate. *Id.* at 3. The Methodology Section of Carin-Weber's Declaration alone is five pages long. Carlin-Webber's Declaration alone contains tens (if not over 100) supplemental factual allegations.

Carlin-Weber's self-serving report details "queries" his research team performed for terms such as "childcare" or "hospitals" and creating maps to enable him to come to various expert and legal conclusions, such as, "of Montgomery County's 506.91 square miles, 106.45 are excluded from carrying a loaded firearm by Bill 21-22E." *Id.* at 11. Carlin-Weber's statement is a "declaration" in name only: it is actually an expert report and contains language routinely used by testifying experts in their FRCP Rule 26 reports, such as "preparation of this declaration was assisted by persons under my immediate control and review…" *Id.* at 2. It is not surprising that Carlin-Weber required assistance from others to research and draft his 32-page report. Critically, Carlin-Weber has not been accepted as an expert witness in this court and his methodology and

scientific and legal conclusions have not been vetted or subject to cross examination which they would have been had Plaintiffs timely disclosed his opinions in this Court. His report also relies heavily upon technologies and online mapping tools which have also not been established to be reliable or accurate. Yet the Plaintiffs would now have this court accept his conclusory and unvetted scientific and legal opinions. Query why Plaintiffs would submit such extensive supplemental evidence if they truly believed, as they say, that the factual allegations before the district court were sufficient to prevail on the merits of its Motion for TRO/PI. (ECF 93 at 9).

However, despite its lengthiness, all of the information contained in the Carlin-Weber's Declaration was available to Plaintiffs at the time Bill 21-22E was enacted on November 28, 2022, and at the time they filed their Motion for TRO/PI on December 6, 2022. At no time did Plaintiffs seek to amend their Motion for TRO/PI to include the lengthy supplemental arguments contained in the Carlin-Weber Declaration.

While the County has not had reasonable and necessary time to fully evaluate Carlin-Weber's Declaration, a cursory review of it reveals numerous, readily apparent errors in both its methodology and conclusions. For example, Carlin-Weber's maps do not reflect the existence of the private residence exception (MCC § 57-11(b)(3)) or the business exception (MCC § 57-11(b)(4)) where a firearm may be kept under the County Firearms Law. Using Carlin-Weber's map as support, the Emergency Motion incorrectly concludes that "it is literally impossible to drive in or through the County…with a firearm without quickly entering one or more of these 100-yard exclusionary zones [set forth in Section 57-11]." (Doc. 10-1 at 11). This is also inaccurate as a person can transport the weapon in a locked case, separate from its ammunition (MCC § 57-11(b)(4)).

The Second Supplemental Declaration of Allan D. Barrall should also be struck as it is an

attempt to provide new factual allegations to rebut the District Court's opinion and "back-fill" the record. Just as with the Declaration of Carlin-Webber, the Second Supplemental Declaration of Barrall provides no new evidence that was not available at the time the Motion for TRO/PI was filed, including Mr. Barrall's use of Google Maps to render legal conclusions about the County Firearms Law.

> ### A.   Plaintiffs' Fourth Circuit Filings Demonstrate Why Plaintiffs' New and Supplemental Factual Allegations and Exhibits Should be Struck.

Plaintiffs previously and unsuccessfully attempted to submit identical supplemental factual allegations and exhibits, including the Carlin-Weber expert report, to the Fourth Circuit in their Emergency Motion for a Rule Injunction Pending Appeal on August 17, 2023. (Doc. Nos. 10, 10-7). The County filed a motion to strike Plaintiff's improper new supplemental allegations, including the Carlin-Weber report, in the Fourth Circuit. (Doc. No.14, attached as Ex. 1). Plaintiffs filed an opposition to the motion to strike in the Fourth Circuit (Doc. 17) to which the County filed a reply (Doc. 20). (Doc. 17 and Doc. 20 are attached hereto as Ex. 2 and 3, respectively).

