IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*,  )<br>  )<br>    *Plaintiffs*,  )<br>  )<br>   v.  )<br>  )<br>MONTGOMERY COUNTY, MD,  )<br>  )<br>    *Defendant*.  ) | No. 8:21-cv-01736-TDC (L)<br>No. 8:22-cv-01967-DLB |

**REPLY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A RULE 8 INJUNCTION PENDING APPEAL**

Pursuant to Rule 8(a)(1)(C), plaintiffs respectfully submit this Reply in support of Plaintiffs' Emergency Motion for a Rule 8 Injunction Pending Appeal, and in response to the Opposition filed on September 6, 2023, by the defendant, Montgomery County, Maryland ("the County"). For the reasons set forth below and in the original motion, plaintiffs' request for emergency relief should be granted.

ARGUMENT

I.    RULE 8 ALLOWS THE SUBMISSION OF EVIDENCE

   A.    A Rule 8 Motion Is Distinct

The County asserts (Co.Mem. at 3) that plaintiffs improperly submitted the declarations of Daniel Carlin-Weber and Allan Barall because these declarations were not filed with the motion for a preliminary injunction. But as explained in plaintiffs' motion (but ignored by the County), a Rule 8 motion is addressed to this Court's equitable discretion on the entirely separate issue of whether an injunction should issue pending appeal. As stated in *Priorities USA v. Nessel*, 978 F.3d 976, 982 (6th Cir. 2020), "[w]e consider the [Rule 8] motion *de novo* because 'we are not reviewing any district court decision or order.'" (Citation omitted). The Court may, of course, consider that

1

the underlying appeal is from a denial of a preliminary injunction, *Does 1-3 v. Mills,* 39 F.4th 20, 24 (1st Cir. 2022), but that does not change the *de novo* standard or preclude new evidence on the motion. *Id*. This Rule 8 "standard 'does not require the trial court to change its mind or conclude that its determination on the merits was erroneous.'" *Fraser v. ATF*, 2023 WL 5617894 at *2 (E.D.Va. Aug. 30, 2023), quoting *United States v. Fourteen Various Firearms*, 897 F.Supp. 271, 273 (E.D.Va. 1995) (citation and quotation marks omitted).

Rule 8(a)(2)(B) requires that "[t]he motion must also include (ii) originals or copies *of affidavits or other sworn statements supporting facts subject to dispute*; **and** (iii) relevant parts of the record." (Emphasis added). The "supporting" material for a Rule 8 motion filed with the court of appeals is thus **not** limited to "relevant parts of the record." In response, the County ignores *Priorities USA* and , *Does 1-3,* cited by plaintiffs, and argues (Co.Mem. at 11), that any reading of Rule 8 as allowing additional evidence is "strained." But there is nothing strained about this plain language of Rule 8. That reading of Rule 8 is perfectly consistent with the holdings in *Priorities USA* and in *Does 1-3* that Rule 8 is separate from the underlying merits decision and thus a motion for Rule 8 relief is considered de novo. The County does not deny that Rule 8 relief expressly directs parties to first file a Rule 8 motion in district court prior to filing such a motion in the court of appeals. If the court of appeals may consider new evidence on such a Rule 8 motion, then, obviously, this Court may as well.

The County cites *dmarcian, Inc. v. dmarcian Europe BV*, 2021 WL 3561182 (W.D.N.C. 2021), as support for its contention that plaintiffs are "backfilling" the record. Co.Mem. at 6. But the district court there mistakenly believed that it lacked jurisdiction to consider Rule 8 evidence where a notice of appeal had been filed. Slip op. at *3. That holding is simply wrong. While a notice of appeal generally does divest this Court of jurisdiction over any further review of the

merits, *Coinbase, Inc. v. Bielski*, 143 S.Ct. 1915, 1919 (2023), Rule 8 motions are an exception because the Rule expressly requires a party seeking such relief to file first in the district court. See *North Central Truck Lines, Inc. v. United States*, 384 F.Supp. 1188, 1189 n.1 (W.D. Mo. 1974) (3-judge court), citing *Long v. Robinson,* 432 F.2d 977, 979 (4th Cir. 1970). Obviously, a district court is not divested of its authority to rule on a motion that must be filed in district court. Indeed, the court's holding in *dmarcian* that it lacked jurisdiction once a notice of appeal was filed is at odds with the court's further holding that it would consider new evidence if "it was not available to the parties for presentation … at the time of the preliminary injunction hearing." Id. If a court truly lacks "jurisdiction" to consider evidence on a Rule 8 motion, then that jurisdictional disability would apply to bar any consideration of new evidence, regardless of the reason.