As to the substance of the Carlin-Weber report, Plaintiffs' Opposition to the Motion to Strike in the Fourth Circuit contradictorily vacillates between highlighting the difficulty ("it was hard to do") and time demands (could not "marshal necessary resources") of producing the Carlin-Weber Report, but also downplaying the report as nothing more than a series of internet searches capable of being performed by any member of the public ("*any reasonable capable person* with a modicum of computer experience could duplicate those steps and come to the same result…") (Ex. 2, Doc. 17 at 4, 6) (emphasis in original). Of course, the County disagrees with Plaintiffs' conclusions about the simplicity of the Carlin-Weber report, because, among other things, Carlin-Weber required a research team under his supervision to complete it. *Id.* at 2 ("preparation of this declaration was assisted by persons under my immediate control and review…").

The irony should not escape this court that if the results of the Carlin-Weber Report could actually be replicated by any John Doe of average intelligence with a laptop (even without a team of supporting researchers) that there is no reasonable explanation as to why Plaintiffs were unwilling or unable to timely submit the Carlin-Weber report to this Court at any time during the seven (7) months from when the Motion for TRO/PI (ECF 52) was filed on December 6, 2022 and when the Court issued its order on July 6, 2023. (ECF 83).[4]

The length and complexity of the Carlin-Weber report is self-evident and the undue prejudice to the County here is obvious. Plaintiffs are attempting to reargue their position by providing complex new supplemental evidence in an attempt to essentially re-litigate that which has already been ruled upon by this Court and thus would create the prospect of endless litigation. Furthermore, "requiring parties to present the entire available factual record when moving for or opposing a preliminary injunction promotes diligence and preserves judicial resources that would otherwise be expended combing through multiple rounds of briefing." *Dmarcian, Inc,* U.S. Dist. LEXIS 150517, *8.

**B.      Plaintiffs' Interpretation of Rule 8 is Flawed.**

As set forth in Plaintiffs' Opposition to the Motion to Strike in the Fourth Circuit, Plaintiffs' primary argument as to why they should be permitted to include significant new factual allegations and evidence in their request for a preliminary injunction pending appeal is based upon

---

[4] MSI argued in its Opposition to the Motion to Strike in the Fourth circuit that it should be permitted to file new and late evidence with its Rule 8 motion because it is an "'all-volunteer,' non-profit organization…" (Ex. 2, Doc. 17 at 4). MSI's non-profit status is not a magic wand that can be used to waive the Federal Civil and Appellate Rules of Procedure, it is a frequent and active litigant, and it should not be permitted to purposefully ignore them to the prejudice to the County.

a novel and unsupported interpretation of Rule 8. (Ex. 2, Doc. 17 at 2). Plaintiffs are of the mistaken belief that Rule 8's reference to "copies of … sworn statements supporting facts subject to dispute" somehow permits the unrestricted introduction of new evidence to this court because Rule 8 also separately references "relevant parts of records." *Id*. Plaintiffs do not offer any legal citation or legislative history to support their strained interpretation of Rule 8.

Wherefore, for the reasons set forth herein, Plaintiffs' improper attempts to include new and supplemental factual allegations and exhibits in the Emergency Motion should be struck.

**III.   This Court Should Deny Plaintiffs' Request for Emergency Injunctive Relief.**

**A.   The Limitations in Chapter 57 Are Not What Plaintiffs Would Have This Court Believe Them to be.**

Plaintiffs overstate grossly the reach of the County Firearms Law. They characterize the County's restrictions on public carry as banning the ability to carry a firearm throughout the County, including private property. This is simply not true. The County's law restricts firearms in places of public assembly, and that restriction does **not** apply to:

- possession of a firearm or ammunition in a person's home;[5]

- possession of a firearm and its ammunition at a business by its owner or an authorized employee of the business;[6]

- a law enforcement officer or a licensed security guard;[7]

- a retired law enforcement officer;[8] and

---

[5] *See* MCC § 57-11(b)(2). This exception does not include ghost guns and undetectable guns. *See id.*

[6] *See* MCC § 57-(b)(4). Both the business owner and employee must have State-issued wear-and-carry permits. *See id.*

[7] *See* MCC § 57-11(b)(2).