The same points apply to *Graveline v. Johnson,* 2018 WL 4184577, at *3 (E.D. Mich. Aug. 30, 2018), also cited by the County. Co.Mem. at 6. Indeed, the court's reasoning in *Graveline* was effectively abrogated by the Sixth Circuit's later decision in *Priorities USA*, where the court of appeals explained that a Rule 8 motion is considered *de novo* precisely because such a motion requests relief distinct from that addressed by any underlying decision on the merits. Again, the County does not even attempt to rebut that point. Neither *Graveline* nor *dmarcian* addressed, much less applied, the language of Rule 8, noted above, that expressly contemplates new evidence beyond the existing record.

The County also argues that plaintiffs "unsuccessfully" attempted to submit these materials to the court of appeals. Co.Mem. at 9. That's just false. The County's motion to strike was "denied as moot" by the court of appeals in its first order, dated August 3, 2023 (attached), in which the court denied plaintiffs' Rule 8 motion "without prejudice to consideration of a future, timely motion." In the court of appeals second order, dated August 25, 2023 (submitted to this Court with

3

plaintiffs' Request for Clarification) the Fourth Circuit simply "defer[red]" consideration of plaintiffs' Rule 8 motion to permit plaintiffs "to seek clarification from the district court regarding the status of the proceedings." The court of appeals did not further opine on the County's motion to strike, which the court had already **denied**. As the record currently stands, the court of appeals emphatically has **not** rejected plaintiffs' supplemental materials. Neither should this Court.

The Fourth Circuit's second order was obviously intended to accord this Court the opportunity to adjudicate plaintiffs' motion and consider these additional materials prior to consideration by the court of appeals. That ruling makes sense. In *Ruiz v. Estelle*, 650 F.2d 555, 567 (5th Cir. 1981), the court of appeals applied Rule 8 to hold "the district court should have the opportunity to rule on the reasons and evidence presented in support of a stay, unless it clearly appears that further arguments in support of the stay would be pointless." The court then ruled that the Rule 8 movant in that case was "entitled to present" additional evidence to the district court in "a new motion to stay" an injunction pending appeal. Id. at 577. Again, the Fourth Circuit wants the benefit of this Court's consideration of plaintiffs' evidence prior to ruling on the Rule 8 motion on which the court of appeals has "deferred" a ruling. See Rule 8(a)(2)(A)(ii) (requiring that a Rule 8 motion filed in the court of appeals "state any reasons given by the district court for its action"). Refusing to do so, as the County demands, would frustrate the request of the court of appeals for no good reason.

The County contends that plaintiffs could have submitted the Declarations with plaintiffs' emergency motion for a TRO and a preliminary injunction filed December 6, 2022, or thereafter while the case was pending for decision. Not so. The motion for a preliminary injunction was filed on December 6, 2022 (ECF 52), approximately one week after the November 28, 2022, enactment of Bill 21-22E by the County. Plaintiffs simply did not have the opportunity or the resources to

investigate and apply the techniques publicly available to produce such a declaration at the time the motion for emergency relief was filed. Nor did plaintiffs see any need to do so as the breathtaking scope of Chapter 57's bans was (and is) both undisputed and self-evident. In any event, the reasons are irrelevant. As explained, plaintiffs are entitled to submit new materials in support of a Rule 8 motion under the express terms of the Rule and as permitted by the case law.

The provision of new materials under the circumstances that necessitate a Rule 8 motion is an unavoidable practical reality obviously contemplated by the Rule itself. For example, in *Mock v. Garland*, 2023 WL 2711630 (N.D. Texas March 31, 2023), the plaintiffs in *Mock* moved for— and were granted—an emergency injunction pending appeal, even though the district court had denied the plaintiffs' motion for a preliminary injunction. *Mock v. Garland*, No. 23-10319, ECF #52-2 (5th Cir. May 23, 2023). See also *Mock v. Garland,* 75 F.4th 563, 576-77 (5th Cir. Aug. 1, 2023). The Rule 8 motion in *Mock* was supported by arguments and assertions that relied on specific facts that were "subject to dispute" within the meaning of Rule 8. *See id.*, Dkt # 25-1. New evidence under Rule 8 is not uncommon.