[8] The Law Enforcement Officers Safety Act permits a qualified law enforcement officer or

- the transport of a firearm in a vehicle when it is locked in a case, separate from its ammunition.[9]

Plaintiffs' newfound maps, which as noted above should not even be considered by this Court, fail to show the private residence or business exceptions where a gun may be kept. Contrary to Plaintiffs' assertions, it is possible to carry a weapon anywhere outside of one's home in the County, as a person can transport the weapon in a locked case, separate from its ammunition. Plaintiffs' maps are therefore inaccurate and misleading.

The County's restrictions are not the totalitarian hand of government reaching into Plaintiffs' homes and private property as Plaintiffs' breathless hyperbole would have this Court believe.

**B.     This Court Correctly Concluded That Plaintiffs Are Not likely to Succeed on the Merits.**

Under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), if the Second Amendment applies to the conduct regulated by the government, there is only one step for a court to consider: whether the government can justify its regulation by demonstrating it is "[c]onsistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

*Bruen* identified five[10] "sensitive places" where firearms historically could be prohibited: schools, government buildings, legislative assemblies, polling places, and courthouses. *See id.* at

---

a qualified retired or separate law enforcement officer to carry a concealed weapon regardless of state or local laws. *See* 18 U.S.C. §§ 926B, 926C.

[9] *See* MCC § 57-11(b)(5)(A). This exception does not include ghost guns and undetectable guns. *See id.*

[10] Plaintiffs' Emergency Motion omits schools and government buildings from their list, incorrectly asserting that *Bruen* identified only three locations where firearms may be banned. (ECF 93 at 5.)

2133. The Court instructed courts to "use analogies to those historical regulations of 'sensitive places' to determine [whether] modern regulations prohibiting the carry of firearms in **new** and analogous sensitive places are constitutionally permissible." *Id.* at 2133 (emphasis in original).

The five sensitive places in *Bruen* are not exhaustive, and a government may justify its regulation by identifying other "relevantly similar" historical regulations. *See id.* at 2132. *Bruen* listed two metrics for courts for a "relevantly similar" analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The historical analogue analysis therefore should review "[w]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

The "how" and "why" metrics are central to the analysis, but they are not the only metrics for a court to review. *See id.* at 2132. In addition to the "how" and "why" metrics, the task of analogue analysis can be a "straightforward" assessment if the challenged law "addresses a general societal problem that has persisted since 18th century." *Id.* at 2131. The absence of a similar law addressing the ongoing historical problem is relevant evidence that the new law is unconstitutional. *See id.* at 2131. But for laws that implicate "unprecedented societal concerns or dramatic technological changes," a more "nuanced" approach may be required, as "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 **or the Reconstruction generation in 1868**." *Id.* at 2132 (emphasis added).

To that end, the analogue analysis as "[n]either a straightjacket nor a regulatory blank check." *Id.* at 2133. Analogical reasoning only requires that the government "[i]dentify a well-established and representative historical **analogue**, not a historical **twin**." *Id.* at 2133 (emphasis in original). Even if a challenged law is not a "[d]ead ringer for historical precursors, it still may be

analogous enough to pass constitutional muster." *Id.* at 2133.

    *Bruen* does not support the Plaintiffs' argument that only "Founding Era" laws are instructive in the analogue analysis. (ECF 93 at 7). *Bruen* acknowledged the debate between whether the laws at the time of the Second Amendment's adoption (1791) or the ratification of the Fourteenth Amendment (1868) are more instructive. *See Bruen* at 2138. But the Court **expressly** did not weigh in on which era is definitive. *See id.*[11] Rather, the Court stated the laws in both eras supported its conclusion that New York's law requiring "proper cause" to carry in public did not pass constitutional muster. *See id.*[12]

    Many courts, both prior to *Bruen*[13] and after,[14] considered Reconstruction Era laws as pertinent to Second Amendment challenges to government regulations. As noted by this Court, the Second Amendment originally applied only to the Federal Government. *See McDonald v. City of Chicago*, 561 U.S. 742, 754 (2010); *Barron ex Rel. Tiernan v. Mayor of Balt.*, 32 U.S. (7 Pet.) 243, 250-51 (1833). Thus, sources from the time of the Fourteenth Amendment's ratification are "equally if not more probative of" the scope of the Second Amendment's right to bear arms. *See*

---

[11] The County believes that Plaintiffs had it right the first time when, in their Motion for TRO/PI, they agreed in that *Bruen* did not resolve this debate. (ECF 54-1 at 12).