In this case, the Carlin-Weber Declaration reflects an indisputable reality that Bill 21-22E effectively prevents a permit holder from carrying a loaded firearm in and through the County. Indeed, the County has never seriously disputed that point and does not dispute it in its opposition filed in this Court. As noted in plaintiffs' motion (P.Mot. at 13-14), the County Bill 21-22E creates literally thousands of 100-yard exclusionary zones, totaling many thousands of acres, around the "places of public assembly" defined by Section 57-1 of Chapter 57 of the County Code. The County has **not** disputed the numbers and locations covered by the County's 100-yard exclusionary zones, as specifically set out in plaintiffs' motion. All the Carlin-Weber Declaration does is create graphic images of that reality with additional details to illustrate the point. The argument would

be the same (and has been the same) even without the Declaration. While the graphic is new, that point has been consistently argued by plaintiffs throughout this litigation. The County does not dispute it.

The County also argues that the Rule 8 Motion does not comply with the Court's case management order because the letter requesting a conference indicated that plaintiffs would seek relief as to the County's 100-yard exclusionary zones and not the particular places in which carry is banned by Chapter 57 of the County Code. But such a letter is limited to three pages and need only "contain sufficient information" to demonstrate that it is premised on colorable, good-faith arguments and is not frivolous or brought for any improper purpose, Fed. R. Civ. P. 11, *but need not contain more*." Order at II.A.2 (emphasis added). Plaintiffs' letter easily met that standard. This Court thus does not adjudicate such a letter request; the case management order does not even permit a response from opposing parties. Here, the request was granted without even a conference. Seeking relief as to places of worship is not remotely "frivolous" or brought for an "improper purpose."

Nothing in the case management order suggests that a party is estopped from advancing additional points beyond the minimal requirements imposed by the order. The County has not and cannot claim that it has somehow been prejudiced by the inclusion of places of worship in the motion. Plaintiffs elected to include places of worship because, after the letter was filed, the state of the law changed with the Eleventh Circuit's order granting en banc consideration in *NRA v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023), *vacated, rehearing en banc granted,* 72 F.4th 1346 (11th Cir. July 14, 2023). As noted in the motion (P.Mot. at 19-22), and discussed *infra*, that decision to grant rehearing en banc eliminated the only support for the County's exclusive reliance

on late 19th and 20th century statutes (and local ordinances) for the location bans imposed by Chapter 57.

The issue is also critically important. Plaintiffs' declarants regard the ban on firearms by permit holders in places of worship as tantamount to making them "sitting ducks" for murderous rampages in and at their synagogues and churches. The County's law has made these individuals fearful and reluctant to attend their own places of worship. The County does not dispute that the Second Circuit specifically declined to stay lower court orders enjoining New York's ban on carry in houses of worship if the person was tasked with providing security, like plaintiffs' declarants here. P.Mot. at 19. The importance of the issue simply cannot be overstated. Indeed, given the abrogation of the panel's decision in *Bondi*, plaintiffs exercised restraint in limiting the Rule 8 motion to just the 100-yard exclusionary zones and places of worship.

B.    The Carlin-Weber Declaration

The County takes great issue with the Carlin-Weber Declaration, to wit, the County decries it as "the most egregious example of Plaintiffs' attempt to offer supplemental evidence." Co.Mot. at 7. As plaintiffs have demonstrated, new evidence—specifically declarations—is contemplated by Rule 8. While the County expresses umbrage at the length of the Declaration, it points to no rule that the Declaration violates.

Most curiously, the County speaks from both sides of its mouth when it complains about the purported expert nature of the Carlin-Weber Declaration. In one sentence, it argues that "[t]he Methodology Section of [the] Declaration is five pages long", and then, in another sentence, the County asserts that the Declaration contains "conclusory and unvetted scientific and legal opinions." Co.Mem. at 7-8. Yet, the methodology was purposefully laid out in the Declaration in such detail so that any reasonably capable person with a modicum of computer experience could

duplicate those steps and come to the same result: a map showing the areas where the County criminalizes carry by permit holders. The Declaration's maps can easily be replicated.