[12] "[A] short review of the public discourse surrounding Reconstruction is useful in demonstrating how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens." *Bruen* at 2150.

[13] *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012).

[14] *See Goldstein v. Hochul*, No. 22-CV-8300 (VSB), 2023 U.S. Dist. LEXIS 111124, at *30-31 (S.D.N.Y. June 28, 2023); *Frey v. Nigrelli,* No. 21-CV-05334 (NSR), 2023 U.S. Dist LEXIS 42067 at *39, *48-49 (S.D.N.Y. March 13, 2023).

ECF 82 at 18.[15]

Contrary to Plaintiffs' assertion of broad rights of armed confrontation, the Second Amendment right to bear arms is not a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The Second Amendment right to bear arms for purposes of self-defense is most acute in one's own home. *See Heller*, 554 U.S. at 628. And an individual's Second Amendment right to possess a firearm for self-defense is not limitless and is appropriately subject to government regulation. *See Bruen* at 2162 (Kavanaugh, J., concurring) ("[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations" (quoting *Heller*, 554 U.S. at 636)); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (noting that it is "important to keep in mind" that *Heller* did not cast doubt on certain "longstanding regulatory measures" in connection with firearms); *Heller*, 554 U.S. at 595 (2008) (the right to keep and bear arms is "not unlimited").

As discussed below, under *Bruen*'s analysis, the County's Firearms Law is constitutional.

> 1.    **The County Identified Multiple Historical Analogues for its Prohibition Against Firearms in a 100-Yard Buffer Zone Around Places of Public Assembly.**

Precedent for a buffer zone[16] around various areas, activities, and populations can be found in many historical laws.

Maryland prohibited guns within one mile of polling places on election days in Calvert County (1886 and 1888) and in Kent, Queen Anne's, and Montgomery Counties (1874). *See* Exs.

---

[15] Indeed, the Second Amendment was made applicable to the States via the Fourteenth Amendment only 13 years ago. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

[16] As context for the County's "buffer zone," the State statute authorizing the County's Firearms Law provides that the County may regulate firearms "within 100 yards of or in a park, church, school, public building, and other place of public assembly" *See* Md. Code Ann., Crim. Law § 4-209(b) (2021).

4, 5, 6. Louisiana in 1870 similarly prohibited guns within "one-half mile of any place of registration" for elections. *See* Ex. 7.

To protect water fowl, Somerset County in 1837 banned guns in or within 50 yards of any water fowl blind on Smith Island. *See* Ex. 8.

Many localities (Philadelphia; St. Paul; Pittsburgh; Reading, Pennsylvania; Trenton, New Jersey) banned guns within 50 or 100 yards of their parks, squares, or common areas between 1868 and 1903. *See* Exs. 9, 10, 12, 12, 13, 14.

New Mexico, in 1887 when it was still a Territory,[17] prohibited the unlawful brandishing of a weapon within a "settlement," defined to mean "any point within three hundred yards of any inhabited house." *See* Ex. 15.

Mississippi prohibited the concealed carry of weapons within two miles of a university, college, or school in 1892. *See* Ex. 16. And Connecticut in 1859 banned the sale of liquor "within one mile of any military parade-ground, muster-field, or encampment." *See* Ex. 17.

These historical laws *expressly* prohibit weapons in buffer zones around sensitive areas. If Maryland historically protected water fowl with a buffer zone, certainly human life in areas of public assembly can be protected by a buffer zone. The County's regulation of firearms within 100 yards of places of public assembly is consistent with historical firearm regulation and is constitutional.[18]

---

[17] *See* Andrew Willinger, *Territorial Gun Regulation and the "Lost" History of the Federal Second Amendment*, Duke Center for Firearms Law Blog (August 8, 2022) https://firearmslaw.duke.edu/2022/08/territorial-gun-regulation-and-the-lost-history-of-the-federal-second-amendment/ (arguing the Second Amendment has always applied in territories, and historical territorial laws should be given weight despite the *Bruen* court's discount of same).