The County does not dispute that the Declaration creates maps generated solely from identified publicly available data used by the State and the public alike every day. The County does not assert that it is unable to follow the methodology set out in the Declaration or that the required minimal ability is somehow beyond the grasp of a unit of local government that has a 6.3-billion-dollar budget for fiscal 2023. See https://bit.ly/45IoZxp. The County does not dispute the Declaration's accuracy, even though it has now possessed the Declaration since July 17, 2023, when it was first filed with the Fourth Circuit. The County thus has had a lengthy opportunity to examine the Declaration in depth. By failing to contest the facts set forth in the Declaration, the County has conceded them.

The County asserts that Mr. Carlin-Weber must be viewed as an expert, but any reasonably computer-literate layperson can perform the tasks set forth in the Declaration if they take the time. Doing so does not take "scientific, technical or other specialized knowledge" of the type covered by Rule 702(a), Federal Rules of Evidence. The Declaration sets forth facts, not opinions (expert or otherwise). The term "query" as used in the Declaration is a simple request for information from a database. A person need not be an expert to perform a "query." Every user of PACER, Westlaw or LEXIS poses a "query" when that user performs a search on a legal database. The databases and tools used by the Declaration are identified and are publicly available. The County does not argue otherwise.

But even assuming *arguendo* that Mr. Carlin-Weber is an "expert" of sorts (he is undoubtedly computer-literate), the County does not fault any aspect of the methodology employed in the Declaration. Under *Daubert*, a court acts as a gatekeeper but in performing that

role, "the focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993). Thus, "[t]o determine whether an opinion of an expert witness satisfies *Daubert* scrutiny, courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017). The County understandably does not like Mr. Carlin-Weber's conclusions, but it has not challenged his methodology and thus has forfeited any such challenge.

The County complains that the maps do not consider that possession and carry is allowed by the County's law in the home and, more limitedly, in businesses under the exceptions for these locations set forth in Section 57-11(b) of the County Code. Co.Mem. at 8. But the limited exceptions for businesses in Section 57-11(b) apply only to "one" gun for the owner and "one" employee, each of whom must have a carry permit. The County's law thus bars every other permit holder (the other individual plaintiffs and MSI members with permits) from carrying in such locations. Similarly, the exceptions for the home and businesses are for the interior of these locations, and thus even if one takes those sites into account, it will not affect the scope or reach of the thousands of 100-yard exclusionary zones created by Bill 21-22E. These locations where limited carry is permitted merely create small holes in the 100-yard circles of prohibited zones associated with privately owned "places of public assembly."

Moreover, as plaintiffs explain in the motion (P.Mot. at 15), the homes of several of the plaintiffs fall within one or more of these exclusionary zones and thus these plaintiffs are effectively barred from using their permits to step outside their homes while armed. The physical address of each such plaintiff is on the face of the Verified Second Amended Complaint and inputting that address into Google Maps will fully identify the banned location adjacent to their

9

homes. The Second Supplemental Declaration of Allan Barall, who is also effectively confined to his home, shows how to do so. It is that easy. The County does not dispute this point.

The Declaration, with its maps, and references, does not contain an iota of legal argument, much less any argument not previously presented. The County cannot defend a strict liability law that provides it with the means to criminally charge permit holders for straying into a 100-yard exclusionary zone and, at the same time, object to maps that detail the all-encompassing and legally absurd scope of such zones. The only "legal conclusion" the County points to is Mr. Carlin-Weber's observation of how much of the County's surface area is covered by the areas proscribed by Bill 21-22E. (Co.Mem. at 7). That conclusion is not legal, it is math. The maps are simply a graphic rendition of the underlying data that the County has not disputed. That math for the vast number of exclusionary zones makes clear that the County's law effectively bans carry throughout the County by banning carry on every thoroughfare and many sideroads, in every downtown and in many rural areas. It is legally impossible for a permit holder to enter or exit the County while armed. The Carlin-Weber Declaration merely identifies the locations of the exclusionary zones in which carry is banned by the County's law. Indeed, while the County complains about the Declaration, it does not dispute the thousands of specific locations **otherwise** identified by plaintiffs as places at which Chapter 57 bans the mere possession or transport of all firearms. See P.Mot. at 15-16.