[18] Three federal circuits found firearm bans in government buildings included the parking lots and property surrounding those buildings. *See U.S. v. Class*, 930 F.3d 460, 464 (D.C. Cir.

### 2.    The County Identified Many "Twin" or "Dead Ringer" Laws Prohibiting Guns in Places of Worship.

As noted above, Plaintiffs failed to identify in their Notice of Intent the County's Firearms Law's prohibition in places of worship as grounds for an injunction pending appeal.

Assuming this Court elects to reach this issue despite that procedural deficiency, there are many historical analogues to support the County's ban on guns in places of worship. Georgia in 1870 and 1882 prohibited the carrying of a "pistol or revolver, or any kind of deadly weapon, to any…place of public worship." *See* Exs. 18, 19. The 1882 law excepted law enforcement. *See* Ex. 19. In 1870 and 1879, Texas prohibited any person from going into "any church or religious assembly" with a gun. *See* Exs. 20, 21. The Texas laws did not apply, however, to law enforcement. *See id.*

Missouri in 1875, 1879, and 1883 prohibited firearms in any church or place where people assembled for religious worship, except for law enforcement. *See* Exs. 22, 23, 24. Virginia prohibited pistols or other dangerous weapons in 1877 in "any place of worship while a meeting for religious purposes is being held at such a place, or without good or sufficient cause therefor." *See* Ex. 25.

Arizona, while still a territory in 1889, prohibited the carry of "a pistol or other firearm" in "any church or religious assembly." *See* Ex. 26 § 3. This prohibition did not apply to law enforcement. *See id.* § 4.

In 1890, Columbia, Missouri prohibited anyone other than police officers from carrying dangerous weapons "into any church, or place where people have assembled for religious

---

2019); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1123, 1124-25 (10th Cir. 2015); *U.S. v. Dorosan*, 350 Fed. Appx. 874, 875-76 (5th Cir. 2009). These decisions predated *Bruen*, but all relied heavily upon the *Heller* court's discussion of "sensitive locations," which *Bruen* augmented.

worship." *See* Ex. 27.

When it was still a territory, Oklahoma, in 1890 and 1893, prohibited the carry of firearms by anyone other than a peace officer into "any church or religious assembly." *See* Ex. 28, 29.

In 1894, Huntsville, Missouri, prohibited the carry of a deadly or dangerous weapon in "any church or place where people have assembled for religious worship." This prohibition did not apply to police officers. *See* Ex. 30.

These historical precursors are exact matches of the County's prohibition of guns in places of worship. Like these laws, the County's law does not apply to law enforcement officers or security guards.

In addition to these historical statutory precursors, several courts in the 1870s viewed churches or places of worship as no place for firearms. *See Hill v. State*, 53 Ga. 472, 475 (Ga. 1874) (carrying arms at places of worship improper and not protected by constitution); *English v. State*, 35 Tex. 473, 478-79 (Tex. 1872) ( finding it "[l]ittle short of ridiculous" that anyone should claim right to carry weapon into a peaceful public assembly such as church); *Andrews v. State*, 50 Tenn. 165, 182 (Tenn. 1871) (observing it is not appropriate to carry arms to church and such practice may be prohibited).[19]

Given the "twin" historical analogues above, as well as the historical views of courts on the impropriety of firearms in places of worship, the County's gun restriction in places of worship is constitutional.

---

[19] While *Bruen* distinguished the *English* decision and some statutes relied upon by the County, it did so only in the context of assessing the "proper cause" requirement in in New York's public carry law, not in the context of a "sensitive places" analysis required in this appeal. *Bruen* at 2133-34 (observing defenders of New York's law "[e]rr in their attempt to characterize New York's proper-cause requirement as a 'sensitive-place law'").

C.      **This Court Properly Found No Irreparable Harm to Plaintiffs.**

The County's removal of the ability of State wear-and-carry permit holders in places of public assembly via Bill 21-22E has been in effect since November 28, 2022, for over  nine (9) months. Plaintiffs' assertions of exigency and irreparable injury ring hollow given this passage of time. There is no exigency or immediate harm to Plaintiffs under these circumstances.