The County further ignores the context of the Carlin-Weber Declaration, which is a Second Amendment complaint that focuses on the "the general right to publicly carry arms for self-defense" as recognized in *NYSRPA v. Bruen*, 142 S.Ct. 2111, 2134 (2022). The County's argument that an individual can "transport the weapon in a locked case, separate from its ammunition" (Co.Mem. at 8), is effectively a concession that it is *impossible*, under the County's law, for **a**

permit holder to legally travel through or in the County and carry a loaded firearm for armed self-defense, the mode of carry permitted by State law for permit holders. That reality extinguishes the general right of armed self-defense in public recognized in *Bruen*, just as the County Council intended. The County does not dispute that Bill 21-22E was passed for the express and singular purpose of precluding the exercise of the "general right" sustained in *Bruen*.

The threat of criminal liability under Chapter 57 is akin to the proverbial "Sword of Damocles" in that it hangs over the heads of plaintiffs and MSI members who live throughout the State, creating a continuing *in terrorem* effect. See *United States v. Bilodeau*, 24 F.4th 705, 713-14 (1st Cir. 2022) (likening the possibility of prosecution to the Sword of Damocles and rejecting the government's reliance on prosecutorial discretion). No law-abiding permit holder can comply with Chapter 57 unless they forgo their constitutional right of armed self-defense or stay completely outside of the County. The latter option is not available to the named individual plaintiffs who reside or work in the County. Permit holders residing elsewhere in the State (including many MSI members) may not constitutionally be banned from exercising their Second Amendment rights in the County.

### C. The Allan Barall Declaration

The County's objection to the Second Supplemental Declaration of Allan D. Barall is likewise dependent on *dmarcain*'s mistaken analysis. As articulated *supra*, there is no "back-filling" attendant to new evidence on a Rule 8 motion. Particularly baseless is the County's suggestion that "Mr. Barrall's use[d] Google Maps to render legal conclusions about the County Firearms Law." Co.Mem. at 9. Using a Google Maps tool to measure a 100-yard boundary around a synagogue is easily done by any layperson who need only navigate to Google Maps in any web browser and "right-click" on any location on the screen to access the measurement tool. The actual

measurement is not a legal conclusion – the measured distance appears on the screen. The County does not dispute that the synagogues identified by Mr. Barall are "places of worship" subject to the County's bans and that they exist at those locations. The County does not assert that Mr. Barall somehow has misused the Google Maps measurement tool or measured the distance mistakenly. The County does not dispute that there are 605 houses of worship in the County, including the places identified by Mr. Barall. See https://bit.ly/3OLbfvG.

## II. CHAPTER 57 "EFFECTIVELY" BANS CARRY COUNTY-WIDE

The County next contends that plaintiffs "overstate grossly the reach of the County's Firearms Law," arguing that the County's law allows possession in the home, limited possession in a business, by security guards and retired law enforcement officers and transport in a vehicle if it is unloaded and locked in case separate from the ammunition. Co.Mem. at 11. That argument just proves plaintiffs' point. Prior to the enactment of Bill 21-22E carry permit holders were allowed by County law and State law to wear, carry and transport *fully loaded* firearms *wherever* they could otherwise go armed in public under State law. Bill 21-22E bans such carry by repealing the prior exception for permit holders.

Again, the County's law effectively ban carry everywhere in the County because no permit holder can drive (or even walk in downtown areas) very far carrying a loaded firearm for self-defense without rapidly coming within one of the County's myriads of unmarked 100-yard exclusionary zones, a reality that the County does not dispute. *Bruen* holds that the Second Amendment protects "the general right to publicly carry arms for self-defense," 142 S.Ct. at 2134. The right extends to ordinary citizens with a carry permit (not just security guards and retired officers) to carry in "public" (not just in homes and by owners at businesses) and obviously embodies more than the carry of an unloaded firearm locked in a case separated from the

ammunition, a form of transport that renders the firearm useless for self-defense. Likewise, the "general right" to carry in public cannot be limited to possession at isolated locations from which movement while carrying is banned by a network of thousands of often interlocking exclusionary zones affecting every major thoroughfare and many side roads in the County. See Declaration of Daniel Carlin-Weber. The County's suggestion that its narrow exceptions are consistent with *Bruen* is ridiculous.