D.      **This Court Properly Held That the Balance of Equities and the Public Interest Weigh in Favor of the County.**

When a temporary restraining order is sought against the government, "the government's interest is the public's interest," and the third and fourth elements necessary for an injunction – the balance of the equities and the public interest – merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Staying enforcement of Bills 4-21 and 21-22E will undermine the public's strong interest in preventing gun violence in areas where people, especially vulnerable populations, congregate. The County Council enacted the Bills in direct response to (a) an increase in ghost guns in the community[20] (including one high school student shooting another student with a ghost gun at

---

[20] The number of guns, excluding ghost guns, confiscated by County Police increased 51% in 2021. *See* Montgomery County, Maryland, Office of Legislative Oversight, Memorandum Report No. 2022-13 at 13 (2022),
 https://www.montgomerycountymd.gov/OLO/Resources/Files/2022_reports/OLOReport2022-13.pdf.

school in the middle of the school day[21]), (b) an increase in gun violence in the country[22] and the County,[23] and (c) an increase the number of gun permit applications in Maryland following *Bruen*.[24] With these unquestioned facts, the Council enacted the laws it believed necessary for the safety and welfare of its residents. Enjoining the County's law will strip residents of these protections in this atmosphere of heightened gun violence.

The balance of the equities and the public interest weigh in favor of the County, which enacted the challenged law in response to the rise of gun violence, and to protect the safety of the public when exercising their constitutional right to assemble.

**CONCLUSION**

This Court need not reach two-thirds of Plaintiffs' arguments for the reasons noted above.

For the sole issue that is only arguably properly before this Court—the challenge to the County's 100-yard buffer zone around places of public assembly—Plaintiffs failed to meet the demanding standard for obtaining an injunction. Plaintiffs' Emergency Motion should be denied,

---

[21] Darcy Spencer, *Maryland Teenager Sentenced to 18 Years for Shooting Student at Magruder High,* NBCwashington.com, December 22, 2022, https://www.nbcwashington.com/news/local/maryland-teenager-sentenced-to-18-years-for-shooting-student-at-magruder-high/3239939/.

[22] In 2020, 45,222 people died from gun-related injuries in the United States—the most in any year recorded. *See* Doc. 10-12 at 21. Gun deaths are now the leading cause of death for children, teens, and young adults in the country. *See Bruen* at 2165.

[23] As of July 2022, nonfatal shootings were up 75% in the County, and noncontact shootings increased 29% compared to the same period in 2021. *See* Dan Morse, *Gun violence rises sharply in Montgomery County, police chief says*, The Washington Post, July 11, 2022, https://www.washingtonpost.com/dc-md-va/2022/07/11/montgomery-county-gun-violence-double/.

[24] *See* Fredrick Kunkle, *Supreme Court ruling sets off rush for concealed gun permits in Maryland,* The Washington Post (July 25, 2022) *https://www.washingtonpost.com/dc-md-va/2022/07/15/concealed-carry-maryland-guns-hogan/.*

20

and new and improper evidence struck.

Respectfully submitted,

JOHN P. MARKOVS
COUNTY ATTORNEY

/s/
Edward B. Lattner, Deputy County Attorney
edward.lattner@montgomerycountymd.gov
Bar No. 03871

/s/
Erin J. Ashbarry
Associate County Attorney
erin.ashbarry@montgomerycountymd.gov
Bar No. 26298

/s/
Matthew H. Johnson
Associate County Attorney
matthew.johnson3@montgomerycountymd.gov
Bar No. 17678

Attorneys for Defendant Montgomery County,
Maryland
101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 6, 2023, a copy of the foregoing was filed to be

transmitted via this Court's CM/ECF Electronic Document Filing System to:

> Mark W. Pennak
> Maryland Shall Issue, Inc.
> 9613 Harford Rd., Ste C #1015
> Baltimore, Maryland 21234-21502
> mpennak@marylandshallissue.org

_____/s/_____

Erin J. Ashbarry