When it finally gets around to the merits, the County once again fails to engage with the reality that the County's 100-yard exclusionary zones effectively ban carry in the County. The County offers no response, much less a rebuttal, to plaintiffs' point (P.Mot. at 16) that the County may not "effectively" ban carry County-wide any more than New York was permitted "to effectively declare the island of Manhattan" a gun-free zone because doing so "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S.Ct. at 2134. The County has no response to plaintiffs' point that the Third Circuit has refused to stay a district court order that enjoined enforcement of New Jersey's analogous presumptive ban on carry by permit holders on private property, N.J.S.A. § 2C:58-4.6(a)(24), an unconstitutional restriction substantially *less* draconian than the County's total ban. P.Mot. at 18.

As to places of worship, the County relies on a few Reconstruction era (and later) statutes primarily from the same jurisdictions whose laws were specifically rejected in *Bruen*. The County concedes that point in a footnote (Co.Mem. at 18 n.19) but boldly argues that *Bruen's* rejection of these laws does not apply to bans on carry in "sensitive places" which, according to the County, includes all locations where "people congregate." Co.Mem. at 19. Such a broad definition of "sensitive places" as including "places of public congregation" was *expressly* rejected in *Bruen*,

because it would impermissibly ban the exercise of the right in "cities," which is precisely what the County's law does. *Bruen*, 142 S.Ct. at 2134. And *Bruen* rejected the statutes on which the County relies because they were outliers *on the right to carry* and thus could not establish a national "consensus" over the scope of the right. 142 S.Ct. at 2146. That holding equally applies to the right to carry in sensitive places.

The County likewise inappropriately relies on local ordinances from *two* municipalities, Columbia and Huntsville, Missouri. Co.Mem. at 19. The 1900 Census estimated that there were 10,602 incorporated cities, towns, villages, and boroughs in the United States. See Census Bulletin No. 65, U.S. Census Bureau (June 8, 1901), https://bit.ly/3GkuFnm. A "historical tradition," 142 S.Ct. at 2149, 2154, or "an enduring American tradition," id. at 2155, cannot be based on the regulations of two municipalities and a few outliers from the late Reconstruction era, the late 19th century and early 20th century. See *Wolford v. Lopez*, 2023 WL 5043805 at *22-*24 (D. Hawaii Aug. 8, 2023) ("respectfully disagree[ing]" with this Court's reliance on late 19th and 20th century statutes and finding this Court's approach "unpersuasive"). The County does not dispute that in no case did these 19th and 20th century statutes effectively ban carry throughout any area nearly as large or as encompassing as the 506 square miles occupied by Montgomery County, Maryland.

The County also does not address *Hirschfeld v. ATF*, 5 F.4th 407, 419 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), which held that 1791 is the "critical year" for these analogue determinations. P.Mot. at 8. The County thus does not dispute that *Hirschfeld* remains persuasive precedent. Id. at n.2. Again, the only case on which this Court relied as support for its holding that late 19th century and 20th century analogues are "more probative" was *NRA v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023), which was vacated and withdrawn on a grant of rehearing en banc shortly after this Court issued its July 6, 2023, order. *NRA v. Bondi*, 72 F.4th 1346 (11th

Cir. July 14, 2023). The County has no response to plaintiffs' point that in addition to *Hirschfeld*, the Fifth, Seventh and Ninth Circuits along with **every** district court to have considered the issue have uniformly looked first to 1791 in undertaking the analogue inquiry mandated by *Bruen*. P.Mot. at 11-13. See also *Jones v. Bonta*, 34 F.4th 704, 714 (9th Cir. 2022), *vacated on panel rehearing in light of* Bruen *and vacating district court denial of preliminary relief and remanding for further consideration under* Bruen, 47 F. 4th 1124 (9th Cir. 2022) ("In our historical analysis, the Framers' understanding of the Second Amendment at and around the time of ratification has special significance."). Without *Bondi*, the County does not dispute that this court's decision stands *alone* in its exclusive reliance on late 19th and early 20th century statutes and ordinances. These considerations suggest that plaintiffs have a strong likelihood of success on appeal and thus militate in favor or returning the parties to the *status quo ante* pending appeal. See P.Mot. at 22. See also *Fraser v. ATF,* 2023 WL 5617894 at *2-*4 & n.2 (E.D. Va Aug. 30, 2023).

Nor does the County dispute plaintiffs' argument that an analogue (from any period) must be "distinctly similar" to the County's law. P.Mot. at 14, quoting *United States v. Daniels*, 77 F.4th 337, 343-44 (5th Cir. 2023). For example, the County does not dispute that the 1875 Missouri law and the 1878 Virginia laws on which it relies barred only *concealed* carry in places of worship (P.Mot. at 18-19), which is not remotely "similar" in its effect on the right of self-defense to the total ban imposed by the County. The County does not dispute that the 1870 Georgia law and the 1870 and 1871 Texas laws on which it relies were premised on the mistaken belief that the Second Amendment applied only to arms possessed by the militia and thus were rejected by the Supreme Court in *Bruen* for that reason alone. Id. at 18. That leaves territorial laws which were categorically rejected in *Bruen*. 142 S.Ct. at 2154-55. The County does not address that point either. The few local ordinances cited by the County are too inconsequential in scope and number to establish the

15

type of "national" historical tradition required by *Bruen*. See *Wolford*, 2023 WL 5043805 at *23-*24.

## III.   THE EQUITIES FAVOR PLAINTIFFS

The County claims that plaintiffs are not suffering irreparable harm because Bill 21-22E "has been in effect since November 28, 2022, for over nine (9) months" and thus there is no "exigency or immediate harm to Plaintiffs under these circumstances." Co.Mem. at 19. That contention ignores the well-established principle, cited by plaintiffs, that the loss of a constitutional right for "even minimal periods of time" constitutes irreparable harm. *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). See also *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 12 F.4th 330, 346 (4th Cir. 2021) (en banc) (reversing a denial of a preliminary injunction and holding that "[b]ecause there is a likely constitutional violation, the irreparable harm factor is satisfied," citing and quoting *Mills*). Indeed, not only have plaintiffs been irreparably harmed *every day* during the last nine months while the emergency motion for a TRO and a preliminary injunction was pending in this Court, but plaintiffs are also suffering continuing and ongoing harm *every day* that the County's law remains in effect. The delay in adjudicating plaintiffs' motion is not a reason to allow the irreparable harm to *continue* unabated for many more months (perhaps years) while the case is on appeal.

Beyond conclusory assertions (Co.Mem. at 19-20), the County offers no response to plaintiffs' argument that the equities favor plaintiffs on this request for Rule 8 relief. As the *en banc* Fourth Circuit stated in *Leaders of a Beautiful Struggle*, "the balance of the equities favors preliminary relief because '[our] precedent counsels that 'a state is in no way harmed by issuance

16

of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.'" 2 F.4th at 346, quoting *Centro Tepeyac v. Montgomery Co.*, 722 F.3d 184, 191 (2013) (bracket's the court's). See also *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). Second Amendment rights are entitled to the same consideration. See *Bruen,* 142 S.Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'"). (Citation omitted). Requiring any additional showing is barred by this recent and controlling precedent.

The County does not dispute that trained and thoroughly vetted permit holders are not even remotely the reason for the County's surge in violent crime, including carjackings. The County also ignores that the Maryland General Assembly's assessment of the "public interest" concerning carry by permit holders as expressed in Senate Bill 1 is far different than that of the County's. P.Mot. at 25-26, citing 2023 Maryland Session Laws Ch. 680. That State-wide legislation does not impose any buffer zones and does not designate places of worship as a sensitive area. The County does not dispute that the Maryland Constitution, Article XI-A, § 3, commands that "in case of any conflict between said local law and any Public General Law now or hereafter enacted *the Public General Law shall control*." (Emphasis added). See *Boulden v. Mayor and Com'rs of Town of Elkton*, 311 Md. 411, 415, 535 A.2d 477 (1988) ("In cases of conflict, however, the public general law must prevail"). The General Assembly's assessment of the public interest trumps that of the County. This Court should not second-guess that assessment in favor of an outlier ordinance of a subordinate locality.

## CONCLUSION

The motion for an injunction pending appeal should be granted.

*/s/ Mark W. Pennak*

_____
MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste, C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
Bar No. 21033
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on September 8, 2023, the forgoing "Reply In Support Of Plaintiff's Emergency Motion For A Rule 8 Injunction Pending Appeal" was served on all counsel of record via ECF service:


*s/ Mark W. Pennak*

_____
MARK W. PENNAK
*Counsel for Plaintiffs*

Dated: September 8, 2023